

Office of the Clerk
**United States Court of Appeals for the Ninth Circuit**
Post Office Box 193939
San Francisco, California 94119-3939
415-355-8000


**FILED**

Molly C. Dwyer
Clerk of Court

JUN 13 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

## DOCKETING NOTICE

| | |
|---|---|
| Docket Number: | 25-3757 |
| Originating Case Number: | 2:23-cv-01954-BAT |

| | |
|---|---|
| Short Title: | Skagit County Dike Drainage and Irrigation Improvement District No 12 v. National Marine Fisheries Service, et al. |

Dear Appellant/Counsel

A copy of your notice of appeal/petition has been received in the Clerk's office of the United States Court of Appeals for the Ninth Circuit. The U.S. Court of Appeals docket number shown above has been assigned to this case. You must indicate this Court of Appeals docket number whenever you communicate with this court regarding this case.

Motions filed along with the notice of appeal in the district court are not automatically transferred to this court for filing. Any motions seeking relief from this court must be separately filed in this court's docket.

Please furnish this docket number immediately to the court reporter if you place an order, or have placed an order, for portions of the trial transcripts. The court reporter will need this docket number when communicating with this court.

You must file a Disclosure Statement (Form 34) within 14 days of this notice if your case: (1) involves a non-governmental corporation, association, joint venture, partnership, limited liability company, or similar entity; (2) is a bankruptcy case; (3) is a criminal case involving an organizational victim; or (4) involves review of state court proceedings. See Ninth Circuit Rule 26-1.1.

**Failure of the appellant to comply with the time schedule order may result in dismissal of the appeal.**

**Please read the enclosed materials carefully.**



Office of the Clerk
**United States Court of Appeals for the Ninth Circuit**
Post Office Box 193939
San Francisco, California 94119-3939
415-355-8000

Molly C. Dwyer
Clerk of Court

## TIME SCHEDULE ORDER

| | |
|---|---|
| Docket Number: | 25-3757 |
| Originating Case Number: | 2:23-cv-01954-BAT |
| | |
| Case Title: | Skagit County Dike Drainage and Irrigation Improvement District No 12 v. National Marine Fisheries Service, et al. |

**Wednesday, June 18, 2025**

| | |
|---|---|
| Skagit County Dike Drainage and Irrigation Improvement District No 12 | Mediation Questionnaire due |

**Friday, July 25, 2025**

| | |
|---|---|
| Skagit County Dike Drainage and Irrigation Improvement District No 12 | Appeal Opening Brief (No Transcript Due) |

**Monday, August 25, 2025**

| | |
|---|---|
| National Marine Fisheries Service | Appeal Answering Brief (No Transcript Due) |
| United States Department of Commerce | Appeal Answering Brief (No Transcript Due) |
| Howard Lutnick | Appeal Answering Brief (No Transcript Due) |
| Emily Menashes | Appeal Answering Brief (No Transcript Due) |

If there were reported hearings, the parties shall designate and, if necessary, cross-designate the transcripts pursuant to 9th Cir. R. 10-3. If there were no reported hearings, the transcript deadlines do not apply.

The optional reply may be filed within 21 days of service of the answering brief.  See Fed. R. App. P. 31 and 9th Cir. R. 31-2.1.

**Failure of the appellant to comply with the time schedule order may result in automatic dismissal of the appeal.  See 9th Cir. R. 42-1.**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 7. Mediation Questionnaire

*Instructions for this form: https://www.ca9.uscourts.gov/forms/form07instructions.pdf*

**9th Cir. Case Number(s)**

**Case Name**

**Counsel submitting this form**

**Represented party/parties**

*Briefly describe the dispute that gave rise to this lawsuit.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 7**                                                                 *Rev. 09/01/22*

1

*Briefly describe the result below and the main issues on appeal.*

*Describe any proceedings remaining below or any related proceedings in other tribunals.*

**Signature** |_____| **Date** |_____|

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 7**                                                    *Rev. 09/01/22*

2

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

JUN 20 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| SKAGIT COUNTY DIKE DRAINAGE AND IRRIGATION IMPROVEMENT DISTRICT NO 12, | No. 25-3757 |
| Plaintiff - Appellant, | District No.    2:23-cv-01954-BAT |
| v. | **ORDER SETTING ASSESSMENT CONFERENCE** |
| NATIONAL MARINE FISHERIES SERVICE; et al., | **Date:** 7/1/2025 **Time:** 10:00 AM **Pacific Time** |
| Defendants - Appellees. | **(DIAL-IN CONFERENCE)** |

The Mediation Program of the Ninth Circuit Court of Appeals facilitates

settlement while appeals are pending.  See Fed. R. App. P. 33 and Ninth Cir. R.

33-1.

The court has scheduled a dial-in telephone assessment conference with

counsel on the date and time indicated above.

Each participant on the attached list will receive an email with dial-in

information. If there are any changes or additions to the list, please notify the

Mediation Office at mediation@ca9.uscourts.gov.

Also, please notify Circuit Mediator Jonathan Westen immediately by email

(jonathan_westen@ca9.uscourts.gov) if counsel has an unavoidable scheduling

conflict.  Please copy all counsel on any such communications.

All communications should include the Ninth Circuit case name and number in the subject line.

All discussions that take place in the context of the conference are confidential. <u>See</u> Cir. R. 33-1.

For more detailed information about the assessment conference, confidentiality, the Mediation Program and its procedures generally, please see the attachment to this order and the Mediation Program web site: www.ca9.uscourts.gov/mediation.

The briefing schedule previously set by the court remains in effect.

FOR THE COURT:

By: Jonathan Westen
Circuit Mediator

LIST OF CONFERENCE PARTICIPANTS

| | |
|---|---|
| SKAGIT COUNTY DIKE DRAINAGE AND IRRIGATION IMPROVEMENT DISTRICT NO 12<br>    Plaintiff - Appellant | Charlene Koski<br>ckoski@vnf.com |
| | Tyson Clinton Kade<br>tck@vnf.com |
| | Sophia Elizabeth Amberson<br>samberson@vnf.com |
| | Jenna Mandell-Rice<br>jrm@vnf.com |
| NATIONAL MARINE FISHERIES SERVICE; et al.<br>    Defendants - Appellees | Rickey Doyle Turner<br>rickey.turner@usdoj.gov |
| | Thekla Hansen-Young<br>thekla.hansen-young@usdoj.gov |

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
CIRCUIT MEDIATION OFFICE

Website:  www.ca9.uscourts.gov/mediation
Email: ca09_mediation@ca9.uscourts.gov
Phone: 415-355-7900

## INFORMATION ABOUT ASSESSMENT CONFERENCES

### Overview

- The purpose of the assessment conference is to provide an opportunity for counsel and the Circuit Mediator to have a frank discussion about settlement.  The mediator will explore the parties' interests in settlement and, if appropriate, work with counsel to design a process to pursue resolution of the dispute.

- The conference will be conducted by one of the eight Circuit Mediators, all of whom are court employees with extensive mediation and litigation experience.  The conference typically lasts from 30-60 minutes.  The Circuit Mediators are authorized to file orders on most procedural matters, including vacating or moving the briefing schedule.

- Counsel for each party that intends to file a brief in this matter should participate in the assessment conference.  The lawyer with the closest relationship to the client should be on the call.  Clients are not expected to participate in the assessment conference.

- In advance of the conference, counsel should have a discussion with their clients about their goals in the litigation, its possible costs and outcomes (good and bad), the potential for further legal proceedings, and what issues beyond the litigation might be explored in mediation.

- During the conference, counsel and the Circuit Mediator will discuss the factual and legal background of the dispute, the legal issues involved in the litigation and on appeal, any related legal proceedings, and any other considerations that may affect the parties' willingness to engage in settlement discussions.  The scope of discussion is not limited to the issues on appeal: it may include related legal proceedings or any other issues between the parties.

## Confidentiality

- Settlement-related information disclosed to a Circuit Mediator will be kept confidential and will not be disclosed to the judges deciding the appeal or to any other person outside the Mediation Program participants. Ninth Cir. R. 33-1.

- All participants in the assessment conference are required to abide by the court's confidentiality rules, which are set forth in Rule 33-1 and can be found at: www.ca9.uscourts.gov/mediation.  With limited exceptions, any communication made by the Circuit Mediator or any participant during the conference may not be used in any pending or future proceeding in this court or any other forum and may not be disclosed to anyone who is not a participant.  Ninth Cir. R. 33-1.

## Likely Outcomes of Assessment Conference

- At the conclusion of the assessment conference, the Circuit Mediator may confirm in an order the agreements of the parties regarding the scope, process and timing of any further settlement efforts.  Typical settlement processes include in-person mediation sessions, telephone settlement dialogues facilitated by the Circuit Mediator, or direct discussions between counsel.

- The parties may agree to extend briefing in order to focus on settlement efforts.  In most cases, the deferral of briefing will not delay disposition of the appeal because the date of the filing of the notice of appeal controls when an appeal is assigned to a three-judge panel for decision.

- If at any point the parties choose not to pursue settlement efforts, the Circuit Mediator will work with counsel to resolve any outstanding procedural issues and will enter orders effectuating any procedural agreements.

**More information is available on the Mediation Circuit link on the Ninth Circuit website www.ca9.uscourts.gov/mediation.**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| Skagit County Dike Drainage and Irrigation Improvement District No 12,<br><br>Appellant,<br><br>v.<br><br>National Marine Fisheries Service, Department of Commerce, Howard Lutnick, and Emily Menashes,<br><br>Appellees. | Case No. 25-3757<br>APA Review/Appeal<br><br>**SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION TO INTERVENE AS AN INTERVENOR-APPELLEE** |

Filed by:
Wyatt Golding
Ziontz Chestnut LLP
2101 4th Avenue, Suite 1230
Seattle, WA 98121
(206) 448-1230
wgolding@ziontzchestnut.com

Emily Haley
Swinomish Indian Tribal Community
11404 Moorage Way
La Conner, WA 98257
(360) 466-1134
ehaley@swinomish.nsn.us

*Attorneys for Proposed Intervenor Swinomish Indian Tribal Community*

## I.    Introduction

The Swinomish Indian Tribal Community ("Swinomish" or "Tribe"), a federally recognized Indian Tribe that is an adjudicated co-manager of the Endangered Species Act-listed fish at issue in this case, moves under Federal Rule of Civil Procedure 24(a) to intervene in defense of the challenged Biological Opinion ("BiOp") and the order affirming that BiOp entered by the district court. Alternatively, the Tribe seeks permissive intervention pursuant to Rule 24(b).

The challenged BiOp reviews a major construction proposal by Appellant to replace a tidegate complex and install permanent shore armoring in the southeast portion of Padilla Bay in the Puget Sound (the "Project"). AR0051115-20. The BiOp concludes that the Project would jeopardize Puget Sound Chinook salmon ("PS Chinook") by impeding PS Chinook access to essential estuary rearing habitat and by creating sublethal and lethal aquatic conditions for PS Chinook for at least an additional 50 years. AR0051224-35.

Under the Treaty of Point Elliott ("Treaty"), 12 Stat. 927, and *United States v. Washington*, 384 F. Supp. 312 (W.D. Wash. 1974), *aff'd sub nom. in relevant part by Wash. v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658 (1979) ("*Fishing Vessel*"), the Tribe has a reserved Treaty right to, and Federally-adjudicated co-management responsibility for, every fish that would be harmed

- 2 -

and jeopardized by the Project absent the protections and Reasonable and Prudent Alternatives ("RPAs") imposed by the BiOp and challenged by Appellees.  This reserved right includes ESA-listed threatened fish subject to federal jurisdiction, as well as the other fish that rely on the habitat blocked by the tidegate construction.

A motion to intervene is evaluated based on the stage of proceedings in which it is filed.  The Tribe's motion to intervene was denied below, primarily based on the district court's concerns with timeliness and a conclusion that the United States adequately represented the Tribe's interest.  Those circumstances have changed. This motion is timely at this stage of litigation and would not delay proceedings.  The United States no longer adequately represents the Tribe.  While the United States has not submitted its merits briefing in this case, the National Marine Fisheries Service and the Fish and Wildlife Service (respectively "NMFS" and "FWS" and collectively "the Services") recently formally proposed reversing course on the United States' decades-long position that habitat degradation may be prohibited "take" under the ESA.  *See* 90 Fed. Reg. 16102, *Rescinding the Definition of "Harm" Under the Endangered Species Act* (April 17, 2025).  This fundamental change of position would directly undermine Swinomish's interests and protection of its legal rights.  Intervention is warranted.

Undersigned counsel informed counsel for the Parties of the Tribe's proposed

- 3 -

intervention via email.  Appellant opposes intervention, and the United States has
not yet stated a position.

## II.    Grounds for Motion.

### A. Factual Background and Swinomish's Involvement.

Swinomish is a federally recognized Indian tribe and political successor in
interest to certain tribes and bands that signed the 1855 Treaty.  Declaration of
Swinomish Chairman Steve Edwards, Pars. 2, 4.  The Treaty established the
Swinomish Reservation on Fidalgo Island, which sits at the mouth of the Skagit
River and is situated approximately a mile west of the Project. *Id.*

Since time immemorial, Swinomish and its predecessors have occupied and
utilized land and water throughout the Skagit River system, the Samish River
system, and the Northern Salish Sea to support the Swinomish way of life, which
relies upon Chinook and other salmon as the heart of Swinomish's identity,
subsistence, economy, culture, and spirituality. *Id.* at Pars. 3, 8.  In the Treaty,
Swinomish reserved its right to take fish at its usual and accustomed fishing places
in perpetuity. *Id.* Par. 4.

Harm to salmon harms Swinomish and impairs the Tribe's Treaty fishing
right.  To Swinomish and its members, fewer Chinook salmon means less harvest
is available for subsistence, ceremonial, and commercial purposes. Edwards Decl.

Pars. 3, 7-9; *see also* AR0051070, 72 (NMFS declaration recognizing Swinomish

interest and the Project's effects on the Tribe's Treaty trust resources).  Although

Swinomish used to fish sustainably for salmon year-round, due to the precipitous

decline in salmon populations the Tribe can now only fish a few weeks a year,

impairing Tribal members' ability to feed their families and community. Edwards

Decl. Pars. 3, 7-10.

The Supreme Court has recognized that salmon are no less important to

Pacific Northwest tribes than the very air they breathe. *Winans*, 198 U.S. at 381.

As a sovereign tribal government and an adjudicated co-manager of Treaty

resources, Swinomish plays a key role in ensuring salmon habitat protection and

restoration.  Edwards Decl. Par. 6.  Swinomish has utilized its Reservation lands to

help restore salmon habitat.  The Tribe recently completed a tidal restoration

project along Swinomish Channel and has two other projects underway totaling

nearly 250 acres of restored estuary habitat.  *Id.* at Par. 13.

Swinomish is a founding member of the Skagit River System Cooperative

(SRSC), a Tribal cooperative that leads scientific research and restoration in the

Skagit River basin.  Many of the studies cited in the BiOp are authored by SRSC

scientists.  SRSC is also a co-author of the federally approved Skagit Chinook

Recovery Plan, which set estuary habitat restoration acreage targets and is a

foundational element of the BiOp.  *See* Edwards Decl. at Pars. 11, 14-15.

As detailed *infra*, Swinomish has played a central role in the steps preceding this litigation.  *See Swinomish Indian Tribal Cmty. v. Skagit Cty. Dike Dist. No. 22*, 618 F. Supp. 2d 1262 (W.D. Wash. 2008).  These efforts confirmed the need for ESA section 7 consultation and incidental take authorization for the Project.  The Tribe commented on the challenged BiOp, AR0051107, and submitted an amicus brief in the proceedings below.  *See* ECF 56.  The district court affirmed the BiOp.

Shortly before the notice of appeal was filed in this case, the United States published a proposed rule shifting its longstanding interpretation of the ESA.  90 Fed. Reg. 16102.  The United States now appears to assert that prohibited "take" under the ESA does not include habitat degradation, but rather is limited to direct killing, injury, or capture of members of the listed species.  The Tribe submitted comments explaining how this position is contrary to the statutory text, legislative history, best available science, and would cause significant adverse effects to ESA-listed species and the Tribe's Treaty rights.  Edwards Decl. Pars. 23-25. Intervention is warranted and necessary to defend the BiOp and protect the Tribe's interests in light of the Tribe's unique sovereign interests, Treaty rights, and the United States' change in its legal position.

## B. Legal Background and Standard of Review

Intervention on appeal is governed by Rule 24 of the Federal Rules of Civil Procedure. *See Landreth Timber Co. v. Landreth*, 731 F.2d 1348, 1353 (9th Cir.), *rev'd on the merits*, 469 U.S. 1016 (1984). The evaluation of a motion to intervene is based upon the circumstances at the phase of litigation where intervention is sought. *Day v. Apoliona*, 505 F.3d 963, 964–66 (9th Cir. 2007). While intervention at the appellate stage is uncommon, it is allowed. *Bates v. Jones*, 127 F.3d 870, 873 (9th Cir. 1997).

Rule 24(a) governs intervention as of right. "Under Rule 24(a)(2), a nonparty is entitled to intervention as of right when it "(i) timely moves to intervene; (ii) has a significantly protectable interest related to the subject of the action; (iii) may have that interest impaired by the disposition of the action; and (iv) will not be adequately represented by existing parties." *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603, 620 (9th Cir. 2020). An applicant bears the burden of proving these requirements. *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011).

This Court construes Rule 24(a)(2)'s requirements for intervention as of right "broadly in favor of proposed intervenors." *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011) (en banc) (citation omitted); *Sw. Ctr. for*

- 7 -

*Biological Diversity v. Berg*, 268 F.3d 810, 818 (9th Cir. 2001). This "liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts." *Wilderness Soc'y*, 630 F.3d at 1179 (quoting *United States v. City of Los Angeles*, 288 F.3d 391, 397–98 (9th Cir. 2002)).

"In evaluating whether these requirements are met, courts are guided primarily by practical and equitable considerations." *Callahan v. Brookdale Senior Living Communities, Inc.*, 42 F.4th 1013, 1020 (9th Cir. 2022) (citation omitted). "We stress that intervention of right does not require an absolute certainty that a party's interests will be impaired or that existing parties will not adequately represent its interests. Rule 24(a) is invoked when the disposition of the action 'may' practically impair a party's ability to protect their interest in the subject matter of the litigation, 'unless existing parties adequately represent that interest.'" *Citizens for Balanced Use*, 647 F.3d at 900.

Rule 24(b) governs permissive intervention. An application is warranted where the applicant shows (1) independent grounds for jurisdiction; (2) the motion is timely; and (3) the applicant's claim or defense, and the main action, have a question of law or a question of fact in common. The Court may also consider other factors in the exercise of its discretion, including "the nature and extent of the intervenors' interest" and "whether the intervenors' interests are adequately

- 8 -

represented by other parties." *Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir.1977); Rule 24(b)(3).  "Resolution of a motion for permissive intervention is committed to the discretion of the court before which intervention is sought." *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 278–79 (2022).

A ruling on intervention may in some instances constitute law of the case. *See Crosby v. St. Paul Fire & Marine Ins. Co.*, 15 F.3d 1084 (9th Cir. 1994) (memorandum opinion applying law of the case to grant of intervention); *but see Arizona v. California*, 460 U.S. 605, 614 (1983), *decision supplemented*, 466 U.S. 144 (1984) (intervention granted despite earlier denial).[1]  However, the district court's order denying intervention here does not implicate law of the case. Timeliness and adequacy of representation considerations have changed based on the stage of litigation.  The district court's consideration of the legal interests at stake and practical effect of the ruling correctly concluded that "adjudication of the existence or extent of [the Tribe's] Federal [Treaty] rights is not at issue in this . . . proceeding," ECF 42 at 5, but did not address the Tribe's protected property and

---

[1] The Ninth Circuit has identified five circumstances under which a court may have discretion to depart from the law of the case, including: "the first decision was clearly erroneous," "other changed circumstances exist," or "a manifest injustice would otherwise result." *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir.1997).  To the extent the Court determines that law of the case is at issue, each of these cited exceptions apply.

- 9 -

management interests in the fish which will be harmed by the Project.

Participation as an amicus in an earlier stage does not foreclose later intervention. *Day v. Apoliona*, 505 F.3d 963, 964–66 (9th Cir. 2007) ("That the State has participated previously in this action as amicus curiae does not mean that its interest is protected now, as its ability to seek further review is conditioned on attaining party status."); *see also United States v. City of Los Angeles,* 288 F.3d 391, 400 (9th Cir.2002) ("Amici status is insufficient to protect the [intervenor's] rights because such status ... gives it no right of appeal.").

In a later phase of litigation, considerations of timeliness, delay, and potential prejudice to other parties may change, and the Court considers those factors when evaluating intervention. *See Arizona v. California*, 460 U.S. at 614; *W. Watersheds Project v. Haaland*, 22 F.4th 828, 837 (9th Cir. 2022). When the United States changes its position and declines to defend its challenged action, it may change the determination whether the proposed intervenor's interests are adequately represented, and thus warrant intervention. *See, e.g.*, *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 935 (N.D. Tex. 2019) (intervention warranted after initial denial because of change of administration and resulting change in legal position).

### C. Swinomish May Intervene as of Right

Swinomish satisfies the four-part test set forth in Rule 24(a).

**1.    The motion to intervene is timely.**

The consideration of timeliness is based upon the timing within the phase of litigation in which intervention is sought. *See Day v. Apoliona*, 505 F.3d at 964–66; *Arizona v. California*, 460 U.S. at 614 ("[t]he Tribes' motions to intervene are sufficiently timely with respect to this phase of the litigation."). "[A]ll the circumstances of a case must be considered in ascertaining whether or not a motion to intervene is timely under Fed.R.Civ. P. 24." *Legal Aid Society of Alameda Co. v. Dunlop*, 618 F.2d 48, 50 (9th Cir.1980).

Here, the district court entered its final order on the merits on April 28, 2025. Appellant filed its notice of appeal on June 13, 2025. Because a United States agency and officer or employee are parties, the deadline to appeal is sixty days after the entry of the final order, which is June 27, 2025. Fed.R.App. P. 4(B). The Court has issued a briefing schedule that provides for an opening brief on the merits on July 25, 2025, and a response brief on August 25, 2025.

While timeliness is an equitable consideration and no rule directly controls when a motion to intervene may be filed in an appeal from district court, two related rules are instructive. Under Fed.R.App. P. 15(d), a prospective intervenor has 30 days from the filing of a petition for review to move to intervene.

Additionally, the "general rule is that a post-judgment motion to intervene for purposes of appeal is timely if filed within the time allowed for the filing of an appeal." *W. Watersheds Project v. Haaland*, 22 F.4th at 836. This filing would be timely under either rule.

Only two weeks have passed since the notice of appeal, the appeal period is still pending, and there would be no disruption to the briefing schedule set by this Court. The Tribe's motion is timely.

**2.      The Tribe has a significantly protectable interest relating to the property or transaction that is the subject of the action.**

The significantly protectable interest requirement is satisfied when "the interest asserted is protectable under some law, and there is a relationship between the legally protected interest and the claims at issue." *Northwest Forest Res. Council v. Glickman*, 82 F.3d 825, 837 (9th Cir. 1996) (internal quotation marks and citation omitted).

The Tribe easily meets this burden, as it possesses a federally reserved Treaty right to and property interest in the fish and the habitat necessary for their survival and recovery at issue in the BiOp. The Project would reduce the number of fish available for the Tribe to exercise its legal right to harvest, and the BiOp would mitigate those impacts.

The Treaty fishing right includes a right to the fish themselves—it is a right

- 12 -

to harvest, eat, and sell fish.  The Tribe utilizes fish for ceremonial, spiritual, subsistence, and commercial purposes.  The Treaty guarantees the Tribe a sufficient quantity of fish to ensure a moderate standard of living.  *Fishing Vessel*, 443 U.S. at 686.  The Treaty also guarantees the Tribe protection of habitat necessary to provide those fish and prohibits structures that block fish access to habitat.  *See United States v. Washington*, 853 F.3d 946, 966 (9th Cir. 2017), *aff'd by equally divided court in Washington v. United States*, 584 U.S. 837 (2018).

The Tribe's Treaty rights to fish and their habitat constitute a property interest held by the Tribe.  *See Menominee Tribe of Indians v. United States*, 391 U.S. 404, 413 (1968).  Treaty rights function akin to easements running with the lands or places they attach to, and are protected from federal, state, and private interference.  *See United States v. Winans*, 198 U.S. 371, 381 (1905); *United States v. Oregon*, 718 F.2d 299, 304 (9th Cir. 1983); *United States v. Washingto*n, 20 F. Supp. 3d 828, 889 (W.D. Wash. 2007).  Harm to a Tribe's Treaty resources "are separately sufficient for it to intervene as a matter of right under Rule 24(a)(2)." *Protect the Peninsula's Future v. Haaland*, Civ. No. CV23-5737-BHS, 2024 WL 4751512, at *1 (W.D. Wash. Nov. 12, 2024).

Development in the Skagit River basin has led to substantial declines in salmon runs, in significant part due to an 85% decrease in estuary rearing habitat

caused by diking and drainage for intensive agriculture.  AR0051176.  Lack of

adequate estuarine habitat is a primary limiting factor for recovery of ESA-listed

PS Chinook.  AR0051229.  Loss of estuary habitat also impairs the Tribe's Treaty

fishing right and Treaty resources by reducing fish production and the Tribe's

harvest of other fish, including wild pink, sockeye, chum, and coho salmon, as well

as hatchery-origin Chinook salmon.  Edwards Decl. at Par. 17.

    In large part due to dikes, levees, and tidegates, less than half of

outmigrating juvenile Chinook salmon can access rearing habitat in the Skagit

estuary to support optimum growth levels needed for ocean survival. AR0051142.

The extensive use of tidegates also injures, kills, or otherwise harms fish by

blocking passage, preventing the formation of suitable habitat both in the nearshore

in front of the tidegate and the estuary lands behind the tidegate, and decreasing

water quality.  AR0051138, 165, 186, 201-204; Edwards Decl. Pars. 12, 15-16;

AR0020023-26 (Skagit River Chinook Recovery Plan).

    As the Services concluded in the BiOp, the Project at issue would jeopardize

listed species by blocking fish access to estuarine habitat 50% of the time,

preventing estuarine habitat-forming processes from occurring, and continuing

sublethal and lethal aquatic conditions for PS Chinook.  AR0051201.

    To avoid jeopardy and illegal take under the ESA, the Bi-Op imposes a

"reasonable and prudent alternative" ("RPA") and the associated incidental take statement imposes "reasonable and prudent measures."  These protections are necessary to ensure that the Project will not violate the ESA, which is the United States' interest in this case.  They are also necessary to limit damage to the Tribe's Treaty rights and property interest in Treaty resources, which is the Tribe's separate and primary interest in this case.  There is a direct connection between the distinct interests of defense of the BiOp and protection of the Tribe's Treaty rights to listed PS Chinook and other listed and non-listed fish species, and those species' habitat.

> **3.    The Tribe is so situated that the disposition of the action may, as a practical matter, impair or impede its ability to protect its important interests.**

The Ninth Circuit "follow[s] the guidance of Rule 24 advisory committee notes that state that '[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene.'" *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d at 822.

The relief sought by the Appellant is, in relevant part, a request that the court "[d]eclare that the [BiOp] is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and/or is in excess of statutory jurisdiction, authority or limitations," and a request to "[v]acate and remand the [BiOp] to NMFS so that

NMFS may reconsider it based on the Court's findings and rulings, and prepare a new biological opinion in a manner consistent with the ESA and other requirements of law."  ECF No. 23, Prayer for Relief Nos. 3 and 4.

Among the rulings sought by Appellant is a determination that "the RPA includes duplicative mitigation and requires [Appellant] to generate far more credits than are necessary to avoid jeopardy and/or adverse modification [of critical habitat]."  *Id.* Par. 80.  A ruling in Appellant's favor would almost certainly result in significantly less mitigation to offset the jeopardy posed to PS Chinook by the Project and adversely affect the Tribe's Treaty rights and Treaty resources.  In contrast, upholding the BiOp would require the Appellant to perform the mitigation the Services have determined is necessary to avoid jeopardy.  This outcome would also reduce harm to the Tribe's Treaty rights and Treaty resources, in which the Tribe has a legal and practical interest, and deep cultural, spiritual, and economic connection.

### 4. The United States does not adequately represent the Tribe's interests.

The burden of showing inadequacy of representation is "minimal" and satisfied if the applicant can demonstrate that representation of its interests "may be" inadequate.  *Citizens for Balanced Use*, 647 F.3d at 898 (citing *Arakaki v. Cayetano,* 324 F.3d 1078, 1086 (9th Cir.2003)); *Trbovich v. United Mine Workers,*

404 U.S. 528, 538 n. 10 (1972).  In determining adequacy of representation, the Court considers whether the interest of a present party is such that it will undoubtedly make all the intervenor's arguments; whether the present party is capable and willing to make such arguments; and whether the intervenor would offer any necessary elements to the proceedings that other parties would neglect. *See Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1498–99 (9th Cir. 1995), abrogated *on other grounds* by *Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011).

The determination of adequacy may change over time based on the stage of proceeding and changing legal positions.  For example, in *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 935 (N.D. Tex. 2019), the court determined that intervention was warranted because, following a change in administration, the United States no longer defended the challenged rule and no longer provided adequate representation of the applicant's interests.

If an applicant for intervention and an existing party share the same ultimate objective, a presumption of adequacy of representation arises.  *Citizens for Balanced Use*, 647 F.3d at 898.  To rebut the presumption, an applicant must make a "compelling showing" of inadequacy of representation.  *Id.*  However, "the government's representation of the public interest may not be identical to the

individual parochial interest of a particular group just because both entities occupy the same posture in the litigation." *Id.* at 899 (internal quotation and citation omitted).

     **a. The Tribe has a property right to listed and non-listed fish that presents a distinct interest from the United States' broad public obligations.**

A lack of adequate representation may occur where the applicant has a legal interest in a property right at issue. *W. Watersheds Project v. Haaland*, 22 F.4th 828, 842 (9th Cir. 2022) ("Given its specific financial and property interest, Chesapeake brings a unique perspective to this litigation that existing parties may neglect."); *Protect the Peninsula's Future v. Haaland*, 2024 WL 4751512, at *1. Here, the United States' duty is to implement and enforce the ESA for the general public. In contrast, the Tribe seeks to protect its specific legal and property interests in the right to Treaty fish and their habitat, for the benefit of Tribal members' subsistence, ceremonies, and profession. These distinct interests weigh in favor of intervention.

     **b. The United States' recent reversal of its longstanding interpretation of the ESA demonstrates lack of adequate representation, and that the Tribe must intervene to protect its legal interests.**

A lack of adequate representation may also occur where there is a difference in legal arguments presented or a difference in the robustness of those arguments.

- 18 -

If the Court "cannot conclude that the [agency defendant] will undoubtedly make all of Applicants' arguments" or be "assured that the [agency defendant] is capable of making and willing to make such arguments," representation may be inadequate. *Citizens for Balanced Use*, 647 F.3d at 901.

In *W. Watersheds Project v. Haaland*, 22 F.4th at 841, the Court determined that even though the proposed intervenor shared the ultimate objective of the United States, its interests were not adequately represented because it raised several "colorable arguments" not addressed by the United States, and it had specific property rights at issue.

Similarly, if the record indicates that proposed intervenor had to pursue legal advocacy to force a federal agency to take a position, the agency may not as robustly defend the decision, and intervention may be warranted. In *Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392 (9th Cir.1995), the Court affirmed the district court's decision granting intervention as of right under Rule 24(a) to a conservation organization on the side of FWS to defend a final rule. *Id.* at 1395. Despite the conservation group seeking the same outcome as FWS (upholding the rule), the Court concluded that the FWS may have inadequately represented the interests of the conservation organization because "FWS delayed its decision on the listing proposal for years and took action only after [intervenor] filed suit to

compel FWS to make a decision." *Id.* at 1398.

In *Citizens for Balanced Use*, 647 F.3d at 900, applicants sought intervention to defend a Forest Service decision. The Court found the record of past legal advocacy by the applicants "adds substantial weight to Applicants' position that the Forest Service may be unable or unwilling to pursue vigorously all available arguments in support of the Applicants' interest." *Id.* at 900. The Court opined that "[b]ased on the relevant precedent and the peculiar circumstances of this case, there is sufficient reason to doubt the adequacy of the Forest Service's representation of Applicants' interest so as to warrant intervention as of right by Applicants." *Id.*

The administrative record, briefing below, and recent actions by the Services demonstrate lack of adequate representation. This case arose in large part because of more than twenty years of persistent legal advocacy by the Tribe. *See Swinomish Indian Tribal Cmty. v. Skagit Cty. Dike Dist. No. 22*, 618 F. Supp. 2d 1262.

As a result of Swinomish's advocacy, regional stakeholders convened to determine a programmatic approach to repair and replacement of tidegate complexes and define necessary mitigation offsets. In the resulting 2008 Tidegate and Fish Initiative, dike districts—including Appellant—agreed to restore estuary

habitat to obtain credits to offset the adverse impacts of tidegate replacement or major repair projects *prior to* obtaining Army Corps permits and beginning work, in exchange for the benefit of receiving ESA "take" coverage under programmatic ESA consultation.  AR0050739.  Swinomish was a non-voting member of the TFI oversight board.

Unfortunately, the dike districts did not comply with TFI, and the estuary restoration efforts NMFS determined were necessary to avoid jeopardy slowed and then ceased.  NMFS did not enforce the TFI requirements.  Two tidegate replacement projects that required 656 acres of estuary habitat restoration credits prior to tidegate replacement under the programmatic biological opinion were completed without obtaining required credits and without regulatory consequence. AR0000002-04; AR0000069-70; AR0050347; AR0003254.

In 2021, Swinomish issued a Notice of Intent to Sue, *see* AR0000017, and the Corps withdrew programmatic ESA coverage and reinitiated consultation with NMFS. This led to the project specifically challenged by Appellants here.

These circumstances are similar to those present in *Idaho Farm Bureau Federation v. Babbitt* and *Citizens for Balanced Use v. Montana Wilderness Ass'n* in that the Tribe seeks to defend an agency decision which came about at least in part due to the Tribe's legal advocacy. After more than twenty years of advocating

- 21 -

for regulation and mitigation of harm to ESA-listed and other fish from tidegates, based on "the relevant precedent and the peculiar circumstances of this case, there is sufficient reason to doubt the adequacy of the [agency's] representation of Applicants' interest so as to warrant intervention as of right by Applicants." *See Citizens for Balanced Use*, 647 F.3d at 900.

The Tribe's case for inadequate representation is particularly compelling given recent changes in the United States' legal position. The statutory definition of "take" of a listed species, which is prohibited under ESA Section 9, includes the term "harm." According to the United States' longstanding regulatory definition, "[h]arm in the definition of `take' in the Act means an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. 222.102. This regulatory definition is consistent with the broad scientific consensus that habitat degradation is a leading cause of harm to ESA-listed species. As well-documented in the BiOp, estuarine habitat loss from tidegates harms PS Chinook and other species. AR0051252.

On April 17, 2025 the Services jointly proposed a radical change to this longstanding interpretation of the ESA. 90 Fed. Reg. 16102. The agencies

propose to fully rescind the harm regulation, and now assert their understanding that the "single, best interpretation" of the term "take" under the ESA is limited to the purportedly "well-established, centuries-old understanding of 'take' as meaning to kill or capture a wild animal." *See* Edwards Dec. Pars. 23-25 and Exh. 1.

This change in position by the United States does not directly control the case here, which addresses an existing permit and BiOp under ESA Section 7, and the Tribe does not know how the United States will defend the BiOp. However, the proposed rule provides a new legal interpretation which is starkly different from the statutory text and the general scientific consensus regarding harm caused by habitat degradation, the central issue in this case. If granted intervention, the Tribe will vigorously assert that the ESA prohibits harm to listed species through habitat modification, a position which Appellee NMFS appears to no longer share. These divergent, "colorable arguments" which implicate the Tribe's Treaty and property rights at issue strongly support intervention. *W. Watersheds Project v. Haaland*, 22 F.4th at 841. The potential that the United States may no longer vigorously defend its prior positions necessitates party status for the Tribe, such that the Tribe may defend its interests and oppose or seek rehearing or certiorari if necessary. *See Day v. Apoliona*, 505 F.3d at 964–66.

**5.    In the Alternative, Permissive Intervention is Warranted.**

For all the reasons set forth above, permissive intervention is warranted under Rule 24(b).  Intervention will not unduly delay or prejudice the adjudication of the original parties' rights, because intervention is timely and the Tribe will not seek to modify the existing briefing schedule.  The Tribe's most cherished Treaty and property rights are at issue, and the Tribe has fiercely worked for decades to protect fish from the adverse impacts of tidegates.  The Tribe merits party status to protect its interests.  As recognized by the Supreme Court, "it is obvious that the Indian Tribes, at a minimum, satisfy the standards for permissive intervention ... the Indians are entitled 'to take their place as independent qualified members of the modern body politic…Accordingly, the Indians' participation in litigation critical to their welfare should not be discouraged." *Arizona v. California*, 460 U.S. at 614–15 (cleaned up).

## III.        Relief Sought and Conclusion.

Swinomish respectfully requests that the Court grant the motion to intervene.

Dated this 27th day of June, 2025.

*s/Wyatt Golding*
Wyatt Golding
Ziontz Chestnut LLP
2101 4th Avenue, Suite 1230
Seattle, WA 98121
(206) 448-1230
wgolding@ziontzchestnut.com

Emily Haley
Swinomish Indian Tribal Community
11404 Moorage Way
La Conner, WA 98257
(360) 466-1134
ehaley@swinomish.nsn.us

*Attorneys for Proposed Intervenor*
*Swinomish Indian Tribal Community*

CERTIFICATE OF COMPLIANCE

Pursuant to FRAP 32(g)(1), I certify that this document contains 5,121

words, in compliance with the type-volume limitation.

*s/Wyatt Golding*
Wyatt Golding
Ziontz Chestnut LLP
2101 4th Avenue, Suite 1230
Seattle, WA 98121
(206) 448-1230
wgolding@ziontzchestnut.com
*Attorney for Proposed Intervenor Swinomish*
*Indian Tribal Community*

Motion to Intervene Exhibit A:

Declaration of Chairman Steve Edwards in Support of
Swinomish Indian Tribal Community's Motion to Intervene

# UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

| | |
|---|---|
| Skagit County Dike Drainage and Irrigation Improvement District No 12, | Case No. 25-3757 |
| | APA Review/Appeal |
| Appellant, | |
| v. | **DECLARATION OF CHAIRMAN STEVE EDWARDS IN SUPPORT OF SWINOMISH INDIAN TRIBAL COMMUNITY'S MOTION TO INTERVENE AS AN INTERVENOR-APPELLEE** |
| National Marine Fisheries Service, Department of Commerce, Howard Lutnick, and Emily Menashes, | |
| Appellees. | |

Chairman Steve Edwards states and declares:

1.      I am the duly elected Chairman of the Swinomish Indian Senate, the governing body of the Swinomish Indian Tribal Community and have been so since 2020. I have also been a member of the Swinomish Indian Senate since 2003. I was born, raised, and have lived on the Swinomish Indian Reservation my entire life.

2.      Prospective Intervenor-Appellee Swinomish Indian Tribal Community ("Swinomish" or "Tribe") is a federally recognized Indian tribe organized pursuant to Section 16 of the Indian Reorganization Act of 1934,

25 U.S.C. § 5123, and located on the Swinomish Reservation on Fidalgo Island in Skagit County of the State of Washington. The Tribe's mailing address is 11404 Moorage Way, La Conner 98257.

3.      Since time immemorial, the Tribe has lived, hunted, fished and gathered in and around the Skagit River Basin and the North Salish Sea, including Padilla Bay and the area that is now the location of the No Name Slough Replacement Project ("Project"). Anadromous fish, and particularly salmon, have played a central role in the Tribe's subsistence, economy, culture, spiritual life, and day-to-day existence. The Tribe has witnessed the precipitous decline of Puget Sound Chinook salmon in recent decades, and has watched its members' livelihood deteriorate as fishing runs have plummeted and fishing seasons have been shortened and closed. The loss of fishing opportunities has strained the Tribe's cultural lifeline and diminished Tribal members' overall well-being.

4.      The Tribe has been adjudicated to be a successor-in-interest to signatories of the Treaty with the Duwamish, Suquamish, etc., 12 Stat. 927 ("Treaty of Point Elliott" or "Treaty"), by which the Tribe reserved various rights, including the right to use and occupy exclusively Reservation lands and to exercise off-Reservation fishing rights at usual and accustomed fishing areas of the Tribe pursuant to the Treaty. As part of the *United*

*States v. Washington* litigation, the Skagit River Basin and northern Salish Sea have been determined to be within the usual and accustomed fishing areas of the Tribe. 459 F. Supp. 1020, 1049 (W.D. Wash. 1978).

5.      The Swinomish Indian Tribal Community has over 1,100 enrolled members. Many of those members, including myself, exercise the Tribe's Treaty fishing rights for sustenance, cultural purposes, and for our livelihoods as commercial fishers. Salmon are our way of life. Every fish is important to our Tribe.

6.      Since the court decision was issued in *United States v. Washington*, the Tribe, along with the other treaty tribes in Northwest Washington, has co-managed the salmon fishery with the State of Washington. Like the State of Washington, the Tribe issues regulations governing the harvest of fish. Since 1978, the Tribe has not issued a regulation opening a directed fishery on wild spring Skagit Chinook because of the severe decline in Skagit Chinook populations and the concomitant need for a conservation closure. As a result, tribal members have been unable to harvest the most prized of all salmon species.

7.      When I was a child, I was able to fish for all the species of salmon: Chinook, sockeye, pinks, coho, and chums. I learned how to fish when I first assisted my elder brother when he went fishing. Fishing is a family

affair in Indian country. I have harvested, and continue to harvest, salmon commercially as well as for subsistence and tribal ceremonies. Thanks to the previous abundance of salmon in our home waters, I have been fortunate to feed my family over the years. However, today we can catch far fewer fish than previously, which impacts my ability to feed my family. Where before I used to be able to harvest all year round, now, because of the tremendous decline in salmon populations, I can only fish a few weeks a year. The total income to the Tribe's members from commercial, ceremonial and subsistence finfish fisheries was $1,035,522 in 2022; $484,956 in 2023; and $584,748 in 2024.[1]

8.      Judge Boldt in *U.S. v Washington*, and the United States Supreme Court before him, understood the importance of salmon to me and our people when he said that the right to fish at our traditional fishing places was "not much less necessary to the existence of the Indians than the atmosphere [we] breathed." Historically, many of our villages and camps were located along marine shorelines and at the mouths of and along the Skagit and Samish Rivers. Since time immemorial, salmon have been the life force for our people. They were and remain an important part of our diet

---

[1] Because pink salmon only run every other year, there is a natural fluctuation in salmon fishery revenue every other year.

throughout the year – whether fresh, dried, or smoked. Salmon provides us with the proteins, fats, vitamins and minerals that we need to be a strong and healthy people.

9.     Fishing is the primary means of subsistence of many of our people. Our livelihood and culture have been based on fishing since time immemorial. Every spring our people honor the salmon with the first salmon ceremony and continue to do so today. This ceremony is a religious rite to ensure the continued return of the salmon. It has been recognized by anthropologists familiar with the Tribe that our reverence, respect and concern for the salmon reflect a spiritual understanding of the interdependence and relatedness of all living beings. Our religious beliefs and rites ensured that salmon were never overharvested or wasted. Our ancestors were careful not to allow the waters to be polluted during the salmon season. They knew that if the salmon were harmed, our people would suffer. Those rites and this knowledge stay with us today.

10.     The Treaty fishing right and our property interest in fish caught in our Treaty fisheries are fundamental to the Tribe's existence. We invest tremendous resources and protecting and recovering salmon populations, and every single fish matters in that process. Recovering salmon is high on the Tribe's list of priorities for many reasons. One of them is because we

are starting to lose fishermen due to the devastating declines in salmon populations. This loss breaks the generational cycle that has existed for millennia. Before, our earliest thoughts were on the water, with our parents and grandparents catching salmon. But with the plummeting salmon populations, some of our children are no longer following in our footsteps – with the result that we, as a Tribe, as a people, are threatened with losing a way of life – a way of life that has been with us for thousands of years.

11.     As a result, the Tribe has taken an important leadership role in working to maintain and recover salmon stocks in the region and in responsibly managing and using the threatened salmon resource. The Tribe was a founding member of the Skagit River System Cooperative ("SRSC") (originally the Skagit System Cooperative from when it was founded in 1976 until 2003), a fisheries and environmental science and research consortium between Swinomish and the Sauk Suiattle Indian Tribe. SRSC is a highly respected entity with more than 25 highly qualified scientists and biologists with expertise in fish biology, hydrology, hydrogeology, restoration ecology and environmental permitting and regulatory compliance.

12.     SRSC was the co-author of the 2005 Skagit Chinook Recovery Plan (the "Recovery Plan") with the WA Department of Fish & Wildlife after

Chinook salmon were listed as "threatened" in 1999 under the Endangered Species Act. The Recovery Plan was subsequently approved by NOAA Fisheries. It includes historic ecology showing that approximately 85% of the Skagit River estuary habitat has been converted to farmland and agricultural uses through a series of extensive dikes, tidegates and drainage ditches over the past one hundred years. The Recovery Plan lists estuary habitat restoration as a primary limiting factor to ESA-listed Skagit Chinook recovery, and concludes that twenty-seven hundred (2,700) acres of estuary habitat must be restored to support the additional 1.35 million Chinook smolts needed to achieve recovery.

13.     The Tribe has not sought to restore *all* of the converted agricultural lands back into estuary habitat, but just enough to ensure that adverse effects from human actions are fully mitigated and that Chinook recovery can be achieved. The Tribe has taken a leadership role for years in restoring parts of the Swinomish Reservation to estuary habitat in order to do its part in salmon recovery, and is a primary guardian of the Skagit River. The Tribe is a leader in protecting existing habitat and restoring any available estuary habitat on its modest Reservation. Swinomish has recently completed a tidal restoration project along Swinomish Channel, and has two other estuary restoration projects underway, including at Similk Bay and

DEC. OF CHAIRMAN STEVE EDWARDS IN SUPPORT
OF SWINOMISH MOTION TO INTERVENE - 7

along Swinomish Channel, totaling over 250 acres of estuary habitat.

Conversely, no private agricultural land has been restored to estuary habitat

in over ten years.

14.     SRSC has authored dozens of peer-reviewed scientific articles based

on its monitoring of the Skagit estuary, delta, floodplain and mainstem river

habitats. The No Name Slough Replacement Project Biological Opinion

that Appellant District 12 is challenging in this case relies on many studies

and reports prepared by SRSC scientists in addition to the Recovery Plan.[2]

SRSC has partnered with federal and state agency scientists to establish

scientific monitoring methodologies that are considered some of the most

robust in Puget Sound. SRSC and NOAA scientists have measured

estuarine use by juvenile ESA-listed Chinook Salmon and other salmon.

Since the 1970s, research has shown that Chinook salmon are particularly

reliant on estuary habitat because of the time they need to rear in the estuary

prior to outmigrating to the sea. Over the last four decades, scientific

research in the Skagit has shown that the growth rates for juvenile Chinook

salmon in estuaries are high, that once completed restoration projects open

---

[2] *See e.g.* Beamer, E., and K. Larsen. 2004, The Importance of Skagit delta habitat on the growth of wild ocean-type Chinook in the Skagit Bay: Implications for delta restoration; Beamer, E., A. McBride, C. Greene, R. Henderson, G. Hood, K. Wolf, K. Larsen, C. Rice and K. Fresh. 2005, Delta and nearshore restoration for the recovery of wild Skagit River Chinook salmon: Linking estuary restoration to wild Chinook salmon populations.

new estuary habitats that are immediately utilized by Chinook smolts, and that the amount of estuary habitat available is directly linked to Chinook salmon productivity. More recent science makes clear that in addition to juvenile Chinook salmon, estuaries are regularly used by juvenile chum Salmon, juvenile coho Salmon and ESA-listed Bull trout for rearing. Sockeye and pink salmon and steelhead trout are also present in the estuary and impacted by tidegates. These non-listed fish are also harvested by the Tribe in its Treaty fisheries.

15.     SRSC's scientific research with NOAA Fisheries and the WA Department of Fish & Wildlife shows a clear distinction between Skagit estuary habitat that is behind a tidegate and estuary habitat that is not behind a tidegate. Under normal operations, documented observations have shown a 4:1 to 800:1 difference in the number of juvenile Chinook salmon outside the tidegate versus the number of juvenile Chinook salmon behind the tidegate because tidegates impede passage and access to estuary habitat for juvenile ESA-listed Chinook salmon 50% of the time. The Tribe has worked continuously for 25 years to find ways to restore estuary habitat and ensure that adverse effects caused by tidegates are fully mitigated, given the Recovery Plan objectives and scientific reality of the need for estuary habitat restoration to recover ESA-listed Chinook.

16.     The proposed No Name Slough Tidegate Replacement Project, which would be operated and maintained by Appellant Dike District No. 12, would harm Treaty fish. It would harm juvenile and adult salmon in many ways, including:  preventing access to the estuary, suffering injury from the gate, and being exposed to sub-lethal and lethal effects from the warm and polluted water behind the tidegate. Because this harm will last over the useful life of the new tidegate complex, a minimum of 50 years, this project will cause ongoing harm. That is why it requires ESA Section 7 consultation, and why NMFS correctly made a jeopardy finding, imposed mitigation, and issued an incidental take statement. These harms to Puget Sound Chinook also interfere with and impair the legal rights or privileges of the Tribe. The Project would harm fish that the Tribe would otherwise be able to harvest in its Treaty fisheries. In other words, the tidegate complex diminishes the Tribe's federally reserved property rights. If the biological opinion is overturned or mitigation reduced, the harms to the Tribe would be heightened.

17.     Our Treaty fisheries target non-listed fish species, including wild coho, chum, sockeye, and pink salmon, as well as hatchery-origin Chinook. These fish are also present in the estuary. Tidegates like the No Name Slough complex also harm these fish and reduce the number of fish

available to take in the Tribe's Treaty fisheries, impairing the Tribe's property rights.

18.    The dire state of ESA-listed Chinook also has secondary effects on our fisheries. Every year, we are required to reduce our number of fishing days on otherwise-harvestable salmon to reduce incidental take of Chinook salmon. Stated another way, every year there are harvestable salmon returning to the Skagit system that the Tribe is unable to harvest because continuing fishing would result in unacceptable impacts on ESA-listed Chinook. This too reduces our harvest and impairs the Tribe's property rights.

19.    The interests the Tribe seeks to protect are within the zone of interests protected or regulated by the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 500 *et seq*.

20.    While the Tribe's interest arises from the Treaty of Point Elliott, the Tribe does not assert Treaty rights claims in this case. The Tribe explicitly reserves, any and all claims to or arising from the Tribe's Treaty rights, including but not limited to claims of Treaty interference and Federally reserved water rights. Adjudication of the existence or extent of the Tribe's Federal rights is not at issue in this judicial review proceeding, and

adjudication of such rights would exceed the permissible scope of this judicial review proceeding.

21.     The Tribe's interest in this litigation is based on its legal and property interest in the actual fish guaranteed by the Treaty which will be harmed by Appellant District 12's proposed project. We also have a strong interest in the precedential impact of these proceedings, as there are many tidegates located throughout the Skagit estuary, which will need replacement over time.

22.     On April 17, 2025, in a Federal Register notice titled "Rescinding the Definition of 'Harm' Under the Endangered Species Act," NMFS and the United States Fish and Wildlife Service jointly proposed a radical change to the United States' longstanding interpretation of the ESA as prohibiting harm to listed species through habitat degradation. That notice is attached hereto as Exhibit 1.

23.     The agencies propose to fully rescind the current harm regulation, and now assert their understanding that the "single, best interpretation" of the term "take" under the ESA is limited to the purportedly "well-established, centuries-old understanding of 'take' as meaning to kill or capture a wild animal." This change in position by the United States evidences a new legal interpretation in which habitat degradation may not be regulated under

ESA Section 9, which is starkly different from the statutory language of the ESA, the United States longstanding legal position, and overwhelming scientific consensus that habitat degradation adversely affects listed species.

24.     The Tribe timely submitted extensive comments opposing the proposed rescission (comment tracking number mav-srnt-aj83). Those comments detailed how the statute and best available science strongly support the existing harm regulation. We provided hundreds of pages of scientific literature in support of the well-established conclusion that habitat degradation is the leading cause of decline in listed fish populations, including Puget Sound Chinook.

25.     I am also aware of recent executive orders which have directed reduced review under the Endangered Species Act for logging activities and energy extraction-related activities. For example, the March 1, 2025 order titled "Immediate Expansion of American Timber Production" directs maximum consideration of ESA exemption applications and streamlined permitting. These orders are not applicable here, but combined with the proposed rescission of the "harm" regulation, give me great concern regarding the future of the United States' defense of the challenged BiOp and regulation of the Project. I represent a sovereign Indian Tribe with unique rights and interests. The United States does not adequately represent

1   our interests, and I believe that the Tribe must be involved as a party in this

2   litigation to protect its interests.

3

4

5        I declare under penalty of perjury that the foregoing is true and

6   correct to the best of my knowledge.

7        Dated this 27th day of June, 2025 on the Swinomish Indian

8   Reservation, Skagit County, State of Washington.

9

10

11

12                              Steve Edwards, Chairman

13

14

15

16

17

18

19

20

21

22

23

24

25

Chairman Steve Edwards Declaration Exhibit 1:

Federal Register Notice re "Harm" Definition Rescission

**16102**  **Federal Register** / Vol. 90, No. 73 / Thursday, April 17, 2025 / Proposed Rules

## Incorporation by Reference

Class E5 airspace designations are published in Paragraph 6005 of FAA Order JO 7400.11, Airspace Designations and Reporting Points, which is incorporated by reference in 14 CFR 71.1 on an annual basis. This document proposes to amend the current version of that order, FAA Order JO 7400.11J, dated July 31, 2024, and effective September 15, 2024. These updates will be published in the next update to FAA Order JO 7400.11. FAA Order JO 7400.11J is publicly available as listed in the **ADDRESSES** section of this document.

FAA Order JO 7400.11J lists Class A, B, C, D, and E airspace areas, air traffic service routes, and reporting points.

## The Proposal

The FAA proposes an amendment to 14 CFR part 71 that would amend the Class E airspace extending upward from 700 feet above the surface designated for Chambersburg, PA. Controlled airspace is necessary for the safety and management of instrument flight rules (IFR) operations in the area. The VOR portion of the St. Thomas VORTAC was decommissioned on November 30, 2023, and only the TACAN remains as a functional part of the NAVAID. This rule would change the associated references in the airspace legal description from St. Thomas VORTAC to St. Thomas TACAN. This action would also amend the airspace by updating the airport coordinates and the airport name in the airspace legal description to reflect the current information.

## Regulatory Notices and Analyses

The FAA has determined that this proposed regulation only involves an established body of technical regulations for which frequent and routine amendments are necessary to keep them operationally current. It, therefore, (1) is not a ''significant regulatory action'' under Executive Order 12866; (2) is not a ''significant rule'' under Department of Transportation (DOT) Regulatory Policies and Procedures (44 FR 11034; February 26, 1979); and (3) does not warrant preparation of a regulatory evaluation as the anticipated impact is so minimal. Since this is a routine matter that will only affect air traffic procedures and air navigation, it is certified that this proposed rule, when promulgated, will not have a significant economic impact on a substantial number of small entities under the criteria of the Regulatory Flexibility Act.

## Environmental Review

This proposal will be subject to an environmental analysis in accordance with FAA Order 1050.1F, ''Environmental Impacts: Policies and Procedures,'' prior to any final regulatory action by the FAA.

## Lists of Subjects in 14 CFR Part 71

Airspace, Incorporation by reference, Navigation (air).

## The Proposed Amendment

In consideration of the foregoing, the Federal Aviation Administration proposes to amend 14 CFR part 71 as follows:

## PART 71—DESIGNATION OF CLASS A, B, C, D, AND E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS

■ 1. The authority citation for 14 CFR part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(f), 106(g), 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

## § 71.1   [Amended]

■ 2. The incorporation by reference in 14 CFR 71.1 of FAA Order JO 7400.11J, Airspace Designations and Reporting Points, dated July 31, 2024, and effective September 15, 2024, is amended as follows:

*Paragraph 6005   Class E Airspace Areas Extending Upward From 700 Feet or More Above the Surface of the Earth.*

\*      \*      \*      \*      \*

**AEA PA E5   Chambersburg, PA [Amended]**

Franklin County Regional Airport, PA
  (Lat. 39°58′23″ N, long. 77°38′36″ W)
St. Thomas TACAN
  (Lat. 39°56′00″ N, long. 77°57′03″ W)

That airspace extending upward from 700 feet above the surface within a 6.5-mile radius of Franklin County Regional Airport and within a 7-mile radius of Franklin County Regional Airport extending clockwise from a 039° bearing from the airport to a 061° bearing from the airport and within a 13.1-mile radius of Franklin County Regional Airport extending clockwise from a 061° bearing from the airport to a 135° bearing from the airport and within a 7-mile radius of Franklin County Regional Airport extending clockwise from a 135° bearing from the airport to a 174° bearing from the airport and within 3.5 miles each side of the St. Thomas TACAN 082° radial extending from the TACAN to 25.2 miles east of the TACAN and excluding that portion within the Hagerstown, MD, Class E airspace area.

\*      \*      \*      \*      \*

Issued in College Park, Georgia, on April 14, 2025.

**Patrick Young,**
*Manager, Airspace & Procedures Team North, Eastern Service Center, Air Traffic Organization.*

[FR Doc. 2025–06570 Filed 4–16–25; 8:45 am]

**BILLING CODE 4910–13–P**

## DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

## 50 CFR Part 17

## DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

## 50 CFR Part 222

[Docket No. FWS–HQ–ES–2025–0034; FXES11110900000–256 FF09E23000; 250411–0064]

RIN 1018–BI38; 0648–BN93

## Rescinding the Definition of ''Harm'' Under the Endangered Species Act

**AGENCY:** U.S. Fish and Wildlife Service, Interior; National Oceanic and Atmospheric Administration, Commerce.

**ACTION:** Notice of proposed rulemaking; request for comments.

**SUMMARY:** The U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) (collectively referred to as the Services or we) are proposing to rescind the regulatory definition of ''harm'' in our Endangered Species Act (ESA or the Act) regulations. The existing regulatory definition of ''harm,'' which includes habitat modification, runs contrary to the best meaning of the statutory term ''take.'' We are undertaking this change to adhere to the single, best meaning of the ESA.

**DATES:** Comments must be received by May 19, 2025.

**ADDRESSES:** A plain language summary of this proposed rule is available at *https://www.regulations.gov* in Docket No. FWS–HQ–ES–2025–0034. You may submit comments by one of the following methods:

(1) *Electronically:* Go to the Federal eRulemaking Portal: *https:// www.regulations.gov.* In the Search box, enter FWS–HQ–ES–2025–0034, which is the docket number for this rulemaking. Then, click on the Search button. On the resulting page, in the panel on the left side of the screen, under the Document Type heading,

**Federal Register** / Vol. 90, No. 73 / Thursday, April 17, 2025 / Proposed Rules **16103**

check the Proposed Rule box to locate this document. You may submit a comment by clicking on "Comment."

(2) *By hard copy:* Submit by U.S. mail to: Public Comments Processing, Attn: FWS–HQ–ES–2025–0034, U.S. Fish and Wildlife Service, MS: PRB/3W, 5275 Leesburg Pike, Falls Church, VA 22041–3803.

We request that you send comments only by the methods described above. Comments must be submitted to *https://www.regulations.gov* before 11:59 p.m. (Eastern Time) on the date specified in **DATES**. We will not consider mailed comments that are not postmarked by the date specified in **DATES**.

We will post your entire comment—including your personal identifying information—on *https://www.regulations.gov*. If you provide personal identifying information in your comment, you may request at the top of your document that we withhold this information from public review. We cannot guarantee, however, that we will be able to do so. Anonymous comments will be considered. Comments and materials we receive, as well as supporting documentation we used in preparing this proposed rule, will be available for public inspection on *https://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Gina Shultz, Acting Assistant Director, Ecological Services, at 703–358–2171 or *ADEcologicalServices@fws.gov* with a subject line of "1018–BI38." Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States. For a summary of the proposed rule, please see the proposed rule summary document in Docket No. FWS–HQ–ES–2025–0034 on *https://www.regulations.gov.*

**SUPPLEMENTARY INFORMATION:**

## Background

The Endangered Species Act (ESA) prohibits the "take" of endangered species.[1] Under the ESA, "[t]he term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."[2] This makes sense in light of the well-established, centuries-old understanding of "take" as meaning

to kill or capture a wild animal.[3] Regulations previously promulgated by FWS expanded the ESA's reach in ways that do not reflect the best reading of the statute, to prohibit actions that impair the habitat of protected species: "Harm in the definition of 'take' in the Act means an act which actually kills or injures wildlife. Such an act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."[4] NMFS' definition is materially identical: "Harm in the definition of 'take' in the Act means an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering."[5]

In *Babbitt* v. *Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687 (1995), the Supreme Court upheld FWS' regulation under *Chevron* deference.[6] Justice Scalia dissented, joined by Chief Justice Rehnquist and Justice Thomas, and would have held that even under *Chevron* this interpretation was unsustainable.[7] As Justice Scalia observed, "[i]f 'take' were not elsewhere defined in the Act, none could dispute what it means, for the term is as old as the law itself. To 'take,' when applied to wild animals, means to reduce those animals, by killing or capturing, to human control."[8] In addition, under the *noscitur a sociis* canon, the definition of "harm," like the other nine verbs in the definition, should be construed to require an "affirmative act[ ] . . . directed immediately and intentionally against a particular animal—not [an] act[ ] or omission[ ] that indirectly and accidentally cause[s] injury to a population of animals."[9]

The Supreme Court, nearly 30 years after *Sweet Home,* overruled the *Chevron* doctrine in *Loper Bright Enterprises* v. *Raimondo,* 603 U.S. 369, 400 (2024). Under *Loper Bright,* "the question that matters" is whether "the *statute* authorizes the challenged agency action."[10] In other words, does the agency's regulation match the single, best meaning of the statute?[11]

We have concluded that our existing regulations, which still contain the definition of "harm" contested in *Sweet Home,* do not match the single, best meaning of the statute. As Justice Scalia's dissent in *Sweet Home* explains, the regulations' interpretation of the statutory language violates the *noscitur a sociis* canon, did not properly account for over a thousand years of history, and is inconsistent with the structure of the ESA. Nor is any replacement definition needed. The ESA itself defines "take,"[12] and further elaborating on one subcomponent of that definition—"harm"—is unnecessary in light of the comprehensive statutory definition.

We recognize that the Supreme Court held in *Loper Bright* that its "prior cases that relied on the *Chevron* framework . . . are still subject to statutory *stare decisis.*"[13] But under the then-prevailing *Chevron* framework, *Sweet Home* held only that the existing regulation is a permissible reading of the ESA, not the only possible such reading. Our rescission of the regulation definition on the ground that it does not reflect the best reading of the statutory text thus would not only effectuate the Executive Branch's obligation to "take Care that the Laws be faithfully executed,"[14] but would also be fully consistent with *Sweet Home.*

Accordingly, because our regulations do not accord with the single, best meaning of the statutory text, we propose to rescind the regulatory definition of "harm" and rest on the statutory definition of "take." This revision would be prospective only and would not affect permits that have been granted as of the date the regulation becomes final.

## No Reliance in Unlawful Regulations

In proposing to rescind our regulatory definitions of harm, we are considering whether there are legitimate reliance interests on the regulations under reexamination. *Dep't of Homeland Sec.* v. *Regents of the Univ. of California,* 591

---

[1] 16 U.S.C. 1538(a)(1)(B)–(C).

[2] 16 U.S.C. 1532(19).

[3] *See, e.g.,* 11 Oxford English Dictionary (1933); Webster's New International Dictionary of the English Language (2d ed. 1949); *Geer* v. *Connecticut,* 161 U.S. 519, 523 (1896); 2 W. Blackstone, Commentaries 411 (1766).

[4] 50 CFR 17.3.

[5] 50 CFR 222.102.

[6] 515 U.S. at 703. Although *Sweet Home* concerned FWS's regulation at 50 CFR 17.3, it applies equally to 50 CFR 222.102 given the definitions are substantially the same.

[7] *Id.* at 715. The D.C. Circuit also rejected the Secretary's definition. *See Sweet Home Chapter of Communities for a Great Oregon* v. *Babbitt,* 17 F.3d 1463 (D.C. Cir. 1994); *id.* at 1472 (Sentelle, J., concurring); *but see id.* at 1473 (Mikva, C.J., dissenting).

[8] 515 U.S. at 717.

[9] *Id.* at 719–20.

[10] 603 U.S. at 406 (emphasis added).

[11] *Id.* at 400.

[12] 16 U.S.C. 1532(19).

[13] 603 U.S. at 412.

[14] U.S. Const. art. II, § 3.

**16104** **Federal Register** / Vol. 90, No. 73 / Thursday, April 17, 2025 / Proposed Rules

U.S. 1, 30 (2020). However, because it is the President's duty to see that the laws are faithfully executed, in all but the most unusual cases, we believe that reliance interests likely will be outweighed by the constitutional interest in repealing regulations that do not reflect the best reading of the statute.[15]

We are aware that there are parties who are likely to provide comments concerning their reliance interests on environmental and aesthetic grounds, even as we are aware there are property owners and regulated entities who are likely to provide comments regarding interests in not being subject to a regime Congress may never have authorized. We therefore solicit public comment on reliance interests.

**Regulatory Planning and Review—Executive Orders 12866 and 14192**

This proposed rule has been determined to be significant for purposes of Executive Order 12866. This proposed rule, if finalized as proposed, is expected to be an E.O. 14192 deregulatory action.

**Regulatory Flexibility Act**

Under the Regulatory Flexibility Act (as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA) of 1996; 5 U.S.C. 601 *et seq.*), whenever a Federal agency is required to publish a notice of rulemaking for any proposed or final rule, it must prepare and make available for public comment a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.,* small businesses, small organizations, and small government jurisdictions). No regulatory flexibility analysis is required if the head of an agency or an appropriate designee certifies that the rule will not have a significant economic impact on a substantial number of small entities. Here, if adopted as proposed, this rulemaking may have a significant economic impact on a substantial number of small entities. The following discussion explains our rationale.

This proposed rule seeks comment on rescission of the definition of "harm" for both NMFS and FWS. In the proposed rule seeking to codify the redefinition of the FWS regulations defining harm, the Department of the Interior noted its determination that the rule would not have a significant economic impact on a substantial number of small entities under the RFA. See 46 FR 29490 (June 2, 1981). As for NMFS, in the preamble to the proposed

rule that proposed to codify NMFS's then-current interpretation of "harm," the Assistant General Counsel for Legislation and Regulation of the Department of Commerce certified that the proposed rule, if adopted, would not have a significant economic impact on a substantial number of small entities because "NMFS is not implementing a new policy or definition. NFMS [sic] definition of harm would remain the same whether or not it is codified. . . ." 63 FR 24148 at 24149–24150 (May 1, 1998).

In response to public comments at that time, NMFS developed a final regulatory flexibility analysis that analyzed the rule's potential effects on agriculture, residential or commercial construction, mining, and municipal water, sewer, and waste management. NMFS concluded that the analysis "indicates that this regulation may pose some incremental cost for some small entities; however it remains uncertain whether these costs constitute a significant economic impact on a substantial number of small entities."

Because this proposed rule would rescind that definition of "harm" for both NMFS and FWS, it is expected that incremental costs on small entities imposed by that prior definition will be relieved, and this rulemaking, if adopted as proposed, may have a significant economic impact by reducing burden on a substantial number of small entities relative to the previous rulemaking. As a result, an initial regulatory flexibility analysis has been prepared and is provided as follows.

The reasons for this deregulatory action are set out above, along with a succinct statement of the objectives and legal basis for the proposed rule. See 5 U.S.C. 603(b)(1)–(2). An estimate of the potentially large number of small entities that could be impacted by this deregulatory action is unknown at this time because the 1981 rulemaking record does not contain that information and because the proposed rule will impact any small entity complying with the Endangered Species Act. See 5 U.S.C. 603(b)(3). As part of the public comment process and for its final regulatory flexibility analysis under 5 U.S.C. 604, the Services will undertake that estimation process in consultation with the Office of Advocacy. This deregulatory action would not impose projected reporting, recordkeeping, or other compliance activities. See 5 U.S.C. 603(b)(4). No other agency actions duplicate, overlap, or conflict with this deregulatory action. See 5 U.S.C. 603(b)(5). Finally, by eliminating a legally incorrect definition of "harm"

under the Endangered Species Act, this proposed rule, if adopted, would be deregulatory and would benefit small entities impacted by the Endangered Species Act. The alternative to this proposed deregulatory action is the status quo, which does not need to be analyzed. See 5 U.S.C. 603(c).

**National Environmental Policy Act**

We are analyzing this proposed rule in accordance with the National Environmental Policy Act (NEPA, 42 U.S.C. 4321 *et seq.*), the Department of the Interior regulations on Implementation of the National Environmental Policy Act (43 CFR 46.10–46.450), the Department of the Interior Manual (516 DM 8), the NOAA Administrative Order 216–6A, and the NOAA Companion Manual (CM), "Policy and Procedures for Compliance with the National Environmental Policy Act and Related Authorities" (effective January 13, 2017).

We are proposing to undertake this revision because we believe it is compelled by the best reading of the statutory text. As such, we believe that "the proposed agency action is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action" (42 U.S.C. 4336(a)(4); *see Dep't of Transp.* v. *Pub. Citizen,* 541 U.S. 752, 766–70 (2004)). In the alternative, we believe that the proposed regulation changes are within a category of actions that the Department of the Interior and NOAA have each found have no significant individual or cumulative effect on the quality of the human environment and are therefore excluded from the requirement to prepare an environmental assessment or an environmental impact statement, specifically, the Department of the Interior categorical exclusion for "Policies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case" (43 CFR 46.210(i)), and the NOAA categorical exclusion for "[P]reparation of policy directives, rules, regulations, and guidelines of an administrative, financial, legal, technical, or procedural nature, or for which the environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will be subject later to the NEPA

---

[15] See *Regents,* 591 U.S. at 30–32.

process, either collectively or on a case-by-case basis'' (CM Appendix E, G7).

In this regard, we note that the two recent proposed and final rulemakings addressing a regulatory definition of ''habitat'' under the Endangered Species Act found that these categorical exclusions applied. *See Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat,* 87 FR 37757, June 24, 2022; *Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat,* 86 FR 59353, October 27, 2021; *Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat,* 85 FR 81411, December 16, 2020); *Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat,* 85 FR 47333, August 5, 2020).

We are continuing to consider the extent to which our proposed regulation changes may have a significant effect on the human environment or fall within one of the categorical exclusions for actions that have no individual or cumulative significant effect on the quality of the human environment. We invite the public to comment on these or any other aspects of the NEPA analyses of these revisions. We will complete our analysis in accordance with NEPA and applicable regulations before finalizing this proposed rule.

### Endangered Species Act

In developing this proposed rule, the Services are acting in their unique statutory role as administrators of the Act and are engaged in a legal exercise of interpreting the standards of the Act. The Services' promulgation of rules that govern their implementation of the Act is not an action that is in itself subject to the Act's provisions, including section 7(a)(2). The Services have a historical practice of issuing their general implementing regulations under the ESA without undertaking section 7 consultation. Given the plain language, structure, and purposes of the ESA, we find that Congress never intended to place a consultation obligation on the Services' promulgation of implementing regulations under the Act. In contrast to actions in which we have acted principally as an ''action agency'' in implementing the Act to propose or take a specific action (*e.g.,* issuance of section 10 permits and actions under statutory authorities other than the ESA), here the Services are carrying out an action that is at the very core of their unique statutory role as administrators—promulgating general implementing regulations or revisions to those regulations that interpret the terms and standards of the Act.

### Authority

We issue this proposed rule under the authority of the Endangered Species Act, as amended (16 U.S.C. 1531 *et seq.*).

### List of Subjects

*50 CFR Part 17*

Endangered and threatened species, Exports, Imports, Plants, Reporting and recordkeeping requirements, Transportation, Wildlife.

*50 CFR Part 222*

Administrative practice and procedure, Endangered and threatened species, Exports, Reporting and recordkeeping requirements, Transportation.

### Proposed Regulation Promulgation

For the reasons set out in the preamble, we hereby propose to amend part 17 of chapter I and part 222 of chapter II, title 50 of the Code of Federal Regulations, as set forth below:

## PART 17—ENDANGERED AND THREATENED WILDLIFE AND PLANTS

■ 1. The authority citation for part 17 continues to read as follows:

**Authority:** 16 U.S.C. 1361–1407; 1531–1544; and 4201–4245, unless otherwise noted.

### Subpart A—Introduction and General Provisions

### § 17.3   [Amended]

■ 2. Amend § 17.3 by removing the definition for ''Harm''.

## PART 222—GENERAL ENDANGERED AND THREATENED MARINE SPECIES

■ 3. The authority citation for part 222 continues to read as follows:

**Authority:** 16 U.S.C. 1531 *et seq.;* 16 U.S.C. 742a *et seq.* Section 222.403 also issued under 16 U.S.C. 1361 *et seq.*

### Subpart A—Introduction and General Provisions

### § 222.102   [Amended]

■ 4. Amend § 222.102 by removing the definition for ''Harm''.

**Maureen Foster,**
*Chief of Staff, Exercising the Delegated Authority of the Assistant Secretary for Fish and Wildlife and Parks, Department of the Interior.*

**Laura Grimm,**
*Chief of Staff, Exercising the Delegated Authority of the Under Secretary of Commerce for Oceans and Atmosphere and NOAA Administrator, Department of Commerce.*

[FR Doc. 2025–06746 Filed 4–16–25; 8:45 am]

**BILLING CODE 4333–15–P; 3510–22–P**

No. 25-3757

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

SKAGIT COUNTY DIKE DRAINAGE AND IRRIGATION IMPROVEMENT
DISTRICT NO 12,
Plaintiff-Appellant,

v.

NATIONAL MARINE FISHERIES SERVICE, et al,
Federal Defendants-Appellees

On Appeal from the U.S. District Court
for the Western District of Washington (No. 2:23-cv-01954-BAT)

**OPPOSITION TO MOTION TO INTERVENE**

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*

ROBERT J. LUNDMAN
THEKLA HANSEN-YOUNG
*Attorneys*
Environment & Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 307-2710
thekla.hansen-young@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ii

INTRODUCTION................................................................................................ 1

BACKGROUND................................................................................................. 2

    A.    The agency action and underlying litigation................................. 2

    B.    The Tribe's motion to intervene.................................................... 3

    C.    Resolution of the underlying litigation. ....................................... 5

ARGUMENT ..................................................................................................... 6

CONCLUSION .................................................................................................. 8

# TABLE OF AUTHORITIES

## Cases

*Alsea Valley All. v. Dep't of Com.*,
  358 F.3d 1181 (9th Cir. 2004)..........................................................................8, 11-13

*Crow Indian Tribe v. United States*,
  965 F.3d 662 (9th Cir. 2020)...........................................................................11-13

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
  886 F.3d 803 (9th Cir. 2018)................................................................................ 12

*Pit River Tribe v. U.S. Forest Serv.*,
  615 F.3d 1069 (9th Cir. 2010)............................................................................. 11

*Sierra Forest Legacy v. Sherman*,
  646 F.3d 1161 (9th Cir. 2011)............................................................................. 11

## Statutes and Court Rules

28 U.S.C. § 1291 .................................................................................................................

## Regulations

40 C.F.R. § 232.2(q) (1988) ................................................................................... 2

**INTRODUCTION**

This Court should deny the Swinomish Indian Tribal Community's (Tribe) motion to intervene on appeal. In December 2023, the plaintiff Skagit County Dike Drainage and Irrigation Improvement District No. 12 (District 12) challenged the National Marine Fisheries Service's (Service) failure to meet statutory deadlines for completing Endangered Species Act (ESA) consultation analyzing the effects of a U.S. Army Corps of Engineers proposal permitting the reconstruction of a tide gate in the Puget Sound. The Service subsequently issued a biological opinion concluding that the project would cause jeopardy to endangered and threatened salmon and killer whale species.

District 12 amended its complaint in July 2024 to challenge the biological opinion. Months later, on the eve of summary judgment briefing, the Tribe moved to intervene either as of right or on a permissive basis. In December 2024, the district court denied the requests not only as untimely, but also because the Tribe had not asserted legally protectable interests that could be impaired by disposition of the litigation and because the Service adequately represented its interests. Instead of appealing the district court's denial of its request, the Tribe sought (and was granted) the ability to participate as amicus.

Because the Tribe failed to appeal the denial of its motion, appellate review is foreclosed. As in the district court, the Tribe may timely seek to participate as amicus, a request that the Service would not oppose.

1

## BACKGROUND

### A.    The agency action and underlying litigation.

District 12 sought a Clean Water Act permit from the Corps that would enable it to replace three failing tide gates and associated structures in the Puget Sound. Tide gates such as these create physical barriers between water bodies and may have environmental impacts, including modifying the functions that estuaries serve for juvenile salmon. To comply with ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2), the Corps sought formal consultation with the Service about the project's potential impacts on species listed as threatened or endangered under the ESA. In certain circumstances present here, the Service must prepare a biological opinion determining whether the action is likely to jeopardize the continued existence of a listed species; if so, the Service must provide reasonable and prudent alternatives (which can include mitigation) to the proposed project. *See id.* § 1536(a)(2), (b)(3)(A).

When the Service had not yet issued a biological opinion, District 12 filed suit in December 2023, and sought an injunction in February 2024, requiring the Service to issue the biological opinion within 14 days on the basis that the tide gate structure was facing imminent total failure. The district court granted the request in March 2024. ECF No. 15. The Service complied with the court's order by issuing a biological opinion in April 2024. ECF No. 23-1. The Service concluded that proposal is likely to jeopardize the continued existence of listed Puget Sound Chinook salmon and the Southern Resident killer whale, and adversely modify those species' designated critical

2

habitats. The Service selected nearshore and estuarine habitat restoration as a reasonable and prudent alternative that would, if implemented, avoid jeopardy and adverse modification.

On July 2, 2024, District 12 amended its complaint to challenge the biological opinion as arbitrary and capricious under the Administrative Procedure Act and the ESA. District 12 requested declaratory relief that the biological opinion violates those statutes and requested the court vacate and remand the biological opinion. ECF No. 23 at 21-22. The court set a summary judgment briefing schedule on November 8, 2024. ECF No. 31.

### B.    The Tribe's motion to intervene.

The Tribe moved to intervene on November 21, 2024. ECF No. 36. The motion was noted for December 13, 2024, the same day that District 12's summary judgment motion was due. District 12 opposed the Tribe's motion to intervene and the Service took no position.

On December 19, 2024, the court denied the Tribe's requests to intervene both as of right and on a permissive basis. *See* Order, *Skagit County Dike Drainage and Irrigation improvement District No 12 v. National Marine Fisheries Service*, W.D. Wa. No. 2:23-cv-01954-BAT, ECF No. 42 (Dec. 19, 2024). In determining whether an intervenor may intervene as of right under Rule 24(a) of the Federal Rules of Civil Procedure, the court considers whether: (1) the motion is timely; (2) the applicant has a "significantly protectable interest" relating to the subject matter; (3) disposition may

3

impair the movant's ability to protect that interest; and (4) existing parties adequately represent the movant's interest. The district court held that none of those factors supported the Tribe's request to intervene as of right.

The court first held that the requests were untimely because intervention at that stage would delay resolution of the case and cause prejudice to District 12. *Id.* at 4. The court went on to find that the Tribe had not demonstrated a protected legal interest related to District 12's claims. *Id.* at 4-5. The Tribe asserted treaty fishing rights allegedly affected by tide gates in the Skagit Basin and environmental conservation interests. *Id.* at 5. But the Tribe conceded that adjudication of the existence or extent of its treaty rights was not at issue in the litigation and the district court found that its determination of the adequacy of the biological opinion would not impact such rights. *Id.*

The court also held that the Tribe's generalized conservation interests were insufficient to support intervention as of right. *Id.* But even if they were, the connection between the lawsuit and any decrease in protection for fish was too attenuated for such interests to be directly impaired by the lawsuit. *Id.* at 5-6. The court explained that the tide gate exists today and is part of the status quo, and that hypothetical resolution of the case in District 12's favor would result only in a remand to the Service, and not in immediate replacement of the tide gate. *Id.* at 6. Any injury to the Tribe was accordingly speculative. The district court also rejected the request

for intervention as of right on the basis that the Service would adequately represent the Tribe's interests. *Id.* at 6-8.

The court rejected the Tribe's request for permissive intervention as untimely, concluding that intervention would unduly delay resolution of the litigation. *Id.* at 9. The court again noted that the Service could adequately defend the Tribe's interests and that the benefits of intervention were slight, where "resolution hinges on review of the administrative record and [the Service is] in a better position to defend the [biological opinion] and respond to District 12's claims." *Id.* at 9.

### C.    Resolution of the underlying litigation.

The Tribe did not appeal the adverse decision on intervention. Instead, the Tribe requested leave to participate as amici curiae, which the court granted. The Tribe filed an amicus brief. ECF Nos. 48, 49, 50, 55, 56.

After briefing, the court granted summary judgment for the Service, concluding that the Service complied with both the ESA and APA in issuing the biological opinion for the proposed tide gate replacement project. The court issued its decision on April 28, 2025, and entered judgment on June 9, 2025.

District 12 appealed on June 13, 2025. The Tribe moved to intervene in the appeal on June 27, 2025. District 12's opening brief is currently due on September 9, 2025.

## ARGUMENT

The Tribe's motion to intervene on appeal should be denied. The Tribe did not appeal the district court's denial of the motion to intervene. The Tribe's new intervention request on appeal circumvents the normal appeal process and undermines rules governing appellate procedure, and no new circumstances justify intervention at this late stage of appellate review. And the Tribe may seek leave to participate as amicus curiae in order to present its views on appeal and the government would not oppose such a request.

The court's December 2024 denial of the Tribe's motion to intervene was a final, appealable order. *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 69 F.4th 588, 593 (9th Cir. 2023). In the ordinary course, an unsuccessful movant must timely appeal the denial of intervention and succeed on appeal in order to be granted party status. *See, e.g., Hutchinson v. Pfeil*, 211 F.3d 515, 518 (10th Cir. 2000) ("[A]n appeal from the denial of intervention cannot be kept in reserve; it must be taken within thirty days of the entry of the order, or not at all."); *Credit Francais Int'l, S.A. v. Bio-Vita, Ltd.*, 78 F.3d 698, 703 (1st Cir. 1996) (an appeal from a denial of intervention "cannot be kept in reserve; it must be taken within thirty days of the entry of the order, or not at all."); *B.H. by Pierce v. Murphy*, 984 F.2d 196, 199 (7th Cir. 1993) (same); *Polak v. Lebron*, 61 F. App'x 807, 811 (3d Cir. 2003) (same). "Intervention at the appellate stage is . . . unusual and should ordinarily be allowed only for 'imperative reasons.'" *Bates v. Jones*, 127 F.3d 870, 873 (9th Cir. 1997). And "[a]ppellate

intervention is not a means to escape the consequences of noncompliance with traditional rules of appellate jurisdiction and procedure." *Hutchinson v. Pfeil*, 211 F.3d 515, 519 (10th Cir. 2000).

Consideration of the Tribe's new appellate intervention motion would short-circuit the normal appeal process and undermine rules governing appellate procedure. Permitting this practice would give unsuccessful movants an unfair advantage by permitting them to obtain a second bite at the apple while skirting deferential standards of review and allowing a putative party to avoid seeking reversal of the district court's decision. *See, e.g.*, *Richardson v. Flores*, 979 F.3d 1102, 1105 (5th Cir. 2020). This is especially true here, where the Tribe's appellate motion to intervene essentially repeats the assertions that it made in—and were wholly rejected by—the district court. *Compare* ECF No. 36 *with* 9th Cir. ECF No. 7.1. Appellate intervention would enable the Tribe to avoid seeking reversal of the district court's rulings, including the court's conclusion that the Tribe waited too long, and that the Tribe lacked legally protected interests that could be directly impacted by the litigation, among other things.

The Tribe contends that a newly proposed change in the Service's ESA regulations suggests that the Service will no longer adequately represent its interests. The proposed regulation referenced by the Tribe, if finalized, would alter the Services' position as to what acts constitute "take" under the ESA. That is not an issue raised in this appeal; all claims that District 12 raised on summary judgment relate to the

validity of NMFS's jeopardy analysis and the reasonable and prudent alternative set forth in the biological opinion. And even the Tribe acknowledges that the proposed regulatory change does not directly control this case. *See* Tribe's Motion to Intervene at 23. In any event, the Tribe presents no reason in its motion that undermines the sound reasoning and analysis in the court's decision. Nor has it shown any "imperative reasons" to permit intervention.

The better path is for the Tribe to seek leave to participate as amicus curiae in this appeal, as it did in the district court. The government has no objection to the participation of the Tribe in this appeal as amicus curiae provided the Tribe files a timely motion for leave to participate as amicus that complies with applicable rules.

## CONCLUSION

For the foregoing reasons, the Tribe's motion to intervene on appeal should be denied.

Respectfully submitted,

s/ Thekla Hansen-Young
ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*
ROBERT J. LUNDMAN
THEKLA HANSEN-YOUNG
*Attorneys*
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7415
Washington, DC 20044
(202) 307-2710
Thekla.hansen-young@usdoj.gov

July 15, 2025
90-8-6-08694

## CERTIFICATE OF COMPLIANCE

I certify that this motion complies with the requirements of Fed. R. App. P.

27(d) and 32(a)(5) and (6) because it has been prepared in 14-point Garamond, a

proportionally spaced font.

I further certify that this motion complies with the type-volume limitation of

Fed. R. App. P. 27(d)(2) because it contains 1,889 words.

s/ Thekla Hansen-Young
THEKLA HANSEN-YOUNG

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

SKAGIT COUNTY DIKE, DRAINAGE
AND IRRIGATION IMPROVEMENT
DISTRICT No. 12,

              Plaintiff-Appellant,

   v.

NATIONAL MARINE FISHERIES
SERVICE, DEPARTMENT OF
COMMERCE, HOWARD LUTNICK,
EMILY MENASHES,

              Respondents.

No. 25-3757
APA Review/Appeal

**APPELLANT'S RESPONSE
OBJECTING TO SWINOMISH
INDIAN TRIBAL
COMMUNITY'S MOTION TO
INTERVENE**

The Swinomish Indian Tribal Community ("Tribe") unsuccessfully

sought to intervene in this litigation before the district court[1] and did

not appeal that court's decision rejecting its arguments. Instead, in a

transparent and improper attempt to circumvent the rules of appellate

procedure, it has filed a second motion with this Court, arguing

"changed circumstances."  The Tribe's arguments are pretextual

gamesmanship and its motion is procedurally improper and meritless.

---

[1] The parties consented to appearing before the Magistrate Judge, who
was "[e]ffectively presiding as a district judge over the suit." *Robert Ito
Farm, Inc. v. Cnty. of Maui*, 842 F.3d 681, 688 (9th Cir. 2016).

1

The "changed circumstances" the Tribe describes are irrelevant to this appeal. The nature of the Tribe's purported interest has not changed and no evidence suggests that Respondents are unwilling to continue defending the biological opinion ("BiOp"). Quite the opposite. Respondents defended the BiOp *after* the change in presidential administrations. The Tribe also claims recent changes to the definition of "harm" under the Endangered Species Act ("ESA") warrant its intervention now, but that definition is not—and has never been—at issue in this litigation. Even if this Court considers the Tribe's procedurally improper motion, it should deny it on the merits. As the Tribe has repeatedly conceded and insisted, its Treaty rights and any property interest arising under those rights are not at issue in this appeal. Any *relevant* interests the Tribe might have are not new and are—and have been—adequately represented by Respondents.

## I.    BACKGROUND

The No Name Slough Tidegate Replacement Project ("Project") that is the subject of the BiOp involves replacing existing tidegates in a location where tidegates have operated for more than 100 years. ECF

64 at 2.[2] Replacement would not increase the footprint of the existing infrastructure. *Id.* at 9. The only population of ESA-listed fish in the vicinity of the tidegates are the Skagit Chinook population of Puget Sound Chinook. Even with the existing tidegates in place for more than a century, the Skagit Chinook population has increased since the 1970s and natural origin spawner counts between the two most recent five-year review periods for five of the six Skagit populations have experienced a significant, positive increase. ECF 39 at 11–12 (citing NOAASkagitAR0001319–20, 0051210, 0051134–35). As the district court recognized, replacing the existing top-hinged tidegates with side-hinged gates will improve fish passage. ECF 64 at 9.

On December 19, 2023, Skagit County Dike, Drainage and Irrigation Improvement District 12 ("District 12") filed a complaint challenging National Marine Fisheries Service's ("NMFS") failure to meet the statutory deadlines for completing ESA Section 7 consultation on the Project. ECF 1. District 12 sought and was granted a mandatory injunction requiring NMFS to complete consultation. ECF 15. NMFS then issued the BiOp. ECF 64 at 4. On July 2, 2024, District 12

---

[2] "ECF" refers to docket entries in the district court's docket.

3

amended its complaint to challenge the BiOp. ECF 23.

In December 2024, the Tribe moved to intervene. ECF 36. The court denied intervention, finding that none of the four mandatory factors for intervention had been satisfied. ECF 42 at 1. The court also denied permissive intervention. *Id.* The Tribe did not appeal. It later sought, and was granted, leave to file an amicus brief. ECF 55. The court subsequently upheld the BiOp, relying extensively on statements in NMFS's brief that were unsupported by, and contrary to, the administrative record. ECF 64 at 2. District 12 timely appealed and the Tribe filed a second motion to intervene.

## II.  STANDARD OF REVIEW

Although "[n]o statute or rule provides a general standard to apply in deciding whether intervention on appeal should be allowed," the "policies underlying" Federal Rule of Civil Procedure 24 guide the Court's analysis. *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 276–77 (2022). To intervene as of right under Rule 24(a)(2), the Tribe must show: "(1) their motion is timely; (2) they have a significantly protectable interest relating to the property or transaction which is the subject of the action; (3) the disposition of the action may

4

as a practical matter impair or impede their ability to protect that interest; and (4) their interest is inadequately represented by the parties to the action." *E. Bay Sanctuary Covenant v. Biden*, 102 F.4th 996, 1001 (9th Cir. 2024) (internal quotations omitted). The party seeking intervention "bear[s] the burden of showing that these four elements are met." *Id.* Intervention on appeal requires "closer scrutiny" than intervention before the district court. *Id.* at n.2.  "Intervention at the appellate stage is, of course, unusual and should ordinarily be allowed only for 'imperative reasons.'" *Bates v. Jones*, 127 F.3d 870, 873 (9th Cir. 1997) (citation omitted). Preventing "procedural gamesmanship to skirt unfavorable standards of review [requires] a steep threshold for allowing intervention on appeal." *Richardson v. Flores,* 979 F.3d 1102, 1105 (5th Cir. 2020).

## III.  ARGUMENT

The Tribe's motion should be denied on procedural and substantive grounds. The rules of appellate procedure and equitable doctrines prohibit the Tribe's attempt to avoid the consequences of a ruling it failed to appeal. Since the district court denied the Tribe's first motion to intervene, the parties, their interests, and their positions

have not changed. Instead, the Tribe raises previously waived and rejected arguments under a more favorable standard of review than would have applied had it followed the rules of appellate procedure. Its arguments are procedurally improper and fail to meet the applicable legal standards for intervention on appeal.

### A.    The Tribe's Motion is Procedurally Improper

#### 1.    The District Court's Denial of Intervention Was a Final Order That the Tribe Failed to Appeal

Allowing the Tribe to appeal here based on already rejected, irrelevant, and waived arguments would effectively "vitiate[ ]" the "mandatory nature of the [appellate] time limits." *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 315 (1988). The district court's order denying intervention was final and immediately appealable. *United States v. City of Oakland,* 958 F.2d 300, 302 (9th Cir. 1992). The Tribe was required to appeal within 60 days. *See* Fed. R. App. P. 4(a)(B); *Mt. Graham Red Squirrel v. Madigan,* 954 F.2d 1441, 1463 (9th Cir. 1992) (court lacked jurisdiction to review denial of intervention where appeal was filed more than sixty days after the denial).

The Tribe did not appeal. Instead, it filed a second motion on appeal from the court's order on summary judgment in a blatant

attempt to avoid the court's prior ruling. That is precisely the type of procedural gamesmanship federal appellate courts, including the Supreme Court, have warned against. *Cameron,* 595 U.S. at 289 (Kagan, J. concurring) ("litigants should not be allowed to use intervention procedures to end-run jurisdictional rules.").

The Tenth Circuit denied intervention in a nearly identical scenario. In *Hutchinson v. Pfeil*, 211 F.3d 515, 519 (10th Cir. 2000), the district court's order denying intervention was not appealed. The movant intervenor later sought to intervene on appeal. *Id.* The Tenth Circuit concluded the motion was, "in effect, an attempt to obtain appellate review lost by her failure to timely appeal the denial of her motion to intervene in district court" and denied intervention. *Id.* ("Appellate intervention is not a means to escape the consequences of noncompliance with traditional rules of appellate jurisdiction and procedure."). The Federal Circuit reached the same result in *Broadcom Corp. v. Qualcomm Inc.*, 274 F. App'x 866, 867 (Fed. Cir. 2008), finding that "permitting [the applicant] to intervene at this stage would essentially reward its failure to timely challenge the district court's order that denied its motion for leave to intervene." *See also*

7

*Richardson*, 979 F.3d at 1104.  The same is true here. The Tribe's motion is an improper attempt to escape the consequences of noncompliance with traditional rules of appellate jurisdiction and procedure and should be denied.

### 2.    Equitable Doctrines Also Require Denial

As a general matter of equity, parties may not relitigate matters already decided in the same case. *See Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018). "The law-of-the-case doctrine generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Id.* (citations omitted). This Court and others have treated unchallenged decisions on motions to intervene as law of the case. *Crosby v. St. Paul Fire & Marine Ins. Co.*, 15 F.3d 1084 (9th Cir. 1994)*; United States v. Chin*, 913 F.3d 251, 255 (1st Cir. 2019).

Similarly, the Eighth Circuit concluded that res judicata required denial of a movant's attempted participation in a case after the movant had been denied intervention. *See Cheyenne River Sioux Tribe of Indians v. United States*, 338 F.2d 906, 911 (8th Cir. 1964). These equitable doctrines require denial here. The Tribe attempted to

8

intervene. The district court concluded that none of the factors for intervention had been met, including that the Tribe lacked a protectable interest in the litigation. Because the decision was not appealed, the court's conclusions are binding. *Id.*; *see also Slattery v. United States*, 102 Fed. Cl. 27, 31 (2011), *aff'd sub nom. Slattery v. Roth*, 710 F.3d 1336 (Fed. Cir. 2013).

### 3. The Tribe Has Not Identified Relevant "Changed Circumstances"

The Tribe manufactures "changed circumstances," but the circumstances it describes are irrelevant to this case.  First, the Tribe contends its motion is timely because the litigation has proceeded to a different stage. If the natural progression of a case is a "changed circumstance" that justifies departure from a prior determination of untimeliness, the timeliness requirement is meaningless.

Second, the Tribe suggests that NMFS' and U.S. Fish & Wildlife Service's (collectively, "Services") change to the definition of "harm" under the ESA demonstrates lack of adequate representation. Mot. at 22.[3] The definition of "harm" has nothing to do with this case. This

---

[3] "Motion" refers to the Tribe's motion to intervene filed in this appeal.

9

litigation concerns the adequacy of the BiOp under *Section 7* of the ESA, which addresses whether the Project is likely to "jeopardize the continued existence of" a listed species or cause "adverse modification" of critical habitat. 16 U.S.C. § 1536(a)(4), (b)(3). Conversely, the definition of "harm" is relevant to whether there will be "take" of listed species requiring an incidental take statement pursuant to *Section 9* of the ESA. 16 U.S.C. § 1538; 16 U.S.C. § 1532(19) (defining "take" to include "harm"). "Harm," as a component of "take," is a distinct concept under the ESA from "jeopardize the continued existence of" and "adverse modification," which have their own regulatory definitions. 50 C.F.R. § 402.02. Neither Respondents nor the Tribe, participating as amicus, argued below that the adequacy of the BiOp is related to the Services' interpretation of "harm" or even cited that regulatory definition. *See* ECF 47 and 48-1. Thus, the Services' recission of the definition of "harm" is not a "major shift" demonstrating that Respondents no longer adequately represent the interests of the Tribe.

Third, the Tribe claims its tribal treaty rights are a property interest. The Tribe is simply recasting the same purported interests it presented below—tribal treaty rights—as a property interest because

10

the Tribe disagrees with the district court's conclusion that its treaty rights are not a protectable interest in this case. *Compare* Mot. at 12 *with* ECF 36 at 11–13; *see also* ECF 42 at 5. The Tribe's suggestion that it should be allowed to intervene because the district court failed to make an explicit finding on whether the Tribe's treaty rights are property rights is, at best, disingenuous. To the extent that the court failed to address this argument, it is because the Tribe failed to raise, and thus waived, it. *Ad nandus v. King Cnty. Pub. Def. Off.*, 47 F. App'x 832 (9th Cir. 2002). The Tribe's claimed property interest is not a new "condition;" it is simply a new (waived) argument. Changed arguments are not changed circumstances warranting intervention.

## B.   Mandatory Intervention is Not Warranted

If this Court considers the Tribe's arguments, they fail now for the same reasons they previously failed: the Tribe has not met the applicable legal standard for mandatory intervention, which requires a timely motion, a "significantly protectable interest," a showing that disposition of this appeal might impair the Tribe's ability to protect that interest, and a showing that the parties do not adequately represent the Tribe's interest. Fed. R. Civ. P. 24(a); *Sw. Ctr. for Biological Diversity v.*

*Berg*, 268 F.3d 810, 817–18 (9th Cir. 2001).

### 1. The Motion is Untimely

The stage of proceedings, the reason for and length of delay, and prejudice to other parties all weigh against intervention here. *See W. Watersheds Project v. Haaland*, 22 F.4th 828, 835–36 (9th Cir. 2022). First, this case has been pending for a year and a half, and the district court has entered a final judgment. The Tribe claims its motion is timely because it was filed "within the time allowed for the filing of the appeal," Mot. at 11–12, but the case it cites involved a motion to intervene in a new phase of litigation before a district court when the movant had not previously known about the lawsuit. *See W. Watersheds Project*, 22 F.4th at 835–36. Here, the Tribe knew of the lawsuit, did not appeal the district court's denial of its motion and instead seeks to inject itself into appellate proceedings that were foreseeable to the Tribe as part of the "general progression of the case to a close." *See Garza v. Cnty. of L.A.*, 918 F.2d 763, 777 (9th Cir. 1990). Under such circumstances, this Court should not treat the Tribe's motion as timely.

Second, the reason for delay is gamesmanship. Rather than timely appeal the court's denial of intervention under a less favorable standard

of review, the Tribe elected to file a second motion with this Court.

Third, District 12 will be prejudiced by the Tribe's late intervention. Allowing the Tribe to intervene at this late stage would complicate and prolong the litigation by introducing additional briefing and arguments, given that the issues the Tribe now raises—property rights and arguments regarding "harm" under the ESA[4]—were not part of this litigation before the district court. *See, e.g.*, *United States v. State of Wash.*, 86 F.3d 1499, 1504 (9th Cir. 1996).  The Tribe's motion to intervene at this late stage is intended to introduce new issues and thwart any remedy that might be available to District 12 should its appeal succeed. Neither is an appropriate basis for intervention,[5] and both are prejudicial to District 12.

### 2. The Tribe Lacks a Significantly Protectable Interest

To demonstrate a significantly protectable interest, the Tribe must show it has a legally protectable interest and a relationship

---

[4] The Tribe claims it will "vigorously assert that the ESA prohibits harm to listed species through habitat modification." Mot. at 23.
[5] *See E. Bay Sanctuary Covenant*, 102 F.4th at 1001 (disfavoring "putative intervenors who merely seek to attack or thwart a remedy") (quotations omitted).

between that interest and District 12's claims. *Sweet v. Cardona*, 121 F.4th 32, 48 (9th Cir. 2024). The Tribe shows neither.

The Tribe's claimed "federally reserved Treaty right to and property interest in the fish and the habitat" do not amount to a significantly protectable interest *in this case*. Mot. at 12.  As the Tribe has conceded, including in its filings before this Court, and as the district court concluded, the Tribe's treaty rights are not implicated in this case. *See* Decl. of Steve Edwards iso Mot. at 37–38; ECF 42 at 5 ("[D]etermin[ing] the adequacy of the BiOp . . . does not touch on the nature or extent of the Tribe's treaty rights.").  The mere existence of a tribe's treaty rights does not warrant intervention in any and all tangentially related litigation. *Greene v. United States*, 996 F.2d 973, 798 (9th Cir. 1993). In *Greene*, this Court affirmed denial of the Tulalip Tribes' intervention motion, which had asserted that federal recognition of the Samish Tribe would potentially impact the Tulalip Tribes' treaty fishing rights. *Id*. at 975. Because federal recognition was not determinative of the Samish's treaty fishing rights, the Tulalip Tribes lacked a protectable interest. *Id*. at 976. Similarly, here, the adequacy of the BiOp has no impact on the extent of the Tribe's treaty rights.

14

The Tribe also argues for the first time that this litigation affects its property interest. That argument is waived. Regardless, to the extent the Tribe has a property interest, it derives from the Tribe's treaty rights. Just as the Tribe's treaty rights are not at issue in this case, any property interest derived therefrom is not at issue. The BiOp does not determine the extent of the Tribe's property or treaty rights.[6]

### 3.    Disposition of This Appeal Will Not Impair the Tribe's Ability to Protect its Interests

Even if the Tribe had demonstrated a significantly protectable interest, disposition of this appeal will not impair that interest. Although the Tribe contends "a ruling in Appellant's favor would almost certainly result in significantly less mitigation," Mot. at 16, the connection between this lawsuit and any potential decrease in mitigation for fish is far too attenuated to warrant intervention. Even if District 12 succeeds on appeal, the only available remedy is remand to NMFS, which might or might not require different mitigation. Any injury to the Tribe is speculative and would result from a separate

---

[6] The tidegates exist today. The Project will *improve* fish passage relative to the existing configuration. ECF 64 at 9.  The harm to fish that the Tribe claims is based on the fallacy that absent the Project, the existing tidegates would no longer exist.

future administrative process. Such attenuated and speculative possibilities do not establish a "direct, substantial, legally protectable interest in this lawsuit." *Ctr. For Biological Diversity v. U.S. E.P.A.,* 2014 WL 636829, at *5 (W. D. Wash. Feb. 18, 2014).

The Tribe will also be able to participate in any future administrative process for the Project, including for any BiOp prepared on remand. *See S.F. Baykeeper v. U.S. Fish & Wildlife Serv.*, 2021 WL 3426961, at *6–7 (N. D. Cal. Aug. 5, 2021); *Ctr. For Biological Diversity*, 2014 WL 636829, at *9. Finally, if dissatisfied with a revised BiOp, the Tribe can challenge it. There is absolutely no risk of harm from *this proceeding* to any of the Tribe's claimed interests.

### 4.   Adequacy of Representation

The district court properly concluded that Respondents adequately represent the interests of the Tribe. The Tribe now claims it has a property right to fish that presents a distinct interest from Respondents' broad public obligations, but that fails because the Tribe's treaty rights, and any property interest arising thereunder, are not at issue here. ECF 42 at 7.  The Tribe's reliance on *W. Watersheds Project*, 22 F. 4th at 842, is misplaced. There, the court found that the

16

intervenor was not adequately represented because it had a property interest in the lease that was the subject of the legal challenge. *Id*. Here, the Tribe's asserted property interest is not in the BiOp and is not the subject of (or at issue in) this case.

This Court has also held in other contexts that "the United States, based on its trust relationship with Indian tribes, generally may 'adequately represent an Indian tribe unless there exists a conflict of interest between the United States and the tribe.'" *Jamul Action Comm. v. Simermeyer*, 974 F.3d 984, 997 (9th Cir. 2020) (quoting *Sw. Ctr. for Biological Diversity v. Babbitt*, 150 F.3d 1152, 1154 (9th Cir. 1998)). There is no conflict here. The BiOp's jeopardy conclusion aligns with the Tribe's asserted interests.

Next, the Tribe suggests that the Services' change to the definition of "harm" demonstrates lack of adequate representation. Mot. at 18. As explained above, this change is not relevant to this case.

The Tribe also suggests that "[w]hen the United States changes its position and declines to defend its challenged action," it may change whether the movant is adequately represented. *Id*. at 10. But Respondents have not changed their position and there is no evidence

17

they intend to. The Tribe's speculative fears do not demonstrate inadequacy of representation. *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983) ("[T]he mere change from one presidential administration to another . . . should not give rise to intervention as of right in ongoing lawsuits"); *United States v. City of L.A.*, *Cal.*, 288 F.3d 391, 403 (9th Cir. 2002) (same).

Finally, the Tribe cites *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995), and *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893 (9th Cir. 2011), to suggest that intervention may be warranted when the proposed intervenor had to pursue legal advocacy to force a federal agency to take a position. Mot. at 19. The Tribe does not claim that it forced NMFS to reach the conclusions that it did in the BiOp.

Instead, the Tribe points to a lawsuit it brought nearly twenty years ago against another district for unauthorized take of listed species. *Id*. at 20, citing *Swinomish Indian Tribal Cmty. v. Skagit Cnty. Dike Dist. No. 22*, 618 F. Supp. 2d 1262 (W.D. Wash. 2008). That lawsuit did not involve NMFS or any allegation that NMFS was incorrectly carrying out its ESA Section 7 consultation responsibilities.

18

Next, the Tribe suggests that NMFS was reluctant to reinitiate consultation on a programmatic biological opinion for the Tidegate and Fish Initiative ("TFI")—a biological opinion not at issue here. Any delay in reinitiating consultation on the TFI is not probative of whether NMFS will defend this BiOp. Regardless, Respondents did what the Tribe asked: following a notice of intent to sue on the TFI, NMFS required the U.S. Army Corps of Engineers to reinitiate consultation and began requiring project-specific consultations for tidegate repairs. *See* ECF 42 at 8.

As the district court found, Respondents are capable and willing to make any relevant arguments that the Tribe would make. *Id*. Ultimately, the Tribe and Respondents have the same objective on appeal: affirmance of the BiOp. "Where an applicant for intervention and an existing party 'have the same *ultimate objective*, a presumption of adequacy of representation arises.'" *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1305 (9th Cir. 1997) (emphasis in original) (quoting *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 838 (9th Cir.1996)). A presumption of adequacy also exists when the government is acting on behalf of a constituency it represents. *City of*

19

*L.A.*, 288 F.3d at 402. The Tribe has failed to overcome these presumptions. "NMFS's unmatched expertise and familiarity with the issues makes NMFS best positioned to defend a suit over alleged defects in its own administrative proceedings," ECF 42 at 7 (quotation omitted), and there is no evidence to indicate that NMFS is reluctant to do so.

### C.    Permissive Intervention Should be Denied

The Tribe's assertion that permissive intervention is warranted fails for three reasons. First, the Court may allow permissive intervention only when the intervention is timely. Fed. R. Civ. P. 24(b)(1). As discussed above, the Tribe's second motion for intervention is untimely.  Second, benefits of intervention are especially slight on review of the administrative record where the agency is in a better position to respond to the claims. *See* S.*F. Baykeeper*, 2021 WL 3426961, at *7.  Third, as described above, any contribution to the case the Tribe would make beyond the arguments raised by Respondents would distract from relevant issues.

## IV.   CONCLUSION

For the foregoing reasons, District 12 respectfully asks this Court to deny the Tribe's Motion to Intervene.

Dated: July 15, 2025.

Respectfully submitted,

*/s/ Charlene Koski*
Charlene Koski
Jenna R. Mandell-Rice
Sophia E. Amberson
Tyson C. Kade
Van Ness Feldman LLP
1191 Second Avenue, Suite 1800
Seattle, WA 98101
T: 206-623-9372
E: ckoski@vnf.com; jrm@vnf.com
samberson@vnf.com; tck@vnf.com

*Counsel for Appellant Skagit County Dike, Drainage, and Irrigation Improvement District No. 12*

## CERTIFICATE OF COMPLIANCE

I certify that this motion complies with the requirements of Fed. R. App. P. 27(d) and 32(a)(5) and (6) because it has been prepared in a 14-point proportionally spaced font.

I further certify that this motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 20 pages.

*/s/ Charlene Koski*
Charlene Koski
Van Ness Feldman LLP
1191 Second Avenue, Suite 1800
Seattle, WA 98101
T: 206-623-9372
E: ckoski@vnf.com

*Counsel for Appellant Skagit County
Dike, Drainage, and Irrigation
Improvement District No. 12*

1

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated at Seattle, Washington, this 15th day of July, 2025.

/s/ Charlene Koski
Charlene Koski
Van Ness Feldman LLP
1191 Second Avenue, Suite 1800
Seattle, WA 98101
T: 206-623-9372
E: ckoski@vnf.com

*Counsel for Appellant Skagit County Dike, Drainage, and Irrigation Improvement District No. 12*

1

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| Skagit County Dike Drainage and Irrigation Improvement District No 12, | Case No. 25-3757 |
| | APA Review/Appeal |
| Appellant, | |
| | **SWINOMISH INDIAN TRIBAL** |
| v. | **COMMUNITY'S REPLY ON** |
| | **MOTION TO INTERVENE AS AN** |
| National Marine Fisheries Service, Department of Commerce, Howard Lutnick, and Emily Menashes, | **INTERVENOR-APPELLEE** |
| | |
| Appellees. | |

Filed by:
Wyatt Golding
Ziontz Chestnut LLP
2101 4th Avenue, Suite 1230
Seattle, WA 98121
(206) 448-1230
wgolding@ziontzchestnut.com

Emily Haley
Swinomish Indian Tribal Community
11404 Moorage Way
La Conner, WA 98257
(360) 466-1134
ehaley@swinomish.nsn.us

*Attorneys for Proposed Intervenor Swinomish Indian Tribal Community*

## I.     Introduction

Swinomish Indian Tribal Community ("Swinomish" or "Tribe"), hereby files a joint reply to the responses submitted by Appellant Dike District 12 ("District") and Appellee National Marine Fisheries Service and associated federal defendants ("NMFS").

It is black-letter law that intervention is considered at the instant stage of the proceeding.  The Tribe did not appeal denial before the district court because at that time there were legitimate concerns as to timing and delay of proceedings, and the Tribe was assured that NMFS would fully defend the challenged Biological Opinion ("BiOp").

Both circumstances have changed.  NMFS has dramatically shifted its interpretation of the scope of habitat protection mandated by the Endangered Species Act ("ESA") and now opposes the Tribe intervening.  Additionally, NMFS has entered into mediation with the District, raising risk that if the Tribe is not a party it will be unable to protect its significant legal interests in the fish and habitat at issue.  The Tribe meets all the criteria for intervention as of right and permissive intervention.

## II.    Argument

### A. The Tribe's Motion to Intervene is Procedurally Appropriate Because a Motion to Intervene is Determined at the Instant Stage of Proceedings.

For sound legal and policy reasons, intervention is considered at the "stage

1

of the proceeding at which an applicant seeks to intervene," taking into account parties' and proposed intervenor's positions and changed circumstances. *United States v. Alisal Water Corp.*, 370 F.3d 915, 921 (2004). Rule 24 directs courts to examine how a proposed intervenor is "so situated" at the time of the motion and the positions of the "existing parties." Fed. R. Civ. Proc. 24(a)(2). Accordingly, "intervention [is] analyzed in relation to the current stage of proceedings[.]" *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 529 (9th Cir. 1983).

In *Arizona v. California*, the Supreme Court granted intervention to five tribes decades into the case and years after decrees were entered, despite that the United States represented the tribes' interests and the Court had previously denied a motion to intervene by three of the tribes. 460 U.S. 605 (1983), *decision supplemented*, 466 U.S. 144 (1984). The Court observed, "[t]he Tribes do not seek to bring new claims or issues … but only ask leave to participate in an adjudication of their vital water rights[.]" *Id*. at 614. The Court continued:

> …the Indians' participation in litigation critical to their welfare should not be discouraged. The States have failed to present any persuasive reason why their interests would be prejudiced or this litigation unduly delayed by the Tribes' presence. The Tribes' motions to intervene are sufficiently timely with respect to this phase of the litigation.

*Id*. at 614-15 (internal quotation and citations omitted).

Both the District and NMFS fail to present persuasive reasons why their interests would be prejudiced by the Tribe's intervention and acknowledge that

2

intervention on appeal is allowable.  *See* NMFS Resp. (ECF 11.1) at 6 (citing *Bates v. Jones*, 127 F.3d 870, 873 (9th Cir. 1997)); Dist. Resp. (ECF 12.1) at 5 (same). Lacking controlling authority, the District points to out-of-circuit, non-binding cases that turned on specific factual circumstances of those cases and are inapposite here.  For example, *Cheyenne River Sioux Tribe of Indians v. United States* is distinguishable because there a tribe was denied intervention and subsequently sought to be declared an indispensable party under Rule 19 before the *same court* based on "identical questions and issues[.]" 338 F.2d 906, 911 (8th Cir. 1964).  Likewise, *Hutchinson v. Pfeil*, 211 F.3d 515 (10th Cir. 2000) involved multiple prospective intervenors and "[n]othing stated in their conclusory motion or inherent in the surrounding circumstances suggests the requisite justification for … intervention on appeal."  *Id*.

By contrast, here the Tribe comprehensively identifies "the surrounding circumstances" giving rise to the "requisite justification" for intervention on appeal.  *Id*.  As the Supreme Court has stated, "the Indians' participation in litigation critical to their welfare should not be discouraged."  *Arizona*, 460 U.S. at 615.

## B. Circumstances Have Materially Changed Such That the Tribe Is Not Adequately Represented by NMFS.

This Court has made clear that "the requirement of inadequacy of representation is satisfied if the applicant shows that representation of its interests

'may be' inadequate and that the burden of making this showing is

minimal." *Sagebrush*, 713 F.2d at 528 (quoting *Trbovich v. United Mine*

*Workers*, 404 U.S. 528, 538 n.10 (1972); *Legal Aid Society of Alameda County v.*

*Dunlop,* 618 F.2d 48, 50 (9th Cir.1980).

The "potential inadequacy of representation" may come "into existence only

at the appellate stage." *Smoke v. Norton*, 252 F.3d 468, 471 (D.C. Cir. 2001)

(citations omitted).  Where federal parties take "actions out of step with their

original position, demonstrating they will not adequately represent …

[i]ntervenors' interests[,]" courts should "reconsider [an] earlier denial of

intervention … and grant [i]ntervenors' renewed request to intervene in light of the

government's subsequent actions." *Franciscan All. v. Azar*, 414 F. Supp. 3d 928,

935 (N.D. Tex. 2019) (internal quotations and modification omitted).

Developments since the trial court's decision constitute changed

circumstances demonstrating that NMFS does not adequately represent the Tribe's

interest.  Most significantly, NMFS has formally proposed to rescind the regulatory

definition of "harm" as a form of prohibited take under the ESA, reversing decades

of regulatory stability (*see* 50 CFR § 222.102) and contravening *Babbitt v. Sweet*

*Home Chapter of Communities for a Great Oregon,* 515 U.S. 687 (1995).  *See* 90

Fed. Reg. 16102, Rescinding the Definition of "Harm" Under the Endangered

Species Act (April 17, 2025).  NMFS's new legal position is that the definition of

harm, which prohibits "significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering," is no longer a defensible reading of ESA Section 9. This new position radically diverges from the long-standing interpretation of the ESA and the arguments the Tribe would present in this appeal.

The District contends that terms "take" and "harm" are isolated to ESA Section 9 and have no relevance here. *See* District Response at 9-10. While the District is correct that the adequacy of the challenged BiOp does not rise and fall on the "take" definition, the extent and scope of incidental "take," including that caused by "harm," is a sufficiently critical issue in this litigation that it renders NMFS' ability to represent the Tribe's interests inadequate.

According to the ESA Section 7 Consultation Handbook jointly published by NMFS, determination of the extent of incidental take is a part of analysis of "effects of the action" under 16 U.S.C. § 1536(a)(2). In "[a]nalyses for effects of the action" in a biological opinion, NMFS provides that "[i]f the analyses for this section determine that some individuals of a listed animal might be 'taken' as a direct or indirect result of the proposed action, that information is included in the incidental take statement."[1] Handbook at 4-26. The Consultation Handbook

---

[1] The Handbook is regularly relied upon by courts, *see, e.g., San Luis & Delta-*

extensively discusses "incidental take," and attaches as an appendix the *Babbitt v. Sweet Home* decision that NMFS now disavows.  *Id.* at 4-46 to 47.

At the culmination of ESA Section 7 consultation, the Secretary must consider, *inter alia*, "the taking of an endangered species or a threatened species incidental to the agency action."  16 U.S.C. § 1536(b)(4)(B).  Then, the Secretary provides an "Incidental Take Statement," which, inter alia, "specifies the impact of such incidental taking on the species," and "specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact…."  16 U.S.C. § 1526(b)(4)(C).

The challenged BiOp cites and discusses the regulatory definition of "harm" - which NMFS has since proposed to rescind – as part of its rationale and the associated incidental take statement.  *See* AR 0051252-53 (citing 50 CFR § 222.102).  The BiOp details that incidental take from the District's proposed tidegate is anticipated to include: "Harm of juvenile and adult PS Chinook salmon and PS steelhead resulting from impeded access to, and degradation of estuarine habitat, including from high water temperatures, low dissolved oxygen, salinity changes, and reduced forage."  AR 0051253.  The BiOp references incidental take (and by association relies upon the harm rule that NMFS proposes to rescind)

---

*Mendota Water Auth. v. Jewell*, 747 F.3d 581, 634 (9th Cir. 2014), and is available here:  https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf

dozens of times, including throughout its reasonable and prudent measures, terms and conditions, and reinitiation of consultation provisions. *See* AR0051255-58.

It is now far from assured that NMFS will make the same arguments as the Tribe in defending the BiOp and its assessment of habitat degradation as causing harm to listed species. If the Tribe is not allowed to intervene, it may be forced to watch NMFS abandon core legal principles integral to protecting the Tribe's rights without any recourse. If allowed to intervene, the Tribe would provide necessary elements to the proceedings—among them an unequivocal science-based assertion that habitat degradation does in fact "take" listed species, including protected Chinook salmon. Intervention is required. *Shermoen v. United States*, 982 F.2d 1312, 1318 (9th Cir. 1992).

While Appellees dismiss the importance of the "harm" rule rescission, additional changed circumstances confirm lack of adequate representation by NMFS. Executive Order titled "Initial Rescissions of Harmful Executive Orders and Actions," January 20, 2025, rescinds orders directing consideration of the impacts of climate change. The challenged BiOp states that "[o]ne factor affecting the status of ESA-listed species considered in this opinion, and aquatic habitat at large, is climate change." AR0051123. The Tribe strongly supports this conclusion; NMFS may no longer recognize the impacts of climate change in the same manner.

Finally, the District and NMFS are engaged in active mediation to settle the appeal. NMFS now opposes the Tribe's intervention, in contrast to its position below. *See* NMFS Resp. at 3.

As an independent sovereign and adjudicated Co-manager of fisheries and their habitat, the Tribe offers a materially different perspective and expertise apart from NMFS – a divergence critically heightened by NMFS' changed positions relevant to this case.

## C. The Tribe's Treaty Rights to Fish are a Significantly Protectable Interest that Disposition of this Litigation May Impair.

The "significant protectable interest" prong of the intervention analysis requires a showing that a proposed intervenor possesses an "interest [that] is protected by law and there is a relationship between the legally protected interest and the … claims" in the case. *Alisal*, 370 F.3d at 919. Appellees mistake the assertion of legal *claims*, which the Tribe expressly does not assert, with *significantly protectable interests* under Rule 24(a)(2), which the Tribe possesses. District Resp. at 14.

A prospective intervenor "has a sufficient interest for intervention purposes if it will suffer a practical impairment of its interests as a result of the pending litigation." *Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011) (citing *California ex rel. Lockyer v. United States,* 450 F.3d 436, 441 (9th Cir.2006)). "Rule 24(a)(2) does not require a specific legal or equitable interest …

8

'the 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process.'" *Wilderness Soc.*, 630 F.3d at 1179 (citation omitted).

In *Sagebrush*, for example, this Court readily found that a coalition of conservation nonprofit organizations demonstrated a significant protectable interest for intervention given that they were "devoted to the protection of birds and other animals and their habitats." 713 F.2d at 526. Because an "adverse decision in this suit would impair the [nonprofits'] interest in the preservation of birds and their habitats[,]" there was "no serious dispute" that the nonprofits demonstrated "a protectable interest … which may, as a practical matter, be impaired." *Id*. at 528.

The Tribe clearly meets the threshold for demonstrating a significantly protectable interest. As Co-manager of and Treaty rights-holder to these fish and habitat, the Tribe's interest is well beyond the intervenors in *Sagebrush*. The Tribe has relied on these fish stocks for cultural, subsistence, economic and spiritual purposes since time immemorial, *see* Decl. of Edwards pars. 2-6, with rights memorialized in the Treaty of Point Elliott and adjudicated by federal courts. *United States v. Washington*, 459 F. Supp. 1020, 1039, 1049 (W.D. Wash. 1975).

Appellee incorrectly argues that "the connection between this lawsuit and any potential decrease in mitigation for fish is far too attenuated to warrant intervention." District response at 15-16. Unlike in the cases relied upon by

Appellees, here the Tribe's Treaty rights to fish and habitat are directly implicated in the pending appeal and the effect of a potential ruling. The District seeks a determination that existing deteriorating tidegates that cause harm to the Tribe's Treaty rights by blocking fish access 50% of the time should be considered a permanent part of the "environmental baseline" for purposes of ESA regulation. If the Court accepts that argument, the resulting ruling would significantly limit the scope of Project effects for purposes of ESA section 7 analyses and associated mitigation, with resulting harm to the Tribe's Treaty rights to fish and their habitat. While the District argues the Tribe could challenge some future BiOp, District response at 16, at that point this Court will have already issued binding precedent, and intervention at this stage is intended to prevent just such inefficiencies. *Wilderness Soc.*, 630 F.3d at 1179.

### D. Permissive Intervention Would be Just and Warranted.

The Tribe has a fundamentally important legal right and practical stake in these proceedings. The record demonstrates that the Tribe has been integral to advancing the protection of estuary habitat for decades, through litigation, the Tidegate Fish Initiative, extensive scientific research, and co-authoring the NMFS-approved Skagit Chinook Recovery Plan. The Tribe's Reservation is within two miles of the Project. The Tribe has a unique and valuable perspective to bring to this case, and seeks to be a party in order to defend its legal rights, participate in

the pending mediation, have a right to seek rehearing or petition for certiorari, and participate in any remand to the district court.

Appellee argues that permissive intervention should be denied because "any contribution to the case the Tribe would make beyond the arguments raised by Respondents would distract from relevant issues." District response at 20. Untrue, and distraction is not the standard. This Court favors intervention and open presentation of all relevant issues in the interests of justice. "A liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts. By allowing parties with a *practical* interest in the outcome of a particular case to intervene, we often prevent or simplify future litigation involving related issues; at the same time, we allow an additional interested party to express its views before the court." *United States v. City of Los Angeles, Cal.*, 288 F.3d 391, 397–98 (9th Cir. 2002) (citation omitted) (emphasis in original).

To the extent there is any prejudice or delay from the Tribe's participation, it can properly be addressed through reasonable limiting measures to the briefing pages or schedule, not denial of party status. *See, e.g.*, *Def. of Wildlife v. U.S. Fish and Wildlife Serv.*, Nos. 21-cv-00344-JSW, 21-cv-00349-JSW, 21-cv-00561-JSW, 2012 WL 4552144, at *4 (N.D. Cal. May 3, 2021) (requiring intervenors to "endeavor in good faith to avoid duplicative briefing of matters already covered in Federal Defendants' briefs").

11

### III.    Conclusion

Intervention should be granted.


Dated this 25th day of July, 2025.

s/Wyatt Golding
Wyatt Golding
Ziontz Chestnut LLP
2101 4th Avenue, Suite 1230
Seattle, WA 98121
(206) 448-1230
wgolding@ziontzchestnut.com


Emily Haley
Swinomish Indian Tribal Community
11404 Moorage Way
La Conner, WA 98257
(360) 466-1134
ehaley@swinomish.nsn.us

*Attorneys for Proposed Intervenor*
*Swinomish Indian Tribal Community*


CERTIFICATE OF COMPLIANCE

Pursuant to FRAP 32(g)(1), I certify that this document contains 2,551

words, in compliance with the type-volume limitation.

s/Wyatt Golding
Wyatt Golding
Ziontz Chestnut LLP
2101 4th Avenue, Suite 1230
Seattle, WA 98121
(206) 448-1230

wgolding@ziontzchestnut.com
*Attorney for Proposed Intervenor Swinomish*
*Indian Tribal Community*

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

AUG 14 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| SKAGIT COUNTY DIKE DRAINAGE AND IRRIGATION IMPROVEMENT DISTRICT NO 12, | No. 25-3757 |
| Plaintiff - Appellant, | D.C. No. 2:23-cv-01954-BAT Western District of Washington, Seattle |
| v. | ORDER |
| NATIONAL MARINE FISHERIES SERVICE; et al., | |
| Defendants - Appellees, | |
| ---------------------------------------- SWINOMISH INDIAN TRIBAL COMMUNITY, | |
| Intervenor - Pending. | |

Counsel for appellee shall provide a status report by email to the Circuit

Mediator (Jonathan_Westen@ca9.uscourts.gov), copied to all counsel, by

September 4, 2025. Counsel are requested to include the Ninth Circuit case name

and number in the subject line. The status report should not be filed with the court.

The briefing schedule previously set by the court is amended as follows: the

opening brief is due October 9, 2025; the answering brief is due November 10,

2025; the optional reply brief is due within 21 days from the service date of the

answering brief.

FOR THE COURT:


By: Jonathan Westen
Circuit Mediator

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

SEP 10 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS



| | |
|---|---|
| SKAGIT COUNTY DIKE DRAINAGE AND IRRIGATION IMPROVEMENT DISTRICT NO 12, | No. 25-3757 |
| Plaintiff - Appellant, | D.C. No. 2:23-cv-01954-BAT Western District of Washington, Seattle |
| v. | ORDER |
| NATIONAL MARINE FISHERIES SERVICE; et al., | |
| Defendants - Appellees, | |
| --------------------------------------- | |
| SWINOMISH INDIAN TRIBAL COMMUNITY, | |
| Intervenor - Pending. | |

Counsel for all parties shall provide a status report by email to the Circuit

Mediator (Jonathan_Westen@ca9.uscourts.gov), copied to all counsel, by

September 12, 2025. Counsel are requested to include the Ninth Circuit case name

and number in the subject line. The status report should not be filed with the court.

FOR THE COURT:

By: Jonathan Westen
Circuit Mediator

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT



**FILED**

SEP 24 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| SKAGIT COUNTY DIKE DRAINAGE AND IRRIGATION IMPROVEMENT DISTRICT NO 12, | No. 25-3757 |
| Plaintiff - Appellant, | D.C. No. 2:23-cv-01954-BAT Western District of Washington, Seattle |
| v. | ORDER |
| NATIONAL MARINE FISHERIES SERVICE; et al., | |
| Defendants - Appellees, | |
| -------------------------------------- | |
| SWINOMISH INDIAN TRIBAL COMMUNITY, | |
| Intervenor - Pending. | |

Before: SUNG and H.A. THOMAS, Circuit Judges.

The motion (Docket Entry No. 7) to intervene as an appellee is granted. *See Bates v. Jones*, 127 F.3d 870, 873 (9th Cir. 1997) (discussing intervention on appeal).

Intervenor's answering brief is due 30 days after the date the opening brief is filed.

The existing briefing schedule remains otherwise in effect.