# ADDENDUM OF AUTHORITIES

**Code of Federal Regulations**

50 C.F.R. § 402.02 (2019) …………………………………….… A-2

84 Fed. Reg. 44976 (Aug. 27, 2019) [excerpt] ……………..…… A-6

**Other Authorities**

U.S. Fish & Wildlife Service and National Marine Fisheries Service, *Endangered Species, Consultation Handbook* (Mar. 1988), available at https://www.fws.gov/media/endangered-species-consultation-handbook [excerpt] ……………..………… A-10

Code of Federal Regulations
   Title 50. Wildlife and Fisheries
      Chapter IV. Joint Regulations (United States Fish and Wildlife Service, Department of the Interior and National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Department of Commerce); Endangered Species Committee Regulations
        Subchapter A
          Part 402. Interagency Cooperation—Endangered Species Act of 1973, as Amended (Refs & Annos)
            Subpart A. General

This section has been updated. Click here for the updated version.

50 C.F.R. § 402.02

§ 402.02 Definitions.

Effective: October 28, 2019 to May 5, 2024

Act means the Endangered Species Act of 1973, as amended, 16 U.S.C. 1531 et seq.

Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to:

(a) actions intended to conserve listed species or their habitat;

(b) the promulgation of regulations;

(c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or

(d) actions directly or indirectly causing modifications to the land, water, or air.

Action area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action.

Applicant refers to any person, as defined in section 3(13) of the Act, who requires formal approval or authorization from a Federal agency as a prerequisite to conducting the action.

Biological assessment refers to the information prepared by or under the direction of the Federal agency concerning listed and proposed species and designated and proposed critical habitat that may be present in the action area and the evaluation potential effects of the action on such species and habitat.

Biological opinion is the document that states the opinion of the Service as to whether or not the Federal action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

Conference is a process which involves informal discussions between a Federal agency and the Service under section 7(a)(4) of the Act regarding the impact of an action on proposed species or proposed critical habitat and recommendations to minimize or avoid the adverse effects.

Conservation recommendations are suggestions of the Service regarding discretionary measures to minimize or avoid adverse effects of a proposed action on listed species or critical habitat or regarding the development of information.

Critical habitat refers to an area designated as critical habitat listed in 50 CFR parts 17 or 226.

Cumulative effects are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation.

Designated non-Federal representative refers to a person designated by the Federal agency as its representative to conduct informal consultation and/or to prepare any biological assessment.

Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species.

Director refers to the Assistant Administrator for Fisheries for the National Marine Fisheries Service, or his or her authorized representative; or the Director of the U.S. Fish and Wildlife Service, or his or her authorized representative.

Early consultation is a process requested by a Federal agency on behalf of a prospective applicant under section 7(a)(3) of the Act.

Effects of the action are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action. (See § 402.17).

Environmental baseline refers to the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. The consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline.

Formal consultation is a process between the Service and the Federal agency that commences with the Federal agency's written request for consultation under section 7(a)(2) of the Act and concludes with the Service's issuance of the biological opinion under section 7(b)(3) of the Act.

Framework programmatic action means, for purposes of an incidental take statement, a Federal action that approves a framework for the development of future action(s) that are authorized, funded, or carried out at a later time, and any take of a listed species would not occur unless and until those future action(s) are authorized, funded, or carried out and subject to further section 7 consultation.

Incidental take refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant.

Informal consultation is an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non-Federal representative prior to formal consultation, if required.

Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.

Listed species means any species of fish, wildlife, or plant which has been determined to be endangered or threatened under section 4 of the Act. Listed species are found in 50 CFR 17.11–17.12.

Major construction activity is a construction project (or other undertaking having similar physical impacts) which is a major Federal action significantly affecting the quality of the human environment as referred to in the National Environmental Policy Act [NEPA, 42 U.S.C. 4332(2)(C)].

Mixed programmatic action means, for purposes of an incidental take statement, a Federal action that approves action(s) that will not be subject to further section 7 consultation, and also approves a framework for the development of future action(s) that are authorized, funded, or carried out at a later time and any take of a listed species would not occur unless and until those future action(s) are authorized, funded, or carried out and subject to further section 7 consultation.

Preliminary biological opinion refers to an opinion issued as a result of early consultation.

Programmatic consultation is a consultation addressing an agency's multiple actions on a program, region, or other basis. Programmatic consultations allow the Services to consult on the effects of programmatic actions such as:

(1) Multiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas; and

(2) A proposed program, plan, policy, or regulation providing a framework for future proposed actions.

Proposed critical habitat means habitat proposed in the Federal Register to be designated or revised as critical habitat under section 4 of the Act for any listed or proposed species.

Proposed species means any species of fish, wildlife, or plant that is proposed in the Federal Register to be listed under section 4 of the Act.

Reasonable and prudent alternatives refer to alternative actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, that is economically and technologically feasible, and that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.

Reasonable and prudent measures refer to those actions the Director believes necessary or appropriate to minimize the impacts, i.e., amount or extent, of incidental take.

Recovery means improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act.

Service means the U.S. Fish and Wildlife Service or the National Marine Fisheries Service, as appropriate.

**Credits**

[73 FR 76286, Dec. 16, 2008; 74 FR 20422, May 4, 2009; 80 FR 26844, May 11, 2015; 81 FR 7225, Feb. 11, 2016; 84 FR 45016, Aug. 27, 2019; 84 FR 50333, Sept. 25, 2019]

SOURCE: 51 FR 19957, June 3, 1986, unless otherwise noted.

AUTHORITY: 16 U.S.C. 1531 et seq.

**End of Document**                                      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

# DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

### 50 CFR Part 402

[Docket No. FWS–HQ–ES–2018–0009; FXES11140900000–189–FF09E300000; Docket No. 180207140–8140–01; 4500090023]

RIN 1018–BC87; 0648–BH41

### Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation

**AGENCY:** U.S. Fish and Wildlife Service (FWS), Interior; National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration, Commerce.

**ACTION:** Final rule.

**SUMMARY:** FWS and NMFS (collectively referred to as the "Services" or "we") revise portions of our regulations that implement section 7 of the Endangered Species Act of 1973, as amended ("Act"). The revisions to the regulations clarify, interpret, and implement portions of the Act concerning the interagency cooperation procedures.

**DATES:** This final rule is effective on September 26, 2019.

**ADDRESSES:** This final rule is available on the internet at *http://www.regulations.gov* at Docket No. FWS–HQ–ES–2018–0009. Comments and materials we received on the proposed rule, as well as supporting documentation we used in preparing this rule, are available for public inspection at *http://www.regulations.gov*.

**FOR FURTHER INFORMATION CONTACT:** Gary Frazer, U.S. Fish and Wildlife Service, Department of the Interior, Washington, DC 20240, telephone 202/208–4646; or Samuel D. Rauch, III, National Marine Fisheries Service, Department of Commerce, 1315 East-West Highway, Silver Spring, MD 20910, telephone 301/427–8000. If you use a telecommunications device for the deaf (TDD), call the Federal Relay Service at 800–877–8339.

**SUPPLEMENTARY INFORMATION:**

## Background

Title 50, part 402, of the Code of Federal Regulations establishes the procedural regulations governing interagency cooperation under section 7 of the Act, which requires Federal agencies, in consultation with and with the assistance of the Secretaries of the Interior and Commerce (the "Secretaries"), to insure that any action authorized, funded, or carried out by such agencies is not likely to jeopardize the continued existence of endangered or threatened species or result in the destruction or adverse modification of critical habitat of such species.

On July 25, 2018, the Services published a proposed rule to amend our regulations that implement section 7 of the Act (83 FR 35178). The proposed rule addressed alternative consultation mechanisms; the definitions of "destruction or adverse modification" and "effects of the action"; certainty of measures proposed by action agencies to avoid, minimize, or offset adverse effects; and other improvements to the consultation process. The proposed rule also sought comment on: The advisability of addressing several other issues related to implementing section 7 of the Act; the extent to which the proposed changes outlined would affect timeframes and resources needed to conduct consultation; anticipated cost savings resulting from the proposed changes; and any other specific changes to any provisions in part 402 of the regulations. The proposed rule requested that all interested parties submit written comments on the proposal by September 24, 2018. The Services also contacted Federal and State agencies, certain industries regularly involved in Act section 7(a)(2) consultation, Tribes, nongovernmental organizations, and other interested parties and invited them to comment on the proposal.

In this final rule, we focus our discussion on changes from the proposed regulation revisions, including changes based on comments we received during the comment period. For background relevant to these regulations, we refer the reader to the proposed rule (83 FR 35178, July 25, 2018).

This final rule is one of three related final rules that the agencies are publishing in this issue of the **Federal Register.** All of these documents finalize revisions to various regulations that implement the Act. The revisions to the regulations in this rule are prospective; they are not intended to require that any previous consultations under section 7(a)(2) of the Act be reevaluated at the time this final rule becomes effective (see **DATES**, above).

## Final Regulatory Revisions

### Discussion of Changes From Proposed Rule

Below, we discuss the changes between the proposed regulatory text and regulatory text that we are finalizing with this rule. We did not revise the regulatory text between the proposed and final rules for the definitions of "Destruction or adverse modification," "Director," and "Programmatic consultation". Therefore, we do not address those definitions within this portion of the preamble.

### Section 402.02—Definitions

Definition of "Effects of the Action"

The Services proposed to revise the definition of "effects of the action" in a manner that simplified the definition by collapsing the terms "direct, "indirect," interrelated," and "interdependent" and by applying a two-part test of "but for" and "reasonably certain to occur."

Effects of the action was proposed to be defined as all effects on the listed species or critical habitat that are caused by the proposed action, including the effects of other activities that are caused by the proposed action. An effect or activity is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include effects occurring outside the immediate area involved in the action.

The Services requested comments on (1) the extent to which the proposed revised definition simplified and clarified the definition of "effects of the action"; (2) whether the proposed definition altered the scope of effects considered by the Services; (3) the extent to which the scope of the proposed revised definition was appropriate for the purposes of the Act; and (4) how the proposed revised definition may be improved. We received numerous comments regarding the proposed revision to the definition of "effects of the action," including the two-part test, and the scope of the definition as proposed. Some commenters felt that the proposed two-part test for both effects and activities caused by the proposed action was either inappropriate or still subject to misapplication and misinterpretation. Others were concerned that the changed definition would narrow the scope of effects of the action, resulting in unaddressed negative effects to listed species and critical habitat. As stated in the proposed rule, the Services' intended purpose of the revised definition of effects of the action was to

simplify the definition while still retaining the scope of the assessment required to ensure a complete analysis of the effects of proposed actions. Further, we stated that by revising the definition, consultations between the Services and action agencies, including consultations involving applicants, can focus on identifying the effects and not on categorizing them. The two-part test was included to provide a transparent description of how the Services identify effects of the proposed action. A summary of the comments and our responses are below at Summary of Comments and Recommendations.

In response to comments and upon further consideration, the Services are adopting a revised, final definition of "effects of the action" to further clarify that effects of the action include all consequences of a proposed action, including consequences of any activities caused by the proposed action. We revised the definition to read as set out in the regulatory text at the end of the document.

The principal changes we have made in this final rule include: (1) Introducing the term "consequences" to help define what we mean by an effect; and (2) emphasizing that to be considered the effect of the action under consultation, the consequences caused by the action would not occur but for the proposed action and must be reasonably certain to occur.

The Services believe that the definition of "effects of the action" contained in this final rule will reduce confusion and streamline the process by which the Services identify the relevant effects caused by a proposed action. The Services do not intend for these regulatory changes to alter how we analyze the effects of a proposed action. We will continue to review all relevant effects of a proposed action as we have in past decades, but we determined it was not necessary to attach labels to various types of effects through regulatory text. That is, we intend to capture those effects (consequences) previously listed in the regulatory definition of "effects of the action"— direct, indirect, and the effects from interrelated and interdependent activities—in the new definition. These effects are captured in the new regulatory definition by the term "all consequences" to listed species and critical habitat.

We introduced the term "consequences," in part, to avoid using the term "effects" to define "effects of the action". Consequences are a result or effect of an action, and we apply the two-part test to determine whether a given consequence should be considered an effect of the proposed action that is under consultation. Requiring evaluation of all consequences caused by the proposed action allows the Services to focus on the impact of the proposed action to the listed species and critical habitat, while being less concerned about parsing what label to apply to each effect (e.g., direct or indirect effect, or interdependent or interrelated activity).

As discussed in the proposed rule, the Services have applied the "but for" test to determine causation for decades. That is, we have looked at the consequences of an action and used the causation standard of "but for" plus an element of foreseeability (i.e., reasonably certain to occur) to determine whether the consequence was caused by the action under consultation. In this final rule, we have added regulatory text to confirm that, by definition, "but for" causation means that the consequence in question would not occur if the proposed action did not go forward. This added regulatory language does not add a more stringent standard than what was applied already under our current "but for" causation, but is meant to clarify and reinforce the standard we currently implement and will do so in the future. Additionally, there are several relevant considerations where the proposed action is not the "but for" cause of another activity (not included in the proposed action) because the other activity would proceed in the absence of the proposed action due to the prospect of an alternative approach (e.g., if a Federal right-of-way (proposed action) is not granted, a private wind farm on non-federal lands (other activity) would still be developed through the building of a road on private lands (alternative approach)). In particular, the Services consider case-specific information including, but not limited to, the independent utility of the other activity and proposed action, the feasibility of the alternative approach and likelihood the alternative approach would be undertaken, the existence of plans relating to the activity and whether the plans indicate that an activity will move forward irrespective of the action agency's proposed action, and whether the same effects would occur as a result of the other activity in the absence of the proposed action. In other words, if the agency fails to take the proposed action and the activity would still occur, there is no "but for" causation. In that event, the activity would not be considered an effect of the action under consultation.

Consequences to the species or critical habitat caused by the proposed action must also be reasonably certain to occur. The term "reasonably certain to occur" is not a new or heightened standard, but it was not clearly defined or given any parameters in previous regulations. Experience has taught us that the failure to provide a definition and any parameters to the term "reasonably certain to occur" left the concept vague and occasionally produced determinations that were inconsistent or had the appearance of being too subjective. As such, there were sometimes disagreements between the Services and action agencies as to what constituted "reasonably certain to occur." Our intention in these regulations is to provide a solid framework, with specific factors for both action agencies and the Services to evaluate, in order to determine whether a consequence is "reasonably certain to occur." In addition, we added a regulatory requirement that this framework be reviewed and followed by both the action agency and the Services. See § 402.17(c). When the Services write an incidental take statement for a biological opinion, under section 7(b)(4)(iv) of the Act they can assign responsibility of specific terms and conditions of the incidental take statement to the Federal action agency, the applicant, or both taking into account their respective roles, authorities, and responsibilities. The Services have worked with Federal action agencies in the past, and will continue to do so into the future, to ensure that a reasonable and prudent measure assigned to a Federal action agency does not exceed the scope of a Federal action agency's authority.

As discussed below in our discussion of changes to § 402.17, we have clarified that for a consequence or an activity to be considered reasonably certain to occur, the determination must be based on clear and substantial information. The term "clear and substantial" is used to describe the nature of information needed to determine that a consequence or activity is reasonably certain to occur. By clear and substantial, we mean that there must be a firm basis to support a conclusion that a consequence of an action is reasonably certain to occur. The determination of a consequence to be reasonably certain to occur must be based on solid information and should not be based on speculation or conjecture. This added term also does not mean the nature of the information must support that a consequence must be guaranteed to occur, but rather, that it must have a degree of certitude.

We revised § 402.17 to help guide the determination of "reasonably certain to occur." The "reasonably certain to occur" determination applies to other

activities caused by (but not part of) the proposed action, activities considered under cumulative effects (as defined at § 402.02), and to the consequences caused by the proposed action. However, it does not apply to the proposed action itself, which is presumed to occur as described. First, in § 402.17(a), we discuss factors to consider when determining whether an activity is reasonably certain to occur for purposes of determining the effects of the action or which activities to include under Cumulative Effects. Second, we describe considerations for evaluating whether a consequence is reasonably certain to occur in § 402.17(b). For further explanation, please see our discussion of § 402.17, below.

We also continue to emphasize that effects may occur beyond the proposed action's footprint. This concept was reflected in the proposed rule and the final definition states that effects may include consequences occurring outside the immediate area involved in the action.

As discussed above, we articulated a two-part test for effects of the action that is consistent with our existing practice and prior interpretations. This test for determining effects includes effects resulting from actions previously referred to as "interrelated or interdependent" activities. In order for consequences of other activities caused by the proposed action to be considered effects of the action, both those activities and the consequences of those activities must satisfy the two-part test: They would not occur but for the proposed action and are reasonably certain to occur. As a result, when we discuss effects or effects of the action throughout the rest of this rule, we are referring only to those effects that satisfy the two-part test. For further discussion of the application of the "reasonably certain to occur" test to activities included within the definition of *effects of the action*, see our discussion of changes to proposed § 402.17, below.

Definition of Environmental Baseline

We proposed a stand-alone definition for "environmental baseline" as referenced in the discussion above in the proposed revised definition for *effects of the action*.

Environmental baseline was proposed to be defined to include the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact

of State or private actions which are contemporaneous with the consultation in process.

In the proposed rule, we also sought comment on potential revisions to the definition of "environmental baseline" as it relates to ongoing Federal actions. The Services received numerous comments regarding the proposed definition of "environmental baseline" and the consideration of ongoing Federal actions.

In response to these comments and upon further consideration, through this final rule, we are revising the definition of "environmental baseline" to read as set out in the regulatory text at the end of this document.

We revised the definition of environmental baseline to make it clear that "environmental baseline" is a separate consideration from the effects of the action. In practice, the environmental baseline should be used to compare the condition of the species and the designated critical habitat in the action area with and without the effects of the proposed action, which can inform the detailed evaluation of the effects of the action described in § 402.14(g)(3) upon which the Services formulate their biological opinion.

In addition, we added a sentence to clarify that the consequences of ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are included in the environmental baseline. This third sentence is specifically intended to help clarify environmental baseline issues that have caused confusion in the past, particularly with regard to impacts from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify.

We added this third sentence because we concluded that it was necessary to explicitly answer the question as to whether ongoing consequences of past or ongoing activities or facilities should be attributed to the environmental baseline or to the effects of the action under consultation when the agency has no discretion to modify either those activities or facilities. The Courts and the Services have concluded that, in general, ongoing consequences attributable to ongoing activities and the existence of agency facilities are part of the environmental baseline when the action agency has no discretion to modify them. With respect to existing facilities, such as a dam, courts have recognized that effects from the existence of the dam can properly be considered a past and present impact included in the environmental baseline, particularly when the Federal agency lacks discretion to modify the dam. See,

*e.g., Friends of River* v. *Nat'l Marine Fisheries Serv.,* 293 F. Supp. 3d 1151, 1166 (E.D. Cal. 2018). Having the environmental baseline include the consequences from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify is supported by the Supreme Court's conclusion in *National Ass'n of Home Builders* v. *Defenders of Wildlife,* 551 U.S. 644, 667–71 (U.S. 2007) ("Home Builders"). In that case, the Court held that it was reasonable for the Services to narrow the application of section 7 to a Federal agency's discretionary actions because it made no sense to consult on actions over which the Federal agency has no discretionary involvement or control. It follows, then, that when a Federal agency has authority for managing or operating a dam, but lacks discretion to remove or modify the physical structure of the dam, the consequences from the physical presence of the dam in the river are appropriately placed in the environmental baseline and are not considered an effect of the action under consultation.

We distinguish here between activities and facilities where the Federal agency has no discretion to modify and those discretionary activities, operations, or facilities that are part of the proposed action but for which no change is proposed. For example, a Federal agency in their proposed action may modify some of their ongoing, discretionary operations of a water project and keep other ongoing, discretionary operations the same. The resulting consultation on future operations analyzes the effects of all of the discretionary operations of the water project on the species and designated critical habitat as part of the effects of the action, even those operations that the Federal agency proposes to keep the same. We also note that the obligation is on the Federal action agency to propose actions for consultation and while they should not improperly piecemeal or segment portions of related actions, a request for consultation on one aspect of a Federal agency's exercise of discretion does not de facto pull in all of the possible discretionary actions or authorities of the Federal agency. This is a case-by-case specific analysis undertaken by the Services and the Federal action agency as needed during consultation.

Attributing to the environmental baseline the ongoing consequences from activities or facilities that are not within the agency's discretion to modify does not mean that those consequences are ignored. As discussed in more detail below, the environmental baseline is a

description of the condition of the species or the designated critical habitat in the action area. To the extent ongoing consequences are beneficial or adverse to a species, the environmental baseline evaluations of the species or designated critical habitat will reflect the impact of those consequences and the effects of the action must be added to those impacts in the Services' jeopardy and adverse modification analysis.

*Section 402.13—Deadline for Informal Consultation*

The Services sought comment on potentially establishing a 60-day deadline, subject to extension by mutual consent, for informal consultations. More specifically, we sought comment on (1) whether a deadline would be helpful in improving the timeliness of review; (2) the appropriate length for a deadline (if not 60 days); and (3) how to appropriately implement a deadline (*e.g.,* to which portions of informal consultation the deadline should apply [*e.g.,* technical assistance, response to requests for concurrence, etc.], when informal consultation begins, the ability to extend or "pause the clock" in certain circumstances, etc.).

The Services received numerous comments regarding the establishment of a deadline for informal consultation. A summary of those comments and our responses are below at Summary of Comments and Recommendations. In response to these comments and upon further consideration, through this final rule, we are revising § 402.13, Informal consultation, to read as set out in the regulatory text at the end of this document.

These changes institute a new § 402.13(c), which is a process framework for the Federal agency's written request for concurrence and the Service's response. The changes to the informal consultation process are limited to only the written request for concurrence and the Service's response. This preserves the flexibility in discussions and timing inherent in the portion of the informal consultation process that is intended to assist the Federal agency in determining whether formal consultation is required. In the new framework, we require in § 402.13(c)(1) that the written request for our concurrence should contain information similar to that required in § 402.14(c)(1) for formal consultation, but only at a level of detail sufficient for the Services to determine whether or not it concurs. Consistent with past practice, the Services determine whether the information provided by the Federal agency provides sufficient information upon which to make its

determination whether to concur with Federal agency's request for concurrence. We anticipate that this level of detail will often be less than that required for the initiation of formal consultation and the evaluation of adverse effects to species and designated critical habitat. Second, we establish in § 402.13(c)(2) a timeline for the written request and concurrence process. As stated in the new § 402.13(c)(2), upon receipt of an adequate request for concurrence from a Federal agency, the Services shall provide their written response within 60 days. The 60-day response period may be extended, with the mutual consent of the Federal agency (or its designated representative) and any applicant, for up to an additional 60 days, bringing the total potential timeframe for this written request and response process to 120 days. The intent of the 60-day, and no more than 120-day, deadline is to increase regulatory certainty and timeliness for Federal agencies and applicants.

The changes at § 402.13(c) do not alter or apply to the Services' review of and response to biological assessments prepared for major construction activities, as outlined at § 402.12. For those consultations, the response would be required within 30 days, as outlined at § 402.12(j) and (k).

*Section 402.14—Formal Consultation*

The Services proposed several amendments to § 402.14. Consistent with the Services' existing practice, we proposed to revise § 402.14(c) to clarify what is necessary to initiate formal consultation and to allow the Services to consider documents such as those prepared pursuant to the National Environmental Policy Act (NEPA; 42 U.S.C. 4321 *et seq.*) to be considered as initiation packages, as long as they meet the requirements for initiating consultation. We also proposed to: (1) Revise portions of § 402.14(g) that describe the Services' responsibilities during formal consultation; (2) revise § 402.14(h) to allow the Services to adopt all or part of a Federal agency's initiation package, or all or part of the Services' own analyses and findings that are required to issue a permit under section 10(a) of the Act, in its biological opinion; and (3) add a new provision titled "Expedited consultations" at § 402.14(l) to offer opportunities to streamline consultation, particularly for actions that have minimal adverse effects or predictable effects based on previous consultation experience.

The Services received numerous comments related to our proposed amendments to § 402.14, Formal

consultation, as set forth in 83 FR 35192, July 25, 2018. A summary of those comments and our responses are below at Summary of Comments and Recommendations.

In response to these comments and upon further consideration, in this final rule, we are finalizing the proposed revisions to § 402.14(g)(2) and (4) and (l), and we are amending § 402.14(c), (g)(8), and (h) to read as set out in the regulatory text at the end of this document.

The Services are making a non-substantive edit to the proposed regulatory text at § 402.14(c)(1)(iii). This non-substantive edit clarifies that the Services are referring to information about both the species and its habitat, including any designated critical habitat.

The Services are also making edits to the proposed regulatory text at § 402.14(g)(8) to simplify the text while maintaining the intent of the proposed regulatory revisions. More specifically, we are striking the proposed text that referenced "specific" plans and "a clear, definite commitment of resources" with respect to measures intended to avoid, minimize or, or offset the effects of an action. Instead, the Services are simplifying the regulatory text to indicate that such measures are considered like other portions of the action and do not require any additional demonstration of binding plans.

The simplified regulatory text avoids potential confusion between the need to sufficiently describe measures a Federal agency is committing to implement as part of a proposed action to avoid, minimize, or offset effects pursuant to § 402.14(c)(1), and how those measures are taken into consideration after consultation is initiated. Any type of action proposed by a Federal agency receives a presumption that it will occur, but it must also be described in sufficient detail that the Services can both understand the action and evaluate its adverse and beneficial effects. By eliminating the word "specific" in § 402.14(g)(8), we reinforce that an appropriate level of specificity regarding the description of measures included in the proposed action may be necessary to provide sufficient detail to assess the effects of the action on listed species and critical habitat. However, inclusion of measures to avoid, minimize, or offset adverse effects as part of the proposed action does not result in a requirement for an additional demonstration of binding plans. To simplify the regulatory text and improve clarity, we also eliminated the reference to "a clear, definite commitment of resources." That change is not meant to imply that an

*Endangered Species*



# Consultation Handbook

*Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act*

**U.S. Fish & Wildlife Service**
**and**
**National Marine Fisheries Service**

**March 1998**
**Final**

-------------------------------------------------------------------------------------------------------------------------------

additional effects on the species.  The trends of the remaining populations of listed species form the basis for evaluating the effects of a proposed action on that species.

<u>New threats</u>:  Often, factors not considered when a species was first listed can threaten its continued existence, and must be considered when establishing the environmental baseline.  For example, the zebra mussel (*Dreissena polymorpha*), an exotic species threatening native mussel fauna throughout its range, wasn't considered when most native mussels were listed.

### e.  Analysis of the species/critical habitat likely to be affected

This section summarizes the previous discussion in Status of the species/ critical habitat and identifies those species or designated critical habitat likely to be adversely affected by the proposed action, which will be considered further in the remaining sections of the biological opinion.  If the action agency requests consultation on a beneficial action, that will be noted here.  Other listed species/designated critical habitat present in the project area are also listed here along with the reasons they are not likely to be adversely affected.  Since the Services concur with the action agency's determination of "is not likely to adversely affect," a statement that those species will not be considered further in the consultation should be included.

## Environmental baseline

This section is an analysis of the effects of past and ongoing human and natural factors leading to the current status of the species, its habitat (including designated critical habitat), and ecosystem, within the action area.  The environmental baseline is a "snapshot" of a species' health at a specified point in time.  It does not include the effects of the action under review in the consultation.

### a.  Status of the species within the action area

Unless the species' range is wholly contained within the action area, this analysis is a subset of the preceding rangewide status discussion.  The purpose is to analyze the effects on the species and/or critical habitat at the action level.  For example, the following issues are considered:

> o      the percent or amount of the species range or designated critical habitat in the action area;

-----------------------------------------------------------------------------------------------------------------------------

o    whether the effect is quantitative, qualitative, or both;

o    the distribution of the affected and unaffected habitat; and

o    if critical habitat will be impacted, the effect on the constituent elements.

**b.  Factors affecting species environment within the action area**

This analysis describes factors affecting the environment of the species or critical habitat <u>in the</u> <u>action area</u> (Figure 4-3).  The baseline includes State, tribal, local, and private actions already affecting the species or that will occur contemporaneously with the consultation in progress. Unrelated Federal actions affecting the same species or critical habitat that have completed formal or informal consultation are also part of the environmental baseline, as are Federal and other actions within the action area that may benefit listed species or critical habitat.

An agency action can be removed from the environmental baseline analysis under any of the following conditions:

o    an action agency notifies the Services in writing that a previously proposed action
      will not be implemented;

o    a biological opinion for the proposed action (not an ongoing action) is no longer
      valid because reinitiation of consultation is required and the action agency has been
      so informed in writing by the Services, or has requested that the Services reinitiate
      consultation; or

o    alternatives have been implemented that remove all adverse effects.

<u>**Effects of the action**</u>

This section includes an analysis of the direct and indirect effects of the proposed action on the species and/or critical habitat and its interrelated and interdependent activities.

**a.   Factors to be considered**

<u>Proximity of the action</u>:  to the species, management units, or designated critical habitat units.

<u>Distribution</u>:  geographic areas where the disturbance occurs (e.g., may be several small or one large area).

-----------------------------------------------------------------------------------------------------------------------

<u>Timing</u>:  relationship to sensitive periods of a species' lifecycle.

<u>Nature of the effect</u>:  effects of the action on elements of a species' lifecycle, population size or variability, or distribution; or on the primary constituent elements of the critical habitat, including direct and indirect effects.

<u>Duration</u>:  The effects of a proposed action on listed species or critical habitat depend largely on the duration of its effects.  Three potential categories of effects are: (1) a short-term event whose effects are relaxed almost immediately (pulse effect), (2) a sustained, long-term, or chronic event whose effects are not relaxed (press effect), or (3) a permanent event that sets a new threshold for some feature of a species' environment (threshold effect).  For many species, a proposed action producing a single, short-term effect is less likely to jeopardize the continued existence of a species than a long-term chronic event or the permanent alteration of a species' habitat.

<u>Disturbance frequency</u>:  the mean number of events per unit of time affects a species differently depending on its recovery rate.  If the disturbance frequency is less than the species' recovery rate, the species might persist in the face of the disturbance (Figures 4-7a-b).  If the disturbance frequency equals the species' recovery rate, the species becomes more sensitive to the effects of other disturbances (Figure 4-7c).  If the disturbance frequency is greater than a species' recovery rate, the species will be unable to recover between disturbances (Figure 4-7d).  Disturbance frequency is an important consideration when evaluating the accumulating effects of proposed actions on listed species and/or designated critical habitat, particularly when it is combined with information on a species' recovery rate.

--------------------------------------------------------------------------------------------------------------------

**Figure 4-7.  Effects of the disturbance.** (figures modified from Trudghill 1988)

Disturbance intensity:  the effect of the disturbance on a population or species as a function of



the population or species' state after the disturbance.  For example, a disturbance reducing the size of a population or critical habitat unit by 40 percent is more intense than a disturbance reducing population or unit size by 10 percent.

---------------------------------------------------------------------------------------------------------------------------------

Disturbance severity:  the effect of a disturbance on a population or species as a function of recovery rate.  The longer the recovery rate, the more severe the disturbance.  For example, a disturbance from which a species or habitat takes 10 years to recover is more severe than a disturbance requiring 2 years for recovery.  A severe disturbance makes a population or species more susceptible to the effects of multiple actions.

**b.  Analyses for effects of the action**

Sufficient description of the proposed action should be included so that the subsequent analysis of effects and the scope of the opinion are clear.  If the analyses for this section determine that some individuals of a listed animal might be "taken" as a direct or indirect result of the proposed action, that information is included in the incidental take statement.

Beneficial effects:  are those effects of an action that are wholly positive, without any adverse effects, on a listed species or designated critical habitat.  Determination that an action will have beneficial effects is a "may affect" situation (see section 3.5).  However, since there are no adverse effects, formal consultation is not required.  Biological opinions may discuss beneficial effects if the applicant requests it, or if a biological assessment considers numerous species, some with adverse effects, and one or more with beneficial effects.

> Example:  The National Park Service proposes to modify an existing rock climbing management plan that allows climbing in historic peregrine falcon nesting areas.  The new plan restricts climbing activities to areas outside of a zone 1/4 mile wide on either side of active peregrine falcon aeries during the breeding season.  This protects the birds from human disturbance and eliminates take that could occur if an adult was flushed from an aerie with eggs or young needing incubation or brooding to survive.  Therefore, the effects are wholly beneficial.

Direct effects:  the direct or immediate effects of the project on the species or its habitat, e.g., driving an off road vehicle through the nesting habitat of the piping plover may destroy its ground nest; building a housing unit may destroy the habitat of an endangered mouse.  Direct effects result from the agency action including the effects of interrelated actions and interdependent actions (see definitions below for clarification).  Future Federal actions that are not a direct effect of the action under consideration (and not included in the environmental baseline or treated as indirect effects) are not considered in this biological opinion.

Interrelated and interdependent actions: Effects of the action under consultation are analyzed together with the effects of other activities that are interrelated to, or interdependent with, that action.  An interrelated activity is an activity that is part of the proposed action and depends

--------------------------------------------------------------------------------------------------------------------------

on the proposed action for its justification.  An underdependent activity is an activity that has no independent utility apart from the action under consultation.  (Note: the regulations refer to the action under consultation as the "larger action" [50 CFR § 402.02]).  In fact, the use of the term "larger" has proven to be confusing when applied in the case of a modification to an existing project.  Instead of keeping the inquiry on whether other activities are interrelated to or interdependent with the modification, it has unintentionally and inappropriately shifted the focus to an inquiry on whether the modification itself is interrelated to or interdependent with the "larger" action or project.  To better understand how the interdependent or interrelated analysis should work, see the detailed examples below.

As a practical matter, the analysis of whether other activities are interrelated to, or interdependent with, the proposed action under consultation should be conducted by applying a "but for" test.  The biologist should ask whether another activity in question would occur "but for" the proposed action under consultation.  If the answer is "no," that the activity in question would not occur but for the proposed action, then the activity is interrelated or interdependent and should be analyzed with the effects of the action.  If the answer is "yes," that the activity in question would occur regardless of the proposed action under consultation, then the activity is not interdependent or interrelated and would not be analyzed with the effects of the action under consultation.  There will be times when the answer to this question will not be apparent on its face.  The biologist should ask follow-up questions to the relevant parties to determine the relationship of the activity to the proposed action under consultation. It is important to remember that interrelated or interdependent activities are measured against the **proposed action**.  That is, the relevant inquiry is whether the activity in question should be analyzed with the effects of the action under consultation because it is interrelated to, or interdependent with, the proposed action.  Be careful not to reverse the analysis by analyzing the relationship of the proposed action against the other activity.  For example, as cited below, if the proposed action is the addition of a second turbine to an existing dam, the question is whether the dam (the other activity) is interrelated to or interdependent with the proposed action (the addition of the turbine), not the reverse.

> Example: The Corps of Engineers requests consultation for construction of a dam which requires a section 404 permit.  The dam will provide water to private irrigation canals that will come on line once the dam is completed.  The private irrigation canals are interrelated to the proposed dam and must be considered in a biological opinion for the larger water development project since they would not be in existence "but for" the presence of the proposed dam under consultation.  Similarly, a power turbine to be constructed concurrently with the dam cannot function and has no independent utility "but for" the dam and is, therefore, interrelated with the project.  Thus the effects of this

-------------------------------------------------------------------------------------------------------------------------------------

turbine on fish passage and water quality are to be considered in the biological opinion on the proposed dam.

Ten years after construction of the dam, a federal permit is needed to add a second turbine to the dam to increase power generation.  The addition of the turbine, as the proposed action under consultation, is now the "larger action" against which the "but for" test for interrelated or interdependent effects would be applied.  The pre-existing dam  has independent utility without the new turbine and therefore is not interrelated to, or interdependent with, the proposed action.  Ongoing effects of the existing dam are already included in the Environmental Baseline and would not be considered an effect of the proposed action under consultation.  Activities which would be interdependent and interrelated to the proposed turbine could include construction of new power lines or conversion of natural habitat if the additional power capacity allowed for the development of a manufacturing facility that was dependent upon the new power grid.

Later, a new federal safety law requires the dam operator to construct a fuse plug on an existing spillway which improves response to emergency flood conditions.  Construction of the fuse plug is now the proposed "larger action."  Again, the existing dam is not interdependent or interrelated to the proposed fuse plug because it does not depend upon the proposed action for its existence.  That is, the test is not whether the fuse plug in some way assists or facilitates in the continued operation of the pre-existing project, but instead whether the water project could not exist "but for" the fuse plug.  Because the answer is that the project would exist independent of the fuse plug, the operation of that project is not interrelated or interdependent.  Accordingly, the biologist would not consider the effects of the dam to be effects of the "larger" action under consultation (the proposed construction of the fuse plug).  However, if the fuse plug would allow a greater flow of water through the spillway, thereby requiring the operator to increase the depth of the spillway channel and armor it with concrete, such activities would be interrelated to the proposed action.

Example:  Another example would be a proposed agency action to enlarge the water supply storage capacity of an existing flood control reservoir.  An existing water supply system into which the stored water will be released does not depend on the proposed action, and hence is not interrelated.

When one or more Federal actions are determined by the Services to be interdependent or interrelated to the proposed action, or are indirect effects of the proposed action, they are combined in the consultation and a lead agency is determined for the overall consultation.

-----------------------------------------------------------------------------------------------------------------------------

Indirect effects:  are caused by or result from the proposed action, are later in time, and are reasonably certain to occur, e.g., predators may follow ORV tracks into piping plover nesting habitat and destroy nests; the people moving into the housing unit bring cats that prey on the mice left in the adjacent habitat.  Indirect effects may occur outside of the area directly affected by the action.

Indirect effects may include other Federal actions that have not undergone section 7 consultation but will result from the action under consideration.  In order to treat these actions as indirect effects in the biological opinion, they must be reasonably certain to occur, as evidenced by appropriations, work plans, permits issued, or budgeting; they follow a pattern of activity undertaken by the agency in the action area; or they are a logical extension of the proposed action.

Non-Federal activities with indirect effects can also be predicted, particularly for ongoing projects that have a past pattern of use that is anticipated to continue.

> Example:  A very complex example of indirect effects arose in determining effects of renewing water service contracts from a large reclamation project (Friant Unit of the Central Valley Project) in the San Joaquin Basin of California.  Upon checking with other Federal and State agencies, the FWS determined that the distribution of water for agricultural use on the higher east side of the Valley provided a hydrologic head maintaining the groundwater table on the west side of the Valley at a level making it economical to pump.  As a result, occupied habitats for several species on the west side of the Valley were being destroyed because the pumped water could be used to convert this land to agriculture.  The California Department of Water Resources provided trend data indicating a continuing conversion of habitat of 10,000 to 30,000 acres per year.  These data were used to assess future non-Federal effects of the project.

Several court cases provide examples of indirect effects of a proposed action.  In National Wildlife Federation v. Coleman, 529 F.2d 359 (5th Cir.), cert. denied, 429 U.S. 979 (1976), the court ruled that indirect effects of private development resulting from proposed construction of highway interchanges had to be considered as impacts of a proposed Federal highway project, even though the private development had not been planned at the time the highway project was proposed.  In another case, Riverside Irrigation District v. Andrews, 758 F.2d 508 (10th Cir. 1985), the court ruled that the Corps of Engineers must consider the effects of consumptive water uses made possible by the proposed dam on critical habitat for whooping cranes 150 miles away, in addition to the local impacts of placing fill for the dam.

* * * * * *   Final ESA Section 7  Consultation Handbook, March 1998  * * * * * *
---------------------------------------------------------------------------------------------------------------------------

Determining the effect of ongoing water projects:  Under the Federal Power Act, as amended by the Electric Consumers Protection Act of 1986, the Federal Energy Regulatory Commission (FERC) issues new licenses for existing hydropower projects as the original licenses expire.  FERC has determined that these new licenses represent a new commitment of resources.  Therefore, a section 7 analysis of the project's effects on listed species is done in the same way as new projects. When analyzing these water projects, as well as water contract renewals for Bureau of Reclamation (Bureau) programs and ongoing discretionary operations of Bureau and Corps of Engineers water facilities, use the same approach as for other types of section 7 analyses.

o    The total effects of all past activities, including effects of the past operation of the project, current non-Federal activities, and Federal projects with completed section 7 consultations, form the environmental baseline;

o    To this baseline, future direct and indirect impacts of the operation over the new license or contract period, including effects of any interrelated and interdependent activities, and any reasonably certain future non-Federal activities (cumulative effects), are added to determine the total effect on listed species and their habitat.

Annual operating permits issued prior to issuance of a new hydropower license are subject to section 7 consultation if the Federal agency has discretion to determine the terms of the annual permits.

**c.  Species' response to a proposed action**

[Note:  For critical habitat analyses, many of the following considerations can be addressed in terms of the effect on the functional suitability of the habitat to support the species.]

Numbers of individuals/populations in the action area affected:  Many **jeopardy** analyses emphasize the effects of a proposed action on the size of a species' populations because small populations are more threatened by extinction due to demographic accidents than large populations.  However, the length of time a species exists before extinction depends on more than population size.  Large population size may not protect a species in the face of extreme disturbance.  A species' response to disturbance will depend on the number of individuals or amount of habitat affected, although the age, sex, breeding status, and distribution of affected individuals, as well as the genetic variability within the remaining population(s), are equally important because they determine a population's ability to recover from the loss of individuals.

4-30

--------------------------------------------------------------------------------------------------------------------------------

Sensitivity to change:  This factor relates to the degree to which a population or species is prone to change when disturbed.

Resilience:  This factor relates to the characteristics of populations, species, or critical habitat units allowing them to recover from different magnitudes of disturbance.  For example, the greater the reproductive rate, the more resilient the species may be to population losses.  Moreover, habitat specificity and other factors also contribute to a species' resiliency.  Critical habitat also has resilience:  grasslands, for example, can be more resilient to the adverse effects of fire than a forest.  In a biological opinion, the biologist should determine the type and severity of the disturbance and determine how resilient the species or its habitat is to that particular type of disturbance.

Recovery rate:  This factor relates to the time required for an individual, population, species, community, or ecosystem to return to equilibrium after exposure to a disturbance.  A population, species, community, or ecosystem that has a fast recovery rate is called stable.  It is often difficult to know the recovery rate or resilience of species.  In the absence of information, the best biological estimate should be used.

## Cumulative effects

Section 7 regulations require the Federal action agency to provide an analysis of cumulative effects, along with other information, when requesting initiation of formal consultation.  Additionally, the Services are required to consider cumulative effects in formulating their biological opinions (50 CFR §402.14(g)(3) and (4)).  The standardized paragraph to introduce the cumulative effects section is:

> **Cumulative effects include the effects of future State, tribal, local or private actions that are reasonably certain to occur in the action area considered in this biological opinion.  Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act.**

The concept of cumulative effects is frequently misunderstood as it relates to determining likely **jeopardy** or **adverse modification**.  Cumulative effects include effects of future State, tribal, local, and private actions, not involving a Federal action, that are reasonably certain to occur within the action area under consideration.  Future Federal actions requiring separate consultation (unrelated to the proposed action) are not considered in the cumulative effects section.