No. 25-3757

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

SKAGIT COUNTY DIKE, DRAINAGE AND IRRIGATION
IMPROVEMENT DISTRICT NO. 12,

*Plaintiff-Appellant*,

v.

NATIONAL MARINE FISHERIES SERVICE, et al.,

*Defendant-Appellees.*

On Appeal from the United States District Court for the Western
District of Washington, No. 2:23-cv-01954-BAT
Hon. Brian A. Tsuchida

_____

**APPELLANT'S OPENING BRIEF**

_____

Charlene Koski
Jenna R. Mandell-Rice
VAN NESS FELDMAN LLP
1191 Second Avenue, Suite 1800
Seattle, WA 98101
(206) 623-9372
cbk@vnf.com
jrm@vnf.com

*Attorneys for Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................iv

INTRODUCTION ............................................................................. 1

JURISDICTIONAL STATEMENT ..................................................... 4

STATEMENT OF ISSUES............................................................... 5

ADDENDUM OF AUTHORITIES ....................................................... 6

STATEMENT OF THE CASE ........................................................... 6

    I.    District 12's statutory obligation to prevent flood damage....6

    II.    Existing tidegate environment. ............................................7

    III.    District 12's efforts to replace the tidegate. ..........................9

        A.    The tidegate is damaged and District 12 seeks to replace it with an improved tidegate that allows for better fish passage. ......................................................9

        B.    District 12's proposal is approved as an "operational improvement" with "no jeopardy" to endangered species...................................................................10

        C.    NMFS withdraws the TFI BiOp and, based on unchanged facts, reverses its jeopardy conclusion and requires mitigation. ...............................................12

    IV.    The district court affirms the BiOp. ....................................14

STANDARD OF REVIEW.................................................................15

SUMMARY OF THE ARGUMENT ......................................................16

ARGUMENT ...................................................................................17

I.    The court erroneously relied on the post-hoc rationalizations
      of the agency's attorneys, which conflicted with evidence
      in the record. .......................................................................... 17

      A.    NMFS failed to address or explain the conflict between
            its jeopardy finding and evidence in the record on
            Skagit Chinook population trends. ............................... 19

      B.    To compensate for NMFS's errors, its attorneys offered
            post-hoc rationalizations in briefing before the district
            court and the court erroneously relied on those
            rationalizations. ........................................................... 23

II.   NMFS misapplied the regulatory definition of "effects
      of the action." ...................................................................... 25

      A.    The "effects of an action" on a species must be
            measured from existing conditions as reflected in
            the "environmental baseline." ..................................... 25

      B.    The "effects of the action" are those caused by the
            Project. ............................................................................ 27

      C.    Instead of measuring the incremental effects of the
            action from the existing environmental baseline,
            NMFS erroneously compared post-Project conditions
            to natural pre-development conditions. ...................... 28

III.  The court's analysis of the Project BiOp's "effects of the
      action" lacks support in fact and law and conflicts with
      precedent. .............................................................................. 31

      A.    The court improperly substituted its judgment for
            the agency's. .................................................................. 32

      B.    The cited unpublished interagency memo cannot
            excuse compliance with unambiguous regulatory
            requirements. ................................................................. 34

C. In addition to conflicting with ESA regulations and long-standing agency interpretation, including existing baseline conditions as future effects of the action would conflict with case law. ........................................ 39

IV. NMFS failed to sufficiently explain why it changed its determination from "no jeopardy" to jeopardy based on unchanged facts ........................................................ 41

A. The TFI BiOp. .............................................................. 42

B. The draft Dry Slough BiOp. ........................................ 44

CONCLUSION ................................................................................ 47

CERTIFICATE OF COMPLIANCE ................................................ 48

CERTIFICATE OF SERVICE ......................................................... 49

ADDENDUM OF AUTHORITIES .................................................. A-1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alaska Eskimo Whaling Comm'n v. Env't Prot. Agency*,
791 F.3d 1088 (9th Cir. 2015) ............................................................ 32

*Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*,
175 F.3d 1156 (9th Cir. 1999) ............................................................ 40

*Am. Textile Mfrs. Inst. v. Donovan*,
452 U.S. 490 (1981) ............................................................................ 18

*Ariz. Cattle Growers Ass'n v. U.S. Fish & Wildlife*,
273 F.3d 1229 (9th Cir. 2001) ................................................ 16, 23, 24

*Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. Of Trade*,
412 U.S. 800 (1973) ............................................................................ 41

*Auer v. Robbins*,
519 U.S. 452 (1997) ............................................................................ 35

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ............................................................................ 18

*Confederated Tribes & Bands of the Yakama Nation v. McDonald*,
2003 WL 1955763 (E.D. Wash. Jan. 24, 2003) ............................ 37, 38

*Ctr. for Biological Diversity v. Env't Prot. Agency*,
141 F.4th 153 (D.C. Cir. 2025) ................................................ 36, 39, 40

*Defs. of Wildlife v. Hall*,
565 F. Supp.2d 1160 (D. Mont. 2008) ................................................ 42

*Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*,
591 U.S. 1 (2020) ................................................................................ 18

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ................................................................ 38, 39, 40

*Forest Serv. Emp. for Env't Ethics v. U.S. Forest Serv.*,
   726 F.Supp.2d 1195 (D. Mont. 2010) ................................................. 26

*Loper Bright Enter. v. Raimondo*,
   603 U.S. 369 (2024) ........................................................................... 38

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ....................................................................... 17, 42

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
   668 F.3d 1067 (9th Cir. 2011) ........................................................... 15

*Nat. Res. Def. Council v. Haaland*,
   102 F.4th 1045 (9th Cir. 2024) ............................................. 15, 16, 32

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   524 F.3d 917 (9th Cir. 2008) ...................................................... *passim*

 *Native Ecosystems Council v. U.S. Forest Serv.*,
   418 F.3d 953 (9th Cir. 2005) ............................................................. 15

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.*,
   477 F.3d 668 (9th Cir. 2007) ............................................................. 41

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
   426 F.3d 1082 (9th Cir. 2005) ........................................................... 17

*Perez-Gonzalez v. Ashcroft*,
   379 F.3d 783 (9th Cir. 2004) ............................................................. 36

*Portland Audubon Soc'y v. Endangered Species Comm.*,
   984 F.2d 1534 (9th Cir. 1993) ........................................................... 45

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989.) ......................................................................... 36

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ............................................................. 27

*San Luis & Delta-Mendota Water Auth. v. Locke*,
   776 F.3d 971 (9th Cir. 2014) ................................................. 16, 25, 26

*Sec. Exch. Comm'n v. Chenery Corp.,*
  332 U.S. 194 (1947)................................................................ 32

*Skidmore v. Swift & Co.,*
  323 U.S. 134 (1944)......................................................... 27, 38

*Swinomish Indian Tribal Cmty. v. Skagit Cnty. Dike Dist. No. 22,*
  618 F. Supp. 2d 1262 (W.D. Wash. 2008).................................... 45, 46

*Turtle Island Restoration Network v. U.S. Dep't of Com.,*
  878 F.3d 725 (9th Cir. 2017)...................................................... 28

*Waterkeeper All. v. U.S. Env't Prot. Agency,*
  140 F.4th 1193 (9th Cir. 2025) ................................................... 42

*Wild Fish Conservancy v. Salazar,*
  628 F.3d 513 (9th Cir. 2010)............................................. 17, 23, 36

*Young v. United Parcel Serv., Inc.,*
  575 U.S. 206 (2015)................................................................ 38

**Statutes**

5 U.S.C. § 702 ...................................................................... 4

 5 U.S.C. § 706 ................................................................ 15, 16

5 U.S.C. § 706(2) .................................................................. 4

16 U.S.C. § 1536(a)(2)......................................................... 5, 13

16 U.S.C. § 1540(g) ............................................................... 5

28 U.S.C. § 1291 .................................................................. 5

28 U.S.C. § 1331 .................................................................. 5

RCW § 85.38.180 ................................................................. 6

RCW Title 85 ..................................................................... 6

## Regulations

50 C.F.R. § 402.02 ................................................................ 26, 27, 36

50 C.F.R. § 402.13(c) ..................................................................... 13

50 C.F.R. § 402.13(c)(2) ................................................................ 13

84 Fed. Reg. 44976 ........................................................................ 26

84 Fed. Reg. 44977 ........................................................................ 27

84 Fed. Reg. 44978 ........................................................................ 26

## Rules

Fed. R. App. P. 4(a)(1)(B) ............................................................... 5

## Other Authorities

U.S. Fish and Wildlife Serv. and Nat'l Marine Fisheries
    Serv., *Endangered Species Consultation Handbook* 4-22
    (Mar. 1998), available at
    https://www.fws.gov/media/endangered-species-
    consultation-handbook ............................................................... 26, 37

## INTRODUCTION

The project at the heart of this dispute is a straightforward fix to an urgent problem: consistent with its statutory obligations to protect life and property from flooding, Skagit County Dike, Drainage and Irrigation Improvement District No. 12 (District 12) seeks to fix a 140-year-old damaged tidegate. Instead of simply repairing what is broken, District 12 wants to provide a substantially more costly alternative that will improve conditions for fish. Specifically, District 12 has proposed replacing the existing tidegate with a tidegate that will improve fish passage while continuing to allow District 12 to meet its duty to protect developed flatlands from flooding during high tide (Project).

In 2019, appellee National Marine Fisheries Service (NMFS) reviewed the Project under the programmatic Tidegate and Fish Initiative (TFI) biological opinion (TFI BiOp) that, between 2009 and 2021, provided Endangered Species Act (ESA) coverage to proposed tidegate maintenance, repair, and replacement projects in the area. The TFI BiOp concluded that actions identified in and covered by the TFI would not cause jeopardy to ESA-listed species or adverse modification to critical habitat. In 2019, NMFS determined that the Project qualified

for ESA coverage under the TFI BiOp with no mitigation required because the Project is an operational improvement that will enhance fish passage.

In 2021, NMFS withdrew the TFI BiOp and, in 2024, issued the project-specific BiOp on the Project at issue in this dispute (Project BiOp). The Project BiOp, based on unchanged facts, reversed course, finding the Project likely to jeopardize listed species and cause adverse modification to critical habitat. It also required District 12 to perform extensive and costly mitigation.

NMFS failed to identify any change in the status of the species to support its new "jeopardy" finding. The agency also failed to explain how or why a replaced tidegate that improves fish passage over existing conditions will cause new jeopardy to fish. Instead, to support a finding of jeopardy where no jeopardy existed, NMFS simply noted that the TFI BiOp had failed to achieve its mitigation goals as quickly as expected. It then engaged in a confusing and convoluted analysis that took facts out of context and misapplied the law.

First, NMFS, without explanation, arbitrarily selected a 2005 abnormal spike in the relevant fish population (the highest recorded

2

number in the record) to conclude that the Skagit Chinook salmon population has since experienced a 15-year declining trend. But the long and short-term population trends and NMFS's own technical report show the exact opposite: that Skagit Chinook populations are *improving*, even with the existing tidegate in place.

NMFS then engaged in a legally erroneous and internally inconsistent analysis in which it determined the effects of the Project by measuring them against "natural" shoreline conditions that have not existed for at least 140 years. This approach is contrary to other findings in the Project BiOp, the existing environmental baseline, the relevant regulatory definitions, the agency's prior practice, and legal precedent.

Instead of remanding for NMFS to correct its errors, the district court tried to rectify inconsistencies that should have been fatal to the agency's conclusions. To begin with, the court incorrectly accepted post-hoc rationalizations NMFS's attorneys made for the first time in their reply brief to try to explain Chinook population data that conflicted with the agency's findings. In addition to being legally improper, those

pos-hoc rationalizations relied on facts not in—and contrary to—the record.

The court then invented its own rationalizations to try to explain NMFS's conclusions and, in doing so, substituted its reasoning for the agency's. The court's justifications—in addition to being improperly offered—conflict with evidence in the record and lead to (and affirm) an analysis that is arbitrary, capricious, and contrary to regulatory, statutory, and common law.

## JURISDICTIONAL STATEMENT

On December 19, 2023, District 12 filed suit in the United States District Court for the Western District of Washington, seeking injunctive relief to compel NMFS to complete ESA consultation on the Project. Dkt 1.[1] On March 8, 2024, the court issued a preliminary injunction, Dkt. 15, and NMFS subsequently completed ESA consultation by issuing the Project BiOp. 2-ER-139. On July 2, 2024, District 12 amended its complaint to challenge NMFS's BiOp under the Administrative Procedure Act (APA), 5 U.S.C. §§ 702 and 706(2), and

---

[1] "Dkt." refers to entries in the district court docket.

alleged violations of Section 7 of the ESA, 16 U.S.C. § 1536(a)(2). 2-ER-116.

On April 28, 2025, the court granted NMFS's motion for summary judgment and denied District 12's motion for summary judgment. 1-ER-3–4. On June 9, 2025, the court entered final judgment. 1-ER-2. The court had jurisdiction under 28 U.S.C. § 1331 and 16 U.S.C. § 1540(g).

On June 13, 2025, District 12 timely appealed the court's order. Fed. R. App. P. 4(a)(1)(B); 5-ER-936. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether the district court erred when it relied on post-hoc rationalizations of NMFS's attorneys, which conflicted with evidence in the record demonstrating positive Skagit Chinook salmon population trends.

2. Whether NMFS's method of calculating the "effects of the action" conflicted with ESA regulations by failing to compare the post-Project environment to an environmental baseline that includes the existing tidegate.

3. Whether the district court improperly substituted its judgment for the agency's, improperly relied on an unpublished agency memo that conflicts with controlling regulations, and adopted a method for analyzing "effects of the action" that is inconsistent with regulations and the precedent applying them.

5

4. Whether NMFS failed to sufficiently explain why it changed its determination from "no jeopardy" to "jeopardy" based on a record containing no new relevant information.

## ADDENDUM OF AUTHORITIES

The pertinent regulations and other authorities are set forth in the Addendum accompanying this brief.

## STATEMENT OF THE CASE

### I. District 12's statutory obligation to prevent flood damage.

District 12 is a Washington State Revised Code of Washington Title 85 Special Purpose District responsible for maintaining the portion of the right bank of the Skagit River Levee System within its boundaries and portions of a marine dike system. Under state law, District 12 is obligated to protect life and property from the hazards of flooding, improve flood infrastructure, maintain flood facilities, repair flood damage, and mitigate all elevated risks of flood impacts. Wash. Rev. Code § 85.38.180. The District's levees and dikes protect more than 10,000 acres of agricultural land from flooding, along with local access roads, recreational trails, railway crossings, and commercial and residential structures and access points. 3-ER-447–50, 469.

Part of District 12's drainage system uses tidegates to provide drainage for low-lying land in the Skagit Delta at Padilla Bay.

6

Tidegates are at the end of a drainage system and have flaps that open to allow drainage water to pass from delta uplands to Padilla Bay. When the tide rises, the flaps close to prevent saltwater from entering the drainage system and flooding delta uplands. 3-ER-448; 4-ER-684.

## II. Existing tidegate environment.

The tidegate structure at the center of this litigation (referred to as the No Name Slough Tidegate) is at the mouth of No Name Slough along the southeastern shore of Padilla Bay, which is part of the Skagit River delta. 2-ER-214. Waterward of the tidegate is Padilla Bay, which is shallow and composed almost entirely of mudflats. 4-ER-674–75. Beginning in the 1860s, sloughs and drainage ditches were used to drain the land for farmland, and a sea dike several miles long consisting of shoreline armoring and riprap was built on the bay's southeast shore. 2-ER-214.[2] Since its construction, the dike has isolated No Name Slough from Padilla Bay. 2-ER-213–14. The No Name Slough Tidegate was installed at the dike by 1886. 2-ER-214–15; 3-ER-368; *see also* 2-ER-213 (photo of dike and existing tidegate).

---

[2] The Project BiOp uses the terms "shoreline armoring, dike, and riprap" interchangeably "to describe the structures at the project site." 2-ER-148 n.4.

Digitized 1886 maps show the dike in place, and the area directly landward of the Tidegate as upland. 2-ER-214–15; 3-ER-499–01. Since 1886, agricultural use landward of the Tidegate has remained largely unchanged, 3-ER-411–15, and the habitat waterward of the Tidegate has been retained, 3-ER-501. Landward of the tidegate, the condition is mostly historic slough channels and artificial ditches. 2-ER-218. Those channels are devoid of habitat features and have elevated water temperatures. 2-ER-218. Waterward of the tidegate, the bay contains nearly 8,000 acres of eelgrass, which provides nursery habitat for salmon, crab, perch, flatfish, and herring. 2-ER-214.

Padilla Bay and the Swinomish Channel, which is adjacent to Padilla Bay, contain juvenile Skagit Chinook salmon,[3] most of which originate in the Skagit River. 2-ER-214. Since its construction in 1937, a rock jetty has diverted freshwater from the Skagit River away from Swinomish Channel and Padilla Bay, 4-ER-672, creating a physical obstruction for the migratory pathway for juvenile and adult Skagit Chinook to Padilla Bay and a physiological barrier due to rapid changes

---

[3] Skagit Chinook are part of the Puget Sound Chinook evolutionary significant unit. Only Skagit Chinook are present in the vicinity of the Project and comprise six distinct Chinook populations. *See* 2-ER-175.

8

in salinity. 4-ER-852. Accordingly, juvenile Skagit Chinook densities in Padilla Bay are "generally much lower than other portions of the [Skagit] estuary and bay." 4-ER-809.

## III. District 12's efforts to replace the tidegate.

### A. The tidegate is damaged and District 12 seeks to replace it with an improved tidegate that allows for better fish passage.

Prior to September 2019, the No Name Slough Tidegate consisted of four culverts, three of which had top-hinged tidegates, and an associated riprapped earthen dike. 2-ER-148–49. In September 2019, the No Name Slough Tidegate was damaged when a wooden gate superstructure collapsed and fell into the discharge tubes. 3-ER-448. District 12 declared an emergency, which allowed for limited emergency repairs pending a more permanent solution.[4] 3-ER-448, 452.

Subsequently, District 12 sought a permanent solution. Rather than pursue a minor, less costly repair, District 12 proposed removing two (of the four) existing culverts and replacing the two other existing culverts and tidegates with a single tidegate complex that would allow more Skagit Chinook salmon to pass through the tidegate. 2-ER-149, 3-

---

[4] One of the four tidegates was partially decommissioned. 2-ER-148.

9

ER-387–88; *see also* 4-ER-657–59; 4-ER-657. Instead of top hinges, the replacement tidegates will have side hinges, which allow for better fish passage. 2-ER-149; 3-ER-426–27 (photos comparing tidegates with top hinges to tidegates with side hinges); 4-ER-657–59; 3-ER-482 (recognizing that fish passage can be improved by focusing on tidegate designs that create natural velocities and stay open longer); *see also* 4-ER-646. Instead of small and long pipes, the structure will have a large concrete box, which also supports better fish passage. *See, e.g.*, 4-ER-920 (describing benefits).

The total hydraulic opening is designed to remain the same and the existing footprint of the structure will not change. 3-ER-381. To replace the two culverts and tidegate, presently existing shoreline armoring must be temporarily removed and put back (i.e. replaced). 2-ER-148–49; 3-ER-381; *see also* 4-ER-656. In addition, District 12 would remove creosote piles. 2-ER-150; 4-ER-656.

## B. District 12's proposal is approved as an "operational improvement" with "no jeopardy" to endangered species.

District 12 sought approval for the Project under the 2008 TFI Agreement and TFI BiOp. 2-ER-144; *see generally* 4-ER-677. The TFI

10

Agreement was a regional tidegate initiative involving a range of stakeholders, including the industry, state and federal agencies (including NMFS) as voting members on the oversight committee, and with the Swinomish Indian Tribal Community as a non-voting member. 2-ER-144 (describing history); 4-ER-735–36.

Under the TFI Agreement, some tidegate repair, replacement, and maintenance projects required applicants to obtain a certain number of habitat restoration credits (measured as acres) before a project could proceed. 2-ER-144. However, tidegate projects that were "operational improvements" did not require credits and could in fact be used to *generate* habitat restoration credits. 2-ER-144–45. "Operational improvements" were defined as including the replacement of conventional top-hinged tidegates with side-hinged projects. 2-ER-144.

In 2009, NMFS issued a biological opinion analyzing the TFI Agreement and reached a "no jeopardy" conclusion. 2-ER-144 (history); *see also* 4-ER-788 (TFI BiOp). Subsequently, project applicants could seek approval from the oversight committee (including NMFS) to use the TFI BiOp to satisfy any ESA consultation obligations related to the proposed project. 2-ER-145.

11

In 2019, NMFS, in its role on the TFI oversight committee, determined that the No-Name Slough Tidegate replacement project qualified for coverage under the "no jeopardy" TFI BiOp and, because it was an "operational improvement," did not require mitigation credits. 2-ER-145; *see also* 4-ER-653–54.[5]

## C. NMFS withdraws the TFI BiOp and, based on unchanged facts, reverses its jeopardy conclusion and requires mitigation.

In February 2020, after receiving confirmation of coverage under the TFI no-jeopardy BiOp, District 12 submitted an application to the U.S. Army Corps of Engineers (Corps) requesting a Clean Water Act Section 404 permit for the Project. 3-ER-454–67.

In 2021, the Swinomish Indian Tribal Community threatened to sue NMFS, contending the TFI oversight committee should not interpret tidegate projects as "operational improvements." 2-ER-145. In response, NMFS determined that "progress toward the restoration goals specified in the TFI Agreement and assumed in NMFS' biological opinion was much slower than expected," and withdrew the TFI BiOp.

---

[5] The oversight committee also approved several other operational improvement projects, including Big Ditch, Higgens Slough, and Joe Leary Slough, without requiring habitat credits. 3-ER-632; 3-ER-597.

2-ER-145; 3-ER-595. Because District 12 had not yet received its Section 404 permit, the Corps advised the district to request individual ESA consultation. 2-ER-145.

District 12 then prepared a Biological Assessment that concluded its Project was not likely to adversely affect listed species that might be present in the project area (including Puget Sound Chinook) and would have no effect on listed Southern Resident killer whales. 3-ER-547. In February 2022, the Corps notified NMFS that it concurred with District 12's conclusion and requested informal ESA consultation. 3-ER-510–11; 2-ER-145.[6] NMFS disagreed with the Corps' conclusion. 3-ER-509. Accordingly, pursuant to ESA requirements, on December 16, 2022, the Corps requested formal consultation. 2-ER-146. Although NMFS was statutorily required to complete formal consultation within 90 days, it

---

[6] The ESA requires federal agencies to engage in consultation with NMFS as part of their duty to guard against harm to species listed under the ESA or the destruction of their critical habitat. 16 U.S.C. § 1536(a)(2). If a proposed project may affect but is "not likely to adversely affect" a listed species or its critical habitat, the agency notifies NMFS of this conclusion as part of what is referred to as "informal" consultation. NMFS has 60 days to respond to an agency's notification. 50 C.F.R. § 402.13(c)(2). If NMFS concurs in writing with the agency's determination, "formal" consultation is not required. 50 C.F.R. § 402.13(c). If NMFS disagrees, "formal" consultation is required.

failed to do so. 3-ER-432. More than 400 days later, District 12 sought and received a mandatory injunction ordering NMFS to comply with its statutory obligations to complete formal consultation. 3-ER-446.

On April 22, 2024, NMFS issued the BiOp at the center of this litigation in which, based on unchanged facts, NMFS concluded that the Project would cause jeopardy and adverse modification to critical habitat, a 180-degree reversal of its prior determination that the Project was eligible for coverage under the TFI "no jeopardy" BiOp. 2-ER-139. The Project BiOp requires mitigation through the generation of at least 275 habitat credits and the restoration of at least 8.6 acres of estuary habitat within the Skagit Bay/Padilla Bay area 2-ER-268, whereas under the TFI BiOp, NMFS had approved the Project with *no* mitigation.

## IV.  The district court affirms the BiOp.

Before the district court, District 12 moved for summary judgment challenging the Project BiOp as arbitrary and capricious and NMFS filed a cross-motion for summary judgment. 2-ER-81, 2-ER-55. The court granted summary judgment to NMFS. 1-ER-3. As described in more detail below, when it did so, the court relied on the post-hoc

rationalizations of NMFS's attorneys, improper evidence not in the record, and substituted its own reasoning for the agency's.

## STANDARD OF REVIEW

This Court reviews the district court's decision and analysis de novo. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927 (9th Cir. 2008). Under the Administrative Procedure Act, 5 U.S.C. § 706, this Court reviews the underlying agency action to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.*; *see also Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045, 1056 (9th Cir. 2024). An action is arbitrary or capricious "if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1074–75 (9th Cir. 2011) (citation omitted).

While the arbitrary and capricious standard is deferential, it does not shield agency decisions from a "thorough, probing, in-depth review."

*Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (cleaned up). A court must "determine whether the agency articulated a rational connection between the facts found and the choice made." *Ariz. Cattle Growers Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001). An agency is not entitled to deference when its conclusions "do not have a basis in fact." *Id.* Judicial review pursuant to the APA is limited to the administrative record at the time of the agency's decision. *Nat. Res. Def. Council*, 102 F.4th at 1056; *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 1008 (9th Cir. 2014); 5 U.S.C. § 706.

## SUMMARY OF THE ARGUMENT

To support a finding of "jeopardy" for a Project that improves existing conditions and that NMFS previously concluded would not cause jeopardy, the agency took data out of context and made findings that conflict with the record and the agency's own technical analysis. NMFS also incorrectly measured the "effects" of the Project by comparing it to pre-development "natural" conditions as they existed 140 years ago, instead of to the existing environment, which includes more than a century of development and the existing tidegate.

16

Instead of recognizing these errors and requiring the agency to correct its BiOp, the district court relied on the unsupported post-hoc rationalizations of NMFS's attorneys, which are not based on record evidence and *conflict* with the record. Similarly, when reviewing the agency's analysis of the Project's effects on listed species and habitat, the court relied on extra-record information and its own reasoning, which it incorrectly substituted for that of the agency's. The result was the court's affirmance of a BiOp that is arbitrary, capricious, and contrary to law.

## ARGUMENT

### I. The court erroneously relied on the post-hoc rationalizations of the agency's attorneys, which conflicted with evidence in the record.

To avoid reversal, NMFS needed to articulate a rational connection "between the facts found and the conclusions made." *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 527 (9th Cir. 2010) (quoting *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1090 (9th Cir. 2005)). Its action "must be upheld, if at all, on the basis articulated by the agency itself," not on the "post hoc rationalizations" of its lawyers. *Motor Vehicle Mfrs. Ass'n v. State Farm*

17

*Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983); *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 23 (2020) (quoting *Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 539 (1981)); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).

Here, NMFS based its jeopardy conclusion solely on its own arbitrary, misleading, and wholly unexplained selection of an arbitrary 15-year period (2005-2019) that NMFS suggests shows a declining Skagit Chinook population trend.[7] However, the "trend" during the selected period is driven by an anomalous population spike in 2005 and conflicts with positive population trends across both shorter and longer periods.

To compensate for these errors before the district court, NMFS's attorneys, for the first time in their reply brief, invented a new post-hoc rationalization for the jeopardy conclusion that lacked any evidentiary support and conflicted with the record. The court acknowledged that relying on such information would be legally improper, but did so

---

[7] NMFS's conclusion that the Project will jeopardize Southern Resident killer whales depends on its arbitrary conclusion that the Project will jeopardize Puget Sound Chinook, a prey species of the Southern Resident killer whale. 2-ER-250–51.

18

anyway, citing the post-hoc rationalizations of NMFS's attorneys as a basis for its decision.

### A. NMFS failed to address or explain the conflict between its jeopardy finding and evidence in the record on Skagit Chinook population trends.

In the BiOp, when explaining the basis for its jeopardy finding, NMFS cited "15-year declining trends" in the abundance of Skagit populations of Puget Sound Chinook salmon. 2-ER-261–62, 3-ER-344 ("The status of the Skagit populations is best summed up" by the BiOp's conclusion that they "are at less than 20 percent of their overall recovery goal and have experienced 15-year declining trends in abundance (Ford 2022)."). Other than producing the chart reproduced below, NMFS did not explain the basis for its conclusion that fish trends are declining. 2-ER-242. The relevant chart, which is Figure 9 in the Project BiOp, shows the following:



2-ER-242.

As is plain from this chart, between 1980 and 2020, the Skagit Chinook population has gone up and down (despite the continuous presence of the tidegate), but, since before 1980, has been trending *up* (as indicated by the orange dashed line). Indeed, NMFS has recognized that populations of Skagit Chinook are faring better than other Chinook populations in Puget Sound. *See, e.g.*, 3-ER-579 ("The populations with the highest fractions of natural-origin spawners across the entire 1980 to 2018 time period are the six Skagit River population"); *see also* 3-ER-574,577, 582, 594. Further, the five-year geometric mean for both the Lower and Upper Skagit spawner counts has increased by 219 percent and 169 percent, respectively, since they were listed under the ESA. 3-

20

ER-575 (compare 1995–1999 count to 2015–2019 count); *see also* 2-ER-242.

The most recent short-term trends are also positive, as is apparent from NMFS's technical memorandum, which demonstrates based on natural origin spawner counts between the two most recent five-year review periods (2010-2014 and 2015-2019) that five of the six Skagit Chinook populations[8] have experienced a significant, positive population increase, and have population productivity values above zero in the most recent analysis.[9] 3-ER-575; *see also* 2-ER-166-67; 3-ER-575 (showing increases between 35 and 70 percent for Lower Skagit River, Upper Skagit River, Lower Sauk River, Upper Sauk River, and Suiattle River populations.)

Rather than relying on those short- or long-term trends, when determining the trend of the Skagit Chinook populations, NMFS cherrypicked a 15-year period that, when considered in context, is both

---

[8] The six Skagit Chinook populations comprise the Lower Skagit River, Upper Skagit River, Lower Sauk, Upper Sauk, Suiattle River, and Cascade River populations. *See generally* 3-ER-392.

[9] Productivity values above zero indicate that productivity is estimated to be higher than replacement rates for returning natural-origin spawners. *See* 3-ER-575.

misleading and inconsistent with nearly every other measure of abundance trends. The 15-year trend NMFS identified begins in 2005—a year containing an anomalous population spike. *See* 2-ER-242. That spike, an extreme outliner, skews NMFS's entire population trajectory. *See* 2-ER-242. NMFS did not explain why it relied on the misleading 15-year trend instead of the other more representative positive population data.

As explained above, the Project involves replacing a 140-year-old tidegate with a more modern version that will *improve* fish passage. NMFS did not explain in any way how replacing a 140-year-old tidegate with a tidegate that improves fish passage would reverse demonstrated *positive* fish population trends that have persisted with the existing tidegate in place. Instead, it disregarded without explanation the positive population trends in favor of a 15-year declining trend skewed by a 2005 spike, to conclude populations are decreasing, even though they are not.

NMFS's arbitrary and misleading reliance on its chosen 15-year population trend and the agency's failure to explain how it arrived at conclusions contrary to short- and long-term population trends

constituted reversible error. *Wild Fish Conservancy*, 628 F.3d at 526–27 (rejecting NMFS's conclusion that fish population would stay the same as irreconcilable with its finding that population trend is negative); *see also Ariz. Cattle Growers Ass'n*, 273 F.3d at 1236.

> **B.    To compensate for NMFS's errors, its attorneys offered post-hoc rationalizations in briefing before the district court and the court erroneously relied on those rationalizations.**

As shown above, NMFS did not offer any explanation for why it chose to measure trends beginning at the most extreme upward spike in 2005, or why it disregarded the overall upward trend portrayed in its own chart and technical memorandum. To offset this explanatory and evidentiary gap, in its reply brief before the district court, NMFS's attorneys argued for the first time that NMFS's reliance on the 15-year trend was consistent with "raw data" underlying Figure 9 that showed "negative trends for each of the six Skagit populations (ranging from -1% to -75%)" between 1990 and 2019. 2-ER-51. NMFS's attorneys did not cite any evidence to support their claim, and there is no such evidence in the Project BiOp or administrative record. Instead, the agency's purported reliance on "raw data" underlying Figure 9 is the post-hoc rationalization of NMFS's attorneys.

District 12 moved to strike NMFS's post-hoc statements and its reliance on uncited evidence. 2-ER-37-38. The court denied District 12's motion but said it would not consider such information because doing so would be improper. 1-ER-13-14. Despite this, when granting NMFS's motion for summary judgment, the court rationalized NMFS's reliance on "15-year declining trends in abundance" by noting that "raw data from" Figure 9 "between 1990 and 2019 yields negative trends for each of the six Skagit populations (ranging from -1 to -75%)." 1-ER-27. In support, the court cited only Figure 9 which, as demonstrated above, contains no such information and indicates a contrary result. 1-ER-27.

In short, despite expressly recognizing it would be wrong to do so, the court adopted verbatim the unsupported post-hoc rationalizations of NMFS's attorneys and cited those assertions as a basis for its decision. This is reversible error. *Ariz. Cattle Growers Ass'n*, 273 F.3d at 1236. Without NMFS's improper post-hoc arguments, only the statements of the agency remain and those statements, as described above, cannot be reconciled with the rest of the evidentiary record and are insufficient to provide the explanation the law requires when an agency chooses between conflicting information.

24

## II.   NMFS misapplied the regulatory definition of "effects of the action."

ESA implementing regulations plainly and expressly require agencies to measure the "effects" of a proposed action on a species by comparing the environment post-project to the current existing environment, which, in this case, would have included all impacts from existing tidegates and development in the area. NMFS identified this rule, cited the correct regulations, and described these conditions in the "baseline" section of the Project BiOp. But when the agency conducted its effects analysis, it measured the Project's effects by comparing it to a fictional scenario in which the existing tidegate does not exist and natural pre-development conditions return.

### A.   The "effects of an action" on a species must be measured from existing conditions as reflected in the "environmental baseline."

When measuring the "effects" of a proposed action on an ESA-listed species, the critical first step is to set the environmental baseline from which to measure those effects. *San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 1008 ("To determine how agency action affects listed species, the consulting agency must analyze the action in relation to the 'environmental baseline'") (quoting 50 C.F.R. § 402.02).

The ESA's implementing regulations[10] define "environmental baseline" as "the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action." 50 C.F.R. § 402.02. This baseline includes "the past and present impacts of all Federal, State, or private actions and other human activities in the action area." *Id.*; *see also Forest Serv. Emp. for Env't Ethics v. U.S. Forest Serv.*, 726 F.Supp.2d 1195, 1225 (D. Mont. 2010).

The purpose of the baseline is to describe "the status quo, i.e., the current condition of the species *before* the proposed action" occurs. *Forest Serv. Emp.*, 726 F.Supp.2d. at 1226. "[T]he particular characteristics of the project are irrelevant to the establishment of an environmental baseline." *Id*. In other words, the baseline serves as a "snapshot" of a species' health at a particular point in time. *San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 1008; *see also* U.S. Fish and Wildlife Serv. and Nat'l Marine Fisheries Serv., *Endangered Species*

---

[10] The relevant regulations have gone through modifications in recent years, including in 2019 and 2024. For purposes of the Project BiOp, the 2019 regulations govern. *Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation*, 84 Fed. Reg. 44976, 44978 (Aug. 27, 2019).

26

*Consultation Handbook* 4-22 (Mar. 1998), available at

https://www.fws.gov/media/endangered-species-consultation-handbook

("Consultation Handbook").[11]

### B. The "effects of the action" are those caused by the Project.

Although using a baseline based on existing conditions might

mean a species has already been jeopardized, that existing jeopardy

does not prevent new federal action. *Nat'l Wildlife Fed'n*, 524 F.3d at

930. Instead, agencies must assess whether a proposed project is the

"but for" cause of any *new* harm to the species. 84 Fed. Reg. at 44977;

50 C.F.R. § 402.02. That is because the term "'jeopardize'—the action

ESA prohibits—means to 'expose to loss or injury' or to 'imperil.' Either

of these implies causation, and thus some new risk of harm." *Nat'l*

*Wildlife Fed'n*, 524 F.3d at 930 (quoting American Heritage Dictionary

of the English Language (4th Ed.)). The correct analysis is therefore

"whether the 'action effects, *when added to the underlying baseline*

---

[11] Courts recognize and rely on the Consultation Handbook for
interpretive guidance and have afforded it *Skidmore* deference. *See, e.g.*,
*San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 634–35
(9th Cir. 2014) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).
For this Court's convenience, pertinent excerpts have been included in
the Addendum of Authorities attached to this brief.

*conditions*,' are such that they would cause jeopardy." *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 737 (9th Cir. 2017) (emphasis added), quoting *Id.* at 929.

### C. Instead of measuring the incremental effects of the action from the existing environmental baseline, NMFS erroneously compared post-Project conditions to natural pre-development conditions.

As described above, the Project involves replacing a 140-year-old tidegate with a new tidegate that will improve fish passage. The current tidegate exists in an area that has been developed for agricultural uses, where the natural shoreline has already been replaced with shoreline armoring/dikes, and where the existing tidegate blocks access to landward fish habitat. 2-ER-213–15; 3-ER-368. As described above, pursuant to the plain and unambiguous language of the ESA's implementing regulations, these existing conditions form the environmental baseline from which the new tidegate's effects on endangered species in the area must be measured.

NMFS recognized that the environmental baseline must include existing conditions and exclude consequences of the proposed action. 2-ER-207–18. NMFS also said its effects analysis did not consider "the theoretical, possible future degradation of" existing tidegate structures

28

on the environment and that, in any event, the most likely scenario is
that the existing tidegate would continue to be maintained, even if the
Project does not go forward. 2-ER-220. Yet despite these disclaimers,
rather than analyze the incremental effects of the Project against the
current, factually verifiable condition (i.e. with the existing tidegate),
when it conducted its effects analysis, NMFS attributed changes that
occurred more than 140 years ago to the Project.

The inherent contradiction between the actual (and legally sound)
"environmental baseline" and the baseline from which NMFS calculated
the effects of the Project is fatal to its analysis. For example, the Project
BiOp claims installation of replacement armoring associated with the
Project will increase "beach erosion" and compares the shoreline to "a
natural shoreline" and "natural beach" featuring "natural upper
intertidal shoreline processes." 2-ER-228–29, 249. The Project BiOp also
claims the Project will "reduce or eliminate shallow water habitats" and
"result in a higher rate of beach erosion . . . compared to a natural
shoreline." 2-ER-228. It similarly claims the physical "deepening" of the
nearshore zone caused by shoreline armoring will reduce cover for
juvenile salmon, 2-ER-229, that the Project will "convert what would

29

otherwise be marine wetlands to agricultural land with greater freshwater influence (and maintain it that way)," and that "[o]nce replaced, the tidegates at [No Name Slough] will impair access to available habitat in No Name Creek." 2-ER-232–33.

But the baseline NMFS used in its BiOp found that every one of these listed "effects" had already occurred and is present in the environment today. 2-ER-207–18. The new tidegate has the same structural footprint as the existing tidegate and is designed to *improve* fish passage compared to existing conditions. *See, e.g.*, 4-ER-920 (with side-hinge tidegates, the "doors open wide, and fish passage is expected to be significantly better than when top-hinged tide gates are used."); *see also* 2-ER-233; 4-ER-657–59; 3-ER-482.

The Project BiOp's effects analysis fails to describe the effects of the Project compared to an environment that includes the existing top-hinged tidegate and other existing conditions because NMFS *did not perform that analysis*. Instead, it erroneously compared the effects of the proposed action to natural conditions that have not existed for more than 140 years.

30

Because NMFS did not review the incremental effects of the replacement tidegate compared to actual existing conditions, it had no basis for its conclusion that the Project will jeopardize the species or cause adverse modification to critical habitat. The Project BiOp's incorrect application of the ESA regulations and the irreconcilable inconsistencies in its analysis constitute error requiring reversal.

## III. The court's analysis of the Project BiOp's "effects of the action" lacks support in fact and law and conflicts with precedent.

Instead of grappling with NMFS's internally contradictory and incoherent analysis and its obvious errors, the court rationalized NMFS's consideration of "natural" conditions as reasonable because, absent the Project, the existing tidegate would "not continue to exist." 1-ER-25. In so finding, the court falsely equated habitat conditions as they exist with a "failing" tidegate to conditions without any tidegate (or other development) at all. In doing so, the court assumed facts and reasoning not in—and contrary to—the record and improperly relied on several documents, including a 2022 interagency memo and a 2002 draft BiOp for a different tidegate not in the record.

This resulted in the court upholding an analysis that treats a replacement tidegate as the but-for cause of conditions that already exist. That is the exact opposite of what the regulations require and, if affirmed, would conflict with this Court's precedent and a recent decision considering the same question before the U.S. Court of Appeals for the D.C. Circuit.

## A. The court improperly substituted its judgment for the agency's.

It is an axiomatic principle of administrative law that a reviewing court may not substitute its judgment for the agency's. If grounds an agency gives for its decision "are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis" and "must remand rather than combing the record for evidence on which the agency may have relied." *Alaska Eskimo Whaling Comm'n v. Env't Prot. Agency*, 791 F.3d 1088, 1093 (9th Cir. 2015) (quoting *Sec. Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947)); *Nat. Res. Def. Council*, 102 F.4th at 1056.

Here, the court concluded the Project BiOp's effects analysis was reasonable because, according to the court, "'but for' the permitting of

the [No Name Slough] Tidegate Project, a structurally sound tidegate complex would not continue to exist," 1-ER-24–25, and, presumably, pre-development natural conditions would eventually return. 1-ER-22. In other words, in a misguided and somewhat convoluted attempt to reconcile NMFS's (a) use of "natural" conditions as a baseline instead of actual, verifiable environmental conditions with (b) NMFS's finding that the broken tidegate would continue to exist, the court falsely equated a structurally "unsound" tidegate with *no* tidegate.

As a preliminary matter, nothing in the record suggests conditions would be the same with a structurally unsound tidegate versus no tidegate at all, or that natural conditions could return if a structurally unsound tidegate remained in place. Indeed, the record contradicts this. The Project BiOp recognizes that, although the tidegate is structurally compromised, it exists and continues to "drain the slough to the west and southwest," 2-ER-218 and "diminish habitat quality and block fish from accessing tidal creeks." 2-ER-217–18.

Further, the assumption underlying the court's decision—that, but for the Project, "the tidegate and armoring would degrade and ultimately fail," leading to a return of natural conditions, 1-ER-22, is

33

contrary to the record. Indeed, the Project BiOp expressly stated it "does not consider the theoretical, possible future degradation" of the tidegate because "the range of potential outcomes is exponential, to the point it is not reasonable to assume them all, nor is there currently enough data or analysis that would support such an evaluation." 2-ER-220. According to the Project BiOp, even if left to degrade, "complete degradation could take years" and impacts could be "both negative . . . and positive." 2-ER-220.

Instead, and directly contrary to the court's rationale, NMFS concluded that, according to a "preponderance of evidence," the "reasonable likely" outcome, absent replacement, is that "this structure will *not* be left to degrade." 2-ER-220 (emphasis added). The agency's own findings contradict the court's invented rationale which, as a matter of law and fairness, cannot stand.

### B. The cited unpublished interagency memo cannot excuse compliance with unambiguous regulatory requirements.

NMFS attempted to support its faulty and incoherent effects analysis by citing an unpublished interagency memo in which the agency suggests that when an existing structure is at the end of its

34

"useful" life, the effects of extending the life of the structure may be treated as effects of the action. The court relied in part on this unpublished interagency memo to conclude that when a project "extends the life" of a structure, the effects of that extension are analyzed as effects of the proposed action. 1-ER-21–22.

District 12 disagrees with the court's (and NMFS's) proffered interpretations of the memo, which states that agencies should evaluate "what consequences would not occur but for the action," while recognizing that issuance of a permit is not a "but for" cause of an existing structure and denial of such a permit "would not revoke or otherwise affect a prior authorization for the structure to exist." 3-ER-566–67. Here, the court and NMFS did just the opposite in their effects analyses: they assumed that, but for the permit, the structure would not exist.

More importantly, however, the memorandum, regardless of how it is interpreted, has no precedential value and is entitled to no weight because the regulatory definitions of "environmental baseline" and "effects of the action" control, and are not ambiguous. *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (an agency's interpretation of its own

regulation does not control when it is "inconsistent with the regulation.") (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989.))

As described above, the implementing regulations require agencies to include existing structures in the environmental baseline and measure "but for" effects of the proposed action from that baseline. 50 C.F.R. § 402.02; *see also Nat'l Wildlife Fed'n*, 524 F.3d at 924 (relying on plain language of definitions); *Wild Fish Conservancy*, 628 F.3d at 525–27 (same); *Ctr. for Biological Diversity v. Env't Prot. Agency*, 141 F.4th 153, 177–79 (D.C. Cir. 2025) (same). Agency guidance that is inconsistent with the regulations receives no deference. *Perez-Gonzalez v. Ashcroft*, 379 F.3d 783, 793–94 (9th Cir. 2004) (deferring to regulations rather than informal guidance where the interpretation set forth in the guidance rendered the regulations "nonsensical").

The unpublished 2022 interagency memo's interpretation is also inconsistent with the agency's longstanding treatment of the regulations. For example, the Services' Consultation Handbook, when describing how to treat projects effecting existing structures, provides an example involving an agency's approval of a new turbine at an

existing dam: "Ongoing effects of the existing dam are already included in the Environmental Baseline and would not be considered an effect of the proposed action under consultation." *Consultation Handbook*, 4-28. In another example, the Consultation Handbook explains that when making safety upgrades to an existing dam, the dam is not treated as an "effect" of those upgrades because it "does not depend upon the proposed action for its existence." *Id.* The test, according to the Consultation Handbook, is whether the structure would exist "but for" for the new federal action, "not whether the [federal action] in some way assists or facilitates in the continued operation of the pre-existing project." *Id.*

Likewise, in its review of a proposed action to rebuild a *failing* dam, NMFS concluded that "the dam has already been constructed, and its existence is an element of the environmental baseline," and that "other than these temporary effects of construction, the proposed action adds nothing to the existing environmental baseline in the action area." *Confederated Tribes & Bands of the Yakama Nation v. McDonald*, 2003 WL 1955763, at *10–11 (E.D. Wash. Jan. 24, 2003). The reviewing court concurred, holding that the "existing dam is part of the 'environmental

37

baseline.'" *Id.* at *14; *see also Nat'l Wildlife Fed'n*, 524 F.3d at 930–31 ("The current existence of the [] dams constitutes an existing human activity which is already endangering the fishes' survival and recovery . . . . Any proposed agency action must be evaluated in the conte[xt] of this baseline in order to properly determine whether the proposed actions will jeopardize the listed fishes.")(cleaned up.)

These prior positions cannot be squared with interpretations the court and NMFS proposed in this litigation and further cut against the memo's persuasive weight. *See Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 388 (2024) (weight given to "interpretations and opinions of the relevant agency," depends "upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control") (quoting *Skidmore*, 323 U.S. at 140); *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 225 (2015) (current position "inconsistent with positions for which the Government has long advocated" entitled to no special persuasive weight); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)("An unexplained inconsistency in agency policy is a reason for holding an interpretation

to be an arbitrary and capricious change from agency practice.")(cleaned up). It was error for the court and NMFS to rely in any way on the unpublished memo.

### C. In addition to conflicting with ESA regulations and long-standing agency interpretation, including existing baseline conditions as future effects of the action would conflict with case law.

The D.C. Circuit recently rejected the precise interpretation NMFS and the court applied here. In *Center for Biological Diversity*, EPA had calculated the effects of a proposed action by analyzing the incremental, forward-looking effects of that action compared to a scenario in which the proposed rule did not go into effect. 141 F.4th at 178–79.[12] The agency used an environmental baseline based on the current (pre-proposed action) environment, which included existing effects from previous iterations of the rule. *Id.*

Plaintiffs argued EPA should have instead compared the effects of the proposed rule to a hypothetical baseline in which the entire regulatory scheme, dating back almost 20 years, never existed. *Id.* at

---

[12] The challenge was to EPA's biological assessment, rather than the Services' biological opinion, but the same regulations govern both types of documents.

178. They argued such a baseline would "force EPA to reckon with the cumulative environmental effects of [the regulatory scheme] since [its inception] for which EPA did not comply with its ESA obligations." *Id*. The DC Circuit flatly rejected this argument. In doing so, it noted that plaintiffs had identified "no authority" for such an approach and, citing the plain regulatory definition of "environmental baseline," found that "the ESA's implementing regulations foreclose it." *Id*. at 178–79.

Similarly, this Court has repeatedly relied on the plain language of the implementing regulations to conclude that an effects analysis must consider the incremental effects of a project compared to a baseline that includes the effects of existing and prior federal actions. *See, e.g.*, *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1162 n.6 (9th Cir. 1999) (regulations require consideration of a proposed project "within the context of other existing human activities that impact the listed species" and whether "incremental" effects of the proposed project jeopardize the species); *Nat'l Wildlife Fed'n*, 524 F.3d at 930 (to "jeopardize" means to cause "some new risk of harm" beyond existing conditions that "causes some deterioration in the species' pre-action condition").

40

NMFS has not cited—and District 12 is unaware of—any case that has upheld use of a baseline that omits existing structures and related human activities. Such an approach is directly at odds with the plain language of the ESA regulations, the government's prior interpretation of those regulations, and case law applying those regulations.

## IV. NMFS failed to sufficiently explain why it changed its determination from "no jeopardy" to jeopardy based on unchanged facts.

In 2019, based on the same facts, NMFS, as part of the TFI oversight committee, determined that the Project qualified for ESA coverage under the TFI no jeopardy BiOp and did not require mitigation. NMFS had a duty to explain why those same facts led to the opposite conclusion in this BiOp. *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. Of Trade*, 412 U.S. 800, 808 (1973) (plurality opinion) (describing an "agency's duty to explain its departure from prior norms" and holding that when an agency departs from prior norms, its reasons "must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate"); *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 690 (9th Cir. 2007) (same). An agency may

41

not rely on "an explanation for its decision that runs counter to the evidence." *State Farm*, 463 U.S. at 43 (cleaned up); *Waterkeeper All. v. U.S. Env't Prot. Agency*, 140 F.4th 1193, 1228 (9th Cir. 2025); *see also Defs. of Wildlife v. Hall*, 565 F. Supp.2d 1160, 1170 (D. Mont. 2008) (applying same rules to agency's unexplained departure from prior factual finding). In defense of its changed determination, NMFS made several arguments, none of which have support in the record.

### A.    The TFI BiOp.

In defense of its changed position, NMFS first argued, and the court agreed, that the TFI BiOp is distinguishable because it was programmatic and "there was never an individual ESA determination on the [No Name Slough] Tidegate Project." 1-ER-15. That is incorrect. The individual determination is included in the administrative record, which the court recognized elsewhere in its decision. 4-ER-634, 636, 656; *see also* 1-ER-14. In 2019, NMFS concurred that District 12's replacement project was an "operational improvement" for which credit and mitigation was not required under the TFI BiOp. *See, e.g.*, 4-ER-653–54. That finding is consistent with the TFI's definition of "operational improvement," which explicitly includes the type of

replacement project proposed here. 4-ER-729–30 ("operational improvement" includes replacement of a conventional tidegate with a side-hinge tidegate).

The court also accepted NMFS's explanation that it had changed its mind on the treatment of replacement projects as operational improvements because under its prior interpretation, restoration credits associated with tidegate complexes were not materializing as had been expected. 1-ER-15 n.9. But this is a red herring. Under the TFI BiOp, restoration credits were never required for operational improvements. The fact that other projects covered under the TFI BiOp failed to generate credits quickly enough has no bearing on the impacts of operational improvements, whether operational improvements cause jeopardy, and whether such projects require mitigation.

NMFS's insinuation that habitat restoration was slower than anticipated *because* the oversight committee was improperly allowing operational improvements is also refuted by the 10-year report the TFI oversight committee drafted in response to comments on the TFI. According to that document, progress on restoration goals was slower than initially anticipated simply because "the pace of both restoration

actions and tidegate repairs have both been slower than anticipated." 3-ER-605. Thus, the document recognized a "*surplus* of habitat credits available for use." 3-ER-605 (emphasis added). NMFS's explanation for why it withdrew the TFI BiOp therefore conflicts with the record and cannot support NMFS's reversed position with respect to the Project.

Regardless of whether NMFS's rationale for its withdrawal of the TFI BiOp was pretextual, NMFS's explanation for its changed position with respect to the Project is insufficient because it lacks any scientific or factual support. NMFS offered no rational, legal, or scientific basis to explain why the same Project that qualified for coverage under a no-jeopardy opinion in 2019 without mitigation, was found to cause jeopardy requiring significant mitigation in 2024.

### B.     The draft Dry Slough BiOp.

The court also cited jeopardy and adverse modification findings NMFS purportedly made in a draft BiOp for another tidegate in a different area (the Dry Slough tidegate) more than 20 years ago to suggest NMFS's treatment of the No Name Slough replacement project was consistent with how it had analyzed the effects of other tidegate replacements. The cited draft BiOp was never completed and is not in

the administrative record. Instead, it is referenced in *Swinomish Indian Tribal Cmty. v. Skagit Cnty. Dike Dist. No. 22 ("District 22")*, 618 F. Supp. 2d 1262, 1264–65, 71 (W.D. Wash. 2008). The court had no basis to conclude that the Project BiOp is consistent with a draft BiOp the court never saw.

The court acknowledged that the *District 22* draft BiOp is not in the record and said it was instead relying on statements Kim Kratz made about the *District 22* BiOp on April 19, 2024, when describing information NMFS had considered for the Project BiOp. 1-ER-16 n.10. But that is a distinction without a difference. Simply saying the agency considered a document outside the record does not somehow transform that extra-record information into something on which the court may affirm agency action. *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1536–37 (9th Cir. 1993) ("a record that does not include all matters on which the Committee relied does not constitute the 'whole record' required for judicial review and…the failure to include all materials in the record violates the Administrative Procedure Act"). If merely describing a document was sufficient, any agency could simply describe information it had considered without

making it part of the record, forcing project applicants and the public to take the agency at its word. But "trust me" is not a basis for affirming agency action. The APA prohibits agencies from engaging in such hide-the-ball tactics.

The court also mischaracterized the *District 22* decision. The Dry Slough tidegate replacement project at issue in that case had been proposed as an in-kind replacement, not an operational improvement. Indeed, to avoid a jeopardy determination, the agency had imposed a condition requiring installation of a "self-regulating" tidegate within a year—an operational improvement intended to improve fish passage, comparable to the side-hinge tidegate District 12 seeks to install. *District 22*, 618 F. Supp. 2d at 1264. Likewise, nothing in the decision suggests the Dry Slough tidegate's effects were measured against natural pre-development conditions. The court committed legal and factual error when relying on the draft undisclosed Dry Slough BiOp referenced in *District 22*.

46

## CONCLUSION

For reasons stated herein, this Court should reverse the district court's judgment with instructions to remand.

Respectfully submitted,

*s/ Charlene Koski*
Charlene Koski, WSBA No. 43178
Jenna R. Mandell-Rice, WSBA No. 49667

VAN NESS FELDMAN LLP
1191 Second Avenue, Suite 1800
Seattle, WA 98101
(206) 623-9372
ckoski@vnf.com
jrm@vnf.com

*Attorneys for Appellants*

Date: February 9, 2026

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s): 25-3757**

I am the attorney or self-represented party.

**This brief contains 8,730 words,** including 27 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6). I certify that this brief *(select only one)*:

[**X**] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Charlene Koski*  **Date** February 9, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated at Seattle, WA, this 9th day of February, 2026.

*/s/ Charlene Koski*
Charlene Koski