**No. 25-3757**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

SKAGIT COUNTY DIKE, DRAINAGE AND IRRIGATION
IMPROVEMENT DISTRICT NO. 12,

*Plaintiff-Appellant,*

v.

NATIONAL MARINE FISHERIES SERVICE, et al.,

*Defendant-Appellees.*

On Appeal from the United States District Court for the Western
District of Washington, No. 2:23-cv-01954-BAT
Hon. Brian A. Tsuchida

---

**APPELLANT'S EXCERPTS OF THE RECORD**
**VOLUME 2 of 5 – PAGES 36–335**

---

Charlene Koski
Jenna R. Mandell-Rice
VAN NESS FELDMAN LLP
1191 Second Avenue, Suite 1800
Seattle, WA 98101
(206) 623-9372
cbk@vnf.com
jrm@vnf.com

*Attorneys for Appellant*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

The Honorable Brian A. Tsuchida

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTICT OF WASHINGTON
AT SEATTLE

SKAGIT COUNTY DIKE, DRAINAGE,
& IRRIGATION IMPROVEMENT DIST.
NO. 12

                              Plaintiff,

    v.

NATIONAL MARINE FISHERIES
SERVICE; DEPARTMENT OF
COMMERCE; HOWARD LUTNIK in his
official capacity as Secretary of Commerce;
EMILY MENASHES in her official
capacity as the Assistant Administrator for
NOAA Fisheries,

                              Defendants.

Case No. 2:23-cv-01954-BAT

PLAINTFF'S SURREPLY TO
DEFENDANTS' REPLY IN SUPPORT
OF CROSS-MOTION FOR SUMMARY
JUDGMENT

## I.    INTRODUCTION

Pursuant to Local Civil Rule ("LcR") 7(g)(2), Skagit County Dike, Drainage, & Irrigation

Improvement District No. 12 ("District") respectfully requests that the Court strike and disregard

portions of Defendants' Reply in Support of Cross-Motion for Summary Judgment ("Reply"), ECF

59. Defendants impermissibly: (1) present new arguments and/or evidence; (2) rely on pre-

PLAINTIFF'S SURREPLY - 1
Case No. 2:23-cv-01954-BAT

**Van Ness
Feldman** LLP

1    decisional materials not in the administrative record ("Record"); and/or (3) raise factual assertions

2    without any citation to the Record.

3                                    **II.    ARGUMENT**

4            Material contained in a reply brief can be struck when a party fails to raise arguments in

5    their motion or response or raises new arguments and presents new evidence on reply.  *See, e.g.,*

6    *Roth v. BASF Corp.*, C07-106MJP, 2008 WL 2148803, at *3 (W.D. Wash. May 21, 2008) (new

7    evidence or new argument in a reply brief is not "acceptable" practice); *Stelman v. Amazon.com*

8    *Inc.*, No. C22-01632 RSM, 2023 WL 1879472, at *3 n.1 (W.D. Wash. Feb. 10, 2023) (party's

9    failure to address movant's arguments in the response brief resulted in waiver), *rev'd on other*

10   *grounds* 2023 WL 7017093; *Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1178 n.7 (9th Cir. 2016).

11           Additionally, "[j]udicial review pursuant to the [Administrative Procedure Act] is based

12   solely on the administrative record[.]" *Ctr. for Biological Diversity v. U.S. EPA*, 90 F. Supp. 3d

13   1177, 1197 (W.D. Wash. 2015); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.*

14   *Ins. Co.*, 463 U.S. 29, 50 (1983) ("agency's action must be upheld, if at all, on the basis articulated

15   by the agency itself," not based on a "*post hoc* rationalization") (emphasis in original).  Factual

16   assertions that are unsupported by the record must be stricken.  *St. Paul Fire & Marine Ins. Co. v.*

17   *Hebert Constr., Inc.,* No. C05-388Z, 2006 WL 2045804, at *13 (W.D. Wash. July 19, 2006)

18   (striking "factual assertions . . .  that are unsupported by citation to the record as required under

19   FED. R. CIV. P. 56."); LcR 10(e)(6).

20           The District respectfully requests that the Court strike the following portions of Defendants'

21   Reply:

22      (1) ECF 59 at 10:10–14: "For example, Plaintiff relies heavily on the data in Table 50 at
23          AR0035536 to assert positive population trends. However, that Table shows only

PLAINTIFF'S SURREPLY - 2
Case No. 2:23-cv-01954-BAT



geometric means, which do not provide adequate data from which to draw conclusions about population trends because they fail to capture important variability data."

Rationale: Defendants provide no citation to support the proposition that geometric means do not provide adequate data from which to draw conclusions. Indeed, Table 50 is from Defendants' own technical memorandum. AR0035315. Defendants' statement is an impermissible post-hoc rationalization. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50; *Nat. Res. Def. Council v. U.S. EPA*, 857 F.3d 1030, 1040 (9th Cir. 2017). Defendants also waived this argument, and it is an impermissible new argument on reply. In its Motion for Summary Judgment ("Motion"), the District relied on Table 50[1] to support its argument regarding Chinook abundance, ECF 40-1 at 12:1–3; 29:18–24. Defendants did not raise any limitations to Table 50 in their Response. ECF 51-1 at 21–22.

(2) ECF 59 at 10:16–24: "Using raw data from the figure in AR0051210 between 1990 and 2019 yields negative trends for each of the six Skagit populations (ranging from -1 to -75%). The facts are what they are. Plaintiff cannot ignore the long-term data demonstrating that the NNS tide gate complex, and structures like it, contributed to the current PS Chinook population status and habitat conditions. Nor can it deny the fact that, in the last 25 years, the PS Chinook has had no meaningful progress toward reversing its threatened status, due in part to structures like the NNS tide gate complex and – as seen with the TFI Agreement/Oversight Committee – creative attempts to skirt obligations for meaningful habitat mitigation."

Rationale: Defendants provide no citation to the Record to support any of these factual assertions. Defendants discuss "raw data," but do not provide any citation to where this "raw data" can be found. Defendants cannot rely on evidence or data not included in their Record, which the District (and the Court) have had no opportunity to review or probe. Furthermore, Defendants

---

[1] AR0001319 (cited in the District's Motion) is a duplicate of AR0035536 (cited in Defendants' Reply).

PLAINTIFF'S SURREPLY - 3
Case No. 2:23-cv-01954-BAT

**Van Ness Feldman** LLP

1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

ER-39

1    waived this argument, and it amounts to an impermissible new argument on reply.  In its Motion,

2    the District argued that short-term Skagit Chinook abundance trends are increasing, ECF 40-1 at

3    29–30, and Defendants did not contest this in their Response. ECF 51-1 at 21–22.

4         (3) ECF 59 at 3:8–27: [Quotation omitted for brevity.]

5         Rationale:  Defendants rely on a pre-decisional, draft biological opinion ("biop") that is

6    not in the Record.  Although limited information regarding that draft biop can be drawn from

7    *Swinomish Indian Tribal Cmty. v. Skagit Cnty. Dike Dist. No. 22*, 618 F. Supp. 2d 1262, 1264

8    (W.D. Wash. 2008), Defendants' contention that the Dry Slough biop is consistent with the No

9    Name biop cannot be supported based on the Record and must be stricken.

10        (4) ECF 59 at 11 n.6: "Plaintiff's claim regarding the effects of McGlinn Jetty is not true. The
11        majority of juvenile Chinook in Samish Bay, just to the North of Padilla Bay, are from
          populations outside of the Skagit Basin, AR0000530-31, and do not encounter the jetty.
12        Furthermore, while the jetty constrains passage for Skagit Chinook, it does not block them
          from using the Swinomish corridor, AR0040254, to access habitat in Padilla Bay,
13        AR0037833-836."

14        Rationale:   In its Motion, the District demonstrated through citation to the Record that the

15   McGlinn Jetty substantially limits juvenile Chinook access to Padilla Bay.  ECF 40-1 at 8:19–9:5;

16   27:22–28:5. In its Response, Defendants did not present argument or evidence to contradict the

17   District's evidence. ECF 51-1. Therefore, the above-quoted text must be stricken because

18   Defendants waived this argument, and it amounts to impermissible new argument/evidence on

19   reply.[2]

20

21

22   ─────────────────────
     [2] The District disputes that Defendants' citations support the proposition for which they are
     asserted, but omits such arguments consistent with LcR 7(g).

23

PLAINTIFF'S SURREPLY - 4
Case No. 2:23-cv-01954-BAT



**Van Ness Feldman** LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

### III.    CONCLUSION

The District respectfully requests that this Court strike Defendants' improper statements in

their Reply.

Respectfully submitted this 5th day of March 2025.

VAN NESS FELDMAN LLP

*I certify that this memorandum contains 1012 words,*
*in compliance with the Local Civil Rules.*

s/ Jenna Mandell-Rice
Jenna Mandell-Rice, WSBA No. 49667
Sophia E. Amberson, WSBA No. 52528
1191 Second Avenue, Suite 1800
Seattle, WA 98101-2996
T: (206) 623-9372
E: jrm@vnf.com
samberson@vnf.com

s/ Tyson C. Kade
Tyson C. Kade, WSBA No. 37911
2000 Pennsylvania Avenue, NW
Suite 6000
Washington, DC 20006
T: (202) 298-1800
E: tck@vnf.com

*Attorneys for Plaintiff Skagit County Dike, Drainage,*
*& Irrigation Improvement District No. 12*

PLAINTIFF'S SURREPLY - 5
Case No. 2:23-cv-01954-BAT



1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

LISA L. RUSSELL, Deputy Assistant Attorney General
S. JAY GOVINDAN, Section Chief
BRIDGET K. McNEIL, Assistant Section Chief
RICKEY D. TURNER, JR.,
Senior Attorney (CO Bar No. 38353)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Tel: (303) 844-1373
Email: rickey.turner@usdoj.gov

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| SKAGIT COUNTY DIKE, DRAINAGE, & IRRIGATION IMPROVEMENT DIST. NO. 12, <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL MARINE FISHERIES SERVICE; DEPARTMENT OF COMMERCE; HOWARD LUTNIK,[1] in his official capacity as Secretary of Commerce; EMILY MENASHES in her official capacity as the Assistant Administrator for NOAA Fisheries, <br><br> Defendants. | Case No. 2:23-cv-01954-BAT <br><br> **DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT** <br><br> **NOTE ON MOTION CALENDAR: FRIDAY, MARCH 14, 2025** |

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Howard Lutnik is automatically substituted for Gina Raimondo as Secretary of Commerce, and Emily Menashes is automatically substituted for Janet Coit as Acting Assistant Administrator for National Marine Fisheries Service.

**INTRODUCTION**

In reply, Plaintiff, the Skagit County Dike, Drainage, and Improvement District No. 12 ("District"), still fails to show any arbitrary and capricious aspects of the National Marine Fisheries Service's ("Service") biological opinion ("BiOp") analyzing the effects of the U.S. Army Corps of Engineers' ("Army Corps") proposed action to permit the No Name Slough ("NNS") Replacement Project, under Section 7(a)(2) of the Endangered Species Act ("ESA"). *See* Reply in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 52. The Service's analysis is simple and straightforward. The NNS tide gate is, as Plaintiff insists, "fatally damaged" and "on the verge of total collapse," ECF No. 7 at 2, 4, and thus at the end of its useful life. The Army Corps' permit allows Plaintiff to rebuild the entire NNS complex – not just replace the specific gate components – thereby extending its useful life for at least another 50 years. As required by the ESA, the Service, among other things, analyzed all past and present effects of the current NNS tide gate, analyzed the current species status and habitat conditions for the threatened Puget Sound Chinook salmon ("PS Chinook") and the endangered Southern Resident killer whales ("SRKW"), and then added the likely enduring effects of a newly replaced, fully functional tide gate complex for an additional 50 years into the future.

Here, the baseline population numbers for both species are already low, and habitat quality is poor and not contributing to either species' recovery. Both species have been listed for decades with no meaningful progress toward reversing their imperiled status, not even close. And the long-term enduring effects of a rebuilt tide gate complex, for an additional 50 years – without offsetting habitat mitigation – will further degrade the present already-failing nearshore and estuarine habitat of PS Chinook, which in turn, will restrict the vital and preferred prey source for the SRKW. For these reasons, the Service determined that the NNS Project would likely result in jeopardy and adverse modification. Accordingly, the Service issued a Reasonable and Prudent Alternative ("RPA") based on its long-standing approach of requiring proportional habitat mitigation to avoid jeopardy/adverse modification in analogous contexts. The Service's BiOp and RPA are reasonable, supported by the record, and should be upheld.

**ARGUMENT**

ER-43

**A.  The NNS BiOp is Consistent with Past Tide Gate Analyses.**

As detailed in Defendants' cross motion, ECF No. 51-1 at 6-8, since at least 2005, the Service found that the enduring effects of tide gate operation and replacement in the Skagit system adversely impact the ecological needs of listed species (PS Chinook in particular) and their designated critical habitat, and that offsetting habitat mitigation is therefore required under the ESA. The Service's approach to the NNS Project is no different.

**1.  The 2005 Dry Slough BiOp focused on enduring effects and habitat mitigation.**

The Dry Slough Project and the NNS Project are similar replacement projects: both extend the useful life of tide gate complexes through extensive excavation, replacement of rip rap, etc. AR0000002-4; *see also Swinomish Indian Tribal Comty. v. Skagit Cnty. Dike Dist. No. 22*, 618 F. Supp. 2d 1262, 1264 (W.D. Wash. 2008) (highlighting that the Dry Slough "tidegate replacement" project "involved digging out 90 feet of four-foot pipe from deep inside the dike, replacing it with new pipe and a new tidegate, and replacing the fill . . . ."). And the Service's ESA Section 7 analysis for both replacement projects – regardless of whether the specific gate component was side-hinged or self-regulating – was analytically consistent. Both analyses focused on the long-term enduring effects from the extended useful life of the newly-replaced tide gate structures and both required habitat mitigation to avoid jeopardy and adverse modification.

Specifically, like the NNS BiOp, the Dry Slough BiOp focused primarily on the likely enduring effects of the tide gate complex's extended useful life on estuarine and nearshore habitat. *Id.* at 1270 (explaining that juvenile chinook can no longer use the Dry Slough habitat and that the tide gate "reduces the 'extent and quality' of the habitat downstream"). Also, in the Dry Slough BiOp, the Service disagreed with District No. 22's ESA analysis which focused only on construction effects and instead found, like the NNS BiOp, that the long-term enduring effects from the replacement project's renewed useful life would likely result in jeopardy and adverse modification. *Id.* at 1265. Finally, like the NNS RPA, in the Dry Slough BiOp, the Service determined that, regardless of the type of tide gate components, the RPA required habitat mitigation to avoid jeopardy and adverse modification. *Id.*

Furthermore, while the Dry Slough claims in *Swinomish* are different than the case at hand,

the case is still relevant and instructive. The *Swinomish* court took the position that "take" (which is inherently an effect under the ESA) was not limited to just the construction associated with the replacement project but was also caused by the future presence of the rebuilt tide gate structure – even though (like NNS) the Dry Slough tide gate had been there before and was being replaced. *Id.* at 1270.[2] Accordingly, here, the Service's analysis of the long-term enduring effects from the newly replaced NNS tide gate is consistent with its 2005 approach for the proposed Dry Slough replacement as well as the court's ruling.

### 2. The 2009 TFI BiOp focused on enduring effects and habitat mitigation.[3]

The Tidegate and Fish Initiative ("TFI") BiOp, like the Dry Slough BiOp and NNS BiOp, focused on the enduring effects from the renewed and extended lives of replacement tide gate structures and the need for habitat mitigation to avoid jeopardy and adverse modification. The NNS Project involves approximately 73.6 cubic yards of new rock armoring[4] and excavation of the dike/levee to accomplish the replacement, easily qualifying it as a "replacement" project under the TFI Agreement, and thus, under the terms of that Agreement, and the BiOp which analyzed it, the NNS Project would have required 100% of habitat restoration credits to be in hand prior to permit issuance. AR0051117; AR0050770-71; AR000070; AR0050785. However, as the Service explained in the NNS BiOp's Consultation History and the Appendix 4 Response to Comments, AR0051326; AR0051113, in November 2019, based solely on the "side-hinge gate" component of the Project, the TFI Oversight Committee deemed the entire NNS Project to be an "operational improvement action," completely ignoring the Agreement's framework for classifying projects as minor, major, or replacement, and thereby ignoring the overall life-extending purpose of the "replacement" project with its enduring adverse effects. This creative approach inappropriately

---

[2]  *See* 50 C.F.R. § 402.02 ("Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action.").

[3]  Plaintiff asserts incorrectly at various points, that the Service advances "post hoc rationalizations." *See, e.g.*, Pl.'s Reply at 7. The Service responded to the same arguments in the responses to comments the Service prepared after Plaintiff's review of the draft jeopardy BiOp. AR0051314.

[4] The Service has previously refuted Plaintiff's argument that the description of the Project is not accurate because it replaces what is there today. AR0051310; AR0051314-15.

skirted any habitat mitigation requirement by eliminating the 8.6 acres of restoration that would have been assigned to the NNS Project if properly categorized as a replacement project under the TFI Agreement. AR0050880–81; AR0050761-71; AR0050784.

The Service ultimately determined that the Oversight Committee's decision on the NNS Project, along with its pattern of misapplication of the Agreement in other similar projects, undermined the assumptions (habitat restoration obligations occurring at a certain pace) in the Service's programmatic TFI BiOp, resulting in the Army Corps' reinitiation of the TFI BiOp and suspension of the TFI program in 2021. AR0000002-04; AR0000069-70; AR0050347; AR0003254; AR0015131-32; AR0015193-94. The 2024 NNS BiOp analyzes enduring effects of the replacement tide gate project and requires habitat restoration to offset those effects, the same premise underlying the TFI Agreement and BiOp, despite the TFI Oversight Committee's failure to correctly apply that framework.[5] The 2005 Dry Slough BiOp, the 2009 TFI BiOp, and the 2024 NNS BiOp all focus the long-term enduring effects from newly replaced tide gate complexes and the need for habitat mitigation to avoid jeopardy and adverse modification is the same.

### 3. Other recent BiOps focused on enduring effects and habitat mitigation.

Finally, other recent BiOps followed the same analytical approach with respect to Puget Sound nearshore habitat. AR0002852-930; AR0002931-3228; AR0026435-779; AR0000113-471. All these BiOps reflect the same established conclusion that Puget Sound nearshore habitat cannot sustain additional net loss. Additionally, in all of these consultations, the Service required that each project individually mitigate for its enduring nearshore effects, *see, e.g.*, AR0003128, AR000132, thus undermining Plaintiff's attempt to distinguish the batched and programmatic consultations from the individual NNS BiOp. And Plaintiff is wrong to suggest a higher jeopardy bar for one single project, like the NNS Project. When it comes to protecting listed species, the ESA was designed to precisely address the risk of additive effects from multiple individual actions,

---

[5] The Oversight Committee's classification of NNS Project was incorrect. As explained, the Service's representative on the Committee routinely provided personal views not approved by the agency. Those issues aside, the Service clearly explained why the NNS Project qualifies as a replacement project, not an operational improvement under the TFI Agreement and BiOp. This explanation, even if it were a change in agency position (it is not), is sufficient and entitled to deference.

ER-46

therefore requiring a strong focus on environmental context. If the Service conducted its "jeopardy analysis in a vacuum[,]" focusing only on the individual agency action at issue, then "a listed species could be gradually destroyed, so long as each step on the path to destruction [wa]s sufficiently modest." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 929–30 (9th Cir. 2008). But this "slow slide into oblivion is one of the very ills the ESA seeks to prevent." *Id.* at 930; *see also Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1093 (9th Cir. 2005); *Ctr. for Native Ecosystems v. U.S. Fish & Wildlife Serv.*, 795 F. Supp. 2d 1199, 1207 (D. Colo. 2011).

In sum, the NNS BiOp is consistent with the Service's long-standing approach – avoid jeopardy and adverse modification from long-term enduring effects through offsetting habitat mitigation (including no net loss of nearshore habitat). Plaintiff's argument to the contrary fails.

**B. The Action Area Appropriately Accounts for the SRKW's Reduced Prey Base.**

The Service did not designate its action area "based on where an impacted species may swim." Pl.'s Reply at 10-11. Rather, as required by 50 C.F.R. § 402.02, the Service properly included the *indirect biological effects* of the NNS Project on SRKW (*i.e.*, reduced prey base) in the specific geographic area where those effects are anticipated to occur. *See Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 898 (9th Cir. 2002) (finding the action area impermissibly narrow because it failed to reflect areas where grizzly bears impacted by the proposed action would move in search of food); *see also* AR0000245-46; AR0002881-2; AR0026454. For this reason, the cases cited by Plaintiff do not undermine the Service's approach here but rather support it. Like the NNS BiOp, those cases define the action area based on direct and indirect effects in a geographic area.

Plaintiff fails in its attempt to cite to the recovery plan to refute Defendants' explanation regarding older BiOps. Although that plan stated that SRKW prefer Chinook prey, as already explained in Defendants' cross motion, even in the past few years, there have been significant advancement in understanding just how crucial the restoration of the Chinook prey base is to SRKW recovery. That current science justifies the approach to SRKW prey base in the NNS and other recent BiOps. AR0024914-28; AR0017275-83; AR0023731; AR0051160-61. The action

area is reasonable and should be upheld.

**C.  The NNS Project's Enduring Adverse Effects Over the Next 50 Years Will Further Deteriorate Already-Poor Estuarine and Nearshore Habitat Conditions.**

Plaintiff wrongfully accuses the Service of double counting effects by comparing NNS enduring effects against a reference scenario of what undeveloped habitat could be without the presence of the tide gate. Pl.'s Reply at 12-13. Plaintiff confuses the Service's straightforward analysis. Put simply, the Service determined that the NNS Project's long-term adverse effects would further deteriorate the current, fragile condition of both the PS Chinook and the SRKW and their habitats.

The existing abundance and productivity numbers for both species are already low and habitat quality for both species is poor and unable to support the current biological needs, let alone contribute to the recovery of either species. AR0051229-31. In fact, both species have been ESA-listed for decades with no real or meaningful progress toward reversing their imperiled status. AR0051130-37; AR0051156-59. The newly replaced, fully functional tide gate complex will cause enduring effects for an additional 50 years and will thus further deteriorate the baseline conditions of the already-deficient habitat for both species. For these reasons alone, the Service determined that the NNS Project, with its effects locked in for an additional five decades (with no offsetting habitat mitigation), would likely result in jeopardy by appreciably reducing the likelihood of both the survival and recovery (as evidenced by decades of no meaningful change in their status) of PS Chinook and SRKWs in the wild by reducing their numbers and productivity and would likely result in adverse modification by appreciably diminishing the value of critical habitat, as a whole, for the conservation of PS Chinook and SRKW. 50 C.F.R. § 402.02; AR0051224-35.

Plaintiff misunderstands the relevance of the BiOp's references to habitat quality without the presence of the tide gate. Again, the general outline of the effects analysis is clear: the existing tide gate complex is a significant cause of the poor current habitat conditions, including the preclusion of natural shorelines and beaches, and rebuilding the tide gate complex will worsen current conditions and preclude the return of natural habitat features for an additional 50 years. AR0051196. References to natural shorelines and beaches were intended only to reinforce and

ER-48

explain both the past and present effects of the tide gate structures as well as the additional effects 50 years into the future. The references to natural shorelines and beaches do not mean that the Service assumed pristine conditions would immediately occur in the absence of the Project or that they would occur immediately at the 50-year mark. In fact, the Service acknowledges that "where structures are left to degrade beyond their useful life . . . complete degradation could take years in some cases." AR0051188. Plaintiff's argument should be rejected.

### D. The NNS Project Is the "But For" Cause of the Tide Gate's Adverse Effects on Already-Poor Estuarine and Nearshore Habitat Over the Next 50 Years.

The same confusion infects Plaintiff's "but for" argument. Pl.'s Reply at 15-19. The Service did not base its jeopardy and adverse modification determinations on a comparison with pre-1880 habitat conditions or any other speculative assessment of habitat conditions. Likewise, the Service did not premise its decision on the notion that the tide gate would be removed. Rather, the BiOp is based on a simple causation analysis. "But for" the proposed Project, a structurally sound tide gate complex would not continue to exist because the current tide gate structures are failing and near imminent collapse. The consequence of the Project is that the failing structures will be replaced entirely by new structures that have at least a 50-year life span thus causing 50 additional years of enduring effects.

Plaintiff's alternate causal analyses make no sense. Plaintiff would have the Service assume that the proposed action would not cause any further change to habitat conditions. Pl.'s Reply at 22 ("The tidegate exists in the environment today, and has for more than 140 years, and thus its effects are known."). This starkly contradicts Plaintiff's sworn statements that the tide gate is near collapse and that saltwater inundation would occur in the absence of the Project, and also the plain fact that the proposed action involves building replacement structures with a 50-year life span. Alternatively, despite its complaints regarding speculation as to future conditions without the Project (which the Service did not do), Plaintiff suggests the Service should have done just that. Plaintiff states that, even though the tide gate may no longer function for its intended purpose (which is to prevent saltwater intrusion), it will nevertheless have effects that the Service should have attempted to predict. Pl.'s Reply at 15. In the BiOp, the Service explained in detail why it is

not feasible or helpful to speculate about the exponentially different scenarios if a structure is not repaired or replaced. AR0051187-89. Instead, the Service based its effects analysis on the actual proposed project, including its clear purpose and consequence. *See* 84 Fed. Reg. 44976, 44994 (Aug. 27, 2019). To do otherwise would be to ignore reality.

**E. The NNS Project's Enduring Adverse Effects Over the Next 50 Years Will Adversely Modify Already-Poor Critical Habitat.**

Contrary to Plaintiff's argument, *see* Pl.'s Reply at 19-20, the Service's critical habitat analysis focused on the Project's likely enduring effects over the next 50 years on the current condition of the PS Chinook and SWRK habitat as a whole. The current status of critical habitat for both species is poor and does not support the species' conservation. AR0051130-37; AR0051156-59. The Service considered localized effects of the proposed action on critical habitat through qualitative analysis, supplemented by the peer-reviewed Puget Sound calculator. AR0051338-45; AR0003262; AR0051196-98; AR0051203-05; AR0051213-19. The Service determined that even those localized adverse effects, over the next 50 years, are consequential at the designation scale given the current status of the critical habitat, which has only a small amount of habitat remaining in good condition. AR0051231-35. The Service appropriately concluded that, when the enduring effects of the NNS Project over the next 50 years are added to the current poor status of critical habitat, the Project is likely to adversely modify PS Chinook and SRKW designated critical habitat. The diminishment of the value of critical habitat caused by the proposed action – without any meaningful habitat mitigation – will only perpetuate the degraded habitat function of the nearshore and estuarine habitat and preclude the development of more functional habitat conditions over the next 50 years – *i.e.*, likely adverse modification. *See* 84 Fed. Reg. at 44985 (explaining that adverse modification results where an alteration caused by the proposed action delays the development of physical or biological features in degraded habitat).

**F. The Best Available Science Supports the Service's Section 7 Determinations.**

Plaintiff further confuses the Service's analysis with cherry picked data while turning a blind eye to the overall analysis (and how key aspects of the analysis fit together). Pl.'s Reply at 21-28. As explained, at its core, the Service's analyses concerning the PS Chinook and SWRK are

ER-50

straightforward. The Service listed the PS Chinook in 1999. In the intervening 25 years, while range-wide population trends and abundance have varied slightly, the long-term data and trends fall well below recovery targets. Since 1990 population trends have not improved and even show a slight decline in the last 15 years. AR0051135. All long-term data indicate that Puget Sound Chinook salmon subpopulations continue to remain well below the recovery targets. AR0035562. With respect to the Skagit Chinook, the subpopulation is at less than 20 percent of their overall recovery goal and has also experienced a 15-year declining trends in abundance. AR0051210. Additionally, habitat quality remains poor and unable to support the species recovery. AR0051181-186; AR0051133; AR0051205-08.

Evading those facts, Plaintiff misconstrues data to quibble about short-term positive trends in isolation and out of context.[6] Pl.'s Reply at 24. For example, Plaintiff relies heavily on the data in Table 50 at AR0035536 to assert positive population trends. However, that Table shows only geometric means, which do not provide adequate data from which to draw conclusions about population trends because they fail to capture important variability data. Plaintiff also fails to recognize the scientific significance of long-term trends by focusing, in places, on only two five-year periods. In contrast, the complete, long-term data clearly indicate "either flat or negative trends for the entire ESU." *See* AR0035535. Using raw data from the figure in AR0051210 between 1990 and 2019 yields negative trends for each of the six Skagit populations (ranging from -1 to -75%). The facts are what they are. Plaintiff cannot ignore the long-term data demonstrating that the NNS tide gate complex, and structures like it, contributed to the current PS Chinook population status and habitat conditions. Nor can it deny the fact that, in the last 25 years, the PS Chinook has had no meaningful progress toward reversing its threatened status, due in part to structures like the NNS tide gate complex and – as seen with the TFI Agreement/Oversight Committee – creative attempts to skirt obligations for meaningful habitat mitigation. The NNS Project's enduring effects – locked in for the next 50 years, with no meaningful habitat mitigation

---

[6] Plaintiff's claim regarding the effects of McGlinn Jetty is not true. The majority of juvenile Chinook in Samish Bay, just to the North of Padilla Bay, are from populations outside of the Skagit Basin, AR0000530-31, and do not encounter the jetty. Furthermore, while the jetty constrains passage for Skagit Chinook, it does not block them from using the Swinomish corridor, AR0040254, to access habitat in Padilla Bay, AR0037833-836.

ER-51

– will add to and worsen the current population and habitat status of PS Chinook and SRKW.

Accordingly, the Service reasonably concluded, and the data supports, that the long-term adverse effects from the newly rebuilt NNS tide gate complex, over the next 50 years, "would cause an appreciable reduction of the Puget Sound ESU to survive and recover because, individually and collectively, the six Skagit stocks are critical to ESU-wide life-history and genetic diversity. In all, 27 percent of the ESU's populations reside in the Skagit system." AR0051209; *see also* 50 C.F.R. § 402.02. This is the type of scientific conclusion within the Service's "special expertise," and the Court should defer to the agency's "determination of what constitutes the best scientific data available[,]" *Conservation Cong. v. Finley*, 774 F.3d 611, 620 (9th Cir. 2014) (cleaned up), as well as its "interpretation of [that] complex scientific data[,]" *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv*., 475 F.3d 1136, 1150 (9th Cir. 2007); *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014).

## G. The Service's RPA is Feasible and Reasonable.

The Service thoroughly evaluated the feasibility of its RPA. In reply, Plaintiff does not demonstrate otherwise. Pl.'s Reply at 29-30. First, Plaintiff had the opportunity to comment on the draft RPA and, apart from unsupported assertions, did not (and still has not) provided any documentation or other similar evidence of economic infeasibility. For this reason, when finalizing the BiOp, the Service relied on publicly available records from the Skagit County assessor and other public entities, and these records provide information indicating that the RPA "can be taken by the . . . applicant[,]" 16 U.S.C. § 1536(b)(3)(A), and show that the Service has met its obligation to consider only whether the RPA is "financially . . . *possible.*" *San Luis & Delta-Mendota Water Auth. v. Jewell,* 747 F.3d 581, 637 (9th Cir. 2014) (emphasis added). Second, Plaintiff provides no support for its assertion that it can only use its small "drainage" funds for the NNS Project, rather than other larger portions of its budget. ECF No. 41-1 at 34; AR0002888; AR0051333. The applicant entity is the Skagit County Dike, Drainage and Irrigation Improvement District No. 12 and Plaintiff provides no legal authority specifying a distinct jurisdiction and/or spending authority for diking versus drainage districts. ECF No. 41-1 at 34; AR0002888; AR0051333. In any event, the NNS Project inherently involves diking consistent with Plaintiff's diking obligations. And

finally, for similar reasons, Plaintiff's objections regarding financial levies ring hollow. Plaintiff denies but fails to explain why it cannot use the significant levy capacity of the applicant entity, which is the Skagit County Dike, Drainage and Irrigation Improvement District No. 12 for the NNS Project. As the Service noted, Plaintiff's drainage and diking assessment areas both include NNS. AR00051248; AR0051333.

Finally, Plaintiff's assertion that the Service misapplied the pocket estuary/embayment factor is meritless. Pocket estuaries do not include embayments, but both pocket estuaries and embayments provide similar features found to be important for Chinook rearing. AR0021528-29. In identifying pocket estuaries/embayments features, the Service did not rely on a map with incomplete data; rather, it developed and documented "a rapid assessment to identify areas that are likely to provide pocket estuary services (Appendix L)." AR0021528–29. The maps at issue, AR0039714; AR0038414, refer to pocket estuaries only. The maps do not refer to the broader definition of embayments – embayments which the Service found to provide similar favorable features and rearing benefits as pocket estuaries. AR0021528–29.

For these reasons, along with the arguments outlined in Defendants' cross motion, the Service's RPA is feasible and reasonable.

## CONCLUSION

As explained, the Court should deny Plaintiff's motion for summary judgment and grant Defendants' cross-motion for summary judgment.


Respectfully submitted on this 28th day of February, 2025.

> LISA L. RUSSELL,
> Deputy Assistant Attorney General
> S. JAY GOVINDAN, Section Chief
> BRIDGET K. McNEIL, Assistant Section Chief
>
> */s/ Rickey D. Turner, Jr.*
> RICKEY D. TURNER, JR.
> CO Bar No. 38353
> Senior Attorney
> Wildlife and Marine Resources Section
> 999 18th Street, South Terrace, Suite 370

11

Denver, Colorado 80202
Phone: (303) 844-1373
rickey.turner@usdoj.gov

*Attorneys for Defendants*

I certify that this memorandum contains 4,174 words, in compliance with the Local Civil Rules.

1  LISA L. RUSSELL, Deputy Assistant Attorney General
   S. JAY GOVINDAN, Section Chief
2  BRIDGET K. McNEIL, Assistant Section Chief
   RICKEY D. TURNER, JR.,
3  Senior Attorney (CO Bar No.38353)
4  U.S. Department of Justice
   Environment & Natural Resources Division
5  Wildlife & Marine Resources Section
   999 18TH Street, South Terrace, Suite 370
6  Tel: (303) 844-1373
7  Email: rickey.turner@usdoj.gov

8  *Attorneys for Defendants*

9              IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF WASHINGTON
10                         AT SEATTLE

11
   SKAGIT COUNTY DIKE, DRAINAGE,      )
12 & IRRIGATION IMPROVEMENT DIST.     )
   NO. 12,                            )
13                                    )
14            Plaintiff,              )   Case No. 2:23-cv-01954-BAT
                                      )
15 v.                                 )   **DEFENDANTS' CROSS-MOTION**
                                      )   **FOR SUMMARY JUDGMENT AND**
16                                    )   **RESPONSE TO PLAINTIFF'S**
   NATIONAL MARINE FISHERIES          )   **MOTION FOR SUMMARY**
17 SERVICE; DEPARTMENT OF             )   **JUDGMENT**
   COMMERCE; GINA RAIMONDO in her     )
18 official capacity as Secretary of  )
   Commerce; JANET COIT in her official)  **NOTE ON MOTION CALENDAR:**
19 capacity as the Assistant Administrator for )  **FRIDAY, FEBRUARY 28, 2025**
20 NOAA Fisheries,                    )
                                      )
21            Defendants.             )
22 _____        )

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................ 1

STATUTORY AND REGULATORY BACKGROUND ............................... 2

   A. ESA Section 7(a)(2) Consultation Process.......................................... 2

FACTUAL BACKGROUND ....................................................................... 3

   A. General Tide Gate Effects On ESA-Listed Species............................. 3

   B. Section 7 Consultation on the District's NNS Replacement Project. ..... 3

STANDARD OF REVIEW .......................................................................... 4

ARGUMENT ............................................................................................... 4

   A. The Service's NNS BiOp is Thorough and Reasonable. .................... 4

   B. Plaintiff's Critiques of the BiOp Fail. ................................................ 6

      1. The BiOp is consistent with past tide gate analyses. ..................... 6

      2. The Service appropriately delineated the action area. ................... 8

      3. The Service appropriately excluded future effects from the
         environmental baseline. ............................................................... 10

      4. The Service's effects analysis is thorough and complete.............. 12

      5. The Service utilized the best available science in its effects analysis. ................ 15

      6. The Service's RPA is feasible. .................................................... 18

CONCLUSION ........................................................................................... 22

ER-56

1
2

# <u>TABLE OF AUTHORITIES</u>

**CASE**                                                                  **PAGE(S)**

*Confederated Tribes and Bands of the Yakama Nation v. McDonald*,
  2003 WL 1955763 (E.D. Wash. 2003) ................................................................ 11

*DOW v NMFS*,
  707 F.3d 462 (4th Cir. 2013) ............................................................................ 18

*Friends of River v. Nat'l Marine Fisheries Serv.*,
  293 F. Supp. 3d 1151 (E.D. Cal. 2018) ............................................................. 10

*Greenpeace v. Nat'l Marine Fisheries Serv.*,
  55 F.Supp.2d 1248 (W.D.Wash.1999) ............................................................... 18

*In Nat'l Wildlife Fed'n v. NMFS*,
  524 F.3d 917 (9th Cir. 2008) ............................................................................ 11

*In re Consol. Salmonid Cases*,
  791 F. Supp. 2d 802 (E.D. Cal. 2011) ............................................................... 11

*Kandra v. U.S.*,
  145 F. Supp. 2d 1192 (D. Ore. 2001) ................................................................ 11

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) .............................................................................. 4

*Oceana, Inc. v. Evans*,
  384 F. Supp. 2d 203 (D.D.C. 2005) .................................................................... 9

*Oceana, Inc. v. Evans*,
  389 F. Supp. 2d 4 (D.D.C. 2005) ........................................................................ 9

*River Runners for Wilderness v. Martin*,
  593 F.3d 1064 (9th Cir. 2010) ............................................................................ 4

*San Luis & Delta-Mendota Water Authority v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ............................................................................ 18

*Swinomish Indian Tribal Community v. Skagit County Dike District No. 22*,
  618 F. Supp. 2d 1262 (W.D. Wash. 2008) .......................................................... 7

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) ......................................................................................... 22

23
24
25
26
27
28

ER-57

*All for the Wild Rockies v. Pena,*
    865 F.3d 1211 (9th Cir. 2017) ................................................................. 4

**STATUTES**

5 U.S.C. § 706(2) ..................................................................................... 4

16 U.S.C. § 1532(15) ............................................................................... 2

16 U.S.C. § 1536(a)(2) ............................................................................ 2

**REGULATIONS**

50 C.F.R. § 17.11 ..................................................................................... 2

50 C.F.R. § 402.01(b) .............................................................................. 2

50 C.F.R. § 402.02 ............................................................................ passim

50 C.F.R. § 402.14 ................................................................................... 2

50 C.F.R. § 402.14(a) .............................................................................. 2

50 C.F.R. § 402.14(g)(3) ........................................................................ 14

50 C.F.R. § 402.17 ................................................................................. 12

**FEDERAL REGISTER**

51 Fed. Reg. 19, 926 (June 3, 1986) ...................................................... 2

84 Fed. Reg. 44,976 (August 27, 2019) ......................................... 9, 14, 15

## INTRODUCTION

This case challenges the National Marine Fisheries Service's ("Service") biological opinion analyzing the effects of the U.S. Army Corps of Engineers' ("Army Corps") proposed action, to permit the Skagit County Dike, Drainage, and Improvement District No. 12's ("District") No Name Slough ("NNS") Replacement Project, under Section 7(a)(2) of the Endangered Species Act ("ESA"). *See* Plaintiff's Corrected Motion for Summary Judgment ("Pl's Mot."), ECF No. 40-1. The District's Replacement Project seeks to replace a tide gate "on the verge of total collapse," ECF No. 7-1 at 3, by reconstructing the entire NNS tide gate complex. The work is extensive, including installation of a new concrete culvert with two 4.0' by 5.83' side-hinge gates, and excavation and rebuilding of shoreline armoring (dike) which will have 62 linear feet of large rock, 23 linear feet of vertical concrete, and involve the addition of 73.6 cubic yards of new rock material. AR00051117;[1] AR000033-39 (photos providing a visual perspective of the large-scale work involved in replacing a "simple tide gate"). The Replacement Project means that the NNS structures will exist for an additional 50 years, and the enduring effects will significantly impact nearshore and estuarine habitat of the threatened Puget Sound Chinook salmon ("PS Chinook") which in turn, restricts the vital and preferred prey source for the endangered Southern Resident killer whales ("SRKW").

Thus, the Service determined that, taking into account already low and declining population numbers and poor, declining habitat quality, the impacts of the Replacement Project would likely jeopardize the continued existence of PS Chinook and SRKW and would also likely adversely modify those species' designated critical habitat. Accordingly, the Service included a Reasonable and Prudent Alternative ("RPA") to the Replacement Project that, if implemented, would avoid jeopardy and adverse modification. At bottom, the NNS BiOp and RPA require only that the District offset the enduring effects of its own significant fortified Replacement Project for the anticipated life of the new tide gate complex.

Plaintiff's attempt to flyspeck the Service's complex, comprehensive, and thorough Section 7 analysis and expert conclusions fails. Since at least 2005, the Service (and others)

---

[1] Defendants cite to the administrative record as follows: "AR(Bates-stamped page numbers)."

identified significant concerns regarding the effects of tide gates in the Skagit system and the impacts of those effects on the viability of ESA-listed species and their designated critical habitat. And since that time, the Service required habitat mitigation for tide-gate enduring effects to avoid jeopardy and adverse modification. The Service's Section 7 analysis and conclusion is no different with respect to the NNS Replacement Project. Plaintiff obviously disagrees with the Service's expert opinion; but mere disagreement does not invalidate an otherwise consistent, lawful, and reasonable decision that is amply supported by the administrative record. For these reasons, the Court should uphold the Service's NNS Section 7 conclusions and deny Plaintiff's motion for summary judgment.

## STATUTORY AND REGULATORY BACKGROUND

### A. ESA Section 7(a)(2) Consultation Process.

ESA Section 7(a)(2) directs each federal action agency to ensure, in consultation with the appropriate consulting agency, that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of" a listed species or destroy or adversely modify designated critical habitat. 16 U.S.C. § 1536(a)(2).[2] "Formal" ESA consultation" occurs if the action agency determines that the proposed action is "likely to adversely affect" a threatened or endangered species or its critical habitat. 50 C.F.R. § 402.14(a). In this instance, the Service must prepare a biological opinion ("BiOp") concluding whether or not the action is likely to "jeopardize the continued existence of" a listed species or destroy or adversely modify its critical habitat, *id.* § 1536(a)(2); 50 C.F.R. § 402.14(h).

Where, as here, a BiOp concludes that the proposed action is likely to jeopardize the continued existence of a listed species or adversely modify its critical habitat, then the Service must provide RPAs. These are alternative or mitigating actions that the Service "believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.02.

---

[2] The U.S. Fish & Wildlife Service is generally responsible for consulting on terrestrial plants and animals and inland fish species. The National Marine Fisheries Service is generally responsible for consulting on other fish and marine species, such as the ones at issue here. *See, generally* 16 U.S.C. § 1532(15); 50 C.F.R. §§ 17.11, 402.01(b); 51 Fed. Reg. 19926 (June 3, 1986).

ER-60

**FACTUAL BACKGROUND**

**A. General Tide Gate Effects On ESA-Listed Species.**

Tide gate complexes – which typically involve extensive shoreline armoring in addition to the tide gate structures themselves – alter hydrology, physical connections between marine and estuarine habitats, sedimentation processes, water quality, and organic matter flow. AR0039357-60. Hydrological alteration results in increased water temperature, altered dissolved oxygen, and altered concentrations of some chemicals. AR0039358; AR0022345. Tide gates create physical obstructions to historically accessible habitat behind the gates. AR0039358-59; AR0020398. High flow rates through tide gates also prevent small fish from accessing critical marsh and freshwater habitats. AR0039359. Tide gate complexes modify several functions of estuaries for juvenile salmon, including (1) inhibiting migration, (2) blocking access to important nursery areas, (3) affecting prey production, and (4) blocking the normal patterns of use of the tidal systems. AR0031745-47; AR0039358-62.

**B. Section 7 Consultation on the District's NNS Replacement Project.**

The District's Replacement Project seeks to replace a failing tide gate and associated structures. In order to do the work, the District applied for a Section 404 Clean Water Act permit. AR0051115. After initially requesting informal consultation, on December 16, 2022, the Corps requested formal ESA Section 7 consultation. AR0051113-4. In February 2024, Plaintiff petitioned the Court for a mandatory injunction requiring the BiOp be issued within 15 working days – on the basis of imminent total failure of the NNS tide gate and the alleged need to replace it prior to fall/winter 2024 in order to protect life and property. ECF No. 7-1 at 3. On March 8, 2024, the Court granted Plaintiff's mandatory injunction, finding in part the "imminent total failure" of the tide gate structure supported the relief the District sought. ECF No. 15 at 15. The Service complied with the Court's order. On April 22, 2024, after analyzing the effects of the NNS Replacement Project on listed species and their critical habitat, including its enduring effects, the Service concluded that the Army Corps' proposed action, to permit the NNS Replacement Project, is likely to jeopardize the continued existence of listed PS Chinook and SRKW and adversely modify those species' designated critical habitats. AR0051224-35. The Service included an RPA

3

in its BiOp – involving nearshore and estuarine habitat restoration that, if implemented, would avoid jeopardy and adverse modification. AR0051235-51.

## STANDARD OF REVIEW

Courts review agency decisions under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06. In such review the Court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" "in excess of statutory jurisdiction," or "without observance of procedure required by law[.]" *Id.* § 706(2). This scope of review is narrow and deferential. *See River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (per curiam) (the APA "does not allow the court to overturn an agency decision because it disagrees with the decision") (citations omitted). It is "not the role of a reviewing court to weigh competing scientific analyses." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1221 (9th Cir. 2017) (citation omitted).

## ARGUMENT

Since at least 2005, the Service found that tide gate operation and maintenance in the Skagit system adversely impacts the ecological needs of Puget Sound Chinook and their designated critical habitat and that offsetting habitat mitigation is therefore required under the ESA. The Service's approach to the NNS Replacement Project is consistent with that history, while also reflecting current science. The Service's BiOp regarding the NNS Project is consistent, lawful, reasonable, amply supported by the administrative record, and should be upheld. *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (en banc) (holding that courts are to be "most deferential" when, as here, "the agency is 'making predictions, within its area of special expertise, at the frontiers of science'") (citation omitted).

### A. The Service's NNS BiOp is Thorough and Reasonable.

The proposed NNS Replacement Project is extensive. The Project seeks to remove three existing tide gates and associated culverts in two locations and replace them with a new large concrete tide gate structure (rebar enforced), which would involve excavating, removing and then rebuilding a large earthen and rock-armored dike. AR0051115-20. The Project's new concrete split box culvert would have two 4' by 5.83' side-hinge gates. AR0051115. Total shoreline

armoring is proposed to include 62 linear feet of large rock and 23 linear feet of vertical concrete structural support for the tide gate. AR0051117. In rebuilding the dike, the Project would add new clean clay, concrete, rock fill, and sheet pile, and regrade and strengthen the dike using modern compacting requirements. AR0051115. An approximate total of 73.6 cubic yards of new riprap (rocky material to protect from scour and erosion) is anticipated. AR0000115-17.

In its ESA Section 7 analysis, the Service started with the low and declining population numbers for both the PS Chinook and SRKW – a fraction of historic levels – and the poor status of critical habitat for both species, which is not supporting the species' conservation. The Service next determined the likely effects of the NNS Project over the next 50 years of additional life, supplementing qualitative analysis with the peer-reviewed Puget Sound Calculator to analyze nearshore habitat effects. When using the Calculator, the Service input specific aspects of the tide gate complex – *e.g.*, the precise geographic location, the length and width of dike, the proximity to natal streams and pocket estuaries, the availability of prey species, the lack of typical beach slope, the 10 years of remaining life in the dike, etc.[3] AR0051338-45; AR0003262. When analyzing estuarine habitat effects, the Service expressly considered Skagit estuarine conditions including water quality behind the NNS tide gate, AR0051142-44, AR0051203, extrapolated data from nearby tide gates, AR0051202, and analyzed the proposed linear feet of shoreline armoring, as well as the design and construction materials of the Project, AR0051213, AR0051201.

The Service determined the enduring effects of the NNS Replacement Project would further reduce the quality and perpetuate poor conditions of nearshore and estuary habitat for PS Chinook for 50 additional years. The Service explained that this would negatively impact productivity and abundance of the affected populations, which already have a 15-year declining trend in abundance, and that these populations play a very important role in conservation of the listed species. AR0051228. The Service explained that, although the critical habitat directly affected by the Project may seem small when compared to the PS Chinook critical habitat

---

[3] Amicus curiae, the Pacific Northwest Waterways Association ("PNWA"), incorrectly asserts that the Nearshore Calculator lacks transparency and scientific rigor. ECF No. 44 at 10. The nearshore calculator is a commonly used, publicly-available user interface. Further, an independent expert panel recently peer reviewed the nearshore calculator and determined it to be based on the best available science and found its outputs to be reasonable and well-supported. AR0051122.

ER-63

designation as a whole, impacts at the local scale are nevertheless consequential at the designation scale given the current status of the critical habitat, which has only a small amount of habitat remaining in good condition. AR0051231-33. The Service described recent science showing that SRKW prey is at a fraction of historical levels, and that protecting SRKW requires restoration of diminished populations of PS Chinook. AR0051230. For these reasons, the Service appropriately concluded that, when the enduring effects of the NNS Project are added to the environmental baseline and cumulative effects, and the status of the species and critical habitat is taken into account, the Project is likely to jeopardize PS Chinook and SRKW and adversely modify their designated critical habitat. As a result, the Service provided an RPA outlining habitat mitigation and restoration.

**B. Plaintiff's Critiques of the BiOp Fail.**

Plaintiff's numerous attempts to discredit the analyses, Pl's Mot. 8-28, lack merit, as explained below.

**1. The BiOp is consistent with past tide gate analyses.**

Plaintiff's argument that the Service reversed its position on the 2024 NNS BiOp, Pl's Mot. 8-9, is not true. The Service's NNS BiOp is consistent with past tide gate analyses, going as far back as 2005, and including the 2009 Tidegates and Fish Initiative ("TFI") BiOp.

As an initial matter, Plaintiff's focus on the NNS as an individual project under the 2008 TFI Agreement is misplaced. The TFI Agreement was a *program*, analyzed in the 2009 *programmatic* TFI BiOp. Thus, the TFI BiOp analyzed the aggregate effects of a broad suite of actions, including beneficial actions. To be clear, the Service never made an ESA determination on any individual TFI project, including the NNS Project. The Service only analyzed and reached ESA conclusions on the TFI program as a whole. Subsequent categorizations of TFI projects by the TFI Committee were not ESA conclusions and were not made by the Service. In contrast, the NNS BiOp is the result of an *individual* ESA consultation by the Service, analyzing the specific effects of the NNS Replacement Project using the best available science – and reaching ESA conclusions on that Project, based on best available science.

In any event, the NNS BiOp is consistent with the Service's nearly two-decades-long

approach to tide gate consultations. As early as 2005, the Service produced a jeopardy and adverse modification BiOp[4] on the proposed replacement of the Dry Slough tide gate on the Skagit River. AR0000002. The Dry Slough project, like the 2024 NNS Project, concerned a tide gate replacement that impeded access to estuarine habitat and damaged nearshore habitat. AR0000002-4; *see also Swinomish Indian Tribal Community v. Skagit County Dike District No. 22*, 618 F. Supp. 2d 1262, 1270 (W.D. Wash. 2008) (describing and endorsing the Service's analysis of tide gate impacts on listed species and habitat to include the long-term effects of the Dry Slough structures). Like the NNS BiOp, the Dry Slough BiOp included an RPA requiring mitigation to offset adverse habitat impacts in nearshore and estuary habitats. AR0000002-04; *Swinomish*, 618 F. Supp. 2d at 1265.

The NNS BiOp is also consistent with the TFI BiOp, and the assumptions the TFI BiOp made about projects such as NNS. The NNS Project involves 73.6 cubic yards of new rock armoring and excavation of the dike/levee to accomplish the replacement, easily qualifying it as a "replacement" project under the TFI Agreement, and thus, under the terms of that Agreement, and the BiOp which analyzed it, the NNS Project would have required 100% of habitat restoration credits to be in hand prior to permit issuance. AR0015354; AR0000115-17; AR0050785. However, in November 2019, based on the "side-hinge gate" component of the Project, the TFI Oversight Committee deemed the NNS Project to be an "operational improvement action," but failed to also qualify the Project as  a "replacement" project, meaning that the required habitat credits for the Project were inappropriately revised to zero down from the 8.6 acres of restoration assigned to it under the TFI Agreement. AR0050741; AR0050770-771; AR0050785; AR0050744; AR0050880–81. In fact, the Oversight Committee's decision on the NNS Project, along with its pattern of misapplication in numerous other similar projects, undermined the assumptions (habitat restoration obligations occurring at a certain pace) in the Service's programmatic TFI BiOp resulting in the Army Corps' reinitiation of the TFI BiOp and suspension of the TFI program in

---

[4] Although a draft BiOp, as noted in the lawsuit challenging the project, it was because of "the District's abandonment of its 'after the fact' permit application" that the Service never finalized the BiOp. *Swinomish Indian Tribal Community v. Skagit County Dike District No. 22*, 618 F. Supp. 2d 1262, 1271 (W.D. Wash. 2008).

ER-65

2021.[5] AR0000002-04; AR0000069-70; AR0050347; AR0003254; AR0003240. The 2024 NNS BiOp requires habitat restoration for a replacement tide gate project, as did the TFI Agreement and BiOp, despite the TFI Oversight Committee's failure to correctly apply that framework.[6]

Finally, the NNS BiOp is consistent with other recent consultations on proposed repair and replacement of structures in Puget Sound. In those recent consultations, the Service reached jeopardy and adverse modification conclusions on PS Chinook and SRKW based on the enduring effects of structures, the useful lives of which would be extended into the future by the proposed repair or replacement. *See, e.g.*, AR0002931; AR0002852; AR0026435. And, just like the NNS BiOp, the Service required mitigation in those BiOps/RPAs to offset those future effects to avoid jeopardy and adverse modification. AR0003128-31; AR0026635. In the case of the Salish Sea Nearshore programmatic opinion, the proposed action itself included habitat mitigation which allowed the Service to reach a no jeopardy/no adverse modification conclusion (similar to its approach in the 2009 TFI BiOp). AR0000113; 0000337-38.

In sum, the Service's approach in the 2024 NNS BiOp is not an anomaly, but is consistent with the approach to tide gates in Puget Sound for nearly two decades as well as other contemporary Puget Sound consultations involving PS Chinook, SRKW, and existing structures. Plaintiff's argument that the Service reversed its position fails.

**2. The Service appropriately delineated the action area.**

Contrary to Plaintiff's argument, Pl's Mot. 9-11, the Service's decision to consider indirect effects on the SRKW's prey base as a basis to delineate the marineward side of the action area is lawful, reasonable, and supported by the record.

"Action area" means "all areas to be affected directly or indirectly by the Federal action

---

[5] From 2018 to 2021, the Service (and others) repeatedly raised concerns with this pattern of misapplication of the TFI. AR0000002-04; AR0050347; AR0003254; AR0003240.

[6] As Plaintiff points out, the Service had a representative on the TFI Oversight Committee, but decisions under the TFI were made by the entire Committee, not by the Service. And the Service representative on the Committee routinely took actions and shared information based on her personal views prior to final agency positions being reached. *See, e.g.*, AR0050879; AR0050862-78; AR0003236.

ER-66

and not merely the immediate area involved in the action." 50 C.F.R. § 402.02;[7] *see also* AR0051174. The action area consists of all the areas where the environmental effects (physical, chemical, and biotic) of the proposed NNS Project are expected to occur. 50 C.F.R. § 402.02; 84 Fed. Reg. 44,988-89 (Aug. 27, 2019).

Here, the Service identified the geographic extent of all direct and indirect effects and determined the action area to be the outermost extent of all of these "zones of effect" combined. AR0051174. The Service used the enduring effects of the replacement structures on estuary habitat to define the action area on the landward side of the tide gate structures. AR0051174. The Service also accounted for the indirect, biological effects of the Project on the prey base for SRKW. AR0051174. The Service explained that the best available science demonstrated that Skagit River PS Chinook migrate out into Padilla Bay, among other pathways, and, after that, they travel and are available as prey for SRKW throughout the Puget Sound. AR0051174. Thus, the potential for the Project to further reduce PS Chinook as SRKW prey defined the outer marineward edge of the action area – the zone of effect where greater numbers of PS Chinook would have been available as SRKW prey but for the Project. AR0051174. For these reasons, the Service appropriately defined the marineward side of the action area to include all of Puget Sound– *i.e.*, the area "to be affected directly or indirectly by the federal action and not merely the immediate area involved in the action." *See* 50 C.F.R. § 402.02.

Plaintiff now argues that the Service improperly based its "action area" designation on the migratory range of PS Chinook and is inconsistent with its 2009 TFI BiOp (and others). *Id.* 10-11 (citing *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 229 (D.D.C. 2005). Plaintiff is wrong and *Oceana* is inapposite. The NNS BiOp does not delineate the action area based on the migratory range of PS Chinook or the SRKW, both of which are in fact much larger than the delineated action area. AR0015508, AR0051163, AR0051169. Rather, the Service properly included the indirect biological effects of the action (reduced prey base), as required by 50 C.F.R. § 402.02, on the SRKW where those effects likely occur. Contrary to Plaintiffs' argument, there is nothing novel about this approach; the Service often delineates action areas to include areas where a listed

---

[7] References to the ESA implementing regulations refer to the 2019 regulations.

species' prey base is impacted. *See, e.g.*, AR0000245-46; AR0002881-2; AR0026454. Furthermore, the 2009 programmatic TFI BiOp (and the other cited BiOps) did not address indirect, biological effects on the SRKW prey base, most likely because the best available science linking PS Chinook prey base to SRKW survival has evolved since that time and/or the differing impacts of those actions on PS Chinook populations; hence why those action areas did not reflect the SRKW prey base. AR0024914-28; AR0017275-83; AR0051230.

Plaintiff fails to demonstrate an error in the Service's action area. The Service's consideration of indirect biological effects on the SRKW's prey base as a basis to delineate the marineward side of the action area for the NNS replacement project is lawful, reasonable, supported by the record, and should be upheld.

### 3. The Service appropriately excluded future effects from the environmental baseline.

Plaintiff's objections to the Service's environmental baseline analysis have no merit. *See* Pl's Mot. 12-14. The Service's analysis is reasonable and supported by the record. AR0051175-89.

The "environmental baseline" "refers to the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action." 50 C.F.R. § 402.02. The environmental baseline includes consequences to listed species or designated critical habitat from existing agency facilities that are not within the agency's discretion to modify. 50 C.F.R. § 402.02; s*ee, e.g., Friends of River v. Nat'l Marine Fisheries Serv.*, 293 F. Supp. 3d 1151, 1166 (E.D. Cal. 2018) (when a Federal agency lacks discretion, the effects from an existing dam are properly considered a past and present impact included in the environmental baseline). Accordingly, as outlined in a 2020 interagency memo between the Army Corps and the Service, if an agency, like the Army Corps, has discretion to issue regulatory permits concerning an existing structure, the Service must analyze whether the permit extends the life of the existing structure. If the permit extends the useful life, then the resulting effects of the extension are not part of the environmental baseline but rather properly categorized and analyzed as effects of the proposed action. *See* AR0002764-70.

In analyzing the NNS environmental baseline, the Service determined that the tide gate itself had no remaining useful life and, based on comments from the District, that the dike/riprap to be replaced had 10 years of useful life remaining. AR0051187. The Service incorporated this 10-year useful life into the environmental baseline. The Service also included in the environmental baseline the effects of the historic and current existence and operation of the NNS tide gates and associated dike structures. AR0051175-89. The Service explained that the Army Corps' permit, which authorizes the rebuild of the structures, causes an additional 50-year life span for the NNS tide gate and associated dike and that the effects stemming from that would not occur in the absence of the Army Corps' discretion to issue the permit. AR0051186-87. The Service then explained that the replaced NNS tide gate structure would have an additional "useful life" of approximately 50 years for shoreline armoring and the concrete tide gates before requiring an additional Army Corps permit to maintain their structural integrity. AR0051187. Based on this analysis, the Service did not include the effects on listed species and critical habitat stemming from the new useful life of 50 years in the environmental baseline but explained that it would analyze them as effects from the proposed NNS Project. AR0051187. The Service's approach is reasonable, and, as mentioned above, fully consistent with the ESA regulations, the interagency memo, as well as how it analyzes similar structures in the other Puget Sound consultations.

Plaintiff relies on cases concerning existing dam structures to argue that the Service should have included the effects of the soon-to-be replaced tide gate's new useful life in the environmental baseline (in addition to the effects from the 10 years of dike/riprap useful life already included in the baseline). Pl's Mot. 12-13. Plaintiff is wrong. The unpublished decision, *Confederated Tribes and Bands of the Yakama Nation v. McDonald*, 2003 WL 1955763, *14 (E.D. Wash. 2003), is distinguishable because the scope of the proposed project was limited by the Safety of Dams Act, and the project involved modifications: the existing "dam, with some modification, will continue to exist." In *Nat'l Wildlife Fed'n v. NMFS ("NWF II")*, 524 F.3d 917 (9th Cir. 2008), *In re Consol. Salmonid Cases*, 791 F. Supp. 2d 802 (E.D. Cal. 2011) and *Kandra v. U.S.*, 145 F. Supp. 2d 1192 (D. Ore. 2001), there was no question that the Federally-operated structures were going to be replaced, and no analogous discretion to what the Corps has here in terms of issuing a regulatory

1    construction permit.

2         Plaintiff also objects to the Service's determination that effects of the tide gate "would not

3    occur in the absence" of the new Army Corps permit (and are therefore not included in the

4    baseline). Pl's Mot. 14. The argument is misguided. The Service determined the Army Corps'

5    permit would significantly extend the life of what Plaintiff characterizes as a "failing" tide gate.

6    As acknowledged in the TFI Agreement, projects as extensive as the NNS Project, involving

7    replacement of tide gates and that require excavation of the tide gate and surrounding dike, extend

8    the life of the structures. *See* AR0050769; AR0050771. Here, the Project requires removal and

9    replacement of the entire tide gate structure, thereby perpetuating the resulting degraded habitat

10   conditions for another 50 years. AR0051315; AR0051189. This extensive work would not occur

11   but for the Army Corps' discretionary permit issuance. Thus, consistent with its past and present

12   approach to tide gates, the Service appropriately excluded the future effects of the rebuilt NNS tide

13   gate from the environmental baseline, reasonably finding that they should be considered as effects

14   of the proposed Project. AR0051175-89; AR0051315. The Service's environmental baseline

15   analysis is lawful, reasonable, supported by the record, and should be upheld.

16        **4.   The Service's effects analysis is thorough and complete.**

17        The Service appropriately analyzed the full suite of effects of the NNS Project. After

18   reviewing the anticipated effects from the reinforced replacement tide gate, the Service determined

19   that these effects, in addition to the environmental baseline, would likely jeopardize the PS

20   Chinook and SRKW and would also likely adversely modify those species' designated critical

21   habitat. The Service's effects analysis was reasonable and supported by the record.

22        The "effects of the action" "are all consequences to listed species or critical habitat that

23   are caused by the proposed action, including the consequences of other activities that are caused

24   by the proposed action." 50 C.F.R. § 402.02. "A consequence is caused by the proposed action if

25   [1] it would not occur but for the proposed action and [2] it is reasonably certain to occur." 50

26   C.F.R. § 402.02. Effects of the action may occur later in time and may include consequences

27   occurring outside the immediate area involved in the action. 50 C.F.R. § 402.17. As outlined in

28   the 2020 interagency memo, where the Army Corps has discretion to issue regulatory permits for

the replacement of existing tide gates, the agencies analyze future effects stemming from that authorization as an "effect of the action" – what consequences would not occur but for the action and are reasonably certain to occur. AR0002764.

Here, as part of its effects analysis, *see* AR0051189-1235, the Service noted that the Army Corps had discretion to issue the permit to allow the Project, and, as described above, determined the reinforced replacement structure would have useful life of another 50 years. As a result, the Service analyzed the future enduring effects of the NNS tide gate for those additional 50 years. AR0051189. As part of this analysis, the Service reviewed again the status of PS Chinook, SRKW, and their designated critical habitat and noted that both population abundance and habitat quality are poor and declining AR0051224-35. The Service next noted that under the current environmental baseline, nearshore and estuary habitat in Puget Sound cannot support the biological requirements of PS Chinook, as evidenced by low survival of PS Chinook salmon juveniles in the nearshore of Puget Sound. AR0051230. Fewer PS Chinook, which are key to the SRKW's prey base, will reduce the representation of diversity of life histories, resiliency in withstanding stochastic events, and redundancy to ensure there is a margin of safety for the salmon and SRKWs to withstand catastrophic events. AR0051230. The Service then explained that the condition of the environmental baseline is such that additional impacts on the quality and quantity of nearshore and estuary habitat further impairs the ability of that habitat to support conservation of these species. AR0051230.

Using the status of the species' populations and habitat as a starting point, the Service then turned to the future effects of the NNS Project. AR0051189-1235. The Service determined that the enduring effects of the NNS Project would further reduce abundance and productivity and spatial structure of PS Chinook through a combination of the loss of nearshore habitat quality and by maintaining as agricultural land, with low habitat value, what otherwise would return to more beneficial saltwater marsh/estuary habitat. Given the negative trend in status for PS Chinook and the risk that poses for both the salmon and SRKWs, avoiding such negative effects for decades would be critically important. The Service noted that the additional life span of the rebuilt tide gate structures would also exacerbate habitat-limiting factors identified in the PS Chinook and SRKW

13

recovery plans. For all these reasons, the Service reasonably concluded that, at this critical juncture, when the enduring effects of the rebuilt tide gate structures are added to the environmental baseline and cumulative effects, and the status of the species is taken into account, the NNS Project will likely result in jeopardy by appreciably reducing the likelihood of both the survival and recovery of PS Chinook and SRKWs in the wild by reducing their numbers and reproduction and will likely result in adverse modification by appreciably diminishing the value of critical habitat, as a whole, for the conservation of PS Chinook and SRKWs. AR0051189-1235.

Plaintiff takes issue with these determinations and first argues erroneously that the Project is not the "but for" cause of the future existence of the tide gate. Pl's Mot. 15. But the existing tide gate is at or near the end of its useful life (a fact that Plaintiff clearly emphasized in its motion for preliminary injunction). AR0051189-90. The Project will rebuild the tide gate and dike, giving it an additional 50-year life. That new 50-year life would not occur but for the Army Corps' permit.

Plaintiff next accuses the Service of using an invalid reference scenario and not analyzing the incremental impact of extending the life of the tide gate for 50 years based on present conditions. Pl's Mot. 15-17. To be clear, the Service did not base its jeopardy and adverse modification decisions on a reference scenario of a new tide gate in a situation where a tide gate did not previously exist. Plaintiff confuses so-called reference scenarios with an appropriate environmental baseline analysis that requires the Service "to compare the condition of the species and the designated critical habitat in the action area with and without the effects of the proposed action, which can inform the detailed evaluation of the effects of the action described in § 402.14(g)(3) upon which the Services formulate their biological opinion." *See* 84 Fed. Reg. at 44,978. The Service acknowledged that parts of the structure had 10 more years of useful life, the effects of which the Service properly included in the environmental baseline. AR0051182-86, AR0051187. The Service next explained the basis for treating that useful life as being over (for the tide gate itself and 10 years left for the dikes). AR0051187-88. The Service then treated the effects of the replaced and rebuilt tide gate structures into the future as the effects of the action, added them to the to the environmental baseline and cumulative effects, and reasonably determined that together, these impacts showed that the Project would likely result in jeopardy and adverse

modification. AR0051189-235.

Finally, the Court can equally reject Plaintiff's argument that the Service improperly double counted the existence of the tide gate in the environmental baseline and the effects analyses. Pl's Mot. 17-20. The Service properly included the past and present effects of the existing tide gate structures in the environmental baseline, as well as including the 10 remaining years of useful life for the dike/riprap. *See* 50 C.F.R. § 402.02. The Service appropriately found (and Plaintiff concedes) that the tide gate is at or near the end of its useful life. After explaining why it could not analyze the innumerable scenarios of effects were the tide gate not replaced or removed, AR0051188, the Service properly included in the effects section/analysis, the future effects of the Project for an additional 50 years. AR0051189-90. The Service then looked at the aggregate of these effects and made a reasonable jeopardy and adverse modification determination, that is supported by the record, AR0051224-35, and should be upheld.[8]

### 5. The Service utilized the best available science in its effects analysis.

The Service considered the best available science concerning PS Chinook and SRKW and resolved uncertainty and data gaps using accepted scientific techniques and its best professional judgement as the expert agency charged with implementing the ESA. The Service's ultimate determinations based on the available science are reasonable, supported by the record, and entitled to deference.

Plaintiff asserts that the Service failed to provide any quantitative or qualitative assessment of the number of Skagit Chinook that would be affected by the Project, how that compares to the overall population of PS Chinook, and then how the Chinook effects impact the SRKW. Pl's Mot. 21-22. As an initial matter, it is not necessary to quantify impacts to listed species and critical habitat in order for those impact to "count" as effects under the ESA. *See* 84 Fed. Reg. at 44,987 and 45,000 ("Where appropriate, the Services use statistical and quantifiable methods . . . but the

---

[8] PNWA argues inaccurately that the Service failed to take into account improved passage and reduced sediment production. ECF No. 44 at 9. The Service considered the passage effects of the proposed side hinged gate and still found adverse effects. AR0051201. The Service also discussed sediment production and routing and found them to be generally negative through increased sediment temperature, more coarse sediment, etc., all of which results in less favorable habitat quality and quantity for salmonids. AR0051196-204.

best scientific and commercial data available often does not support this degree of precision. As such, the Services are required to apply the statute and regulations, and reach a conclusion even where such data and methods are not available."). Here, the type of assessments Plaintiff demands does not exist. But the record amply demonstrates that the PS Chinook and SRKW populations are small and at risk, that the Skagit Chinook stocks are of critical importance to the listed unit as a whole, and that the available habitat for PS Chinook is poor and cannot support the conservation of this species. The record further shows that the prey component of critical habitat for SRKW is at a fraction of historical levels and critical to protecting the species. The condition of the environmental baseline is such that additional long-term negative effects on the quantity and quality of nearshore and estuarine habitat for PS Chinook and prey availability for SRKW will therefore impair its ability to support conservation of these species. The effects of the NNS Project will do just that. Accordingly, the record of the Project's effects fully supports the Service's jeopardy and adverse modification conclusions, even without the nonexistent analysis demanded by Plaintiff. AR0051224-35.

Plaintiff next argues that the Service erred in its use of an 1886 map to assume that the habitat landward of the tide gate would return to marsh habitat. Pl's Mot. 22. Plaintiff is wrong. First, the dikes were reportedly installed just shortly before the 1886 surveys were conducted. AR0036306. Therefore, the map still accurately showed the pre-tide gate habitat characteristics. Second, the presence of historical marsh habitat landward of the tide gate is documented in other studies as well. AR0036302; AR0036220. And third, Plaintiff assumes that the dikes installed in the 1800s were of the same height and composition as today's dikes. That is not likely. Further, if the elevation were similar on both sides of the dike, then Plaintiff's argument would suggest that mud flats existed landward of the dike historically. There is no support for this argument. *See, e.g.*, AR0050679 (map depicting historic habitat of the NNS area as "estuarine emergent wetland").

Plaintiff's assertions that the Service failed to explain how 85 feet of existing armored shoreline could return to functioning habitat and failed to explain the significance of that restored habitat to the species, Pl's Mot. 22-23, are meritless. First, the Service explained that it does not undertake a detailed evaluation of the theoretical future degradation of existing structures because

the range of potential outcomes is exponential, to the point it is not reasonable to assume them all; and because even if the Service were to consider what might happen to a structure absent the proposed repair or replacement, those impacts are still part of the effects analysis - they have just been moved out in time to occur after the new useful life. AR0051188.

Notwithstanding, historical conditions are considered to be informative of a future state absent manmade stressors, AR0036311, and the Service described the historic habitat in and around the NNS tide gate, AR0051181-86. In particular, the BiOp included historic maps showing that marsh vegetation existed landward of the tide gate and cited other sources indicating marsh habitat to be historically common in Padilla Bay. AR51182-83. Moreover, the Service provided a detailed analysis as to why the RPA will avoid jeopardy and adverse modification, AR51249-51, which is in essence an explanation of the significance of the habitat that would be restored absent the tide gate structures. *See, e.g.*, AR0051250. Finally, it should be noted that Plaintiff's skepticism about the significance of restored tide gate habitat is inconsistent with the TFI Agreement (which Plaintiff supported) – *i.e.*, the Agreement was premised on the understanding that "conversion [] of delta agricultural lands [w]as a means to achieve the estuarine habitat restoration and smolt production goals . . . ." AR0050776.

Next, Plaintiff's argument that the Service inappropriately relied on generalized impacts when known tide gate impacts were available, Pl's Mot. 23-24, is wrong.[9] First, Plaintiff errs in arguing that the Project would not cause deepening of the nearshore zone because the shoreline armoring exists today, and the area marineward of the tide gate is shallow mudflat. The Service explained that, at high tide, the area immediately marineward of the shoreline armoring steeply deepens. AR0051186, AR0050547. Moreover, the Service considered very specific features of the Project environment and the Project design and materials in analyzing both the nearshore and estuarine impacts – including in the assumptions and adjustments made to the Calculator, *see supra* Argument Section A. Second, Plaintiff's characterization of PS Chinook status is misleading and not grounded in best available science. Plaintiff only cites to short-term population trends to argue

---

[9] PNWA makes similar, erroneous arguments that are equally refuted by the arguments set out here and in Argument Section A, *supra*.

ER-75

the population status is improving. Pl's Mot. 24. But Skagit Basin stocks are at less than 20% of their recovery goal and have experienced 15-year declining trends in abundance. AR0051210. The long-term abundance trends of Puget Sound Chinook since 1980 are strongly negative. AR0051225. Moreover, the six Skagit stocks and the Skagit watershed are critical to population-wide spatial structure and so population-level effects would cause an appreciable reduction of the PS Chinook unit to survive and recover, individually and collectively. AR0051225. And finally, concerning submerged aquatic vegetation, Pl's Mot. 24, the issue is not how much vegetation is in Padilla Bay, rather, it is whether the replaced tide gate will impact the vegetation in Padilla Bay. The Service never claimed the tide gate impacted the vegetation in the entirety of Padilla Bay, only in front of the armoring.

In sum, the Army Corps' permit allowing the District to rebuild a reinforced NNS tide gate structure will add a 50-year lifespan. The Project will continue to add adverse effects to the already low species' population numbers and poor habitat quality. Without habitat mitigation, those enduring effects will result in jeopardy and adverse modification. The Service's effects analysis is reasonable, supported by the record, and should be upheld.

**6.  The Service's RPA is feasible.**

Lastly, because of the BiOp's conclusions, the Service provided an RPA that, if implemented, would avoid jeopardy and adverse modification. AR0051251. The Service's RPA is feasible and supported by the record.

A "reasonable and prudent alternative" refers to an alternative action that is economically and technologically feasible and that, if implemented, would avoid jeopardy and adverse modification. 50 C.F.R. § 402.02. In forming an RPA, the Service is not required to "account for the cost" of the RPA, *see San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581 (9th Cir. 2014)), but is required to provide "some analysis" of the RPA it selects. *DOW v. NMFS*, 707 F.3d 462, 475 (4th Cir. 2013) *citing Greenpeace v. Nat'l Marine Fisheries Serv.*, 55 F.Supp.2d 1248, 1268–69 (W.D.Wash.1999).

In developing its RPA, the Service directly addressed the bases for its jeopardy and adverse modification determinations. The underpinning of the finding on PS Chinook is the combined,

enduring impacts of the NNS Replacement Project on nearshore and estuarine habitat which, in turn, also will limit this vital prey resource for SRKW to a level that will jeopardize SRKW and adversely modify its designated critical habitat. AR0051235-51. Thus, the Service developed the RPA to directly address the anticipated impacts from the Project by requiring the District to (1) generate a minimum of 275 credits as measured by the Nearshore Calculator (or equivalent) to address the NNS projects' adverse effects to nearshore habitat ("nearshore RPA") and (2) to restore a minimum of 8.6 acres of estuary habitat within the Skagit Bay/Padilla Bay area to account for the NNS Project's loss of estuary habitat ("estuary RPA"). AR0051236. The Service's RPA provides a range of ways for the District to reduce and offset the impacts of the NNS Project on both nearshore and estuarine habitat to a level that avoids jeopardy and adverse modification for PS Chinook and SRKW. The RPA is flexible, containing five options for implementation of the nearshore RPA and two options for the estuarine RPA, and the options may be used in any combination with each other to achieve the necessary offsets. AR0051237-42.

In challenging the RPA, Plaintiff asserts erroneously that the RPA is inconsistent with the TFI BiOp. Pl's Mot. 25-26. First, as explained above, *see supra* Argument Section B.1, the TFI Agreement is not the legally correct benchmark for evaluating the reasonableness of this RPA. The NNS BiOp challenged here is an independent individual (rather than programmatic) consultation, reflecting 15 years of additional best available science. As explained, the incorrect characterization of the NNS Project by the Operational Committee undermined the purpose and terms of the TFI Agreement, was part of pattern of misapplied categorizations that doomed the TFI, and, in any event, was not a decision made by the Service. Nevertheless, the Service's 2024 NNS Section 7 analysis and RPA is consistent with the TFI BiOp, which expressly relied on the need for offsetting habitat mitigation in order to reach no jeopardy/no adverse modification conclusions. While the Service relied on a discrete part of the TFI (8.6 acres assigned to NNS) to inform the estuary RPA mitigation requirement in the absence of any better available science, that discrete 8.6-acre restoration assignment in the TFI Agreement was not the reason for reinitiation of the TFI BiOp; rather, it was the misapplication of the TFI Agreement and lack of progress in achieving mitigation requirements. AR0051236.

Second, Plaintiff erroneously claims that the estuary RPA addresses all the adverse effects of the tide gate and that the nearshore RPA is duplicative. Pl's Mot. 26-27. The Service's jeopardy/adverse modification conclusion is based on impacts to both estuarine and nearshore habitats and the estuary RPA does not mitigate or address the adverse effects of the tide gate on nearshore habitat. In several other recent biological opinions with Puget Sound nearshore impacts, the Service concluded that a no-net loss approach was necessary and that mitigation for nearshore impacts was therefore required to avoid jeopardy and adverse modification. AR0002931; AR0002852; AR0026435; AR0000113. Scientific information regarding the critical role of nearshore impacts, the need to offset those impacts, as well as the ability to objectively calculate the impacts and required mitigation, has evolved considerably since the 2008 TFI Agreement and that 2009 BiOp. Based on best available science, the Service reasonably concluded in the NNS BiOp that Plaintiff must offset the adverse impacts of its Project to both estuarine *and nearshore* habitat in order to avoid jeopardy and adverse modification. *See, e.g.*, AR0003850; AR0004195; AR0004524; AR0029132.

Third, Plaintiff's argument that the Service incorrectly applied the "Pocket Estuary or Embayment" adjustment factor is inaccurate. Pl's Mot. 27. The definition of the "Pocket Estuary or Embayment" adjustment factor is comprehensive and used with the Nearshore Calculator. AR0014911. The "Ref. tab" of the Nearshore Calculator explains:

> When using the term 'pocket estuary', we include embayments, estuaries, and lagoons. The Geographic Information Systems (GIS) layer we use to designate Pocket Estuaries also encompasses these geomorphic type . . . Cereghino et al. (2012) proposed two classes of embayment sites: coastal inlets, which are formed such that their protected shallow structures are not dependent on beach dynamics for their existence, and barrier-type, which are embedded in a beach system and are somewhat dependent on a barrier beach for wave protection and wetland development. We also drew upon Shipman (2008) who uses the term embayment to include protected estuaries and lagoons where there is little wave action to form beaches.

*See* AR0051122, n. 8 (quote found in interactive calculator tool, *see* Ref tab, rows 81-84);[10] *see*

---

[10] The weblink in footnote 8 has been updated to https://www.fisheries.noaa.gov/resource/tool-app/puget-sound-nearshore-conservation-calculator.

ER-78

*also* AR0014911; AR0015057. The GIS map accompanying the Nearshore Calculator identifies the area adjacent to the NNS tide gate as "Pocket Estuary or Embayment." AR0051122, n. 8, *see* Project D tab, row 22.

Finally, Plaintiff wrongfully asserts that the Service had no basis for, and did not provide, an analysis to support its conclusion of RPA feasibility. Pl's Mot. 27-28. The Service's RPA analysis more than meets the appropriate standard outlined above and thoroughly examined the technological and economic feasibility of the range of RPA options, AR0051244-48, including detailed responses to each of Plaintiff's comments on the draft RPA, pointing out misplaced assumptions and factual inaccuracies in Plaintiff's assessment of likely RPA costs. AR0051329-34. To support the feasibility, the Service researched the general availability of restoration opportunities, the costs of past restoration projects, the cost of conservation credits, and land ownership relevant to restoration options, AR0051244-48, including Plaintiff's own significant and potentially relevant landholdings, AR0051333-51334.

In its comments on the draft BiOp, Plaintiff asserted, without support, that it could only apply its $100,000 per annum drainage component to the NNS Project (which is puzzling given Plaintiff's indication that the proposed action – before the Service's RPA – will cost well in excess of $1,300,000). In response, the Service reviewed the financial status of the applicant for the NNS Project, which is the "Skagit County Dike, Drainage and Irrigation Improvement District 12." Citing to an audit by the Skagit County Assessor of that applicant entity, the Service noted that the District's balance sheet reflected a total of $19,066,157 in cash and investments. Regardless, the Service did not rest its economic feasibility conclusion on this point. As noted in the Service's analysis, the "diking and drainage districts have the authority and ability to collect levies/assessments (RCW 85.18.010; RCW 85.06) and District 12's drainage and diking assessment areas both include No Name Slough, indicating the applicant's ability to raise funds as needed for project costs." AR0051248. Plaintiff's claim regarding an omitted or deficient feasibility analysis fails.[11]

---

[11] PNWA also incorrectly asserts that the Service's nearshore calculator produces arbitrary and disproportionately high mitigation costs that will cripple its industry, local economies, etc. ECF No. 44 at 11-12. At bottom, PNWA inappropriately seeks to litigate projects not at issue in this

The Service's RPA is reasonable, supported by the record, and should be upheld.

## CONCLUSION

For the reasons explained above, the Court should deny Plaintiff's motion for summary judgment and grant Defendants' cross-motion for summary judgment.

Respectfully submitted on this 24th day of January, 2025.

LISA L. RUSSELL,
Deputy Assistant Attorney General
S. JAY GOVINDAN, Section Chief
BRIDGET K. McNEIL, Assistant Section Chief

*/s/ Rickey D. Turner, Jr.*
RICKEY D. TURNER, JR.
CO Bar No. 38353
Senior Attorney
Wildlife and Marine Resources Section
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Phone: (303) 844-1373
rickey.turner@usdoj.gov

*Attorneys for Defendants*

I certify that this memorandum contains 8,285 words, in compliance with the Local Civil Rules.

---

case. Regardless, the peer-reviewed nearshore calculator is the best available science. And the Service's use of the calculator is permissible and reasonable in its efforts to implement the requirement of the ESA to, among other things, avoid jeopardy and adverse modification. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978) (noting that the ESA embodies Congress's "plain intent" to "halt and reverse the trend toward species extinction, whatever the cost.").

ER-80

1

2 The Honorable Brian A. Tsuchida

3

4

5

6

7 IN THE UNITED STATES DISTRICT COURT

8 WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

| | |
|---|---|
| 10 SKAGIT COUNTY DIKE, DRAINAGE, & IRRIGATION IMPROVEMENT DIST. NO. 12 | Case No. 2:23-cv-01954-BAT |
| 11 | SKAGIT COUNTY DIKE, DRAINAGE, |
| 12 Plaintiff, | & IRRIGATION IMPROVEMENT DIST. NO. 12'S MOTION FOR SUMMARY |
| 13 v. | JUDGMENT AND MEMORANDUM IN SUPPORT - **CORRECTED** |
| 14 NATIONAL MARINE FISHERIES | **NOTE ON MOTION CALENDAR:** |
| 15 SERVICE; DEPARTMENT OF | **FRIDAY, FEBRUARY 28, 2025** |
| 16 COMMERCE; GINA RAIMONDO in her official capacity as Secretary of Commerce; | **ORAL ARGUMENT REQUESTED** |
| 17 JANET COIT in her official capacity as the Assistant Administrator for NOAA | |
| 18 Fisheries, | |
| 19 Defendants. | |
| 20 | |

21

22

23

24

25

PL.'S MOT.  FOR SUMM.  J. & MEMO. IN SUPP.
CASE NO.  2:23-CV-01954-BAT



1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

ER-81

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................... 1

II.  FACTUAL BACKGROUND ................................................................... 2

  A. Existing Tidegate ............................................................................. 2

  B. The Project ........................................................................................ 3

  C. The Tidegate and Fish Initiative ..................................................... 3

  D. Consultation History ......................................................................... 4

  E. Status of the Species and Critical Habitat...................................... 5

    1. Chinook Salmon .......................................................................... 5

    2. Southern Resident Killer Whales ............................................... 6

    3. Designated Critical Habitat ....................................................... 6

III.  LEGAL BACKGROUND ....................................................................... 7

IV.  STANDARD OF REVIEW ...................................................................... 7

V.  ARGUMENT............................................................................................ 8

  A. The BiOp is Irreconcilable with NMFS's Prior Conclusions for this Project ................ 8

  B. The Action Area is Contrary to Law and Fact................................. 9

  C. The Baseline is Contrary to Law and Fact .................................... 11

    1. The Baseline Focuses on the Wrong Action Area .................... 12

    2. The Baseline Improperly Excludes the Tidegate .................... 12

    3. The Tidegate Would Still Exist Absent the Project ................. 14

  D. NMFS's Effects Analysis is Contrary to Law and Fact................ 15

    1. The Existence of the Tidegate is Not an Effect of the Project ................. 15

    2. The Effects Analysis Relies on an Invalid Reference Scenario ................. 15



3. NMFS Improperly Double Counts the Existence of the Tidegate in the Baseline and the Effects of the Project.................................................... 17

E. NMFS's Conclusions Are Unsupported, Speculative, and Contradicted by Best Available Science................................................................................ 20

1. NMFS Cannot Rely on Speculative Impacts to "Some" Skagit Juvenile Chinook   21

2. NMFS Cannot Speculate about Habitat Conditions Absent the Tidegate................ 22

3. NMFS Cannot Rely on Generalities When Specific Impacts Are Known.............. 23

F. NMFS's Jeopardy and Adverse Modification Determinations are Based on Speculation........................................................................................ 24

G. NMFS's RPA is Arbitrary and Capricious ................................................ 25

1. The RPA is Irreconcilable with NMFS's Prior Decisions ........................ 25

2. The RPA Includes Duplicative Mitigation Requirements............................ 26

3. NMFS Improperly Calculated the Credit RPA ...................................... 27

4. The RPA is Not Economically or Technologically Feasible ...................... 27

VI.  CONCLUSION................................................................................ 29



1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

**ER-83**

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Federal Cases**

4

*Am. Rivers v. U.S. Army Corps of Eng'rs,*
5
    271 F. Supp. 2d 230 (D.D.C. 2003) ...................................................................9

6
*Ariz. Cattle Growers Ass'n v. U.S. Fish & Wildlife,*
    273 F.3d 1229 (9th Cir. 2001) ........................................................................8
7

8
*Bennett v. Spear,*
    520 U.S. 154 (1997) ......................................................................................20

9
*Butte Env't Council v. U.S. Army Corps of Eng'rs,*
10
    620 F.3d 936 (9th Cir. 2010) .........................................................................24

11
*Confederated Tribes and Bands of the Yakama Nation v. McDonald,*
    2003 WL 1955763 (E.D. Wash. 2003) .....................................................13, 16
12

13
*In re Consol. Salmonid Cases,*
    791 F. Supp. 2d 802 (E.D. Cal. 2011) .......................................................13, 15

14
*Ctr. for Biological Diversity v. Haaland,*
15
    998 F.3d 1061 (9th Cir. 2021) ......................................................................9, 26

16
*Ctr. for Biological Diversity v. NMFS,*
    977 F. Supp. 2d 55 (D.P.R. 2013) .................................................................20
17

18
*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,*
    807 F.3d 1031 (9th Cir. 2015) .......................................................................19

19
*Ctr. for Biological Diversity v. Zinke,*
20
    900 F.3d 1053 (9th Cir. 2018) .........................................................................9

21
*Dow AgroSciences LLC v. NMFS,*
    707 F.3d 462 (4th Cir. 2013) ........................................................................28
22

23
*Kandra v. U.S.,*
    145 F. Supp. 2d 1192 (D. Ore. 2001) ...........................................................13

24
*Kisor v. Wilkie,*
25
    588 U.S. 558 (2019) ......................................................................................12



*Maine Lobstermen's Ass'n v. NMFS*,
  70 F.4th 582 (D.C. Cir. 2023) .......................................................... 20

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
  668 F.3d 1067 (9th Cir. 2011) ........................................................... 8

*Nat. Res. Def. Council v. Haaland*,
  102 F.4th 1045 (9th Cir. 2024) .......................................................... 7

*Nat'l Wildlife Fed'n v. NMFS*,
  2005 WL 1278878 (D. Or. May 26, 2005) ....................................... 13

*Nat'l Wildlife Fed'n v. NMFS*,
  524 F.3d 917 (9th Cir. 2008) ............................................. 13, 16, 19, 24

*Native Ecosystems Council v. U.S. Forest Serv.*,
  418 F.3d 953 (9th Cir. 2005) .............................................................. 8

*Nw. Env'tl. Def. Ctr. v. NMFS*,
  647 F. Supp. 2d 1221 (D. Or. 2009) ................................................. 19

*Ocean Conservancy v. Gutierrez*,
  394 F. Supp. 2d 147 (D.D.C. 2005) .................................................. 10

*Oceana, Inc. v. Evans*,
  384 F. Supp. 2d 203 (D.D.C. 2005) .................................................. 10

*Organized Village of Kake v. U.S. Dept. of Agric.*,
  795 F.3d 956 (9th Cir. 2015) ....................................................... 12, 13

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014) ............................................................ 13

*Sierra Club v. U.S. Dep't of Interior*,
  990 F.3d 909 (5th Cir. 2021) ............................................................ 10

*Wild Fish Conservancy v. Salazar*,
  628 F.3d 513 (9th Cir. 2010) ............................................................ 24

**Federal Statutes**

5 U.S.C. § 706 ....................................................................................... 8

16 U.S.C. § 1536(a) .............................................................................. 7

16 U.S.C. § 1536(a)(2) ..................................................................... 7, 20



Van Ness
Feldman LLP

1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

ER-85

16 U.S.C. § 1536(b) .......................................................................................7

16 U.S.C. § 1536(b)(3)(A) ..........................................................................7, 25

**Rules**

Fed. R. Civ. P. 56(a) ......................................................................................7

**Regulations**

50 C.F.R. § 402.02 (2019) .................................................................. *passim*

50 C.F.R. § 402.14(a) (2019) ..........................................................................7

50 C.F.R. § 402.14(g)(2)-(3) (2019) ..........................................................7, 24

50 C.F.R. § 402.14(g)(8) (2019) ..................................................................20

50 C.F.R. § 402.14(h)(3) (2019) ....................................................................7

*Endangered and Threatened Wildlife and Plants; Regulations for Interagency
    Cooperation*, 84 Fed. Reg. 44976, 44978 (Aug. 27, 2019) ...................12, 15, 19, 24

**Other Authorities**

USFWS & NMFS, *Consultation Handbook* (1998) available at:
    https://www.fws.gov/sites/default/files/documents/endangered-species-
    consultation-handbook.pdf..........................................................12, 14, 27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TABLE OF AUTHORITIES - v
Case No. 2:23-cv-01954-BAT



Van Ness
Feldman LLP

1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

**ER-86**

# I.    INTRODUCTION

Plaintiff Skagit County Dike, Drainage, & Irrigation Improvement Dist. No. 12 ("District 12") seeks summary judgment and declaratory relief on grounds that Defendants violated the Administrative Procedures Act ("APA").[1]   After this Court ordered National Marine Fisheries Service ("NMFS") to complete Endangered Species Act ("ESA") consultation, NMFS issued a biological opinion ("BiOp") for the No Name Slough ("NNS") tidegate replacement project ("Project").   The Project is a simple tidegate replacement that does not expand the footprint of the existing structures and provides benefits to fish compared to the status quo.   Yet, the BiOp concluded that the Project would cause jeopardy to Puget Sound Chinook Salmon ("PS Chinook") and Southern Resident Killer Whale ("SRKW") and adverse modification of their designated critical habitat.

To reach these unsupported conclusions, NMFS made innumerable scientific and legal errors.   It reversed its prior determination for this very Project without explanation.   It misapplied its own regulations by: (1) defining the action area for an isolated tidegate replacement as all of Puget Sound; (2) double counting the impacts of the tidegate in both the environmental baseline and effects of the action; (3) attributing jeopardy in the baseline to the Project; and (4) analyzing the effects of the Project as if the Project was occurring in natural conditions.   Furthermore, the jeopardy and adverse modification conclusions for both PS Chinook and SRKW are dependent on the assumption that the Project will impair the habitat of the juvenile Skagit Chinook populations, but the tidegate exists today, juvenile Skagit Chinook numbers are increasing, and juvenile Skagit

---

[1] To the extent necessary to preserve its claims for attorney fees with respect to Claims I-III, District 12 incorporates by reference arguments raised in its Motion for Preliminary Injunction, and also requests summary judgment with respect to those claims.

**Van Ness Feldman** LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

Chinook's use of the area near the Project is limited. As a result, the BiOp fails to rationally evaluate the effects of the Project and should be vacated and remanded to NMFS.

## II.    FACTUAL BACKGROUND

### A.    Existing Tidegate

The NNS tidegates regulate tidal fluctuations and ensure that marine waters do not interfere with inland drainage and agricultural activities. Under existing conditions, there are three[2] top-hinged tidegates and an associated ripprapped earthen dike ("Tidegate"). AR0051116–17.[3] Alongside the Tidegate, several miles of existing shoreline armoring extend along the southeastern shore of Padilla Bay. *See* AR0000539–42; AR0051182.

The Tidegate has been located at the mouth of NNS in southeastern Padilla Bay for approximately 140 years. AR0051182. Digitized 1886 maps show the dike was already in place, and the area directly landward of the Tidegate was upland. AR0051182–83; NOAASupp0000197–98. Since 1886, agricultural use landward of the Tidegate has remained largely unchanged, AR0002819–23, and the habitat near the Tidegate has been retained, NOAASupp0000198.

Waterward of the Tidegate is Padilla Bay, primarily composed of shallow mudflats. AR0037645, AR0037813. Deeper areas of Padilla Bay feature one of largest contiguous stands of eelgrass along the Pacific Coast of North America. AR0051182, AR0002820–21. Prior to the 1930s, water from the North Fork Skagit River flowed into the south end of the Swinomish Channel, which connected the mouth of the river to Padilla Bay during times of high river flow. AR0037796; AR0037646. Since its construction in 1937, a rock jetty has diverted freshwater from

---

[2] A fourth culvert has already been partially decommissioned. AR0051116.
[3] Citations to "NOAASkagitAR" are abbreviated to "AR."

PL.'S MOT. FOR SUMM. J. & MEMO. IN SUPP. - 2
Case No. 2:23-cv-01954-BAT



1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

ER-88

the Skagit River away from Swinomish Channel and Padilla Bay, AR0037796, creating both a

physical obstruction for the migratory pathway for juvenile and adult salmon to Padilla Bay as

well as a physiological barrier due to rapid changes in salinity. AR0001571. Accordingly, juvenile

Chinook densities in Padilla Bay are "generally much lower than other portions of the [Skagit]

estuary and bay." AR0000081.

### B.    The Project

The Project "is not complex." ECF 15 at 2. It would replace the existing top-hinged

tidegates and associated culverts with one large concrete split box culvert with two side-hinged

gates, AR0015339. By replacing top-hinged tidegates with side-hinged tidegates, the Project

improves fish passage relative to existing conditions. AR0051201. The Project would also remove

two creosote piles, which will improve long-term water quality and reduce contaminants.

AR0051196. To access the tidegates, the existing riprap will be removed and then replaced with

like material within the same footprint. AR0051189; AR0051310.

### C.    The Tidegate and Fish Initiative

The Project initially relied on the Tidegate and Fish Initiative Implementing Agreement

("TFI") programmatic biological opinion ("TFI BiOp") (AR0000060) for ESA coverage.

AR0051113. The TFI, to which NMFS was a signatory, streamlined permitting for tidegate repairs

and replacements in the Skagit and Samish River delta. AR0050739. The TFI BiOp concluded that

the TFI actions were not likely to jeopardize the continued existence of PS Chinook or result in

the destruction or adverse modification of critical habitat. AR0000060. NMFS did not find it

necessary to consider the impacts of the TFI on SRKW. *See id*.

The TFI contemplated that mutually agreed upon habitat credits would accompany each

PL.'S MOT.  FOR SUMM.  J. & MEMO. IN SUPP. - 3
Case No. 2:23-cv-01954-BAT

**Van Ness Feldman** LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

ER-89

project, AR0050782–83, but did not require habitat credit to implement operational improvement projects, including "[r]eplacement of conventional tidegates . . . with a side hinge gate." AR0050787. Instead, operational improvements could *generate* habitat credits. AR0050788. The TFI established an Oversight Committee, which included NMFS, to oversee the generation and debit of habitat credits. AR0050792–93. The Oversight Committee approved several operational improvement projects, including Big Ditch, Higgens Slough, and Joe Leary Slough, without requiring habitat credits. AR0003253; AR0050282; AR0003244.

### D. Consultation History

In November 2019, the Oversight Committee interpreted the Project to be an operational improvement under the TFI and did not require the Project to use habitat credits. AR0003238; AR0050883; AR0003253; AR0050880–81. No further action was needed from NMFS for the U.S. Army Corps of Engineers ("USACE") to rely on the TFI BiOp for ESA coverage.

In September 2021, before the remaining aspects of USACE permitting on the Project could be completed, under threat of third-party litigation, NMFS recommended that USACE reinitiate consultation on the TFI. AR0000017; AR0015131–32. Accordingly, USACE requested that District 12 prepare a biological assessment ("BA") to facilitate project-specific ESA consultation. AR0015339.

In 2022, District 12 submitted the BA, evaluating the Project's short-term construction impacts and the "delayed consequences." AR0015361–64. The BA concluded that "[t]he project does not change the level of service associated with the project. Therefore, there will be no effect of delayed consequences resulting from changes in human activities or land use." AR0015362. The BA concluded that the Project was not likely to adversely affect ("NLAA") PS Chinook or



their critical habitat and would have no effect ("NE") on SRKW. AR0015365. USACE confirmed

theses determinations and initiated informal consultation with NMFS. AR0015311–12. NMFS

declined to concur with USACE's determinations, triggering formal consultation. AR0015126.

Only after this Court mandated that NMFS complete consultation, NMFS issued the BiOp.

AR0051107. Reversing its position on the Project under the TFI and USACE's NLAA/NE

determinations, NMFS concluded that the Project would jeopardize PS Chinook and SRKW and

adversely modify their critical habitat. *Id.*

### E. Status of the Species and Critical Habitat

#### 1. Chinook Salmon

The PS Chinook evolutionary significant unit ("ESU") is comprised of twenty-two distinct

and quasi-independent populations. Within the PS Chinook ESU, there are six distinct Skagit

Chinook populations, AR0051143–44, each with life history subtypes. AR0051143. Several life

history subtypes do not reside in estuary habitat. *Id.*

For those life history subtypes that use estuary habitat, juvenile Skagit Chinook's ability to

access the area near the Tidegate is limited. Juvenile Chinook densities within Padilla Bay are

generally much lower than other portions of the estuary due to USACE's rock jetty, AR0000081,

AR0051144, and the long distance from the mouth of the Skagit River. AR0039136. To reach

Padilla Bay and the Project, juvenile Chinook would have to swim approximately 21.4 km from

the Skagit River around the jetty to the Project site. Studies have found that streams further than

about 20km from natal Chinook salmon mouths have no juvenile Chinook present. *Id.*

Evidence of Skagit Chinook declines begins in the 1930s—nearly 50 years after the

Tidegate was installed. AR0020047. While Chinook populations decreased for several decades,

PL.'S MOT. FOR SUMM. J. & MEMO. IN SUPP. - 5
Case No. 2:23-cv-01954-BAT



1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

today, five of the six Skagit Chinook populations show an increase in abundance between the two most recent 5-year review periods (2010–2014 and 2015–2019), AR0001319, AR0051134–35, with productivity estimates above zero. AR0051135, AR0001320.

### 2. Southern Resident Killer Whales

Given the shallow depth of water at the Project site, SRKW are unlikely to be present. AR0051191. According to the BiOp, the Project's impacts to SRKW result from potential reduction in SRKW prey due to the Project's impact on PS Chinook. AR0051174; AR0051199. However, the Project only impacts juvenile Skagit Chinook, which must migrate to the ocean and mature for several years before they become prey for SRKW. AR0033300–02, 04; AR0051159–60.

### 3. Designated Critical Habitat

Landward of the Tidegate has never been identified as critical habitat for Chinook or SRKW. AR0051200, AR0051213. NMFS has previously concluded that Padilla Bay drainages, including NNS, provide "little in the way of harm or potential benefit to Puget Sound Chinook." AR0000630.

Waterward of the Tidegate, estuarine and nearshore marine habitat is designated as critical habitat for PS Chinook and SRKW. AR0051165. Critical habitat for PS Chinook includes "1,683 miles of streams, 41 square miles of lakes, and 2,182 miles of nearshore marine habitat" in Puget Sound. AR0051173. SRKW critical habit includes approximately 15,910 square miles of marine waters between the 6.1-m depth contour and the 200-m depth contour from the U.S. border with Canada to California. AR0051169–70.

PL.'S MOT.  FOR SUMM.  J. & MEMO. IN SUPP. - 6
Case No. 2:23-cv-01954-BAT



Van Ness
Feldman LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

ER-92

## III. LEGAL BACKGROUND

Under the ESA, a federal agency must ensure that an "agency action" is not likely to jeopardize the continued existence of any listed species or destroy or adversely modify the critical habitat thereof. 16 U.S.C. § 1536(a)(2). If the action "may affect" a listed species, the agency must consult with NMFS and/or U.S. Fish & Wildlife Service ("Services"). 16 U.S.C. § 1536(a), (b); 50 C.F.R. § 402.14(a). Unless the Services concur with a NLAA/NE determination, formal consultation is necessary and concludes with the issuance of a biological opinion, 16 U.S.C. § 1536(b)(3)(A), including a summary of information relied upon, a discussion of the effects of the action, and the Services' opinion on whether the action is likely to jeopardize the species or adversely modify critical habitat. 50 C.F.R. § 402.14(h)(3). In making jeopardy and adverse modification determinations, the Services evaluate "the current status . . . of the listed species or critical habitat," the "effects of the action," and "cumulative effects." *Id.* § 402.14(g)(2)-(3). The biological opinion must utilize best available science. 16 U.S.C. § 1536(a)(2). If a Service issues a biological opinion finding jeopardy or adverse modification, the Service must suggest reasonable and prudent alternatives ("RPA") that avoid jeopardy and adverse modification. *Id.* § 1536(b)(3).

## IV. STANDARD OF REVIEW

The court shall grant summary judgment if no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The adequacy of a biological opinion is reviewed under the APA. *Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045, 1056 (9th Cir. 2024). Judicial review pursuant to the APA is based solely on the administrative record at the time of the agency's decision. *Id.*

Under the APA, a court may set aside an agency action if the court determines that the



1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

ER-93

action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. An action is arbitrary and capricious "if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1074–75 (9th Cir. 2011) (citation omitted).

While the arbitrary and capricious standard is deferential, it does not shield agency decisions from a "thorough, probing, in-depth review." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (cleaned up). A court must "determine whether the agency articulated a rational connection between the facts found and the choice made." *Ariz. Cattle Growers Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001). An agency is not entitled to deference where its conclusions "do not have a basis in fact." *Id.*

## V.   ARGUMENT

### A.   The BiOp is Irreconcilable with NMFS's Prior Conclusions for this Project

It is arbitrary and capricious for NMFS to now conclude that the Project results in jeopardy and adverse modification and requires substantial mitigation when, five years earlier, it concluded that the same Project provided a conservation benefit to ESA-listed species. There has been no change in the Project, and NMFS has failed to identify a change in the biological or physical environment that would warrant this reversal.

In 2019, the TFI Oversight Committee, which included NMFS, determined that the Project was an "operational improvement" eligible for ESA coverage under the TFI BiOp without any need for mitigation or use of credit. AR0003238; AR0050883; AR0003253. In 2022, USACE

PL.'S MOT.  FOR SUMM.  J. & MEMO. IN SUPP. - 8
Case No. 2:23-cv-01954-BAT



Van Ness Feldman LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

confirmed NLAA/NE determinations for the Project. AR0015311–12. In 2024, NMFS reversed its prior conclusion, overruled USACE's determination, and found that the Project would jeopardize PS Chinook and SRKW and adversely modify their critical habitat. AR0051107.

NMFS has neither identified nor explained any change in the condition of the species or their habitat between 2019 and 2024 that would justify its reversed position. AR0051325–26 (asserting without citation or explanation that best available science has changed since the TFI). *See Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 237 (D.D.C. 2003) (agency failure to justify its reversal of position from its 2000 biological opinion to its 2003 biological opinion supported a preliminary injunction); *Ctr. for Biological Diversity v. Haaland ("CFBD I")*, 998 F.3d 1061, 1068 (9th Cir. 2021) (agency's reversal of prior listing decision not justified when agency failed to explain why previously identified stressors no longer threatened the species); *cf. Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1071–72 (9th Cir. 2018) (recent population data and new scientific opinions sufficient to explain Service's change in position). Indeed, the most recent status review for PS Chinook predates both NMFS's 2019 decision and its 2024 BiOp, and NMFS acknowledges that "[a]bundance across the Puget Sound ESU has generally increased since the last status review." AR0051133.

### B. The Action Area is Contrary to Law and Fact

NMFS's overbroad definition of the "action area" for this localized Project to include the entirety of Puget Sound solely based on PS Chinook's migratory range is arbitrary and capricious and runs afoul of NMFS's regulations and caselaw. Indeed, such an approach to "action area" would broaden the term to include all migratory habitat for terrestrial and anadromous species and alter years of how the Services have characterized an "action area."



1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

ER-95

The regulations define "action area" as including "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02.[4] Notably, "[t]he regulatory definition of 'action area,'... focuses on the effects of an action in a geographic 'area,' and not on a species." *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 229, *order clarified,* 389 F. Supp. 2d 4 (D.D.C. 2005). Using the migratory range of an impacted species to determine the action area is improper. *Id.* In *Oceana*, the plaintiff argued that the action area for a scallop fisheries management plan should be extended to the migratory range of a species of turtle impacted by the plan, instead of the area in which the fishery operated. *Id.* at 228. The court disagreed, finding "no support" for extending the action area to the migratory range of the species and that a "contrary conclusion would contravene the regulatory definition of 'action area.'" *Id.* at 229; *see also Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 916 (5th Cir. 2021) (rejecting attempt "to expand the action area based on where the cats roam as opposed to where the project's direct or indirect effects will occur"); *Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 161 (D.D.C. 2005) (history omitted) ("plaintiffs misconstrue the definition of 'action area' . . . to include the full migratory range of the sea turtles.").

Here, NMFS established the action area for the Project in precisely the same manner that these courts rejected. NMFS included "all of Puget Sound" based solely on the range of PS Chinook. AR0051174. Under NMFS's approach, the action area would be the same for any federal action that effects PS Chinook. NMFS has not identified any physical effects (i.e., construction noise, flow modifications, water quality impacts) that extend beyond the immediate vicinity of the Project. *See, e.g.*, AR0051192 (water quality impacts are "localized"); AR0051193 (area in which

---

[4] References herein are to the 2019 regulations.

PL.'S MOT. FOR SUMM. J. & MEMO. IN SUPP. - 10
Case No. 2:23-cv-01954-BAT

**Van Ness Feldman** LLP

1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

ER-96

1  benthic forage base is "temporarily diminished" is "very small"); AR0051195 (PAHs expected

2  within "a short distance of creosote pile removal").

3          NMFS also diverges without explanation from its narrower delineation of action areas in

4  other consultations. For example, the TFI, which covered activities throughout Skagit and Samish

5  River deltas defined the action area more narrowly than the entirety of Puget Sound. AR0000070–

6  71. Other biological opinions in the region have also more narrowly defined the action area.

7  AR0000771 (action area for marina breakwater replacement "limited to the marine waters and

8  substrates within 3.4 miles around the Elliott Bay Marina"); AR0001456 (action area for marine

9  pier maintenance "limited to the marine waters and substrates within 13.4 miles around the

10  applicant's pier."); NOAASupp0000057 (apron repair project action area limited to 300 ft radius

11  around the project). Therefore, NMFS's reliance on a broader action area is arbitrary, capricious,

12  and contrary to law.

13

14          **C.      The Baseline is Contrary to Law and Fact**

15          The BiOp's environmental baseline is inconsistent with NMFS's regulations, its past

16  practice, and case law. The baseline is the condition against which the effects of the action are

17  measured; if the baseline is wrong, the effects analysis is wrong. Under the regulations in effect

18  when the BiOp was issued, baseline was defined as "the past and present impacts of all Federal,

19  State, or private actions and other human activities in the action area . . . ." 50 C.F.R. § 402.02.

20  When adopting this definition, NMFS explained:

21

22          We revised the definition of environmental baseline to make it clear that
            "environmental baseline" is a separate consideration from the effects of the action.
23          In practice, the environmental baseline should be used to compare the condition of
            the species and the designated critical habitat in the action area with and without
24          the effects of the proposed action.

25

PL.'S MOT.  FOR SUMM.  J. & MEMO. IN SUPP. - 11
Case No. 2:23-cv-01954-BAT

**Van Ness
Feldman** LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

*Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation*, 84 Fed. Reg. 44976, 44978 (Aug. 27, 2019).  The purpose of the baseline is to "provide a snapshot of the health of the species within the action area without considering the effects of the proposed action." USFWS & NMFS, *Consultation Handbook*, 4–22 (1998).

### 1.    The Baseline Focuses on the Wrong Action Area

The baseline includes past and present conditions in the "action area." 50 C.F.R. § 402.02. Because of the flawed scope of the action area (*see* Section V.B above), NMFS's assessment of the baseline is overbroad and improperly incorporates degraded conditions in all of Puget Sound.

### 2.    The Baseline Improperly Excludes the Tidegate

The Tidegate has existed for approximately 140 years. AR0051182. The BiOp's baseline description includes the habitat conditions as they exist today with the Tidegate but excludes the Tidegate itself because the Tidegate purportedly "has no remaining useful life." AR0051186–88. This approach is inconsistent with the plain text of the definition of the "environmental baseline," which includes all "past and present impacts of . . . actions." 50 C.F.R. § 402.02. Neither the definition of baseline, nor the preamble of the rule accompanying the promulgation of that definition, contemplate that existing structures that are beyond their useful life should be omitted from the baseline. An agency's interpretation is not entitled to deference when, as here, the regulation is only susceptible one reasonable reading.  *Kisor v. Wilkie*, 588 U.S. 558, 574–75 (2019).

NMFS's interpretation is also not entitled to deference because it is inconsistent with how NMFS previously treated existing structures. *Organized Village of Kake v. U.S. Dept. of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (cleaned up). When evaluating an action to rebuild a failing

PL.'S MOT.  FOR SUMM.  J. & MEMO. IN SUPP. - 12
Case No. 2:23-cv-01954-BAT



1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

ER-98

dam, NMFS concluded that "the dam has already been constructed, and its existence is an element of the environmental baseline," and that "other than these temporary effects of construction, the proposed action adds nothing to the existing environmental baseline in the action area." *Confederated Tribes and Bands of the Yakama Nation v. McDonald*, No. CY–02–3079–AAM, 2003 WL 1955763, at *10–11 (E.D. Wash. 2003). The reviewing court concurred, holding that the "existing dam is part of the 'environmental baseline'." *Id.* at *14. Here, NMFS inexplicitly reverses its reasoning in *McDonald* and concludes that the Tidegate is not part of the baseline. "Unexplained inconsistency between agency actions is 'a reason for holding an interpretation to be an arbitrary and capricious change.'" *Organized Village of Kake*, 795 F.3d at 966; *Nat'l Wildlife Fed'n v. NMFS ("NWF I")*, No. CV 01-640-RE, 2005 WL 1278878, *14 (D. Or. May 26, 2005) *aff'd Nat'l Wildlife Fed'n v. NMFS ("NWF II")*, 524 F.3d 917 (9th Cir. 2008) (giving little deference to NMFS's regulatory interpretation because it was "a significant departure from previous interpretations of § 402.02.").

Courts have consistently concluded that existing structures are part of the baseline, not effects of the action. *NWF II*, 524 F.3d at 930–31 ("existence of the dams must be included in the environmental baseline"); *Kandra v. U.S.*, 145 F. Supp. 2d 1192, 1208 (D. Ore. 2001) ("all human activities that impact the listed species must be considered in the environmental baseline."); *In re Consol. Salmonid Cases*, 791 F. Supp. 2d 802, 847 (E.D. Cal. 2011) *aff'd in part, rev'd in part sub nom. San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971 (9th Cir. 2014) (upholding NMFS's rationale that the "effects of the mere existence of the structures are not effects of the proposed action"). Therefore, NMFS erred by omitting the existence of the Tidegate from the baseline.

PL.'S MOT.  FOR SUMM.  J. & MEMO. IN SUPP. - 13
Case No. 2:23-cv-01954-BAT



1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

3.   The Tidegate Would Still Exist Absent the Project

NMFS's justification for omitting the Tidegate from the baseline is based on the erroneous assumption that the impacts of the Tidegate "would not occur in the absence" of the new USACE permit. AR0051186. This is a 180-degree reversal of the assumption NMFS made under the TFI BiOp, which explained that "the effects of the proposed action assumes that regardless of the proposed action, the existing tidegate infrastructure will remain in place." AR0000089.

In support of its flawed assumption, NMFS relies on a USACE requirement that applicants maintain authorized structures in a safe and "good" condition. AR0051188. NMFS's explanation is without merit. NMFS concedes that "[w]hen the USACE originally permits a structure, or part of a structure, *there is no 'end date'* on the permit that would require the future removal of the structure." AR0051187 (emphasis added). The request to replace the structure does "not affect an underlying, prior permit that authorized the existence of the structure for an indefinite duration. The decision on the permit facilitating maintenance is not a decision on whether the structure should continue to exist…" NOAASupp0000210. The fact that a structure may require a maintenance permit does not mean that the structure would cease to exist but for USACE's issuance of the permit. *Id.*; *Consultation Handbook* at 4–28.

The Tidegate may remain in safe and good condition, even if it is beyond its useful life. Regardless, as NMFS admits, that "[f]ailure to maintain nearshore, in- and/or overwater structures *is not unheard of*." AR0051188 (emphasis added). The BiOp acknowledges that structures can continue to persist and degrade in the environment. AR0051187–88. NMFS's assumption that, absent the permit, the Tidegate would cease to exist is unsupported.

**Van Ness Feldman** LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

ER-100

**D.      NMFS's Effects Analysis is Contrary to Law and Fact**

NMFS's effects analysis is fundamentally flawed in at least three ways: (1) NMFS improperly attributed the existence of the Tidegate to effects of the Project; (2) NMFS measured the incremental impact of the Project, not from the actual conditions, but from a hypothetical reference scenario; and (3) NMFS double counted the impacts of the Tidegate.  The effects of the action are "consequences caused by the action that would not occur *but for* the proposed action." 84 Fed. Reg. 44977 (emphasis added); 50 C.F.R. § 402.02.

### 1.      The Existence of the Tidegate is Not an Effect of the Project

According to NMFS, the existence of the Tidegate is attributable to the Project. This is illogical. The applicable regulatory definition of "effects of the action" only includes consequences that would not occur "but for" the Project. 84 Fed. Reg. 44977. The Project is not the "but for" cause of the existence of the Tidegate, which has existed for 140 years. *In re Consol. Salmonid Cases*, 791 F. Supp. 2d at 847 (history omitted) ("Operations of existing structures, such as dams and gates . . . are integrally related to the existence of the structures themselves, but effects of the mere existence of the structures are not effects of the proposed action").

NMFS evades this fact by improperly assuming that the Tidegate cannot continue to exist but for USACE's issuance of a permit. AR0051187. As explained above, that assumption is contradicted by fact and law.  The existence of the Tidegate belongs in the baseline, not the effects of the action.

### 2.      The Effects Analysis Relies on an Invalid Reference Scenario

NMFS also suggests that its effects analysis merely represents an *extension* of the effects of the current structure into the future. AR0051116. However, NMFS's effects analysis did not

**Van Ness Feldman** LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

ER-101

analyze the incremental impact of extending the life of the Tidegate for 50 years because NMFS did not evaluate the effects of the Project compared to present conditions. Instead, the BiOp analyzed the impact of building a new tidegate in a hypothetical scenario that assumed the Tidegate never existed. AR0051209 ("Absent the tidegate, this estuary habitat would provide high quality rearing habitat for PS Chinook salmon"); AR0051189 ("action prolongs the life of the dike and associated tidegate, thereby preventing the recovery of habitat[.]"). NMFS erroneously overstates the Project's effects because the speculative change in conditions from installing a new tidegate in a hypothetical natural scenario is obviously more substantial than the incremental change caused by replacing a tidegate where one has existed for 140 years and would continue to exist absent the Project.

The Ninth Circuit has rejected this approach, finding that NMFS may not conduct its effects analysis relative to a "reference" scenario; instead, it must "consider the proposed . . . operations in their actual context." *NWF II*, 524 F.3d at 930; *see also McDonald*, 2003 WL 1955763, at *14.

Numerous examples from the BiOp illustrate that NMFS's enduring effects analysis is impermissibly based on a comparison of the Project to a hypothetical natural reference scenario that excludes the Tidegate. NMFS discusses what impacts would occur if the shoreline armoring was being installed for the first time along a "natural shoreline" or a "natural beach" featuring "natural upper intertidal shoreline processes." AR0051196–97. NMFS concluded that the proposed action would "*reduce* or *eliminate* shallow water habitats . . . [and] result in a higher rate of beach erosion…compared to a *natural shoreline*." AR0051196 (emphasis added). Based on the physical processes resulting from "new" shoreline armoring, NMFS claims cascading biological and ecological shifts, including "*reductions* in primary productivity and invertebrate density," "a

PL.'S MOT.  FOR SUMM.  J. & MEMO. IN SUPP. - 16
Case No. 2:23-cv-01954-BAT



1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

ER-102

*reduction* to [gravel and sand] substrate type[s] within the intertidal and nearshore zone as a result of the *proposed* dike," and a reduction in "potential salmon habitat availability." AR0051196–97 (emphases added). Similarly, NMFS claims that the physical "deepening" of the nearshore zone caused by shoreline armoring will reduce cover for juvenile salmon. AR0051197. Under present conditions, the shoreline armoring has existed for 140 years. AR0051182. The waterward habitat consists of mudflats, AR0037813, not the hypothetical beach NMFS utilizes for its analysis and subsequent illogical conclusion regarding impacts.

NMFS alleges that the Project would "convert what would otherwise be marine wetlands to agricultural land with greater freshwater influence (and maintain it that way)," and that "[o]nce replaced, the tidegates at NNS will impair access to available habitat in No Name Creek." AR0051200–01. The Project does not convert any marine wetlands to agricultural land; that previously occurred 140 years ago when NNS was first diked. AR0051182. The Project does not impact access to available habitat; if anything, it improves fish passage landward of the Tidegate compared to existing conditions. AR0051201 (discussing relative benefits of side-hinged vs. top-hinged gates); AR0040344. All of the "enduring" effects identified by NMFS are effects that might occur if a new tidegate were being installed in a hypothetical natural reference scenario, which does not represent *actual* existing conditions. By failing to start with *actual* existing conditions, NMFS overstated the effects of the Project by treating it as a new tidegate in a natural environment, and this was arbitrary and capricious and contrary to law.

3.     <u>NMFS Improperly Double Counts the Existence of the Tidegate in the Baseline and the Effects of the Project</u>

The result of NMFS's improper analysis of the Project compared to a hypothetical natural reference scenario is that NMFS's jeopardy and adverse modification conclusions result from

PL.'S MOT.  FOR SUMM.  J. & MEMO. IN SUPP. - 17
Case No. 2:23-cv-01954-BAT



1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

ER-103

counting the impacts of the Tidegate *twice*: first in the baseline and again in its effects analysis.
Numerous examples illustrate this flaw:

| Baseline (Waterward of the Tidegate) | Effects of the Action |
|---|---|
| "The area immediately bayward of the shoreline armoring steeply deepens" AR0051186. | "As a result of deepening of the nearshore zone adjacent to shoreline armoring . . ." AR0051197. |
| "The steepened shoreline lacks cover from predators and has reduced prey availability due to reduced riparian vegetation and beach wrack" AR0051186. | "Shoreline armoring, located within the intertidal zone (below HAT) disrupts upper intertidal zone and natural upper intertidal shoreline processes such as accumulation of beach wrack." AR0051197. |
| **Baseline (Landward of the Tidegate)** | **Effects of the Action** |
| "This dike cut off hundreds of acres of shallow bay area which was then converted to farmland." AR0051182 | "By blocking incoming tides, tidegates and associated shoreline armoring convert what would otherwise be marine wetlands to agricultural land with greater freshwater influence." AR0051200. |
| "Many channels were converted to ditches that drain farmlands and are no longer accessible to salmonids at their upper ends." AR0051182 | "Once replaced, the tidegates at No Name Slough will impair access to available habitat in No Name Creek." AR0051201. |
| "Historic diking of upper reaches of tidal channels reduced the tidal prism for channel reaches downstream, and this loss of tidal energy continues to cause a decrease of channel size and depth through sediment redistribution." AR0051184. | "The proposed structure is expected to virtually eliminate tidal influence and hydraulic mixing from wave action upstream of (behind) the gate. The reduction of hydrologic flushing in turn would contribute to decrease the channel in width and depth from sediment deposition" AR0051202. |
| "The causes for the water quality problems in the Sloughs are thought to be low flows, non-point pollution, loss of riparian vegetation, loss of wetland habitat, and absence of flushing and circulation due to presence and maintenance of dikes and levees." AR0051185. | "The replacement tidegate project is expected to create conditions that reduce water quality," AR0051202. |

As these examples illustrate, NMFS recognizes that habitat conditions have already been modified by the Tidegate's 140-year existence. NMFS errs by also attributing those already existing effects to the Project. NMFS's jeopardy and adverse modification determinations are

PL.'S MOT. FOR SUMM. J. & MEMO. IN SUPP. - 18
Case No. 2:23-cv-01954-BAT



1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

ER-104

based on double counting the same habitat degradation in both the baseline and the effects of the Project. AR0051233–34. This is inaccurate, arbitrary, and capricious.

Furthermore, any jeopardy to the species or adverse modification to critical habitat (which District 12 disputes) are solely attributable to the baseline. *See e.g.*, AR0051182 ("this dike cut off hundreds of acres of shallow bay area"); AR0051183 ("blind channels…have been reduced by an estimated 94.6 percent"); AR0051184 (accessible habitat in the estuary is "degraded"); AR0051186 ("Landward of the tidegates, the habitat is mostly composed of hardened dikes and slough channels."). Baseline conditions cannot be the basis for a jeopardy or adverse modification conclusion. *NWF II*, 524 F.3d at 930; *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv. ("CFBD II")*, 807 F.3d 1031, 1052 (9th Cir. 2015). The action itself must be the cause relative to the species' pre-action condition. *NWF II*, 524 F.3d at 930; 84 Fed. Reg. 44976.

The Tidegate exists and will continue to exist absent replacement, and all of the enduring effects that NMFS incorrectly asserts will result from the Project are those presently occurring. To the extent the Project would cause additional habitat loss compared to what has already occurred due to the Tidegate's 140 year existence, NMFS fails to identify or explain what that would be.

If NMFS had properly analyzed the Project in relation to actual existing conditions, it would have found that the Project will improve, not degrade, the environment. Actions that provide benefits to listed species do not contribute to jeopardy. *CFBD II*, 807 F.3d 1031 (no jeopardy conclusion appropriate where the federal action provided only benefits to the species); *Nw. Env'tl. Def. Ctr. v. NMFS*, 647 F. Supp. 2d 1221, 1234 (D. Or. 2009) (upholding no jeopardy finding when a new dock covers less surface than the old dock, allows additional light penetration,

PL.'S MOT. FOR SUMM. J. & MEMO. IN SUPP. - 19
Case No. 2:23-cv-01954-BAT

**Van Ness Feldman** LLP

1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

**ER-105**

and reduces impacts on preferred species habitat); *Ctr. for Biological Diversity v. NMFS*, 977 F. Supp. 2d 55, 84 (D.P.R. 2013), *as amended* (Oct. 23, 2013) (upholding no jeopardy conclusion where "the harvest of herbivorous fish will continue to adversely affect the [coral] and their critical habitat, [but] such effects are likely to be *reduced*" compared to the baseline).

NMFS previously classified this Project as an "operational improvement." AR0003238; AR0050883; AR0003253. The Project removes culverts, replaces top-hinged gates with side-hinged gates, and improves fish passage relative to existing conditions. AR0040346; AR0051201. The Project would also remove two creosote piles, which will improve water quality and reduce exposure to contaminants. AR0051195–96. Because the Project improves baseline conditions, NMFS's determination that the Project causes jeopardy and adverse modification is arbitrary, capricious and is based on NMFS's flawed effects analysis.

### E. NMFS's Conclusions Are Unsupported, Speculative, and Contradicted by Best Available Science

A biological opinion must be based on "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8). The purpose of this requirement "is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise. . . . [A]nother objective (if not indeed the primary one) is to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Bennett v. Spear*, 520 U.S. 154, 176–77 (1997). NMFS cannot "'distort[] the decisionmaking process by overemphasizing highly speculative harms' whenever the available data is wanting." *Maine Lobstermen's Ass'n v. NMFS*, 70 F.4th 582, 596 (D.C. Cir. 2023). "Under the Service's interpretive rules, the 'effects of the action' are those effects that are 'reasonably certain to occur,' a finding the Service must make 'based on clear and substantial information.'" *Id.* at 598.

PL.'S MOT. FOR SUMM. J. & MEMO. IN SUPP. - 20
Case No. 2:23-cv-01954-BAT

**Van Ness Feldman** LLP

1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

1.  NMFS Cannot Rely on Speculative Impacts to "Some" Skagit Juvenile Chinook

NMFS's analysis of effects, and jeopardy and adverse modification conclusions, are premised on speculation, not clear and substantial information. NMFS asserts that the Project will impact a "small number" or "some" juvenile Skagit Chinook. AR0051227–28; AR0051194, AR0051207. NMFS posits these impacts would be significant to the entire PS Chinook ESU and SRKW. AR0051209; AR0051228. Yet NMFS fails to provide any quantitative or qualitative assessment of the number of Skagit Chinook that would be affected by the Project or how that compares to the overall population of PS Chinook. AR0051194 ("we cannot predict the exact number of individual fish that will be exposed"); AR0051204 (same).

Because NMFS's conclusion regarding the impact of PS Chinook is not based on substantial information, NMFS's conclusion that diminishment of PS Chinook as prey for SRKW causes jeopardy of SRKW and adverse modification of its habitat, AR0051218–19, is also speculative. NMFS fails to explain the overall significance of the impact to the SRKW's prey base or how many SRKW would be harmed. AR0051253 ("unable to reliably quantify and monitor the number of individual SRKWs that may be harmed.").

Contrary to NMFS's assumptions, the record demonstrates that very few juvenile PS Chinook will be impacted either from construction or enduring effects. First, the Project will occur in Padilla Bay, where only specific life histories of Skagit Chinook populations may be present. AR0051190–91. Second the USACE jetty physically obstructs the migratory pathway of Skagit Chinook into Padilla Bay and creates a physiological barrier for juvenile Skagit Chinook. AR0037796; AR0001571. To reach Padilla Bay and the Project, juvenile salmonids would have to swim approximately 21.4 km from the Skagit River around the jetty to the Tidegate site, and


1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

studies have concluded that "streams further than about 20 km away had no juvenile Chinook present in them," AR0039136, and that "[r]estoration of [Skagit] river-channel connectivity is necessary to allow juvenile salmon to access rearing habitat in Padilla Bay." AR0001571. NMFS's jeopardy and adverse modification conclusions for both species are not only unsupported but cannot be reconciled with this information.

2.    NMFS Cannot Speculate about Habitat Conditions Absent the Tidegate

NMFS's effects analysis assumes that the Project is preventing "recovery" of habitat, AR0051189, AR0051233, but NMFS's assumptions regarding what the habitat would be absent the tidegate are unsupported. NMFS speculates that, but for the Project, the area landward of the Tidegate would be marsh habitat based on an 1886 map that purportedly shows the existence of marsh vegetation. AR0051183. The map relied upon by NMFS represents conditions after the area was diked. To the extent the map shows marsh habitat, this suggests that the Tidegate was not the cause of habitat changes. *Id.* Regardless, 1886 digitized versions of these historical maps show that the area directly landward of the Project site was upland, not marsh. NOAASupp0000197 (figure 6.A). This leaves NMFS without a basis to assume that landward areas would become marsh if the Tidegate ceased to exist. Furthermore, Padilla Bay is almost entirely composed of mudflats, not marsh habitat. AR0037813. The land interior to the Tidegate is similar to the tidal elevation of the Padilla Bay mudflat habitat. Salt marsh vegetation forms in areas higher in elevation relative to mudflats. NOAASupp0000356 (Fig. 7). Therefore, NMFS's assumption that landward areas would become marsh habitat, but for the Project, is unfounded.

NMFS also makes a similarly flawed assumption regarding the recovery of habitat waterward of the Tidegate. The Project will replace approximately 85 linear feet of *existing*



shoreline armoring within miles of existing shoreline armoring. NMFS suggests that replacing this existing armoring "preclud[es] the return of the affected area to functioning habitat." AR0051190. NMFS neither defines functioning habitat nor explains how the existing armored shoreline could return to functioning habitat absent the Tidegate. NMFS merely offers unsupported speculation about future habitat conditions. Even if this area was to return to "functioning habitat," NMFS did not analyze the significance to the species of a potential return of only 85 feet of shoreline to "functioning habitat," where only some life histories of Skagit Chinook use and occupy the area. AR0051143. In sum, NMFS's assumptions about what the habitat would be absent the Tidegate are unsupported, arbitrary and capricious.

3.     <u>NMFS Cannot Rely on Generalities When Specific Impacts Are Known</u>

NMFS erred by substituting generalizations regarding impacts of structures in marine and estuarine environments for known impacts of this Tidegate, which has been in place for 140 years. NMFS assumes that the Project would cause "deepening of the nearshore zone adjacent to shoreline armoring . . ." AR0051197. But the shoreline armoring exists today, and the area waterward of the Tidegate is shallow mudflat. AR0037645, AR0037813.

NMFS assumes that the Project "would reduce abundance and productivity of affected populations of PS Chinook salmon." AR0051227. Skagit Chinook populations are the only populations directly or indirectly affected by the Tidegate. These populations have increased since their listing in 1999. AR0001319. Five of the six Skagit Chinook subpopulations show an increase in abundance between the most recent 5-year review periods (2010–2014 and 2015–2019), AR0001319, AR0051135, and have productivity estimates above zero. AR0051134, AR0001320. NMFS concludes that there will be *less* Skagit Chinook, but the record demonstrates that Skagit

PL.'S MOT. FOR SUMM. J. & MEMO. IN SUPP. - 23
Case No. 2:23-cv-01954-BAT



1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

1  Chinook numbers are increasing. *See Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 527 (9th

2  Cir. 2010) (finding irrational NMFS's conclusion that the number of bull trout was likely to stay

3  the same despite a declining population trend). NMFS's assumption that the Project would reduce

4  abundance and productivity of Skagit Chinook populations is irreconcilable with the fact the

5  Tidegate exists today, and the productivity and abundance of these populations are increasing.

6      Furthermore, the BiOp concludes that "replaced shoreline armoring would also be expected

7  to reduce [submerged aquatic vegetation]." AR0051197. NMFS's conclusion is irreconcilable with

8  the fact that Padilla Bay is already home to one of the largest extents of eel grass along the Pacific

9
10  Coast even though the Tidegate has existed at this location for 140 years. AR0051182.

11      **F.    NMFS's Jeopardy and Adverse Modification Determinations are Based on
           Speculation**

12
13      The errors identified above render NMFS's jeopardy and adverse modification conclusions

14  for both PS Chinook and SRKW arbitrary and capricious because these conclusions are necessarily

15  based on NMFS's unsupported and legally incorrect analyses of the action area, baseline, effects

16  of the action, and cumulative effects. 50 C.F.R. § 402.14(g)(2)-(3).

17      "Agency action can only 'jeopardize' a species' existence if that agency action causes some

18  deterioration in the species' pre-action condition." *NWF II*, 524 F.3d at 930. "Destruction

19  or adverse modification" means "a direct or indirect alteration that appreciably diminishes the

20  value of critical habitat as a *whole* for the conservation of a listed species." 50 C.F.R. § 402.02

21  (emphasis added). "[A]s a whole" reflects "the Services' longstanding interpretation that the final

22  destruction or adverse modification determination is made at the scale of the entire critical habitat

23  designation." 84 Fed. Reg. 44981. "An area of a species' critical habitat can be destroyed without

24
25  appreciably diminishing the value of critical habitat for the species' survival or recovery." *Butte*

PL.'S MOT. FOR SUMM. J. & MEMO. IN SUPP. - 24
Case No. 2:23-cv-01954-BAT



1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

ER-110

1    *Env't Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 948 (9th Cir. 2010).

2        NMFS's jeopardy determination for PS Chinook is arbitrary and capricious because it: (1)

3    is based on jeopardy in the baseline; (2) results from double counting the impact of the Tidegate

4    in the baseline and the effects of the action; (3) fails to recognize that the Project improves

5    conditions for the species compared to the pre-action condition; (4) fails to contextualize the

6    relative number of PS Chinook impacted by the Project; and (5) is irreconcilable with the fact that

7    the Tidegate exists today and abundance and productivity trends are positive.

8        NMFS's adverse modification conclusion for PS Chinook is arbitrary and capricious

9    because it: (1) is based on "adverse modification" in the baseline (i.e. the Tidegate already exists);

10   and (2) lacks a reasoned explanation how the replacement of 85 linear feet of shoreline armoring

11   causes an appreciable diminishment of PS Chinook's critical habitat as a whole, which includes

12   2,182 miles of nearshore marine habitat in Puget Sound.  AR0051173.

13       NMFS's jeopardy and adverse modification determinations for SRKW are based

14   exclusively on NMFS's erroneous conclusion's regarding the Project's impacts on PS Chinook,

15   and thus must also fail.

16   **G.    NMFS's RPA is Arbitrary and Capricious**

17       NMFS's jeopardy and adverse modification determinations are arbitrary and capricious

18   and, accordingly, NMFS is without authority to suggest an RPA. 16 U.S.C. § 1536(b)(3)(A).

19   Notwithstanding, the BiOp's RPA is arbitrary, capricious, and inconsistent with law.

20       1.    The RPA is Irreconcilable with NMFS's Prior Decisions

21       As discussed in Section V.A above, the BiOp reverses NMFS's prior position under the

22   TFI. Previously, the Project was approved by the TFI Oversight Committee as an "operational

PL.'S MOT.  FOR SUMM.  J. & MEMO. IN SUPP. - 25
Case No. 2:23-cv-01954-BAT



Van Ness
Feldman LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

improvement" project, and it was not required to provide habitat credits or other mitigation. There is no rational basis for NMFS to conclude in 2019 that no mitigation was needed for this Project, but to conclude that extensive mitigation is required for the very same Project in 2024. *CFBD I*, 998 F.3d at 1068.

The BiOp incorrectly suggests that the mitigation required is consistent with what was required under Table 4-2 of the TFI. AR0051236–37. Table 4-2 identified habitat credits that would have been required to repair or replace the Tidegate *in-kind*. The Project is not replacing the Tidegate *in-kind*; it is an operational improvement. AR0051113. Under the TFI, "[h]abitat credit will not be required to implement any of the operational improvement actions." AR0050786. NMFS erroneously used Table 4-2 of the TFI to develop its RPA for the Project.  If NMFS applies the TFI, it must apply the TFI consistent with its own terms.

Furthermore, NMFS's reliance on the credit calculation in Table 4-2 is inconsistent with its position that it is "not appropriate to rely on the" the TFI and TFI BiOp. AR0051326. On one hand, NMFS wants to deny the significance of the TFI and TFI BiOp to avoid the inevitable conclusion that the BiOp is directly inconsistent with NMFS's own prior analysis of the Project. On the other hand, NMFS wants to continue to rely on the TFI (albeit incorrectly) to determine mitigation included in the RPA.

### 2. The RPA Includes Duplicative Mitigation Requirements

The RPA includes two components: (1) to generate a minimum of 275 credits ("Credit RPA") and (2) to restore a minimum of 8.6 acres of estuary habitat ("Acre RPA"). To calculate the Credit RPA, NMFS used the Salish Sea Nearshore Conservation Calculator. To calculate the Acres RPA, NMFS purports to have used the TFI. In requiring both, NMFS is requiring District

PL.'S MOT.  FOR SUMM.  J. & MEMO. IN SUPP. - 26
Case No. 2:23-cv-01954-BAT



12 to mitigate the purported impacts of the Project not just once, but twice. When the TFI required the use of credits, those credits mitigated all adverse impacts of a tidegate replacement. AR0000066. Therefore, the Acre RPA is solely sufficient to mitigate the impacts of the Project, and the Credit RPA is redundant.

### 3.    NMFS Improperly Calculated the Credit RPA

With respect to the Credit RPA, NMFS incorrectly applied the Conservation Calculator by assuming that the Project is in a pocket estuary. AR0051307, AR0051339. As a result, NMFS multiplied the credits that would be required by a factor of 1.9. AR0021531. The area adjacent to the Tidegate is not a pocket estuary. Scientific literature cited throughout the BiOp contains a figure identifying pocket estuaries in Skagit, Samish, and Padilla Bays. AR0039714; *see also* AR0038414. No pocket estuary is identified near the Project. *Id.* Contrary to this best available science, NMFS incorrectly assumed that the Project location is a pocket estuary.

### 4.    The RPA is Not Economically or Technologically Feasible

An RPA must be "economically and technologically feasible." 50 C.F.R. § 402.02. Pursuant to the Service's own handbook, the action agency and the applicant are often "the only ones who can determine if an alternative is within their legal authority and jurisdiction, and if it is economically and technologically feasible." *Consultation Handbook* at 4–43.

In the draft BiOp, NMFS stated without any support that the "RPA is economically and technologically feasible."AR0046766. District 12 commented on the costs of the RPA and District 12's financial ability to bear those costs. AR0002806–13. The final BiOp dismisses District 12's concerns by citing irrelevant legal authority and facts that do not support its conclusion.

PL.'S MOT. FOR SUMM. J. & MEMO. IN SUPP. - 27
Case No. 2:23-cv-01954-BAT



1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

**ER-113**

First, citing to *Dow AgroSciences LLC v. NMFS*, 707 F.3d 462, 475 (4th Cir. 2013), the BiOp asserts that NMFS was not required to "pick the best option for the industry." AR0051247. That case, however, recognizes that NMFS "must provide some analysis of the options it selects." *Dow AgroSciences,* 707 F.3d at 475. NMFS's assertion that it does not have to pick the best option for District 12 says nothing of the sufficiency of its analysis of the economic feasibility.

Second, to rationalize its unsupported assumption in the draft BiOp that the RPA is economically feasible, NMFS dismisses District 12's information that its operating budget is only $100,000 per year, AR0002808, and instead points to an audit of Skagit County *Dike* District No. 12. AR0051333. The Project is being undertaken by the drainage component, and not the dike component, of District 12. Therefore, NMFS's referenced document says nothing about District 12's ability to finance the RPA. The uncontroverted evidence in the record is that District 12 cannot afford the RPA. AR0002806–13.

Third, the only estimates that NMFS provides relate to the cost to purchase property for restoration. AR0051248. NMFS fails to analyze what other elements of the RPA would cost, such as on-site habitat improvements, credit purchases, removing overwater structures, etc. *Id.*

Fourth, District 12's comments explained why each of the Credit RPA options were infeasible. AR0002806–13. NMFS asserts that the Credit RPA is feasible because NMFS has provided multiple options. If all options are infeasible, as District 12's comments explained, there is no feasible option left. In sum, the RPA is arbitrary and capricious.

PL.'S MOT. FOR SUMM. J. & MEMO. IN SUPP. - 28
Case No. 2:23-cv-01954-BAT



1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

**ER-114**

## VI.    CONCLUSION

For the foregoing reasons, District 12's Motion for Summary Judgment should be granted, and this Court should remand the BiOp back to NMFS to be reissued consistent with the Court's opinion.

Respectfully submitted this 16th day of December, 2024.

VAN NESS FELDMAN LLP

*I certify that this memorandum contains 8270 words, in compliance with the Local Civil Rules.*

s/ Jenna Mandell-Rice
Jenna Mandell-Rice, WSBA No. 49667
s/ Sophia E. Amberson
Sophia E. Amberson, WSBA No. 52528
1191 Second Avenue, Suite 1800
Seattle, WA 98101-2996
T: (206) 623-9372
E: jrm@vnf.com
samberson@vnf.com

s/ Tyson C. Kade
Tyson C. Kade, WSBA No. 37911
2000 Pennsylvania Avenue, NW
Suite 6000
Washington, DC 20006
T: (202) 298-1800
E: tck@vnf.com

*Attorneys for Plaintiff Skagit County Dike, Drainage, & Irrigation Improvement District No. 12*

**Van Ness Feldman** LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

ER-115

1

2

3

4

5

6

7       IN THE UNITED STATES DISTRICT COURT
        WESTERN DISTICT OF WASHINGTON
8                   AT SEATTLE

9

10  SKAGIT COUNTY DIKE, DRAINAGE,          Case No. 2:23-cv-01954-BAT
    AND IRRIGATION IMPROVEMENT
11  DISTRICT NO. 12,                        FIRST AMENDED COMPLAINT FOR
                                            AFFIRMATIVE DECLARATORY
12                    Plaintiff,            RELIEF

13        v.

14  NATIONAL MARINE FISHERIES
15  SERVICE; DEPARTMENT OF
    COMMERCE; GINA RAIMONDO in her
16  official capacity as Secretary of Commerce;
    JANET COIT in her official capacity as the
17  Assistant Administrator for NOAA
    Fisheries,
18
19                    Defendants.

20

21              I.      INTRODUCTION

22        1.      This case arises from a failure by NATIONAL MARINE FISHERIES SERVICE

23  ("NMFS"), DEPARTMENT OF COMMERCE, GINA RAIMONDO in her official capacity as

24  Secretary of Commerce, and JANET COIT in her official capacity as the Assistant Administrator

25  for National Oceanic and Atmospheric Administration Fisheries ("Defendants") to competently,

---

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF -
1
Case No. 2:23-cv-01954-BAT



1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

ER-116

objectively, and lawfully fulfill their responsibilities under the federal Endangered Species Act, 16 U.S.C. § 1531 et seq. ("ESA").

2.  On December 19, 2023, Plaintiff Skagit County Dike, Drainage, and Irrigation Improvement District No. 12 ("District 12" or "Plaintiff") filed the original complaint in this case, challenging the failure of Defendants to comply with Section 7 of the ESA, 16 U.S.C. § 1536, and its implementing regulations. ECF 1. Specifically, NMFS failed to complete interagency consultation with the U.S. Army Corps of Engineers ("USACE") under timelines prescribed by the ESA and its implementing regulations with respect to District 12's request for authorization to complete a tidegate replacement project (identified by USACE as NWS-2020-195) ("Project").

3.  On March 8, 2024, this Court granted a preliminary injunction, requiring NMFS to complete consultation on the Project by April 1, 2024. ECF 15. The deadline for NMFS to complete consultation was extended to April 22, 2024 pursuant to stipulation and Court order. ECF 18. On April 22, 2024, NMFS issued the ESA Section 7(a)(2) Jeopardy Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response for the Issuance of Permits for No Name Slough Tidegate Replacement Project in Skagit County, Washington (NWS-2020-195) ("Biological Opinion"). *See* **Exhibit A**. The Biological Opinion concluded that the Project is likely to jeopardize the continued existence of Puget Sound Chinook Salmon and Southern Resident Killer Whale, and is likely to adversely modify their critical habitat.

4.  In reaching these conclusions, NMFS committed numerous reversible errors. The Biological Opinion ignores contrary scientific data, misstates and misapplies the data it cites, is internally inconsistent, relies on speculation and overbroad generalizations, arbitrarily attributes to the Project adverse effects that are part of the environmental baseline, and fails to rationally relate the impacts of the Project to population level effects. Despite taking 493 days to complete formal consultation (nearly four times the statutory limitation), NMFS did very little to consider

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF - 2
Case No. 2:23-cv-01954-BAT

Van Ness
Feldman LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

the impacts of the Project. Instead, the Biological Opinion improperly relied on generalized statements and unsupported conclusions, and the draft Biological Opinion blamed inadequacies in the analysis on time pressure caused by District 12's lawsuit. NMFS compounded its failure to do a reasoned and lawful analysis of the Project's effects by developing a "reasonable and prudent alternative" ("RPA") that is neither reasonable nor prudent.

5. District 12 challenges the Biological Opinion and seeks an order declaring that the Biological Opinion is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

## II. JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (action to compel an officer of the United States to perform his or her duty), 16 U.S.C. § 1540(g), and 5 U.S.C. §§ 555, 701–06.

7. An actual controversy exists between the parties to this lawsuit under 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–02, 1361, and 5 U.S.C. §§ 705–06.

8. Defendants' violations of statutory and regulatory timelines for completing consultation are subject to this Court's review pursuant to the ESA, 16 U.S.C. § 1540(g). Plaintiff provided Defendants with written notice of Plaintiff's intent to file this suit more than sixty days prior to the commencement of this action as required by 16 U.S.C. § 1540(g)(2)(A). This written notice is attached as **Exhibit B** to this Complaint.

9. The requested relief would redress the harm to Plaintiff caused by Defendants' failure to comply with the ESA.

10. Defendants' violations of statutory and regulatory timelines for completing consultation are also subject to this Court's review pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 702. Under Section 702 of the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF - 3
Case No. 2:23-cv-01954-BAT

Van Ness
Feldman LLP

1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

ER-118

of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA allows this Court to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

11.     Defendants' Biological Opinion is subject to this Court's review pursuant to the APA, 5 U.S.C. § 702. The APA allows this Court to hold as unlawful and set aside agency actions, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or otherwise in excess of the authority granted by statute. *Id.* § 706(2).

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District. In addition, under 16 U.S.C. § 1540(g)(3)(A), this lawsuit may be brought in this judicial district because Defendants' violations of the ESA occurred in this District.

13.     The Seattle Division in the Western District of Washington is the proper forum for this lawsuit pursuant to Local Civ. R. 3(e) because the claims arose in Skagit County, Washington.

### III.     PARTIES

14.     Plaintiff District 12 is a Washington State Revised Code of Washington Title 85 Special Purpose District located at 1317 Anacortes Street, Burlington, WA 98233, and is responsible for maintaining the portion of the right bank of the Skagit River Levee System within its boundaries. In addition, District 12 maintains approximately ten miles of saltwater bay dike at Padilla Bay, Washington, and a 650-acre drainage service area at Bay View. District 12 is the applicant for an authorization under Nationwide Permit 3 from USACE with regard to the Project. Until such time as Defendants issue a biological opinion on the Project that is not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law, District 12 continues to be directly, adversely, and irreparably harmed.

15.     Defendant NMFS is a line office within the National Oceanic and Atmospheric Administration, a Federal agency within the Department of Commerce. The Secretary of Commerce delegated the authority to conserve federally listed endangered and threatened marine

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF - 4
Case No. 2:23-cv-01954-BAT

Van Ness
Feldman LLP

1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

ER-119

and anadromous species under the ESA to NMFS. NMFS is responsible for consulting with federal agencies to ensure that agency actions are not likely to jeopardize the continued existence of ESA-protected marine and anadromous species, or destroy or adversely modify their critical habitat.

16. Defendant Department of Commerce is a federal department within the Executive Branch of the United States government charged with ESA consultations for marine and anadromous species.

17. Defendant Gina Raimondo, U.S. Secretary of Commerce, is the highest-ranking official within the Department of Commerce, and in that capacity, has responsibility for administration and implementation of the ESA and for compliance with all other federal laws applicable to the Department of Commerce. She is being sued in her official capacity.

18. Defendant Janet Coit is the Assistant Administrator for NMFS. As Assistant Administrator, Defendant Coit is the federal official responsible for implementing and enforcing the ESA and its implementing regulations. She is being sued in her official capacity.

## IV. LEGAL BACKGROUND

19. Under Section 7 of the ESA, all Federal agencies shall "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species . . . ." 16 U.S.C. § 1536(a)(2). This is a substantive duty.

20. The Secretaries of Commerce and Interior are charged with administering and enforcing the ESA, but they have delegated this responsibility to NMFS and U.S. Fish and Wildlife Service ("FWS"), respectively. 50 C.F.R. § 402.01(b) (2019).

21. The ESA requires Federal agencies to engage in consultation with NMFS (and/or FWS) to comply with their substantive Section 7(a)(2) duty to guard against jeopardy to listed

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF - 5
Case No. 2:23-cv-01954-BAT



1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

ER-120

species or destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2). This is a procedural duty.

22.     If the Federal action agency determines that an action may affect, but is "not likely to adversely affect," the listed species or its critical habitat and NMFS concurs in writing with that determination, the action agency does not have to undergo formal consultation with NMFS. 50 C.F.R. § 402.13 (2019). Pursuant to 50 C.F.R. § 402.13(c)(2), NMFS is required to timely complete informal ESA consultation within 60 days of a Federal action agency's request for concurrence or non-concurrence with the Federal action agency's determination that the action is not likely to adversely affect listed species or critical habitat.

23.     Informal consultation may only be extended if the applicant and the Federal action agency consent, but "shall not exceed 120 days total from the date of receipt of the Federal agency's written request." *Id*.

24.     If NMFS does not concur with the Federal action agency's determination that the action is not likely to adversely affect listed species or critical habitat, the Federal action agency must initiate formal consultation. 50 C.F.R. § 402.14(a) (2019).

25.     Under ESA Section 7, 16 U.S.C. § 1536(b)(1), NMFS is required to complete formal consultation within 90 days unless consultation is extended in compliance with 16 U.S.C. § 1536(b)(1)(B).

26.     Where the agency action involves a permit applicant, formal consultation may be extended from 90 days to 149 days if NMFS and the Federal action agency mutually agree and provide a written statement to the applicant setting forth: (i) the reasons why a longer period is required; (ii) the information that is required to complete the consultation; and (iii) the estimated date on which consultation will be completed. *Id.* § 1536(b)(1)(B).

Van Ness
Feldman LLP

1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

ER-121

27.     Where the agency action involves a permit applicant, formal consultation may not be extended to 150 or more days unless NMFS and the Federal action agency mutually agree and NMFS obtains the consent of the applicant. *Id*.

28.     NMFS's implementing regulations state that "[f]ormal consultation concludes within 90 days after its initiation" and that a "consultation involving an applicant cannot be extended for more than 60 days without the consent of the applicant." 50 C.F.R. § 402.14(e) (2019).

29.     During formal consultation, NMFS is required to evaluate the "current status and environmental baseline of the listed species or critical habitat," and evaluate the direct and cumulative effects of the proposed action on the listed species and its critical habitat relative to that current status and environmental baseline.  *Id.* § 402.14(g)(2)-(3).

30.     NMFS's ESA implementing regulations in effect at the time of the issuance of the Biological Opinion provided that the environmental baseline

> includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process.

*Id.* § 402.02 (2019). Conversely, those regulations defined "effects of the action" as:

> all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action.

*Id.*

31.     Based on the analysis of the effects of the action relative to the environmental baseline, NMFS determines whether the proposed action "is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.* § 402.14(g)(4) (2019).



Van Ness Feldman LLP
1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

ER-122

32.     The ESA does not enable NMFS to use a "baseline jeopardy" analysis, such that *any* action taken will result automatically in jeopardy to a listed species. *Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 486 (D.D.C. 2014) (quoting *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 930 (9th Cir. 2008) ("[T]he agency action under review 'can only jeopardize a species' existence if that agency action causes some deterioration in the species' pre-action condition.'") (internal quotation marks omitted)).   The jeopardy inquiry is specifically related to whether the proposed action itself will jeopardize the continued existence of a listed species. *See generally Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d at 930.

33.     NMFS's determination regarding whether the proposed action will likely result in jeopardy to a listed species or destruction or adverse modification of its designated critical habitat is set forth in a biological opinion.   50 C.F.R. § 402.14(h)(1)(iv) (2019).   A biological opinion must include a summary of the information on which the opinion is based and must detail how the agency action affects the species or its critical habitat. 16 U.S.C. § 1536(b)(3)(A). In formulating the biological opinion, any RPAs, and any reasonable and prudent measures ("RPMs"), NMFS must use the best scientific and commercial data available.   *Id.* § 1536(a)(2); 50 C.F.R. § 402.14(g)(8) (2019). NMFS must give appropriate consideration to any beneficial actions taken by the federal agency or applicant, including any actions taken prior to the initiation of consultation. 50 C.F.R. § 402.14(g).

34.     If the biological opinion results in a jeopardy or adverse modification determination, NMFS must suggest an RPA to the proposed action.   16 U.S.C. § 1536(b)(3)(A).

35.     RPAs "refer to alternative actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, that is economically and technologically feasible, and that the Director believes would avoid the

Van Ness
Feldman LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

ER-123

likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.02 (2019).

36.     ESA Section 7(b)(4) requires that a biological opinion include an incidental take statement that identifies the level of take expected to result from a Federal agency action. 16 U.S.C. § 1536(b)(4).

37.     Incidental take statements set forth a trigger that, when reached, results in an unacceptable level of incidental take. A surrogate may be used to express the amount or extent of anticipated take, but there must be a causal link between the surrogate and the take of listed species. 50 C.F.R. § 402.14(i)(1) (2019).

38.     The ESA requires that the Secretary issue, as part of the incidental take statement, a written statement that "specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact." 16 U.S.C. § 1536(b)(4)(C)(ii). The regulations mandate that RPMs, along with the terms and conditions that implement them, cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes. 50 C.F.R. § 402.14(i)(2) (2019).

## V.     FACTUAL BACKGROUND
### District 12's Infrastructure

39.     The low-lying land in the Skagit Delta requires the use of tidegates to provide adequate drainage.  Tidegates are one-way check valves at the end of the drainage system that allow drainage water to flow to a natural marine waterbody (i.e., Skagit Bay, Swinomish Channel, Padilla Bay, and Samish Bay) during a low tide cycle and then close to prevent saltwater from entering an interior drainage system when the tide rises.

40.     District 12 operates and maintains tidegates and miles of shoreline armoring, riprap, levees, and dikes along the coast of Puget Sound which protect inland development, infrastructure,

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF - 9
Case No. 2:23-cv-01954-BAT

Van Ness
Feldman LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

ER-124

and agricultural fields across Skagit County. District 12 operates and maintains the tidegates at No Name Slough for these purposes.

41.     The No Name Slough tidegates work to regulate tidal fluctuations and ensure that marine waters do not interfere with inland drainage and agricultural activities.

42.     The No Name Slough tidegates and related shoreline armoring, riprap, and dike have existed in their present configuration for at least a century.

43.     The No Name Slough tidegates exist at the mouth of No Name Slough in Padilla Bay. Padilla Bay and the geographically adjacent Skagit Bay comprise a portion of the designated critical habitat for the Southern Resident Killer Whale and for the Skagit Chinook subpopulation of the Puget Sound Chinook Evolutionarily Significant Unit ("ESU").

44.     There is no designated critical habitat for Southern Resident Killer Whale or any subpopulation of the Puget Sound Chinook ESU landward of the No Name Slough tidegates.

### Permitting History

45.     In 2010, NMFS entered into the Skagit Tidegate and Fish Initiative ("TFI") Implementing Agreement with certain drainage districts, including District 12, and the Washington Department of Fish and Wildlife. The purpose of the TFI was to identify pathways and protocols for Federal, state, and local permitting of tidegate and floodgate repair and replacement activities within the Skagit and Samish River deltas.

46.     Pursuant to the TFI, NMFS issued a programmatic biological opinion (the "TFI Biological Opinion") to provide ESA coverage for tidegate and floodgate repair and replacement activities that would be subject to USACE approval.

47.     In 2019, District 12 determined that all four of the tidegates associated with No Name Slough needed to be replaced.

48.     District 12 proposed the Project, which involves the replacement of four existing drainage pipes (three 48-inch top hinge gates and one 32-inch x 40-inch box culvert) with two

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF - 10
Case No. 2:23-cv-01954-BAT

**Van Ness Feldman** LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

ER-125

side-hinged gates in a concrete structure. The Project became necessary following an emergency declaration on September 9, 2019, due to the failure and decommissioning of one of the existing tidegates at No Name Slough.

49.     The Project was contemplated to be done under the TFI. District 12 proposed the Project to the TFI Oversight Committee in November 2019.

50.     The TFI Oversight Committee, which included NMFS, the Swinomish Indian Tribal Community ("SITC"), and Washington Department of Fish and Wildlife approved the Project as an operational improvement project eligible for ESA coverage under the no-jeopardy TFI Biological Opinion.

51.     On February 21, 2020, District 12 submitted a Joint Aquatic Resource Permit Application to the USACE, requesting authorization for the Project under Nationwide Permit 3 and relying on the TFI Biological Opinion for ESA compliance.

52.     On September 9, 2021, Earthjustice sent a 60-day Notice of Intent to Sue ("60-day Notice") USACE on behalf of the SITC, alleging that USACE had violated Sections 7 and 9 of the ESA by issuing authorizations to the TFI signatory districts for tidegate repair and replacement under the TFI Biological Opinion.

53.     Almost immediately after receiving the 60-day Notice, and without properly investigating the allegations of the SITC, on September 29, 2021, NMFS sent a letter to USACE recommending that USACE request reinitiation of ESA consultation on the TFI Biological Opinion.

54.     USACE subsequently requested that District 12 prepare a project-specific biological assessment for the Project.

55.     On February 9, 2022, District 12 submitted a project-specific Biological Assessment and Essential Fish Habitat Evaluation to USACE, which concluded that the Project was Not Likely to Adversely Affect ("NLAA") any listed species or their critical habitat.

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF - 11
Case No. 2:23-cv-01954-BAT

Van Ness
Feldman LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

ER-126

56.     Upon receipt, on February 28, 2022, USACE confirmed a finding of NLAA and requested informal consultation on the Project with NMFS.

57.     NMFS did not respond to USACE's request for informal consultation on the Project within 60 days, and neither USACE nor District 12 agreed to an extension of the timeline for NMFS to respond to the request, nor was one ever requested by NMFS.

58.     Over nine months after USACE requested informal consultation, on December 14, 2022, NMFS sent a non-concurrence letter to USACE. The next day, on December 15, 2022, USACE requested formal consultation with NMFS.

59.     NMFS did not complete formal consultation on the Project within 90 days, and neither USACE nor District 12 agreed to an extension of the timeline for NMFS to complete formal consultation, nor was one ever requested by NMFS until after this Court issued a preliminary injunction requiring NMFS to complete consultation by April 1, 2024.

60.     On October 18, 2023, District 12 sent NMFS, Defendant Raimondo, and Defendant Coit a 60-day Notice of Intent to Sue. *See* **Exhibit B**.

61.     On December 19, 2023, District 12 filed the Complaint in this case to compel Defendants to complete consultation after NMFS failed to do so within the statutorily and regulatorily prescribed time.

62.     On February 15, 2024, District 12 moved for an injunction ordering Defendants to complete consultation on the Project.

63.     On March 8, 2024, this Court granted District 12's Motion for Preliminary Injunction, requiring NMFS to issue a final biological opinion by April 1, 2024.

64.     On March 29, 2024, the parties stipulated to extend NMFS's deadline to issue a final biological opinion to April 22, 2024 to allow for District 12 and USACE to comment on a draft biological opinion prior to issuance of a final biological opinion.

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF - 12
Case No. 2:23-cv-01954-BAT



1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

65.    On April 1, 2024, NMFS issued a draft biological opinion that concluded that the Project would likely jeopardize Puget Sound Chinook Salmon and Southern Resident Killer Whale, and likely adversely modify both species' critical habitat.

66.    On April 11, 2024, District 12 submitted comments to NMFS on the draft biological opinion, setting forth numerous critical deficiencies which contributed to the flawed jeopardy and adverse modification determinations, as well as flawed RPAs and RPMs.  District 12's comments included more than 50 attachments and scientific references comprising communications, studies, photographs, and additional agency analyses that NMFS did not include or consider in its draft biological opinion. District 12's comments (excluding the exhibits) are attached here as **Exhibit C**.

### The Final Biological Opinion

67.    On April 22, 2024, Defendants issued the Biological Opinion, which maintains the finding that the Project will likely jeopardize Puget Sound Chinook Salmon and Southern Resident Killer Whale and likely adversely modify each species' designated critical habitat.

68.    NMFS did not conduct an objective analysis, but instead excluded and dismissed credible analyses and the best scientific and commercial data available.  The Biological Opinion reaches conclusions that are internally inconsistent.  The Biological Opinion relies on speculative and conclusory determinations without providing any foundation linking such determinations to actual or site-specific data or analyses. Accordingly, the Biological Opinion is arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law, and is in excess of statutory jurisdiction and authority.  The Biological Opinion contains numerous reversible errors, including but not limited to the following errors identified in paragraphs 69–88.

69.    In 2019, when District 12 originally applied for the USACE permit, the TFI Oversight Committee, which included NMFS staff, determined that the Project, as proposed and without alteration or mitigation, was covered by the existing no-jeopardy determination under the

Van Ness
Feldman LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

ER-128

TFI. The Biological Opinion's later conclusion that the Project likely causes jeopardy and adverse modification is irreconcilable with the prior conclusion that the Project was eligible for coverage under a no-jeopardy determination.

70.     Between 2010 and 2019, NMFS consulted on at least four tidegate operational improvement projects in the Skagit Delta, similar to the Project.  None of the consultations on those projects resulted in a jeopardy or adverse modification determination by NMFS.  The Biological Opinion is irreconcilable with the analysis of effects of those projects.

71.     The Biological Opinion mischaracterizes the Project by incorrectly describing its design.

72.     The Biological Opinion's identification of the environmental baseline is arbitrary and capricious and otherwise inconsistent with law and regulations. The Biological Opinion excludes from the environmental baseline the impacts of the existing tidegate, marine dike and riprap, which have been in place and continuously operated for more than 100 years.  Exhibit A at 77.  Thus, in describing the effects of the action, the Biological Opinion erroneously assumes that land located interior to the existing tidegates at the marine dike would be an idealized estuarine marsh habitat suitable for and utilized by juvenile Chinook rearing if the Project was not authorized, and that the area waterward of the marine dike would be tidal marsh habitat. *Id.* at 85, 91-93.  NMFS fails to acknowledge that the habitat waterward of the Project area is extensive mudflat due to natural processes unrelated to the Project, the tidegate, or the marine dike. NMFS fails to acknowledge that the habitat landward of the tidegate is subsided and would likely also become mudflat if the current tidegate and dike were removed.

73.     The Biological Opinion assumes baseline jeopardy to Puget Sound Chinook Salmon and Southern Resident Killer Whale such that any proposed action would default to a jeopardy determination.

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF - 14
Case No. 2:23-cv-01954-BAT

**Van Ness Feldman** LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

ER-129

74. The Biological Opinion's effects analysis is flawed for numerous reasons including, but not limited to, the following:

    a. The Biological Opinion's inclusion of impacts and conditions attributable to the existing tidegate and the marine dike in the effects of the action is contrary to the regulatory definition of "effects of the action."

    b. The Biological Opinion's failure to analyze the effects of the Project in relation to the proper environmental baseline results in the improper attribution of baseline conditions to the effects of the action. For example, relying on the flawed environmental baseline that improperly pretends that the existing shoreline armoring and dike structures do not exist, the Biological Opinion asserts that the "*proposed* shoreline armoring is also expected to result in a higher rate of beach erosion waterward of the armoring," such that "a reduction in [beach] substrate type within the intertidal and nearshore zone as a result of the *proposed* dike is expected to reduce potential spawning habitat" for PSC. Exhibit A at 86 (emphasis added). This is compounded by the fact that the current habitat waterward is mudflat not a beach, <u>with no evidence of spawning substrate or erosion and the current habitat landward of the tidegates and dike are not identified as critical habitat</u>.

    c. The Biological Opinion improperly substitutes generalizations regarding the impacts of tidegates for analysis of the specific attributes of the Project.

    d. The Biological Opinion's assessment of population-level effects is unsupported and is untethered to the proportional impact of the Project on the population.

    e. The Biological Opinion speculates regarding what impacts could occur from the continued existence of the No Name Slough tidegates and marine dike, and ignores the historical record of what impacts (or lack thereof) occurred as a result of the No

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF - 15
Case No. 2:23-cv-01954-BAT

**Van Ness
Feldman** LLP

1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

ER-130

1    Name Slough tidegate and marine dike being present at that location for more than

2    100 years.

3    f.   The Biological Opinion does not contain the requisite analysis to determine whether

4         any impacts to critical habitat attributable to the Project causes an appreciable

5         diminishment in the "value of critical habitat as a whole." Given the disparity

6         between the vast extent of designated critical habitat and the small, localized

7         footprint of the Project, Defendants fail to explain how the Project along with any

8         purported consequences to critical habitat will result in any diminishment of the

9         value of the entirety of the designations.

10    75.    The Biological Opinion incorrectly identifies the "action area" as the entirety of

11   Puget Sound despite the small, localized footprint of the Project.

12    76.    The Biological Opinion fails to use the best scientific and commercial data

13   available. NMFS based its analysis on data that was incorrect, incomplete, or otherwise of poor

14   quality. NMFS's analysis suffers from invalid assumptions, improper transformation of data,

15   exclusion of valid data points, and impermissible speculation.  For example:

16    a.   NMFS ignores or improperly discounts numerous sources identified by District 12

17         in its comments on the draft biological opinion.

18    b.   The Biological Opinion mischaracterizes habitat near the Project by confusing and

19         conflating Padilla Bay with Skagit Bay, identifying No Name Creek as a perennial

20         stream, and assuming without support that the habitat interior to the No Name

21         Slough tidegates would be tidal marsh habitat but for the existence of the tidegates.

22    c.   The Biological Opinion does not evaluate the specific effects of the Project on the

23         Skagit Chinook subpopulations or any other Puget Sound Chinook salmon

24         subpopulations, or even meaningfully consider the relative magnitude of the impact

25         of the Project on the species' adult abundance.

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF -
16
Case No. 2:23-cv-01954-BAT

**Van Ness
Feldman** LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

    d.    The Biological Opinion acknowledges that the relevant subpopulations of Skagit Chinook have actually been increasing since 2005, in direct conflict with NMFS's conclusion that population trends are decreasing. The Project area is located within the geographic area associated with juvenile life stages of the Skagit Chinook sub-populations. The Biological Opinion incorrectly concludes that trends of the Puget Sound Chinook could be negatively influenced by the Project irrespective of the positive trends in the Skagit Chinook sub-populations.

    e.    The Biological Opinion makes unsubstantiated projections of the Project's impact on juvenile salmon, while simultaneously conceding that it lacks data regarding Puget Sound Chinook fry in No Name Slough.

    f.    The Biological Opinion ignores the best scientific and commercial data available regarding the status of estuary habitat restoration for juvenile Skagit Chinook.

    g.    The Biological Opinion's conclusions regarding the Skagit Chinook's progress toward its overall recovery goal are inconsistent with the Skagit Chinook Recovery Plan and best available science about restoration project performance.

    h.    The Biological Opinion's conclusions regarding Southern Resident Killer Whale are dependent on its flawed assessment of the Project's impacts to juvenile Chinook salmon and the complete lack of analysis of Project impacts to returning adult Puget Sound Chinook Salmon.

77.    Accordingly, the Biological Opinion's conclusions that the Project will likely jeopardize the continued existence of Southern Resident Killer Whale and Puget Sound Chinook Salmon and adversely modify designated critical habitat are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

78.    The Biological Opinion concludes that the Project can avoid jeopardy and adverse modification if the Project adopts the RPA. The Biological Opinion contains one RPA, which

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF - 17
Case No. 2:23-cv-01954-BAT

Van Ness
Feldman LLP

1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

ER-132

"comprises a combination of actions necessary to address the combined impacts of the proposed action on nearshore and estuarine habitat that underpin" NMFS's jeopardy and adverse modification determinations. Exhibit A at 125. The RPA requires District 12 to generate a minimum of 275 credits as measured by the Puget Sound Nearshore Habitat Values Model Nearshore Calculator ("Nearshore Calculator") and to restore a minimum of 8.6 acres of estuary habitat within the Skagit Bay/Padilla Bay area. *Id.* The RPA identifies various options for generating credit and restoring habitat.

79.     NMFS's calculation of credits that must be generated and acres of habitat that must be restored pursuant to the RPA are arbitrary and capricious and not based on the best scientific and commercial data available.

80.     By using both the TFI Implementing Agreement and the Nearshore Calculator to identify two different types of mitigation, the RPA includes duplicative mitigation and requires District 12 to generate far more credits than are necessary to avoid jeopardy and/or adverse modification.

81.     Defendants include flawed assumptions in the Nearshore Calculator regarding the Project site and incorrectly account for the removal of creosote piles. These errors result in a requirement to generate far more credits than are necessary to avoid jeopardy and/or adverse modification.

82.     In identifying the minimum acres to be restored, Defendants improperly rely on the TFI Implementing Agreement, misapply the TFI Implementing Agreement, and fail to do any Project-specific analysis.

83.     Defendants' RPA fails to give appropriate consideration to "beneficial actions taken by" District 12 including the operational improvement that the Project provides as compared to the existing No Name Slough tidegates.

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF - 18
Case No. 2:23-cv-01954-BAT

**Van Ness Feldman** LLP

1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

ER-133

84.     The RPA is not economically or technically feasible.  District 12 anticipates that compliance with the RPA will cost several million dollars, whereas District 12's drainage operating budget is $100,000 per year. NMFS undertook no analysis of economic feasibility in the draft biological opinion and included a flawed financial viability assessment of the ability of District 12 to undertake the RPA in the final Biological Opinion as a post-hoc rationalization for the RPA.  The financial viability assessment in the Biological Opinion is flawed and ignores information provided by District 12 regarding the costs associated with the RPA and District 12's ability to bear those costs.

85.     The RPA includes methods for generating conservation credits and restoring habitat that are infeasible and/or outside the scope of the USACE's legal authority and jurisdiction. For example, the RPA includes an option to modify habitat on Washington state-owned property. Neither District 12, nor USACE, have control over that property.

86.     Accordingly, the RPA is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

87.     The incidental take statement is arbitrary and capricious because it uses a specified number of minutes of piling driving as a surrogate for incidental take that fails to take into account the actual anticipated amount of piling driving required.

88.     Term and condition 3.a implementing reasonable and prudent measure #3 is arbitrary and capricious.

89.     District 12 has been, is, and will continue to be directly and adversely affected by Defendants' failures and unlawful actions.  Without intervention by this Court, the Biological Opinion will remain in effect and District 12 will be forced either to expend millions of dollars to comply with the RPA or to abandon the Project, which this Court previously concluded was essential to prevent tidal flooding that "could cause severe irreparable harm to people who live and

Van Ness
Feldman LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

ER-134

work in the area by threatening farmland, public sea dike trails, access to roads, residential areas, recreational areas, commercial and industrial facilities, and railroad crossings." Dkt. 15 at 9.

## VI.    FIRST CLAIM FOR RELIEF
### Violation of ESA § 7, 16 U.S.C. § 1536(b), and 50 C.F.R. § 402.14—Failure to Complete Formal Consultation

90.    District 12 realleges, as if fully set forth here, each and every allegation contained in the preceding paragraphs.

91.    Under ESA Section 7, 16 U.S.C. § 1536(b)(1), NMFS is required to complete formal consultation within 90 days, unless extended in compliance with 16 U.S.C. § 1536(b)(1)(B). Where the agency action involves a permit applicant, formal consultation may not be extended to 150 or more days unless the action agency and NMFS mutually agree and NMFS obtains the consent of the applicant. *Id.* § 1536(b)(1)(B).

92.    NMFS's implementing regulations state that "[f]ormal consultation concludes within 90 days after its initiation" and that "[a] consultation involving an applicant cannot be extended for more than 60 days without the consent of the applicant." 50 C.F.R. § 402.14(e) (2019).

93.    USACE initiated formal consultation on the Project on December 15, 2022.

94.    Neither USACE nor District 12 agreed to extend consultation beyond the established time limits.

95.    NMFS took 493 days to complete formal consultation and only did so after being ordered by this Court to do so, in violation of the ESA statutory and regulatory deadlines.

## VII.    SECOND CLAIM FOR RELIEF
### Violation of APA §§ 555(b) and 706(1)—Failure to Complete Consultation Within Prescribed Statutory and Regulatory Timeframes

96.    District 12 realleges, as if fully set forth here, each and every allegation contained in the preceding paragraphs.

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF - 20
Case No. 2:23-cv-01954-BAT



1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

97.     The APA, 5 U.S.C. § 555(b), mandates that an agency conclude matters presented to it within a reasonable time.  The APA, *id.* § 706(1), also provides the Court with authority to compel agency action unlawfully withheld or unreasonably delayed.  Defendants unlawfully and unreasonably withheld agency action under APA Section 706(1) because they failed to take the required action by the date set by Congress under 16 U.S.C. § 1536(b)(1).

98.     NMFS took 493 days to complete formal consultation and only did so after being ordered by this Court to do so, in violation of the ESA statutory and regulatory deadlines.

## VIII.   THIRD CLAIM FOR RELIEF
### Relief under the Mandamus Act (28 U.S.C. § 1361)

99.     District 12 realleges, as if fully set forth here, each and every allegation contained in the preceding paragraphs.

100.     The Mandamus Act, 28 U.S.C. § 1361, vests district courts with original jurisdiction over any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to Plaintiff.

101.     Pursuant to the ESA § 7, 16 U.S.C. § 1536(b)(1), and 50 C.F.R. § 402.14, NMFS has a clear, non-discretionary duty to complete formal ESA consultation within 90 days, unless extended in compliance with 16 U.S.C. § 1536(b)(1)(B).

102.     NMFS breached its duty by failing to complete formal consultation on the Project for 493 days without the agreement of USACE and the consent of District 12.

103.     District 12 had no other adequate remedy available to it other than to compel NMFS to complete formal consultation.

## IX.     FOURTH CLAIM FOR RELIEF
### Violation of 5 U.S.C. § 706(2) - The Biological Opinion is arbitrary, capricious, an abuse of discretion, and contrary to law, and in excess of statutory authority.

104.     District 12 realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF - 21
Case No. 2:23-cv-01954-BAT



105.    The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

106.    The Biological Opinion is a final agency action.

107.    The Biological Opinion, its jeopardy and adverse modification determinations, the RPA, the incidental take statement, and the RPMs are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or in excess of statutory authority.

108.    District 12 has no other adequate remedy available to it.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment providing the following relief:

1.    Declare that NMFS violated its duties under 16 U.S.C. § 1536(b) and 50 C.F.R. § 402.14 by failing to complete formal consultation within the prescribed time.

2.    Declare that NMFS unlawfully withheld or unreasonably delayed agency action.

3.    Declare that the Biological Opinion is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and/or is in excess of statutory jurisdiction, authority or limitations.

4.    Vacate and remand the Biological Opinion to NMFS so that NMFS may reconsider it based on the Court's findings and rulings, and prepare a new biological opinion in a manner consistent with the ESA and other requirements of law.

5.    Award Plaintiff its costs and reasonable attorney fees; and

6.    Grant Plaintiff such additional and further relief as the Court may deem just and appropriate.

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF - 22
Case No. 2:23-cv-01954-BAT



Van Ness
Feldman LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

1     Respectfully submitted this 1st of July, 2024.

2                               VAN NESS FELDMAN LLP

3                               *s/ Jenna Mandell-Rice*
                                Jenna Mandell-Rice, WSBA No. 49667
4                               1191 Second Avenue, Suite 1800
                                Seattle, WA 98101-2996
5                               Tel: (206) 623-9372
                                Fax: (206) 623-4986
6                               E-mail: jrm@vnf.com

7
                                *Attorney for Plaintiff Skagit County Dike, Drainage,*
8                               *and Irrigation Improvement District No. 12*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF -
23
Case No. 2:23-cv-01954-BAT



1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

ER-138



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
West Coast Region
501 West Ocean Blvd., Suite 4200
LONG BEACH, CALIFORNIA 90802

Refer to NMFS No:
**WCRO-2022-03092**                                                    April 22, 2024

Todd Tillinger
Chief, Regulatory Branch
U.S. Army Corps of Engineers, Seattle District
4735 East Marginal Way South, BLDG 1202
Seattle, Washington   98134-2388

Re:     Endangered Species Act Section 7(a)(2) Jeopardy Biological Opinion and Magnuson-
        Stevens Fishery Conservation and Management Act Essential Fish Habitat Response for
        the Issuance of Permits for No Name Slough Tidegate Replacement Project in Skagit
        County, Washington (NWS-2020-195)

Dear Mr. Tillinger:

We received your emails of April 7, 2022, (No Name Slough Tidegate Replacement project)
requesting initiation of consultation with NOAA's National Marine Fisheries Service (NMFS)
pursuant to section 7 of the Endangered Species Act of 1973 (ESA) (16 U.S.C. 1531 et seq.) for
the replacement of tidegates in Skagit County, Washington.

On February 1, 2024, the project applicant filed a motion for preliminary injunction requesting
the court order NMFS to issue a biological opinion by April 1, 2024. On March 8, 2024, the
court granted the District's request and ordered NMFS to complete formal consultation before
April 1, 2024. On March 29, 2024, the Court granted the parties' stipulated motion to extend the
April 1, 2024, deadline to submit a final biological opinion. Pursuant to that Court order, NMFS
sent a draft biological opinion to Plaintiff, as well as the Army Corps of Engineers (USACE) and
three Tribal entities, the Upper Skagit, Swinomish, and Sauk-Suiattle on April 1, 2024. NMFS
received comments from the Plaintiff, USACE, and the Swinomish Indian Tribal Community on
April 11, 2024, and has reviewed and responded, as appropriate, within this Opinion.

We have determined that the USACE's proposed action, to permit the No Name Slough tidegate
project, is likely to jeopardize the continued existence of listed Puget Sound (PS) Chinook
salmon and Southern Resident killer whales (SRKW). The proposed action also is likely to
adversely modify those species' designated critical habitats. We also determined that the
proposed action is likely to adversely affect, though not likely to jeopardize, listed PS steelhead.
PS steelhead critical habitat is not designated in the action area.

Our opinion includes a Reasonable and Prudent Alternative (RPA) to the proposed action that, if
implemented, will not jeopardize PS Chinook salmon or SRKW or adversely modify those
species' designated critical habitats.

WCRO-2022-03092



**ER-139**

NOAASkagitAR0051107

-2-

As required by section 7 of the ESA, we have provided an incidental take statement with the biological opinion. The incidental take statement describes reasonable and prudent measures that NMFS considers necessary or appropriate to minimize incidental take of PS Chinook salmon, PS steelhead and SRKW associated with the proposed action, as modified by the RPA. The incidental take statement also includes terms and conditions that must be followed by the USACE and/or the applicant in order to be exempt from the prohibitions of section 9 of the ESA. If the entity to whom a term and condition is directed does not comply with the terms and conditions, protective coverage for the proposed action would likely lapse.

NMFS also reviewed the likely effects of the proposed action on essential fish habitat (EFH), pursuant to section 305(b) of the Magnuson–Stevens Fishery Conservation and Management Act (16 U.S.C. 1855(b)), and concluded that the action would adversely affect the EFH of Pacific Coast salmon and coastal pelagic species. Therefore, we have included the results of that review in Section 3 of this document.

Please direct any questions regarding this consultation to David Price, consulting biologist in the National Marine Fisheries Service's Lacey, Washington, office at david.price@noaa.gov.

Sincerely,

Jennifer Quan
Regional Administrator
West Coast Region

cc:     Randel Perry, Project Manager, United States Army Corps of Engineers, Seattle District
        Kelly Werdick, Project Manager, United States Army Corps of Engineers, Seattle District

WCRO-2022-03092

NOAASkagitAR0051108

**Endangered Species Act (ESA) Section 7(a)(2) Biological Opinion and Magnuson–Stevens Fishery Conservation and Management Act Essential Fish Habitat Response for the**

Issuance of a Permit under Section 404 of the Clean Water Act and/or Section 10 of the Rivers and Harbors Act for the No Name Slough Tidegates Replacement Project in the Nearshore Environment of Puget Sound, Skagit County, Washington
(NWS-2020-195)

**NMFS Consultation Number:** WCRO-2022-03092

**Action Agency**: U.S. Army Corps of Engineers

**Affected Species and NMFS' Determinations:**

| ESA-Listed Species | Status | Is Action Likely to Adversely Affect Species? | Is Action Likely To Jeopardize the Species? | Is Action Likely to Adversely Affect Critical Habitat? | Is Action Likely To Destroy or Adversely Modify Critical Habitat? |
|---|---|---|---|---|---|
| PS steelhead (*Oncorhynchus mykiss*) | Threatened | Yes | No | NA | NA |
| PS Chinook salmon (*O. tshawytscha*) | Threatened | Yes | Yes | Yes | Yes |
| Southern Resident Killer Whale (*Orcinus orca*) | Endangered | Yes | Yes | Yes | Yes |

| Fishery Management Plan That Identifies EFH in the Project Area | Does Action Have an Adverse Effect on EFH? | Are EFH Conservation Recommendations Provided? |
|---|---|---|
| Pacific Coast Salmon | Yes | Yes |
| Coastal Pelagic species | Yes | Yes |

**Consultation Conducted By:** National Marine Fisheries Service, West Coast Region

**Issued By:**

Jennifer Quan
Regional Administrator
West Coast Region

**Date:** April 22, 2024

WCRO-2022-03092

NOAASkagitAR0051109

# TABLE OF CONTENTS

1. **Introduction**.................................................................................................... 1
   1.1 Background ............................................................................................. 1
   1.2 Consultation History............................................................................... 1
   1.3 Proposed Federal Action ........................................................................ 4
2. **Endangered Species Act Biological Opinion And Incidental Take Statement**.................. 9
   2.1 Analytical Approach................................................................................. 9
   2.2 Rangewide Status of the Species and Critical Habitat ................................... 12
       2.2.1     Status of the Species ....................................................................18
               Status of Puget Sound Chinook Salmon ......................................... 19
               Status of Puget Sound Steelhead.................................................... 34
               Status of Southern Resident Killer Whales (SRKWs)..................................... 45
       2.2.2     Status of the Critical Habitat ...........................................................53
               Puget Sound Chinook Salmon Critical Habitat ............................. 53
               SRKW Critical Habitat ................................................................ 58
   2.3 Action Area ............................................................................................ 63
   2.4 Environmental Baseline .......................................................................... 64
       2.4.1     Distinguishing Baseline from Effects of the Action..........................75
   2.5 Effects of the Action............................................................................... 78
       2.5.1     Effects on Listed Species................................................................79
               Temporary Effects ....................................................................... 79
               Enduring Effects on Nearshore Habitat ......................................... 85
               Effects on of the Proposed Action on Population Viability........................... 97
       2.5.2     Effects on Critical Habitat .............................................................102
               Puget Sound Chinook Salmon Critical Habitat ........................... 102
               Critical Habitat Summary ........................................................... 108
   2.6 Cumulative Effects ................................................................................ 108
   2.7 Integration and Synthesis ...................................................................... 113
       2.7.1     Integration and Synthesis of Effects on Species............................114
       2.7.2     Integration and Synthesis of Effects of Critical Habitat................120
   2.8 Conclusion............................................................................................ 124
   2.9 Reasonable and Prudent Alternative ....................................................... 124
   2.10 Incidental Take Statement ..................................................................... 141
       2.10.1    Amount or Extent of Take ...........................................................141

**ER-142**

NOAASkagitAR0051110

Harassment from Temporary Effects ............................................................ 142

Harm from Enduring Effects ..................................................................... 143

2.10.2    Effect of the Take ..........................................................................144

2.10.3    Reasonable and Prudent Measures ...............................................144

2.10.4    Terms and Conditions.....................................................................145

2.11 Conservation Recommendations ..................................................................... 146

2.12 Reinitiation of Consultation ........................................................................... 147

3.    **Magnuson–Stevens Fishery Conservation and Management Act Essential Fish Habitat Response.................................................................................................................. 147**

3.1    Essential Fish Habitat Affected by the Project.............................................. 147

3.2    Adverse Effects on Essential Fish Habitat .................................................... 148

3.3    Essential Fish Habitat Conservation Recommendations................................ 148

3.4    Statutory Response Requirement ................................................................... 149

3.5    Supplemental Consultation............................................................................. 149

4.    **Data Quality Act Documentation and Pre-Dissemination Review................................ 149**

5.    **References ..................................................................................................................... 151**

●    **APPENDICES ................................................................................................................ 194**

NOAASkagitAR0051111

# 1. INTRODUCTION

This Introduction section provides information relevant to the other sections of this document and is incorporated by reference into Sections 2 and 3, below.

## 1.1    Background

The National Marine Fisheries Service (NMFS) prepared the biological opinion (opinion) and incidental take statement (ITS) portions of this document in accordance with section 7(b) of the Endangered Species Act (ESA) of 1973 (16 U.S.C. 1531 et seq.), and implementing regulations at 50 CFR part 402, as amended.

We completed pre-dissemination review of this document using standards for utility, integrity, and objectivity in compliance with applicable guidelines issued under the Data Quality Act (DQA) (section 515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001, Public Law 106-554). The document will be available at the NOAA Library Institutional Repository [https://repository.library.noaa.gov/welcome]. A complete record of this consultation is on file in Lacey, Washington.

## 1.2    Consultation History

A project very similar to the proposed action was previously the subject of a separate programmatic ESA consultation, which is no longer in effect. In the interests of providing some historical context for the present consultation, we provide information here about that prior consultation. In 2009, NMFS issued a programmatic biological opinion (NMFS, 2009) analyzing the 2008 Tidegate and Fish Initiative ("TFI") Agreement (WWAA et al. 2008). The TFI was a regional tidegate initiative involving a range of stakeholders including industry, state, and federal agencies, with the Swinomish Tribe participating as a non-voting member on the TFI Oversight Committee.

In the TFI Agreement, analyzed in NMFS 2009 opinion, tidegate projects were determined to require a certain number of habitat restoration credits (measured as acres) and the Agreement required the credits to be provided before tidegate projects could proceed. The restoration acres/credits for each tidegate were based on the number of delta acres affected and were tied to recovery goals under the PS Chinook Salmon Recovery Plan. The credits allocated to each tidegate in order to generate the total restoration acreage were set out in the TFI Agreement (Table 4-2). In the TFI Agreement, the No Name Slough tidegates proposed for replacement (at tidegate complex 103) were determined to influence 207 delta acres of and to warrant 8.6 acres of credits.

The TFI Agreement defined Minor, Major, and Replacement projects and these categories dictated the extent to which credits would be required for projects at each tidegate. Minor repair required no credits; major repairs required half the credits allocated to the complex; and, replacement projects required all the credit allocated. Any tidegate project "that require[d] excavation of the dike or levee to accomplish the repair" exceeded the definition of Major project and was defined as a Replacement project. In addition, major projects were expected to require 10 cubic yards or less of rock armoring to restore the original footprint of the rock.

ER-144

NOAASkagitAR0051112

Operational improvement projects were separately defined as those "actions that primarily improve fish passage" and they could be used to generate credits which could be retained for use by the relevant District. Operational improvement projects included replacement of conventional tidegates or tier 1 floodgates with a side hinge gate.

NMFS' biological opinion described and analyzed the effects of the scheme set out in the TFI Agreement (NMFS, 2009):

> To stimulate restoration of the necessary acreage, the Western Washington Agricultural Association proposed coupling tidegate maintenance activities with restoration projects identified in the Skagit Chinook Recovery Plan. Therefore, the restoration goal was set at 2,700 acres of estuarine habitat. To ensure that restoration projects and tidegate maintenance would proceed simultaneously, the proposed action would enable permit issuance under the provisions of this programmatic (i.e. without project-specific ESA consultation) so long as the necessary habitat restoration "credits" are in hand to justify permit issuance. If credits are not available, the applicant will be required to complete a project-specific ESA consultation on any proposed action. Credits required for individual tidegate actions are based upon the total area behind the tidegate (Table 4-2 of IA). Half of the designated credits are necessary for a major repair and all of the credits are required for a replacement.

In the years following issuance of NMFS' opinion on the TFI Agreement, the TFI Oversight Committee began interpreting tidegate projects with elements that improved on past conditions as being Operational Improvements, even if they would otherwise fall under the definition of a Major Project or Replacement project.[1] On this basis, the credit allocation for the applicable tidegate(s) was revised to zero. The No Name Slough project was one such project, with this determination made on November 18, 2019. Due in part to such interpretations of the TFI Agreement, progress toward the restoration goals specified in the TFI Agreement and assumed in NMFS' biological opinion was much slower than expected. NMFS began discussions about these concerns with TFI Agreement signatories and the action agency, the United States Army Corps of Engineers (Corps or USACE) and ultimately, on September 29, 2021, NMFS sent a letter to USACE recommending reinitiation of the TFI biological opinion. On November 3, 2021, the USACE requested reinitiation, and the TFI programmatic biological opinion was no longer considered an operable opinion for future projects. The No Name Slough project had not been permitted at that point in time, and so the applicant was advised by USACE to request individual consultation.

On April 7, 2022, NMFS received a request for informal consultation from USACE for the proposed action at No Name Slough (Table 1). The Corps had apparently transmitted the request on February 28, 2022, but it was not received due to file size limitations. Upon review of the information provided, we determined that the information did not demonstrate that the effects of the proposed action are either wholly beneficial, discountable, or insignificant. Therefore, NMFS could not concur with the Corps' not likely to adversely affect (NLAA) determination for PS Chinook salmon and its designated critical habitat, or its NLAA determination for PS steelhead.

---

[1] For examples, see 60 Day Notice of Intent to Sue sent by Earthjustice to NMFS on behalf of the Swinomish Indian Tribal Community on September 9, 2021, pp 8-10.

NOAASkagitAR0051113

We electronically provided a non-concurrence letter to the Corps on December 14, 2022, that included a request for the Corps to consider a formal consultation.

**Table 1.** Proposed No Name Slough tidegate replacement project.

| NMFS Consultation # | USACE Identification # (NWS #) | Project Name | Georeferenced location of project site | Consultation Request Date |
|---|---|---|---|---|
| WCRO-2022-03092 | NWS-2020-195 | No Name Slough | Latitude 48.46944° N Longitude -122.46901°W | 4/7/2022 |

Subsequently, the Corps requested formal consultation for the proposed action on December 16, 2022. The consultation request includes the original February 28, 2022, Memorandum for the Services (MFS) and informal consultation request letter; an emergency declaration from the Commissioners of Skagit County Dike, Drainage, and Irrigation Improvement District No. 12 (DID 12), a Washington special purpose district, dated September 9, 2019; a Biological Assessment (BA); and project drawings. NMFS also requested additional information on November 17, 2022, which was received from Jenna Friebel on November 18 and November 21, 2022. Upon review, we determined that the information provided by the Corps included the necessary information to complete ESA Section 7 and EFH consultation, and formal consultation was initiated on December 16, 2022.

On December 21, 2023, the project applicant, DID 12, filed a complaint against the NMFS with the United States District Court, Western Washington District (Case 2:23-cv-01954) alleging NMFS had failed to complete ESA consultation in a timely manner. On February 1, 2024, DID 12 filed a motion for preliminary injunction requesting the court order NMFS to issue a biological opinion by April 1, 2024. NMFS opposed the motion, requesting until July 3, 2024, due to factors such as the complexity of the consultation, significant human resource constraints, and time needed for external coordination. However, on March 8, 2024, the court granted the DID 12's request and ordered NMFS to complete formal consultation before April 1, 2024, allowing 15 business days to complete the consultation after the order was issued. A subsequent March 29, 2024, Order extended that deadline until April 22, 2024 to allow the applicant to comment on a draft. NMFS received comments from the applicant, the USACE, and the Swinomish Tribe, on April 11, 2024, and has considered all information received, and responded, as appropriate, throughout this Opinion, as well as in Appendix 4. This Opinion is based on the best scientific and commercial information available.

Updates to the regulations governing interagency consultation (50 CFR part 402) published April 5, 2024, but are not effective until May 6, 2024 (89 Fed. Reg. 24268). As a result, we are continuing to apply the currently effective regulations (i.e., up to and including the regulations adopted for section 7 in 2019 (84 Fed. Reg. 44976 (August 27, 2019)). For purposes of this determination and in an abundance of caution, we considered whether the analysis or its conclusions would be any different under the pre-2019 regulations. We have determined that our analysis and conclusions presented here would not be any different.

NOAASkagitAR0051114

**Table 2.** ESA-listed species and critical habitat effect determinations by NMFS and the Corps for the No Name Slough Tidegate replacement project.

| Species | Status | NMFS | | Corps | | Listed / CH Designated |
|---------|--------|------|------|-------|------|------------------------|
| | | Species | CH | Species | CH | |
| PS Chinook salmon (*Oncorhynchus tshawytscha*) (NMFS 2006) | Threatened | LAA | LAA | NLAA | NLAA | 06/28/05 (70 FR 37160) / 09/02/05 (70 FR 52630) |
| PS steelhead (*O. mykiss*) (NMFS 2019) | Threatened | LAA | NA | NLAA | NE | 05/11/07 (72 FR 26722) / 02/24/16 (81 FR 9252) |
| Southern Resident Killer Whale (*Orcinus orca*) (NMFS 2008b) | Endangered | LAA | LAA | NE | NE | 11/18/05 08/02/21 (86 FR 41668) |

NE is 'no effect '; NLAA is 'may affect, not likely to adversely affect'; LAA is 'may affect, likely to adversely affect'; NA is 'not applicable' because steelhead critical habitat has not been designated in marine waters of Puget Sound.

## 1.3     Proposed Federal Action

Under the ESA, "action" means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by federal agencies (see 50 CFR 402.02).

The Corps is proposing to permit, under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act, tidegate replacement activities at No Name Slough (Figure 1) (discussed in detail below). The effects of this action are the consequences caused by the Corps' decision to grant the permit that would not occur but for that decision and that are reasonably certain to occur (see also Section 2.4.1, Distinguishing Baseline from Effects of the Action). Permits allowing in and near water structures in the nearshore and estuaries of the Salish Sea to be repaired or replaced generally extend the time those existing structures will exist on the landscape and thus, their effects on species and their habitat. At the same time, currently existing that are yet to-be-repaired, rebuilt and/or replaced are part of the environmental baseline conditions, and in many cases, would persist for some period of time regardless of a request for a USACE permit. Our analysis differentiates between effects that are part of the baseline and effects that are caused by the proposed action. In the case of No Name Slough, based on the information submitted by the applicant and USACE documenting the state of the structure to be repaired/replaced, NMFS assumes that the structure has 10 years of remaining life and this is reflected in our analysis. This approach is consistent with assumptions made in the Salish Sea Nearshore Programmatic Consultation (NMFS 2022c) and other similar consultations[2] (see

---

[2]   In most cases, NMFS assumes a "10-year" time period as a default assumption for consultations where the project may have a remaining "useful life period." NMFS developed this assumption through input from marine

ER-147

NOAASkagitAR0051115

NMFS 2020, NMFS 2021, and NMFS 2022b). We discuss these assumptions further in the description of the Environmental Baseline (Section 2.4) below.

Based on these assumptions, our effects analysis thus focuses on how the proposed action will extend the useful life of the repaired and replaced structure, and any associated effects, into the future. Here, based on what we know about the life of the structures and the proposed action, we assume the proposed repair and replacement project will extend the useful life of the structures being rebuilt by 50 years.[3] We discuss this approach in more detail in the Effects of the Action Section 2.5 below.

As stated above, the proposed action is the USACE's issuance of a permit for the No Name Slough tidegate project, consisting of several components. The USACE permit would authorize the project under the Clean Water Act and/or Rivers and Harbors Act. The project replaces existing shoreline armoring[4] and associated tidegate structures with a single shoreline armoring/tidegate structure in Puget Sound. Two existing culverts will be removed and two others will be replaced with a single large concrete split box culvert structure with two side-hinged tidegates (Figure 1).

Currently, No Name Slough flows south and westerly through the project area and under a rip-rapped earthen dike through two parallel 4-foot-wide round culverts with top-hinge tidegates before discharging into Padilla Bay. This structure is the primary discharge point for No Name Slough into Padilla Bay. A pump house building is located on the landward side of these two culverts. Ditch 1 is an otherwise unnamed drainage ditch, which flows southeast into the project area and into No Name Slough at the pump house structure location. Another 4-foot-wide round culvert with a top-hinge tidegate is located approximately 250 feet northwest of the primary discharge point for No Name Slough and drains a portion of flows within Ditch 1 to Padilla Bay. A fourth culvert (a wooden box culvert) has already failed and has been partially decommissioned.

---

industry stakeholders and the Corps while working to implement the mitigation calculator that supported the RGP-6/Structure in Marine Waters Programmatic (NMFS 2016c).

[3] NMFS based the assumed duration of the new "useful life period" on RGP-6/Structure in Marine Waters Programmatic (NMFS 2016c), as referenced in footnote 1, as well as input from consultants that regularly assist applicants through permitting processes (Ehinger et al. 2023, Appendix E) and our best professional judgment. Depending on design, engineering, and materials, useful life periods could also be shorter or longer. For this consultation we applied the 50-year assumption, as described above.

[4] The terms shoreline armoring, dike, and riprap are used interchangeably throughout this document to describe the structures at the project site..

NOAASkagitAR0051116



**Figure 1.** No Name Slough tidegate replacement site at the confluence with Padilla Bay at low tide. The tidegate in the center of this photo has been partially removed and the area filled with material.

The proposed action would enable the applicant to remove three existing tidegates and associated culverts in two locations and replace them with one large concrete split box culvert with two 4.0-foot by 5.83-foot side-hinge gates in one location. Under the proposed permit, the project will be implemented in two phases: (1) remove and replace (with a single concrete split box culvert) the two parallel 4-foot-wide round culverts currently discharging flows from No Name Slough to Padilla Bay and remove two creosote piles (Figure 2) and the associated trash rack (Figure 3), and (2) remove two culverts in Ditch 1 (Figure 1). A contractor will conduct the replacement work for the two main discharge culverts at the confluence of No Name Slough, and DID 12 will remove the culverts from Ditch 1. The Ditch 1 culverts will not be removed until after the No Name Slough tidegates have been replaced (GeoEngineers 2022). A total of 73.6 cy[5] of new riprap on the marine shoreline of Padilla Bay is anticipated for the project (GeoEngineers 2022). Total shoreline armoring is proposed to include 62 linear feet of large rock and 23 linear feet of vertical concrete structural support for the tidegates. The project will include a sheet pile isolation area (fish relocation plan described below) to construct the project, of which approximately 330 square feet (33 feet long by 10 feet deep) is proposed to be left permanently submerged below the substrate at the shoreline face of the project[6]. In their memo to NMFS,

---

[5] The 73.6 cubic yard number is from the description of the action in the Biological Assessment; the numbers referenced in the November 18, 2022, email referenced in District Comment 1 on the Draft Opinion only apply to one part of the project site, but not other parts, which include additional new armoring as described on page 2 of the November 18, 2022 email.

[6] This permanent sheet pile piece does not affect the output of the Nearshore Calculator. Use of the Calculator, as part of our assessment, is fully described below.

ER-149

NOAASkagitAR0051117

dated February 28, 2022, the Corps determined that the in-water work would be conducted between July 16 and February 15 to minimize impacts to ESA-listed species.

Approximately seven creosote treated wood piles are located in Padilla Bay immediately west of the outlets of the two parallel 4-foot-wide round culverts that drain No Name Slough. Under the proposed action, the applicant would remove two of these piles, at low tide to enable worksite dewatering. Dewatering of the site will include the installation of a coffer dam and pumping system prior to casting in-place a concrete split box culvert (GeoEngineers 2022). Best management practices (BMPs) are described in GeoEngineers (2022) and are incorporated here by reference and described briefly below.



**Figure 2.**    No Name Slough tidegate at the confluence with Padilla Bay with high tide line represented by aquatic debris. Photo credit: Jenna Friebel.

NOAASkagitAR0051118



**Figure 3**.    Trash Rack (approximately 12 feet wide) on the Slough side of the No Name Slough tidegate. The trash rack is proposed for removal. Photo credit: Jenna Friebel.

Best management practices (BMPs), which we assume will be followed, are described in detail in GeoEngineers (2022) from available project plans and emails, and include:

- All work will be conducted in the dry where appropriate and at least 3 feet above the waterline otherwise;
- No construction debris or deleterious materials may be disposed of or abandoned on-site;
- All equipment for excavation of the existing structure will be staged on the dike above the OHWM;
- Excavated material will be temporarily stockpiled in the grassy upland field south of the tidegates;
- The contractor will prepare a Spill Prevention and Emergency Cleanup Plan (SPECP) for this project, and adequate materials and procedures to respond to unanticipated weather conditions or accidental releases of materials (sediment, petroleum hydrocarbons, etc.) will be available on site;

WCRO-2022-03092    -8-

NOAASkagitAR0051119

- Disturbed areas of the streambank and dike will be hydro-seeded with a native seed mix after construction completion;
- Erosion control measures will be implemented.

Fish isolation and removal would occur as follows:
- Fish removal will only be conducted on an outgoing tide
- Block nets will be set up to isolate the work area
- The isolated work area will be inspected (moving rocks as needed to flush fish) for stranded and trapped fish. Any observed fish will be removed with sanctuary dip nets.
- Once fish exclusion netting has been installed and fish have been removed from the work area, silt curtains will be installed along the inside of the fish exclusion netting.
- Before work begins on the second day of in-water work, a biologist will conduct a sweep of the isolated work area using sanctuary dip nets to confirm that no fish have emerged from refugia within the isolated work area overnight.

We considered, under the ESA, whether the proposed action would cause any other activities. We determined that it would cause the future operation and maintenance of the tidegate facility including routine and minor maintenance of the tidegates, of marine rip rap and waterway rip rap. Although dredging, either behind or waterward of the tidegate, might be necessary in the future, we assume that dredging would require authorization by the Corps as it involves discharge of material into waters of the U.S. We will analyze any effects of future dredging in a separate, future consultation. Also, the proposed action would cause the operation of the tidegates, which changes the interchange of salt and freshwater behind the tidegate, essentially maintaining what would be a salt marsh estuary as a brackish slough enabling habitat behind to be managed for agriculture. In this way, the project precludes the development of a certain amount of estuary habitat behind the tidegate by precluding the physical and biological process that allow for development of this type of habitat.

## 2. ENDANGERED SPECIES ACT BIOLOGICAL OPINION AND INCIDENTAL TAKE STATEMENT

The ESA establishes a national program for conserving threatened and endangered species of fish, wildlife, plants, and the habitat upon which they depend. As required by section 7(a)(2) of the ESA, each federal agency must ensure that its actions are not likely to jeopardize the continued existence of endangered or threatened species or to adversely modify or destroy their designated critical habitat. Per the requirements of the ESA, federal action agencies consult with NMFS, and section 7(b)(3) requires that, at the conclusion of consultation, NMFS provide an opinion stating how the agency's actions would affect listed species and their critical habitats. If incidental take is reasonably certain to occur, section 7(b)(4) requires NMFS to provide an ITS that specifies the impact of any incidental taking and includes reasonable and prudent measures (RPMs) and terms and conditions to minimize such impacts.

### 2.1 Analytical Approach

This biological opinion includes both a jeopardy analysis and an adverse modification analysis. The jeopardy analysis relies upon the regulatory definition of "jeopardize the continued existence

NOAASkagitAR0051120

of" a listed species, which is "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species" (50 CFR 402.02). Therefore, the jeopardy analysis considers both survival and recovery of the species.

This biological opinion relies on the definition of "destruction or adverse modification," which "means a direct or indirect alteration that appreciably diminishes the value of critical habitat for the conservation of a listed species. Such alterations may include, but are not limited to, those that alter the physical or biological features essential to the conservation of a species or that preclude or significantly delay development of such features" (81 FR 7214, February 11, 2016).

The designation(s) of critical habitat for PS Chinook salmon and SRKW use the term primary constituent element (PCE) or essential features. The 2016 final rule (81 FR 7414; February 11, 2016) that revised the critical habitat regulations (50 CFR 424.12) replaced this term with physical or biological features (PBFs). The shift in terminology does not change the approach used in conducting a "destruction or adverse modification" analysis, which is the same regardless of whether the original designation identified PCEs, PBFs, or essential features. In this biological opinion, we use the term PBF to mean PCE or essential feature, as appropriate for the specific critical habitat.

The ESA Section 7 implementing regulations define effects of the action using the term "consequences" (50 CFR 402.02). As explained in the preamble to the final rule revising the definition and adding this term (84 FR 44976, 44977; August 27, 2019), that revision does not change the scope of our analysis, and in this opinion, we use the terms "effects" and "consequences" interchangeably.

We use the following approach to determine whether a proposed action is likely to jeopardize listed species or destroy or adversely modify critical habitat:

- Evaluate the range-wide status of the species and critical habitat expected to be adversely affected by the proposed action.
- Evaluate the environmental baseline of the species and critical habitat.
- Evaluate the effects of the proposed action on species and their critical habitat using an exposure–response approach.
- Evaluate cumulative effects.
- In the integration and synthesis, add the effects of the action and cumulative effects to the environmental baseline, and, in light of the status of the species and critical habitat, analyze whether the proposed action is likely to: (1) directly or indirectly reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species; or (2) directly or indirectly result in an alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species.
- If necessary, suggest a reasonable and prudent alternative to the proposed action.

NOAASkagitAR0051121

Our analytical approach utilizes best available qualitative and quantitative methods to evaluate the effects of the action. Specifically, in addition to our usual qualitative approaches, we employ a Habitat Equivalency Analysis (HEA) methodology and our Puget Sound Nearshore Habitat Values Model (NHVM) to evaluate certain enduring effects of the shoreline armoring component of the proposed action on the marine side of the structure. NMFS has been using the Puget Sound Nearshore Habitat Calculator (Calculator, or Nearshore Calculator) as a user interface to the NHVM and HEA for various projects that affect the Puget Sound nearshore environment, a tool that can quantify "debits" that identify a measure of how much a project affects nearshore habitat function. NMFS has used the Nearshore Calculator in similar contexts to this project (See, e.g., (NMFS 2020, NMFS 2021, NMFS 2022b), and NMFS 2022c (Salish Sea Nearshore Programmatic). Although the Calculator can evaluate the loss of nearshore habitat resulting from the shoreline armoring, it is not currently able to evaluate all effects of the action. In particular, the Calculator is not able to assess impacts behind/landward of the dike, including loss of access to habitat. We employ other best available and qualitative approaches to assess these impacts, as we would for other similar actions in Puget Sound or other areas on NMFS's West Coast Region.

NMFS's Nearshore Calculator was recently peer reviewed by an independent expert panel who found that the Nearshore Calculator is based on best available science and generates reasonable and well-supported outputs.[7] This tool and underlying model was used to quantify the enduring in-water and riparian habitat effects on the marine side of the shoreline armoring component of the proposed action on ESA listed salmonids. Impacts are expressed in Conservation Debits which equal Discounted Service Acre Years (DSAYs)*100. The Nearshore Calculator does not evaluate any short- or medium-term effects, including construction effects (e.g., sheet pile driving or turbidity) or ongoing maintenance, and it does not evaluate freshwater effects. Habitat equivalency, which forms the basis of the Nearshore Calculator, is a concept that uses a common ecological currency (DSAYs) to express and assign a value to functional habitat loss and gain. Ecological equivalency is traditionally a service-to-service approach where the ecological functions and services for a species or group of species lost from an impacting activity can be fully offset by the services gained from a conservation activity.[8] In this case, we use this approach to quantify the impacts of certain enduring effects of the proposed action on the marine side of the tidegates.

Output from the Nearshore Calculator accounts for the following consequences of the action on the marine side of the tidegate:
- Beneficial aspects of the proposed project, including any positive nearshore effects that would result from removing certain structures, here, creosote piles;
- Minimization of effects incorporated through project design improvements
- Adverse effects caused by the proposed action on the marine side of the structures (here, resulting from the shoreline armoring component of the project), that are expected to occur for the duration of a new useful life of that armoring and associated tidegate.

---

[7] https://www.fisheries.noaa.gov/west-coast/habitat-conservation/independent-peer-review-noaa-fisheries-puget-sound-nearshore

[8] NMFS has a webpage with general information, frequently asked questions, and a downloadable Nearshore Calculator and User Guide here: https://www.fisheries.noaa.gov/west-coast/habitatconservation/puget-sound-nearshore-habitat-conservation-calculator.

ER-154

NOAASkagitAR0051122

We applied the following assumptions and inputs to the Calculator:

- The remaining useful life of the existing riprap armouring is 10 years (*see* Section 2.4.1 for additional explanation);
- The useful life of the new tidegate and shoreline armoring structures is 50 years (*see* Section 2.4.1. and 2.5 for additional explanation);
- Riparian plantings have a relatively low success rate over time, which is especially likely on the rip rap shoreline of Padilla Bay and No Name Slough; and,
- Two creosote piles will be removed, which will be disposed of at an approved upland facility.

Further details about our quantitative assessment of the enduring effects on nearshore habitat are set out in Appendix 1.

Other resources used to inform this Opinion include:

- SalmonScape –Washington Department of Fish and Wildlife's interactive, computer mapping system of salmon habitat data at https://apps.wdfw.wa.gov/salmonscape/map.html
- USGS The National Map - Elevation Tool "Profile Tool" to determine gradation of potential fish habitat at https://apps.nationalmap.gov/elevation/
- Washington Department of Ecology Water Quality Assessment Tool at https://apps.ecology.wa.gov/waterqualityatlas/wqa/
- Washington Department of Natural Resources Aquatic Resources Interactive Map – Aquatic Reserves at https://aquarim.dnr.wa.gov/default.aspx
- Washington Department of Ecology's Washington Coastal Atlas Map at https://apps.ecology.wa.gov/coastalatlas/tools/Map.aspx

## 2.2    Rangewide Status of the Species and Critical Habitat

This opinion examines the status of each species that is likely to be adversely affected by the proposed action. The status is determined by the level of extinction risk that the listed species face, based on parameters considered in documents such as recovery plans, status reviews, and listing decisions. This informs the description of the species' likelihood of both survival and recovery. The species status section also helps to inform the description of the species' "reproduction, numbers, or distribution" for the jeopardy analysis. The opinion also examines the condition of critical habitat throughout the designated area, evaluates the conservation value of the various watersheds and coastal and marine environments that make up the designated area, and discusses the function of the PBFs that are essential for the conservation of the species.

One factor affecting the status of ESA-listed species considered in this opinion, and aquatic habitat at large, is climate change. Climate change is likely to play an increasingly important role in determining the abundance and distribution of ESA-listed species, and the conservation value of designated critical habitats, in the Pacific Northwest. These changes will not be spatially homogeneous across the Pacific Northwest. Major ecological realignments are already occurring in response to climate change (IPCC WGII, 2022). Long-term trends in warming have continued at global, national and regional scales. Global surface temperatures in the last decade (2010s)

ER-155

NOAASkagitAR0051123

were estimated to be 1.09°C higher than the 1850-1900 baseline period, with larger increases over land ~1.6°C compared to oceans ~0.88°C (IPCC WGI, 2021). The vast majority of this warming has been attributed to anthropogenic releases of greenhouse gases (IPCC WGI, 2021). Globally, 2014-2018 were among the 5 warmest years on record both on land and in the ocean (2018 was the 4th warmest) (NOAA and NCEI 2022). The year 2023 was the highest global temperature on record by far among all years between 1850 – 2023 (NOAA 2024a). Events such as the 2013-2016 marine heatwave (Jacox et al. 2018) have been attributed directly to anthropogenic warming in the annual special issue of Bulletin of the American Meteorological Society on extreme events (Herring et al. 2018). Global warming and anthropogenic loss of biodiversity represent profound threats to ecosystem functionality (IPCC WGII 2022). These two factors are often examined in isolation, but likely have interacting effects on ecosystem function.

Updated projections of climate change are similar to or greater than previous projections (IPCC WGI, 2021). NMFS is increasingly confident in our projections of changes to freshwater and marine systems because every year brings stronger validation of previous predictions in both physical and biological realms. Retaining and restoring habitat complexity, access to climate refugia (both flow and temperature), and improving growth opportunities in both freshwater and marine environments are strongly advocated in the recent literature (Siegel and Crozier 2020).

Climate change is systemic, influencing freshwater, estuarine, and marine conditions. Other systems are also being influenced by changing climatic conditions. Literature reviews on the impacts of climate change on Pacific salmon (Crozier 2015, 2016, 2017, Crozier and Siegel 2018, Siegel and Crozier 2019, 2020) have collected hundreds of papers documenting the major themes relevant for salmon. Here we describe habitat changes relevant to Pacific salmon and steelhead, prior to describing how these changes result in the varied specific mechanisms impacting these species in subsequent sections.

*Forests*
Climate change will impact forests of the western U.S., which dominate the landscape of many watersheds in the region. Forests are already showing evidence of increased drought severity, forest fire, and insect outbreak (Halofsky et al. 2020). Additionally, climate change will affect tree reproduction, growth, and phenology, which will lead to spatial shifts in vegetation. Halofsky et al. (2018) projected that the largest changes will occur at low- and high-elevation forests, with expansion of low-elevation dry forests and diminishing high-elevation cold forests and subalpine habitats.

Forest fires affect salmon streams by altering sediment load, channel structure, and stream temperature through the removal of canopy. Holden et al. (2018) examined environmental factors contributing to observed increases in the extent of forest fires throughout the western U.S. They found strong correlations between the number of dry-season rainy days and the annual extent of forest fires, as well as a significant decline in the number of dry-season rainy days over the study period (1984-2015). Consequently, predicted decreases in dry-season precipitation, combined with increases in air temperature, will likely contribute to the existing trend toward more extensive and severe forest fires and the continued expansion of fires into higher elevation and wetter forests (Alizedeh et al. 2021).

**ER-156**

NOAASkagitAR0051124

Agne et al. (2018) reviewed literature on insect outbreaks and other pathogens affecting coastal Douglas-fir forests in the Pacific Northwest and examined how future climate change may influence disturbance ecology. They suggest that Douglas-fir beetle and black stain root disease could become more prevalent with climate change, while other pathogens will be more affected by management practices. Agne et al. (2018) also suggested that due to complex interacting effects of disturbance and disease, climate impacts will differ by region and forest type.

*Freshwater Environments*

The following is excerpted from Siegel and Crozier (2019), who present a review of recent scientific literature evaluating effects of climate change, describing the projected impacts of climate change on instream flows:

Cooper et al. (2018) examined whether the magnitude of low river flows in the western U.S., which generally occur in September or October, are driven more by summer conditions or the prior winter's precipitation. They found that while low flows were more sensitive to summer evaporative demand than to winter precipitation, inter-annual variability in winter precipitation was greater. Malek et al. (2018), predicted that summer evapotranspiration is likely to increase in conjunction with declines in snowpack and increased variability in winter precipitation. Their results suggest that low summer flows are likely to become lower, more variable, and less predictable.

The effect of climate change on ground water availability is likely to be variable. Sridhar et al. (2018) coupled a surface-flow model with a ground-flow model to improve predictions of surface water availability with climate change in the Snake River Basin. Projections using RCP 4.5 and 8.5 emission scenarios suggested an increase in water table heights in downstream areas of the basin and a decrease in upstream areas.

Isaak et al. (2018), examined recent trends in stream temperature across the Western U.S. using a large regional dataset. Stream warming trends paralleled changes in air temperature and were pervasive during the low-water warm seasons of 1996-2015 (0.18-0.35°C/decade) and 1976-2015 (0.14-0.27°C/decade). Their results show how continued warming will likely affect the cumulative temperature exposure of migrating sockeye salmon *O. nerka* and the availability of suitable habitat for brown trout *Salmo trutta* and rainbow trout *O. mykiss*. Isaak et al. (2018) concluded that most stream habitats will likely remain suitable for salmonids in the near future, with some becoming too warm. However, in cases where habitat access is currently restricted by dams and other barriers salmon and steelhead will be confined to downstream reaches typically most at risk of rising temperatures unless passage is restored (FitzGerald et al. 2020, Myers et al. 2018).

Streams with intact riparian corridors and that lie in mountainous terrain are likely to be more resilient to changes in air temperature. These areas may provide refuge from climate change for a number of species, including Pacific salmon. Krosby et al. (2018), identified potential stream refugia throughout the Pacific Northwest based on a suite of features thought to reflect the ability of streams to serve as such refuges. Analyzed features include large temperature gradients, high canopy cover, large relative stream width, low exposure to solar radiation, and low levels of human modification. They created an index of refuge potential for all streams in the region, with

**ER-157**

NOAASkagitAR0051125

mountain area streams scoring highest. Flat lowland areas, which commonly contain migration corridors, were generally scored lowest, and thus were prioritized for conservation and restoration. However, forest fires can increase stream temperatures dramatically in short time-spans by removing riparian cover (Koontz et al. 2018), and streams that lose their snowpack with climate change may see the largest increases in stream temperature due to the removal of temperature buffering (Yan et al. 2021). These processes may threaten some habitats that are currently considered refugia.

*Marine and Estuarine Environments*

Along with warming stream temperatures and concerns about sufficient groundwater to recharge streams, a recent study projects nearly complete loss of existing tidal wetlands along the U.S. West Coast, due to sea level rise (Thorne et al. 2021). California and Oregon showed the greatest threat to tidal wetlands (100 percent), while 68 percent of Washington tidal wetlands are expected to be submerged. Coastal development and steep topography prevent horizontal migration of most wetlands, causing the net contraction of this crucial habitat. Global sea levels are expected to continue rising throughout this century, reaching predicted increases of 10-32 inches by 2081-2100 (IPCC 2014). These changes will likely result in increased erosion and more frequent and severe coastal flooding, and shifts in the composition of nearshore habitats (Tillmann and Siemann 2011; Reeder et al. 2013). Estuarine-dependent salmonids, such as chum and Chinook salmon, are predicted to be impacted by significant reductions in rearing habitat in some Pacific Northwest coastal areas (Glick et al. 2007). Further, changes to estuarine and coastal conditions, as well as the timing of seasonal shifts in these habitats, have the potential to impact a wide range of listed aquatic species (Tillmann and Siemann 2011; Reeder et al. 2013).

Rising ocean temperatures, stratification, ocean acidity, hypoxia, algal toxins, and other oceanographic processes will alter the composition and abundance of a vast array of oceanic species. In particular, there will be dramatic changes in both predators and prey of Pacific salmon, salmon life history traits and relative abundance. Siegel and Crozier (2019) observe that changes in marine temperature are likely to have a number of physiological consequences on fishes themselves. For example, in a study of small planktivorous fish, Gliwicz et al. (2018) found that higher ambient temperatures increased the distance at which fish reacted to prey. Numerous fish species (including many tuna and sharks) demonstrate regional endothermy, which in many cases augments eyesight by warming the retinas. However, Gliwicz et al. (2018) suggest that ambient temperatures can have a similar effect on fish that do not demonstrate this trait. Climate change is likely to reduce the availability of biologically essential omega-3 fatty acids produced by phytoplankton in marine ecosystems. Loss of these lipids may induce cascading trophic effects, with distinct impacts on different species depending on compensatory mechanisms (Gourtay et al. 2018). Reproduction rates of many marine fish species are also likely to be altered with temperature (Veilleux et al. 2018). The ecological consequences of these effects and their interactions add complexity to predictions of climate change impacts in marine ecosystems.

Perhaps the most dramatic change in physical ocean conditions will occur through ocean acidification and deoxygenation. It is unclear how sensitive salmon and steelhead might be to the direct effects of ocean acidification because of their tolerance of a wide pH range in freshwater (although see Ou et al. 2015 and Williams et al. 2019), however, impacts of ocean acidification

ER-158

NOAASkagitAR0051126

and hypoxia on sensitive species (e.g., plankton, crabs, rockfish, groundfish) will likely affect salmon indirectly through their interactions as predators and prey. Similarly, increasing frequency and duration of harmful algal blooms may affect salmon directly, depending on the toxin (e.g., saxitoxin vs domoic acid), but will also affect their predators (seabirds and mammals). The full effects of these ecosystem dynamics are not known but will be complex. Within the historical range of climate variability, less suitable conditions for salmonids (e.g., warmer temperatures, lower stream flows) have been associated with detectable declines in many of these listed units, highlighting how sensitive they are to climate drivers (Ford 2022, Lindley et al. 2009, Williams et al. 2016, Ward et al. 2015). In some cases, the combined and potentially additive effects of poorer climate conditions for fish and intense anthropogenic impacts caused the population declines that led to these population groups being listed under the ESA (Crozier et al. 2019).

*Climate change effects on salmon and steelhead*
In freshwater, year-round increases in stream temperature and changes in flow will affect physiological, behavioral, and demographic processes in salmon, and change the species with which they interact. For example, as stream temperatures increase, many native salmonids face increased competition with more warm-water tolerant invasive species. Changing freshwater temperatures are likely to affect incubation and emergence timing for eggs, and in locations where the greatest warming occurs may affect egg survival, although several factors impact inter-gravel temperature and oxygen (e.g., groundwater influence) as well as sensitivity of eggs to thermal stress (Crozier et al. 2020). Changes in temperature and flow regimes may alter the amount of habitat and food available for juvenile rearing, and this in turn could lead to a restriction in the distribution of juveniles, further decreasing productivity through density dependence. For migrating adults, predicted changes in freshwater flows and temperatures will likely increase exposure to stressful temperatures for many salmon and steelhead populations, and alter migration travel times and increase thermal stress accumulation for Evolutionarily Significant Units (ESU) or Distinct Population Segments (DPS) with early-returning (i.e. spring- and summer-run) phenotypes associated with longer freshwater holding times (Crozier et al. 2020, FitzGerald et al. 2020). Rising river temperatures increase the energetic cost of migration and the risk of *en route* or pre-spawning mortality of adults with long freshwater migrations, although populations of some ESA-listed salmon and steelhead may be able to make use of cool-water refugia and run-timing plasticity to reduce thermal exposure (Keefer et al. 2018, Barnett et al. 2020).

Marine survival of salmonids is affected by a complex array of factors including prey abundance, predator interactions, the physical condition of salmon within the marine environment, and carryover effects from the freshwater experience (Holsman et al. 2012, Burke et al. 2013). It is generally accepted that salmon marine survival is size-dependent, and thus larger and faster growing fish are more likely to survive (Gosselin et al. 2021). Furthermore, early arrival timing in the marine environment is generally considered advantageous for populations migrating through the Columbia River. However, the optimal day of arrival varies across years, depending on the seasonal development of productivity in the California Current, which affects prey available to salmon and the risk of predation (Chasco et al. 2021). Siegel and Crozier (2019) point out the concern that for some salmon populations, climate change may drive mismatches between juvenile arrival timing and prey availability in the marine environment. However, phenological diversity can contribute to metapopulation-level resilience by reducing the risk of a

complete mismatch. Carr-Harris et al. (2018), explored phenological diversity of marine migration timing in relation to zooplankton prey for sockeye salmon *O. nerka* from the Skeena River of Canada. They found that sockeye migrated over a period of more than 50 days, and populations from higher elevation and further inland streams arrived in the estuary later, with different populations encountering distinct prey fields. Carr-Harris et al. (2018) recommended that managers maintain and augment such life-history diversity.

Synchrony between terrestrial and marine environmental conditions (e.g., coastal upwelling, precipitation and river discharge) has increased in spatial scale causing the highest levels of synchrony in the last 250 years (Black et al. 2018). A more synchronized climate combined with simplified habitats and reduced genetic diversity may be leading to more synchrony in the productivity of populations across the range of salmon (Braun et al. 2016). For example, salmon productivity (recruits/spawner) has also become more synchronized across Chinook populations from Oregon to the Yukon (Dorner et al. 2018, Kilduff et al. 2014). In addition, Chinook salmon have become smaller and younger at maturation across their range (Ohlberger et al. 2018). Other Pacific salmon species (Stachura el al. 2014) and Atlantic salmon (Olmos et al. 2020) also have demonstrated synchrony in productivity across a broad latitudinal range.

At the individual scale, climate impacts on salmon in one life stage generally affect body size or timing in the next life stage and negative impacts can accumulate across multiple life stages (Healey 2011; Wainwright and Weitkamp 2013, Gosselin et al. 2021). Changes in winter precipitation will likely affect incubation and/or rearing stages of most populations. Changes in the intensity of cool season precipitation, snow accumulation, and runoff could influence migration cues for fall, winter and spring adult migrants, such as coho salmon and steelhead. Egg survival rates may suffer from more intense flooding that scours or buries redds. Changes in hydrological regime, such as a shift from mostly snow to more rain, could drive changes in life history, potentially threatening diversity within an ESU (Beechie et al. 2006). Changes in summer temperature and flow will affect both juvenile and adult stages in some populations, especially those with yearling life histories and summer migration patterns (Crozier and Zabel 2006; Crozier et al. 2010, Crozier et al. 2019).

At the population level, the ability of organisms to genetically adapt to climate change depends on how much genetic variation currently exists within salmon populations, as well as how selection on multiple traits interact, and whether those traits are linked genetically. While genetic diversity may help populations respond to climate change, the remaining genetic diversity of many populations is highly reduced compared to historic levels. For example, Johnson et al. (2018), compared genetic variation in Chinook salmon from the Columbia River Basin between contemporary and ancient samples. A total of 84 samples determined to be Chinook salmon were collected from vertebrae found in ancient middens and compared to 379 contemporary samples. Results suggest a decline in genetic diversity, as demonstrated by a loss of mitochondrial haplotypes as well as reductions in haplotype and nucleotide diversity. Genetic losses in this comparison appeared larger for Chinook salmon from the mid-Columbia than those from the Snake River Basin. In addition to other stressors, modified habitats and flow regimes may create unnatural selection pressures that reduce the diversity of functional behaviors (Sturrock et al. 2020). Managing to conserve and augment existing genetic diversity may be increasingly important with more extreme environmental change (Anderson et al. 2015), though the low levels of remaining diversity present challenges to this effort (Freshwater et al. 2019). Salmon

**ER-160**

NOAASkagitAR0051128

historically maintained relatively consistent returns across variation in annual weather through the portfolio effect (Schindler et al. 2015), in which different populations are sensitive to different climate drivers. Applying this concept to climate change, Anderson et al. (2015) emphasized the additional need for populations with different physiological tolerances. Loss of the portfolio increases volatility in fisheries, as well as ecological systems, as demonstrated for Fraser River and Sacramento River stock complexes (Freshwater et al. 2019, Munsch et al. 2022).

## 2.2.1   Status of the Species

For Pacific salmon, steelhead, and certain other species, we commonly use the four "viable salmonid population" (VSP) criteria (McElhany et al. 2000) to assess the viability of the populations that, together, constitute the species. These four criteria (spatial structure, diversity, abundance, and productivity) encompass the species' "reproduction, numbers, or distribution" as described in 50 CFR 402.02. When these parameters are collectively at appropriate levels, they maintain a population's capacity to adapt to various environmental conditions and allow it to sustain itself in the natural environment.

"Spatial structure" refers both to the spatial distributions of individuals in the population and the processes that generate that distribution. A population's spatial structure depends on habitat quality and spatial configuration, and the dynamics and dispersal characteristics of individuals in the population.

"Diversity" refers to the distribution of traits within and among populations. These range in scale from DNA sequence variation in single genes to complex life history traits (McElhany et al. 2000).
"Abundance" generally refers to the number of naturally produced adults (i.e., the progeny of naturally spawning parents) in the natural environment (e.g., on spawning grounds).

"Productivity," as applied to viability factors, refers to the entire life cycle (i.e., the number of naturally-spawning adults produced per parent). When progeny replace or exceed the number of parents, a population is stable or increasing. When progeny fails to replace the number of parents, the population is declining. McElhany et al. (2000) use the terms "population growth rate" and "productivity" interchangeably when referring to production over the entire life cycle. They also refer to "trend in abundance," which is the manifestation of long-term population growth rate.

For species with multiple populations, once the biological status of a species' populations has been determined, we assess the status of the entire species using criteria for groups of populations, as described in recovery plans and guidance documents from technical recovery teams. Considerations for species viability include having multiple populations that are viable, ensuring that populations with unique life histories and phenotypes are viable, and that some viable populations are both widespread to avoid concurrent extinctions from mass catastrophes and spatially close to allow functioning as metapopulations (McElhany et al. 2000).

**ER-161**

NOAASkagitAR0051129

On October 4, 2019, NMFS published notice of NMFS' intent to initiate a new 5-year status review for 28 listed species of Pacific salmon and steelhead and requested updated information from the public to inform the status review (84 FR 53117). On March 24, 2020, NMFS extended the public comment period, from the original March 27, 2020, through May 26, 2020 (85 FR 16619). The Northwest Fishery Science Center (NWFSC) completed the Viability Risk Assessment for salmon and steelhead (Ford 2022). NMFS' West coast Regional Office (WCRO) is currently preparing the final 5-year status review documents, with anticipated completion in 2024. In this section, where possible, particularly as new material becomes available, the latest final (2016) status review information is supplemented with more recent information and other population specific data that may not have been available during the 2016 status review, including some of the information in the draft 2024 status review, so that NMFS is assured of using the best available information for this opinion.

The summaries that follow describe the status of the ESA-listed species, and their designated critical habitats, that occur within the geographic area of the proposed projects and are considered in this opinion. More detailed information on the status and trends of these listed resources, and their biology and ecology, is in the listing regulations and critical habitat designations published in the Federal Register (Table 3) and is incorporated here by reference.

**Status of Puget Sound Chinook Salmon**
The recovery plan for PS Chinook salmon consists of two documents: the Puget Sound salmon recovery plan (SSPS 2007) and a supplement by NMFS (2006). The recovery plan adopts ESU and population level viability criteria recommended by the Puget Sound Technical Recovery Team (PSTRT) (Ruckelshaus et al. 2002). A critical component of recovery requires the viability status of all populations in the ESU is improved from current conditions, and when considered in the aggregate, persistence of the ESU is assured. The PSTRT's biological recovery criteria will be met when all of the following conditions are achieved:

- The viability status of all populations in the ESU is improved from current conditions, and when considered in the aggregate, persistence of the ESU is assured;
- Two to four Chinook salmon populations in each of the five biogeographical regions of the ESU achieve viability, depending on the historical biological characteristics and acceptable risk levels for populations within each region;
- At least one population from each major genetic and life history group historically present within each of the five biogeographical regions is viable;
- Tributaries to Puget Sound not identified as primary freshwater habitat for any of the 22 identified populations are functioning in a manner that is sufficient to support an ESU-wide recovery scenario;
- Production of Chinook salmon from tributaries to Puget Sound not identified as primary freshwater habitat for any of the 22 identified populations occurs in a manner consistent with ESU recovery; and
- Populations that do not meet the viability criteria for all VSP parameters are sustained to provide ecological functions and preserve options for ESU recovery.

ER-162

NOAASkagitAR0051130

**Table 3.** Listing classification and date, recovery plan reference, most recent status review, status summary, and limiting factors for each species considered in this opinion.

| Species | Listing Classification and Date | Recovery Plan Reference | Most Recent Status Review | Status Summary | Limiting Factors |
|---|---|---|---|---|---|
| **Puget Sound Chinook salmon** | Threatened 6/28/05 (70 FR 37159) | Shared Strategy for Puget Sound 2007 | NMFS 2017; Ford 2022 | This ESU comprises 22 populations distributed over five geographic areas. All PS Chinook salmon populations continue to remain well below the TRT planning ranges for recovery escapement levels. Most populations also remain consistently below the spawner–recruit levels identified by the TRT as necessary for recovery. Across the ESU, most populations have increased somewhat in abundance since the last status review in 2016, but have small negative trends over the past 15 years. Productivity remains low in most populations. Overall, the PS Chinook salmon ESU remains at "moderate" risk of extinction. | ● Degraded floodplain and in-river channel structure<br>● Degraded estuarine conditions and loss of estuarine habitat<br>● Degraded riparian areas and loss of in-river large woody debris<br>● Excessive fine-grained sediment in spawning gravel<br>● Degraded water quality and temperature<br>● Degraded nearshore conditions<br>● Impaired passage for migrating fish<br>● Severely altered flow regime |
| **Puget Sound steelhead** | Threatened 5/11/07 | NMFS 2019 | NMFS 2017; Ford 2022 | This DPS comprises 32 populations. Viability of has improved somewhat since the PSTRT concluded that the DPS was at very low viability, as were all three of its constituent MPGs, and many of its 32 DIPs (Hard et al. 2015). Increases in spawner abundance were observed in a number of populations over the last five years within the Central & South PS and the Hood Canal & Strait of Juan de Fuca MPGs, primarily among smaller populations. There were also declines for summer- and winter-run populations in the Snohomish River basin. | ● Continued destruction and modification of habitat<br>● Widespread declines in adult abundance despite significant reductions in harvest<br>● Threats to diversity posed by use of two hatchery steelhead stocks<br>● Declining diversity in the DPS, including the uncertain but weak status of summer-run fish<br>● A reduction in spatial structure<br>● Reduced habitat quality<br>● Urbanization |

NOAASkagitAR0051131

| Species | Listing Classification and Date | Recovery Plan Reference | Most Recent Status Review | Status Summary | Limiting Factors |
|---|---|---|---|---|---|
| | | | | In fact, all summer-run steelhead populations in the Northern Cascades MPG are likely at a very high demographic risk. | ● Dikes, hardening of banks with riprap, and channelization |
| **Southern resident killer whale** | Endangered 11/18/05 | NMFS 2008 | NMFS 2022a | The Southern Resident killer whale DPS is composed of a single population that ranges as far south as central California and as far north as southeast Alaska. While some of the downlisting and delisting criteria have been met, the biological downlisting and delisting 63 criteria, including sustained growth over 14 and 28 years, respectively, have not been met. The SRKW DPS has not grown; the overall status of the population is not consistent with a healthy, recovered population. Considering the status and continuing threats, the Southern Resident killer whales remain in danger of extinction. | ● Quantity and quality of prey<br>● Exposure to toxic chemicals<br>● Disturbance from sound and vessels<br>● Risk from oil spills |

NOAASkagitAR0051132

*Spatial Structure and Diversity.*
The PS Chinook salmon ESU includes all naturally spawning populations of Chinook salmon from rivers and streams flowing into Puget Sound including the Straits of Juan De Fuca from the Elwha River, eastward, including rivers and streams flowing into Hood Canal, South Sound, North Sound and the Strait of Georgia in Washington. The PSTRT identified 22 extant populations, grouped into five major geographic regions, based on consideration of historical distribution, geographic isolation, dispersal rates, genetic data, life history information, population dynamics, and environmental and ecological diversity. The PSTRT distributed the 22 populations among five major biogeographical regions, or major population groups (MPG), that are based on similarities in hydrographic, biogeographic, and geologic characteristics (Table 4).

Since 1999, most PS Chinook populations have mean natural-origin spawner escapement levels well below levels identified as required for recovery to low extinction risk. Long-term, natural-origin mean escapements for eight populations are at or below their critical thresholds. Both populations in three of the five biogeographical regions are below or near their critical threshold: Georgia Strait, Hood Canal and Strait of Juan de Fuca. When hatchery spawners are included, aggregate average escapement is over 1,000 for one of the two populations in each of these three regions, reducing the demographic risk to the populations in these regions. Additionally, hatchery spawners help two of the remaining three of these populations achieve total spawner abundances above their critical threshold, reducing demographic risk. Nine populations are above their rebuilding thresholds, seven of them in the Whidbey/Main Basin Region. In 2018, NMFS and the NWFSC updated the rebuilding thresholds for several key Puget Sound populations. These thresholds represent the Maximum Sustained Yield estimate of spawners based on available habitat. The new spawner-recruit analyses for several populations indicated a significant reduction in the number of spawners that can be supported by the available habitat when compared to analyses conducted 10 to 15 years ago. This may be due to further habitat degradation or improved productivity assessment or, more likely, a combination of these factors. For example, the updated rebuilding escapement threshold for the Green River is 1,700 spawners compared to the previous rebuilding escapement threshold of 5,523 spawners. So, although several populations are above the updated rebuilding thresholds, indicating that escapement is sufficient for the available habitat in many cases, the overall abundance has declined.

*Abundance and Productivity.*
The abundance of the PS Chinook salmon over time shows that individual populations have varied with increasing or decreasing abundance. Generally, many populations experienced increases in total abundance during the years 2000-2008, and more recently in 2015-2017, but general declines during 2009-2014, and a downturn again in the two most recent years available for the current status review, 2017-2018. Abundance across the Puget Sound ESU has generally increased since the last status review, with only 2 of the 22 populations (Cascade and North Fork and South Fork Stillaguamish) showing a negative percent change in the 5-year geometric mean natural-origin spawner abundances since the prior status review. However, 15 of 20 populations with positive percent change in the 5-year geometric mean natural-origin spawner abundances since the prior status review have relatively low population abundances of <1000 fish, so some of these increases represent small changes in total abundance (Ford 2022). Also, given lack of high confidence in survey techniques, particularly with small populations, there is substantial uncertainty in quantifying fish and detecting trends in small populations (Gallagher et al. 2010).

ER-165

NOAASkagitAR0051133

**Table 4.**     Extant PS Chinook salmon populations in each biogeographic region and percent change between the most recent two 5-year periods (2010-2014 and 2015-2019). Five-year geometric mean of raw natural-origin spawner counts. This is the raw total spawner estimate times the fraction natural-origin estimate, if available. In parentheses, 5-year geometric mean of raw total spawner estimates (i.e., hatchery and natural) are shown. A value only in parentheses means that a total spawner estimate was available but no (or only one) estimate of natural-origin spawners was available. The geometric mean was computed as the product of estimates raised to the power 1 over the number of counts available (2 to 5). A minimum of 2 values were used to compute the geometric mean. Percent change between the most recent two 5-year periods is shown on the far right (Ford 2022).

| Biogeographic Region | Population (Watershed) | 2010-2014 | 2015-2019 | Population trend (% change) |
|---|---|---|---|---|
| Strait of Georgia | **North Fork Nooksack River** | 136 (1205) | 137 (1553) | Positive 1% (29) |
| | **South Fork Nooksack River** | 13 (35) | 42 (106) | Positive 223% (203) |
| Strait of Juan de Fuca | **Elwha River** | 71 (1349) | 134 (2810) | Positive 89% (108) |
| | **Dungeness River** | 66 (279) | 114 (476) | Positive 73% (71) |
| Hood Canal | **Skokomish River** | 136 (1485) | 265 (2074) | Positive 95% (40) |
| | **Mid Hood Canal River** | 80 (295) | 196 (222) | Positive 145% (-25) |
| Whidbey Basin | Skykomish River | 1698 (2462) | 1736 (2806) | Positive 3% (14) |
| | Snoqualmie River | 839 (1082) | 856 (1146) | Positive 2% (6) |
| | North Fork Stillaguamish River | 417 (996) | 302 (762) | Negative 28% (-23) |
| | South Fork Stillaguamish River | 34 (68) | 37 (96) | Positive 9% (41) |
| | Lower Skagit River | 1416 (1541) | 2130 (2640) | Positive 50% (71) |
| | Upper Sauk River | 854 (880) | 1318 (1330) | Positive 54% (51) |
| | Lower Sauk River | 376 (416) | 635 (649) | Positive 69% (56) |
| | **Suiattle River** | 376 (378) | 640 (657) | Positive 70% (74) |
| | Upper Cascade River | 298 (317) | 185 (223) | Negative 38% (-30) |
| Central/South Puget Sound Basin | North Lake Washington/ Sammamish River | 82 (1289) | 126 (879) | Positive 54% (-32) |
| | Green/Duwamish River | 785 (2109) | 1822 (6373) | Positive 132% (202) |
| | Puyallup River | 450 (1134) | 577 (1942) | Positive 28% (71) |
| | **White River** | 652 (2161) | 895 (6244) | Positive 37% (189) |
| | Cedar River | 699 (914) | 889 (1253) | Positive 27% (37) |
| | **Nisqually River** | 481 (1823) | 766 (1841) | Positive 59% (1) |

ER-166

NOAASkagitAR0051134

Trends in abundance over longer time periods are generally slightly negative. Fifteen-year trends in log natural-origin spawner abundance were computed over two time periods (1990-2005 and 2004- 2019) for each Puget Sound Chinook population. Trends were negative in the latter period for 16 of the 22 populations and for four of the 22 populations (SF Nooksack, SF Stillaguamish, Green and Puyallup) in the earlier period. Thus, there is a general decline in natural-origin spawner abundance across all MPGs in the recent fifteen years. Upper Sauk and Suiattle (Whidbey Basin MPG), Nisqually (Central/South MPG) and Mid-Hood Canal (Hood Canal MPG) are the only populations with positive trends, though Mid-Hood Canal has an extremely low population size. Further, no change in trend between the two time periods was detected in SF Nooksack (Strait of Georgia MPG), Green and Nisqually (Central/South MPG). The average trend across the ESU for the 1990-2005 15-year time period was 0.03. The average trend across the ESU for the later 15-year time period (2004-2019) was -0.02. The previous status review in 2015 (NWFSC 2015) concluded there were widespread negative trends for the total ESU despite that escapements and trends for individual populations were variable. The addition of the data to 2018 now also shows even more substantially either flat or negative trends for the entire ESU in natural-origin Chinook salmon spawner population abundances (Ford 2022).

Across the Puget Sound ESU, 10 of 22 Puget Sound populations show natural productivity below replacement in nearly all years since the mid-1980's. These include the North and South Forks Nooksack in the Strait of Georgia MPG, North and South Forks Stillaguamish and Skykomish in Whidbey Basin MPG, Sammamish, Green and Puyallup in the Central/South MPG, the Skokomish in the Hood Canal MPG, and Elwha in the Strait of Juan de Fuca MPG. Productivity in the Whidbey Basin MPG populations was above zero in the mid-late 1990's, with the exception of Skykomish and North and South Forks Stillaguamish populations. White River population in the Central/South MPG was above replacement from the early 1980's to 2001, but has dropped in productivity consistently since the late 1980's. In recent years, only 5 populations have had productivity estimates above zero. These are Lower Skagit, Upper Skagit, Lower Sauk, Upper Sauk, and Suiattle, all Skagit River populations in the Whidbey Basin MPG. This is consistent with, and continues the decline reported in the 2015 Status Review (NWFSC 2015).

All Puget Sound Chinook salmon populations continue to remain well below recovery levels (Ford 2022). Most populations also remain consistently below the spawner-recruit levels identified by the TRT as necessary for recovery. Across the ESU, most native-origin populations have slightly increased in abundance since the last status review in 2016, but have small negative trends over the past 15 years (Figure 4). Productivity remains low in most populations. Hatchery-origin spawners are present in high fractions in most populations outside the Skagit watershed, and in many watersheds the fraction of spawner abundances that are natural-origin have declined over time. Habitat protection, restoration and rebuilding programs in all watersheds have improved stream and estuary conditions despite record numbers of humans moving into the Puget Sound region in the past two decades. Bi-annual four-year work plans document the many completed habitat actions that were initially identified in the Puget Sound Chinook salmon recovery plan.  However, the expected benefits from restoration actions is likely to take years or decades to produce significant improvement in natural population viability parameters (see Roni et al. 2010).

NOAASkagitAR0051135

Development of a monitoring and adaptive management program was required by NMFS in the 2007 Supplement to the Shared Strategy Recovery Plan (NMFS 2006), and since the last review the Puget Sound Partnership has completed this, but this program is still not fully functional for providing an assessment of watershed habitat restoration/recovery programs, nor does it fully integrate the essentially discrete habitat, harvest and hatchery programs. A recent white paper produced by the Salmon Science Advisory Group, of the Puget Sound Partnership concludes there has been "a general inability of monitoring to link restoration, changes in habitat conditions, and fish response at large-scales" (PSP 2021). A number of watershed groups are in the process of updating their Recovery Plan Chapters and this includes prioritizing and updating recovery strategies and actions, as well as assessing prior accomplishments. Overall, recent information on PS Chinook salmon abundance and productivity since the 2016 status review indicates a slight increase in abundance but does not indicate a change in biological risk to the ESU despite moderate inter-annual variability among populations and a general decline in abundance over the last 15 years (Ford 2022).

NOAASkagitAR0051136



**Figure 4.** Trends in population productivity, estimated as the log of the smoothed natural-origin Chinook spawning abundance in year t – smoothed natural-origin spawning abundance in year (t – 4) (Ford 2022).

ER-169

NOAASkagitAR0051137

<u>Limiting Factors.</u> Limiting factors for this species include:

- Degraded floodplain and in-river channel structure
- Degraded estuarine conditions and loss of estuarine habitat
- Riparian area degradation and loss of in-river large woody debris
- Excessive fine-grained sediment in spawning gravel
- Degraded water quality and temperature
- Degraded nearshore conditions
- Impaired passage for migrating fish
- Altered flow regime

*PS Chinook Salmon Recovery*
Productive shoreline habitats of Puget Sound are necessary for the recovery of Puget Sound salmon (SSPS 2007). Nearshore areas serve as the nursery for juvenile PS Chinook salmon. Riparian vegetation, shade and insect production, and forage fish eggs along marine shorelines and river deltas help to provide food, cover and thermoregulation in shallow water habitats. Forage fish spawn in large aggregations along shorelines with suitable habitat, which produce prey for juvenile PS Chinook salmon. Juvenile salmon commonly occupy "pocket estuaries" where freshwater inputs provide salinity gradients that make adjusting to the marine environment less physiologically demanding. Pocket estuaries also provide refugia from predators. As the juvenile salmon grow and adjust, they move out to more exposed shorelines such as eelgrass, kelp beds and rocky shorelines where they continue to grow and migrate into the ocean environment.

The Puget Sound Recovery Plan (Volumes 1 and 2) includes specific recovery actions for each of the 22 extant populations of PS Chinook salmon. General protection and restoration actions summarized from the plan include:

- Counties should pass strong regulations and policies limiting shoreline armoring of these shorelines and offering incentives for protection;
- Aggressively protect areas, especially shallow water/low gradient habitats and pocket estuaries, within 5 miles of river deltas;
- Protect the forage fish spawning areas;
- Conduct limited beach nourishment on a periodic basis to mimic the natural sediment transport processes in select sections where corridor functions may be impaired by extensive armoring;
- Maintain the functioning of shallow, fine substrate features in and near 11 natal estuaries for Chinook salmon (to support rearing of fry);
- Maintain migratory corridors along the shores of Puget Sound;
- Maintain the production of food resources for salmon;
- Maintain functioning nearshore ecosystem processes (i.e., sediment delivery and transport; tidal circulation) that create and support the above habitat features and functions;
- Increase the function and capacity of nearshore and marine habitats to support key needs of salmon;
- Protect and restore shallow, low velocity, fine substrate habitats along marine shorelines, including eelgrass beds and pocket estuaries, especially adjacent to major river deltas;

ER-170

NOAASkagitAR0051138

- Protect and restore riparian areas;
- Protect and restore estuarine habitats of major river mouths;
- Protect and restore spawning areas and critical rearing and migration habitats for forage fish;

Development of shoreline and estuary areas of Puget Sound is expected to continue to adversely impact the quality of marine habitat for PS Chinook salmon. Projected changes in nearshore and estuary development based on documented rates of developed land cover change in Bartz et al. (2015) show that between 2008 and 2060, an additional 14.7 hectares of development of shoreline areas and 204 hectares of estuary development can be expected.

*Chinook Use of Estuaries*

Estuarine residence which allows growth, predator avoidance and smoltification is important to each of the six Skagit Chinook populations, and each function is facilitated by tidal dispersion. Numerous studies have characterized juvenile salmonid rearing within estuarine habitat, ranging from time of arrival and emigration, length of residence, dietary analysis and growth rates, and use of particular habitat types. Among all salmonid species, juvenile Chinook within estuaries is most obligate. Chinook, particularly ocean-type fish, take longer to adjust to increasing saline gradients, and rear and grow in estuaries greater relative to all other salmonid species (Thorpe 1994).

*Timing of Arrival and Growth*

Juvenile Chinook utilize estuarine habitats for foraging and physiological transition zones from fresh to saltwater environments. The timing and age class of Chinook emigration to estuarine habitats can be widely varied. Some Chinook juveniles, typically stream-type fish, will rear within freshwater habitat for several months to over a year, prior to emigration to estuaries. Ocean-type Chinook typically emigrate to the estuary within days or weeks after emergence as fry. The timing of emigration to estuarine habitats is likely a combination of genetically determined life-history expression, as well as environmentally determined factors, such as freshwater temperatures and discharge levels (Groot and Margolis 1991). Within the Skagit Basin, most juvenile Chinook salmon arrive from February through July (Beamer et al., 2000).

Within estuarine habitats juvenile Chinook salmon distribution is tidally dependent, residence time is widely varied, and differs among ocean and stream-type juveniles. Ocean-type fish reside in estuarine habitats for longer periods of time, typically arriving as early as February, with fish residing through July. Stream-type Chinook typically leave fresh water habitat the second spring post-emergence, and generally utilize estuarine habitats from days to weeks as they emigrate to the Puget Sound. Residence time and feeding within estuaries for stream-type Chinook is less obligate relative to ocean-type fish because they arrive at the estuary at larger sizes than ocean-type fish (Groot and Margolis 1991), and are able to exploit larger prey that are present in Puget Sound and the ocean. Conversely, ocean-type Chinook arrive within the estuary at smaller sizes, and rely on smaller food sources available within estuarine habitat prior to emigration to Puget Sound and the ocean.

NOAASkagitAR0051139

When high numbers of juvenile Chinook occupy estuaries, growth within these populations can be slowed and reduced (Reimers 1973; Beamer et al. 2005). Within the Nanaimo River estuary, recovery of marked fry suggested a maximum residence of around 60 days (Groot and Margolis 1991). Juvenile Chinook salmon in the Skagit Basin have been documented to reside in the estuary from an average of 28 to 51 days (Beamer and Larsen 2004). However, fry migrants do not migrate directly to the estuary and instead emigrate directly to distributary channels, and nearshore habitats of Skagit Bay (Beamer and Larsen 2004).

Juvenile Chinook utilize a wide variety of food sources, often varying on the size of the fish. Documented food sources include zooplankton, terrestrial and aquatic insects, and other fish (Groot and Margolis 1991). Larger smolts (typically yearlings) are able to feed upon larger prey, such as chum or pink salmon fry, or other juvenile fish typically found in estuaries such as herring and sticklebacks. Chinook fry less than 50 millimeters (mm) long have diets dominated by benthic detritivores, herbivorous zooplankton and terrestrial insects (Northcote et al. 1979). One study reported juvenile Chinook diets consisting of 40 percent insects, 40 percent benthic organisms, and 20 percent plankton, and larger fish were observed to exploit more diverse diets that also included juvenile fish (Healey 1982).

Estuarine habitats provide rich feeding areas for smaller fry, and observed growth has been documented to be relatively rapid. Studies have reported daily length increases ranging from 0.44 mm (Columbia River estuary) and 0.48 mm in the Sacramento River estuary, to 0.33 mm (Cowichan River estuary), among others (Groot and Margolis 1991). Seasonal variation of growth has been observed as well. Within the Sixes River (Oregon), Reimers (1973) reported that estuarine growth from late April to early June was relatively rapid, ranging from 48 mm to 79 mm (0.9 mm/day), compared to June to August, in which fish length increased by 6mm, or (0.07 mm/d). The rate of growth among juvenile Chinook in the Nanaimo River (Canada) estuary averaged 1.32 mm/day, while the average length data from the general population was 0.5 mm/day (Healey 1980). Juvenile Chinook within the Nitinat River estuary grew 0.62 mm/day (Fedorenko et al., 1979).

Juvenile Chinook in the tidal marshes of the Skagit estuary were documented to be four to seven mm larger than their river cohorts, except during periods of high immigration, likely due to greater growth within the estuary (Congleton et al. 1981). Habitat within the Skagit River estuary, and other Puget Sound estuaries, has been differentiated by salinity and vegetation characteristics (Hayman et al. 1996; Haas and Collins 2001). Within the Skagit River estuary, growth within the estuarine emergent marsh (estuarine emergent marsh) habitat averaged 1.68 mm/day, which was over 3 times measured growth in emergent forested transition (ERT) zones, and forested riverine tidal (FRT) zones, which are upstream from estuarine emergent marsh habitat (SRSC and USGS 1999).

 Within the Nanaimo River, reduced food intake and growth has been observed during periods of peak abundance of juveniles in the estuary (Groot and Margolis 1991). Stomach contents of fry averaged 2-5 percent of body weight, except during the period of peak fry abundance, when it was reduced to 0.5 percent of body weight (Groot and Margolis 1991). Similarly, average length of juveniles decreases with increased abundance of Chinook juveniles in the Skagit estuary (Beamer et. al. 2003).

ER-172

NOAASkagitAR0051140

*Predation Avoidance*

Chinook residence in estuaries is thought to provide a measure of protection from predators, such as birds, fish, otters and seals (Simenstad et al. 1982; Macdonald and Levings 1988; Thorpe 1994), though there are few comprehensive studies that analyze this. McCabe et al. (1986) documented very little predation on salmonids from other fish that reside in the Columbia River estuary. Non-salmonids that reside in estuaries are generally smaller than those in the intertidal region of the adjacent marine habitat (McCabe et al. 1986). Estuarine turbidity could be a mechanism that protects juvenile Chinook salmon from predation (Quinn 2005). The Skagit River has several large glaciers that seasonally cause turbid river and estuarine conditions. Tides and wave action can also suspend sediment, all of which may make juvenile Chinook salmon more difficult locate by predators. Perhaps most importantly, estuaries enable growth of juveniles, which are then less vulnerable from predation when they enter the sea.

*Smoltification*

Smoltification is an energetically demanding and complex change of morphology, physiology, and behavior designed to prepare juvenile salmonids for the vastly different environmental conditions in seawater (Quinn 2005). During this process, fish appearance changes as vertical parr marks fade to blue-green and silver sides, and their bellies turn white. These colors reduce vulnerability to predation in open water because fish are less apparent to predators from the side, above and below (Quinn 2005). The body also becomes more streamlined, and teeth further mature on the gums and tongue that allow fish to catch larger, faster, and a more diverse array of prey (Quinn 2005). Physiological changes include altered osmoregulation (salt balance) system, energy storage and kidney function and ion regulation though the gills. Behavioral changes include altered schooling, predator avoidance and feeding.

*Tidal Distribution*

Growth, predation avoidance and smoltification are enabled, in part, through tidal dispersion. Levy and Northcote (1981) investigated the relationship between occurrence and abundance of Chinook in estuarine habitats based on the physical characteristics of the habitat. Their findings established that juvenile Chinook prefer tidal channels with low banks and subtidal refugia, such as aquatic vegetation, and complex woody materials. Juvenile Chinook in estuaries often distribute with high tides, occupying temporarily inundated mudflats and marshes, and as tides recede, retreat into defined tidal channels that retain water at low tides (Groot and Margolis 1991). Juvenile Chinook are among the last fish to vacate tidal channels in the marsh when the channels dried up at low tide (Levy and Northcote 1981, 1982). Fish often concentrate in tidal channels at low tide, and move to the landward margin of the intertidal area on incoming and high tides (Healey 1980). During high tides, Chinook have been observed to vacate deeper intertidal habitat and preferred temporarily inundated habitat (Healey 1980). This distribution with the tidal cycle is likely a combination of passive movement with the current, and active selection of preferred habitat. Tide-dependent distribution facilitates dispersion into habitats that, by definition, are only available for portions of the day. Tidal dispersion is vital for juvenile Chinook because:

NOAASkagitAR0051141

1. it provides access within small channels that provides cover from predators in the form of structural complexity from emergent vegetation, and general benthic structure (Miller and Simenstad 1997; McMahon and Holtby 1992);
2. it provides access to a greater volume of habitat for feeding opportunities, and simultaneously reduces juvenile Chinook density, and thus cohort competition for food. (Miller and Simenstad 1997; Neilson et al., 1985), and;
3. it provides access to habitats with slower current velocities relative to larger channels. Slower current velocities reduce energy expenditure used to maintain preferred water prism position, thus facilitating greater ability to pursue food. Stomach contents of salmon fry within the Skagit estuary peaked 3 to 4 hours after high tide, and minimum weights occurred late in the slack (ebb) water period (Congleton 1978). Juvenile salmon have been documented to have higher feeding rates at lower water velocities (Bailey et al., 1975).

*Skagit Estuarine Habitat Related to VSP Parameters*

Estuarine and Skagit Bay habitat provide vital functions that support Skagit Chinook abundance (both in terms of habitat capacity to juveniles and influencing the amount of adult returns), productivity, diversity (expressed here in terms of timing of arrival and duration of habitat use), and spatial structure.

*Estuarine Abundance.* Within the past decade, outmigrant abundance (juveniles that emerge from redds and travel downstream) has ranged from approximately 0.5 million to 6.5 million fish (Seiler et al., 2004). Vast habitat loss within the Skagit estuary constrains the amount of juvenile Chinook that can successfully reside and grow there. Within an average outmigrant class of 5.1 million juvenile Chinook, there is only enough rearing habitat in the estuary to host approximately 2,249,581 fish (44 percent) at optimum growth levels (Beamer et al., 2005). Estuarine abundance is minimally influenced by hatchery Chinook releases[9]. The amount of time juvenile Chinook remain in estuarine habitat is inversely proportional to their likelihood of successfully returning as adult fish (Reimers 1973; Levings et al. 1989). Depending upon the outmigrant class size, average juvenile Chinook densities per acre of estuarine habitat ranges from 808 to 5,668 fish per acre during the outmigrant season (Beamer et al. 2005). The quantification of this density is important because fish that have the opportunity to rear in the estuary are larger (Beamer et al. 2005), and in turn have a demonstrated survival advantage over those fish that emigrate directly to Skagit Bay.

*Estuarine Productivity.* Productivity within the Skagit estuary has been reduced from habitat loss and degradation, and as a result juvenile growth is reduced in most years. Habitat in the Skagit estuary is delineated, from upstream to the Skagit Bay, into forested riverine tidal, estuarine forested transition, and estuarine emergent marsh. These delineations represent differing vegetative communities and saline gradients. Measurements of juvenile Chinook growth within these habitats reveals that estuarine emergent marsh is the most productive habitat within the estuary, the average growth rate for juvenile Chinook is estuarine emergent marsh was 1.68 millimeters per day (mm/d), compared to 0.53 (mm/d) within forested riverine tidal and

---

[9] As an example, the 2003 Skagit River Chinook outmigrant class was 5.5 million fish, and 197,000 were also estimated to be hatchery releases, roughly equating to 3.6 percent of the outmigrant class size.

ER-174

NOAASkagitAR0051142

estuarine forested transition habitat (Beamer et al. 2005). Estuarine productivity is related to the amount of time juveniles spend within the estuary, the type of habitat they reside in within the estuary, and the numbers of individuals occupying its habitat, among other environmental factors such as abundance of food sources.

*Estuarine Diversity.*  Habitat loss and degradation within the Skagit estuary likely constrains the diversity of the six Skagit Chinook populations. Within the Skagit River, several different life history subtypes have been identified to describe the variability in utilization patterns of riverine and estuarine habitats by young of the year juvenile Chinook salmon (Beamer and Larson 2004). These rearing subtypes, termed yearlings, tidal delta migrants, parr migrants, and fry migrants have been designated as a result of Skagit River Chinook otolith[10] collection and analysis (Beamer et al. 2005):

Yearling fish rear within freshwater for at least one year, and migrate to Skagit Bay from late March through May at an average size of 120 mm. Yearling fish do not reside in the Skagit estuary for extended periods, and move to deeper water habitats in Skagit Bay, and are rarely found in nearshore habitat.

Parr migrants grow in freshwater habitat to similar sizes as Tidal delta fish, within approximately two months. These fish migrate to Skagit Bay at an average size of 75 mm, and do not reside in tidal delta habitats for measurable periods.

Tidal delta migrants emerge and emigrate downstream concurrently with fry migrants, but reside in the estuary from several weeks to several months (average of 34.2 days in 1995 and 1996), reaching an average length of 74 mm before moving to Skagit Bay in May through June.

Fry migrants are fish that rapidly emigrate down the river after emergence. These fish do not rear for measurable periods within the estuary, and are typically the first juveniles to enter Skagit Bay (from February through March), with an average fork length of 39 mm. Chinook fry migrants are less fit to survive within saltwater relative to the other life-history types. Because of their rapid entry to higher saline environments, it is likely that fry migrants are unable to properly initiate or complete the important process of smoltification.  It is very likely that most fry migrants would be tidal delta migrants, but the Skagit estuary is not large enough to accommodate all juveniles within most years.

All six Skagit Chinook populations have yearlings, parr migrants, tidal delta migrants, and fry migrant life history (Figure 5). Though this is a small data set, it is noteworthy that all populations appear to have relatively similar proportions of fry migrant juveniles, which are less fit (mostly because of their small size) to survive in Skagit Bay, Puget Sound and the Ocean. This diversity, spread out among the populations, enables these stocks to be more resilient to naturally changing habitat conditions. As an example, Yearlings would not be subjected to poor ocean conditions during their year of freshwater residency. Conversely, tidal delta users minimize their risk from poor freshwater conditions because they rely much more on estuarine

---

[10] Otoliths are calcareous particles found in the inner ear of vertebrates. Chinook movement and growth can be generally tracked, on a daily basis, upon removal and investigation of the otolith.

ER-175

NOAASkagitAR0051143

habitat prior to emigration to the ocean. They are also able to capitalize upon favorable ocean conditions sooner than Yearling fish.



**Figure 5.** Proportion of Rearing Life History Types for Each Skagit Chinook Population. (Beamer et al. 2005).

*Estuarine and Skagit Bay Spatial Structure.* Within the Skagit estuary and Bay, juvenile Chinook habitat usage is largely dependent upon landscape and local (or site level) habitat connectivity. Landscape connectivity within the estuary, and in turn juvenile Chinook usage, is influenced by a number of natural and human induced habitat pathways and blockages. For instance, juvenile Chinook densities within the Swinomish Channel and Padilla Bay (located to the North of the Skagit estuary) are generally much lower than other portions of the estuary and bay. These low densities are very likely influenced by reduced connectivity caused by the Swinomish Channel Jetty, which directs river flow, and in turn juvenile Chinook, away from the channel and reduces northward migration opportunity (Yates 2001). Conversely, juvenile Chinook densities within the Skagit estuary itself is the highest, averaging 4,534 fish per hectare of blind channels[11] with high connectivity habitat over the outmigrant season (Beamer et al. 2005). Chinook densities with the Skagit estuary is also dependent upon local habitat characteristics; estuarine habitat use is influenced by current velocities, depths, and amount of edge habitat (Beamer et al. 2005); juvenile Chinook densities are the greatest in deep low velocity blind channels compared to other estuarine habitat.

---

[11] 'Blind Channels' are waterways that are formed by, and drain, tidally introduced water rather than runoff from associated wetlands and upland sources (Simenstad 1983).

NOAASkagitAR0051144

**Status of Puget Sound Steelhead**

The PS steelhead DPS was listed as a threatened species under the ESA on May 11, 2007 (72 FR 26722) (Table 3). Subsequent status assessments of the DPS after the ESA-listing decision have found that the status of PS steelhead regarding risk of extinction has not changed substantially (Ford et al. 2011; NMFS 2017) (81 FR 33468, May 26, 2016) (Ford 2022). As mentioned above in the PS Chinook status review section, on October 4, 2019 NMFS published a Federal Register notice (84 FR 53117), announcing NMFS' intent to initiate a new 5-year status review for 28 listed species of Pacific salmon and steelhead and requesting updated information from the public to inform the most recent five-year status review. On March 24, 2020, NMFS extended the public comment period, from the original March 27, 2020, through May 26, 2020 (85 FR 16619).

As with Chinook salmon status information (above), the Northwest Fishery Science Center (NWFSC) completed the Viability Risk Assessment for steelhead (Ford 2022). NMFS' West coast Regional Office (WCRO) is currently preparing the final 5-year status review documents, with anticipated completion in 2024. In this section, where possible, particularly as new material becomes available, the latest final (2017) status review information is supplemented with more recent information and other population specific data that may not have been available during the 2017 status review, including some of the information in the draft 2024 status review, so that NMFS is assured of using the best available information for this opinion.

At the time of listing the Puget Sound steelhead Biological Review Team (BRT) considered the major risk factors associated with spatial structure and diversity of PS steelhead to be: (1) the low abundance of several summer run populations; (2) the sharply diminishing abundance of some winter steelhead populations, especially in south Puget Sound, Hood Canal, and the Strait of Juan de Fuca; and (3) continued releases of out-of-ESU hatchery fish from Skamania-derived summer run and Chambers Creek-derived winter run stocks (Hard et al. 2007; Hard et al. 2015). Loss of diversity and spatial structure were judged to be "moderate" risk factors (Hard et al. 2007). In 2011 the BRT identified degradation and fragmentation of freshwater habitat, with consequential effects on connectivity, as the primary limiting factors and threats facing the PS steelhead DPS (Ford et al. 2011). The BRT also determined that most of the steelhead populations within the DPS continued to show downward trends in estimated abundance, with a few sharp declines (Ford et al. 2011). The 2015 status review concurred that harvest and hatchery production of steelhead in Puget Sound were at low levels and not likely to increase substantially in the foreseeable future, thus these risks have been reduced since the time of listing (NWFSC 2015). However, unfavorable environmental trends previously identified (Ford et al. 2011) were expected to continue (Hard et al. 2015).

*Spatial Structure and Diversity.*
The PS steelhead DPS includes all naturally spawned anadromous *O. mykiss* (steelhead) populations originating below natural and manmade impassable barriers from rivers flowing into Puget Sound from the Elwha River (inclusive) eastward, including rivers in Hood Canal, South Sound, North Sound and the Strait of Georgia. Non-anadromous ''resident'' *O. mykiss* occur within the range of PS steelhead but are not part of the DPS due to marked differences in physical, physiological, ecological, and behavioral characteristics (Hard et al. 2007). In October

NOAASkagitAR0051145

of 2016, NMFS proposed revisions to the hatchery programs included as part of Pacific salmon ESUs and steelhead DPSs listed under the ESA (81 FR 72759). NMFS issued its final rule in December of 2020 (85 FR 81822). This final rule includes steelhead from five artificial propagation programs in the PS steelhead DPS: the Green River Natural Program; White River Winter Steelhead Supplementation Program; Hood Canal Steelhead Supplementation Program; the Lower Elwha Fish Hatchery Wild Steelhead Recovery Program; and the Fish Restoration Facility Program. (85 FR 81822, December 17, 2020).

In 2013, the Puget Sound Steelhead Technical Review Team (PSSTRT) completed its evaluation of factors that influence the diversity and spatial structure VSP criteria for steelhead in the DPS. For spatial structure, this included the fraction of available intrinsic potential rearing and spawning habitat that is occupied compared to what is needed for viability[12]. For diversity, these factors included hatchery fish production, contribution of resident fish to anadromous fish production, and run timing of adult steelhead. Quantitative information on spatial structure and connectivity was not available for most PS steelhead populations, so a Bayesian Network framework was used to assess the influence of these factors on steelhead viability at the population, MPG, and DPS scales (Hard et al. 2015). The PSSTRT concluded that low population viability was widespread throughout the DPS and populations showed evidence of diminished spatial structure and diversity. Specifically, population viability associated with spatial structure and diversity was highest in the Northern Cascades MPG and lowest in the Central and South Puget Sound MPG (PSSTRT 2013). Diversity was generally higher for populations within the Northern Cascades MPG, where more variability in viability was expressed and diversity generally higher, compared to populations in both the Central and South Puget Sound and Hood Canal and Strait of Juan de Fuca MPG, where diversity was depressed and viabilities were generally lower (NWFSC 2015). Most PS steelhead populations were given intermediate scores for spatial structure and low scores for diversity because of extensive hatchery influence, low breeding population sizes, and freshwater habitat fragmentation or loss (NWFSC 2015). The PSSTRT concluded that the Puget Sound DPS was at very low viability, considering the status of all three of its constituent MPGs, and many of its 32 DIPs (Hard et al. 2015). For spatial structure there were a number of events that occurred in Puget Sound during the last review period (2015-2019) that are anticipated to improve status populations within several of the MPGs within the DPS (Ford 2022).

Since the PSSTRT completed its 2013 review, the only additional spatial structure and diversity data that have become available have been estimates of the fraction of hatchery fish on the spawning grounds (NWFSC 2015, Ford 2022). Since publication of the NWFSC report in 2015, and drafting of the NWFSC biological viability risk assessment (Ford 2022), reductions in hatchery programs founded from non-listed and out of DPS stocks (i.e., Skamania) have occurred. In addition, the fraction of out of DPS hatchery steelhead spawning naturally are low for many rivers (NWFSC 2015). The fraction of natural-origin steelhead spawners was 0.9 or greater for the 2005-2009 and 2010-2014 time periods for all populations where data was available, but the Snoqualmie and Stillaguamish rivers (NMFS 2016a). For 17 of 22 DIPs across the DPS, the five-year average for the fraction of natural-origin steelhead spawners exceeded 0.75 from 2005 to 2009; this average was near 1.0 for 8 populations, where data were available,

---

[12] Where intrinsic potential is the area of habitat suitable for steelhead rearing and spawning, at least under historical conditions (PSSTRT 2013).

NOAASkagitAR0051146

from 2010 to 2014 (NWFSC 2015). However, the fraction of natural-origin steelhead spawners could not be estimated for a substantial number of DIPs during the 2010 to 2014 period, or for the most recent 2015 – 2019 timeframe (NWFSC 2015; Ford 2022). In some river systems, such as the Green River, Snohomish/Skykomish Rivers, and the Stillaguamish rivers these estimates were higher than some guidelines recommend (e.g., no more than 5 percent hatchery-origin spawners on spawning grounds for isolated hatchery programs (HSRG 2009) over the 2005-2009 and 2010-2014 timeframes. The NWFSC biological viability risk assessment (Ford 2022) states that a third of the 32 PS steelhead populations continue to lack monitoring and abundance data, and in most cases, it is likely that abundances are very low.

Early winter-run fish produced in isolated hatchery programs are derived from Chambers Creek stock in southern Puget Sound, which has been selected for early spawn timing, a trait known to be inheritable in salmonids.[13] Summer-run fish produced in isolated hatchery programs were historically derived from the Skamania River summer stock in the lower Columbia River Basin (i.e., from outside the DPS). The production and release of hatchery fish of both run types (winter and summer) may continue to pose risk to diversity in natural-origin steelhead in the DPS, as described in Hard et al. (2007) and Hard et al. (2015). However, the NWFSC biological viability risk assessment (Ford 2022) states that risks to natural-origin PS steelhead that may be attributable to hatchery-related effects has decreased since the 2015 status review due to reductions in production of non-listed stocks, and the replacement with localized stocks. The three summer steelhead programs continuing to propagate Skamania derived stocks from outside of Puget Sound should be phased out completely by 2031 (NMFS 2019; Ford 2022).

*Abundance and Productivity.*
The viability of the PS steelhead DPS has improved somewhat since the PSSTRT concluded that the DPS was at very low viability, as were all three of its constituent MPGs, and many of its 32 DIPs (Hard et al. 2015). Increases in spawner abundance have been observed in a number of populations over the last five years; however, these improvements were disproportionately found within the South and Central Puget Sound and Strait of Juan de Fuca and Hood Canal MPGs, and primarily among smaller populations. The recent positive trends among winter-run populations in the White, Nisqually, and Skokomish rivers improve the demographic risks facing those populations. The abundance, productivity, spatial structure, and diversity of Elwha River steelhead winter and summer-runs has dramatically improved following the removal of the Elwha River dams. Improvements in abundance have not been as widely observed in the Northern Puget Sound MPG. The declines of summer and winter-run populations in the Snohomish Basin are especially concerning. These populations figure prominently as sources of abundance for the MPG and DPS (NMFS 2019). Additionally, the decline in the Tolt River summer-run steelhead population was especially alarming given that it is the only summer-run population for which we have long-term abundance estimates. The demographic and diversity risks to the Tolt River summer-run DIP are very high. In fact, all summer-run steelhead populations in the North Cascades MPG are likely at a very high demographic risk. In spite of improvements in some areas (i.e., Elwha River population following dam removal), most populations are still at relatively low abundance levels, with about a third of the DIPs unmonitored and presumably at very low levels (Table 5) (Ford 2022).

---

[13] The native Chambers Creek steelhead population is now extinct.

NOAASkagitAR0051147

The PSSTRT was reconvened by NOAA Fisheries and convened in March 2014 to develop a Recovery Plan for the PS steelhead DPS. This Recovery Plan was finalized in December 2019 (NMFS 2019). Recovery targets were calculated using a two-tiered approach adjusting for years of low and high productivity. Abundance information is unavailable for approximately one-third of the DIPs, disproportionately so for summer-run populations. In most cases where no information is available it is assumed that abundances are very low. Some population abundance estimates are only representative of part of the population (index reaches, etc.). Where recent five-year abundance information is available, 30 percent (6 of 20 populations) are less than 10 percent of their high productivity recovery targets (lower abundance target), 65 percent (13 of 20) are between 10 and 50 percent, and 5 percent (1 of 20) are greater than 50 percent of their low abundance targets (Table 5). A key element to achieving recovery is recovering a representative number of both winter- and summer-run steelhead populations, and the restoration of viable summer-run DIPs is a long-term endeavor (NMFS 2019). Fortunately, the relatively rapid reestablishment of summer-run steelhead in the Elwha River does provide a model for potentially re-anadromizing summer-run steelhead sequestered behind impassable dams.

**Table 5.** Recent (2015-2019) 5-year geometric mean of raw wild spawner counts for Puget Sound steelhead populations and population groups compared with Puget Sound Steelhead Recovery Plan high and low productivity recovery targets (NMFS 2019). (SR) – Summer-run. Abundance is compared to the high productivity individual DIP targets. Colors indicate the relative proportion of the recovery target currently obtained: red (<10 percent), orange (10 percent>x<50 percent), yellow (50 percent>x<100 percent), green (>100 percent). "*" denotes an interim recovery target.

| Major Population Group | Demographically Independent Population | Recent Abundance (2015-2019) | Recovery Target | |
|---|---|---|---|---|
| | | | High Productivity | Low Productivity |
| Northern Cascades | Drayton Harbor Tributaries | N/A | 1,100 | 3,700 |
| | Nooksack River | 1,906 | 6,500 | 21,700 |
| | South Fork Nooksack River (SR) | N/A | 400 | 1,300 |
| | Samish River & Independent Tributaries | 1,305 | 1,800 | 6,100 |
| | Skagit River | 7,181 | 15,000 * | |
| | Sauk River | N/A | | |
| | Nookachamps River | N/A | | |
| | Baker River | N/A | | |
| | Stillaguamish River | 487 | 7,000 | 23,400 |

ER-180

NOAASkagitAR0051148

| Major Population Group | Demographically Independent Population | Recent Abundance (2015-2019) | Recovery Target | |
|---|---|---|---|---|
| | | | High Productivity | Low Productivity |
| | Canyon Creek (SR) | N/A | 100 | 400 |
| | Deer Creek (SR) | N/A | 700 | 2,300 |
| | Snohomish/Skykomish River | 690 | 6,100 | 20,600 |
| | Pilchuck River | 638 | 2,500 | 8,200 |
| | Snoqualmie River | 500 | 3,400 | 11,400 |
| | Tolt River (SR) | 40 | 300 | 1,200 |
| | North Fork Skykomish River (SR) | N/A | 200 | 500 |
| Central and South Sound | Cedar River | N/A | 1,200 | 4,000 |
| | North Lake Washington Tributaries | N/A | 4,800 | 16,000 |
| | Green River | 1,282 | 5,600 | 18,700 |
| | Puyallup/Carbon River | 136 | 4,500 | 15,100 |
| | White River | 130 | 3,600 | 12,000 |
| | Nisqually River | 1,368 | 6,100 | 20,500 |
| | East Kitsap Tributaries | N/A | 2,600 | 8,700 |
| | South Sound Tributaries | N/A | 6,300 | 21,200 |
| Strait of Juan de Fuca | Elwha River | 1,241 | 2,619 | |
| | Dungeness River | 408 | 1,200 | 4,100 |
| | Strait of Juan de Fuca Independent Tributaries | 95 | 1,000 | 3,300 |
| | Sequim and Discovery Bay Tributaries | N/A | 500 | 1,700 |
| | Skokomish River | 958 | 2,200 | 7,300 |
| | West Hood Canal Tributaries | 150 | 2,500 | 8,400 |

NOAASkagitAR0051149

| Major Population Group | Demographically Independent Population | Recent Abundance (2015-2019) | Recovery Target | |
|---|---|---|---|---|
| | | | High Productivity | Low Productivity |
| | East Hood Canal Tributaries | 93 | 1,800 | 6,200 |
| | South Hook Canal Tributaries | 91 | 2,100 | 7,100 |

There are a number of planned, ongoing, and completed actions that will likely benefit steelhead populations in the near term, but have not yet influenced adult abundance. Among these, the removal of the diversion dam on the Middle Fork Nooksack River, the Pilchuck Dam removal, passage improvements at Mud Mountain Dam, the ongoing passage program in the North Fork Skokomish River, and the planned passage program at Howard Hanson Dam. Additionally, fish passage above three dams on the Skagit River are currently under consideration (Seattle City Light 2023). Dam removal in the Elwha River, and the resurgence of the endemic winter and summer-run steelhead populations have underscored the benefits of restoring fish passage. The Elwha River scenario is somewhat unique in that upstream habitat is in pristine condition and smolts emigrate into the Strait of Juan de Fuca and not Puget Sound or Hood Canal.

Improvements in spatial structure can only be effective if done in concert with necessary improvements in habitat. Habitat restoration efforts are ongoing, but land development and habitat degradation concurrent with increasing human population in the Puget Sound corridor results in a continuing net loss of habitat. Recovery efforts in conjunction with improved ocean and climatic conditions have resulted in improved viability status for the majority of populations in this DPS; however, absolute abundances are still low, especially summer-run populations, and the DPS remains at high to moderate risk of extinction. However, since 2015, fifteen of the 21 populations indicate small to substantive increases in abundance, although most steelhead populations remain small. From 2015 to 2019, nine of the 21 steelhead populations had fewer than 250 natural spawners annually, and 12 of the 21 steelhead populations had 500 or fewer natural-origin spawners (Table 6).

NOAASkagitAR0051150

**Table 6.** Five-year geometric mean of raw natural spawner counts for PS steelhead. In parentheses, the 5-year geometric mean of raw total spawner counts is shown. Percent change between the most recent two 5-year periods is shown on the far-right column (Ford 2022).

| Biogeographic Region | Population | 2010-2014 | 2015-2019 | Population trend (% Change) |
|---|---|---|---|---|
| **North Cascades** | Samish R. / Bellingham Bay Tribs. (W) | 748 | 1305 | Positive (74) |
| | Nooksack R. (W) | 1745 | 1906 | Positive (9) |
| | Skagit R. (S and W) | 6391 | 7181 | Positive (12) |
| | Stillaguamish R. (W) | 386 | 487 | Positive (26) |
| | Snohomish/ Skykomish R. (W) | 975 | 690 | Negative (-29) |
| | Pilchuck R. (W) | 626 | 638 | Positive (2) |
| | Snoqualmie R. (W) | 706 | 500 | Negative (-29) |
| | Tolt R. (S) | 108 | 40 | Negative (-63) |
| **Central/South Puget Sound Basin** | N. Lake WA Tribs. (W) | - | - | - |
| | Cedar R. (W) | 4 | 6 | Positive (50) |
| | Green R. (W) | 662 | 1289 | Positive (95) |
| | White R. (W) | 514 | 451 | Negative (-12) |
| | Puyallup R. (W) | 85 | 201 | Positive (136) |
| | Carbon R. (W) | (290) | (735) | Positive (153) |
| | Nisqually R. (W) | 477 | 1368 | Positive (187) |
| **Hood Canal/Strait of Juan de Fuca** | S. Hood Canal (W) | 69 | 91 | Positive (32) |
| | Eastside Hood Canal Tribs (W) | 60 | 93 | Positive (55) |
| | Skokomish R. (W) | 533 | 958 | Positive (80) |
| | Westside Hood Canal Tribs (W) | 138 | 150 | Positive (9) |

NOAASkagitAR0051151

| Biogeographic Region | Population | 2010-2014 | 2015-2019 | Population trend (% Change) |
|---|---|---|---|---|
| | Dungeness R. (S and W) | 517 | 448 | **Negative (-13)** |
| | Strait of Juan de Fuca Independents (W) | 151 | 95 | **Negative (-37)** |
| | Elwha R. (W) | 680 | 1241 | **Positive (82)** |

<u>Limiting Factors.</u> In our 2013 proposed rule designating critical habitat for this species (78 FR 2725), we noted that the following factors for decline for PS steelhead persist as limiting factors:

- The continued destruction and modification of steelhead habitat.
- Widespread declines in adult abundance (total run size), despite significant reductions in harvest in recent years.
- Threats to diversity posed by use of progeny from two hatchery steelhead stocks (Chambers Creek and Skamania).
- Declining diversity in the DPS, including the uncertain but weak status of summer run fish.
- A reduction in spatial structure.
- Reduced habitat quality through changes in river hydrology, temperature profile, downstream gravel recruitment, and reduced movement of large woody debris.
- In the lower reaches of many rivers and their tributaries in Puget Sound where urban development has occurred, increased flood frequency and peak flows during storms and reduced groundwater-driven summer flows, with resultant gravel scour, bank erosion, and sediment deposition.
- Dikes, hardening of banks with riprap, and channelization, which have reduced river braiding and sinuosity, increasing the likelihood of gravel scour and dislocation of rearing juveniles.

*PS Steelhead Recovery.*
The PS steelhead recovery plan provides guidance to recover the species to the point that it can be naturally self-sustaining over the long term. To achieve full recovery, steelhead populations in Puget Sound need to be robust enough to withstand natural environmental variation and some catastrophic events, and they should be resilient enough to support harvest and habitat loss due to human population growth. The Plan aims to improve steelhead viability by addressing the pressures that contribute to the current condition: habitat loss/degradation, water withdrawals, declining water quality, fish passage barriers, dam operations, harvest, hatcheries, climate change effects, and reduced early marine survival. NMFS is using the recovery plan to organize and coordinate recovery of the species in partnership with state, local, tribal, and federal resource managers, and the many watershed restoration partners in the Puget Sound. Consultations, including this one, will incorporate information from the Plan (NMFS 2019).

ER-184

NOAASkagitAR0051152

Juvenile PS steelhead are less dependent on nearshore habitats for early marine rearing than Chinook or Chum Salmon; nevertheless, nearshore, estuarine, and shoreline habitats provide important features necessary for the recovery of steelhead. PS steelhead spend only a few days to a few weeks migrating through the large fjord, but mortality rates during this life stage are critically high (Moore et al. 2010; Moore and Berejikian 2017). Early marine mortality of PS steelhead is recognized as a primary limitation to the species' survival and recovery (NMFS 2019). Factors in the marine environment influencing steelhead survival include predation, access to prey (primarily forage fish), contaminants (toxics), disease and parasites, migration obstructions (e.g., the Hood Canal bridge), and degraded habitat conditions which exacerbate these factors (NMFS 2019).

The PS steelhead recovery plan identifies ten ecological concerns that directly impact salmon and steelhead:

- Habitat quantity (anthropogenic barriers, natural barriers, competition);
- Injury and mortality (predation, pathogens, mechanical injury, contaminated food);
- Food (altered primary productivity, food-competition, altered prey species composition and diversity);
- Riparian condition (riparian condition, large wood recruitment);
- Peripheral and transitional habitats (side channel and wetland condition, estuary conditions, nearshore conditions);
- Channel structure and form (bed and channel form, instream structural complexity);
- Sediment conditions (decreased sediment quantity, increased sediment quantity);
- Water quality (temperature, oxygen, gas saturation, turbidity, pH, salinity, toxic contaminants);
- Water quantity (increased water quality, decreased water quality, altered flow timing); and
- Population-level effects (reduced genetic adaptiveness, small population effects, demographic changes, life history changes).

The Puget Sound steelhead recovery plan and its associated appendix 3 includes specific recovery actions for the marine environment. General protection and restoration actions summarized from the plan include:

- Continue to improve the assessments of harbor seal predation rates on juvenile steelhead;
- Remove docks and floats which act as artificial haul-out sites for seals and sea lions;
- Consistent with the MMPA, test acoustic deterrents and other hazing techniques to reduce steelhead predation from harbor seals;
- Develop non-lethal actions for "problem animals and locations" to deter predation;
- Increase forage fish habitat to increase abundance of steelhead prey;
- Remove bulkheads and other shoreline armoring to increase forage fish;
- Acquire important forage fish habitat to protect high forage fish production areas;
- Add beach wrack to increase forage fish egg survival;
- Protect and restore aquatic vegetation (e.g., eelgrass and kelp);
- Remove creosote pilings to reduce mortality of herring eggs;
- Increase the assessment of migratory blockages, especially the Hood Canal bridge, where

ER-185

NOAASkagitAR0051153

differential mortality has been documented;
- Identify and remedy sources of watershed chemical contaminants (e.g., PBDEs and PCBs).

In the recovery plan, NMFS and the PSSTRT modified the 2013 and 2015 PSSTRT viability criteria to produce the viability criteria for PS steelhead, as described below:

- All three MPGs (North Cascade, Central-South Puget Sound, and Hood Canal-Strait of Juan de Fuca) must be viable (Hard et al. 2015). The three MPGs differ substantially in key biological and habitat characteristics that contribute in distinct ways to the overall viability, diversity, and spatial structure of the DPS.
- There must be sufficient data available for NMFS to determine that each MPG is viable.

The recovery plan also established MPG-level viability criteria. The following are specific criteria are required for MPG viability:

- At least 50 percent of steelhead populations in the MPG achieve viability.
- Natural production of steelhead from tributaries to Puget Sound that are not identified in any of the 32 identified populations provides sufficient ecological diversity and productivity to support DPS-wide recovery.
- In addition to the minimum number of viable DIPs (50 percent) required above, all DIPs in the MPG must achieve an average MPG-level viability that is equivalent to or greater than the geometric mean (averaged over all the DIPs in the MPG) viability score of at least 2.2 using the 1–3 scale for individual DIPs described under the DIP viability discussion in the PSSTRT Viability Criteria document (Hard et al. 2015). This criterion is intended to ensure that MPG viability is not measured (and achieved) solely by the strongest DIPs, but also by other populations that are sufficiently healthy to achieve MPG-wide resilience. The Plan allows for an alternative evaluation method to that in Hard et al. (2015) may be developed and used to assess MPG viability.
- The plan also identified specific DIPs in each of the three MPGs which must attain viability NMFS 2019).

The Plan (NMFS 2019) also identified specific DIPs in each of the three MPGs which must attain viability. These DIPs, by MPG, are described as follows:

For the **North Cascades MPG**, eight of the sixteen DIPs in the North Cascades MPG must be viable. The eight (five winter-run and three summer-run) DIPs described below must be viable to meet this criterion:

- Of the eleven DIPs with winter or winter/summer runs, five must be viable:
- Nooksack River Winter-Run;
- Stillaguamish River Winter-Run;
- One from the Skagit River (either the Skagit River Summer-Run and Winter-Run or the Sauk River Summer-Run and Winter-Run);
- One from the Snohomish River watershed (Pilchuck, Snoqualmie, or Snohomish/Skykomish River Winter-Run); and
- One other winter or summer/winter run from the MPG at large.

ER-186

NOAASkagitAR0051154

The rationale for this is that there are four major watersheds in this MPG, and one viable population from each will help attain geographic spread and habitat diversity within core extant steelhead habitat (NMFS 2019). Of the five summer-run DIPs in this MPG, three must be viable, representing each of the three major watersheds containing summer-run populations (Nooksack, Stillaguamish, Snohomish rivers). Therefore, the priority summer-run populations are as follows:

- South Fork Nooksack River Summer-Run;
- One DIP from the Stillaguamish River (Deer Creek Summer-Run or Canyon Creek Summer-Run); and
- One DIP from the Snohomish River (Tolt River Summer-Run or North Fork Skykomish River Summer-Run).

As described, these priority populations in the North Cascades MPG include specific, winter or winter/summer-run populations from the Nooksack, Stillaguamish, Skagit or Sauk, and Snohomish River basins and three summer-run populations from the Nooksack, Stillaguamish, and Snohomish basins. These populations are targeted to achieve viable status to support MPG viability. Having viable populations in these basins assures geographic spread, provides habitat diversity, reduces catastrophic risk, and increases life-history diversity (NMFS 2019).

For the **Central and South Puget Sound MPG**, four of the eight DIPs in the Central and South Puget Sound MPG must be viable. The four DIPs described below must be viable to meet this criterion:

- Green River Winter-Run;
- Nisqually River Winter-Run;
- Puyallup/Carbon rivers Winter-Run, or the White River Winter-Run; and
- At least one additional DIP from this MPG: Cedar River, North Lake Washington/Sammamish Tributaries, South Puget Sound Tributaries, or East Kitsap Peninsula Tributaries.

The rationale for this prioritization is that steelhead inhabiting the Green, Puyallup, and Nisqually River watersheds currently represent the core extant steelhead populations and these watersheds contain important diversity of stream habitats in the MPG.

For the **Hood Canal and Strait of Juan de Fuca MPG**, four of the eight DIPs in the Hood Canal and Strait of Juan de Fuca MPG must be viable. The four DIPs described below must be viable to meet this criterion:

- Elwha River Winter/Summer-Run (see rationale below);
- Skokomish River Winter-Run;
- One from the remaining Hood Canal populations: West Hood Canal Tributaries Winter-Run, East Hood Canal Tributaries Winter-Run, or South Hood Canal Tributaries Winter-Run; and
- One from the remaining Strait of Juan de Fuca populations: Dungeness Winter-Run, Strait of Juan de Fuca Tributaries Winter-Run, or Sequim/Discovery Bay Tributaries Winter-Run.

ER-187

NOAASkagitAR0051155

The rationale for this prioritization is that the Elwha and Skokomish rivers are the two largest single watersheds in the MPG and bracket the geographic extent of the MPG. Furthermore, both Elwha and Skokomish populations have recently exhibited summer-run life histories, although the Dungeness River population was the only summer/winter run in this MPG recognized by the PSSTRT in Hard et al. (2015). Two additional populations, one population from the Strait of Juan de Fuca area and one population from the Hood Canal area, are needed for a viable MPG to maximize geographic spread and habitat diversity.

Lastly, the Plan (NMFS 2019) also identified additional attributes, or characteristics which should be associated with a viable MPG:

- All major diversity and spatial structure conditions are represented, based on the following considerations:
- Populations are distributed geographically throughout each MPG to reduce risk of catastrophic extirpation; and
- Diverse habitat types are present within each MPG (one example is lower elevation/gradient watersheds characterized by a rain-dominated hydrograph and higher elevation/gradient watersheds characterized by a snow-influenced hydrograph).

Federal and state steelhead recovery and management efforts will provide new tools and data and technical analyses to further refine PS steelhead population structure and viability, if needed, and better define the role of individual populations at the watershed level and in the DPS. Future consultations will incorporate information from the Plan (NMFS 2019).

**Status of Southern Resident Killer Whales (SRKWs)**

The SRKW DPS, composed of J, K, and L pods, was listed as endangered under the ESA on November 18, 2005 (70 FR 69903). A 5-year review under the ESA completed in 2021 concluded that SRKWs should remain listed as endangered and includes recent information on the population, threats, and new research results and publications (NMFS 2022b).

The NMFS considers SRKWs to be currently among nine of the most at-risk species as part of the Species in the Spotlight initiative because of their endangered status, declining population trend, and because they are high priority for recovery based on conflict with human activities and recovery programs in place to address threats. The population has relatively high mortality and low reproduction unlike other resident killer whale populations that have generally been increasing since the 1970s (Carretta et al. 2020).

The limiting factors described in the final recovery plan included reduced prey availability and quality, high levels of contaminants from pollution, and disturbances from vessels and sound (NMFS 2008). This section summarizes the status of SRKWs throughout their range and summarizes information taken largely from the recovery plan (NMFS 2008), most recent 5-year review (NMFS 2016b), the Pacific Fishery Management Council (PFMC) SRKW Ad Hoc Workgroup's report (PFMC 2020), as well as newly available data.

ER-188

NOAASkagitAR0051156

*Abundance and Productivity.*
Killer whales—including SRKWs—are a long-lived species and sexual maturity can occur at age ten (NMFS (2008)). Females produce a low number of surviving calves (n < 10, but generally fewer) over the course of their reproductive life span (Bain 1990; Olesiuk et al. 1990). Compared to Northern Resident killer whales (NRKWs), which are a resident killer whale population with a sympatric geographic distribution ranging from coastal waters of Washington State and British Columbia north to Southeast Alaska, SRKW females appear to have reduced fecundity (Ward et al. 2013; Vélez-Espino et al. 2014), and all age classes of SRKWs have reduced survival compared to other fish-eating populations of killer whales in the Northeast Pacific (Ward et al. 2013).

Since the early 1970s, annual summer censuses in the Salish Sea using photo-identification techniques have occurred (Olesiuk et al. 1990; Center for Whale Research 2019). The population of SRKW was at its lowest known abundance in the early 1970s following live-captures for aquaria display (n = 68). The highest recorded abundance since the 1970s was in 1995 (98 animals), though the population declined from 1995-2001 (from 98 whales in 1995 to 81 whales in 2001). The population experienced a growth between 2001 and 2006 and has been generally declining since then. However, in 2014 and 2015, the SRKW population increased from 78 to 81 as a result of multiple successful pregnancies (n = 9) that occurred in 2013 and 2014. At present, the SRKW population has declined to near historically low levels. As of March 2024, the population is 74 whales, including 25 whales in J pod, 16 whales in K pod, and 34 whales in L pod, including two calves born to J pod in September 2020 and one new calf to the L pod in February 2021 (Center for Whale Research 2024). The previously published historical estimated abundance of SRKW is 140 animals (NMFS 2008). This estimate (~140) was generated as the number of whales killed or removed for public display in the 1960s and 1970s (summed over all years) added to the remaining population at the time the captures ended.

Based on an updated pedigree from new genetic data, many of the offspring in recent years were sired by two fathers, meaning that less than 30 individuals make up the effective reproducing portion of the population. Because a small number of males were identified as the fathers of many offspring, a smaller number may be sufficient to support population growth than was previously thought (Ford et al. 2011; Ford et al. 2018). However, the consequence of this means inbreeding may be common amongst this small population, with a recent study by Ford et al. (2018) finding several offspring resulting from matings between parents and their own offspring. The fitness effects of this inbreeding remain unclear and are an effort of ongoing research (Ford et al. 2018).

Seasonal mortality rates among Southern and Northern Resident whales may be highest during the winter and early spring, based on the numbers of animals missing from pods returning to inland waters each spring and standings data. Olesiuk et al. (2005) identified high neonatal mortality that occurred outside of the summer season, and multiple new calves have been documented in winter months that have not survived the following summer season (Center for Whale Research, unpublished data). Stranding rates are higher in winter and spring for all killer whale forms in Washington and Oregon (Norman et al. 2004) and a recent review of killer whale strandings in the northeast Pacific provided insight into health, nutritional status and causes of mortality for all killer whale ecotypes (Raverty et al. 2020).

NOAASkagitAR0051157

The NWFSC continues to evaluate changes in fecundity and mortality rates, and has updated the population viability analyses conducted for the 2004 Status Review for SRKWs and the 2011 science panel review of the effects of salmon fisheries (Krahn et al. 2004; Hilborn et al. 2012; Ward et al. 2013) and the most recent 5-year review (NMFS 2017). The updated analysis described the recent changes in population size and age structure, change in demographic rates over time, and updated projections of population viability (Ward 2019). According to Ward (2019), the model results indicate that fecundity rates have declined and have changed more than male or female survival since 2010. Ward (2019) performed a series of projections: (1) projections using fecundity and survival rates estimated over the long-term data series (1985 to 2019); (2) projections using fecundity and survival rates from the most recent 5-year period (2014 to 2019); and (3) projections using the highest fecundity and survival rates estimated (in the period 1985 to 1989). The most optimistic scenario, using demographic rates calculated from the 1985 to1989 period, has a trajectory that increases and eventually declines after 2030, while the scenario with long-term demographic data, or the scenario only including the most recent years' demographic data, projects declines. Additional runs for this scenario (1985 to1989 data) indicated a similar trajectory with a 50:50 sex ratio. Thus, the downward trends are likely driven by the current age and sex structure of young animals in the population (from 2011-2016 new births were skewed slightly toward males with 64 percent male), as well as the number of older animals (Ward 2019). As the model projects out over a longer time frame (50 years) there is increased uncertainty around the estimates. The downward trend is in part due to the changing age and sex structure of the population. If the population of SRKW experiences demographic rates (e.g. fecundity and mortality) that are more similar to 2016 than the recent 5-year average (2011 to 2016), the population will decline faster as shown in Figure 7 (NMFS 2016b). There are several demographic factors of the SRKW population that are cause for concern, namely (1) reduced fecundity; (2) a skewed sex ratio toward male births in recent years; (3) a lack of calf production from certain components of the population (e.g. K pod); (4) a small number of adult males acting as sires (Ford et al. 2018); and (5) an overall small number of individuals in the population (NMFS 2016b).

Because of the whales' small population size, the population is also susceptible to increased risks of demographic stochasticity—randomness in the pattern of births and deaths among individuals in a population. Several sources of demographic variance (e.g. differences between individuals or within individuals) can affect small populations and contribute to variance in a population's growth and increased extinction risk. Sources of demographic variance can include environmental stochasticity, or fluctuations in the environment that drive changes in birth and death rates, and demographic heterogeneity, or variation in birth or death rates of individuals because of differences in their individual fitness (including sexual determinations). In combination, these and other sources of random variation combine to amplify the probability of extinction, known as the extinction vortex (Gilpin and Soulé 1986; Fagan and Holmes 2006; Melbourne and Hastings 2008). The larger the population size, the greater the buffer against stochastic events and genetic risks.

Population-wide distribution of lifetime reproductive success of SRKWs can be highly variable, such that some individuals produce more offspring than others to subsequent generations, and male variance in reproductive success can be greater than that of females (e.g. Clutton-Brock 1998; Hochachka 2006). For long-lived vertebrates such as killer whales, some females in the population might contribute less than the number of offspring required to maintain a constant

NOAASkagitAR0051158

population size (n = 2), while others might produce more offspring. The smaller the population, the more weight an individual's reproductive success has on the population's growth or decline (Coulson et al. 2006). For example, the overall number of reproductive females has been fluctuating between 25 and 35 for most of the last 40 years, and there have been contrasting changes by pod, with declines in L pod females and increases in J pod (Ward 2019). At the start of the survey in 1976, the distribution of females was skewed toward younger ages with few older, post-reproductive females. The distribution in recent years is more uniform across female ages (in other words, more females in their 30s, (Ward 2019)). However, from 2014 through July 2019, only 7 calves were born and survived (3 in J pod and 4 in L pod) (Ward 2019). In a novel study, researchers collected SRKW feces to measure pregnancy hormones (progesterone and testosterone) (Wasser et al. 2017). The fecal hormone data showed that up to 69 percent of the detected pregnancies do not produce a documented calf, and an unprecedented half of those failed pregnancies occurred relatively later in the pregnancy when energetic costs and physiological risk to the mother are higher (Wasser et al. 2017). Recent aerial imagery corroborates this high rate of loss (Fearnbach and Durban unpubl. data). The congruence between the rate of loss estimates from fecal hormones and aerial photogrammetry suggests the majority of the loss is in the latter half of pregnancy when photogrammetry can detect anomalous shape after several months of gestation (Durban et al. 2016). Although the rates of successful pregnancies in wild killer whale populations is generally unknown, a relatively high level of reproductive failure late in pregnancy is uncommon in mammalian species and suggests there may be cause for concern.

*Limiting Factors and Threats.* Several factors identified in the recovery plan for SRKW may be limiting recovery. The recovery plan identified three major threats including (1) the quantity and quality of prey; (2) toxic chemicals that accumulate in top predators; and (3) impacts from sound and vessels. Oil spills and disease as well as the small population size are also risk factors. It is likely that multiple threats are acting together to impact SRKWs. Modeling exercises have attempted to identify which threats are most significant to survival and recovery (e.g. Lacy et al. 2017) and available data suggest that all of the threats are potential limiting factors (NMFS 2008).

*Quantity and Quality of Prey.* SRKWs have been documented to consume a variety of fish species (22 species) and one species of squid (Ford et al. 1998; Ford et al. 2000; Ford and Ellis 2006; Hanson and Emmons 2010; Ford et al. 2016), but salmon are identified as their primary prey. The best available information suggests an overall preference for Chinook salmon (during the summer and fall). Chum salmon, coho salmon, and steelhead may also be important in the SRKW diet at particular times and in specific locations. Rockfish (*Sebastes spp.*), Pacific halibut (*Hippoglossus stenolepis*), and Pacific herring (*Clupea pallasi*) were also observed during predation events (Ford and Ellis 2006), however, these data may underestimate the extent of feeding on bottom fish (Baird 2000). A number of smaller flatfish, lingcod (*Ophiodon elongatus*), greenling (*Hexagrammos spp.*), and squid have been identified in stomach content analysis of resident whales (Ford et al. 1998).

SRKWs are the subject of ongoing research, the majority of which has occurred in inland waters of Washington State and British Columbia, Canada during summer months and includes direct observation, scale and tissue sampling of prey remains, and fecal sampling. The diet data suggest that SRKWs are consuming mostly larger (i.e., generally age 3 and up) Chinook salmon (Ford

WCRO-2022-03092                                    -48-

NOAASkagitAR0051159

and Ellis 2006). Chinook salmon is their primary prey despite the much lower abundance in comparison to other salmonids in some areas and during certain time periods (Ford and Ellis 2006). Factors of potential importance include the species' large size, high fat and energy content, and year-round occurrence in the SRKW's geographic range. Chinook salmon have the highest value of total energy content compared to other salmonids because of their larger body size and higher energy density (kilocalorie/kilogram (kcal/kg)) (O'Neill et al. 2014). For example, in order for a SRKW to obtain the total energy value of one adult Chinook salmon, they would need to consume approximately 2.7 coho, 3.1 chum, 3.1 sockeye, or 6.4 pink salmon (O'Neill et al. 2014). Research suggests that SRKWs are capable of detecting, localizing, and recognizing Chinook salmon through their ability to distinguish Chinook salmon echo structure as different from other salmon (Au et al. 2010). The degree to which killer whales are able to or willing to switch to non-preferred prey sources (i.e., prey other than Chinook salmon) is also largely unknown, and likely variable depending on the time and location.

Over the last forty years, predation on Chinook salmon off the West Coast of North America by marine mammals has been estimated to have more than doubled (Chasco et al. 2017). In particular, southern Chinook salmon stocks ranging south from the Columbia River have been subject to the largest increases in predation, and Chasco et al. (2017) suggested that SRKWs may be the most disadvantaged compared to other more NRKW populations given the northern migrations of Chinook salmon stocks in the ocean and this competition may be limiting the growth of the SRKW population.

Evidence of reduced growth and poor survival in SRKW and NRKW populations at a time when Chinook salmon abundance was low suggests that low abundance may have contributed to nutritional deficiency with serious effects on individual whales. Reduced body condition and body size has been observed in SRKW and NRKW populations. For example, Groskreutz et al. (2019) used aerial photogrammetry to measure growth and length in adult NRKW, which prey on similar runs of Chinook salmon, from 2014 to 2017. Given that killer whales physically mature at age 20 and the body stops growing (Noren 2011), we would expect adult male killer whales to all have similar body lengths and all adult female killer whales to have similar body lengths. However, Groskreutz et al. (2019) found adult whales that were 20 – 40 years old have significantly shorter body lengths than those older than 40 years of age, suggesting the younger mature adults had experienced inhibited growth. Similarly, adult Southern Residents under 30 years of age that were measured in 2008 by the same photogrammetric technique were also shorter on average than older individuals also suggesting reduced growth (Fearnbach et al. 2011).

What appears to be constrained growth in both resident killer whale populations occurred in the 1990s during a time when range-wide abundance of Chinook salmon in multiple subsequent years fell below the 1979–2003 average (Ford et al. 2010). The low Chinook salmon abundance and smaller growth in body size in whales coincided with an almost 20 percent decline from 1995 to 2001 (from 98 whales to 81 whales) in the SRKW population (NMFS 2008b). During this period of decline, multiple deaths occurred in all three pods of the SRKW population and relatively poor survival occurred in nearly all age classes and in both males and females. The NRKWs also experienced population declines during the late 1990s and early 2000s. Hilborn et al. (2012) stated that periods of decline across killer whale populations "suggest a likely common causal factor influencing their population demographics" (Hilborn et al. 2012).

NOAASkagitAR0051160

During this same general period of time of low Chinook salmon abundance, declining body size in whales, and declining resident killer whale populations, all three SRKW pods experienced substantially low social cohesion (Parsons et al. 2009). This temporal shift in SRKW social cohesion may reflect a response to changes in prey. (Foster et al. 2012) similarly found a significant correlation between SRKW social network connectivity and Chinook salmon prey abundance for the years 1984-2007, where in years with higher Chinook salmon abundance, SRKW social network was more interconnected. The authors discuss that because of this result, years with higher Chinook salmon abundance may lead to more opportunities for mating and information transfer between individuals.

A recent study used an integrated population modeling framework to evaluate how the abundance of Chinook salmon stocks in the eastern Pacific may impact the survival and fecundity rates of SRKWs (Nelson et al. 2024). The authors used a sex- and age-structured population model to simulate the dynamics of the SRKW population between 1940 and 2020. They explained that previous work that assessed the relationship between Chinook salmon abundance and SRKW birth and death rates modeled these processes independently, despite the possibility that they may be correlated (Ford et al. 2010; Ward et al. 2009, 2016). After explicitly accounting for several sources of uncertainty in the population dynamics of SRKWs, the authors found modest evidence that Chinook salmon abundance is positively associated with survival rates, and minimal evidence of an association with birth rates. They concluded that those findings, combined with previous research, suggest the recovery of SRKWs may be limited by prey availability, and that the current population size appears to be below carrying capacity (Nelson et al. 2024).

*Toxic Chemicals.* Various adverse health effects in humans, laboratory animals, and wildlife have been associated with exposures to persistent pollutants. These pollutants have the ability to cause endocrine disruption, reproductive disruption or failure, immunotoxicity, neurotoxicity, neurobehavioral disruption, and cancer (Reijnders 1986; Subramanian et al. 1987; de Swart et al. 1996; Bonefeld-Jørgensen et al. 2001; Reddy et al. 2001; Schwacke et al. 2002; Darnerud 2003; Legler and Brouwer 2003; Viberg et al. 2003; Ylitalo et al. 2005; Fonnum et al. 2006; Darnerud 2008; Legler 2008). SRKWs are exposed to a mixture of pollutants, some of which may interact synergistically and enhance toxicity, influencing their health, and reproduction. Relatively high levels of these pollutants have been measured in blubber biopsy samples from SRKWs compared to other resident killer whales in the North Pacific (Ross et al. 2000; Krahn et al. 2007; Krahn et al. 2009; Lawson et al. 2020), and more recently, these pollutants were measured in fecal samples collected from SRKWs providing another potential opportunity to evaluate exposure to these pollutants (Lundin et al. 2016a; Lundin et al. 2016b).

SRKWs are exposed to persistent pollutants primarily through their diet. For example, Chinook salmon contain higher levels of some persistent pollutants than other salmon species when comparing the limited information available for pollutant levels in Chinook salmon (Krahn et al. 2007; O'Neill and West 2009; Veldhoen et al. 2010; Mongillo et al. 2016).  These harmful pollutants, through consumption of prey species that contain these pollutants, are stored in the blubber and can later be released; when the pollutants are released, they are redistributed to other tissues when the SRKWs metabolize the blubber, for example, responses to food shortages or reduced acquisition of food energy as one possible stressor. The release of pollutants can also occur during gestation or lactation. Once the pollutants mobilize from the blubber into

ER-193

NOAASkagitAR0051161

circulation, they have the potential to cause a toxic response. Therefore, nutritional stress from reduced Chinook salmon populations may act synergistically with high pollutant levels in SRKWs and result in adverse health effects.

*Noise and vessels*
Killer whales rely on their highly developed acoustic sensory system for navigating, locating prey, and communicating with other individuals. While in inland waters of Washington and British Columbia, SRKWs are the principal target species for the commercial whale watch industry (Hoyt 2001; O'Connor et al. 2009) and encounter a variety of other vessels in their urban environment (e.g., recreational, fishing, ferries, military, shipping). Several main threats from vessels include direct vessel strikes (which can result in injury or mortality (Gaydos and Raverty 2007)), the masking of echolocation and communication signals by anthropogenic sound, and behavioral changes (NMFS 2008). There is a growing body of evidence documenting effects from vessels on small cetaceans and other marine mammals. Research has shown that SRKWs spend more time traveling and performing surface active behaviors and less time foraging in the presence of all vessel types, including kayaks, and that noise from motoring vessels up to 400 meters away has the potential to affect the echolocation abilities of foraging whales (Holt 2008; Lusseau et al. 2009; Noren et al. 2009; Williams et al. 2010). Individual energy balance may be impacted when vessels are present because of the combined increase in energetic costs resulting from changes in whale activity with the decrease in prey consumption resulting from reduced foraging opportunities (Williams et al. 2006; Lusseau et al. 2009; Noren et al. 2009; Noren et al. 2012).

In addition to vessels, underwater sound can be generated by a variety of other human activities, such as dredging, drilling, construction, seismic testing, and sonar (Richardson et al. 1995; Gordon and Moscrop. 1996; National Research Council 2003). Impacts from these sources can range from serious injury and mortality to changes in behavior. In other cetaceans, hormonal changes indicative of stress have been recorded in response to intense sound exposure (Romano et al. 2003). Chronic stress is known to induce harmful physiological conditions including lowered immune function, in terrestrial mammals and likely does so in cetaceans (Gordon and Moscrop. 1996).

*Climate Change and Other Ecosystem Effects.* In Section 2.2, above, we briefly discussed climate change and the stress it can bring to the ESA-listed species and habitats considered in this Opinion. In a broader view, overwhelming data indicate the planet is warming (IPCC 2014), which poses a threat to many species. Climate change has the potential to impact species abundance, geographic distribution, migration patterns, timing of seasonal activities (IPCC 2014), and species viability into the future. Changes in climate and ocean conditions happen on several different time scales and have had a profound influence on distributions and abundances of marine and anadromous fishes.

Climate change is expected to impact anadromous fish during all stages of their complex life cycle. In addition to the direct effects of rising temperatures, indirect effects include alterations in stream flow patterns in freshwater and changes to food webs in freshwater, estuarine and marine habitats. There is high certainty that predicted physical and chemical changes will occur; however, the ability to predict biological changes to fish or food webs in response to these physical/chemical changes is extremely limited, leading to considerable uncertainty.

ER-194

NOAASkagitAR0051162

Pacific Northwest anadromous fish inhabit as many as three marine ecosystems during their ocean residence period: the Salish Sea, the California Current, and the Gulf of Alaska (Brodeur et al. 1992; Weitkamp and Neely 2002; Morris et al. 2007). The response of these ecosystems to climate change is expected to differ, although there is considerable uncertainty in all predictions. Columbia River and Puget Sound anadromous fish also use coastal areas of British Columbia and Alaska, and mid-ocean habitats in the Gulf of Alaska, although their fine-scale distribution and marine ecology during this period are poorly understood (Morris et al. 2007; Pearcy and McKinnell 2007). Increases in temperature in Alaskan marine waters have generally been associated with increases in productivity and salmon survival (Mantua et al. 1997; Martins et al. 2012).

Warmer streams, loss of coastal habitat due to sea level rise, ocean acidification, lower summer stream flows, higher winter stream flows, and changes in water quality and freshwater inputs are projected to negatively affect salmon (e.g. Mauger et al. 2015). The persistence of cold water "refugia" within rivers and the diversity among salmon populations will be critical in helping salmon populations adapt to future climate conditions. More detailed discussions about the likely effects from climate change in freshwater systems on salmonids can be found in biological opinions such as the implementation of the Mitchell Act (NMFS 2017b).

In marine waters, increasing temperatures are associated with observed and predicted poleward range expansions of fish and invertebrates in both the Atlantic and Pacific oceans (Lucey and Nye 2010; Asch 2015; Cheung et al. 2015). Rapid poleward species shifts in distribution in response to anomalously warm ocean temperatures have been well documented in recent years, confirming this expectation at short time scales. Range extensions were documented in many species from southern California to Alaska during unusually warm water associated with "the blob" in 2014 and 2015 (Bond et al. 2015; Di Lorenzo and Mantua 2016), and past strong El Nino events (Pearcy 2002; Fisher et al. 2015).

The potential impacts of climate and oceanographic change on whales and other marine mammals will likely involve effects on habitat availability and food availability. For species that depend on salmon for prey, such as SRKWs, the fluctuations in salmon survival that occur with these changes in climate conditions can have negative effects. Site selection for migration, feeding, and breeding may be influenced by factors such as ocean currents and water temperature. For example, there is some evidence from Pacific equatorial waters that sperm whale feeding success and, in turn, calf production rates are negatively affected by increases in sea surface temperature (Smith and Whitehead 1993; Whitehead 1997). Different species of marine mammals will likely react to these changes differently. MacLeod (2009) estimated, based on expected shifts in water temperature, 88 percent of cetaceans would be affected by climate change, with 47 percent likely to be negatively affected. Range size, location, and whether or not specific range areas are used for different life history activities (e.g. feeding, breeding) are likely to affect how each species responds to climate change (Learmonth et al. 2007).

Although few predictions of impacts on the Southern Residents have been made, it seems likely that any changes in weather and oceanographic conditions resulting in effects on salmon populations would have consequences for the whales. SRKWs might shift their distribution in response to climate-related changes in their salmon prey. Persistent pollutant bioaccumulation may also change because of changes in the food web.

ER-195

NOAASkagitAR0051163

Recent analysis ranked the vulnerability of West Coast salmon stocks to climate change and, of the top priority stocks for Southern Residents (NMFS and WDFW 2018), California Central Valley Chinook salmon stocks, Snake river fall and spring/summer Chinook salmon, Puget Sound Chinook salmon, and spring-run Chinook salmon stocks in the interior Columbia and Willamette River basins were ranked as "high" or "very high" vulnerability to climate change (Crozier et al. 2019). In general, Chinook, coho, and sockeye salmon runs were more vulnerable and this stemmed from exposure to higher ocean and river temperatures as well as exposure to changes in flow regimes (including in relation to snowpack, upwelling, sea level rise, and flooding). However, certain Chinook salmon runs do have higher ability to adapt and/or cope with climate change due to high life history diversity in juveniles and adults (including both subyearling and yearling smolts, multiple migration timings), but diversity may be lost with future climate change. Overall, chum and pink salmon were less vulnerable to climate change because they spend less time in fresh water than other salmonids, and certain steelhead runs had more moderate vulnerability than many Chinook and coho salmon runs because of higher resilience (Crozier et al. 2019).

## 2.2.2    Status of the Critical Habitat

This section describes the status of designated critical habitat affected by the proposed action by examining the condition and trends of the essential physical and biological features of that habitat throughout the designated areas. These features are essential to the conservation of the PS Chinook salmon because they support one or more of the species' life stages (e.g., sites with conditions that support spawning, rearing, migration and foraging). As stated above, there is no designated critical habitat for Puget Sound steelhead in the action area.[14]

**Puget Sound Chinook Salmon Critical Habitat**
Critical habitat for PS Chinook salmon was designated on September 2, 2005 (70 FR 52630). Critical habitat includes 1,683 miles of streams, 41 square miles of lakes, and 2,182 miles of nearshore marine habitat in Puget Sound. The Puget Sound Chinook salmon ESU has 61 freshwater and 19 marine areas within its range. Of the freshwater watersheds, 41 are rated high conservation value, 12 low conservation value, and eight received a medium rating. Of the marine areas, all 19 are ranked with high conservation value.

As part of the process to designate critical habitat within the PS Chinook salmon ESU, NMFS's critical habitat analytical review teams (CHARTs) ranked watersheds with designated critical habitat at the scale of the fifth-field hydrologic unit code ($HUC_5$) in terms of the conservation value they provide to each ESA-listed species that they support (NMFS 2005). The conservation rankings were high, medium, or low. To determine the conservation value of each watershed to species viability, the CHARTs evaluated the quantity and quality of habitat features, the relationship of the area compared to other areas within the species' range, and the significance to the species of the population occupying that area. Even if a location had poor habitat quality, it could be ranked with a high conservation value if it were essential due to factors such as limited availability, a unique contribution of the population it served, or is serving another important

---

[14] Critical habitat for PS steelhead was designated on February 24, 2016 (81 FR 9252). Critical habitat includes 2,031 stream miles; however, nearshore and offshore marine waters were not designated for this species.

ER-196

NOAASkagitAR0051164

In designating critical habitat (CH) for PS Chinook salmon in estuarine and nearshore marine areas, NMFS determined that the area from extreme high water extending out to the maximum depth of the photic zone (no greater than 30 meters relative to MLLW) contain essential features that require special protection. For nearshore marine areas, NMFS designated the area inundated by extreme high tide because it encompasses habitat areas typically inundated and regularly occupied during the spring and summer when juvenile salmon are migrating in the nearshore zone and relying heavily on forage, cover, and refuge qualities provided by these occupied habitats.

Based on the natural history of Puget Sound Chinook salmon and their habitat needs, NMFS identified the following PBFs essential to conservation located within the action areas:

PBF 4 – Estuarine areas free of obstruction and excessive predation with: 1) water quality, water quantity, and salinity conditions that support juvenile and adult physiological transitions between freshwater and saltwater; 2) natural cover such as submerged and overhanging large wood, aquatic vegetation, large rocks and boulders, and side channels; and 3) juvenile and adult foraging opportunities, including aquatic invertebrates and prey fish, supporting growth and maturation.

PBF 5 – Nearshore marine areas free of obstruction and excessive predation with: 1) water quality and quantity conditions and foraging opportunities, including aquatic invertebrates and fishes, supporting growth and maturation; and 2) natural cover including submerged and overhanging large wood, aquatic vegetation, large rocks and boulders, and side channels.

Each of the physical and biological features (or primary constituent elements) of estuarine and nearshore marine critical habitat for the Chinook salmon critical habitat have been degraded throughout the Puget Sound region. The causes for these losses of critical habitat value include human development, including diking, filling of wetlands and bays, channelization, and nearshore and floodplain development. Land-use change in the form of development and construction are sources of ongoing anthropogenic modification of the Puget Sound shorelines and is the major factor in the cumulative degradation and loss of nearshore and estuarine habitat. The development of shorelines includes bank hardening and the introduction of obstructions in the nearshore area. Each obstruction is a source of structure and shade, which can interfere with juvenile salmonid migration and diminish aquatic food supply, and is a potential source of water pollution from boating uses (Shipman et al. 2010; Fresh et al. 2011; Morley et al. 2012).

Critical habitat throughout the Puget Sound basin has been degraded by numerous activities, including hydropower development, historic loss of mature riparian forests, increased sediment inputs, removal of large woody debris, intense urbanization, agriculture, alteration of floodplain and stream morphology, riparian vegetation disturbance, wetland draining and conversion, dredging, armoring of shorelines, marina and port development, road and railroad construction and maintenance, timber harvest, and mining. Changes in habitat quantity, availability, diversity, stream flow, temperature, sediment load, and channel instability are common limiting factors of critical habitat.

NOAASkagitAR0051165

Diking, agriculture, revetments, railroads and roads in lower stream reaches have caused significant loss of secondary channels in major valley floodplains in this region. Confined main channels create high-energy peak flows that remove smaller substrate particles and large wood. The loss of side-channels, oxbow lakes, and backwater habitats has resulted in a significant loss of juvenile salmonid rearing and refuge habitat. When the water level of Lake Washington was lowered 9 feet in the 1910s, thousands of acres of wetlands along the shoreline of Lake Washington, Lake Sammamish and the Sammamish River corridor were drained and converted to agricultural and urban uses. Wetlands play an important role in hydrologic processes, as they store water that ameliorates high and low flows. The interchange of surface and groundwater in complex stream and wetland systems helps to moderate stream temperatures. Forest wetlands are estimated to have diminished by one-third in Washington State (FEMAT 1993; Spence et al. 1996; SSPS 2007).

Loss of riparian habitat, elevated water temperatures, elevated levels of nutrients, increased nitrogen and phosphorus, and higher levels of turbidity, presumably from urban and highway runoff, wastewater treatment, failing septic systems, and agriculture or livestock impacts, have been documented in many Puget Sound tributaries (SSPS 2007). Landslides can occur naturally in steep, forested lands, but inappropriate land use practices likely have accelerated their frequency and the amount of sediment delivered to streams. Fine sediment from unpaved roads has also contributed to stream sedimentation. Unpaved roads are widespread on forested lands in the Puget Sound basin, and to a lesser extent, in rural residential areas. Historical logging removed most of the riparian trees near stream channels. Subsequent agricultural and urban conversion permanently altered riparian vegetation in the river valleys, leaving either no trees, or a thin band of trees. The riparian zones along many agricultural areas are now dominated by alder, invasive canary grass and blackberries, and provide substantially reduced stream shade and large wood recruitment (SSPS 2007).

Peak stream flows have increased over time due to paving (roads and parking areas), reduced percolation through surface soils on residential and agricultural lands, simplified and extended drainage networks, loss of wetlands, and rain-on-snow events in higher elevation clear cuts (SSPS 2007).

Dams constructed for hydropower generation, irrigation, or flood control have substantially affected PS salmon and steelhead populations in a number of river systems. The construction and operation of dams have blocked access to spawning and rearing habitat (e.g., Elwha River dams block anadromous fish access to 70 miles of potential habitat) changed flow patterns, resulted in elevated temperatures and stranding of juvenile migrants, and degraded downstream spawning and rearing habitat by reducing recruitment of spawning gravel and large wood to downstream areas (SSPS 2007). These actions tend to promote downstream channel incision and simplification (Kondolf 1997), limiting fish habitat. Water withdrawals reduce available fish habitat and alter sediment transport. Hydropower projects often change flow rates, stranding and killing fish, and reducing aquatic invertebrate (prey source) productivity (Hunter 1992).

Juvenile deaths in this context occur in unscreened or inadequately screened diversions. Water diversion ditches resemble side channels in which juvenile salmonids normally find refuge. When diversion head gates are shut, access back to the main channel is cut off and the channel

NOAASkagitAR0051166

goes dry. Mortality can also occur with inadequately screened diversions from impingement on the screen, or mutilation in pumps where gaps or oversized screen openings allow juveniles to get into the system (WDFW 2009). Blockages by dams, water diversions, and shifts in flow regime due to hydroelectric development and flood control projects are major habitat problems in many Puget Sound tributary basins (SSPS 2007).

The degradation of multiple aspects of PS Chinook critical habitat in the nearshore indicates that the conservation potential of the critical habitat is not being reached, even in areas where the conservation value of habitat is ranked high. The nearshore marine habitat has been extensively altered and armored by industrial and residential development near the mouths of many of Puget Sound's tributaries. A railroad runs along large portions of the eastern shoreline of Puget Sound, eliminating natural cover along the shore and natural recruitment of beach sand (SSPS 2007).

Degradation of the nearshore environment has occurred in the southeastern areas of Hood Canal in recent years, resulting in late summer marine oxygen depletion and significant fish kills. Circulation of marine waters is naturally limited, and partially driven by freshwater runoff, which is often low in the late summer. However, human development has increased nutrient loads from failing septic systems along the shoreline, and from use of nitrate and phosphate fertilizers on lawns and farms. Shoreline residential development is widespread and dense in many places. The combination of highways and dense residential development has degraded certain physical and chemical characteristics of the near-shore environment (HCCC 2005; SSPS 2007).

The NMFS has completed several section 7 consultations on large-scale habitat projects affecting listed species in Puget Sound. Among these are the Washington State Forest Practices Habitat Conservation Plan (NMFS 2006b), and consultations on Washington State Water Quality Standards (NMFS 2008c), the National Floodplain Insurance Program (NMFS 2008d), and the Elwha River Fish Restoration Plan (Ward et al. 2008).

In 2012, the Puget Sound Action Plan was also developed with several federal agencies (e.g., Environmental Protection Agency, NOAA Fisheries, the Corps of Engineers, Natural Resources Conservation Service, United States Geological Survey, Federal Emergency Management Agency, and US Fish and Wildlife Service) collaborated on an enhanced approach to implement the Puget Sound Action Plan. On January 18, 2017, the National Puget Sound Task Force reviewed and accepted the Interim Draft of the Puget Sound Federal Task Force Action Plan FY 2017-202129. The purpose of the Puget Sound Federal Task Force Action Plan is to contribute toward realizing a shared vision of a healthy and sustainable Puget Sound ecosystem by leveraging Federal programs across agencies and coordinating diverse programs on a specific suite of priorities.

As discussed in the Status of the species section, the abundance of Chinook salmon in recent years is significantly less than historic abundance due to a number of human activities. The most notable human activities that cause adverse effects on ESA-listed and non-ESA-listed salmon include: land use activities that result in habitat loss and degradation, hatchery practices, harvest and hydropower systems.

ER-199

NOAASkagitAR0051167

As mentioned previously, numerous factors have led to the decline of PS Chinook salmon including overharvest, freshwater and marine habitat loss, hydropower development, and hatchery practices, as mentioned in Section 2.2.1, above. Adjustments can, and have been made in the short term to ameliorate some of the factors for decline. Harvest can be adjusted on yearly or even in-season basis.

Since PS Chinook salmon were listed, harvest in state, tribal, and federal fisheries has been reduced in an effort to increase the number of adults returning to spawning grounds. Likewise, hatchery management can, and has been adjusted relatively quickly when practices are detrimental to listed species. To address needed improvements in hydropower, NMFS has issued biological opinions with reasonable and prudent alternatives to improve fish passage at existing hydropower facilities.

Unlike the other factors, however, loss of critical habitat quality is much more difficult to address in the short term. Once human development causes loss of critical habitat quality, that loss tends to persist for decades or longer. The condition of critical habitat will improve only through active restoration or natural recovery following the removal of human infrastructure. As noted throughout this Opinion, future effects of climate change on habitat quality throughout Puget Sound are expected to be negative.

Habitat use by Chinook salmon in the Puget Sound area has been historically limited by large dams and other man-made barriers in a number of drainages, including the Nooksack, Skagit, White, Nisqually, Skokomish, and Elwha river basins. In addition to limiting habitat accessibility, dams affect habitat quality through changes in river hydrology, altered temperature profile, reduced downstream gravel recruitment, and the reduced recruitment of large woody debris. Such changes can have significant negative impacts on salmonids (e.g., increased water temperatures resulting in decreased disease resistance) (Spence et al. 1996; McCullough 1999).

More recently, stakeholders and other interested entities have worked to address habitat barriers, reducing the number of basins with limited anadromous access to historical habitat. The completion of the Elwha and Glines Canyon dam removals occurred in 2014. The response of fish populations to this action is still being evaluated. Now, Chinook salmon are accessing much of this newly available habitat (Pess et al. 2020).

Improvements in the adult fish collection facility at Mud Mountain Dam (White River basin) are near completion, with the expectation that improvements in adult survival (including of PS Chinook) will facilitate better utilization of habitat above the dam (NMFS 2014).

The recent removal of the diversion dam on the Middle Fork Nooksack Dam (16 July 2020) and the Pilchuck River Dam (late 2020) will provide access to important headwater salmonid spawning and rearing habitats. Similarly, the proposed modification of Howard Hanson Dam for upstream fish passage and downstream juvenile collection in the longer term (NMFS 2019b) will allow winter steelhead to return to historical habitat (Ford 2022).

Additionally, approximately 8,000 culverts that block salmonid habitat have been identified in Puget Sound (NMFS 2019), with plans to address these blockages being extended over many

NOAASkagitAR0051168

years. Smaller scale improvements in habitat, restoration of riparian habitat and reconnecting side- or off-channel habitats, will allow better access to habitat types and niche diversification. While there have been some significant improvements in restoring access, it is recognized that land development, loss of riparian and forest habitat, loss of wetlands, demands on water allocation all continue to degrade the quantity and quality of available fish habitat (Ford 2022).

In summary, even with restoration success, like dam removal and blocked culverts being addressed, critical habitat for salmon throughout the Puget Sound basin continues to be degraded by numerous management activities, including hydropower development, loss of mature riparian forests, increased sediment inputs, removal of large wood, intense urbanization, agriculture, alteration of floodplain and stream morphology (i.e., channel modifications and diking), riparian vegetation disturbance, wetland draining and conversion, dredging, armoring of shorelines, marina and port development, road and railroad construction and maintenance, logging, and mining. Changes in habitat quantity, availability, and diversity, and flow, temperature, sediment load and channel instability are common limiting factors in areas of critical habitat. As mentioned above, development of shoreline and estuary areas of Puget Sound is expected to continue to adversely impact the quality of marine habitat for PS salmonids. Projected changes in nearshore and estuary development based on documented rates of developed land cover change in Bartz et al. (2015) show that between 2008 and 2060, an additional 14.7 hectares of development of shoreline areas and 204 hectares of estuary development can be expected.[15]

**SRKW Critical Habitat**

Critical habitat for the SRKW DPS was designated on November 29, 2006 (71 FR 69054). Critical habitat includes approximately 2,560 square miles of inland waters of Washington in three specific areas: (1) the Summer Core Area in Haro Strait and waters around the San Juan Islands; (2) Puget Sound; and (3) the Strait of Juan de Fuca. Based on the natural history of SRKWs and their habitat needs, NMFS identified the following physical or biological features essential to conservation: (1) Water quality to support growth and development; (2) Prey species of sufficient quantity, quality and availability to support individual growth, reproduction and development, as well as overall population growth; and (3) Passage conditions to allow for migration, resting, and foraging.

In 2006, few data were available on SRKWs distribution and habitat use in coastal waters of the Pacific Ocean. Since the 2006 designation, additional effort has been made to better understand the geographic range and movements of SRKWs. For example, opportunistic visual sightings, satellite tracking, and passive acoustic research conducted since 2006 have provided an updated estimate of the whales' coastal range that extends from the Monterey Bay area in California, north to Chatham Strait in southeast Alaska (NMFS 2019c).

On August 2nd, 2021, NMFS revised the critical habitat designation for the SRKW DPS under the ESA by designating six new areas along the U.S. West Coast (86 FR 41668). Specific new areas proposed along the U.S. West Coast include approximately 15,910 square miles (mi$^2$) (41,207 square kilometers (km$^2$)) of marine waters between the 6.1-meter (m) depth contour and

---

[15] Memorandum from Tim Beechie, Northwest Fisheries Science Center, to Kim Kratz, et al. NMFS, regarding projected developed land cover change in Puget Sound nearshore and estuary zones. (June 23, 2020).

ER-201

NOAASkagitAR0051169

the 200-m depth contour from the U.S. international border with Canada south to Point Sur, California). In the final rule (86 FR 41668), NMFS states that the "designated areas are occupied and contain physical or biological features that are essential to the conservation of the species and that may require special management considerations or protection." The three physical or biological features essential to conservation in the 2006 designated critical habitat were also identified for the six new areas along the U.S. West Coast.

Based on the natural history of SRKW and their habitat needs, NMFS identified the following PBFs essential to conservation located within the action areas:

*Water Quality to Support Growth and Development.* Water quality supports SRKW's ability to forage, grow, and reproduce free from disease and impairment. Water quality is essential to the whales' conservation, given the whales' present contamination levels, small population numbers, increased extinction risk caused by any additional mortalities, and geographic range (and range of their primary prey) that includes highly populated and industrialized areas. Water quality is especially important in high-use areas where foraging behaviors occur and contaminants can enter the food chain. The absence of contaminants or other agents of a type and/or amount that would inhibit reproduction, impair immune function, result in mortalities, or otherwise impede the growth and recovery of the SRKW population is a habitat feature essential for the species' recovery. Water quality in Puget Sound, in general, is degraded as described in the Puget Sound Partnership 2018-2022 Action Agenda and Comprehensive (PSP 2018). For example, toxicants in Puget Sound persist and build up in marine organisms including SRKWs and their prey resources, despite bans in the 1970s of some harmful substances and cleanup efforts. Water quality varies in coastal waters from Washington to California. For example, as described in NMFS (2019c), high levels of DDTs have been found in SRKWs, especially in K and L pods, which spend more time in California in the winter where DDTs still persist in the marine ecosystem (Sericano et al. 2014).

Exposure to oil spills also poses additional direct threats as well as longer term population level impacts; therefore, the absence of these chemicals is of the utmost importance to SRKW conservation and survival. Oil spills can also have long-lasting impacts on other habitat features. Oil spill risk exists throughout the SRKW's coastal and inland range. From 2002-2016, the highest-volume crude oil spill occurred in 2008 off the California coast, releasing 463,848 gallons (Stephens 2017). In 2015 and 2016, crude oil spilled into the marine environment off the California coast totaled 141,680 gallons and 44,755, respectively; no crude oil spills were reported off the coasts of Oregon or Washington in these years (Stephens 2015, Stephens 2017). Non-crude oil spills into the marine environment also occurred off California, Oregon, and Washington in 2015 and 2016 (Stephens 2015, Stephens 2017). The Environmental Protection Agency and U.S. Coast Guard oversee the Oil Pollution Prevention regulations promulgated under the authority of the Federal Water Pollution Control Act. There is a Northwest Area Contingency Plan, developed by the Northwest Area Committee, which serves as the primary guidance document for oil spill response in Washington and Oregon. In 2017, the Washington State Department of Ecology published a new Spill Prevention, Preparedness, and Response Program Annual Report describing the Spills Program as well as the performance measures from 2007–17 (WDOE 2017).

ER-202

NOAASkagitAR0051170

*Prey Species of Sufficient Quantity, Quality, and Availability to Support Individual Growth, Reproduction, and Development, as well as Overall Population Growth.* SRKW are top of the food chain predators with a strong preference for salmonids in inland waters, particularly larger, older age class Chinook salmon (age class of 3 years or older) (Ford and Ellis 2006, Hanson and Emmons 2010). Samples collected during observed feeding activities, as well as the timing and locations of killer whales' high use areas that coincide with Chinook salmon runs, suggest the whales' preference for Chinook salmon extends to outer coastal habitat use as well (Hanson et al. 2017, Hanson et al. 2021). Quantitative analyses of diet from fecal samples indicate a high proportion of Chinook salmon in the diet of whales feeding in waters off the coast but a greater diversity of species, which included substantial contributions of other salmon and also lingcod, halibut, and steelhead (Hanson et al. 2021). Habitat conditions should support the successful growth, recruitment, and sustainability of abundant prey to support the individual growth, reproduction, and development of Southern Residents.

Most wild salmon stocks throughout the whales' geographic range are at fractions of their historic levels. Beginning in the early 1990s, 28 ESUs and DPSs of salmon and steelhead in Washington, Oregon, Idaho, and California were listed as threatened or endangered under the ESA. Historically, overfishing, habitat losses, and hatchery practices were major causes of decline. Poor ocean conditions over the past two decades have reduced populations already weakened by the degradation and loss of freshwater and estuary habitat, fishing, hydropower system management, and hatchery practices. While wild salmon stocks have declined in many areas, hatchery production has been generally strong.

In addition to a sufficient quantity of prey, those fish need to be accessible and available to the whales. Depending on pod migratory behavior, availability of Chinook salmon along the outer coast is likely limited at particular times of year (e.g. winter months) due to run timing of various Chinook salmon stocks. Prey availability may also be low when the distribution of preferred adult Chinook salmon is relatively less dense (spread out) prior to their aggregation when returning to their natal rivers. Prey availability may also be affected by competition from other predators including other resident killer whales, pinnipeds, and fisheries (Chasco et al. 2017).

Contaminants and pollution also affect the quality of SRKW prey in Puget Sound and in coastal waters of Washington, Oregon, and California. Contaminants enter marine waters and sediment from numerous sources, but are typically concentrated near areas of high human population and industrialization. Once in the environment these substances proceed up the food chain, accumulating in long-lived top predators like SRKWs. Chemical contamination of prey is a potential threat to SRKW critical habitat, despite the enactment of modern pollution controls in recent decades, which were successful in reducing, but not eliminating, the presence of many contaminants in the environment. The size of Chinook salmon is also an important aspect of prey quality (i.e., SRKWs primarily consume large Chinook salmon) so changes in Chinook salmon size (for instance as shown by Ohlberger et al. (2018)) may affect the quality of this component critical habitat.

*Passage Conditions to Allow for Migration, Resting, and Foraging.* Southern Residents are highly mobile and use a variety of areas for foraging and other activities, as well as for traveling between these areas. Human activities can interfere with movements of the whales and impact their passage. Southern Residents require open waterways that are free from obstruction (e.g.,

ER-203

NOAASkagitAR0051171

physical, acoustic) to move within and migrate between important habitat areas throughout their range, communicate, find prey, and fulfill other life history requirements. In particular, vessels may present obstacles to whale passage, causing the whales to swim further and change direction more often, which can increase energy expenditure for whales and impact foraging behavior (Ferrara et al. (2017).

A summary of the status of critical habitat, considered in this opinion, is provided in Table 7.

NOAASkagitAR0051172

**Table 7.** Critical habitat, designation date, federal register citation, and status summary for critical habitat considered in this opinion

| Species | Designation Date and Federal Register Citation | Critical Habitat Status Summary |
|---|---|---|
| **Puget Sound Chinook salmon** | 9/02/05 70 FR 52630 | Critical habitat for PS Chinook salmon includes 1,683 miles of streams, 41 square miles of lakes, and 2,182 miles of nearshore marine habitat in PS. The PS Chinook salmon ESU has 61 freshwater and 19 marine areas within its range. Of the freshwater watersheds, 41 are rated high conservation value, 12 low conservation value, and eight received a medium rating. Of the marine areas, all 19 are ranked with high conservation value. |
| **Southern resident killer whale** | 08/02/21 86 FR 41668 | Critical habitat includes approximately 2,560 square miles of marine inland waters of Washington: 1) the Summer Core Area in Haro Strait and waters around the San Juan Islands; 2) Puget Sound; and 3) the Strait of Juan de Fuca. Six additional areas include 15,910 square miles of marine waters between the 20-feet (ft) (6.1-meter (m)) depth contour and the 656.2-ft (200-m) depth contour from the U.S. international border with Canada south to Point Sur, California. We have excluded the Quinault Range Site. Based on the natural history of the Southern Residents and their habitat needs, NMFS identified three PCEs, or physical or biological features, essential for the conservation of Southern Residents: 1) Water quality to support growth and development; 2) prey species of sufficient quantity, quality, and availability to support individual growth, reproduction and development, as well as overall population growth; and 3) passage conditions to allow for migration, resting, and foraging. Water quality in Puget Sound, in general, is degraded. Some pollutants in Puget Sound persist and build up in marine organisms including Southern Residents and their prey resources, despite bans in the 1970s of some harmful substances and cleanup efforts. The primary concern for direct effects on whales from water quality is oil spills, although oil spills can also have long-lasting impacts on other habitat features In regards to passage, human activities can interfere with movements of the whales and impact their passage. In particular, vessels may present obstacles to whales' passage, causing the whales to swim further and change direction more often, which can increase energy expenditure for whales and impact foraging behavior. Reduced prey abundance, particularly Chinook salmon, is also a concern for critical habitat. |

ER-205

NOAASkagitAR0051173

## 2.3    Action Area

"Action area" means all areas to be affected directly or indirectly by the federal action and not merely the immediate area involved in the action (50 CFR 402.02). The Corp's proposed action is the exercise of its permit authorities for the No Name Slough tidegate replacement project. The action area consists of all the areas where the environmental effects of the proposed action are expected to occur.  The proposed action would cause a range of effects, as described in Section 2.5, Effects of the Action, including the temporary effects that occur and relent during construction, the enduring effects of those structures into the future, and the related, enduring effects on the SRKW prey base. To delineate the action area we identified the geographic extent of all the various effect pathways of the proposed action and determined the outermost extent of all of these zones of effect combined. The construction-related effects occur relatively close to the project site with noise having the largest zone of effect. However, as described in more detail in the following paragraphs, there are other effects that have a greater geographical reach and thus those effects define the action area.

The enduring habitat effects of the proposed structures define the outer limits of the action area on the landward side of the proposed tidegate structures. Impeded access to historical estuarine habitat and changes in water quality will cause physical, chemical (salinity, dissolved oxygen) or biological effects stemming from the action for PS Chinook salmon and steelhead landward of the tidegate project. The effect pathway with greatest geographical reach on the landward side is the loss of juvenile salmonid rearing habitat. Thus, the action area extends landward from the proposed tidegate into No Name Slough and the adjacent floodplains, covering hundreds of acres[16] to reflect the extent of the lost juvenile salmonid rearing habitat attributable to the proposed action.

The indirect, biological effects of the proposed action on the SRKW prey base define the outer limits of the action area on the marine side of the proposed tidegate structures. More specifically, the action area for this consultation includes the zone of effect where greater numbers of PS Chinook salmon would have been available but for the proposed action. Thus, the contours of the marineward side of the action area are grounded in the expected migration pattern/presence of the PS Chinook salmon prey impacted by the proposed action. Best available science shows that Skagit River PS Chinook salmon migrate out into Padilla Bay, among other pathways, and, after that, they travel and are available as prey for SRKW throughout the Puget Sound (Ford and Ellis 2006; Hanson and Emmons 2010; Chamberlin and Quinn 2014). PS Chinook salmon represent the majority of the Chinook salmon consumed by SRKWs in Puget Sound. Hanson et al. 2021, determined that 67 percent of Chinook salmon found in SRKW diet samples collected in Puget Sound were estimated to have originated from Puget Sound. By contrast, outside Puget Sound, SRKW prey on Chinook salmon from multiple areas. (Hanson et al. 2021, Hanson and Emmons 2010). Accordingly, the action area for the proposed action includes all of Puget Sound, but no marine areas beyond.

---

[16]   Under the TFI Agreement, the No Name Slough tidegates being replaced through this action was determined to affect 207 acres of estuarine habitat behind the tidegate (WWAA et al. 2008).

ER-206

NOAASkagitAR0051174

## 2.4    Environmental Baseline

The "environmental baseline" refers to the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action. The environmental baseline includes the past and present impacts of all federal, state, or private actions and other human activities in the action area, the anticipated impacts of all proposed federal projects in the action area that have already undergone formal or early section 7 consultations, and the impact of state or private actions which are contemporaneous with the consultation in process. The consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline (50 CFR 402.02).

As identified above, the action area includes Puget Sound and the slough area behind the No Name Slough tidegate. Puget Sound is one of the largest estuaries in the United States, having over 2,400 miles of shoreline, more than two million acres of marine waters and estuarine environment, and a watershed of more than 8.3 million acres. In 1987, Puget Sound was given priority status in the National Estuary Program. This established it as an estuary of national significance under an amendment to the Clean Water Act. In 2006, the Center for Biological Diversity recognized the PS Basin as a biological hotspot with over 7,000 species of organisms that rely on the wide variety of habitats provided by PS (Center for Biological Diversity 2006). There are more than 10,000 streams in the Puget Sound basin. The basin is unique with its historically high salmon species richness and historically high natural salmon productivity (Lombard 2006). However, salmon abundance has decreased 92 percent in Puget Sound streams since 1850 (Gresh et al. 2000), initially due to over-fishing in the late 1800s followed by extensive human development pressures.

The State of the Sound biannual report produced by the Puget Sound Partnership (PSP) (PSP 2019) summarizes how different indicators of health of the PS ecosystem are changing.[17] The assessment identifies that PS marine and freshwater habitats continue to face impacts of accelerating population growth, development, and climate change; and that few of the 2020 improvement targets (including habitat for ESA-listed salmonids) identified by the PSP are being reached.

Over the last 150+ years, 4.5 million people have settled in the PS region. There is a suite of impacts of human development on aquatic habitat conditions in the PS, including water quality effects of stormwater runoff, industrial pollutants and boats, in-water noise from boats and construction activities, and fishing pressure, to name a few (see SSPS 2007; Hamel et al. 2015). With the level of infrastructure development associated with population growth, the PS nearshore has been altered significantly. Major physical changes documented in the PS include the simplification of river deltas, the elimination of small coastal bays, the reduction in sediment supply to the foreshore due to beach armoring, and the loss of tidally influenced wetlands and salt marsh (Fresh et al. 2011).

---

[17] The Puget Sound Partnership tracks 52 vital sign indicators to measure progress toward different Puget Sound recovery goals. Of the 6 Puget Sound recovery goals, the most relevant for this Opinion include: Thriving species and food webs, Protected and Restored Habitat, Healthy Water Quality and Quantity.

ER-207

NOAASkagitAR0051175

As noted throughout this Opinion, future effects of climate change on habitat quality throughout Puget Sound are expected to be negative.

Between 2020 and 2022 NMFS signed three jeopardy and adverse modification opinions (NMFS 2020, NMFS 2021, NMFS 2022b), finding that several projects the USACE proposed to permit in the Puget Sound (otherwise known as the Salish Sea) nearshore were likely to jeopardize the continued existence of PS Chinook salmon and SRKWs, and adversely modify those species' designated critical habitats. All three of those Opinions included a Reasonable and Prudent Alternative (RPA) to the proposed action that, if implemented, NMFS concluded would not jeopardize PS Chinook salmon or SRKW, or adversely modify those species' designated critical habitats. All of the RPAs required the projects to eliminate or fully offset their enduring effects, such that they would not cause a net reduction in nearshore habitat quality. In 2022, NMFS signed a programmatic biological opinion based on a proposed action from the USACE that has been used to cover almost 200 projects that impacted nearshore areas of the Salish Sea and resulted in effects to ESA listed resources. NMFS 2022c (Salish Sea Nearshore Programmatic, or SSNP). SSNP is a voluntary program that can be used to cover certain projects that propose to repair, maintain, or install new culverts, bridges, utilities, stormwater facilities and outfalls; modify shorelines; install, repair, or replace navigation aids, scientific measurement devices, tideland markers, buoys; maintain, repair, or replace in-water or over-water structures (i.e., piers, ramps, floats, boat ramps, etc.); conduct maintenance dredging; or conduct habitat enhancement activities. Importantly, the SSNP programmatic action, should applicants choose to use it to meet ESA consultation requirements, requires that projects either eliminate or offset their expected enduring effects with a commensurate amount of habitat enhancement or other offsetting activities, which can include, e.g., restoration work or the purchase of conservation credits, in an amount that will fully offset the projects' enduring impacts on Puget Sound nearshore habitat quality. *See also* NMFS 2016c (a predecessor to the Salish Sea Nearshore Programmatic).

*Nearshore Habitat in Puget Sound*

The Puget Sound Nearshore Ecosystem Restoration Project (PSNERP), an investigation project between the Corps and the state of Washington, reviewed the historical changes to PS's shoreline environment between 1850-1880, and 2000-2006, and found the most pervasive change to PS to be the simplification of the shoreline and reduction in natural shoreline length (Simenstad et al. 2011). Recent studies have estimated the loss of nearshore habitat in PS at close to 85 percent or more (Brophy et al. 2019). Throughout PS, the nearshore areas have been modified by human activity, disrupting the physical, biological, and chemical interactions that are vital for creating and sustaining the diverse ecosystems of PS. The shoreline modifications are usually intended for erosion control, flood protection, sediment management, or for commercial, navigational, and recreational uses. Seventy-four percent of shoreline modification in PS consists of shoreline armoring (Simenstad et al. 2011), which usually refers to bulkheads, seawalls, or groins made of rock, concrete, or wood. Other modifications include jetties and breakwaters designed to dissipate wave energy, and structures such as tidegates, dikes, and marinas, overwater structures, including bridges for railways, roads, causeways, and artificial fill. Analyses conducted in 2011 though the Puget Sound Nearshore Ecosystem Restoration Project (Fresh et al. 2011; Simenstad et al. 2011) found that since 1850, of the approximately 2,470 miles of PS shoreline:

- Shoreline armoring has been installed on 27 percent of PS shores.

ER-208

NOAASkagitAR0051176

- One-third of bluff-backed beaches are armored along half their length. Roads and nearshore fill have each affected about 10 percent of the length of bluff-backed beaches.
- Forty percent of PS shorelines have some type of structure that impacts habitat quality.
- Conversion of natural shorelines to artificial shoreforms occurred in 10 percent of PS.
- There has been a 93 percent loss of freshwater tidal and brackish marshes. The Duwamish and Puyallup rivers have lost nearly all of this type of habitat.
- A net decline in shoreline length of 15 percent as the naturally convoluted and complex shorelines were straightened and simplified. This represents a loss of 1,062 km or 660 miles of overall shoreline length.
- Elimination of small coastal embayments has led to a decline of 46 percent in shoreline length in these areas.
- A 27 percent decline in shoreline length in the deltas of the 16 largest rivers and a 56 percent loss of tidal wetlands in the deltas of these rivers.

Effects of shoreline modification on nearshore and estuarine habitat function include diminished sediment supply, diminished organic material (e.g., woody debris and beach wrack) deposition, diminished over-water (riparian) and nearshore in-water vegetation (SAV), diminished prey availability, diminished aquatic habitat availability, diminished invertebrate colonization, and diminished forage fish populations (see Toft et al. 2007; Shipman et al. 2010; Sobocinski et al. 2010; Morley et al. 2012; Toft et al. 2013; Munsch et al. 2014; Dethier et al. 2016). Shoreline modification, including armoring, often results in increased beach erosion waterward of the armoring, which, in turn, leads to beach lowering, increases in sediment temperature, and reductions in invertebrate density (Fresh et al. 2011; Morley et al. 2012; Dethier et al. 2016).

The reductions to shallow water habitat, as well as reduced forage potential resulting from shoreline modification may cause juvenile salmonids to temporarily utilize deeper habitat, thereby exposing them to increased piscivorous predation. Typical piscivorous juvenile salmonid predators, such as flatfish, sculpin, and larger salmonids, being larger than their prey, generally avoid the shallowest nearshore waters that out-migrant juvenile salmonids prefer. When juvenile salmonids temporarily leave the relative safety of the shallow water, their risk of being preyed upon by other fish increases. This has been shown in the marine environment where juvenile salmonid consumption by piscivorous predators increased fivefold when juvenile pink salmon were forced to leave the shallow nearshore (Willette 2001).

*Water Quality*

In a typical year in the U.S., pesticides are applied at a rate of approximately five billion pounds of active ingredients per year (Kiely et al. 2004). Therefore, pesticide contamination in the nation's freshwater habitats is ubiquitous and pesticides usually occur in the environment as mixtures. The USGS National Water-Quality Assessment (NAWQA) Program conducted studies and monitoring to build on the baseline assessment established during the 1990s to assess trends of pesticides in basins across the Nation, including PS. More than 90 percent of the time, water from streams within PS agricultural, urban, or mixed-land-use watersheds had detections of 2 or more pesticides or degradates, and about 20 percent of the time they had detections of 10 or more. Fifty-seven percent of 83 agricultural streams had concentrations of at least one pesticide that exceeded one or more aquatic-life benchmarks at least one time during the year (68 percent

ER-209

NOAASkagitAR0051177

of sites sampled during 1993–1994, 43 percent during 1995–1997, and 50 percent during 1998–2000) (Gilliom et al. 2006).

Over the last century, human activities have introduced a variety of toxic contaminants into the Salish Sea at levels that can affect adult and juvenile salmonids and/or the prey that support them. Along shorelines, human development has increased nutrient loads from failing septic systems, and from use of nitrate and phosphate fertilizers on lawns and farms (SSPS 2007). The combination of runoff from highways and dense residential, commercial and industrial development has further degraded chemical characteristics of the PS marine environment (HCCC 2005; SSPS 2007; PSEMP 2017; PSEMP 2019). Toxic pollutants in PS include oil and grease, polychlorinated biphenyls (PCBs), phthalates, polybrominated diphenyl ethers (PBDEs), and heavy metals that include zinc, copper, and lead. In addition to degraded water quality, about 32 percent of the sediments in the PS region are considered to be moderately or highly contaminated (PSAT 2007). Despite some areas undergoing clean-up operations that have improved benthic habitats (Sanga 2015), contamination of these chemicals in fish, including PS Chinook salmon and steelhead persists (West et al. 2017; Carey et al. 2018).

Mackenzie et al. (2018) found that stormwater is the most important pathway to PS for most toxic contaminants, transporting more than half of the PS's total known toxic load (Ecology and King County 2011). During a robust PS monitoring study, toxic chemicals were detected more frequently and at higher concentrations during storm events compared with base flow for diverse land covers, pointing to stormwater pollution (Ecology 2011). The PS basin has over 4,500 unnatural surface water and stormwater outfalls, 2,121 of which discharge directly into the Sound (WDNR 2015).

In general, the pollutants in the existing stormwater discharge are diverse. The discharge itself comes from rainfall or snowmelt moving over and through the ground, also referred to here as "runoff." As the runoff travels along its path, it picks up and carries away natural and anthropogenic pollutants. Pollutants in stormwater discharge typically include the following (Buckler and Granato 1999; Strecker et al. 1990; Kayhanian et al. 2003; Stokstad 2020; Tian et al. 2021):

- Excess fertilizers, herbicides, insecticides and sediment from landscaping areas.
- Chemicals and salts from de-icing agents applied on sidewalks, driveways, and parking areas.
- Oil, grease, PAHs, tire rubber-derived chemicals and other toxic chemicals from roads and parking areas used by motor vehicles.
- Bacteria and nutrients from pet wastes and faulty septic systems.
- Metals (arsenic, copper, chromium, lead, mercury, and nickel) and other pollutants from the pesticide use in landscaping and agriculture, roof runoff, decay of building and other infrastructure, and particles from street and tire wear.
- Atmospheric deposition from surrounding land uses.
- Metals, PAHs, PBDEs, and phthalates from roof and industrial runoff.
- Erosion of sediment and attached pollutants due to hydromodification.

NOAASkagitAR0051178

The full presence of contaminants throughout the action area is poorly understood, but the concentration of many contaminants increases in downstream reaches (Fuhrer 1996; Johnson et al. 2013; Morace 2012). The fate and transport of contaminants varies by type, but are all determined by similar biogeochemical processes (Alpers et al. 2000b; Alpers et al. 2000a; Bricker 1999). After deposition, each contaminant typically processes between aqueous and solid phases, sorption and deposition into active or deep sediments, diffusion through interstitial pore space, and re-suspension into the water column. Uptake by benthic organisms, plankton, fish, or other species may occur at any stage except deep sediment, although contaminants in deep sediments become available for biotic uptake when re-suspended by dredging or other disturbances.

*Climate Change*

The environmental baseline includes the projected effects of climate change for the time period commensurate with the effects of the proposed action. Mauger et al. (2015) predict that circulation in PS is projected to be affected by declining summer precipitation, increasing sea surface temperatures, shifting streamflow timing, increasing heavy precipitation, and declining snowpack. While these changes are expected to affect mixing between surface and deep waters within PS, it is unknown how these changes will affect upwelling. Changes in precipitation and streamflow could shift salinity levels in PS by altering the balance between freshwater inflows and water entering from the North Pacific Ocean. In many areas of PS, variations in salinity are also the main control on mixing between surface and deep waters. Reduced mixing, due to increased freshwater input at the surface, can reduce phytoplankton growth, impede the supply of nutrients to surface waters, and limit the delivery of dissolved oxygen to deeper waters. Patterns of natural climate variability (e.g., El Niño/La Niña) can also influence PS circulation via changes in local surface winds, air temperatures, and precipitation.

PS Chinook salmon and PS steelhead were classified as highly vulnerable to climate change in a recent climate vulnerability assessment (Crozier et al., 2019). In estuarine environments, the two greatest concerns associated with climate change are rates of sea-level rise and temperature warming (Wainwright and Weitkamp 2013; Limburg et al., 2016). While the effects of climate change-induced ocean acidification on invertebrate species are well known, the direct exposure effects on salmon remain less certain (Crozier et al. 2019).

The effects of sea level rise are expected to vary across the Puget Sound seascape. As described in Mauger et al. 2015,

> "Sea level rise is projected to expand the area of some tidal wetlands in PS but reduce the area of others, as water depths increase and new areas become submerged. For example, the area covered by salt marsh is projected to increase, while tidal freshwater marsh area is projected to decrease. Rising seas will also accelerate the eroding effect of waves and surge, causing unprotected beaches and bluffs to recede more rapidly. The rate of sea level rise in PS depends both on how much global sea level rises and on regionally-specific factors such as ocean currents, wind patterns, and the distribution of global and regional glacier melt. These factors can result in higher or lower amounts of regional sea level rise (or

ER-211

NOAASkagitAR0051179

even short-term periods of decline) relative to global trends, depending on the rate and direction of change in regional factors affecting sea level."

Regional and local climate models have increased their utility in recent years by providing down-scaled projections of sea level rise within Puget Sound. The Climate Impacts Group (CIG) at the University of Washington has produced one such model. Using the high greenhouse gas scenario, Padilla Bay has a 50% chance of 0.7 feet sea level rise within 25 years (2050), and a 50% chance of 1.2 feet sea level rise within 50 years (2075) (Figure 6). Seemingly inconsequential, small sea level elevation rises can have significant impacts to infrastructure and low gradient landscapes, including No Name Slough (Figure 7).



**Figure 6.** Sea level rise projections through 2080 using high and low greenhouse emission models (CIG 2024)[18].

---

[18] https://cig.uw.edu/ Accessed April 2024.

NOAASkagitAR0051180



**Figure 7.**    Padilla Bay side of No Name Slough with current and approximate future high tide elevations as projected using a 50% chance of occurrence from CIG models using high greenhouse gas scenarios (CIG 2024).

Skagit Bay and Padilla Bay

The Skagit River has lost extensive estuarine habitat to agricultural and residential development (Collins et al. 2003). Beginning in the 1860s, diking, ditching, and filling of the Skagit River delta reduced estuarine habitat from 11,483 ha to 3,118 ha by 1991 (Collins et al. 2003; Beamer et al. 2005). Additionally, much of the remaining Skagit tidal delta habitat has been disconnected from floodplain and tidal processes, largely through the construction and maintenance of dikes and roads. Approximately, 73 percent of the Skagit tidal delta has been isolated from floodplain and tidal processes, and 24 percent of the Skagit Bay shoreline has been armored to protect agricultural and residential land uses (Greene and Beamer 2011).

Padilla Bay is shallow and flushes most of the water into Puget Sound each day. Thus, residence time for water entering the bay is low. The bay is well-mixed, due to the large tidal prism, shallow depth, and moderately low freshwater inflow (Bulthuis, 2013). Four major freshwater tributaries (Joe Leary Slough, No Name Slough, Little Indian Slough, and Big Indian Slough) drain into Padilla Bay. In the early 1800s, much of the Padilla Bay watershed was lowland marsh area, including much of the Joe Leary Slough watershed identified on old maps as Olympia Marsh (Skagit County 2017; USCGS 1886; McCarthy 2020). These wetlands were drained by

WCRO-2022-03092                                   -70-

NOAASkagitAR0051181

using existing sloughs and adding drainage ditches to produce farmland. Beyond the drainage of these wetlands, the primary change in the Padilla Bay watershed was the construction in the late 19th century of a sea dike along several miles of the southeast shore of Padilla Bay. This dike cut off hundreds of acres of shallow bay area which was then converted to farmland. This area is now drained by Big Indian, Little Indian, and No Name Sloughs (Skagit County, 2017). Padilla Bay drains about 23,000 acres of freshwater, most of which is agricultural. Nearly all freshwater emptying into Padilla Bay is from agricultural watercourses, including No Name Slough. Padilla Bay is about 11,000 acres and contains nearly 8,000 acres of eelgrass, which provides a rich community of nursery habitat for salmon, crab, perch, flatfish and herring. Padilla Bay has one of the largest contiguous stands of eelgrass along the Pacific Coast of North America (Bulthuis, 1996). A portion of the action area is within the Padilla Bay National Estuarine Research Reserve (NOAA 2024b). Padilla Bay is an "orphaned" estuary of the Skagit River (NOAA and Ecology 1980) where the bay is composed of a complex suite of estuarine straits and bays that receive fresh water from the Skagit, Nooksack, and Fraser rivers as well as numerous small coastal streams, sloughs, and rivers (Bulthuis 1996). Juvenile Chinook salmon are known in Padilla Bay and the adjacent Swinomish Channel (Beamer et al. 2007; and Rice et al. 2011). Chinook salmon caught in Padilla Bay sampling efforts indicate that most juveniles originate from the Skagit River (Rhodes et al. 2006). Beamer et al. (2013) reported that Chinook salmon fry use small streams and their confluences in the Whidbey Basin when not blocked by culverts and other fish passage barriers.

In summarizing estuarine habitat conditions of the Skagit River, the Washington State Conservation Commission (Smith 2003) found that distributary channels (channels that branch from the mainstem and drain into the estuary) were historically numerous, and wetland complexes covered more than half of the Skagit River delta resulting in a large amount of land in contact with saltwater (Bortleson et al. 1980; Collins and Montgomery 2001). From the 1860s until 1951, side channel and slough habitat decreased by about 90 percent in the Skagit Delta (Collins 2000). Prior to human impacts, blind tidal habitat comprised an estimated 20,386 acres while riverine tidal wetlands covered about 10,378 acres in the Skagit and Samish deltas for a total of 30,765 acres (Collins and Montgomery 2001). By the end of the 19th century, dikes had isolated most of the Skagit wetlands and by the mid-20th century, numerous distributary channels had been closed off (Collins and Montgomery 2001). As early as 1886, No Name Slough had been isolated from Padilla Bay by a dike (USCGS[19]). The Skagit basin has lost approximately 72% of historic estuarine delta habitat, including a loss of 68% of estuarine emergent habitat, 66% of transitional estuarine forested habitat, 84% of riverine tidal habitat, and 75 percent of its distributary channel (Beamer, et al. 2002a; Collins and Montgomery 2001; Beechie et al. 2001). Many channels were converted to ditches that drain farmlands and are no longer accessible to salmonids at their upper ends, and more than 100 miles of drainage ditches exist in the Skagit delta (Phinney and Williams 1975). In addition, much of the land isolated by dikes has been denuded of vegetation, ditched, dredged, or filled, resulting in a considerable loss

---

[19] https://riverhistory.ess.washington.edu/tsheets/framedex.htm. The U. S. Coast Survey, renamed as the U. S. Coast & Geodetic Survey (USCGS) in 1878, mapped the Puget Sound nearshore at a reconnaissance level in the 1840s, and then at a more detailed scale (1:10,000 and 1:20,000) in the following decades. The agency created two map series: topographic sheets, commonly referred to as "T-sheets, concentrated on intertidal and supratidal areas, and hydrographic sheets, or "H-sheets," showed soundings. The maps available from this site are the earliest detailed (1:10,000 or 1:20,000 scale) T-sheets for the Puget Sound nearshore.

NOAASkagitAR0051182

and conversion of wetland, riparian, and aquatic habitat. For example, historical sources indicate the eastern shore of Padilla Bay, including No Name Slough, once included marsh habitat with aquatic vegetation (Figure 8).



**Figure 8.**     1886 USCGS map of the eastern shore of Padilla Bay and No Name Slough. A dike is apparent along the shoreline with marsh vegetation present bayward and landward of the dike (USCGS). The historic presence of marsh vegetation supports the restoration potential of No Name Slough and adjacent waterways.

Today, much of the Skagit River estuary and delta has been converted from aquatic habitat to farmland and other uses through the development of extensive dike and levee systems (Table 8). In addition to the widespread loss of estuarine/delta habitat, blind channels, which are preferred habitat for juvenile Chinook, have been reduced by an estimated 94.6 percent (2,765.3 acres) (Beamer et. al. 2005).  The net loss of edge and blind channel habitat preferred by rearing Chinook is an estimated 87.9 percent.

**ER-215**

NOAASkagitAR0051183

**Table 8.** Loss of Skagit Delta for each Habitat Type (Beamer et al. 2005).

|  | Current Acres | Historic Acres | Loss |
|---|---|---|---|
| Riverine Tidal | 3,578 | 21,797 | 84 percent |
| Estuarine Forested Transition | 5,916 | 17,213 | 66 percent |
| Estuarine Emergent Marsh | 12,219 | 34,315[*] | 68 percent |
| Total | 20,601 | 73,333 | 72 percent |

[*] Includes the 207 acres affected by the tidegates proposed for replacement at No Name Slough (WWAA et al. 2008).

While a substantial amount of estuarine habitat has been lost or rendered inaccessible, remaining accessible habitats within the estuary have also been degraded from a lack of LWD, lost riparian vegetation, and hydromodifications (i.e., shoreline armoring of the waterway), all of which degrade rearing habitat for juvenile Chinook salmon (Skagit Watershed Council 1999; Dethier et al. 2017). Habitat volume within some remaining tidal channels of the Skagit estuary has also been reduced. Historic diking of upper reaches of tidal channels reduced the tidal prism for channel reaches downstream, and this loss of tidal energy continues to cause a decrease of channel size and depth through sediment redistribution (Hood 2004). As sediment redistributes, channels get shallower, leaving less habitat for Chinook salmon to occupy and more areas dewatered during low tides.

With the extensive hydromodification of the historic Skagit Estuary, it has been suggested that sediment that historically deposited on the now inaccessible floodplain deposits (also termed progradation) within Skagit Bay, now creates shallow areas increasing estuarine habitat outside of existing dikes that compensates for habitat loss. Recent analysis of the Skagit estuary contradicts this hypothesis; in two analyses that accounted for accretion, net habitat loss of estuarine habitat near Wiley Slough was 174 acres, and 102 acres near the North Fork channel (Hood 2004). Since 1956, Hood (2005) estimated that the Skagit delta is prograding at approximately 4.1 acres per year near the North Fork of the delta, and losing an average of 0.74 acres per year in the South Fork. In total, a net increase of 168 acres has occurred. Conversely, in an analysis of the previous 15 years, Hood (2005) estimated that the North Fork region is prograding at roughly the same rate (average of 3.5 acres per year), and the South Fork area showing an average loss of 6.5 acres per year which is a net loss of 46 acres since 1991. An avulsion occurred in the North Fork in 2014 which has likely increased the progradation in this area. Marine currents move sediment from the Skagit Delta, slowing down or halting extensive progradation (Bortleson et al., 1980).

WCRO-2022-03092 -73-

ER-216

NOAASkagitAR0051184

Smith and Manary (2004) summarized water quality in the estuary, as degraded. In addition to the loss of connectivity caused by dikes, water quality conditions were rated as poor for many of these sloughs (Smith 2003). Warm water temperatures and low dissolved oxygen levels have been recorded in Hall, Browns, Dry, and Wiley Sloughs, particularly in the summer months (Entranco 1993). Phosphorus and nitrogen levels were also high in each of these sloughs (Entranco 1993). Mayer and Elkins (1990) observed herbicide runoff in several sloughs of Padilla Bay following a rain event. Following rainfall in 1987, dicamba was found in all slough and Bay water samples at concentrations ranging from 10 to 160 µg/liter, and in 3 of the slough sediment samples at concentrations ranging from 5.8 to 17.1 µg/g. Similarly, 2,4-D was found in 9 slough water and 1 Bay water samples at concentrations ranging from 0.1 to 1.1 µg/liter (Mayer and Elkins 1990). High levels of fecal coliform bacterial contamination are found in Padilla Bay. The contamination is affecting beneficial uses in the area, such as shellfish harvesting and recreation. Several water bodies in eastern Padilla Bay and its watershed are included on Ecology's 303(d) list of impaired waters. On the list of impaired waters are parts of Padilla Bay, Joe Leary Slough, No Name Slough, Indian Slough, and Big Indian Slough. Additional water quality parameters of concern in the sloughs include DO, pH, and temperature (Washington Department of Ecology 2016). No Name Slough is on the 303(d) list for fecal coliform, dissolved oxygen, pH, and temperature (McCarthy 2020). The causes for the water quality problems in the Sloughs are thought to be low flows, non-point pollution, loss of riparian vegetation, loss of wetland habitat, and absence of flushing and circulation due to presence and maintenance of dikes and levees.

**Tidal Channels in Puget Sound**

Connectivity within nearshore and estuarine habitats has been lost and compromised. Smith and Manary 2004 reported that over 125 tidegates, pump houses and floodgates regulated drainage within the Skagit estuary. In recent years, active restoration efforts, including dike setbacks and tidegate removals have reduced the number of these structures.

Tidal channels of sloughs in coastal deltas can be important habitats for salmonids but are often highly modified by human activities. Connectivity between tributary creeks and mainstem channels is often constrained by structures such as dikes and floodgates, designed to protect urban and agricultural areas from flooding. Tidegates can diminish habitat quality and block fish from accessing tidal creeks (Seifert and Moore, 2018). Tidegates may impact fishes in two main ways: altering water quality and restricting fish passage (Kroon and Ansell 2006). First, tidegates can alter water quality by restricting tidal exchange (Raposa and Roman 2003; Ritter et al. 2008). Tidegates are associated with hypoxic dead zones due to eutrophication in the stagnant upstream habitats (Portnoy 1991; Gordon et al. 2015). Impounded water in tidal creeks also tends to have higher concentrations of nutrients, fecal coliforms, and heavy metals, as well as high turbidity and siltation rates (Giannico and Souder 2004; Portnoy and Allen 2006). Second, when closed, tidegates physically restrict fish passage, impeding migratory fishes from entering or leaving tidal creeks (Bass 2010; Doehring et al. 2011; Wright et al. 2014).

During their juvenile migration from freshwater to marine habitat, Chinook salmon may rear for prolonged periods in subsidiary and blind channel networks that connect mainstem estuarine channels with wetlands (Congleton et al. 1981; Simenstad 1983; Healey 1991). These channels are often intertidal, requiring twice-daily emigration from wetland areas and redistribution of

ER-217

NOAASkagitAR0051185

salmon across large stretches of habitat as channels flood and drain with the tide (Rozas 1995; Gibson 2003). Despite these tidal emigrations, individual Chinook salmon may return to particular wetland channels for days to months, moving into flooded channel networks during high tides and retreating to subtidal habitats during low tides (Congleton et al. 1981; Levy and Northcote 1982; Shreffler et al. 1990). Salt marsh habitats provide productive feeding habitats for juvenile salmon (Levy and Northcote 1982; Simenstad et al. 1982; Shreffler et al. 1992) and have been described as potential predator refugia (Shreffler et al. 1992). Consequently, the condition of estuarine marsh habitat may be linked to life history diversity, productivity, and hence resilience of salmon populations (Bottom et al. 2005a, 2005b).

No Name Slough is located at the eastern shore of Padilla Bay. The tidegates drain the slough to the west and southwest, which exposes the shoreline to six to eight miles of fetch. The associated wind carries woody debris to the current armored shoreline which blocks the deposition of woody material from forming beach wrack, productive habitat for juvenile salmonids (Dethier et al. 2016). The habitat immediately waterward of the shoreline is largely composed of mudflat. At low tide, the mud flat is exposed and forms a shallow gradient between the base of the shoreline armoring and eelgrass (*Zostera marina and Z. japonica*), which dominates the substrate between the lower intertidal and subtidal areas of Padilla Bay and provides high quality habitat. At high tide, the area immediately bayward of the shoreline armoring steeply deepens, forming poor habitat conditions for juvenile salmon. The steepened shoreline lacks cover from predators and has reduced prey availability due to reduced riparian vegetation and beach wrack.

Landward of the tidegates, the habitat is mostly composed of hardened dikes and slough channels. The vegetation along the dikes is managed with chemicals or mechanical efforts to minimize riparian growth. The slough channels are devoid of habitat features, such as large wood, which might otherwise be used as cover from predators. Water temperature is elevated in No Name Slough (McCarthy 2020). Excessive sediment runoff from agriculture fields likely are responsible for the high turbidity observed during winter (Skagit Conservation District 2005). Juvenile coho salmon have been observed upstream of the slough in No Name Creek (Dugger 2000, Salmonscape 2024), so some fish passage and rearing in the basin has occurred.

### 2.4.1  Distinguishing Baseline from Effects of the Action

As described in more detail in Section 2.5 below, the effects of an action are the consequences to listed species or critical habitat caused by the proposed action and are reasonably certain to occur. In contrast, the environmental baseline refers to the condition of the listed species or its designated critical habitat in the action area without the consequences caused by the proposed action (50 CFR 402.02).

Distinguishing baseline from effects of the proposed action for new structures is relatively straightforward. Differentiating these effects in repair or replacement projects requires more explanation. For this consultation, we must distinguish what impacts from the existing structure are properly attributed to the baseline compared with what future impacts are consequences of the proposed action. At its most basic, a repair or replacement project at least extends the life of the part of the structure being repaired or replaced. The impacts of part or all of the structure for the duration of that new life that would not occur in the absence of the USACE's discretionary

ER-218

NOAASkagitAR0051186

decision to issue the permit are considered consequences of the action. We explain additional nuances below.

When the USACE originally permits a structure, or a part of a structure, there is no "end date" on the permit that would require the future removal of that structure, or the piece of the structure. However, USACE general condition 2 at 33 CFR Part 325, Appendix A, and Nationwide Permit General Condition Number 14, require permittees to maintain authorized structures in good condition. Based on our experience with hundreds of consultations, to facilitate the existence of a permitted and structurally intact structure into perpetuity, regular maintenance will be necessary to keep that structure in the required good condition.

The expected issuance of future permits to facilitate maintenance work on the structures that are part of this proposed action allows us to make reasonable assumptions about the maximum amount of time certain types of structures will exist before the owner will seek a new USACE permit. The maximum expected number of years before another USACE permit will be needed to perform maintenance (hereafter, useful life period), as explained next, allows NMFS to limit our analysis to those expected time frames. In this case, NMFS assumes that repaired and replaced structures will have a maximum "useful life" of 50 years for shoreline armoring and the concrete tidegates before requiring an additional USACE permit to maintain their structural integrity.

Sometimes there is an increment of future impacts stemming from the existing structures that we consider as part of the environmental baseline. Specifically, we evaluate whether existing structures that are part of a proposed action could persist in the environment and cause the same effects for some additional years left of the structure's *original* useful life. Empirical studies on the useful life of rock revetment on marine shorelines are uncommon. Revetment life span may range from 30 years (McDonnel et al. 1996) to 50 years (Sanitwong-Na-Ayutthaya, 2023). Maintenance costs are a significant and ongoing expense when a hard armoring is selected. These costs are ongoing for the life of the structure and are therefore likely to result in significant levels of investment through a project's lifetime. However, periodic maintenance of revetment rocks require regular maintenance by adding new rocks every 5-10 years to achieve a design life of 50 years (Sanitwong-Na-Ayutthaya, 2023). Here, the submitted project package did not speak to the current condition of the dike. Based on a review of the comments received on the Draft Opinion, and materials submitted by the District and the Corps, we have determined that there could be remaining life left in the armoring and so removal credit is reasonable. We note that the tidegates themselves appear to be failing and in need of immediate repair or replacement (based on the District's representations to the Court, their motion for a preliminary injunction, and the fact that one tidegate has already failed and has been partially removed and the area filled with material). In addition, the BA indicates that removal of the surrounding riprap will be necessary to facilitate those repairs: as part of the construction step involving removal of the two 4-foot-wide round culverts and tidegates that drain No Name Slough, to Padilla Bay, "excavated material, including riprap located on the seaward side of the dike, will be temporarily stockpiled" (page 8. The construction steps for removal of the northern culverts and tidegates include "excavate dike" and "the dike will be rebuilt with clean clay" (page 9). Together this would suggest the old riprap has no remaining useful life because it is integrated and integral to the proper functioning of the new tidegate. That would weigh in favor of giving no credit for any

NOAASkagitAR0051187

remaining life. Nevertheless, for the reasons mentioned above, NMFS has assumed that the parts of the structure/riprap being replaced has 10 years of useful life remaining, and therefore acknowledged commensurate credit for removing the structure early/before the end of its useful life. This is reflected in our analysis and Nearshore Conservation Calculator output. Utilizing a rebuttable presumption that a structure has 10 years of life before it would need a repair to keep it in good working order is consistent with assumptions made in the Salish Sea Nearshore Programmatic Consultation (NMFS 2022c) and other similar consultations. See, e.g., (NMFS 2020a, NMFS 2021, NMFS 2022b).

Notably, NMFS does not consider the theoretical, possible future degradation of these existing structures when evaluating the consequences of this action (what would not occur but for the proposed action and is reasonably certain to occur) for two main reasons. First, NMFS acknowledges if the owner of an existing nearshore, in- or overwater structures ceased to perform any maintenance and essentially abandoned the structure, there could be multiple scenarios relative to how that structure would persist and degrade in the marine shoreline environment. The range of potential outcomes is exponential, to the point it is not reasonable to assume them all, nor is there currently enough data or analysis that would support such an evaluation. In general, for scenarios where structures are left to degrade beyond their useful life, we acknowledge that complete degradation could take years in some cases. Further, the range of possible scenarios could result in impacts associated with a degrading structure over time would be both negative (e.g., decomposing creosote impacts to water quality) and positive (e.g., overwater cover is no longer obstructing migration or a tidegate no longer precluding habitat forming processes). This could also mean that at some point, the structure would fall out of compliance with the USACE original permit, or state or local permits). Failure to maintain nearshore, in- and/or overwater structures is not unheard of (Patterson et al 2014, King County 2019). However, there is also a preponderance of evidence, including the proposed action being evaluated in this Opinion and the thousands of redevelopment consultations that have occurred with the USACE since salmon were listed, that demonstrate that owners of nearshore, in- and overwater structures do at some point in time apply for USACE permit to keep the structure functioning before the structure falls into a less-than useful state. As the proposed applicant has demonstrated a desire to maintain its structures by applying for a USACE permit, and in light of the USACE's own requirements that the structures be maintained in a safe and "good" condition, see General Condition 2 at 33 C.F.R. Part 325, Appendix A, and Nationwide Permit General Condition Number 14, NMFS assumes that it is reasonably likely that regular maintenance will occur, and this structure will not be left to degrade. For these reasons, we appropriately decline to consider a range of possible outcomes that might occur absent the proposed action.

Second, even if we were to consider what might happen to a structure absent the proposed repair or replacement for the duration of its existence on the landscape, and such impacts should be attributed to the baseline, those impacts are still part of the calculus, they have just been moved out in time to occur after the new useful life (rather than any existing useful life). The basic consequence of the currently proposed action is to extend the life of the new tidegate and associated structures, including shoreline armoring. Any effects of possible degradation, instead of occurring now, will occur, if at all, after the new useful life expires. In that way, the potential effects that might occur should the applicant cease maintenance are still part of the baseline.

ER-220

NOAASkagitAR0051188

With this in mind, our analysis thus focuses on the future impacts of the proposed structure to be replaced for a new useful life of 50 years, along with any associated short-term and intermittent impacts, such as construction-related activities, or the beneficial removal of creosote piles, as consequences of the proposed action, which we discuss in the following section.

## 2.5     Effects of the Action

Under the ESA, "effects of the action" are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action (see 50 CFR 402.02). A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action (see 50 CFR 402.17). In our analysis, which describes the effects of the proposed action, we considered the factors set forth in 50 CFR 402.17(a) and (b).

As acknowledged in the TFI Agreement, projects as extensive as the proposed action involving replacement of tidegates, including those that require excavation of the tidegate and surrounding dike, extend the life of the facility. *See* WWAA et al. 2008, Section 4.1, differentiating between minor repairs, major repairs (which shall not include actions that require excavation of the dike to accomplish the repair, and would in any event use no more than 10 cubic yards or less of new rock to restore the original footprint of rock armoring), and replacements (requiring excavation of the dike to provide access to the tube/tidegate, and done to "extend the life of the gate facility or to restore impaired function," WWAA et al. 2008 at 4-3). Here, the proposed action requires excavation and the addition of approximately up to 73.6 cubic yards of new rock material to facilitate the replacement. Thus, this proposed action prolongs the life of the dike and associated tidegate, thereby preventing the recovery of habitat for a length of time commensurate with the new life of the structure.

We assume the new structure will last 50 years based on our best professional judgment and other information, including our work with RGP-6/Structure in Marine Waters Programmatic (NMFS 2016c), as well as input from consultants that regularly assist applicants through permitting processes (Ehinger et al. 2023, Appendix E). Depending on design, engineering, and materials, useful life periods could also be shorter or longer. We acknowledge that the Swinnomish Tribe have asserted that the structure would instead be in place for the next 100 years. We also acknowledge that a dike and tidegate has been at this location and operating for over 100 years (GeoEngineers 2022, at 2). However, for this consultation we applied a 50-year assumption. While we acknowledge that the structure may continue to exist and operate a longer period of time, we expect that it will require repairs to prolong its life within the next 50 years, consistent with our assumptions in other consultations as just described, and we expect that any additional life those repairs may cause, and their associated effects, will be evaluated at that time.

Our conclusion that the proposed action will prolong the life of the structure is supported by the materials provided by the District. For example, excavation of the existing dike is necessary and will occur as needed to access the work areas and facilitate construction activities (GeoEngineers 2022 at 10-12); a new sheet pile piece will be permanently installed to prevent seepage under the structure (email from Jenna Friebel to Kristen Murray on April 16, 2024), stabilizing the

NOAASkagitAR0051189

structure; the project anticipates adding approximately 73.6 cubic yards of new rock material, the dikes will be rebuilt and filled with clean clay, the dike will be regraded and strengthened using modern compacting requirements (engineering standards), and the tidegate will be made of materials including concrete and rebar. (e.g., GeoEngineers 2022, at 3, 6, 9, 13-14). These significant actions will prolong the life of the replaced structure by, we are assuming, 50 years (beyond the 10 years of remaining life), thereby precluding the return of the affected area to functioning habitat by an equal amount of time.

### 2.5.1   Effects on Listed Species

Effects on listed species is a function of (1) the numbers of animals exposed to habitat changes or effects of an action; (2) the duration, intensity, and frequency of exposure to those effects; and (3) the life stage at exposure. This section presents an analysis of exposure and response.

The project has temporary (related to construction) and enduring effects. Our exposure and response analysis identifies the multiple life stages of listed species that use the action area, and whether they would encounter these effects, as different life-stages of a species may not be exposed to all effects, and when exposed, can respond in different ways to the same habitat perturbations.

**Temporary Effects**

The temporary effects are caused by the construction activities necessary to carry out the proposed action, as well as some minor maintenance activities. For PS Chinook salmon and steelhead, these effects are caused by the relocation of fish following work area isolation, degradation of water quality, reduction of benthic prey, and construction noise. For SRKWs, temporary effects are loss of prey. Some future maintenance activities would also occur as a result of this proposed action and cause similar effects. These activities include minor maintenance of the shoreline armoring.

***Period of Exposure to Temporary Effects***

As described in Section 1.3 (Proposed Federal Action), all in-water work would occur only between July 16 and February 15 in any year the permit is valid. The minor future maintenance activities could occur at any time of the year.

*Juvenile Puget Sound Chinook salmon* generally emigrate from freshwater natal areas to estuarine and nearshore habitats from January to April as fry, and from April through early July as larger sub-yearlings. However, juveniles have been found in PS neritic waters between April and November (Rice et al. 2011). The work window avoids peak juvenile Chinook salmon presence from mid-February through mid-July, but does not fully avoid exposure in January through the first half of February. Additionally, a substantial percentage of Chinook salmon rear in Puget Sound without migrating to ocean areas (O'Neill and West 2009).

*Juvenile PS steelhead* primarily emigrate from natal streams in April and May, and appear to move directly out into the ocean to rear, spending little time in the nearshore zone (Goetz et al. 2015). However, steelhead smolts have been found in low abundances in the marine nearshore, outside of their natal estuary, between May and August (Brennan et al. 2004), which overlaps

NOAASkagitAR0051190

with the in-water work window. Juvenile steelhead will therefore be present in Puget Sound during the early part of the work window, July 16 through August, however, because they enter the Sound after a longer freshwater residency, they are larger and less dependent on nearshore locations where work is going to occur. The proposed work window would minimize overlap of temporary construction effects with the presence in nearshore habitat of juvenile PS steelhead in the action area, but will not avoid all exposure.

*Juvenile Summary.* Because exposure cannot be fully excluded by in-water work timing for juvenile salmonids, we evaluate other factors influencing potential presence of these fish, and if present, the potential duration of their exposure. Of these species, juvenile Chinook salmon have the longest period of nearshore association (Fresh 2006) and thus, although numbers are expected to be low at any given time, individual salmon are more likely to encounter the short-term construction effects in the intertidal and nearshore area. Some PS Chinook salmon juveniles would likely be present in the nearshore or estuary area behind the tidegate during future maintenance activities.

*Adult salmonids.* The presence of adult PS Chinook salmon and PS steelhead in PS overlaps with the proposed in-water construction window. Like adult PS Chinook salmon, adult PS steelhead occupy deep water, generally deeper than the location where the structures are proposed. Thus, we expect the direct habitat effects from the construction of the structures themselves to create little exposure or response among adult PS Chinook salmon and PS steelhead as they do not rely on the nearshore. However, some data suggests that up to 70 percent of PS Chinook salmon spend their adult period in Puget Sound without migrating to the ocean (Kagley et al. 2016), suggesting that most adult PS Chinook salmon will experience only the far-reaching effects such as sound from pile driving. Adult PS Chinook salmon and steelhead are unlikely to be exposed to any temporary effects caused by the future maintenance activities.

*Southern Resident Killer Whales.* Between the three pods that comprise this DPS, identified as J, K, and L, some members of the DPS are present in Puget Sound at any time of the year, though data on observations since 1976 have generally shown that all three pods are in Puget Sound June through September, which means that all are likely present in the designated work window that begins on July 16. As discussed in the Status section, the whales' seasonal movements are only somewhat predictable because there can be large inter-annual variability in arrival time and days present in Puget Sound from spring through fall. Late arrivals and fewer days present in Puget Sound have been observed in recent years. The likelihood of exposure to the temporary effects of construction or future maintenance is very low given the shallow depth of the water near the proposed project. Also, the implementation of a marine mammal monitoring plan and associated stop work protocols, during proposed construction, significantly reduces risk of exposure to any temporary effects.

### Species Response to Temporary Effects

Response to Relocation

A small number of juvenile PS Chinook salmon are likely to be captured during work area isolation. PS steelhead are less likely to be in the isolated area, but there is some chance a few could be captured. No more than 100 juvenile Chinook salmon and PS steelhead are likely to be

NOAASkagitAR0051191

encountered. No adult Chinook salmon or steelhead are expected to be encountered during the isolation and relocation. Capturing and handling fish causes them stress, though they typically recover fairly rapidly from the process and therefore the overall effects of the procedure are generally short-lived (NMFS 2002). The primary contributing factors to stress and death from handling are differences in water temperatures (between the river and wherever the fish are held), dissolved oxygen conditions, the amount of time that fish are held out of the water, and physical trauma. Stress on salmonids increases rapidly from handling if the water temperature exceeds 18°C (64°F) or dissolved oxygen is below saturation. More impactful methods of fish capture, such as electrofishing, are not proposed for this action. Most of the relocated fish are expected to survive although a few could be injured during relocation and a very few could die during the process.

Response to Water Quality

In-water work and nearshore work (tidegate and culvert removal and replacement, excavation, construction, shoreline armoring, and future maintenance of armoring) would cause short-term and localized increases in turbidity and total suspended solids (TSS), potential declines in dissolved oxygen (DO), and temporary increases in pollutants such as PAHs. The area of elevated turbidity and TSS levels during construction could extend up to 200 feet radially[20] from the project location during construction, and would return to background levels shortly after the end of proposed construction (hours to days).

Fish Species Response

The effects of suspended sediment on fish increase in severity with sediment concentration and exposure time and can progressively include behavioral avoidance and/or disorientation, physiological stress (e.g., coughing), gill abrasion, and death—at extremely high concentrations. Newcombe and Jensen (1996) analyzed numerous reports on documented fish responses to suspended sediment in streams and estuaries, and identified a scale of ill effects based on sediment concentration and duration of exposure, or dose. Exposure to concentrations of suspended sediments expected during the proposed in-water construction activities could elicit sublethal effects such as a short-term reduction in feeding rate or success, or minor physiological stress such as coughing or increased respiration. Studies show that salmonids have an ability to detect and distinguish turbidity and other water quality gradients (Quinn 2005; Simenstad et al. 1988), and that larger juvenile salmonids are more tolerant to suspended sediment than smaller juveniles (Servizi and Martens 1991; Newcombe and Jensen 1996).

Despite being present during a portion of the work window, juvenile PS steelhead are not nearshore dependent and so are not expected to be in the shallow water in large numbers. Those present are expected to be only briefly in the area where elevated suspended sediment would occur (within a 200-foot radius to account for the point of compliance for aquatic life turbidity criteria) and to have strong capacity as larger juveniles to avoid areas of high turbidity. To the degree that there is a contemporary decrease in DO within the same footprint, because PS

---

[20] Because the project is near the shoreline, only half of an impact circle is in the water and would experience elevated turbidity. We used an area of a semicircle with a 200-foot radius for non-dredging projects to determine impacts associated with elevated turbidity and TSS levels.

ER-224

NOAASkagitAR0051192

steelhead are expected to have only brief exposure to the affected area, we do not anticipate a significant response to reduced DO. We accordingly consider their exposure to the temporary effects will not be sufficient to cause any injury or harmful behavioral response to juvenile PS steelhead.

Juvenile PS Chinook salmon are likely to be present during in-water construction activities and likely to be exposed to the temporary construction effects, most notably elevated levels of suspended sediment. The proposed minimization measures (i.e. only working in the dry) indicate that TSS levels will be only slightly elevated near the construction area and only during tidal inundations of the site during the project and during the first tidal inundation after completion of the project. Turbidity and TSS levels would return to background levels quickly and be localized to the in-water construction areas (200-foot radius turbidity mixing zone). Again, decreased DO is expected to be contemporaneous with and in the same footprint of the suspended sediment. While juvenile PS Chinook salmon are likely to encounter these areas, they can detect and avoid areas of high turbidity, and exposure is expected to be brief. Thus, duration and intensity of exposure of juvenile PS Chinook salmon is also unlikely to cause injury or a harmful response.

The area in which benthic forage base is temporarily diminished by disturbed substrate owing to the proposed project is very small, and because benthic prey recruits from adjacent areas via tides and currents, the prey base can re-establish in a matter of weeks. We expect only the cohorts of PS Chinook salmon and PS steelhead that are present in the action area to be exposed to this temporary reduction of prey, and we expect that because prey is abundant in close proximity, feeding, growth, development and fitness of the individuals that are present during this brief habitat disruption from construction would not be affected. Therefore, we consider the temporary effects on any juvenile PS Chinook salmon and PS steelhead in the action area to be unlikely to cause injury to individual fish.

SRKW Response

As noted above, implementation of a marine mammal monitoring plan and associated stop work protocols during proposed construction significantly reduces risk of exposure to any temporary effects. We do not expect SRKWs to be exposed to elevated turbidity or reduced DO.

Response to Construction Noise

Fish Species Response

The proposed No Name Slough project includes pile driving activities, two piles are proposed for removal by vibratory pile driving and sheet piles will be installed and partially removed. Vibratory pile driving can generate noise levels that fish detect and respond to, including above the 150 Db behavioral threshold but well below the thresholds for physical injury (Erbe and McPherson 2017). We assume that future maintenance will not require pile driving. Fish may exhibit behavioral responses to vibratory driving.

Pile driving can cause high levels of underwater sound. This noise from impact pile driving can injure or kill fish and alter behavior (Turnpenny et al. 1994; Turnpenny and Nedwell 1994; Popper 2003; Hastings and Popper 2005). However, only vibratory driving is proposed. Death from barotrauma can be instantaneous or delayed up to several days after exposure. Even when

ER-225

NOAASkagitAR0051193

not enough to kill fish, high sound levels can cause sublethal injuries. Fish suffering damage to hearing organs may suffer equilibrium problems, and may have a reduced ability to detect predators and prey (Turnpenny et al. 1994; Hastings et al. 1996). Hastings (2007) determined that a cumulative Sound Exposure Level (cSEL) as low as 183 dB (re: 1 µPa2-sec) was sufficient to injure the non-auditory tissues of juvenile spot and pinfish with an estimated mass of 0.5 grams.

Though pile removal at No Name Slough will involve only vibratory pile driving and no direct mortality is expected, adverse effects on survival and fitness can occur even in the absence of overt injury. Exposure to elevated noise levels can cause a temporary shift in hearing sensitivity (referred to as a temporary threshold shift), decreasing sensory capability for periods lasting from hours to days (Turnpenny et al. 1994; Hastings et al. 1996). Popper et al. (2005) found temporary threshold shifts in hearing sensitivity after exposure to cSELs as low as 184 dB. Temporary threshold shifts reduce the survival, growth, and reproduction of the affected fish by increasing the risk of predation and reducing foraging or spawning success.

We cannot predict the exact number of individual fish that will be exposed because of high variability in species presence at any given time. Furthermore, not all exposed individuals will experience adverse effects. We are reasonably certain that some PS steelhead and PS Chinook salmon will experience sublethal effects, such as temporary threshold shifts, or behavior responses to underwater noise for each of the projects that includes pile driving.

The above-discussed criteria specifically address fish exposure to impulsive sound. Stadler and Woodbury (2009) make it clear that the thresholds likely overestimate the potential for impacts on fish from non-impulsive sounds (e.g., vibratory pile driving). Non-impulsive sounds have less potential to cause adverse effects in fish than impulsive sounds. Impulsive sources cause short bursts of sound with very fast rise times and the majority of the energy in the first fractions of a second. Whereas, non-impulsive sources cause noise with slower rise times and sound energy that is spread across an extended period of time; ranging from several seconds to many minutes in duration. Regarding noise from boat motors, some fish species have been noted to not respond to outboard engines, others respond with increased stress levels, and sufficient avoidance as to decrease density (Whitfield and Becker 2014).

With regard to vibratory driving and noise from excavation and construction activities, the behavioral effects from anthropogenic sound exposure remains poorly understood for fishes, especially in the wild. NMFS applies a conservative threshold of 150 dB rms (re 1 µPa) to assess potential behavioral responses of fishes from acoustic stimuli. Fewtrell (2003) observed fish exposed to air gun noise exhibited alarm responses from sound levels of 158 to 163 dB (re 1 µPa). More recently, Fewtrell and McCauley (2012) exposed fishes to air gun sound between 147-151 dB SEL and observed alarm responses in fishes.

Work windows are generally designed to prevent work from occurring during peak presence of salmonids, but do not guarantee that exposure will not occur. Juvenile Chinook salmon will have the most exposure due to their extensive use of nearshore habitats. Adult Chinook salmon, adult and juvenile steelhead make little use of nearshore habitats, and will be exposed to injurious levels of underwater sound in very small numbers. During the in-water work window (July 16 to

**ER-226**

NOAASkagitAR0051194

February 15), all exposed PS Chinook salmon and PS steelhead individuals will be at least two grams, which reduces the likelihood of death.

SRKW Response

SRKWs are unlikely to be injured or disturbed by sound pressure generated by vibratory pile driving. NMFS uses conservative thresholds of sound pressure levels from broad band sounds that cause behavioral disturbance (160dBrms re: 1μPa for impulse sound and 120 dBrms re: 1μPa for continuous sound) and injury (for impulsive: peak SPL flat weighted 230 dB, weighted cumulative SEL 185 dB; for non-impulsive: weighted cumulative SEL 198 dB) (NMFS 2018). Per the best management practices listed in Section 1.3, NMFS assumes that the proposed project will have a Marine Mammal Monitoring Plan. Those criteria and the Plan are intended to ensure monitoring and stop-work on sighting of SRKW such that SRKW will not be exposed to pile driving that would result in disturbance or harm to any individual of this species.

Any potential reduction in prey for SRKWs (PS Chinook salmon) from construction noise, is extremely small, due to the application of work windows to avoid peak presence of this species at the juvenile life stage and the other reasons discussed above. As mentioned above, diet data suggest that SRKWs are consuming mostly larger (i.e., generally age 3 and up) Chinook salmon (Ford and Ellis 2006). Given the total quantity of prey available to SRKWs throughout their range, this short-term harassment of SRKW prey that results from the temporary construction effects is extremely small and not expected to cause injury to or disturb SRKWs.

Response to Water Quality Effects caused by Creosote Removal

Fish Species Response

The proposed action would remove creosote-treated piles. Creosote-treated piles contaminate the surrounding sediment up to two meters away with PAHs (Evans et al. 2009). The removal of the creosote-treated piles mobilizes these PAHs into the surrounding water and sediments (Smith 2008; Parametrix 2011).

Projects can also release PAHs directly from creosote-treated piles if any of the piles break during removal (Parametrix 2011). The concentration of PAHs released into surface water rapidly dilutes. Smith 2008 reported concentrations of total PAHs of 101.8 μg/l 30 seconds after creosote-pile removal and 22.7 μg/l 60 seconds after. However, PAH levels in the sediment after pile removal can remain high for six months or more (Smith 2008). Romberg (2005) found a major reduction in sediment PAH levels three years after pile removal contaminated an adjacent sediment cap.

Because they are shoreline-oriented and spend a greater amount of time within the action area, juvenile PS Chinook salmon would have the highest probability of exposure to PAHs as a result of creosote pile removal. Although we cannot discount the probability of adult and juvenile steelhead and adult PS Chinook salmon exposure, the risk is low.   The removal of the piles will happen relatively quickly, and the amount of time any contaminants will be resuspended would be short.  We expect increased PAHs in the water column and sediments will remain within the area of increased suspended sediment caused by the project within a short distance of creosote pile removal, and we do not expect fish to engage in avoidance behaviors within this area once

NOAASkagitAR0051195

suspended sediment from construction effects have dropped to baseline levels. Within three years after construction, the removal of the creosote-treated timber will begin to reduce PAH levels (Romberg 2005) and thus exposure of listed-fish, and exposure to PAHs at these sites would continue to decline over the long term. For these reasons, we do not expect any fish to be exposed to PAHs at levels that would cause injury or other adverse effects.

SRKW Response

The proposed removal of the piles exposes SRKW to contaminants indirectly through its food web (PS Chinook salmon). However, as explained above, the exposure would be minor and not expected to injure or kill any individual PS Chinook salmon or steelhead. Due to the low number of fish exposed to these contaminants, the proposed action would not cause a meaningful effect on SRKW.

**Enduring Effects on Nearshore Habitat**

The proposed action would cause negative impacts on nearshore habitat availability and function. Once repaired and replaced, the structures would be expected to remain in the aquatic environment for an additional 50-year useful life period. Thus, multiple cohorts of the multiple populations of PS Chinook salmon, PS steelhead, and SRKW would experience the effects of the long-term nearshore habitat modifications caused by the presence of the structure.

Nearshore Habitat Modifications due to Shoreline Armoring

The proposed replacement of 85 linear feet of armored shoreline (62 linear feet of large rock and 23 linear feet of vertical concrete structural support for the tidegate) in Puget Sound would extend the life of this armoring by 50 years. The effects that this structure exerts on habitat features and functions also would persist for the same duration. The impacts of hard armor along marine and estuarine shorelines are well documented. Armoring of the nearshore can reduce or eliminate shallow water habitats through the disruption of sediment sources and sediment transport. (Marine Shoreline Design Guidelines at 2-1 (Johannessen et al. 2014)). The proposed shoreline armoring is also expected to result in a higher rate of beach erosion waterward of the armoring from higher wave energy compared to a natural shoreline. This leads to beach lowering, increases in sediment temperature, and decreased SAV, leading to reductions in primary productivity and invertebrate density within the intertidal and nearshore environment (Bilkovic and Roggero 2008; Fresh et al. 2011; Morley et al. 2012; Dethier et al. 2016). Structures in the nearshore change the hydrodynamics of the waves washing up on the beach. Hard structures reflect waves without dissipating their energy the way a natural beach would, especially if vegetation is present. In addition to higher rates of beach erosion by increased wave energy, the proposed armoring is also expected to prevent input of sediment from landward of the dike, diminishing the supply of fine sediment. Shoreline armoring generally reduces the sediment available for transport by disconnecting the sediment source potentially causing loss of beach width and height as transport of material outpaces supply. This can occur at the site of the structure.

When nearshore physical processes are altered, there is also a shift in the biological communities. The effects of nearshore modification cascade through the Puget Sound food web.

ER-228

NOAASkagitAR0051196

The consequences can be seen in the population declines of a variety of species that depend on these ecosystems, from shellfish, herring, and salmon to SRKWs, great blue heron, and eelgrass. The number and types of invertebrates, including shellfish, can change; forage fish lose spawning areas; and juvenile salmon and forage fish lose the feeding grounds that they use as they migrate along the shore (Shipman et al. 2010). Native shellfish and eelgrass have specific substrate requirements and altered geomorphic processes can leave shellfish beds and eelgrass meadows with material that is too coarse or with too much clay exposed. Finer materials like gravel and sand provide important spawning substrate for sand lance and surf smelt. Therefore, a reduction to this substrate type within the intertidal and nearshore zone as a result of the proposed dike is expected to reduce potential spawning habitat availability and fecundity of both species of forage fish (Rice 2006; Parks et al. 2013), which are important prey species for salmonids.

As a result of deepening of the nearshore zone adjacent to shoreline armoring, as well as increased wave energy, the replaced shoreline armoring would also be expected to reduce SAV (Patrick et al. 2014), reducing cover for juvenile salmon. Salmonids are also affected by the loss of prey communities. When shoreline development removes vegetation, the loss of shading and organic material inputs can increase forage fish egg mortality (Penttila 2007). Surf smelt, for example, use about 10 percent of Puget Sound shorelines for spawning and many bulkheads are built in forage fish spawning habitat, threatening their reproductive capacity (Penttila 2007). A reduction in eelgrass could cause a reduction in potential spawning habitat for Pacific herring, another forage species for salmonids. Shoreline armoring can also physically bury forage fish spawning beaches when structures are placed in or too close to the intertidal zone. Besides being prey, a sometimes-overlooked benefit of forage fish abundance to salmonids is their use as a prey buffer for predation by marine mammals and piscivorous birds. Moore et al. (2021) found that the high abundance of age-1+ anchovy in the Puget Sound provided an alternative prey source for predators of outmigrating steelhead smolts, which resulted in an increase in smolt survival.

Shoreline armoring, located within the intertidal zone (below HAT) disrupts upper intertidal zone and natural upper intertidal shoreline processes such as accumulation of beach wrack (Sobocinski et al. 2010; Dethier et al. 2016). This is an additional mechanism that reduces primary productivity within the intertidal zone and diminishes invertebrate populations associated with beach wrack (Sobocinski et al. 2010; Morley et al. 2012; Dethier et al. 2016). Reductions in forage from shoreline armoring then affect primary productivity and invertebrate abundance in both the intertidal and nearshore environments. Invertebrates are an important food source for PS Chinook salmon and for forage fish, prey species of salmonids.

Thus, the loss of material below the proposed shoreline armoring, together with the loss of upland sources of material from above the shoreline armoring and tidegates, over time, is likely to affect the migration and growth of juvenile salmonids (primarily PS Chinook salmon) by reducing the amount of available shallow habitat that juveniles rely on for food and cover, and by preventing access to habitat upland of these structures at high tides. It is also expected to increase predation on PS Chinook salmon by reducing SAV, an important source of cover for juvenile salmon. This in turn will reduce prey available for SRKWs. As described above shoreline armoring also lowers beaches, coarsens substrates, increases sediment temperature, and decreases beach wrack.  This habitat degradation is expected to reduce the available prey, such as forage fish, for PS Chinook salmon.

NOAASkagitAR0051197

In addition to these qualitative analyses, as indicated in the Analytical Approach section, we have also evaluated certain effects of the proposed action on the marine side of the shoreline armoring, including the tidegate with V1.6 of the Nearshore Calculator, released February 2024. The final output of the calculator is - 275 debits (-2.75 DSAYs[21]). As noted in the Analytical Approach section, this output of -275 debits is based on the following assumptions and inputs to the Calculator:

- The remaining useful life of the existing riprap armoring is 10 years;
- The useful life of the new tidegate and shoreline armoring structures is 50 years;
- Riparian plantings have a relatively low success rate over time, which is especially likely on the rip rap shoreline of Padilla Bay and No Name Slough; and,
- Two creosote piles will be removed, which will be disposed of at an approved upland facility.

Further details about our quantitative assessment of the enduring effects on nearshore habitat are set out in Appendices 1, 2, and 5.

Species Response to Shoreline Armoring

Fish Species Response to Enduring Effects of Shoreline Armoring

Juvenile Chinook salmon migrate along shallow nearshore habitats in Puget Sound. The proposed shoreline armoring would degrade nearshore habitat for an additional 50 years, affecting dozens of cohorts of PS Chinook salmon. Every juvenile PS Chinook salmon will encounter armored beaches during their out-migration. Shoreline armoring reduces several nearshore habitat values, including reduced feeding opportunity, increased predation risk, and lack of shallow habitat areas particularly during high tides.

Given that out-migrating PS Chinook salmon use shallow-water habitats for rearing, foraging, and migration, shoreline armoring would reduce growth and fitness of juvenile salmon during this phase of their life history. In turn, the aggregate impact of this disruption among individuals over each year that the proposed armoring is in place for its new 50-year useful life period will amount to an overall reduction in survival rate. The proposed action would reduce the quality of nearshore habitat, reducing the amount of prey available for juvenile salmonids. Adult Chinook salmon, adult and juvenile steelhead do not migrate along shallow nearshore habitats. As described above, the proposed shoreline armoring will not directly affect them. However, impacts on SAV and epibenthic communities from shore steepening, and sediment coarsening will affect adult and juvenile Chinook salmon and steelhead by reducing available forage. This would result in chronic reductions in abundance from each cohort of each affected population. The long-term effect of downward abundance would be an overall reduction in abundance, productivity, and spatial structure, of the affected PS Chinook salmon populations.

---

[21] Discounted Service Acre Years (DSAYs): Measure of change in habitat services provided over a specific duration of time to a set of target species within the Habitat Equivalency Analysis (HEA) method.

NOAASkagitAR0051198

SRKW Response to Enduring Effects of Shoreline Armoring

The proposed action reduces the quality of nearshore habitat which in turn reduces the abundance of PS Chinook salmon, an important prey item for SRKW. When prey is scarce, SRKW likely spend more time foraging than when prey is plentiful. Increased energy expenditure and prey limitation can cause poor body condition and nutritional stress. Nutritional stress is the condition of being unable to acquire adequate energy and nutrients from prey resources and as a chronic condition, can lead to reduced body size of individuals and to lower reproductive or survival rates in a population (Trites and Donnelly 2003). During periods of nutritional stress and poor body condition, cetaceans lose adipose tissue behind the cranium, displaying a condition known as "peanut-head" in extreme cases (Pettis et al. 2004; Bradford et al. 2012; Joblon et al. 2014). This individual stress and diminished body condition of individuals would lead to an overall decline in the fitness of the species, while accounting for age and sex (Stewart et al. 2021). NMFS qualitatively evaluated long-term effects on the SRKW from the anticipated reduction in PS Chinook salmon. We assessed the likelihood for localized depletions, and long-term implications for SRKW survival and recovery, resulting from the proposed action presenting risks to the continued existence of PS Chinook salmon and reducing the ability for the ESU to expand and increase in abundance. In this way, NMFS can determine whether the reduced likelihood for survival and recovery of prey species is also likely to appreciably reduce the likelihood of survival and recovery of Southern Residents. Viability at the population level is a foundational necessity for PS Chinook salmon persistence and recovery.

Hatchery programs, which account for a large portion of the production of this ESU, may provide a short-term buffer, but it is unlikely that hatchery-only stocks could be sustained indefinitely. The loss of an individual PS Chinook salmon population could preclude the potential for the ESU level future recovery to healthy, more substantial numbers. The weakened ESU demographic structure, with declines in abundance, spatial structure, and diversity, will result in a long-term suppression, if not decline, in the total prey available to Southern Residents. In this consultation, the long-term effects are specifically: fewer populations contributing to Southern Residents' prey base, spatial structure, resiliency of prey base, greater ESU-level risk relative to stochastic events, and diminished redundancy that is otherwise necessary to ensure there is a margin of safety for the PS Chinook salmon and SRKWs to withstand catastrophic events.

Differences in adult salmon life histories and locations of their natal streams likely affect the distribution of salmon across the SRKW's geographic range. The continued decline and reduced potential for recovery of the PS Chinook salmon, and consequent interruption in the geographic continuity of salmon-bearing watersheds in the SRKW's habitat, is likely to alter the distribution of migrating salmon and increase the likelihood of localized depletions in prey, with adverse effects on the SRKW's ability to meet their energy needs. A fundamental change in the prey base is likely to result in SRKW abandoning areas in search of more abundant prey or expending substantial effort searching for prey in areas of depleted prey resources. This potential increase in energy demands should have the same effect on an animal's energy budget as reductions in available energy, such as one would expect from reductions in prey. Any action that exacerbates this situation makes the risk incrementally worse and reduces the likelihood that SRKWs will have an adequate prey base.

NOAASkagitAR0051199

Lastly, the long-term reduction of PS Chinook salmon is likely to lead to nutritional stress in the SRKW. Nutritional stress can lead to reduced body size and condition of individuals and can also lower reproductive and survival rates. Prey sharing would distribute more evenly the effects of prey limitation across individuals of the population that would otherwise be the case. Therefore, poor nutrition from the reduction of prey could contribute to additional mortality in this population. Because SRKWs are already stressed due to the cumulative effects of multiple stressors, and the stressors can interact additively or synergistically, any additional stress such as reduced PS Chinook salmon abundance likely have a greater physiological effect than they would for a healthy population, which may have negative implications for SRKW vital rates (mortality and fecundity) and population viability (e.g., NAS 2017). Intuitively, at some low Chinook salmon abundance level, the prey available to the whales may not be sufficient to allow for successful foraging, leading to adverse effects (such as reduced body condition and growth and/or poor reproductive success). This could affect SRKW survival and fecundity. For example, food scarcity could cause whales to draw on fat stores, mobilizing the relatively high levels of contaminants stored in their fat and potentially affecting reproduction and immune function (Mongillo et al. 2016). Increasing time spent searching for prey during periods of reduced prey availability may decrease the time spent socializing; potentially reducing reproductive opportunities. Also, low abundance across multiple years may have even greater effect because SRKWs likely require more food consumption during certain life stages, female body condition and energy reserves potentially affect reproduction and/or result in reproductive failure at multiple stages of reproduction (e.g., failure to ovulate, failure to conceive, or miscarriage, successfully nurse calves, etc), and effects of prey availability on reproduction should be combined across consecutive years.

Enduring Effects on Habitat Caused by the Tidegate

Estuary habitat in No Name Slough and surrounding floodplains is not designated as critical habitat for PS Chinook salmon, PS steelhead, or SRKW. However, impeding access to the habitat behind the tidegate, in the slough and in the surrounding floodplains for the new 50-year life of the structures would cause enduring effects on PS Chinook salmon, PS steelhead, and SRKWs. By blocking incoming tides, tidegates and associated shoreline armoring convert what would otherwise be marine wetlands to agricultural land with greater freshwater influence (and maintain it that way). The area directly in front of the tidegate could be considered nearshore or estuary habitat and has characteristics of both habitat types. In this analysis, some effects, particularly, those related to water quality, that would occur directly in front of the tidegate are considered effects on estuary habitat.

Estuarine Habitat Modifications Due to Tidegate Replacement

In Puget Sound, it has been estimated that 80% of estuary habitat has been lost to diking and land conversion (Simenstad et al., 2011; Brophy et al., 2019) with more than 90% of delta and riverine habitat isolated by dikes and other structures in the Skagit River delta (Collins and Montgomery, 2001). As is typical throughout PS deltas, the construction and maintenance of dikes to prevent tidal inflow, and the installation of tidegates to drain agricultural fields and stream flow from relict sloughs and distributary channels is spatially extensive (Greene et al. 2012). Tidegates are commonly equipped with hinged flap gates, which open during ebbing tides to allow ditch water to drain and close on rising tides to prevent saline flows back into the diked

area farmland. Thus, without designs that hold the gate open, tidegates block fish passage at least 50% of the time. Additionally, juvenile salmon commonly move with the incoming tide to access nearshore habitats, which coincides with the closing of tide-driven flap gates. When flap gates open with the ebbing of the tide, the differential between water level escaping the ditch and the estuary can create velocity barriers for fish movement (Souder and Giannico 2020). Consequently, flap tidegates limit the passage of adult and juvenile fishes (Greene et al. 2012; Giannico and Souder 2005; Souder and Giannico 2020). Side-hinge tidegates may provide improved fish passage relative to top-hinge tidegates, however, the length of time that side-hinge gates are open is still dependent on the changing of the tides (every 6 hours on average). Thus, fish passage is still restricted by side-hinge tidegates approximately 50% of the time. Tidegates are effective in their intended purpose—blocking marine waters from inundating estuary areas. As a consequence, they are also effective fish passage impediments (Giannico and Souder 2005). As juvenile Chinook salmon rear along estuarine shorelines, in pocket estuaries and distributary channels for a month or more before migrating increasingly to deeper water of PS (Beamer et al. 2000), tidegates impede their growth and survival for several reasons, as discussed below.

Like all conventional tidegates, the proposed No Name Slough tidegate would close on incoming tides. Just as poorly designed dams and culverts delay or completely impede adult fish migration to spawning grounds, conventional tidegates reduce access to rearing habitat of juvenile Chinook salmon and steelhead, disrupt sediment routing, and adversely alter habitat and water quality parameters. Fish can access the slough during low and medium outgoing tides, but not while water is being pumped out. Coho salmon smolts have been observed rearing upstream of the slough in No Name Creek (Dugger 2000). Conventional tidegates severely limit fish abundance and species richness (Giannico and Souder 2005; NMFS unpublished data). The No Name Slough tidegate replacement project is expected to cause impaired fish passage for the next 50 years. The construction materials used to replace the failing system (HDPE culvert with a fiberglass tidegate) are expected to resist decay for many decades. As such, the replacement tidegate is expected to operate, with necessary maintenance such as removing debris, for 50 years.

Once replaced, the tidegates at No Name Slough will impair access to available habitat in No Name Creek. It is currently unknown if PS steelhead currently occupy No Name Creek, but coho salmon have been observed behind the tidegate, suggesting that salmonids can pass through the tidegate or otherwise access No Name Slough under certain conditions (Dugger 2000).

PS Chinook salmon passage within No Name Slough upstream of the tidegate is limited to ebbing (outgoing) tides when the tidegate flap is open. However, within estuarine habitats, juvenile Chinook do not readily migrate upstream during ebb (outgoing) tides. To the contrary, juveniles generally move with outflowing tides, as evidenced by numerous studies that have captured juvenile Chinook salmon in fyke nets as the tide recedes, and fyke net sampling protocol (Beamer et al. 2003; Greene et al. 2017). Even if some fish do migrate upstream, poor water quality draining from the gate may block or slow fish movement, velocities exiting the tidegate may be too great for juvenile Chinook salmon to surpass, and the tidegate and culvert is perched during some low tides, all leading to poor or impossible passage conditions for juvenile PS Chinook salmon. The fish that do pass through the tidegate will experience degraded habitat conditions as further explained below.

NOAASkagitAR0051201

Fish Response to Loss of Estuary Habitat Quality Behind the Tidegate.

The proposed structure is expected to virtually eliminate tidal influence and hydraulic mixing from wave action upstream of (behind) the gate. The reduction of hydrologic flushing in turn would contribute to decrease the channel in width and depth from sediment deposition, and thus reduce the quantity of habitat preferred by juvenile PS Chinook salmon. As further discussed below, the replacement tidegate also causes altered sediment deposition that reduces habitat quantity. Sediment deposition, and the reduction of width and depth reduces channel habitat area, and dewaters the channel more frequently which in turn reduces habitat value as channel boundaries become less defined, and reduces the time of use by juvenile PS Chinook salmon. This reduces the condition of juvenile PS Chinook salmon.

Water quality parameters negatively affected by tidegates include salinity, dissolved oxygen, sediment, and temperature (Greene et al. 2017). The replacement tidegate project is expected to create conditions that reduce water quality. The static environment behind the tidegate can cause thermal loading. This results in growth of periphyton and planktonic algae that lead to reduced dissolved oxygen levels. Periphyton and planktonic algae are composed mainly of primary producers that, within static water bodies, can reduce oxygen levels as they decompose and respire, and at high densities, impede water movement (in turn making conditions more static) (Welch 1967) Reduced dissolved oxygen would adversely affect any juvenile PS Chinook salmon rearing behind the tidegate. Water with low dissolved oxygen will also discharge to habitat on outgoing tides during some (mid to late summer) juvenile Chinook rearing periods. In the latter portions of the outgoing tide, often the only water within these small channels is from the tidegate discharge. Because PS Chinook salmon recede into these channels on low tides (Groot and Margolis 1991; Healey 1980) there can be direct exposure to poor water quality. This exposure to poor water quality reduces the condition of exposed juvenile PS Chinook salmon.

Tidegates can alter temperature regimes in estuary areas behind the gate and in nearshore areas in front the gate. By restricting the normal bidirectional flow of water, tidegates create sharp transitions in water temperature (Bates 1999; Portnoy 1999; Portnoy and Giblin 1997; Portnoy et al. 1987). Abrupt changes in water temperature can impose barriers to fish movements (Jonsson 1991; Bakshtansky et al. 1993; Berggren and Filardo 1993; Kynard 1993; Russel et al. 1998; Bates et al. 1999). For example, the temperature behind a tidegate in Fisher Slough (a slough in the Skagit River delta) was 2.2°C warmer than the temperature immediately downstream of the tidegate (Beamer et al. 2014). A similar difference was observed in Blind Slough (a slough in Tillamook Bay, Oregon) where differences were 2 – 5°C warmer upstream of the tidegate than downstream. Juvenile salmon and steelhead are particularly vulnerable to disease, parasites, and poor competitive interactions in water with elevated temperatures (Reeves et al. 1987), which can form behind closed tidegates (Giannico and Souder 2005).

Growth of juvenile Chinook salmon has been determined to occur between 4.5 and 19.1°C (Armour 1991). In the Snohomish River, temperatures within two blind channels with tidegates were 'potentially lethal' during the latter portions of the Chinook salmon outmigrant season. The channels regulated by tidegates also had significantly more time within the "upper growth boundary" and "stressful" temperature ranges than the reference channel (Tonnes, 2007). The observed temperature range may lead to death of juvenile salmonids, depending upon the

ER-234

NOAASkagitAR0051202

acclimation temperatures prior to exposure, as well as the duration of exposure, relative health of the fish, among other factors (McCullough 1999).

Estuarine temperature regimes can influence salmonid migration timing, feeding and growth, smoltification, predation avoidance, and resistance to parasites, disease, and pollutants (McCullough 1999). Juvenile Chinook within the Sixes River (Oregon) estuary grew less during periods when water temperatures frequently exceeded 18°C (Neilson et al., 1985). Because estuarine residency is associated with smoltification of salmonids, elevated temperatures can result in premature smolting, blockage of seaward migration, de-smoltification, shifts in emigration timing, and other stressors (McCullough, 1999). Elevated temperatures during the smolt phase have led to lowered survival of fish when subjected to seawater test-lowered survival is correlated with inability to osmoregulate due to impaired physiological status (Adams et al., 1973; Zaug and McLain 1976; Hoar 1988). Elevated temperatures behind tidegates may reduce the condition and growth of juvenile PS Chinook salmon.

Because tidegates prevent tidal flows moving upstream, the water behind the gates typically has lower dissolved oxygen, higher temperature, and lower salinity and pH. If no mixing of fresh and brackish waters occurs in these areas, the resulting abrupt change in water quality is stressful for fish and other organisms that migrate up- and/or downstream through tidegates. Gordon et al. (2015) found that dissolved oxygen (DO) was lower in gated streams than in reference systems, in turn the concentration of DO was lower above gates (in average 2.47 mg/L and as low as 0.08 mg/L) than below them and significantly lower than the comparable region at reference sites (8.41 mg/L). The hypoxic zone detected above the tidegates extended at least 100 m upstream. Optimum dissolved oxygen levels are typically near 8.0 mg/l, at reduced levels, such as 6.0 to 7.0 mg/l, swimming performance is reduced, and avoidance of the plume (if possible) may occur (Bjornn and Reiser 1991). Growth and food conversion efficiency reduction can occur at levels near 5.0 mg/l (Bjornn and Reiser 1991). Anoxic conditions created by tidegates have been associated with fish mortality events (Portnoy 1991). No Name Slough is listed in Ecology's 303(d) list for low dissolved oxygen with recorded violations. Lower dissolved oxygen levels may reduce the condition and survival of juvenile PS Chinook salmon.

When closed, tidegates prevent the inundation of upland channels by salt water. Consequently, major differences in salinity develop between the estuary and delta sides of tidegates. Excluding salt water can lead to oxygen depletion in delta channel habitats. The operation of tidegates lowers the salinity of soils on the delta side of dikes, which lowers pH (increasing acidity) (Richardson and Vepraskas 2001) and in turn increases the mobilization of metals in the soil, including, iron, lead, aluminum, copper, silver, and cadmium (Anisfeld and Benoit 1997; Portnoy and Giblin 1997). The mobilization of metals such as iron and aluminum will kill many marsh plants, which can greatly alter invertebrate communities and reduce the prey and cover available to juvenile salmon and steelhead (Giannico and Souder 2005). As a result, replacement of the tidegate will reduce rearing and foraging opportunities of PS steelhead and Chinook salmon.

Fish Response to the Loss of Habitat Quality in Front of the Tidegate

As explained above, a tidegate and its operation cause effects on estuary habitat. Those effects in turn cause several negative downstream impacts on nearshore/estuary habitat in front of the

ER-235

NOAASkagitAR0051203

tidegate. These effects are unique from, and in addition to, those caused by shoreline armoring. As tidegates block two-way flow, fine sediments fill upland channels instead of flushing to the estuary below (Bates 1999). Consequently, as sediments and detritus fill channels, they do not reach the estuary, reducing productivity (Roman et al. 1984).

Altered channel conditions and the interruption of natural sediment routing processes as a result of the proposed action is likely to cause high turbidity as water flows outward from the tidegate. The effects of suspended sediment on fish increase in severity with sediment concentration and exposure time and can progressively include behavioral avoidance and/or disorientation, physiological stress (e.g., coughing), gill abrasion, and death (at extremely high concentrations). Newcombe and Jensen (1996) analyzed numerous reports on documented fish responses to suspended sediment in streams and estuaries, and identified a scale of ill effects based on sediment concentration and duration of exposure, or dose. Exposure to concentrations of suspended sediments expected during the proposed in-water construction activities could elicit sublethal effects such as a short-term reduction in feeding rate or success, or minor physiological stress such as coughing or increased respiration. Studies show that salmonids have an ability to detect and distinguish turbidity and other water quality gradients (Quinn 2005; Simenstad et al. 1988), and that larger juvenile salmonids are more tolerant to suspended sediment than smaller juveniles (Servizi and Martens 1991; Newcombe and Jensen 1996).

Salinity differences may also exist across the tidegate (Giannico and Souder 2005). When the tidegate is closed freshwater pools on the upland side. As a result, a difference in salinity may exist between one side of the gate and the other. When the gate opens, pooled freshwater moves into the estuarine channel, a packet of fresher water that, through turbulence, mixes as it moves down the estuary. The speed of the salinity mixing, and the extent of the freshwater packet, is related to the type and size of the gate, the amount of freshwater pooled upstream, and the relative difference in salinity between fresh and brackish water in the area (Jay and Kukulka 2003). For salmonids, abrupt salinity changes in nearshore habitat may even cause osmotic shock that can result in juvenile mortality and delayed adult migration.

We cannot estimate the exact number of individuals that will experience adverse effects from suspended sediment or changes in salinity caused by the proposed action with any meaningful level of accuracy. We cannot predict the number or duration of salinity changes, nor the number of individual fish that will be exposed to each pulse. Furthermore, not all exposed individuals will experience direct adverse effects. However, we expect that some individuals of listed fish species will experience sublethal effects such as stress and reduced prey consumption, some may respond with avoidance behaviors, and some may be injured. Those that engage in avoidance behaviors or with raised cortisol levels may have decreased predator detection and avoidance (Olla et al.1992). These effects will reduce the condition of PS Chinook salmon.

Fish Response to Effects on the Food Web and Loss of Foraging Opportunities

The disconnectedness of floodplains caused by tidegates also affects the aquatic food web (Winemiller 2004). The inundation of vegetated floodplains provides macrodetritus—a base-level food source. A reduction or elimination of floodplain inundation results in a corresponding reduction in macrodetrital inputs. This reduction in floodplain inundation and macrodetrital inputs has been associated with reductions in flow, the loss of floodplains (e.g. fill, revetments

NOAASkagitAR0051204

and levees), and habitat simplification (NMFS 2011). Junk et al. (1989) found that most vertebrates found in a mainstem channel greatly depend directly or indirectly on primary production in adjacent floodplains, when a regularly inundated floodplain is present. Developments have separated large temperate mainstem rivers from their floodplains (Junk et al. 1989). Therefore, the reduction in floodplain connectivity associated with the proposed action, through this pathway, may further reduce stream productivity and forage availability for rearing PS Chinook salmon and steelhead.

Fish Response to Impaired Access and Loss of Estuary Habitat

This section discusses the importance of estuary habitat to Chinook salmon with a focus on the Skagit populations that will be impacted by the proposed action. As discussed above, even if juvenile fish have some ability to access the estuarine areas behind the tidegate, the proposed action will limit access to this important rearing habitat. In addition to impairing access, the proposed action will reduce the quantity of available estuarine habitat, causing, among other things, density-dependent effects as discussed below.

All six wild Skagit Chinook salmon stocks include delta rearing and fry migrant life history types in their populations. These life history types currently rear in Skagit delta and pocket estuary habitats if available to them. Skagit delta and pocket estuary habitats are currently much smaller and more isolated than historically available habitats (Simenstad et al. 2011). Therefore, rearing opportunities of delta-rearing Chinook salmon juveniles and fry has been greatly reduced. At contemporary Chinook salmon population levels, current delta habitat conditions are limiting the number and size of juvenile Chinook salmon rearing in delta habitat, which include blind channels, distributary channels, pocket estuaries, and off-channel backwater areas. Limitations in available delta habitat conditions are displacing juvenile Chinook salmon from delta habitat into Skagit Bay habitat and forcing a change in their life history strategy from delta-rearing to estuary-rearing (Beamer et al. 2005). Fry migrant survival in the deeper waters of the estuary is much lower than delta-rearing individuals (Quinn 2005).

As juvenile Chinook salmon move out of the estuary, they face a changing gradient of environmental conditions, such as increasing salinity, depth, different food sources, and types of predators. These changing conditions are particularly challenging for fry migrants, and result in large rates of mortality, such that the vast majority do not return as adults (Quinn 2005). Those Chinook salmon that do return as adults have successfully avoided many predators, such as other fish, birds, and marine mammals. Among the many factors that contribute to the return rates of adult Chinook, the timing of juvenile entry to the sea, smoltification status, and their size influence the probability of fish to survive and grow.

The density of juvenile PS Chinook salmon within blind channels and sloughs, growth of fish, and emigration of fry is dependent upon the amount of juveniles moving downstream from freshwater habitat. The wealth of information regarding Skagit Chinook salmon emigration and use within the estuarine portions of the Skagit point to several synergistic population level ramifications of reduced and blocked estuary habitat. Beamer et al. (2005) reasoned that if tidal delta habitat used by juvenile Chinook salmon has been reduced by 88%, then there should be a limitation on the number or size of juvenile Chinook salmon rearing in tidal delta habitat over varying freshwater smolt outmigration population sizes. If tidal delta habitat were limiting, then

WCRO-2022-03092 -94-

NOAASkagitAR0051205

the juvenile Chinook salmon population would experience lower survival in tidal delta habitats or displacement from tidal delta habitats. Displacement would likely result in proportionally more juvenile Chinook salmon in Skagit Bay earlier in the year (coinciding with the tidal delta rearing period). They found that the relationship between freshwater wild juvenile Chinook salmon population size and wild juvenile Chinook salmon abundance in tidal delta habitat is density dependent and that as the total freshwater smolt population increased, average residence time in tidal habitat declined.

Though the exact mechanisms that trigger density-dependent emigration are unknown, it appears that social behavior may play a significant part during periods of high habitat density. PS Chinook fry that arrive within stream and estuarine habitats that already host larger, older Chinook must either compete with these fish for food, or emigrate in search of other habitat. In these instances, interaction occurs that dislodges smaller, less developed Chinook salmon (Reimers 1968; Beamer et al. 2005). If the entire suite of estuarine habitat is occupied, fry must move to higher saline waters. In one experiment, all juvenile Chinook that volitionally emigrated troughs placed in streams were 43 mm or smaller, with the dominant Chinook that remained 67 mm (Reimers 1968). Within the Sixes River estuary, juvenile Chinook displayed antagonistic behavior (such as nipping, lateral display, fighting, chasing, fleeing, submission, and redirected aggression) during the ebb tides, and as the tide flooded, fish dispersed to shallower habitat, and antagonistic behavior ceased (Reimers 1968). Reimers (1968) hypothesized that without this dispersal mechanism, juvenile Chinook would be subject to possible shortages of food, and Skagit estuarine data support this hypothesis (Simenstad et al. 1982; Thorpe 1994; Beamer et al. 2005). Density-dependent emigration has been documented outside of the Skagit Watershed as well. Similar to the Skagit, juvenile Chinook salmon emigration from the Sixes River (Oregon) estuary was observed during periods of high juvenile Chinook abundance in the estuary (Reimers 1973): "During the time of large population abundance…many juveniles left the (Sixes River) estuary and were captured in the ocean surf." Another mechanism that likely leads to some fry movement into saltwater may occur during large outgoing tides and/or high river discharges, which force fish to pass through the mainstem estuary with little opportunity to reside in lower velocity channels, in part because so many of these channels are isolated behind dikes and tidegates.

Beamer et al. (2005) also found that the proportion of the total wild juvenile Chinook salmon population that bypasses rearing in tidal delta habitats and migrates directly to Skagit Bay (fry migrants) increases with wild smolt outmigration levels. Therefore, at least some of the density dependence occurring in the tidal delta results in the displacement of juvenile Chinook salmon out of the rearing habitats in the tidal delta where they end up in the deeper and more saline Skagit Bay. Similarly, Greene and Beechie (2004) determined that the best opportunity for restoring capacity to the Skagit Chinook population would be to increase tidal delta habitat. These results demonstrate density-dependent growth within the estuary and density-dependent emigration into Skagit Bay and support the idea that present day Skagit tidal delta habitat conditions are limiting the capacity of tidal delta-rearing Chinook salmon. The proposed action will continue to impede access to areas of potential estuarine habitat for at least 50 years. The TFI calculated the area influenced by the No Name Slough tidegates being replaced by the proposed action at 207 acres. This best available analysis supports our conclusion that loss of

ER-238

NOAASkagitAR0051206

estuary habitat quality and quantity caused by the tidegate reduces population abundance and productivity by reducing survival.

The longer wild sub-yearling Chinook spend in the delta, the greater their growth rate in the bay. Studies in yearling spring Chinook salmon have demonstrated that faster growth prior to seawater entry in the spring improves smolt physiology (seawater adaptability) and smolt-to-adult survival (Wagner et al. 1969; Beckman et al. 1999). Individuals that spend the longest time in the delta are best able to take advantage of conditions in the bay for accelerated growth while fry migrants that spend no time in the delta grow poorly in the Bay. Beamer and Larson (2004) concluded that this reflects their low bay growth rate, their size at entrance to the bay, and the early time of year they appear in the bay—all factors pointing to poor growth and a high risk of predation compared to other life history types. Increased time of residence in the delta equates to a larger size before entering bay habitat. Larger sub yearling Chinook have lower predation rates (Parker 1971), survived to adulthood at much higher rates (Bilton 1984), and have greater seawater tolerances than smaller fish (Clark and Shelbourne, 1985). Faster growing and larger juvenile Chinook have a survival advantage over smaller individuals. The diminished quantity and quality of nearshore habitat in the Skagit delta forces some juvenile Chinook salmon to prematurely enter the bay where they are not well suited to survive (Beamer and Larson 2004).

Fry migrants are less fit to survive within seawater for several reasons. In addition to (or because of) their small size and slow growth rate, they may have not initiated or finished smoltification, which places them at physical, physiological, and possibly behavioral disadvantages in saltwater. Smoltification and growth are interrelated; Chinook that are rapidly growing possess an osmotic and ionic regulatory system that is more functional at higher saline waters, and may be capable of being initiated more quickly in response to changing saline gradients (Wagner et al. 1969). In an experiment that investigated the importance of transitions from fresh to saltwater, juvenile Chinook salmon that were taken from freshwater and placed in saltwater had much higher mortality rates than those fish that were gradually moved to riverine or estuarine sites (Macdonald and Levings 1988). The streamlining of the body during smoltification enables juvenile Chinook to swim faster, which is their primary mechanism to avoid predators (Quinn 2005). Without coloring changes that adapt them to the saltwater environment, fry may be seen more readily by predators compared to Chinook salmon that have finished smoltification. If the important ion-processing kidney and gill changes are not complete, fry may be under physiological 'distress' that compromises immune function, predation avoidance, and pursuit of food. Without the complete development of defined teeth, combined with their small size, fry are not able to take advantage of the diversity of food sources (such as juvenile fish) in seawater. Finally, fry may not have adapted behaviorally (i.e. surface orientation that makes them vulnerable to birds) to life in saltwater.

Salmonid mortality within ocean environments occurs from predation, disease, parasites, and starvation, some of which may act synergistically and result in death. An inverse relationship between salmonid migrant size and ocean mortality has been identified (Ricker 1962 and 1976; Ward and Slaney 1988; Martin and Wertheimer 1989; Holtby et al. 1990). McGurk (1995) reported body weight as the most important variable affecting relative smolt to adult survival rates analyzed. Among these mortality agents, most is known about predation; smaller salmonids are preferred prey targets (Parker 1971; Henderson and Cass 1991; Ward et al. 1989). Though

ER-239

NOAASkagitAR0051207

the precise cause of apparent early marine mortality has not been readily identified for most juveniles as they leave freshwater and the estuary, predation risk does decrease as juveniles grow (Ricker 1976).

Fry migrant juvenile Chinook are smaller when they enter Skagit Bay, and grow slower relative to those that can use the estuary, thus their vulnerability to predation occurs for a longer period of time. Evidence of predation (and other injury or death factors) exists for fry migrants; after approximately 20 days, fry migrants are no longer found in Skagit Bay, while all other rearing types are detected from 20 to 100 days after entrance into saltwater (Beamer and Larsen 2004). Similar to the Sixes River, the fry migrant life history has yet to be documented within adult returns in the Skagit (Beamer et al. 2005).

In addition to Skagit Basin-specific data on juvenile Chinook size and abundance, several independent data sets and studies support the conclusion that smaller juvenile Chinook migrants do not survive in the ocean. An experimental release of Chinook fry into riverine, estuarine, marine and transition (nearshore between marine and estuarine zones) habitat within and near the Campbell River (Canada), was conducted, and analyzed subsequent adult return rates in the following years. In five years of adult returns, fish that were released into the estuary returned at 3.3 times the rate as fish released into marine habitats (which are analogous to fry that emigrate directly to Skagit Bay) (Levings et al. 1989). In a multi-year comprehensive study of Chinook in the Sixes River, Reimers (1973) reported that Chinook that resided in the estuary the longest represented 90.6 percent of the returning spawners, with the rest of the returning adults reared for up to one year within freshwater as juveniles. The loss of estuarine habitat, the reduction of its quality, and the loss of access by juvenile salmonids reduces their condition, growth, and survival.

SRKW Response to Enduring Effects of Tidegate Replacement

The proposed action reduces the quality and quantity of estuarine habitat behind the proposed tidegate and nearshore habitat in front of the tidegate, which, as described above, in turn reduces the abundance of PS Chinook salmon, an important prey item for SRKW. The enduring effects of the tidegate replacement on SRKW, caused by a reduction in PS Chinook salmon abundance for 50 years, are similar in kind to the enduring effects discussed above caused by the impacts to the nearshore habitat. We refer back to that section for a full explanation. Implications to SRKW population viability are discussed below.

**Effects on of the Proposed Action on Population Viability**

We assess the importance of effects from the proposed No Name Slough project in the action area to the ESUs/ DPS by examining the relevance of those effects to the characteristics of Viable Salmon Populations (VSPs). The characteristics of VSPs are sufficient abundance, population growth rate (productivity), spatial structure, and diversity (McElhany et al. 2000). While these characteristics are described as unique components of population dynamics, each characteristic exerts significant influence on the others. For example, declining abundance can reduce spatial structure of a population when habitats are less varied diversity among the population declines. Due to the short duration and limited geographic scale, none of the temporary effects are likely to have any meaningful impact on the affected populations of PS

ER-240

NOAASkagitAR0051208

Chinook salmon or steelhead. We expect the enduring effects from the proposed action will have a persistent, chronic, negative impact on the survival of juvenile PS Chinook salmon. The adaptive ability of these threatened species is depressed due to reductions in population size, habitat quantity and diversity, and loss of behavioral and genetic variation. Without these natural sources of resilience, systematic changes in local and regional climatic conditions due to anthropogenic global climate change will likely reduce long-term viability and sustainability of populations in many of these ESUs (NWFSC 2015). These conditions will possibly intensify the climate change stressors inhibiting recovery of ESA-listed species in the future. The impacts expected from climate change are addressed in Section 2.2 (Rangewide Status of the Species and Critical Habitat).

PS Chinook Salmon

The proposed action would:

1. Reduce the abundance and productivity of affected populations of PS Chinook salmon by increasing mortality at the juvenile life stage. This would occur through loss of nearshore habitat quality caused by the tidegate and shoreline armoring.
2. Reduce the abundance and productivity of affected populations of PS Chinook salmon by increasing mortality at the juvenile life stage. This results from the interruption of fish passage caused by the operation of the tidegate and maintaining what would be saltwater marsh/estuary habitat as agricultural land with low habitat value for salmonids. Absent the tidegate, this estuary habitat would provide high quality rearing habitat for PS Chinook salmon.
3. Reduce the spatial structure of the affected populations by maintaining what would be saltwater marsh/estuary habitat as agricultural land with low habitat value.

Skagit Populations Related to the Evolutionary Significant Unit

The six Skagit populations are critical to PS Chinook salmon ESU-wide abundance and productivity. Through straying of adult Chinook, the Skagit populations may provide an important source of fish to colonize under-utilized habitat, or habitat where local populations have been extirpated within the rest of the ESU. Nearly 50 percent of the naturally produced fish within the ESU are within the Skagit River, and such a large component of the ESU likely has a proportionally large role of straying adults. The Skagit watershed is located between the Nooksack and Stillaguamish Rivers, which each have two Chinook populations that are at very poor abundance levels, and adult Chinook straying to these two systems may occur on a regular basis because of their proximity to the Skagit. Evidence of straying and population intermingling with the North Fork Stillaguamish Chinook population comes from their close genetic similarity (Marshall et al. 1995). If the Skagit populations continue to decline or stay at static abundance levels, and a concurrent loss of straying fish occurs, this loss may undermine contributions to successful colonization of the rest of the ESU.

The population-level effects would cause an appreciable reduction of the Puget Sound ESU to survive and recover because, individually and collectively, the six Skagit stocks are critical to ESU-wide life-history and genetic diversity. In all, 27 percent of the ESU's populations reside in the Skagit system. Three of the remaining seven Spring PS Chinook populations in the ESU,

ER-241

NOAASkagitAR0051209

reside in the Skagit. These three spring Chinook stocks are particularly important to the ESU because of the widespread loss of spring Chinook distribution and abundance in the ESU, and because they offer a greater degree of life-history diversity relative to summer/fall populations. The six Skagit populations encompass most of one of six designated genetic diversity units that provide the genetic reserves and life history 'building blocks' to increase the probability of species survival and facilitate recovery. All of the Skagit population's genetic 'baselines' have been relatively uninfluenced by historic and present-day hatchery releases (NWFSC 2015; Ford 2022).

The population-level effects would cause an appreciable reduction of the Puget Sound ESU to survive and recover because, individually and collectively, the six Skagit stocks and the Skagit watershed are critical to ESU-wide spatial structure. The Skagit River is the largest and most hydrologically diverse watershed in the ESU, and portions of the upper watershed feature relatively good habitat. The Skagit Chinook spawning habitat is the most geographically removed from the rest of the ESU's spawning habitat, which provides enhanced ESU protection from environmental disturbances, and facilitates increased life-history and genetic diversity. Its large size and habitat variety also enables larger populations to reside within the basin, which in turn can lead to enhanced life-history and genetic diversity. Despite the relative healthy abundance and diversity of the Skagit Basin Chinook populations in the ESU, they are at less than 20 percent of their overall recovery goal, and have experienced 15-year declining trends in abundance (Figure 9) (Ford 2022).



**Figure 9**     Abundance trend of wild and total PS Chinook salmon populations from the Skagit River vs. two different recovery goals. Figure reproduced from Ford 2022. The lower recovery goal reflects an abundance target if adult salmon merely replace themselves in the production of offspring (i.e. one adult offspring returns to spawn for every parent). The upper recovery goal reflects the abundance target needed for recovery if productivity reflected recent levels of offspring replacing their adult parents.

ER-242

NOAASkagitAR0051210

Puget Sound Steelhead

Juvenile PS steelhead primarily emigrate from natal streams in April and May, and appear to move directly out into the ocean to rear, spending little time in the nearshore zone (Goetz et al. 2015), despite some observations of steelhead smolts found in low abundances in the marine nearshore (Brennan et al. 2004) PS steelhead are not known to spawn in No Name Creek and No Name Slough is unlikely to be an important rearing area for this species. Further, as explained above, nearshore habitat is less important to steelhead than it is to PS Chinook salmon. For these reasons, the proposed action would not cause any population-level effects on PS steelhead.

SRKW

The long-term reduction of PS Chinook salmon abundance caused by the proposed action is likely to lead to nutritional stress on SRKWs. Nutritional stress can lead to reduced body size and condition of individuals and can also lower reproductive and survival rates. Prey sharing would distribute more evenly the effects of prey limitation across individuals of the population that would otherwise be the case. Therefore, poor nutrition from the reduction of prey could contribute to additional mortality in this population. Food scarcity could also cause whales to draw on fat stores, mobilizing contaminants stored in their fat and affecting reproduction and immune function.

We review the population level effects on SRKW using the same parameters for viability, namely abundance, productivity, spatial structure, and distribution. This distinct population segment comprises three groups, J, K, and L pods. Abundance is low, (J pod = 25, K pod = 16, L pod = 34) as of April, 2024. Productivity is likely to be impaired by the relatively high number of males to females. Spatial distribution has high inter-annual variability, and diversity is at risk because of the low abundance.

These threats were reviewed by Murray et al. (2021), who found a "cumulative effects" model was better at determining population impacts compared to individual threats. The "cumulative effects" model indicated that Chinook salmon abundance was the most sensitive model parameter, however they highlighted the importance of considering threats collectively. Lacy et al. (2017) developed a PVA model that attempts to quantify and compare the three primary threats affecting the whales (e.g. prey availability, vessel noise and disturbance, and high levels of contaminants). The Lacy et al. (2017) model also found that Chinook salmon abundance was the most important threat to SRKW population growth; however, they also emphasized that prey increases alone would likely not be sufficient to recover the whales and that the other threats would need to be addressed as well. *See also* Williams et al. (2024) (concluding the threat with the greatest impact to SRKW population growth is the availability of Chinook salmon) and Nelson et al. (2024) (using an integrated population modeling framework to evaluate the relative importance of multiple threats, including Chinook salmon abundance, to SRKWs, finding modest evidence that Chinook salmon abundance is positively associated with survival rates, and suggesting, in combination with other research, that the recovery of SRKWs may be limited by prey availability).

The most recent effort to review the relationships of SRKW vital rates and Chinook salmon abundance was conducted by an Ad Hoc Workgroup through the PFMC (PFMC 2020).

NOAASkagitAR0051211

However, the Workgroup did not assess the cumulative threats, and found that the small population size limited their ability to detect a quantitative relationship between Chinook salmon abundance and SRKW demographic metrics (e.g. fecundity and survival) to input into their PVA and the relationship is likely not linear or not constant over time (PFMC 2020). Although there are challenges to detecting quantitative relationships and others have cautioned against overreliance on correlative studies (see Hilborn et al. 2012), given the status of the species (endangered with low abundance and productivity), and their strong preference for Chinook salmon prey, the continued existence and potential for recovery of the species is highly dependent on healthy numbers of Chinook salmon throughout its range.

The enduring effects of the proposed action include the suppression of productivity among (i.e., reduced survival of juvenile) PS Chinook salmon populations during the 50-year time period, and spatial and temporal depletions in Chinook salmon presence. This in turn limits the number of adult PS Chinook salmon available as prey for SRKW over the long-term, as well as causing SRKW to expend energy to seek prey in other locations due to spatial and temporal depletions. These effects of the proposed action are likely to be experienced by all members of this species.

As mentioned previously, there are several factors identified in the final recovery plan for SRKWs that may be limiting recovery: quantity and quality of prey, toxic chemicals that accumulate in top predators, and disturbance from sound and vessels. It is likely that multiple threats are acting together, and while it is not clear which threat or threats are most significant to the survival and recovery of SRKW, all of the threats are important to address. Effects of the proposed action on SRKW would be due to the project's adverse effects on Chinook salmon, the whales preferred prey. Given the status of the species (endangered with low abundance and productivity), and their strong preference for Chinook salmon prey, the continued existence and potential for recovery of the species is highly dependent on healthy numbers of Chinook salmon throughout its range.

The reduction in the number of adult PS Chinook salmon available as prey for SRKW over the long-term would likely result in additional stress and a lower likelihood of survival and reproduction for individual whales in response to decreased prey availability. The Southern Residents would likely increase foraging effort or abandon areas in search of more abundant prey. Reductions in prey or a resulting requirement of increased foraging efficiency would increase the likelihood of physiological effects. The Southern Residents would likely experience nutritional, reproductive, or other health effects (e.g., reduced immune function from drawing on fat stores and mobilizing contaminants in the blubber) from this reduced prey availability. These effects would lead to reduced body size and condition of individuals and can also lower reproductive and survival rates. In particular, the reduction in available prey is likely to put further stress on SRKW juveniles, pregnant females, and nursing females, with likely mortality (decrease in abundance) and decreased fecundity (decreased productivity).

Because of this population's small size, it is susceptible to rapid decline due to demographic stochasticity, and genetic deterioration. Small populations are inherently at risk because of the unequal reproductive success of individuals within the population. The more individuals added to a population in any generation, the more chances of adding a reproductively successful individual. Random chance can also affect the sex ratio and genetic diversity of a small population, leading to lowered reproductive success of the population as a whole. For these

ER-244

NOAASkagitAR0051212

reasons, the failure to add even a few individuals to a small population in the near term can have long-term consequences for that population's ability to survive and recover into the future. A delisting criterion for the SRKW DPS is an average growth rate of 2.3 percent for 28 years (NMFS 2008). In light of the current average annual growth rate of 0.1 percent, this recovery criterion and the risk of stochastic events and genetic issues described above underscore the importance for the population to grow quickly.

Particularly in light of the small population size and the associated risks, the enduring effects of the proposed action could limit survival and impede the recovery of the PS Chinook salmon ESU by reducing the potential for population growth and increasing the likelihood of additional loss of individual whales. Further reductions in Southern Resident prey quantity, or spatial or temporal depletions would reduce the representation of diversity in SRKW life histories, resiliency in withstanding stochastic events, and redundancy to ensure there is a margin of safety for the salmon and Southern Residents to withstand catastrophic events. Long-term prey reductions affect the fitness of individual whales and their ability to both survive and reproduce. Reduced fitness of individuals increases the mortality and extinction risk of Southern Residents and reduces the likelihood of recovery of the DPS.

## 2.5.2    Effects on Critical Habitat

Critical habitat for PS Chinook salmon and SRKW occur within the nearshore and marine portion of the action area. PS steelhead do not have nearshore or marine habitat areas designated as critical. Critical habitat is not designated for any listed species landward of the tidegate and shoreline armoring. NMFS reviews effects on critical habitat affected by a proposed action by examining how the PBFs of critical habitat will be altered, and the duration of such changes, and the influence of these changes on the potential for the habitat to serve the conservation values for which it was designated. The proposed action would extend the life of 85 linear feet of shoreline armoring in Puget Sound for 50 years (total shoreline armoring is proposed to include 62 linear feet of large rock and 23 linear feet of vertical concrete structural support for the tidegates). The effects that this structure exerts on habitat features and functions also would persist for the same duration, into the future.

**Puget Sound Chinook Salmon Critical Habitat**
The effects of the proposed action on PS Chinook salmon and its habitat are described thoroughly above; below is a summary of those effects in relation to the PBFs of critical habitat for this species. As outlined above, in addition to our qualitative analyses of habitat impacts, our quantitative analysis using the Puget Sound Nearshore Calculator provided an output of -275 debits (-2.75 DSAYs) for the impact of the dike to nearshore habitat. *See also* Appendix 1, 2, and 5. Neither our qualitative PBF analysis or quantitative analysis include impacts on habitat behind the tidegate.

**PBF 4—Estuarine areas** (this does not include the area behind the tidegate, which is not designated as critical habitat. As explained earlier, the area directly in front of the tidegate has characteristics of nearshore and estuary habitat. This analysis pertains only to the area in front of the tidegate):

**ER-245**

NOAASkagitAR0051213

a. Forage – Short-term reduction in forage due to turbidity during construction. Loss of forage quality and quantity due to impaired water quality from daily openings of the tidegate post-construction.
b. Free passage – Temporary disruption of free passage due to underwater noise from sheet pile driving and construction.
c. Natural cover – Loss of natural cover resulting from suppression of submerged aquatic vegetation due to daily impaired water quality releases from the tidegate.
d. Salinity – intermittent discharges of lower salinity water from behind the tidegate.
e. Water quality – Temporary water quality degradation in the estuary, including increased temperature and turbidity, due to construction activities and daily releases of impaired water quality from the tidegates. Reduced dissolved oxygen and resuspension of contaminated sediments from construction activities and daily releases of water from the tidegates.
f. Water quantity – no effect.

**PBF 5—Nearshore marine areas:**
a. Forage – Short-term reduction in forage due to turbidity during construction. Enduring loss of forage production due to shoreline armoring and isolation from riparian prey sources. Loss of forage quality and quantity due to introduction of water quality and contaminants from daily openings of the tidegates post-construction.
b. Free passage – Temporary disruption of free passage due to underwater noise from sheet pile driving and construction.
c. Natural cover – Reduction in SAV which decreases cover for rearing juvenile PS Chinook salmon
d. Water quantity – no effect
e. Water quality – Temporary water quality degradation, including reduced dissolved oxygen, resuspension of contaminated sediments, and turbidity, due to construction activities, and enduring water quality degradation, including increased turbidity, increased temperature, reduced dissolved oxygen, and salinity changes from  the presence of and daily openings of the tidegate, post-construction.

*Water Quality*

Designated critical habitat will experience temporary and enduring declines in water quality (a PBF of Chinook critical habitat). Temporary and enduring declines in water quality would result from the proposed action. Water quality would be temporarily degraded during construction work associated with the removal of piles, removal and replacement of tidegate structures, removal and replacement of sheet piles, and removal and replacement of shoreline armoring including large rocks. The enduring effects will be caused by the presence of, and daily operation of, the tidegate for its extended life of 50 years.

*Turbidity* - The proposed action will cause temporary decreases in water quality. Such activities include project construction tasks. Excavation and sheet pile installation will increase turbidity, decreasing existing water quality in the action area. Increased turbidity would also persist in bursts following construction as degraded water conditions are released daily from No Name Sough during ebbing tides for its extended life of 50 years.

ER-246

NOAASkagitAR0051214

To address increased turbidity during construction, the applicant proposes to isolate the worksite from Padilla Bay using sheet piles, some of which would remain after construction. The construction site is proposed to be isolated from No Name Slough by installing sheet piles and routing the brackish water to Padilla Bay using pumps. In estuaries, state water quality regulations establish a mixing zone of 300 feet plus the depth of water over the discharge port as measured during mean lower low water. Elevated turbidity is expected to persist about 1,700 meters into Padilla Bay at low tide where it would likely mix and return to baseline conditions shortly after in-water work and post-construction water releases are complete. Outside of in-water work and post-construction water releases, elevated turbidity is likely to occur when tidal water and No Name Slough flows re-inundate excavated areas, and during daily releases of water from behind the No Name Slough tidegate during ebbing tides, which are expected to occur for its extended life of 50 years.

*Temperature* - By blocking the normal bidirectional movement of water, tidegates disrupt the gradual change in water temperature that occurs between the marine waters and the brackish waters behind them. Consequently, tidegates create sharp transitions in water temperature (Bates 1999; Portnoy 1999; Portnoy and Giblin 1997; Portnoy et al. 1987). For example, tidegates are known to have caused a 2°C - 5°C difference in water temperature above and below the tidegate (Bates et al. 1999; Giannico and Souder 2005; Beamer et al. 2014). Thus, the presence of the tidegate will cause increased water temperatures behind the gate, and increased temperatures in front of the gate when that water is released daily with ebbing tides. For juvenile Chinook salmon rearing on the marine side of the tidegate, rapid changes in temperature of 1°C - 4°C can elicit increased levels of stress in juvenile Chinook salmon and alter their swimming behavior (Quigley and Hinch 2006) as well as increase the risk of disease and parasites and mortality (Bjornn and Reiser 1991).

*Dissolved Oxygen* - Elevated temperatures and water turbidity can reduce dissolved oxygen (DO) within the mixing zone of the marine side of the tidegate during construction and during periodic releases from No Name Slough. No Name Slough is listed for low dissolved oxygen with recorded violations during high flow conditions. Thus, during periodic tidegate openings, reduced DO is expected to exceed the established mixing zone of 300 feet plus the depth of water over the discharge port(s) as measured during mean lower low water. During low tide, it is unlikely that DO would be significantly impacted by the proposed action because low oxygen levels in the outflow during construction would likely re-oxygenate in the marine channel of No Name Slough channel prior to mixing with the marine waters of Padilla Bay. However, at high tide, it is likely that low DO would exceed the established mixing zone of 300 feet plus the depth of water over the discharge port(s), especially during summer months when temperatures are relatively elevated. Construction activities (excavation and sheet pile installation/removal) will increase turbidity and decrease DO in the action area, especially as material is removed from the project site. We expect that reduced levels of DO from construction-related activities will return to near normal levels within hours after construction stops. However, we expect reduced levels of DO to persist with daily releases of flow from No Name Slough during ebbing tides.

*Contaminants* - Re-suspension of contaminants is likely to occur during the proposed pile removal. PAH chemicals are known to create toxic conditions for organisms associated with creosote piles (West et al. 2017, Yanagida et al. 2012). Creosote-treated piles can contaminate surrounding sediment up to two meters away with PAHs (Evans et al. 2009) and removing

NOAASkagitAR0051215

creosote-treated piles would mobilize PAHs that have settled into surrounding sediments (Smith 2008; Parametrix 2011). Projects can also release PAHs directly from creosote-treated piles during the demolition if piles break during removal (Parametrix 2011). However, studies have shown that the concentration of creosote derived PAHs released into surface water rapidly dilutes. Smith 2008 reported concentrations of total PAHs of 101.8 μg/l 30 seconds after creosote-pile removal and 22.7 μg/l 60 seconds after. However, PAH levels in the sediment after pile removal can remain high for six months or more (Smith 2008). Romberg (2005) found a major reduction in sediment PAH levels three years after pile removal. Thus, whereas the removal of creosote timber piles is likely to increase PAH chemicals in the short term, they are likely to reduce leaching of chemical compounds into nearshore and marine sediments over the long term, providing a net benefit to critical habitat in a relatively short amount of time.

As with suspended sediments, re-suspended contaminants resulting from the proposed work are expected to be detectable above background levels near the project area, but diminish in the established mixing zone of 300 feet plus the depth of water over the discharge port(s) as measured during MLLW. Adverse water quality effects will likely abate as the contaminated materials settle out, at which point they would persist in the substrate. Accumulation of contaminants in benthic sediments can cause chronic or sublethal effects to prey and forage species and is discussed later. Re-suspension of contaminants is unlikely to reduce the quality of critical habitat over the long term.

*Noise*

Increased noise and sound pressure during construction reduce water quality and habitat utility. Noise and other sound inputs will increase during vibratory pile driving. Sound pressure waves transmitted through the water diminish the quality of the free passage PBF within the affected zone.

Increased noise would likely occur for short periods of time during specific activities including sheet pile driving and during in-water work to build, repair, and replace structures and from dredging activities. Excavators will be used to construct the proposed project. In each case, the operation of the excavators will increase the amount of noise in the area surrounding each construction site. Both vibratory noise and impact noise can create sufficient disturbance to degrade critical habitat PBFs.

To minimize the effects of increased noise, in-water construction at the toe of the levee and tidegate would occur during low tide. Working at low tide will limit the intensity of sound propagation into the water.

*Effects on Forage and Prey*

As explained previously in this Opinion discussing habitat and effects on species and below, designated critical habitat for PS Chinook salmon will experience temporary and enduring declines in forage or prey communities from the proposed action.

*Physical processes* - The impacts of hard armor along shorelines are well documented (Johannessen et al. 2014). Armoring of the nearshore can reduce or eliminate shallow water habitats through the disruption of sediment sources and sediment transport.

ER-248

NOAASkagitAR0051216

Shoreline armoring degrades sediment conditions, forage base, and access to shallow water waterward of the structures. Armoring also prevents access to forage and shallow water habitat upland of the structures during high tides. Shoreline armoring replacement would increase the rate of beach erosion from higher wave energy compared to a natural shoreline and scour released from the tidegate after high tides. This leads to beach lowering, increases in sediment temperature, and decreased SAV establishment and persistence, leading to reductions in primary productivity and invertebrate density within the intertidal and nearshore environment (Bilkovic and Roggero 2008; Fresh et al. 2011; Morley et al. 2012; Dethier et al. 2016).

Shoreline armoring structures in the intertidal zone changes the hydrodynamics of the waves washing up on the beach. Hard structures reflect waves without dissipating their energy the way a natural beach would, especially if vegetation is present (Griggs, 2010; Ruggiero, 2010). In addition to higher rates of beach erosion by increased wave energy, the proposed shoreline armoring would also limit the delivery of sediment from tidegate-associated ditches to the beach, further diminishing the supply of fine sediment to beaches and facilitating the necessity of ditch dredging by project applicants. Shoreline armoring generally reduces the sediment available for transport by disconnecting the sediment source, potentially causing loss of beach width and height as transport of material outpaces supply (Shipman 2010).

Shoreline armoring alters physical functional processes, causing a shift in the biological communities affected by those processes. The effects of shoreline armoring cascade through the Puget Sound food web. The consequences can be seen in the population declines of a variety of species that depend on these ecosystems, from shellfish, herring, and salmon to orcas, great blue heron, and eelgrass. The number and types of invertebrates, including shellfish, can change; forage fish lose spawning areas; and juvenile salmon and forage fish lose the feeding grounds that they use as they migrate along the shore (Shipman et al. 2010). Native shellfish and eelgrass have specific substrate requirements and altered geomorphic processes can leave shellfish beds and eelgrass meadows with material that is too coarse or with too much clay exposed. Finer materials like gravel and sand provide important spawning substrate for sand lance (*Ammodytes hexapterus*) and surf smelt (*Hypomesus pretiosus*). Therefore, a reduction of gravel and sand within the intertidal and nearshore zone as a result of the proposed shoreline armoring would reduce potential spawning habitat availability and fecundity of both species (Rice 2006; Parks et al. 2013); both species are important prey of PS Chinook salmon.

Deepening of the intertidal zone adjacent to the shoreline armoring and increased wave energy, are also reasonably certain to reduce SAV (Patrick et al. 2014). Salmonids are affected by the loss of prey communities, some of which depend on SAV for various of their own life histories, including spawning. When shoreline armoring and management removes vegetation, the loss of shading and organic material inputs can increase forage fish egg mortality (Penttila 2007). Surf smelt, for example, use about 10 percent of Puget Sound shorelines for spawning and many shoreline armoring projects are built in forage fish spawning habitat, threatening their reproductive capacity (Penttila 2007).

A reduction in eelgrass could cause a reduction in potential spawning habitat for Pacific herring, another forage species for salmonids. Shoreline armoring can also physically bury forage fish spawning beaches when structures are placed in or too close to the intertidal zone. Besides being prey, a sometimes-overlooked benefit of forage fish abundance to salmonids is their use as a prey

ER-249

NOAASkagitAR0051217

buffer against marine mammal and bird predation. Moore et al. (2021) found that the high abundance of age-1+ anchovy in the Puget Sound provided an alternative prey source for predators of out-migrating steelhead smolts which resulted in an increase in smolt survival.

Shoreline armoring located within the intertidal zone (below HAT) limits the upper intertidal zone and natural upper intertidal shoreline processes such as accumulation and ecological use of beach wrack (Sobocinski et al. 2010; Dethier et al 2016). There is a reduction in forage by juvenile salmonids as a result of lost access to beach wrack and associated habitat as primary productivity and invertebrate abundance in both the intertidal and nearshore environments is diminished. Invertebrates are an important food source for juvenile PS Chinook salmon and for forage fish, prey species of salmonids.

Designated critical habitat will have enduring diminishment of aquatic vegetation, beach wrack, and benthic communities in the migration areas of juvenile PS Chinook salmonids. We anticipate impacts to epibenthic forage will be diminished, or fail to establish due to the shoreline armoring. Shoreline armoring will reduce the quality of this PBF. Aquatic vegetation and beach wrack are important in providing cover and a food base for juvenile PS Chinook salmon. Loss of aquatic vegetation (Kelty and Bliven 2003) which creates a reduction to the shoreline primary production, is likely to incrementally reduce the food sources for juvenile PS Chinook salmon. The reduction in food sources includes epibenthos (Haas et al. 2002) as well as forage fish.

Southern Resident Killer Whale Critical Habitat

The PBFs of SRKW critical habitat are:

1. Water quality to support growth and development—minor water quality diminishment during construction activities;
2. Prey species of sufficient quantity, quality and availability to support individual growth, reproduction and development, as well as overall population growth—discussed below; and
3. Passage conditions to allow for migration, resting, and foraging—no effect.

The only SRKW PBF we expect to be meaningfully affected by the proposed action is prey.

*Prey*

Enduring declines of SRKW's prey as a result of the proposed action is expected to occur. The proposed shoreline armoring and tidegate structures are expected to reduce nearshore habitat quality, decrease rearing opportunities and increase predation on juvenile salmonids. Likewise, the proposed shoreline armoring is expected to interrupt natural shoreline processes, degrading nearshore habitat. Over time, this is expected to reduce the amount of salmon available as forage for SRKWs. The existence and operation of the proposed tidegate and associated shoreline modifications are also expected to impair and inhibit the availability and quality of estuary habitat, reducing its value for rearing PS Chinook salmon. The continued decline and reduced potential for recovery of the PS Chinook salmon as a PBF of SRKW critical habitat is likely to alter the abundance and distribution of migrating salmon and increase the likelihood of localized depletions in prey, with adverse effects on the SRKWs' ability to meet their energy needs. SRKWs could abandon depleted areas in search of more abundant prey, and end up expending

ER-250

NOAASkagitAR0051218

substantial effort only to find depleted prey resources elsewhere. Increasing the risk of a permanent reduction in the quantity and availability of prey, and the likelihood for local depletions in prey populations in multiple locations over time, reduces the conservation value of critical habitat for SRKWs.

**Critical Habitat Summary**

The chronic and enduring diminishments of critical habitat created by the proposed shoreline armoring and tidegate structure to water quality, cover, and forage prey will incrementally degrade the function of critical habitat for PS Chinook salmon. The effects will degrade the quality of PS Chinook salmon critical habitat PBFs within the action area, reducing conservation values and/or preventing conservation values from being improved. As a result, SRKW critical habitat PBF of prey base will be impaired.

The continued decline and reduced potential for recovery of the PS Chinook salmon is likely to alter the abundance and distribution of migrating salmon and increase the likelihood of localized depletions in prey, with adverse effects on the forage PBF. SRKWs could abandon depleted areas in search of more abundant prey, and end up expending substantial effort only to find depleted prey resources elsewhere.

Accordingly, we consider the combined temporary and enduring effects of the proposed action will create an incremental but chronic diminishment of the water quality, cover, prey forage, and safe migration PBFs for PS Chinook salmon and for the forage prey PBF for SRKW, throughout the new useful life period of this structure.

## 2.6    Cumulative Effects

"Cumulative effects" are those effects of future state or private activities, not involving federal activities, that are reasonably certain to occur within the action area of the federal action subject to consultation [50 CFR 402.02 and 402.17(a)]. Future federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the ESA.

The action area, all waters of Puget Sound from Olympia, Washington, at its southern end, to north of Bellingham, Washington, and to, but not including, the Strait of Juan de Fuca, is influenced by actions in the nearshore, along the shoreline, and also in tributary watersheds of which effects extend into the action area. Future actions in the nearshore and along the shoreline of Puget Sound are reasonably certain to include port and ferry terminal expansions, residential and commercial development, shoreline modifications, road and railroad construction and maintenance, and agricultural development. The repair, replacement, construction and removal of bulkheads above the High Tide Line[22] (HTL) that may not require federal authorization will continue. Based on current trends, there could continue to be a net reduction in the total amount of shoreline armoring in Puget Sound (PSP 2018). Changes in tributary watersheds that are reasonably certain to affect the action area include reductions in water quality, water quantity,

---

[22] The definitions and processes in USACE regulations, including the "high tide line" (HTL) definition at 33 C.F.R. § 328.3, apply to future permitting and other contexts in which jurisdictional determinations are made.

ER-251

NOAASkagitAR0051219

and sediment transport. Future actions in the tributary watersheds whose effects are reasonably certain to extend into the action area include operation of hydropower facilities, flow regulations, timber harvest, land conversions, disconnection of floodplain by maintaining flood-protection levees, tidegates, effects of transportation infrastructure, and growth-related commercial and residential development. Though the existing regulations minimize future potential adverse effects on salmon habitat, as currently constructed and implemented, they still allow systemic, incremental, and additive degradation to occur. Some of these developments will occur without a federal nexus, however, activities that occur waterward of the OHWM or HTL require a USACE permit and therefore involve federal activities.

Development of shoreline and estuary areas of Puget Sound is expected to continue to adversely impact the quality of marine habitat. Projected changes in nearshore and estuary development based on documented rates of developed land cover change in Bartz et al. (2015) show that between 2008 and 2060, an additional 14.7 hectares of development of shoreline areas and 204 hectares of estuary development can be expected.

Within the freshwater portion of the action area behind the tidegate, non-federal actions are likely to include fertilizer use, riparian degradation (mowing and tree removal), among other activities. Additionally, operation of tidegates will result in continued and blocked access to rearing and spawning habitats in the watershed. Changes in tributary watersheds that are likely to affect the action area include reductions in water quality, water quantity, and sediment transport. Future actions in the tributary watersheds whose effects are likely to extend into the action area include operation of farming equipment, flow regulations, timber harvest, land conversions, disconnection of floodplain by maintaining flood-protection levees, effects of transportation infrastructure, and growth-related commercial and residential development. Some of these developments will occur without a federal nexus; however, activities that occur waterward of the OHWM require a COE permit and therefore involve federal activities, which are not considered in this section.

All such future non-federal actions, in the nearshore as well as in tributary watersheds, will cause long-lasting environmental changes and will continue to harm ESA-listed species and their critical habitats. Especially relevant effects include the loss or degradation of nearshore habitats, pocket estuaries, estuarine rearing habitats, wetlands, floodplains, riparian areas, and water quality. We consider human population growth to be the main driver for most of the future negative effects on salmon and steelhead and their habitat.

The action area is influenced by actions along the shoreline of PS marine waters and actions associated with No Name Slough. Development actions are expected to have adverse impacts on salmon populations, SRKWs, and critical habitat PBFs. These actions have frequently occurred in the recent past, had an effect on the environmental baseline, and can be considered reasonably certain to occur in the future, as a result of current authorizations or permits and continued population growth. When we consider the life of structures in the proposed action, we can anticipate that tidegates, shoreline armoring, and armored dikes are reasonably certain to have a new useful life of roughly 50 years. Thus, to gauge the cumulative effects accurately, we consider the non-federal effects that will occur in the action area within that same timeframe. As mentioned above, human populations are expected to increase within the Puget Sound region,

ER-252

NOAASkagitAR0051220

and if population growth trends remain relatively consistent with recent trends, we can anticipate future growth at approximately 1.5 percent per year.[23]

In June 2005, the Shared Strategy presented its recovery plan for PS Chinook salmon and the Hood Canal Coordinating Council presented its recovery plan for Hood Canal summer-run chum salmon to NMFS who adopted and expanded the recovery plans to meet its obligations under the ESA. Together, the joint plans comprise the 2007 PS Chinook and Hood Canal summer-run chum Salmon Recovery Plan. Several not-for-profit organizations, tribes, and local, state and federal agencies are implementing recovery actions identified in these recovery plans.

Multiple non-federal activities are reasonably certain to occur that impact SRKW interactions with vessels in the Salish Sea. These additional actions are designed to further reduce impacts from vessels on SRKW by limiting the potential for interactions including:

1. Washington State law (Senate Bill 5577) established a commercial whale watching license program and charged WDFW with administering the licensing program and developing rules for commercial whale watching for inland Washington waters (see RCW 77.65.615 and RCW 77.65.620). The new rules were adopted in December 2020, and became effective May 12, 2021, and include limitations on the time, distance, and area that SRKW can be viewed within ½ nautical mile, in an effort to reduce vessel and nose disturbance:
   a. The commercial whale watching season is limited to 3 months/year for viewing SRKW closer than ½ nautical mile, and is limited to 4 hours per day in the vicinity of SRKW.
   b. Up to 3 commercial whale watching vessels are allowed within ½ nautical mile of SRKW at a given time, with exclusion from approaching within ½ nautical mile of SRKW groups containing a calf.
   c. Year-round closure of the "no-go" Whale Protection Zone along the western side of San Juan Island to commercial whale watching vessels, excluding a 100-yard corridor along the shoreline for commercial kayak tours.

2. Continued implementation and enforcement of the 2019 restrictions on speed and buffer distance around SRKW for all vessels.

3. Increased effort dedicated to outreach and education programs. This includes educational material for boating regulations, Be Whale Wise guidelines, the voluntary no-go zone, and the adjustment or silencing of sonar in the presence of SRKWs. Outreach content was created in the form of video, online (including social media), and print advertising targeting recreational boaters. On-site efforts include materials distributed at pumpout and re-fueling stations along Puget Sound, during Enforcement orca patrols, and signage at WA State Parks and WDFW water access sites. Additionally, State Parks integrated materials on whale watching regulations and guidelines in their boating safety education program to ensure all boaters are aware of current vessel regulations around SRKW.

4. Promotion of the Whale Report Alert System (WRAS) in Puget Sound, developed by the Ocean Wise Research Institute, which uses on-the-water reporting to alert large ships

---

[23] https://www.psrc.org/whats-happening/blog/region-adding-188-people-day

NOAASkagitAR0051221

when whales are nearby. Reporting SRKW to WRAS is required for commercial whale watching license holders, and on-the-water staff are also being trained to report their sightings.

5.      Piloting a new program ("Quiet Sound") that will have topic-area working groups to lead projects and programs on vessel operations, incentives, innovations, notification, monitoring, evaluation, and adaptive management. This effort was developed with partners including Commerce, WA State Ferries, and the Puget Sound Partnership in collaboration with the Ports, NOAA, and others. Funding is anticipated to be secured in the 2021 state legislative session.

6.      Continued promotion of the voluntary "No-Go" Whale Protection Zone along the western side of San Juan Island in R-MA and C-MA7 for all recreational boats—fishing and non-fishing—and commercial fishing vessels (with the exception of the Fraser Panel sockeye and pink fisheries)[24] (Figure 9). The geographic extent of this area will stretch from Mitchell Bay in the north to Cattle Point in the south, and extend offshore ¼ mile between these locations. The voluntary "No-Go" Zone extends further offshore—out to ½ mile—from a point centered on Lime Kiln Lighthouse. This area reflects the San Juan County Marine Stewardship Area[25] extended in 2018 and the full protected area recognized by the Pacific Whale Watch Association[26] and is consistent with that proposed by NOAA Fisheries as Alternative 4 in the 2009 Environmental Assessment on New Regulations to Protect SRKWs from Vessel Effects in Inland Waters of Washington and represents the area most frequently utilized for foraging and socialization in the San Juan Islands. WDFW will continue to work with San Juan County and will plan to adjust their outreach on a voluntary No-Go zone to be consistent with any outcomes of current marine spatial planning processes.

---

[24] Non-treaty Fraser River Panel commercial fisheries utilize purse seine gear within ¼ mile of San Juan Island and are required to release non-target species (Chinook and coho); (Cunningham 2021).

[25] https://www.sjcmrc.org/projects/southern-resident-killer-whales/

[26] https://www.pacificwhalewatchassociation.com/guidelines/

NOAASkagitAR0051222



**Figure 9.**　An approximation of the Voluntary "No-Go" Whale Protection Zone, from Mitchell Bay to Cattle Point (Shaw 2018). See https://wdfw.wa.gov/fishing/locations/marine-areas/san-juan-islands

7.　Currently WDFW enforcement boats conduct coordinated patrols with the U.S. Coast Guard, NOAA Office of Law Enforcement, San Juan County Sheriff's Office, Sound Watch, and other partners year-round that include monitoring and enforcement of fisheries and Marine Mammal Protection Act requirements related to vessel operation in the presence of marine mammals throughout Puget Sound. Patrols in the marine areas of northern Puget Sound, particularly MA 7, are specifically targeted to enforce regulations related to killer whales. These patrols will be increased in intensity at times SRKW calves are present. For comparison, in 2017, WDFW Police conducted 55 patrols; in 2018, they conducted 140 patrols; and in 2019 they conducted 105 patrols specific to MA7 during the summer (Cunningham 2021). Outreach and enforcement of vessel regulations will reduce the vessel effects (as described in Ferrara et al. (2017)) of recreational and commercial whale watching vessels in U.S. waters of the action area.

ER-255

NOAASkagitAR0051223

On March 14, 2018, WA Governor's Executive Order 18-02 was signed and it ordered state agencies to take immediate actions to benefit SRKW and established a Task Force to identify, prioritize, and support the implementation of a longer-term action plan needed for SRKW recovery. The Task Force provided recommendations in a final Year 1 report in November 2018.[27] In 2019, a new state law was signed that increases vessel viewing distances from 200 to 300 yards to the side of the whales and reduces vessel speed within ½ nautical mile of the whales to seven knots over ground. SB 5918 amends RCW 79A.60.630 to require the state's boating safety education program to include information about the Be Whale Wise guidelines, as well as all regulatory measures related to whale watching, which is expected to decrease the effects of vessel activities to whales in state waters.

On November 8, 2019, the task force released its Year 2 report that assessed progress made on implementing Year 1 recommendations, identified outstanding needs and emerging threats, and developed new recommendations. Some of the progress included increased hatchery production to increase prey availability. In response to recommendations of the Washington State Southern Resident Killer Whale Task Force, the Washington State Legislature provided approximately $13 million in funding "prioritized to increase prey abundance for southern resident orcas" (Engrossed Substitute House Bill 1109) for the 2019-2021 biennium (July 2019 through June 2021).

On March 7, 2019, the state passed House Bill 1579 that addresses habitat protection of shorelines and waterways (Chapter 290, Laws of 2019 (2SHB 1579)), and funding was included for salmon habitat restoration programs and to increase technical assistance and enforcement of state water quality, water quantity, and habitat protection laws. Other actions included providing funding to the Washington State Department of Transportation to complete fish barrier corrections. Although these measures won't improve prey availability in the near term, they are designed to improve conditions in the long-term.

Notwithstanding the beneficial effects of ongoing habitat restoration actions, the cumulative effects associated with continued development are reasonably certain to have ongoing adverse effects on all the listed species populations addressed in this Opinion. Only improved, low-impact development actions together with increased numbers of restoration actions, watershed planning, and recovery plan implementation would be able to address growth related impacts into the future. To the extent that non-federal recovery actions are implemented and offset ongoing development actions, adverse cumulative effects may be minimized, but will probably not be completely avoided.

## 2.7    Integration and Synthesis

The Integration and Synthesis section is the final step in assessing the risk that the proposed action poses to species and critical habitat. In this section, we add the effects of the action (Section 2.5) to the environmental baseline (Section 2.4) and the cumulative effects (Section 2.6), taking into account the status of the species and critical habitat (Section 2.2), to formulate the agency's biological opinion as to whether the proposed action is likely to: (1) reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by

---

[27] Available at: https://www.https://orca.wa.gov/progress/all-recommendations/, last visited March 30, 2024.

NOAASkagitAR0051224

reducing its numbers, reproduction, or distribution; or (2) appreciably diminish the value of designated or proposed critical habitat as a whole for the conservation of the species.

## 2.7.1    Integration and Synthesis of Effects on Species

*PS Steelhead*

Puget Sound steelhead are currently listed as threatened. The 2022 biological viability assessment (Ford 2022) identified a slight improvement in the viability of the PS steelhead DPS since the PS steelhead technical review team concluded that the DPS was at very low viability in 2015, as were all three of its constituent MPGs, and many of its 32 DIPs (Hard et al. 2015). Ford (2022) reported increases in spawner abundance in a number of populations over the last five years, which were disproportionately found within the South and Central PS, SJDF and Hood Canal MPGs, and primarily among smaller populations. The viability assessment concluded that recovery efforts in conjunction with improved oceanic prey availability have resulted in a slight and short-term increasing viability trend for the PS steelhead DPS, although the extinction risk remains moderate (Ford 2022).

Puget Sound steelhead complete much of their early life history in freshwater and do not rely on nearshore areas of Puget Sound for rearing as Chinook and chum salmon do.  Steelhead smolts make rapid migrations to the open ocean and generally spend little time in estuary and nearshore environments. In Puget Sound average migration times through Hood Canal and Puget Sound ranged from 1.8 to 12.8 days depending on the stock (Moore et. al. 2015). Since a significant proportion of the effects of the proposed action are primarily enduring effects on the quality and quantity of nearshore and estuarine habitat, PS steelhead are spared from many of the adverse effects, especially the long-term effects. Short-term noise impacts related to construction would likely injure or kill a small number of PS steelhead but not enough to result in any population-level effects. Likewise, fish relocation could injure or kill a very small number of PS steelhead. Considering both short-term and potential long-term impacts, the proposed action would not have any meaningful effects on PS steelhead population abundance, productivity, spatial structure, or diversity. The proposed action would also not appreciably reduce the likelihood of both the survival and recovery of PS steelhead in the wild by reducing their numbers and reproduction.

The remainder of the integration and synthesis will therefore focus on PS Chinook salmon and SRKW.

*PS Chinook salmon and SRKW*

Puget Sound Chinook salmon are currently listed as threatened with slightly negative recent trends in status over the previous 15 years (Ford 2022). Widespread negative trends in natural-origin spawner abundance across the ESU have been observed since 1980. Productivity remains low in most populations, and hatchery-origin spawners are present in high fractions in most populations outside of the Skagit watershed. Although most populations have increased somewhat in abundance since the last status review in 2016, they still have small negative trends over the past 15 years, with productivity remaining low in most populations (Ford 2022). All PS Chinook salmon populations remain well below the TRT planning ranges for recovery

WCRO-2022-03092                                        -114-

**ER-257**

NOAASkagitAR0051225

escapement levels, and most populations remain consistently below the spawner-recruit levels identified by the TRT as necessary for recovery.

The SRKW DPS is listed as endangered and the overall status of the population is not consistent with a healthy, recovered population. The SRKW DPS is composed of a single population and it has not grown. The biological downlisting and delisting criteria, including sustained growth over 14 and 28 years, respectively, have not been met. Considering the status and continuing threats, the Southern Resident killer whales remain in danger of extinction.

Numerous factors have led to the decline of PS Chinook salmon including overharvest, freshwater and marine habitat loss, hydropower development, and hatchery practices. Adjustments can, and have been made in the short term to ameliorate some of the factors for decline. Harvest can be adjusted on yearly or even in-season basis. Since PS Chinook salmon were listed, harvest in state and federal fisheries has been reduced in an effort to increase the number of adults returning to spawning grounds. Likewise, hatchery management can, and has been adjusted relatively quickly when practices are detrimental to listed species. To address needed improvements in hydropower, NMFS has issued biological opinions with reasonable and prudent alternatives to improve fish passage at existing hydropower facilities. Unlike the other factors, however, loss of habitat quality is much more difficult to address in the short term. Once human development causes loss of habitat quality, that loss tends to persist for decades or longer. As noted throughout this Opinion, future effects of climate change on habitat quality throughout Puget Sound, including around the project site, are expected to be negative.

Modification of nearshore and estuarine habitat in Puget Sound has resulted in a substantial decrease in habitat quantity and quality for PS Chinook salmon. This has coincided in decreased survival at early life history stages and lower population abundance and productivity (Magnusson and Hilborn 2003, Meador 2013). As noted in Section 2.3, this decline in nearshore and estuarine habitat quality and quantity is the result of shoreline modifications such as dikes and tidegates, the filling of estuaries and tidal wetlands, and the loss of blind and open channels. Estuaries have been drained and diked, cutting off their connection to salt water. Installation of tidegates interrupts normal tidal cycles, converting salt marsh into areas with higher freshwater influence.

Once developed, shoreline and estuarine areas tend to remain developed due to high residential, commercial, industrial, and agricultural demand for use of these areas. New development continues and although designs of replacement infrastructure are often more environmentally friendly, replacement of these structures ensures their physical presence will cause adverse effects on nearshore habitat into the future. This is evidenced by the continued requests for consultation on these types of actions. As a result, shoreline development causes a "press disturbance" in which habitat perturbations accumulate without periods of ecosystem recovery. This interrupts the natural cycles of habitat disturbance and recovery crucial for maintenance of habitat quality over time. The general trend of nearshore and estuarine habitat quality is downward and is unlikely to change given current management of these areas.

Habitat modification has caused broad-scale ecological changes, reducing the ability of critical and other habitat to support PS Chinook salmon juvenile migration and rearing. The loss of submerged aquatic vegetation, including eelgrass and kelp, has reduced cover, an important

ER-258

NOAASkagitAR0051226

feature of habitat for PS Chinook salmon. Degradation of sand lance and herring spawning habitat has reduced the quantity of the forage for PS Chinook salmon. Construction of tidegate structures throughout Puget Sound has degraded PS Chinook salmon habitat by creating artificial obstructions to free passage, cutting off access to estuarine rearing habitat, as well as other impacts to nearshore habitat. Habitat modifications that have occurred in Puget Sound to date have reduced juvenile survival, and in some cases, have eliminated PS Chinook salmon life history strategies that rely on rearing in nearshore and estuarine areas during early life history.

Given the rate of expected population growth in the Puget Sound area, cumulative effects are expected to result in mostly negative impacts on PS Chinook habitat quality. While habitat restoration and advances in best management practices for activities that affect PS Chinook habitat could lead to some improvement, adverse impacts created by the intense demand for future development is likely to outpace any improvements. Current state and local regulations do not prevent much of the development that degrades the quality of nearshore and estuarine habitats. There is no indication these regulations are reasonably certain to change in the foreseeable future.

The proposed action would reduce abundance and productivity of affected populations of PS Chinook salmon by increasing mortality at the juvenile life stage. The construction phase of proposed action is likely to expose a small number of juvenile PS Chinook salmon to elevated turbidity, other water quality effects, and underwater noise. Underwater noise is expected to have a meaningful adverse effect on normal behavior and this will impact a small number of juvenile PS Chinook salmon. Also, a small number of PS Chinook salmon, and possibly PS steelhead, would be injured or killed during fish relocation. Much more concerning are the enduring effects from habitat modification. This modification would occur through a combination of the loss of nearshore habitat quality caused by the tidegate and shoreline armoring, from the interruption of fish passage caused by the operation of the tidegate, and by retaining what would be saltwater marsh/estuary habitat as agricultural land with low habitat value. The proposed action causes:

Enduring Effects on Nearshore Habitat

- Lowering of beaches/beach erosion
- Reduced SAV
- Loss of prey items for juvenile salmonids
- Increased water and sediment temperature
- Reduced dissolved oxygen
- Salinity changes
- Decreased beach wrack
- Increased predation on juvenile salmonids due to reduced cover

Our quantitative analysis of enduring effects on nearshore habitat using the Puget Sound Nearshore Calculator provided an output of -275 debits (-2.75 DSAYs).

Enduring Effects on Estuary Habitat

- Increased turbidity in front of the tidegate
- Changes in salinity in front of the tidegate

ER-259

NOAASkagitAR0051227

- Impaired fish passage to hundreds of acres of potential estuarine habitat behind the tidegate
- Reduced estuary habitat quantity (changes in channel morphology)
- Increased turbidity and reduced dissolved oxygen in front of and behind the tidegate
- Increased water temperature
- Decreased prey for juvenile PS Chinook salmon behind the tidegate
- Decreased cover for juvenile PS Chinook salmon behind the tidegate

This habitat modification increases mortality at the PS Chinook salmon juvenile life stage and would persist for an additional 50 years as a result of the proposed action. The proposed action would also reduce the spatial structure of the affected populations by retaining what would be saltwater marsh/estuary habitat as agricultural land with low habitat value. As noted earlier, the six Skagit populations of PS Chinook salmon play an important role in conservation of the ESU as a whole.

The enduring effects of the proposed action on productivity and abundance of PS Chinook salmon in turn limits the number of adult PS Chinook salmon available as prey for SRKW over the long-term, as well as causing SRKW to expend energy to seek prey in other locations due to spatial and temporal depletions. These effects of the proposed action are likely to be experienced by all members of this species and would likely result in additional stress and a lower likelihood of survival and reproduction for individual whales in response to decreased prey availability. In addition to reducing the representation of diversity in SRKW life histories, the effects of the proposed action would also reduce resiliency in withstanding stochastic events, and redundancy to ensure there is a margin of safety for SRKW to withstand catastrophic events. Long-term prey reductions affect the fitness of individual whales and their ability to both survive and reproduce. Reduced fitness of individuals increases the mortality and extinction risk of SRKW and reduces the likelihood of recovery of the DPS.

This combination of effects would exacerbate limiting factors identified in the recovery plans for PS Chinook salmon and SRKWs. For SRKWs, loss of prey is one of three major threats identified in this species' recovery plan. The proposed action would degrade the quality of the prey PBF of critical habitat, further reducing available prey (Chinook salmon). For PS Chinook salmon, degraded nearshore and estuary conditions are listed as limiting factors. The proposed actions will exacerbate these factors by degrading or impeding the development of nearshore and estuary habitat essential for the conservation of this species.

The proposed action is also inconsistent with recovery actions identified in the PS Chinook salmon recovery plan. Recovery plans are non-binding documents that in and of themselves, do not create any regulatory requirement. However, these plans contain important scientific information about the subject species, particularly in regards to limiting factors, delisting goals, and actions recommended to help recover species. The following recommend actions from the PS Chinook salmon recovery plan speak to the need to protect or restore habitat:

- Counties should pass strong regulations and policies limiting increased armoring of these shorelines and offering incentives for protection;
- Aggressive protect areas, especially shallow water/low gradient habitats and pocket estuaries, within five miles of river deltas;

ER-260

NOAASkagitAR0051228

- Protect the forage fish spawning areas;
- Maintain the functioning of shallow, fine substrate features in and near 11 natal estuaries for Chinook salmon (to support rearing of fry);
- Maintain migratory corridors along the shores of Puget Sound;
- Maintain the production of food resources for salmon;
- Maintain functioning nearshore ecosystem processes (i.e., sediment delivery and transport; tidal circulation) that create and support the above habitat features and functions;
- Increase the function and capacity of nearshore and marine habitats to support key needs of salmon;
- Protect and restore shallow, low velocity, fine substrate habitats along marine shorelines, including eelgrass beds and pocket estuaries, especially adjacent to major river deltas;

The Skagit Chinook Recovery Plan (SRSC and WDFW 2005) identified delta[28] rearing habitat as a limiting factor for PS Chinook salmon recovery:

> "At contemporary Chinook salmon population levels, limitations in current tidal delta habitat conditions are displacing juvenile Chinook salmon from tidal delta habitat to Skagit Bay habitat, and forcing a change in their life history type from tidal delta rearing to fry migrants. Literature values show that fry migrant survival is one order of magnitude lower than tidal delta rearing individuals."

The proposed action is also inconsistent with recovery actions identified in the SRKW recovery plan. The following recommended actions from the SRKW recovery plan speak to the need to protect and rebuild the salmonid prey base through habitat restoration and/or protection:

> Rebuild depleted populations of salmon and other prey to ensure an adequate food base for recovery of the Southern Residents.
> - Support salmon restoration efforts in the region.
>   - Habitat management.
>   - Harvest management.
>   - Hatchery management.
> - Support regional restoration efforts for other prey species.
> - Use NMFS authorities under the ESA and the MSFCMA to protect prey habitat.

In summary, PS Chinook salmon populations are far from meeting recovery goals and trends in abundance and productivity are mostly negative. Despite the relative healthy abundance and diversity of the Skagit Basin Chinook populations in the ESU, they are at less than 20 percent of their overall recovery goal, and have experienced 15-year declining trends in abundance (Ford 2022). The Skagit populations of PS Chinook salmon are important to the ESU because:

- Fifty percent of the naturally produced fish in the ESU come from these populations.
- They provide an important source population for other struggling populations in the ESU.
- They are critical to ESU-wide life history and genetic diversity.

---

[28] Delta is synonymous with estuary or slough.

NOAASkagitAR0051229

- All of these populations' genetic "baselines" have been relatively unaffected by historic and present hatchery releases.
- They are critical to ESU-wide spatial structure. The Skagit Basin is the most historically diverse watershed and portions of the upper basin still provide relatively good habitat.
- Spawning habitat for the Skagit populations is the most geographically removed from the rest of the ESU which provides protection from stochastic events.

The adverse effects of the proposed action exacerbate a known limiting factor and would result in negative impacts on population abundance and productivity. Given the 15-year declining trends in abundance for these populations, additional loss of abundance and productivity are particularly concerning.

The status of SRKWs is also poor and continuing to decline. SRKW prey is at a fraction of historical levels. Recent authors have concluded that protecting SRKWs appears to be impossible without restoring diminished populations of Chinook salmon. Williams et al. (2024). *See also* Nelson et al. (2024) (whose integrated population models suggest that prey limitations are affecting SRKW recovery). Under the current environmental baseline, nearshore and estuary habitat in Puget Sound cannot support the biological requirements of PS Chinook salmon. This is evidenced by low survival of PS Chinook salmon juveniles in the nearshore of Puget Sound. Fewer populations of PS Chinook contributing to SRKW's prey base will reduce the representation of diversity of life histories, resiliency in withstanding stochastic events, and redundancy to ensure there is a margin of safety for the salmon and SRKWs to withstand catastrophic events. The condition of the environmental baseline is such that additional impacts on the quality and quantity of nearshore and estuary habitat is likely to impair the ability of that habitat to support conservation of these species. The proposed action would reduce abundance and productivity and spatial structure of PS Chinook salmon through a combination of the loss of nearshore habitat quality and by retaining what would be saltwater marsh/estuary habitat as agricultural land with low habitat value. Given the negative trend in status for PS Chinook salmon and the risk that poses for SRKWs, avoiding such negative effects is critically important. Additionally, the quality of nearshore habitat is expected to decline in the future as a result of climate change. For example, increasing sea surface temperatures are expected to negatively affect salmon population viability (Mauger et al. 2015). The proposed action would also exacerbate habitat limiting factors identified by the PS Chinook salmon and SRKW recovery plans and are inconsistent with recovery action listed in these plans. In several other recent biological opinions, NMFS has concluded that a no-net loss approach to enduring effects is necessary to avoid jeopardy and adverse modification of critical habitat, and otherwise conserve nearshore habitat in Puget Sound (NMFS 2020, NMFS 2021, NMFS 2022b). In another recent programmatic biological opinion, the USACE's proposed action requires projects to fully offset their enduring effects on Puget Sound nearshore habitat in order to be potentially eligible to use the programmatic for ESA consultation (NMFS 2022c). Due to demand for future human development cumulative effects on nearshore habitat quality are expected to be mostly negative.

At this critical juncture, when the effects of the proposed action are added to the environmental baseline and cumulative effects, and the status of the species is taken into account, the proposed action would appreciably reduce the likelihood of both the survival and recovery of PS Chinook salmon and SRKWs in the wild by reducing their numbers and reproduction. *See also* Williams et al. (2024) summarizing that while extinction of SRKW may still be prevented, it will require

**ER-262**

NOAASkagitAR0051230

greater sacrifices and protections than would have been the case had threats been mitigated even a decade earlier.

## 2.7.2  Integration and Synthesis of Effects of Critical Habitat

Critical Habitat is designated for PS Chinook salmon in marine nearshore environments. Throughout the designated area, multiple features of habitat are degraded, but despite such degradation, many accessible areas remain ranked with high conservation value because of the important life history role it plays. Limiting factors (impaired or insufficient PBFs) include riparian areas and LWD, fine sediment in spawning gravel, water quality, fish passage and estuary conditions. Loss of delta and nearshore critical habitat quality is a limiting factor for all PS Chinook salmon.

At the ESU designation scale, the quality of PS Chinook salmon critical habitat is generally poor with only a small amount of freshwater, estuarine, and nearshore habitat remaining in good condition. Most critical habitat for this species is degraded but nonetheless maintains high value for conservation of the species, based largely on its restoration potential. Development of shoreline and estuary areas of Puget Sound is expected to continue to adversely impact the quality of critical habitat PBFs for PS Chinook salmon.

Critical habitat for the SRKW DPS includes approximately 2,560 square miles of inland waters of Washington in three specific areas including Puget Sound. Within Puget Sound, the quality of critical habitat for SRKWs has been negatively affected by degradation of water quality, vessel noise, and a reduction of prey availability. One of the three PBFs for SRKW critical habitat is prey species of sufficient quantity, quality, and availability to support individual growth, reproduction and development, as well as overall population growth. A recent study using an integrated population model to evaluate the relationship between Chinook salmon abundance and demographic rates of SRKWs attempted to update our understanding of a potential causal relationship between prey availability and SRKW population dynamics, and how these relationships may have changed over time. Results suggest that SRKW mortality rates are more strongly associated with Chinook salmon abundance than birth rates. The authors concluded that their findings, combined with previous research, suggest the recovery of SRKWs may be limited by prey availability, and that the current population size appears to be below carrying capacity (Nelson et al. 2024). Yet most wild salmon stocks, including Chinook, which are SRKW preferred prey, are at fractions of their historic levels. For SRKWs, the impact of the proposed action is on the prey PBF. This impact is caused by the combined loss of nearshore habitat quality and access to quality estuarine rearing habitat that results in a reduction in the abundance, productivity and spatial structure of PS Chinook salmon.

Modification of nearshore habitat in Puget Sound has resulted in a substantial decrease in critical habitat quality for PS Chinook salmon. As noted in Section 2.3, shoreline development is the primary cause of this decline in habitat quality. Development includes shoreline armoring, filling of estuaries and tidal wetlands, and construction of overwater structures. Currently, 27 percent of Puget Sound's shorelines are armored (Simenstad et al. 2011).

Once developed, shoreline areas tend to remain developed due to high residential, commercial, industrial, and agricultural demand for use of these areas. New development continues and

NOAASkagitAR0051231

although designs of replacement infrastructure are often more environmentally friendly, replacement of these structures ensures their physical presence will cause adverse effects on nearshore habitat into the future. This is evidenced by the continued requests for consultation on these types of actions. As a result, shoreline development causes a "press disturbance" in which habitat perturbations accumulate without periods of ecosystem recovery. This interrupts the natural cycles of habitat disturbance and recovery crucial for maintenance of habitat quality over time. The general trend of nearshore habitat quality is downward and is unlikely to change given current management of these areas.

Nearshore habitat modification has caused broad-scale ecological changes, reducing the ability of critical habitat to support PS Chinook salmon juvenile migration and rearing. The loss of submerged aquatic vegetation, including eelgrass and kelp, has reduced cover, an important PBF of critical habitat for PS Chinook salmon. Degradation of sand lance and herring spawning habitat has reduced the quality of the forage PBF. Construction of bank armoring throughout Puget Sound has degraded PS Chinook salmon critical habitat by creating artificial obstructions to free passage in the nearshore marine area. Habitat modifications that have occurred in Puget Sound to date have reduced juvenile survival, and in some cases, eliminated PS Chinook salmon life history strategies that rely on rearing in nearshore areas during early life history.

Impacts on the survival of individual juvenile PS Chinook salmon, from a combination of these effects to their nearshore critical habitat as well as impeded access to, and the negative impacts to the quality of, estuarine rearing habitat (discussed in the Species section above), translate to a reduction of adult PS Chinook salmon, the prey PBF for SRKW critical habitat. The SRKW's population has declined in recent years as has the quality of its critical habitat.

Given the rate of expected human population growth in the Puget Sound area, cumulative effects are expected to result in mostly negative impacts on PS Chinook salmon and SRKW critical habitat quality. While habitat restoration and advances in best management practices for activities that affect critical habitat could lead to some improvement of PBFs, adverse impacts created by the intense demand for future development is likely to outpace any improvements. Current state and local regulations do not prevent much of the development that degrades the quality of nearshore critical habitats. There is no indication these regulations are reasonably certain to change in the foreseeable future.

The previous Species section 2.7.2 summarizes the effects of the proposed action on nearshore and estuarine habitat, and the associated effects on species. The estuarine habitat behind the proposed tidegate is not designated as critical habitat for any species. Thus, below, we limit our analysis to how the proposed action affects the PBFs of critical habitat for PS Chinook salmon and SRKW in front of the proposed tidegate. The proposed action would result in some positive as well as a number of adverse effects on the quality of Puget Sound nearshore habitat critical habitat for PS Chinook salmon including:

- Removal of creosote treated piles would improve water quality by removing these chronic sources of contaminants.
- In the short-term, the proposed construction activities will temporarily degrade the free passage PBF by increasing noise.

NOAASkagitAR0051232

- Construction of shoreline armoring would prevent development of shoreline vegetation, and impede sediment and organic material supply to beaches and suppress development of SAV.
- Construction of shoreline armoring would cause beach erosion waterward of the armoring, increase sediment, temperature, and reduce invertebrate forage for PS Chinook salmon.
- Construction of shoreline armoring would prevent development of suitable habitat for forage fish spawning and likely reduce abundance and productivity of these important salmon prey items.
- Operation of the tidegate will cause adverse effects on nearshore habitat in front of the tidegate by degrading water quality and altering natural sediment transport processes.

In addition to our qualitative analyses of impacts on critical habitat, our quantitative analysis using the Puget Sound Nearshore Nearshore Calculator provided an output of -275 debits (-2.75 DSAYs).

The effects of the proposed action result in a decrease in critical habitat quality. As explained in Section 2.4, *Effects of the Action*, the future consequences of the proposed action for critical habitat include adverse effects to nearshore habitat caused by the replacement tidegate structure and new and replacement bank armoring which are extending the life of those structures. Those adverse effects include the impacts listed above. These effects represent a loss in critical habitat value for PS Chinook salmon. Although the effects of the proposed action may impact a small area when compared to the critical habitat designation as a whole, these effects are meaningful given the current status of the critical habitat.

The adverse effects on PS Chinook salmon, described in the Species and Critical Habitat sections above, result in a decrease in quality and quantity of the prey PBF of SRKW critical habitat. Given the current status of the SRKW critical habitat, particularly lack of prey, this reduction represents a substantial loss of critical habitat quality.

The adverse effects of the proposed action would exacerbate limiting factors identified in the recovery plans for PS Chinook salmon and SRKWs. For SRKWs, loss of prey is one of three major threats identified in this species' recovery plan. The proposed action would degrade the quality of the prey PBF of critical habitat, further reducing available prey (Chinook salmon). For PS Chinook salmon, degraded nearshore conditions are listed as a limiting factor. The proposed actions will exacerbate this factor by degrading or impeding the development of nearshore critical habitat PBFs essential for the conservation of PS Chinook salmon.

The proposed action is also inconsistent with recovery actions identified in the PS Chinook salmon recovery plan. Recovery plans are non-binding documents that in and of themselves, do not create any regulatory requirement. However, these plans contain important scientific information about the subject species, particularly in regards to limiting factors, delisting goals, and actions recommended to help recover species. The following recommended actions from the PS Chinook salmon recovery plan speak to the need to protect or restore nearshore habitat:

- Counties should pass strong regulations and policies limiting increased armoring of these shorelines and offering incentives for protection;

ER-265

NOAASkagitAR0051233

- Aggressively protect areas, especially shallow water/low gradient habitats and pocket estuaries, within five miles of river deltas;
- Protect forage fish spawning areas;
- Maintain the functioning of shallow, fine substrate features in and near 11 natal estuaries for Chinook salmon (to support rearing of fry);
- Maintain migratory corridors along the shores of Puget Sound;
- Maintain the production of food resources for salmon;
- Maintain functioning nearshore ecosystem processes (i.e., sediment delivery and transport; tidal circulation) that create and support the above habitat features and functions;
- Increase the function and capacity of nearshore and marine habitats to support key needs of salmon;
- Protect and restore shallow, low velocity, fine substrate habitats along marine shorelines, including eelgrass beds and pocket estuaries, especially adjacent to major river deltas;

The proposed action is also inconsistent with recovery actions identified in the SRKW recovery plan. The following recommended actions from the SRKW recovery plan speak to the need to protect and rebuild the salmonid prey base through habitat restoration and/or protection:

> Rebuild depleted populations of salmon and other prey to ensure an adequate food base for recovery of the Southern Residents.
> - Support salmon restoration efforts in the region.
>   - Habitat management.
>   - Harvest management.
>   - Hatchery management.
> - Support regional restoration efforts for other prey species.
> - Use NMFS authorities under the ESA and the MSFCMA to protect prey habitat.

When completing our analysis, we add the effects of the action and cumulative effects to the environmental baseline, and, *in light of the status of the critical habitat,* determine if the proposed action is likely to adversely modify critical habitat. The status of critical habitat for both PS Chinook salmon and SRKWs is poor and continuing to decline. Given the negative trend in the quality of nearshore critical habitat for PS Chinook salmon and the risk that poses for SRWKs, protection of functioning habitat is critically important. The need to protect habitat is expressed in the recovery plan for the Skagit populations of PS Chinook salmon (SSPS 2007). Additionally, the quality of nearshore critical habitat is expected to change for the worse in the future as a result of climate change. For example, increasing sea surface temperatures are expected to negatively affect salmon population viability (Mauger et al. 2015). This means that even if human development in nearshore areas ceased completely, currently well-functioning critical habitat is likely to decline in quality over time. For these reasons, decline in the quality of Puget Sound Chinook salmon and SRKW critical habitat is inconsistent with recovery—and this proposed action contributes to that decline. As a recent author put it, *"while extinction of SRKW may still be prevented, it will require greater sacrifices and protections than would have been the case had threats been mitigated even a decade earlier"* (Williams et al. 2024).

In summary, the status of critical habitat for PS Chinook salmon is poor and the current quality of PBFs in nearshore areas cannot support conservation of this species. The prey PBF of critical

ER-266

NOAASkagitAR0051234

habitat for SRKWs is at a fraction of historical levels. Under the current environmental baseline, the PBFs of critical habitat cannot support the biological requirements of PS Chinook salmon or SRKW. The condition of the environmental baseline is such that additional long-term and chronic negative impacts on the quality of critical habitat PBFs (nearshore habitat for PS Chinook salmon and prey availability for SRKWs) will therefore impair the ability of critical habitat to support conservation of these species. The effects of the proposed action would further reduce the quality and further perpetuate poor conditions of nearshore and estuary PBFs for PS Chinook salmon. Although the nearshore and estuary areas directly affected by the proposed action may seem small when compared to the PS Chinook salmon critical habitat designation as a whole, impacts of this scale are nevertheless consequential at the designation scale given the current status of the critical habitat.

Because of the importance of PS Chinook as part of the SRKW prey base, the impacts of the proposed action on PS Chinook would also reduce prey availability for SRKWs. The proposed actions would also exacerbate habitat limiting factors identified by the PS Chinook salmon and SRKW recovery plans and are inconsistent with recovery action listed in these plans. In other recent biological opinions, NMFS has concluded that a no-net loss approach is necessary to avoid jeopardy of PS Chinook salmon and SRKW and adverse modification of their critical habitat and otherwise conserve nearshore habitat in Puget Sound (NMFS 2020, NMFS 2021, NMFS 2022b). Due to demand for future human development, cumulative effects on critical habitat quality are expected to be mostly negative. When the effects of the proposed action are added to the environmental baseline and cumulative effects, and the status of the critical habitat is taken into account, the proposed action is likely to appreciably diminish the value of critical habitat, as a whole, for the conservation of PS Chinook salmon and SRKWs.

## 2.8    Conclusion

After reviewing and analyzing the current status of the listed species and critical habitat, the environmental baseline within the action area, the effects of the proposed action, the effects of other activities caused by the proposed action, and cumulative effects, it is NMFS's biological opinion that the proposed action is likely to jeopardize the continued existence of Puget Sound Chinook salmon and SRKW and adversely modify the designated critical habitats of these two species. However, the proposed action is not likely to jeopardize the continued existence of PS steelhead.

## 2.9    Reasonable and Prudent Alternative

A "reasonable and prudent alternative" (RPA) refers to an alternative action identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the federal agency's legal authority and jurisdiction, that is economically and technologically feasible, and that would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat (50 CFR 402.02).

As described in the Integration and Synthesis section above, underpinning the jeopardy and adverse modification findings on PS Chinook salmon are the combined, enduring impacts of the proposed action on nearshore and estuarine habitat which, in turn, limit this vital prey resource

ER-267

NOAASkagitAR0051235

for SRKW to a level that will jeopardize SRKW and adversely modify its designated critical habitat. The RPA offered here provides an avenue for reducing and offsetting the impacts of the proposed action on nearshore and estuarine habitat to a level that avoids jeopardy and adverse modification to both PS Chinook and SRKW. The RPA comprises a combination of actions necessary to address the combined impacts of the proposed action on nearshore and estuarine habitat that underpin our conclusions.

We have utilized two methods to provide a reliable, well-supported and objective means by which to delineate and measure the RPA. Where applicable, we have used the NHVM Nearshore Calculator, which was used to quantitatively evaluate certain enduring effects of the proposed action. This is a tool that can quantify loss or gain of habitat function. As noted above, as currently designed, the Calculator is not able to take into account all the effects of the action that underpin our conclusions. We have therefore also utilized a best available quantification of offsets for other effect pathways of the proposed action. This quantification was generated by the Skagit Delta TFI, a regional tidegate initiative involving a range of stakeholders including industry, state and federal agencies, with the Swinomish Tribe participating as a non-voting member on the TFI Oversight Committee. The TFI used a science-based methodology to calculate estuary habitat restoration requirements for specific tidegates in the Skagit delta in order to meet Chinook salmon recovery goals.[29] The combination of these methods (NHVM Nearshore Calculator and TFI Agreement) ensures the key effect pathways that underpin our conclusions are able to be delineated and measured for the purposes of the RPA.

The RPA

**The RPA requires the applicant to generate a minimum of 275 credits as measured by the NHVM Nearshore Calculator (or equivalent)[30] and to restore a minimum of 8.6 acres of estuary habitat within the Skagit Bay/Padilla Bay area.**

NMFS used the Calculator to analyze applicable components of the proposed action and the output was a nearshore habitat function loss equivalent to 275 debits—hence the 275 credit requirement of the RPA. The assumptions and details of the Calculator analysis are set out in Appendices 1 and 2.

Under the TFI Agreement, the credit required to offset the two No Name Slough tidegates being replaced by the proposed action was 8.6 acres (Table 4-2, WWAA et al., 2008). The TFI Agreement described estuarine habitat restoration as "conversion of … delta agricultural lands."

---

[29] Progress in meeting the habitat restoration goals was slower than expected (due in part to "interpretation and application" of the TFI Agreement) and it was this, rather than the substantive restoration goals themselves, which led to reinitiation of the biological opinion on the TFI Agreement (*see* Earthjustice letter to NMFS and the USACE, dated September 9, 2021 recommending the suspension of the TFI programmatic Biological Opinion; NMFS letter to the USACE September 29, 2021 recommending the suspension of the TFI programmatic Biological Opinion; and the USACE letter to NMFS on November 3, 2021 suspending the TFI programmatic Biological Opinion).

[30] Any alternative to NMFS's Calculator must be: (1) based on best available science; (2) based on an assessment of nearshore physical and biological features supporting the conservation of ESA listed species affected by the proposed project; and (3) be able to demonstrate equivalency between habitat impacts of the proposed project and conservation offsets offered to compensate for those habitat impacts. NMFS will evaluate any proposed alternative and determine if it meets these criteria.

ER-268

NOAASkagitAR0051236

(WWAA et al., 2008, p. 4-8). Accordingly, the second part of the RPA requires 8.6 acres of estuary habitat restoration.[31]

Before the USACE issues a permit for the proposed action, the applicant must submit its proposal for complying with the RPA to the USACE, and the USACE and NMFS must verify that the proposal complies with the RPA. Specifically, after the USACE receives the applicant's proposal to comply with the RPA, the USACE must respond within 20 calendar days. If the USACE agrees that the proposal complies with the RPA, the USACE shall then submit the proposed plans to NMFS for review. Within 20 calendar days of receipt of a proposed plan, NMFS will reply to the USACE and applicant as to whether the proposed plan meets the requirements of the RPA. A final approved plan for complying with the RPA must be attached to the USACE permit issued for the proposed action and compliance with the RPA must be an enforceable term of the USACE permit. The applicant must implement the plan consistent with the timelines identified in RPA description and the monitoring and reporting requirements below.

The RPA provides for many options by which the applicant can comply with the RPA. Some of the options involve changes to the proposed action and some do not. Because the RPA requires the applicant to generate a minimum of 275 credits as measured by the Calculator and to restore a minimum of 8.6 acres of estuary habitat, compliance must include at least one Credits option and at least one Acres option. This list of options is described in more detail below:

> Credits - Option 1: Habitat improvements within DID 12 control
> Credits - Option 2: Habitat improvements outside of DID 12 control
> Credits - Option 3: Restoration funding
> Credits - Option 4: Conservation credit purchase
> Credits - Option 5: Project modifications
> Acres - Option 1: Habitat restoration
> Acres - Option 2: Restoration funding

**Options for generating 275 credits**

The five options for generating 275 credits (as measured by the NHVM Nearshore Calculator or equivalent) are set out below and these options may be used in any combination with each other to achieve the necessary offsets.

Credits - Option 1: Habitat improvements within DID 12 control

Implement habitat improvements that would result in conservation credits and are within the full discretion and control of DID 12. Improvements that could result in credits include, but are not limited to:

- Remove existing over-water structures or piles;

---

[31] The TFI calculated a ratio of the habitat restoration target and the base area and applied that ratio (0.04156) to the area influenced by each tidegate. This determined the habitat credit acreage per tidegate. See TFI Agreement (WWAA et al. 2008) p. 4-15. For the tidegates being replaced as part of the proposed action, 207 acres x 0.04156 = 8.6 acres. See Table 4-2 of the TFI Agreement (WWAA et al. 2008).

ER-269

NOAASkagitAR0051237

- Remove derelict structures;
- Remove shoreline armoring;
- Plant or relocate submerged aquatic vegetation (SAV); and,
- Shoreline planting of native (non-submerged) vegetation.

The removal of pilings or overwater structures, or any removal of shoreline armoring that is already included as part of the proposed action has already been accounted for in the Calculator output and thus would not be considered again as an action that would contribute towards compliance with this RPA. NMFS included the removal of two creosote piles in calculating the conservation debits. NMFS did not include the removal of the trash rack in the calculation of conservation debits as this structure is behind the existing tidegate and provides minimal habitat value.

If the applicant chooses Credits - Option 1 to meet required conservation credits in whole or in part, the following is required:

- A Habitat Improvement Plan which must be submitted as part of the proposal for complying with the RPA. The plan must include a description of the type(s) of habitat improvements, including:
  - A quantitative description of habitat improvements relative to the Calculator inputs (e.g., square foot (sq ft) of overwater structure removed, linear foot (lf) shoreline armoring removed, cubic yards of gravel placement);
  - Where the improvements would occur;
  - How the improvements would occur (e.g., any construction type actions); and,
  - When the improvements would occur.
- A Calculator output documenting expected credit generation, which must be submitted as part of the proposal for complying with the RPA.
- Habitat improvement projects must be completed within three years of the project's construction start date.

Credits - Option 2: Habitat improvements outside of DID 12 control

Implement habitat improvements within Skagit Bay or Padilla Bay that would result in conservation credits and are outside DID 12's full discretion and control. Improvements that could result in credits include, but are not limited to:

- Removal of pilings or overwater structures that would reduce the loss of nearshore habitat; and/or
- Remove shoreline armoring to reduce the loss of nearshore habitat.

Habitat improvements proposed by the applicant must be stand-alone projects (e.g., discrete actions such as the removal of a specific number of piles).

If the applicant chooses Credits - Option 2 to meet required conservation credits in whole or in part, the following is required:

NOAASkagitAR0051238

- A Habitat Improvement Plan which must be submitted as part of the proposal for complying with the RPA. The plan must include a description of the type(s) of habitat improvements, including:
    - A quantitative description of habitat improvements relative to the Calculator inputs (e.g., sq ft of overwater structure removed, lf shoreline armoring removed, cubic yards of gravel placement);
    - Where the improvements would occur;
    - How the improvements would occur (e.g., any construction type actions); and,
    - When the improvements would occur.
- A Calculator output documenting expected credit generation, which must be submitted as part of the proposal for complying with the RPA.
- A written agreement with any offsite landowner(s), that documents the landowner(s)' consent to the Habitat Improvement Plan, and which must be submitted as part of the proposal for complying with the RPA.
- Land acquisition (if needed) and habitat improvement projects must be completed within three years of the project's construction start date.

<u>Credits - Option 3: Restoration funding</u>

Provide funding to a habitat restoration "sponsor" (i.e., a state agency, Regional Organization, designated Lead Entity, tribal organization, Conservation District or Regional Fisheries Enhancement Group) to support a restoration project that will improve nearshore or estuarine habitat. The project must occur within Skagit Bay or Padilla Bay. One option may be to enter into a revolving restoration agreement with a sponsor, whereby the applicant reimburses the sponsor for completed restoration work (including consideration of inflation, temporary delay between completed and proposed work, and consideration of potential uncertainties), and the funding provided will be used for a future project.

Funding provided under this Option cannot be public funding that was specifically designated for some other purpose by law, regulation, or the rules of a federal or state grant program.

If the applicant chooses Credits - Option 3 to meet required conservation credits in whole or in part, in addition to the bulleted requirements set out above for Option 1, the following is also required:

- Documentation of a presale (or equivalent) agreement between restoration project sponsor and the applicant that identifies the specific name and location of the restoration project, and which must be submitted as part of the proposal for complying with the RPA.
- A Calculator output documenting credits associated with the applicant's funding for the identified restoration project, which must be submitted as part of the proposal for complying with the RPA.
- Written assurances from the restoration project sponsor that the identified restoration project would occur within three years of the full funding transfer/purchase, which also must be submitted as part of the proposal for complying with the RPA.
- Documentation that funds have been paid to the habitat restoration sponsor prior to the project's construction start date.

NOAASkagitAR0051239

Credits - Option 4: Conservation credit purchase

Purchase conservation credits from a NMFS-approved conservation bank, in-lieu fee program, and/or crediting provider.

If the applicant chooses Credits - Option 4 to meet required conservation credits in whole or in part, the following is required:

- Documentation of a presale (or equivalent) agreement between credit provider and applicant that identifies the number of credits the applicant intends to purchase, which must be submitted as part of the proposal for complying with the RPA.
- Documentation that credits have been purchased prior to the project's construction start date.
- The Credit provider must use the funds in the service area(s)[32] relevant to Skagit Basin PS Chinook salmon

Credits - Option 5: Project modifications

Project modifications that reduce overall impacts to habitat function and would be implemented as part of the USACE permit for the proposed action. Project modifications that could result in reduced debit or increased credits include, but are not limited to:

- Setback of shoreline armoring landward of the current location
- Removal of creosote piles, in addition to the two pile removals included in the proposed action

If the applicant chooses Credits - Option 5 to meet required conservation credits in whole or in part, the following is required:
- A Project Update, which must be submitted as part of the proposal for complying with the RPA. The plan must include a description of the type(s) of project updates compared to previous proposed action, including:
  - Quantitative description of project changes relative to the Calculator inputs;
  - Where the improvements would occur;
  - How the improvements would occur (e.g., any construction type actions); and,
  - When the improvements would occur.
- A Calculator output documenting expected credit/debit output, which must be submitted as part of the proposal for complying with the RPA.

Options for restoring 8.6 acres of estuarine habitat

---

[32] A service area is the geographic area in which conservation credits and debits can be traded to offset the loss of service value for listed salmonids. NOAA established five service areas in the Salish Sea. Service areas can be viewed on the Puget Sound Partnership Credit Program (https://www.google.com/url?q=https://www.psp.wa.gov/pspnc.php&sa=D&source=docs&ust=1713388036827956&usg=AOvVaw1SvDQtCqs-yc4BGYgN6BzA) and NOAA's Nearshore web page (https://www.fisheries.noaa.gov/west-coast/habitat-conservation/puget-sound-nearshore-habitat-conservation-calculator) .

NOAASkagitAR0051240

The two options for restoring 8.6 acres of estuarine habitat within the Skagit Bay/Padilla Bay area are set out below and these options may be used in any combination with each other so long as taken together they result in a minimum of 8.6 acres of restoration. In the context of this RPA, to restore means to take actions that will have the effect of returning habitat to full estuarine tidal dynamics and to provide complete volitional access by salmonids to this habitat.

Acres - Option 1: Habitat restoration

Restore estuary habitat on land adjacent to an existing distributary channel, main channel, or side channel within the Skagit Bay/Padilla Bay area, which could involve removal of a tidegate to form a restored natural channel.

If the applicant chooses Acres - Option 1 to meet required estuarine restoration, the following is required:

- A Habitat Improvement Plan which must be submitted as part of the proposal for complying with the RPA. The plan must include a description of the proposed restoration, including:
    - A quantitative description of estuarine habitat to be restored;
    - An explanation of how habitat will be returned to full estuarine tidal dynamics and provide complete volitional access by salmonids to the high quality habitat.
    - Where the restoration would occur;
    - How the restoration would occur (e.g., any construction type actions); and
    - When the restoration would occur.
- A pre-sale agreement with the landowner(s) (if restoration is not occurring on applicant-owned land) that documents the intended sale of land to the applicant, which must be submitted as part of the proposal for complying with the RPA. The equivalent could be provided for an easement in perpetuity.
- Off-site land acquisition (or perpetual easement) and restoration must be completed within three years of the project's construction start date.

Acres - Option 2: Restoration funding

Provide funding to a habitat restoration "sponsor" (i.e., a state agency, Regional Organization, designated Lead Entity, tribal organization, Conservation District or Regional Fisheries Enhancement Group) to support a restoration project within Skagit Bay or Padilla Bay that will restore estuarine habitat to fully functioning habitat. One option may be to enter into a revolving restoration agreement with a sponsor, whereby the applicant reimburses the sponsor for completed restoration work, and the funding provided will be used for a future project. Funding provided under this Option cannot be public funding that was specifically designated for some other purpose by law, regulation, or the rules of a federal or state grant program.

NOAASkagitAR0051241

If the applicant chooses Option 2 to meet required estuarine restoration, the following is required:

- Documentation of a presale (or equivalent) agreement between restoration project sponsor and the applicant, which must be submitted as part of the proposal for complying with the RPA. The document must identify:
  - A quantitative description of estuarine habitat to be restored;
  - An explanation of how habitat will be returned to full estuarine tidal dynamics and provide complete volitional access by salmonids to the high-quality habitat.
  - Where the restoration would occur;
  - How the restoration would occur (e.g., any construction type actions); and
  - When the restoration would occur.
- Written assurances from the restoration project sponsor that the identified restoration project would occur within three years of the full funding transfer/purchase date, which must be submitted as part of the proposal for complying with the RPA.
- Documentation that funds were paid to the habitat restoration partner prior to the project's construction start date.

General Provisions Applicable to RPA

Any delays in implementation of RPA Options that extend beyond the specified timeframes described in the RPA Options may result in proportional increases in the amount of required mitigation.

For any part of this RPA that requires updated NHVM calculator outputs, NMFS will respond to a request for technical assistance within 10 days of any such request.

RPA implementation options that involve habitat improvement or restoration work being undertaken by the applicant must meet the design, best management practices, and conservation measure requirements established in the Fish Passage and Restoration Action Programmatic Biological Opinion ("FPRP III" WCR-2014-1857). If they do not meet these requirements, such work may be subject to a separate, future ESA consultation. RPA implementation options that involve funding or credit purchases for habitat improvement or restoration work being undertaken by third parties are expected to be covered by a separate existing (NWR-2006-5601) or future ESA consultation. Project modifications made per RPA Credits - option 5 are not expected to result in effects outside the scope of those already considered in this Opinion.

Any time after signature of the final Opinion, NOAA staff (biologist and/or accompanied by NOAA enforcement) may do periodic compliance checks on the project.

NOAASkagitAR0051242

RPA Monitoring and Reporting

The following reports are required to document compliance with the terms of this RPA. All reports shall contain the WCRO Tracking number (WCRO-2022-03092) and be sent by electronic copy to NOAA's reporting system email address at: projectreports.wcr@noaa.gov:

    a.  If the applicant uses Credits - Option 1 (habitat improvements within DID12 control) to meet part of their RPA requirements, applicants shall, within three years from the project's construction start date do the following:
        i.  Provide verification, via the RPA Report sheet (Appendix 3) turned in through projectreports.wcr@noaa.gov, that the habitat improvement projects were implemented as proposed. At a minimum this verification should include:
            A.  A description of the final design, and
            B.  Before and after photographs.

    b.  If the applicant uses Credits - Option 2 (habitat improvements outside DID12 control) to meet part of their RPA requirements, the applicant shall, within three years from the project's construction start date do the following:
        i.  Provide verification, via the RPA Report sheet (Appendix 3) turned in through projectreports.wcr@noaa.gov that the habitat improvement projects were implemented as proposed. At a minimum this verification should include:
            A.  A description of the final design, and
            B.  Before and after photographs.

    c.  If the applicant uses Credits - Option 3 (Restoration funding) to meet part of their RPA requirements, the applicant shall, prior to the project's construction start date, provide documentation showing that funds have been paid to the habitat restoration sponsor.

    d.  If the applicant uses Credits - Option 4 (Conservation credit purchase) to meet part of their RPA requirements, the applicant shall, prior to the project's construction start date, provide documentation showing that credits have been purchased.

    e.  If the applicant uses Acres - Option 1 (habitat restoration) to meet part of their RPA requirements, the applicant shall, within three years from the project's construction start date do the following:
        i.  Provide verification, via the RPA Report sheet (Appendix 3) turned in through projectreports.wcr@noaa.gov, that habitat restoration was implemented as proposed. At a minimum this verification should include:
            A.  A description of the final design, and
            B.  Before and after photographs.

NOAASkagitAR0051243

    f.   If the applicant uses Acres - Option 2 (restoration funding) to meet part of their RPA requirements, the applicant shall, prior to the project's construction start date, provide documentation showing that funds have been paid to the habitat restoration sponsor.

    g.   Within 30 days of USACE issuing the final permit, the USACE shall provide NMFS notice and a final copy of the USACE permit to projectreports.wcr@noaa.gov

*Compliance of RPA with Regulatory Criteria*

The RPA can be implemented consistent with the intended purpose of the action and is consistent with the USACE's legal authority and jurisdiction. The intended purpose of the proposed action as described in the Biological Assessment is to maintain flows through the dike in support of aquatic habitat and the continued use of agricultural lands. The USACE has permitting authority and jurisdiction under the Clean Water Act and the Rivers and Harbors Act and these must be exercised consistent with its obligations and responsibilities under the Endangered Species Act, 16 U.S.C. 1536(a).

The RPA is fully consistent with the purpose of the action and the USACE's legal authorities and jurisdiction. Some of the RPA options allow the USACE to finalize a project permit without any alteration to the proposed tidegate and associated structures, while other options would result in project amendments, for example, by setting back the shoreline armoring or removing additional creosote piles. None of the RPA options are mandatory on their own, and none would require the project to be altered such that it would not allow flows to be maintained through the dike in support of continued agricultural use. All of the RPA options fall within the USACE's authority to permit structures in or over navigable waters and authorize discharge of dredged or fill materials into waters of the United States. In addition, all of the RPA options would maintain, and even enhance, flows in support of the aquatic habitat purpose of the proposed action. The suite of RPA options also appears consistent with the USACE's obligations, when issuing permits under section 404 of the CWA, to minimize harm to the aquatic ecosystem, avoid significant adverse effects on aquatic life and fish habitat, and to comply with the ESA (40 C.F.R. 230.10, 230.30; 40 C.F.R. 230.75), as well as its similar obligations with respect to section 10 of the Rivers and Harbors Act. USACE has express authority to condition permits to ensure compliance with the ESA. 33 C.F.R. 325.4. Although the USACE has primary responsibility for interpreting its authorities, we note that USACE is currently implementing RPAs very similar to this, i.e., WCRO-2020-1361 (NMFS 2020), WCRO-2021-1620 (NMFS 2021), and WCRO-2021-03047 (NMFS 2022b).

The RPA is technologically feasible. As an initial matter, it is relevant that the applicant can satisfy the Credits part of the RPA through a combination of any of the five options and to satisfy the Acres part of the RPA through a combination of the two options. Thus, there is broad flexibility in developing an RPA Plan so if one example suggested in one RPA Option turns out not to be feasible that does not undermine the overall feasibility of the RPA.

NOAASkagitAR0051244

With respect to the Credits component of the RPA, conservation credits can readily be obtained through the Puget Sound Partnership (PSP)[33] and the SNNP consultation provides a model for successful utilization of PSP credits to meet mitigation requirements in combination with applicant-responsible restoration projects or project (re)design. NMFS records show that 185 projects have been verified through SSNP to date, with 63 purchasing PSP credits and the balance of credits being generated through applicant-responsible mitigation projects such as pile removal, structure removal, riparian plantings and/or project design modifications.

Regarding technological feasibility of options requiring landowner consent, the County Assessor records indicate that the land on the landward side of the proposed project is owned by the Washington State Department of Fish and Wildlife or the Department of Ecology as are areas marineward of the proposed project[34] (Figure 10). Given the statutory missions of these agencies, this land ownership would suggest the feasibility of RPA Credits-Option 5 (modifying the project to setback the shoreline armoring) and/or Credits-Option 2 (off-site habitat modification).



**Figure 10.**     Land ownership at No Name Slough showing state-owned lands behind the slough.

---

[33] NMFS, FWS and PSP are parties to an Memorandum of Understanding which governs the PSP conservation crediting administration in Puget Sound nearshore. Under the MOU, the Services verifies credit calculations for all conservation projects to be funded through PSP before PSP funds the projects. The Services also assess the valuation of credits and debits to ensure the conservation values offset the impacts as analyzed in relevant Biological Opinions. Based on these, and other assurances contained in the MOU, NMFS considers PSP to be a valid conservation credit bank.

[34] https://www.skagitcounty.net/search/property/ (e.g.,property parcel # p21143)

NOAASkagitAR0051245

In terms of the feasibility of Acres-Option 1 (habitat restoration), Skagit County Assessor records show that "Dike District No 12" owns 100+ parcels of land, totaling more than 270 acres.[35] If it is Skagit County Dike, Drainage and Irrigation Improvement District 12 (i.e. the applicant) that owns or has the ability to control this land, this could provide opportunities for implementing the RPA without landowner permission or the need to acquire additional land. Some parcels are within the non-tidal delta area identified in the Chinook Recovery Plan as having potential for restoration. *See* Figure 11, below.



Figure 10.2. *Floodplain areas for the non-tidal delta portion of the Skagit River.* The map shows changes to floodplain and mainstem habitats. Historic conditions (A) were reconstructed by Collins (2000) and current conditions (B) were assessed using 1991 orthophotos by Beamer et al. (2000b).

**Figure 11.** Skagit Chinook recovery plan (SRSC and WDFW 2005, Figure 10.2) showing an area where there is a gap in habitat opportunity between Sedro-Woolley and the tidal delta.

In terms of project availability, restoration projects in the Skagit Delta have been identified in various documents, involving both nearshore and estuarine habitat. For example, priority restoration projects were specified in the Skagit Chinook recovery plan (SRSC and WDFW 2005) and incorporated into the TFI Agreement (WWAA et al. 2008). Table 9 below lists priority restoration projects for Chinook salmon in the Skagit Delta. The "Estuary Restoration and Strategic Assessment" (ESRA) also identifies priority projects as determined by a coalition

---

[35] https://www.skagitcounty.net/search/property/

ER-278

NOAASkagitAR0051246

of representatives from salmon recovery, flood risk reduction, and agricultural groups—including three Skagit diking districts.[36] The Salmon Recovery Portal is a mapping and project tracking tool that allows Lead Entities (such as the Skagit Watershed Council) to share habitat protection and restoration projects with funders and the public. The Skagit Watershed Council lists 64 active projects, 5 approved projects, 12 alternate projects, 31 proposed projects, and 81 planned projects.[37]

Many successful restoration sponsors exist in the Skagit delta, including the Skagit River Systems Cooperative,[38] the Skagit Conservation District,[39] the Skagit Fisheries Enhancement Group,[40] and the Nature Conservancy,[41] which has led to many beneficial restoration projects for Chinook salmon.[42] Restoration is commonly a partnership among several restoration practitioners. Entities such as the applicant can, and have, partnered with such entities to implement restoration projects in the Skagit delta. For example, the Fisher Slough restoration project is a freshwater tidal marsh restoration project on the South Fork Skagit Delta. The Nature Conservancy of Washington collaborated with local partners (including Dike District 3 and Drainage and Irrigation District 17) to restore the 60-acre site, including a levee setback, relocating and updating drainage infrastructure, installing fish-friendly tidegates, excavating channels and planting native vegetation.[43]

The feasibility of restoration funding options is enhanced by the prospect of revolving restoration agreements with a sponsor, whereby the applicant reimburses the sponsor for completed restoration work (including consideration of inflation, temporary delay between completed and proposed work, and consideration of potential uncertainties), and the funding provided will be used for a future project. NMFS has recently been involved in a successful instance of such an agreement in the Hood Canal area.

In terms of economic feasibility, the ESA requires only that an RPA "*can be* taken by the Federal agency or applicant." 35 USC 1536(b)(3)(A)(emphasis added). Accordingly, NMFS need only "consider whether its proposed alternative is financially and technologically *possible*," and is "not responsible for balancing the life of the [endangered species] against the impact of [the RPA]."[44] NMFS is also not required to "pick the best option for the industry."[45] Here, it appears

---

[36] https://wdfw.wa.gov/sites/default/files/2020-02/hdm-ersa_summary_report_web_version.pdf

[37] https://srp.rco.wa.gov/site/280. The lists include estuary, nearshore and freshwater projects.

[38] http://skagitcoop.org/ The Skagit River System Cooperative (SRSC) has completed many estuarine and nearshore restoration projects in the Skagit delta. The Tribes that make up the SRSC (Swinomish and Sauk-Suiattle) have reservations in the Skagit Basin, and treaty rights to fish in their Usual and Accustomed fishing areas. As a Trustee, NMFS observes that the tribes may have a strong interest in habitat restoration.

[39] https://www.skagitcd.org/

[40] https://www.skagitfisheries.org/

[41] https://www.nature.org/en-us/get-involved/how-to-help/places-we-protect/skagit-river/ The Nature Conservancy has completed numerous large-scale estuarine restoration projects, including Port Susan Bay Preserve.

[42] NMFS is providing this information only to demonstrate that there are feasible options for implementing the RPA and does not endorse any particular conservation credit or restoration provider.

[43] https://salishsearestoration.org/wiki/Fisher_Slough_Restoration

[44] San Luis & Delta-Mendota Water Authority v. Jewell, 747 F.3d 581 (9th Cir. 2014).

[45] DOW v NMFS, 2013 WL 632857 (C.A.4 (Md.) citing Greenpeace v. Nat'l Marine Fisheries Serv., 55 F.Supp.2d 1248, 1268–69 (W.D.Wash.1999).

NOAASkagitAR0051247

in this case that the RPA options NMFS has provided are economically "possible" for the applicant.

As noted above, there appears to be publicly owned land adjacent to the project site, and the applicant appears to own land with restoration potential, both of which would reduce the cost of restoration projects. The County Assessor website also shows that privately held land inland from No Name Slough has a market value of about $7,000 per acre, such that 8.6 acres would cost approximately $60,000. In addition, the balance sheet for the applicant (Skagit County Dike, Drainage and Irrigation Improvement District 12) shows a total of $19,066,157 in cash and investments (Skagit County Audit report published October 2023).[46] Although the relevance of DID 12's drainage budgets and diking budgets ( >$2.5 million annually[47]) in relation to the proposed action are unclear, we note that diking and drainage districts have the authority and ability to collect levies/assessments (RCW 85.18.010; RCW 85.06) and that District 12's drainage and diking assessment areas both include No Name Slough.

Regardless of which options the applicant chooses, compliance with this RPA is expected to avoid jeopardy and adverse modification while allowing the project to achieve its intended purpose. In the following paragraphs we explain how implementing this RPA would ensure that the proposed action would avoid the likelihood of jeopardizing the continued existence of PS Chinook salmon and SRKW, as well as avoid the likelihood of destruction or adverse modification of their critical habitats.

---

[46] Audit report published October 2023.
https://portal.sao.wa.gov/ReportSearch/Home/ViewReportFile?arn=1033364&isFinding=false&sp=false
[47] https://skagitcounty.net/Assessor/Documents/2024%20Levy%20Rate%20Sheet.pdf

NOAASkagitAR0051248

**Table 9.**    Priority restoration projects identified by the Skagit River System Cooperative and the Washington Department of Fish and Wildlife (SRSC and WDFW 2005). NMFS notes that some of the priority restoration projects in this table have since been implemented.

| Water Body | Restored Area (acres) | Restored Channel Area (acres) | Smolts Produced | Smolts per Acre |
|---|---|---|---|---|
| NORTH FORK SETBACK | 658 | 30 | 625,032 | 950 |
| CROSS ISLAND CONNECTOR | 472 | 36.1 | 264,486 | 560 |
| RAWLINS ROAD | 178 | 9.8 | 95,000 | 533 |
| S. FORK DIKE SETBACK | 39.5 | 0.92 | 14,588 | 508 |
| DEEPWATER #2 | 268 | 11 | 95,516 | 356 |
| THEIN FARM | 84.5 | 2.5 | 30,000 | 355 |
| SMOKEHOUSE/FORNSBY 1 | 62 | 6.4 | 20,471 | 344 |
| MILL TOWN | 212 | 14.8 | 57,179 | 330 |
| FISHER SLOUGH | 68 | 2 | 16,431 | 269 |
| WILEY SLOUGH | 160 | 7 | 54,989 | 241 |
| TELEGRAPH #2 | 487 | 37 | 113,145 | 232 |
| **SMOLT PRODUCTION GOAL MET** | **2689** | **157.52** | **1,386,837** | |
| TELEGRAPH SLOUGH #1 | 222 | 17.3 | 50,000 | 225 |
| SULLIVAN HACIENDA | 196.7 | 5.8 | 36,517 | 185 |
| SMOKEHOUSE/FORNSBY 2 | 93 | 3.5 | 10,890 | 171 |
| DAVIS/DRY SLOUGH | 119 | 4.7 | 20,297 | 117 |
| BLAKES BOTTLENECK | 18.5 | 0.2 | 1,780 | 96 |
| MCGLINN CAUSEWAY | No Data | No Data | 40,898 | 0 |
| **ADDITIONAL SMOLT PRODUCTION** | **649.2** | **31.5** | **119,484** | **794** |
| Yellow = completed estuary restoration projects | | | | |
| Green = estuary restoration projects in progress | | | | |
| Pink = smolt recovery goal achieved per Skagit Chinook Recovery Plan = 1,350,000 | | | | |

*Effects of the Proposed Action as Modified by the RPA on PS Chinook salmon and their Critical Habitat*

The jeopardy and adverse modification findings for PS Chinook salmon are premised on the enduring impacts of the proposed action to nearshore and estuarine rearing habitat for an additional 50 years. PS Chinook salmon juvenile survival is directly linked to the quality and quantity of nearshore and estuary habitat and there is higher juvenile survival in areas where there is a greater abundance and quality of estuary and nearshore habitat. PS Chinook habitat quality and quantity is currently insufficient to support conservation of this ESU. The proposed action's combined impacts on nearshore and estuarine habitat would further worsen or perpetuate these conditions and are inconsistent with the species' recovery.

The proposed action, as modified by the RPA, avoids jeopardy and adverse modification of critical habitat for PS Chinook salmon, despite climate change effects, because it directly addresses the habitat impacts that give rise to our jeopardy and adverse modification conclusions by requiring a combination of habitat offsets for impacts to critical habitat in the nearshore and restoration of currently degraded estuarine rearing habitat. These RPA requirements will ensure that limiting factors (degraded nearshore conditions and estuarine habitat loss) and the PBFs

NOAASkagitAR0051249

(water quality, forage, natural cover and free of excessive predation) of PS Chinook salmon critical habitat will not continue to worsen as a result of the proposed action.

All of the Options for generating credit offsets are designed to address the enduring adverse impacts of the proposed action by generating long-term positive effects to species and critical habitat. These activities are reasonably certain to lead to some degree of ecological restoration, including the establishment of environmental conditions associated with functional nearshore and estuary habitat. For example, the types of actions that could be carried out to generate credits will improve habitat quality for PS Chinook salmon. Removal of over-water structures reduces shade and decreases predation on juvenile salmonids; removal of in-water structures such as treated-wood piles removes habitat for piscine predators and eliminates persistent sources of contaminants; the purchases of conservation bank credits will result in improved habitat quantity or quality and, by definition, it will be of ecological relevance to comply with the RPA; and, project modifications that satisfy the RPA will inherently have reduced impacts on nearshore habitat.

Restoration of estuarine habitats in the Skagit Delta over the past 20 years has also repeatedly demonstrated that such actions are effective in increasing PS Chinook salmon abundance and productivity. As a result of restoration activities designed to reverse the loss of tidal marsh habitat in Wiley Slough in 2009, setbacks of dikes and levees increased 156 acres of tidal salt marsh habitat, providing rearing habitat for hundreds of thousands of juvenile Chinook salmon (WDFW 2023). In an additional example, dike setbacks restored 45 acres of estuarine habitat in Fisher Slough, which produced notable improvement in water quality and increased PS Chinook smolt abundance by more than 21,000 fish (Beamer et al. 2014).

Stabilizing the limiting factors of PS Chinook salmon in the context of this consultation will help allow the expected benefits from other efforts such as modified harvest management, hatchery reform and production from conservation hatcheries, improved fish passage at dams, and freshwater habitat restoration to have a meaningful, positive impact on PS Chinook salmon abundance, productivity, spatial structure, and diversity and their related critical habitat.

Although we expect some delay in the ecological benefits associated with some aspects of the RPA, that does not undermine our conclusion that the proposed action as modified by the RPA avoids jeopardy and adverse modification. For example, nearshore habitat improvement and estuarine restoration projects must be completed within three years of the project's construction start date and funded restoration projects must occur within three years of the full funding transfer/purchase date. These expected time delays in achieving conservation benefits are acceptable because significant evidence supports our assumption that ecosystem improvements in nearshore and intertidal environments will occur rapidly once restoration is complete. For example, Lee et al. (2018) documented strong and positive biotic restoration response within one year of the removal of shoreline armoring. Following significant estuary restoration in the Nisqually River delta, salmon catch data indicated that smolts were using this newly accessible habitat as early as one-year post-restoration (Ellings et al. 2016). Even though there will be a short delay in achieving benefits, the benefits will accrue in the first few years of what would otherwise be 50 years of impacts.

ER-282

NOAASkagitAR0051250

We also do not expect impacts from restoration activities implemented pursuant to the RPA to undermine our conclusion that the proposed action as modified by the RPA will avoid jeopardy and adverse modification. The precise habitat improvement and restoration activities associated with the RPA have yet to be determined. However, based on the limitations written into the RPA, we anticipate that restoration actions will meet the design, best management practices, and conservation measure requirements of FPRP III and fall within the effects analysis of that opinion, or be subject to separate future ESA consultations. RPA implementation options that involve funding or credit purchases for habitat improvement or restoration work being undertaken by third parties are expected to be covered by a separate existing or future, ESA consultation. In general, the very purpose of the activities, i.e. habitat improvement and restoration, is expected to limit the scope and scale of any adverse effects and provide overall beneficial effects. Thus, habitat improvement and restoration activities carried out pursuant to the RPA are likely to be in the environmental baseline and/or have some short-term impacts, but none that will have long-term adverse effects on PS Chinook salmon or be severe enough to impair the ability of habitat to support recovery.

*Effects of the Proposed Action as Modified by the RPA on SRKW and their Critical Habitat*

At the foundation of the jeopardy and adverse modification finding for SRKW is the reduced survival of juvenile Puget Sound Chinook salmon that will in turn limit this vital prey resource for SRKW. The status of SRKWs and their critical habitat is poor and continuing to decline. SRKW prey is at a fraction of historical levels. Continued negative impacts on prey availability for SRKWs is likely to impair the ability of critical habitat to support conservation of these species. The result of the proposed actions would further reduce the quality and further perpetuate poor conditions of nearshore and estuarine habitat for PS Chinook salmon and, because of the importance of PS Chinook as part of the SRKW prey base, the impacts of the proposed action on PS Chinook would further reduce prey availability for SRKWs.

The proposed action, as modified by the RPA, avoids jeopardy and adverse modification of critical habitat for SRKW, despite climate change effects, because it directly addresses the prey base impacts that give rise to our jeopardy and adverse modification conclusions. It does this by requiring a combination of habitat offsets for impacts to PS Chinook critical habitat in the nearshore and restoration of impeded access to estuary rearing habitat for PS Chinook salmon. These RPA requirements will ensure that limiting factors of PS Chinook salmon critical habitat will not continue to worsen as a result of the proposed action. Stabilizing the limiting factors of PS Chinook salmon in the context of this consultation will help allow the expected benefits from other efforts such as modified harvest management, hatchery reform and production from conservation hatcheries, improved fish passage at dams, and freshwater habitat restoration to have a meaningful, positive impact on PS Chinook salmon abundance, productivity, spatial structure, and diversity and their related critical habitat. In turn, this addresses SRKW's critical habitat requirement for prey species of sufficient quantity, quality and availability to support individual growth, reproduction and development, as well as overall population growth. The RPA avoids further reductions in SRKW prey that would otherwise be caused by the proposed action.

NOAASkagitAR0051251

**The USACE's Implementation Decision**

Because this Biological Opinion has found jeopardy to PS Chinook salmon and SRKW, and destruction or adverse modification of PS Chinook salmon and SRKW designated critical habitat, and offers a reasonable and prudent alternative to avoid jeopardy and adverse modification of critical habitat, the USACE is required to notify NMFS of its final decision on whether it will implement the RPA (50 CFR 402.15(b)).

## 2.10    Incidental Take Statement

Section 9 of the ESA and federal regulations pursuant to section 4(d) of the ESA prohibit take of endangered and threatened species, respectively, without a special exemption. "Take" is defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct. "Harm" is further defined by regulation to include significant habitat modification or degradation that actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including breeding, spawning, rearing, migrating, feeding, or sheltering (50 CFR 222.102). "Harass" is further defined by interim guidance as to "create the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." "Incidental take" is defined by regulation as takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the federal agency or applicant (50 CFR 402.02). Section 7(b)(4) and section 7(o)(2) provide that taking that is incidental to an otherwise lawful agency action is not considered to be prohibited taking under the ESA if that action is performed in compliance with the terms and conditions of this Incidental Take Statement (ITS).

### 2.10.1  Amount or Extent of Take

In this Opinion, including actions associated with implementation of the action as modified by the RPA, NMFS determined that incidental take is reasonably certain to occur as:

- Capture and relocation of a small number of juvenile PS Chinook salmon and PS steelhead during work area isolation.
- Harassment of juvenile PS Chinook salmon and PS steelhead resulting from construction-related noise
- Harm of juvenile PS Chinook salmon and PS steelhead resulting from increased predation risks, and reduced access to prey (forage), associated with the shoreline modifications;
- Harm of juvenile and adult PS Chinook salmon and PS steelhead resulting from impeded access to, and degradation of estuarine habitat, including from high water temperatures, low dissolved oxygen, salinity changes, and reduced forage; and,
- Harm of SRKW as a consequence of diminishment of their preferred prey, PS Chinook salmon

NMFS anticipates that up to 100 juvenile PS Chinook salmon and steelhead will be captured annually during fish relocation associated with work area isolation. Less than 5% of these fish are expected to die.

**ER-284**

NOAASkagitAR0051252

NMFS cannot predict with meaningful accuracy the number of listed species that are reasonably certain to be injured or killed by exposure to the remaining stressors. The distribution and abundance of the fish that occur within the action area are affected by habitat quality, competition, predation, and the interaction of processes that influence genetic, population, and environmental characteristics. These biotic and environmental processes interact in ways that may be random or directional, and may operate across far broader temporal and spatial scales than are affected by a proposed action. Thus, the distribution and abundance of fish within the action area cannot be attributed entirely to habitat conditions, nor can NMFS precisely predict the number of fish that are reasonably certain to be injured or killed if their habitat is modified or degraded by the proposed action. Additionally, NMFS knows of no device or practicable technique that would yield reliable counts of individuals that may experience these impacts.

Similarly, NMFS is unable to reliably quantify and monitor the number of individual SRKWs that may be harmed by the incidental take identified here.

In such circumstances, NMFS uses the causal link established between the activity and the likely extent of timing, duration and area of changes in habitat conditions to describe the extent of take as a numerical level. Many of the take surrogates identified below could be construed as partially coextensive with the proposed action; however, they nevertheless function as effective re-initiation triggers. If any of the take surrogates established here are exceeded, they are considered meaningful reinitiation triggers because the USACE has authority to conduct compliance inspections and to take actions to address non-compliance, including post-construction (33 CFR 326.4), and exceeding any of the surrogates would suggest a greater level of effect than was considered by NMFS in its analysis.

**Harassment from Temporary Effects**

PS Chinook salmon (juvenile) and PS steelhead (juvenile) will be harassed by construction-related noise resulting from vibratory pile driving. Disruption of normal behavior patterns including feeding and migration, can occur from this exposure. Additionally, implementation of the RPA may result in additional removal of creosote piles. The amount and extent of short-term take resulting from the proposed action, including actions taken to implement RPA, are accounted for and exempted in this take statement.

The duration of vibratory sheet pile driving per day (minutes) is the best available surrogate for the extent of take from exposure to pile removal and installation-related noise. Although the BA did not specify the expected duration of the proposed pile driving, NMFS assumes, based on prior experience, that vibratory pile driving to remove the two piles and install sheet piling will take no longer than 4 hours a day for 3 days. Thus, the maximum number of minutes of vibratory pile driving will be 720 minutes.

The surrogates for take caused by underwater sound generated by pile driving is proportional to the anticipated amount of take. This surrogate is also the most practical and feasible indicator to measure. In some cases, persistent noise can make an affected area inhospitable for normal behaviors such as migrating and foraging. The duration of this disturbance is related to the number of animals potentially affected as well as the intensity of the disturbance. As the duration of noise increases, a larger number of animals migrating or traveling through the affected area

are likely to be exposed. Likewise, the longer the noise persists, the longer the affected area may remain incapable of supporting the normal behaviors of salmon and steelhead.

**Harm from Enduring Effects**

PS Chinook salmon (juvenile), PS steelhead (juvenile), and SRKW will be harmed by the reduction in the quantity and quality of nearshore habitat resulting from shoreline armoring components of the proposed action. More specifically, shoreline modifications are reasonably certain to cause increased predation risk, and reduced forage opportunities for PS Chinook salmon and PS steelhead. In addition, the shoreline modifications impede juvenile PS Chinook salmon and steelhead from entering historical habitat to access prey and refugia from predators, and causes harm related to temperature, dissolved oxygen, and salinity changes. The proposed action is also reasonably certain to cause harm as a result of degradation of estuarine habitat, including from high water temperatures, low dissolved oxygen, salinity changes, and reduced forage. For SRKWs, the impact of the habitat-related effects is related to the reduction in prey, which in turn is caused by the loss of nearshore habitat and access to estuarine habitat that results in a reduction in the abundance of their preferred prey, PS Chinook salmon.

The physical extent (length and width) of shoreline armoring, and placement on the shore below the HAT is the best available indicator for the extent of take from all the take pathways associated with the enduring effects of shoreline modifications.

Shoreline armoring restricts natural beach forming processes (natural erosive processes) by disrupting the supply and replenishment of sediment sources that are the base of forage fish spawning habitat (effects described in Section 2.4.3). As forage fish reproduction is restricted or reduced, so is the availability of food for listed salmon, limiting and reducing the numbers of listed fish that the action area can support. In turn, this limits the number of juvenile PS Chinook salmon that will survive and return to the Puget Sound as adults that supply prey for SRKW. The loss of natural sediment deposition along the shoreline north and south of a structure that supports forage fish and other intertidal and nearshore habitat function are directly proportional to the physical area, length and width of shoreline armoring, and placement on the shore below the HAT. As the length and width of the armoring increases so does impact to sediment inputs. Structures that are placed below the HAT directly eliminate forage fish habitat and feeding habitat for listed species. The further a structure is placed below HAT, the greater the loss of this habitat and thus impacts. There are also correlations between the extent of shoreline armoring and increased predation risks. For instance, shoreline armoring prevents the development of SAV, which juvenile PS Chinook salmon use as cover to hide from predators.

ER-286

NOAASkagitAR0051254

The loss of historical rearing habitat behind the tidegate and shoreline armoring is directly proportional to the rearing productivity of PS Chinook salmon. As the length and width and physical location of the shoreline modifications increases or changes, so does impact on juvenile salmon. For example, the further a structure is placed waterward of HAT, the greater the loss of this habitat and thus effects on juvenile PS Chinook salmon productivity. Thus, the physical extent (length and width) and the physical location of shoreline modifications is also the best available indicator for the extent of take from decreased estuarine habitat quantity and function caused by these structures.

The harm to SRKWs is caused by the reduction in PS Chinook prey which is in turn caused by the enduring loss of nearshore habitat quality and quantity that results in a reduction in the abundance of their preferred prey, PS Chinook salmon. Therefore, the surrogate for SRKW harm is also the physical extent (length and width) of shoreline modifications.

The surrogate of the physical extent (length and width) of shoreline armoring to be constructed, along with the physical location of the proposed tidegate to be constructed, can be reasonably and reliably measured and monitored because of reporting requirements applicable to project construction and will serve as a meaningful reinitiation trigger due to USACE's enforcement authorities.

### 2.10.2 Effect of the Take

In the biological opinion, NMFS determined that the amount or extent of anticipated take under the RPA, coupled with other effects of the proposed action, is not likely to result in jeopardy to PS Chinook salmon, PS steelhead, or SRKW, or the destruction or adverse modification of PS Chinook salmon or SRKW critical habitat.

### 2.10.3 Reasonable and Prudent Measures

"Reasonable and prudent measures" (RPMs) are measures that are necessary or appropriate to minimize the impact of the amount or extent of incidental take (50 CFR 402.02). The following measures are necessary and appropriate to minimize the impact of incidental take of listed species from the proposed action. The Corps or applicants shall:

1. minimize incidental take from construction related noise resulting from exposure to pile driving and removal activities;

2. minimize incidental take from nearshore habitat loss associated with shoreline armouring;

3. minimize incidental take from passage impediments caused by the tidegate and associated shoreline armoring;

4. implement monitoring and reporting programs to confirm that the RPA and RPMs are implemented as required and take exemption for the proposed action is not exceeded, and that the terms and conditions are effective in minimizing incidental take.

ER-287

NOAASkagitAR0051255

**2.10.4  Terms and Conditions**

In order to be exempt from the prohibitions of section 9 of the ESA, the Federal action agency must comply (or must ensure that any applicant complies) with the following terms and conditions. The [name Federal agency] or any applicant has a continuing duty to monitor the impacts of incidental take and must report the progress of the action and its impact on the species as specified in this ITS (50 CFR 402.14). If the entity to whom a term and condition is directed does not comply with the following terms and conditions, protective coverage for the proposed action would likely lapse.

1. The following terms and conditions implement RPM 1 (pile driving and removal activities). To minimize incidental take from sheet pile installation and removal the USACE shall require the applicant to:
   a. Utilize vibratory pile driving whenever sediment conditions allow.

2. The following terms and conditions implement RPM 2 (minimize incidental take from nearshore habitat loss caused by shoreline armoring). To minimize incidental take from nearshore habitat loss:
   a. The USACE shall require the applicant to immediately report any noncompliance with applicable design criteria or other requirements related to scope or placement of the shoreline modifications to NMFS (projectreports.wcr@noaa.gov) and the Corps. The requirement to report noncompliance applies to all activities caused by this action.
   b. The USACE shall include compliance with the proposed action and this incidental take statement and the reasonable and prudent alternative of this Opinion as a condition of the USACE permit for this project.

3. The following terms and conditions implement RPM 3 (impaired passage through tidegate). To minimize incidental take from tidegate operations the USACE shall require the applicant to:
   a. achieve maximum average velocity releases from the tidegates between 2-4 ft per second.

4. The following terms and conditions implement RPM 4 (Monitoring and Reporting). The USACE shall require the applicant to:
   a. Before work begins, all contractors working on site must receive a complete list of the USACE permit special conditions, the USACE best management practices listed above in the Proposed Federal Action section of this document, this Biological Opinion's RPA (and applicant's plan for complying with the RPA), and the ITS, including the RPMs and terms and conditions intended to minimize the amount and extent of take resulting from in-water work.
   b. On the start date of the construction, the applicant (or designated agent) shall notify NMFS, via projectreports.wcr@noaa.gov, that construction has commenced and include:
      i. Email subject line: "NOTIFICATION OF START DATE **WCRO-2022-03092**"

ER-288

NOAASkagitAR0051256

      ii.    Date project construction began

      iii.   USACE NWS project number

      iv.   A written verification that all USACE-required best management practices (including implementation of a MMMP) are being implemented.

c.  Within 60 day of the project being completed, the USACE shall require the applicant to prepare and send to NMFS a project completion report containing the following information:

      i.    Starting and ending dates for project construction

      ii.   Number of fish relocated during work area isolation

      iii.  Minutes per day of vibratory pile driving

      iv.  Final length (linear feet) and width (square feet) and location of installed shoreline armoring

      v.    A fish salvage report of the work in any dewatered area. It should outline species, number, length, and condition of fish entrapped. If no fish were captured, this aspect of the report may identify "NONE."

      vi.  Photo documentation:

         1.  Include photos of habitat conditions before, during, and after construction

         2.  Label each photo with date, time, and location

      vii.  <u>Submit Reports.</u> All reports shall contain the NMFS Number **WCRO-2022-03092** and be sent by electronic copy to NOAA's reporting system email address at: **projectreports.wcr@noaa.gov.**

## 2.11    Conservation Recommendations

Section 7(a)(1) of the ESA directs federal agencies to use their authorities to further the purposes of the ESA by carrying out conservation programs for the benefit of the threatened and endangered species. Specifically, "conservation recommendations" are suggestions regarding discretionary measures to minimize or avoid adverse effects of a proposed action on listed species or critical habitat or regarding the development of information (50 CFR 402.02).

To address the poor passage of fish at tidegates, we recommend that the Corps require the applicants to work with state and federal agencies to implement the following:

- Develop a study plan to better understand how fish passage could be improved at tidegates on the Skagit delta. We recommend that any study be coordinated with the NMFS, EPA, WDFW, SRSC, and Ecology, and that the study results be reported to NMFS and the Corps as they become available;
- Develop a comprehensive and programmatic agreement to achieve the overarching goals of the former TFI agreement;
- Use bioengineering to add large wood to shoreline armoring structures;
- Plant marine tolerant riparian vegetation to increase shade to No Name Slough;
- Develop and implement a water quality management plan to improve conditions in No Name Slough and No Name Creek.

NOAASkagitAR0051257

## 2.12    Reinitiation of Consultation

This concludes formal consultation for the Corps' permitting of the No Name Slough Tidegate Replacement project from DID 12 in Skagit County, Washington (NWS-2020-195).

Under 50 CFR 402.16(a): "Reinitiation of consultation is required and shall be requested by the Federal agency or by the Service where discretionary Federal agency involvement or control over the action has been retained or is authorized by law and: (1) If the amount or extent of taking specified in the incidental take statement is exceeded; (2) If new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or (4) If a new species is listed or critical habitat designated that may be affected by the identified action."

## 3.    MAGNUSON–STEVENS FISHERY CONSERVATION AND MANAGEMENT ACT ESSENTIAL FISH HABITAT RESPONSE

Section 305(b) of the MSA directs federal agencies to consult with NMFS on all actions or proposed actions that may adversely affect EFH. Under the MSA, this consultation is intended to promote the conservation of EFH as necessary to support sustainable fisheries and the managed species' contribution to a healthy ecosystem. For the purposes of the MSA, EFH means "those waters and substrate necessary to fish for spawning, breeding, feeding, or growth to maturity," and includes the physical, biological, and chemical properties that are used by fish (50 CFR 600.10). Adverse effect means any impact that reduces quality or quantity of EFH, and may include direct or indirect physical, chemical, or biological alteration of the waters or substrate and loss of (or injury to) benthic organisms, prey species and their habitat, and other ecosystem components, if such modifications reduce the quality or quantity of EFH. Adverse effects on EFH may result from actions occurring within EFH or outside of it and may include site-specific or EFH-wide impacts, including individual, cumulative, or synergistic consequences of actions (50 CFR 600.810). Section 305(b) of the MSA also requires NMFS to recommend measures that can be taken by the action agency to conserve EFH. Such recommendations may include measures to avoid, minimize, mitigate, or otherwise offset the adverse effects of the action on EFH (CFR 600.905(b)).

This analysis is based, in part, on the EFH assessment provided by the Corps and descriptions of EFH for Pacific Coast groundfish (Pacific Fishery Management Council (PFMC 2005), coastal pelagic species (CPS) (PFMC 1998), and Pacific Coast salmon (PFMC 2014) contained in the fishery management plans developed by the PFMC and approved by the Secretary of Commerce.

## 3.1    Essential Fish Habitat Affected by the Project

The environmental effects of the proposed action may adversely affect EFH for Pacific Coast salmon and coastal pelagic species EFH, all of which are present in the action area. The action area also contains Habitat Areas of Particular Concern (HAPC) for Pacific Coast salmon in marine portions of the action area. Impacts to EFH include blocked access to rearing and

NOAASkagitAR0051258

spawning habitats, increased predation and reduced forage from structures placed in the nearshore environment, and benthic disturbance by structures, sediment quality degradation by re-suspended contaminants, and water quality degradation (temperature, dissolved oxygen, and turbidity).

## 3.2    Adverse Effects on Essential Fish Habitat

The features of EFH of Pacific Coast salmon and coastal pelagic species would include diminishments in water quality, sediment quality, forage. These effects would occur within PS to varying degrees. Additional effects to EFH could occur in freshwater for Pacific Coast salmonids, with disruption of spawning areas. These adverse effects are associated with the habitat impacts of tidegate and shoreline armoring structures in the PS.

As a result of blocking access to spawning and rearing habitat, we anticipate the following habitat effects:

- A 50-year reduction of production potential of PS salmonids;
- A 50-year reduction of Pacific Coastal Pelagic species potential in the nearshore

As a result of the construction, persistence, and operation of the Skagit diking and drainage district tidegates, including maintenance activities, we anticipate the following habitat effects:

- A 50-year reduction of delta rearing habitats for PS salmonids
- A 50-year reduction of foraging habitat for PS salmonids
- A 50-year reduction in spawning and rearing habitats for Pacific Coastal Pelagic forage species along the shoreline.

## 3.3    Essential Fish Habitat Conservation Recommendations

NMFS determined that the following conservation recommendations are necessary to avoid, minimize, mitigate, or otherwise offset the impact of the proposed action on EFH.

1) To address the habitat effects of shoreline armoring, we recommend that the Corps require the applicant to implement the following:
   a. Incorporate landscape planning into remedies that increase the availability of rearing habitat in the Skagit Delta by continuing to work with the conservation community to locate and fund restoration activities in these environments;
   b. Develop mitigation banking opportunities in the Skagit Delta by working with County officials and the conservation community.

2) Use soft approaches (e.g., beach nourishment, vegetative plantings, and placement of LWD) in lieu of "hard" shoreline stabilization and modifications (such as concrete bulkheads and seawalls, concrete or rock revetments).

3) Plant shade-producing riparian trees and shrubs and ensure long-term survival by monitoring and adaptively managing survival and productivity. Take corrective action as needed.

NOAASkagitAR0051259

4) Based on the information collected through the implementation of conservation measures 1 and 2 above, work with state agencies, and the conservation community, and NMFS to develop new or modified BMPs that further reduce adverse habitat effects of tidegate structures and operations.

Fully implementing these EFH conservation recommendations would protect, by avoiding or minimizing the adverse effects described in Section 3.2, above, for Pacific Coast salmon and coastal pelagic species.

## 3.4    Statutory Response Requirement

As required by section 305(b)(4)(B) of the MSA, the Corps must provide a detailed response in writing to NMFS within 30 days after receiving an EFH Conservation Recommendation. Such a response must be provided at least 10 days prior to final approval of the action if the response is inconsistent with any of NMFS' EFH Conservation Recommendations unless NMFS and the Federal agency have agreed to use alternative time frames for the Federal agency response. The response must include a description of the measures proposed by the agency for avoiding, minimizing, mitigating, or otherwise offsetting the impact of the activity on EFH. In the case of a response that is inconsistent with the Conservation Recommendations, the Federal agency must explain its reasons for not following the recommendations, including the scientific justification for any disagreements with NMFS over the anticipated effects of the action and the measures needed to avoid, minimize, mitigate, or offset such effects [50 CFR 600.920(k)(1)].

In response to increased oversight of overall EFH program effectiveness by the Office of Management and Budget, NMFS established a quarterly reporting requirement to determine how many conservation recommendations are provided as part of each EFH consultation and how many are adopted by the action agency. Therefore, we ask that in your statutory reply to the EFH portion of this consultation, you clearly identify the number of conservation recommendations accepted.

## 3.5    Supplemental Consultation

The Corps must reinitiate EFH consultation with NMFS if the proposed action is substantially revised in a way that may adversely affect EFH, or if new information becomes available that affects the basis for NMFS' EFH Conservation Recommendations [50 CFR 600.920(l)].

## 4.  DATA QUALITY ACT DOCUMENTATION AND PRE-DISSEMINATION REVIEW

The Data Quality Act (DQA) specifies three components contributing to the quality of a document. They are utility, integrity, and objectivity. This section of the opinion addresses these DQA components, documents compliance with the DQA, and certifies that this opinion has undergone pre-dissemination review.

ER-292

NOAASkagitAR0051260

## 4.1    Utility

Utility principally refers to ensuring that the information contained in this consultation is helpful, serviceable, and beneficial to the intended users. The intended users of this opinion is the Corps. Other interested users could include permit applicants, citizens of affected areas and others interested in the conservation of the affected ESUs/DPS. Individual copies of this opinion were provided to the Corps. The document will be available at the NOAA Library Institutional Repository [https://repository.library.noaa.gov/welcome]. The format and naming adhere to conventional standards for style.

## 4.2    Integrity

This consultation was completed on a computer system managed by NMFS in accordance with relevant information technology security policies and standards set out in Appendix III, 'Security of Automated Information Resources,' Office of Management and Budget Circular A-130; the Computer Security Act; and the Government Information Security Reform Act.

## 4.3    Objectivity

***Information Product Category***: Natural Resource Plan

***Standards:*** This consultation and supporting documents are clear, concise, complete, and unbiased; and were developed using commonly accepted scientific research methods. They adhere to published standards including the NMFS ESA Consultation Handbook, ESA regulations, 50 CFR 402.01 et seq., and the MSA implementing regulations regarding EFH, 50 CFR part 600.

***Best Available Information:*** This consultation and supporting documents use the best available information, as referenced in the References section. The analyses in this opinion and EFH consultation contain more background on information sources and quality.

***Referencing:*** All supporting materials, information, data and analyses are properly referenced, consistent with standard scientific referencing style.

***Review Process:*** This consultation was drafted by NMFS staff with training in ESA and MSA implementation, and reviewed in accordance with West Coast Region ESA quality control and assurance processes.

ER-293

NOAASkagitAR0051261

## 5. REFERENCES

Adams B. L., Zaug W. S., and L. R. McLain. 1973. Temperature effect on parr-smolt transformation in steelhead trout (Salmo gairdneri) as measured by gill sodium-potassium stimulated adenosine triphosphatase. Comp Biochem Physiol 44A:1333-1339.

Agne, M.C., P.A. Beedlow, D.C. Shaw, D.R. Woodruff, E.H. Lee, S.P. Cline, and R.L. Comeleo. 2018. Interactions of predominant insects and diseases with climate change in Douglas-fir forests of western Oregon and Washington, U.S.A. Forest Ecology and Management 409(1). https://doi.org/10.1016/j.foreco.2017.11.004

Alizedeh, M.R., J.T. Abatzoglou, C.H. Luce, J.F. Adamowski, A. Farid, and M. Sadegh. 2021. Warming enabled upslope advance in western US forest fires. PNAS 118(22) e2009717118. https://doi.org/10.1073/pnas.2009717118.

Alpers, C.N., R.C. Antweiler, H.E. Taylor, P.D. Dileanis, and J.L. Domagalski (editors). 2000a. Volume 2: Interpretation of metal loads. In: Metals transport in the Sacramento River, California, 1996-1997, Water-Resources Investigations Report 00-4002. U.S. Geological Survey. Sacramento, California.

Alpers, C.N., R.C. Antweiler, H.E. Taylor, P.D. Dileanis, and J.L. Domagalski (editors). 2000b. Volume 1: Methods and Data. In: Metals transport in the Sacramento River, California, 1996-1997, Water-Resources Investigations Report 99-4286. U.S. Geological Survey. Sacramento, California.

Anisfeld, S. C., and G Benoit. 1997. Impacts of flow restrictions on salt marshes: an instance of acidification. Environmental Science and Technology 31:1650–1657.

Anderson, S. C., J. W. Moore, M. M. McClure, N. K. Dulvy, and A. B. Cooper. 2015. Portfolio conservation of metapopulations under climate change. Ecological Applications 25:559-572.

Armour, Carl L. 1991. Guidance for Evaluating and Recommending Temperature Regimes to Protect Fish. U.S. Fish Wildl. Serv., Biol. Rep. 90(22). 13 pp.

Asch, R. G. 2015. Climate change and decadal shifts in the phenology of larval fishes in the California Current ecosystem. Publications National Academy of Sciences. 112: E4065-E4074.

Au W. W., J. K. Horne, and C. Jones. 2010. Basis of acoustic discrimination of Chinook salmon from other salmons by echolocating Orcinus orca. The Journal of the Acoustical Society of America. 128: 2225-32.

Bailey, J.F., B.L. Wing, and C.R. Mattson. 1975. Zooplankton abundance and feeding habits of fry of pink salmon (Oncorynchus gorbuscha) and chum salmon (Oncorynchus keta), in traitors Cove Alaska, with speculations on the carrying capacity of the area. National Marine Fisheries Service, Fishery Bulletin 73:846-861.

ER-294

NOAASkagitAR0051262

Bain, D. 1990. Examining the validity of inferences drawn from photo-identification data, with special reference to studies of the killer whale (Orcinus orca) in British Columbia. Report of the International Whaling Commission, Special Issue 12:93- 100.

Baird, R.W. 2000. The killer whale: foraging specializations and group hunting. Pages 127- 153 in J. Mann, R.C. Connor, P.L. Tyack, and H. Whitehead, editors. Cetacean societies: field studies of dolphins and whales. University of Chicago Press, Chicago, Illinois.

Bakshtansky, E. L., V. D. Nesterov, and A. Haro. 1993. Some aspects of juvenile anadromous salmonid behavior and behavioral studies, and their applications to development of fish passage systems. Pages 205–209 in K. Bates, editor. Fish passage policy and technology: bioengineering section. American Fisheries Society, Bethesda, Maryland.

Barnett, H.K., T.P. Quinn, M. Bhuthimethee, and J.R. Winton. 2020. Increased prespawning mortality threatens an integrated natural- and hatchery-origin sockeye salmon population in the Lake Washington Basin. Fisheries Research 227. https://doi.org/10.1016/j.fishres.2020.105527

Bartz, K.K., Ford M.J., Beechie T.J., Fresh K.L., Pess G.R., et al. 2015. Trends in Developed Land Cover Adjacent to Habitat for Threatened Salmon in Puget Sound, Washington, U.S.A.. PLOS ONE 10(4): e0124415. https://doi.org/10.1371/journal.pone.0124415

Bass, A., 2010. Juvenile coho salmon movement and migration through tidegates. MS Thesis. Oregon State University, Corvallis, OR.

Bates, K. 1999. Flap gates. Pages 13-1–13-4 in Fishway design guidelines for Pacific salmon. Notes from fish passageways and diversion studies. USFWS, Keaneysville, West Virginia.

Bates, K., B. Barnard, B. Heiner, P. Klavas, and P. Powers. 1999. Fish passage design at road culverts. WAC 220-110-070, Washington Department of Fish and Wildlife, Habitat and Lands Program, Environmental Engineering Division.

Beamer, E., R. R. McClure, and B. A. Hayman. 2000. Fiscal Year 1999 Skagit River Chinook Restoration Research. Skagit System Cooperative report for the Northwest Indian Fisheries Commission Contract #3902 for FY 1999. http://www.skagitcoop.org/documents.html

Beamer, E., A. McBride, R. Henderson, and K. Wolf. 2003. The importance of non-natal pocket estuaries in Skagit Bay to wild Chinook salmon: An emerging priority for restoration. Skagit System Cooperative. http://www.skagitcoop.org/documents.html

Beamer, E., and K. Larsen. 2004. The Importance of Skagit delta habitat on the growth of wild ocean-type Chinook in the Skagit Bay: Implications for delta restoration. http://www.skagitcoop.org/documents.html

ER-295

NOAASkagitAR0051263

Beamer, E., Rice, C., Henderson, R., Fresh, K. and Rowse, M., 2007. Taxonomic Composition of Fish Assemblages, and Density and Size of Juvenile Chinook Salmon in the Greater Skagit River Estuary Field Sampling and Data Summary Report. https://skagitcoop.org/wp-content/uploads/Final_ACOE_REPORT.pdf

Beamer, E., R. Henderson, C. Ruff, and K. Wolf. 2014. Juvenile Chinook salmon utilization of habitat associated with the Fisher Slough Restoration Project, 2009 - 2013. Report prepared for The Nature Conservancy, Washington.

Beamer, E.M., W.T. Zackey, D. Marks, D. Teel, D. Kuligowski, and R. Henderson. 2013. Juvenile Chinook salmon rearing in small non-natal streams draining into the Whidbey Basin. Skagit River System Cooperative, LaConner, WA.

Beamer, E., A. McBride, C. Greene, R. Henderson, G. Hood, K. Wolf, K. Larsen, C. Rice, and K. Fresh. 2005. Delta and nearshore restoration for the recovery of wild Skagit River Chinook salmon: Linking estuary restoration to wild Chinook salmon populations. Appendix D in: SRSC and WDFW (2005), Skagit Chinook Recovery Plan.

Beckman, B. R., Dickhoff, W. W., Zaugg, W. S., Sharpe, C., Hirtzel, S., Schrock, R., … Mahnken, C. V. W. (1999). Growth, Smoltification, and Smolt-to-Adult Return of Spring Chinook Salmon from Hatcheries on the Deschutes River, Oregon. Transactions of the American Fisheries Society, 128(6), 1125–1150. https://doi.org/10.1577/1548-8659(1999)128<1125:GSASTA>2.0.CO;2

Beechie, T.J., B.D. Collins, and G.R. Pess. 2001. Holocene and recent geomorphic processes, land use, and salmonid habitat in two North Puget Sound River Basins. In: Geomorphic Processes and Riverine Habitat (Dorava, J.M., D.R. Montgomery, B.B. Palcsak, F.A. Fitzpatrick, eds.). Water Science and Application Volume 4, pp.37-54.

Beechie, T., E. Buhle, M. Ruckelshaus, A. Fullerton, and L. Holsinger. 2006. Hydrologic regime and the conservation of salmon life history diversity. Biological Conservation, 130(4), pp.560-572.

Berggren, T. J., and M. J. Filardo. 1993. An analysis of variables influencing the migration of juvenile salmonids in the Columbia River basin. North American Journal of Fisheries Management 13:48–63.

Bilkovic, D.M., and M.M. Roggero. 2008. Effects of coastal development on nearshore estuarine nekton communities. Marine Ecology Progress Series. 358:27-39.

Bilton, H.T. (1984). Returns of Chinook salmon in relation to juvenile size at release. CanadianTechnical Report of Fisheries and Aquatic Sciences 1245: 1-33.

Bjornn, T.C. and Reiser, D.W., 1991. Habitat requirements of salmonids in streams. American Fisheries Society Special Publication, 19(837), p.138.

ER-296

NOAASkagitAR0051264

Black, B.A., P. van der Sleen, E. Di Lorenzo, D. Griffin, W.J. Sydeman, J.B. Dunham, R.R. Rykaczewski, M. García-Reyes, M. Safeeq, I. Arismendi, and S.J. Bograd. 2018. Rising synchrony controls western North American ecosystems. Global change biology, 24(6), pp. 2305-2314.

Bond, N.A., M.F. Cronin, H. Freeland, and N. Mantua. 2015. Causes and impacts of the 2014 warm anomaly in the NE Pacific. Geophysical Research Letters. 42(9): 3414–3420.

Bonefeld-Jørgensen, E. C., H. R. Andersen, T. H. Rasmussen, and A. M. Vinggaard. 2001. Effect of highly bioaccumulated polychlorinated biphenyl congeners on estrogen and androgen receptor activity. Toxicology 158:141–153.

Bortleson, G.C., M.J. Chrzastowski, and A.K. Helgerson. 1980.  Historical changes of shoreline and wetland at eleven major deltas in the Puget Sound Region, Washington. U.S. Dept. of the Interior, Geological Survey.

Bottom, D.L., C.A. Simenstad, J. Burke, A.M. Baptista, D.A. Jay, K.K. Jones, E. Casillas, and M.H. Schiewe. 2005a. Salmon at river's end: the role of the estuary in the decline and recovery of Columbia River salmon. U.S. Dept. Commer., NOAA Tech. Memo. NMFS-NWFSC-68, 246 p.

Bottom, D.L., Jones, K.K., Cornwell, T.J., Gray, A. and Simenstad, C.A., 2005. Patterns of Chinook salmon migration and residency in the Salmon River estuary (Oregon). Estuarine, Coastal and Shelf Science, 64(1), pp.79-93.

Bradford, A. L, D. W. Weller, A. E. Punt, Y. V. Ivashchenko YV, A. M. Burdin, G. R. Van Blaricom, and R. L. Brownell. 2012. Leaner leviathans: body condition variation in critically endangered whale population. J. Mammal. 93(1):251-266.

Braun, D.C., J.W. Moore, J. Candy, and R.E. Bailey. 2016. Population diversity in salmon: linkages among response, genetic and life history diversity. Ecography, 39(3), pp.317-328.

Brennan, J.S., K. F. Higgins, J. R. Cordell, and V. A Stamatiou. 2004. Juvenile salmonid composition, timing, distribution and dies in Marine Nearshore waters of Central Puget Sound in 2001-2002. WRIA 8 and WRIA 9 Steering Committees and King County Water and Land Resources Division, Seattle, Washington. 167.

Bricker, O.P., 1999. An overview of the factors involved in evaluating the geochemical effects of highway runoff on the environment.

Brodeur, R. D., R. C. Francis, and W. G. Pearcy. 1992. Food consumption by juvenile coho (Oncorhynchus kisutch) and chinook salmon (0. tshawytscha) on the continental shelf off Washington and Oregon. Can. J. Fish. Aquat. Sci. 49:1670-1685.

NOAASkagitAR0051265

Brophy L.S., Greene C.M., Hare V.C., Holycross B., Lanier A., et al. 2019. Insights into estuary habitat loss in the western United States using a new method for mapping maximum extent of tidal wetlands. PLOS ONE 14(8): e0218558.

Buckler, D.R. and Granato, G.E., 1999. *Assessing biological effects from highway-runoff constituents* (No. 99-240). US Geological Survey.

Bulthuis, D.A. (1996). "Coastal habitats in Padilla Bay, Washington: A review," Technical Report EL-96-15, U.S. Army Engineer Waterways Experiment Station, Vicksburg, MS.

Bulthuis, D.A., 2013. The Ecology of Padilla Bay, Washington: An Estuarine Profile of a National Estuarine Reserve. 198 pp. http://www.padillabay.gov/pdfs/SiteProfile.pdf

Burke, B.J., W.T. Peterson, B.R. Beckman, C. Morgan, E.A. Daly, M. Litz. 2013. Multivariate Models of Adult Pacific Salmon Returns. PLoS ONE 8(1): e54134. https://doi.org/10.1371/journal.pone.0054134

Carey, Andrea J.; West, James E.; Fisk, Robert J.; Langness, Mariko M.; Ylitalo, Gina Maria; and O'Neill, Sandra M. 2018. "Input of PBDE exposure in juvenile Chinook salmon along their out-migrant pathway through the Snohomish River, WA" (2018). Salish Sea Ecosystem Conference. 355. https://cedar.wwu.edu/ssec/2018ssec/allsessions/355

Carr-Harris, C.N., J.W. Moore, A.S. Gottesfeld, J.A. Gordon, W.M. Shepert, J.D. Henry Jr, H.J. Russell, W.N. Helin, D.J. Doolan, and T.D. Beacham. 2018. Phenological diversity of salmon smolt migration timing within a large watershed. Transactions of the American Fisheries Society, 147(5), pp.775-790.

Carretta, J.W., K.A. Forney, E.M. Olson, D.W. Weller, A.R. Lang, J. Baker, M.M. Muto, B. Hanson, A.J. Orr, H. Huber, M.S. Lowry, J. Barlow, J.E. Moore, D. Lynch, L. Carswell, and R.L. Brownell. 2020. U.S. Pacific Marine Mammal Stock Assessments: 2019. NOAA- TM-NMFS-SWFSC-629.

Center for Biological Diversity (CBD). 2006. The Puget Sound Basin. Center for Biological Diversity web page. http://www.biologicaldiversity.org/swcbd/ecosystems/pugetsound/index.html. Article dated December 6, 2006. Accessed May 31, 2019.

Center for Whale Research. 2024. https://www.whaleresearch.com/orca-population. Accessed on March 28, 2024.

Cereghino, P., J. Ory, P. Pope, S. Ehinger, M. Bhuthimethee, K. Wykoff, and J. Chamberlin. 2023. Estimation of Typical High Intertidal Beach-Face Slope in Puget Sound. D. Northwest Fisheries Science Center. Fish Ecology, N. R. Center, T. University of, and R. United States. National Marine Fisheries Service. West Coast, editors., NOAA.

ER-298

NOAASkagitAR0051266

Chamberlin, J.W. and T.P. Quinn. 2014. Effects of natal origin on localized distributions of Chinook salmon, *Oncorhynchus tshawytscha*, in the marine waters of Puget Sound, Washington. Fisheries Research, 153:113-122, ISSN 0165-7836, https://doi.org/10.1016/j.fishres.2014.01.008.

Chasco, B., I. C. Kaplan, E. J. Ward, A. Thomas, A. Acevedo-Gutierrez, D. P. Noren, M. J. Ford, M. B. Hanson, J. Scordino, S. J. Jeffries, S. F. Pearson, K. N. Marshall. 2017. Estimates of Chinook salmon consumption in Puget Sound area waters by four marine mammal predators from 1970 - 2015. Canadian Journal of Fisheries and Aquatic Sciences.

Chasco, B. E., B. J. Burke, L. G. Crozier, and R. W. Zabel. 2021. Differential impacts of freshwater and marine covariates on wild and hatchery Chinook salmon marine survival. PLoS ONE 16:e0246659. https://doi.org/0246610.0241371/journal.pone.0246659.

Cheung, W. W., R. D. Brodeur, T. A. Okey, D. Pauly. 2015. Projecting future changes in distributions of pelagic fish species of Northeast Pacific shelf seas. Progress in Oceanography, 130:19-31.

Clarke, W.C., and Shelbourne, J.E. (1985). Growth and development of seawater adaptability by juvenile fall Chinook salmon (Oncorhynchus tshawytscha) in relation to temperature. Aquaculture 45: 21-31.

Clutton-Brock, T. H. 1988. Reproductive Success. Studies of individual variation in contrasting breeding systems. University of Chicago Press; Chicago, Illinois.

Collins, B. 2000. Mid-19th century stream channels and wetlands interpreted from archival sources for three north Puget Sound estuaries. Prepared for: Skagit System Cooperative, Bullitt Foundation, Skagit Watershed Council. Prepared by: Brian Collins, University of Washington, Seattle, WA. Aug. 1, 2000.

Collins, B.D., and D.R. Montgomery. 2001. Importance of archival and process studies to characterizing pre-settlement riverine geomorphic processes and habitat in the Puget Lowland, p. 227–243. In J. M. Dorava, D. R. Montgomery, B. Palcsak, and F. Fitzpatrick (eds.), Geomorphic Processes and Riverine Habitat. American Geophysical Union, Washington, D.C.

Collins, B.D., Montgomery, D.R. and Sheikh, A.J., 2003. Reconstructing the historical riverine landscape of the Puget Lowland. In: Restoration of Puget Sound Rivers, pp.79-128.

Congleton, J.L. 1978. Feeding patterns of juvenile chum in the Skagit River salt Marsh. Pages 141-150 in Lipovsky, S.J. and J.A. Simenstad, ed. Gutshop '78 Fish food habits studies, Proceedings of the second Pacific Northwest Technical Workshop. Washington Sea Grant, University of Washington, Seattle, Washington. 222p.

ER-299

NOAASkagitAR0051267

Congleton, J.L., S.K. Davis, and S.R. Foley. 1981. Distribution, abundance, and outmigration timing of chum and Chinook salmon fry in the Skagit salt marsh, p. 153-163. in E. L. Brannon and E. O. Salo (eds). Proceedings of the Salmon and Trout Migratory Behaviour Symposium. School of Fisheries, University of Washington, Seattle, WA.

Cooper, M.G., J. R. Schaperow, S. W. Cooley,S. Alam,L. C. Smith, D. P. Lettenmaier. 2018. Climate Elasticity of Low Flows in the Maritime Western U.S. Mountains. Water Resources Research. https://doi.org/10.1029/2018WR022816

Coulson, T., Benton, T. G., Lundberg, P., Dall, S. R., Kendall, B. E., & Gaillard, J. M. 2006. Estimating individual contributions to population growth: evolutionary fitness in ecological time. Proceedings. Biological sciences, 273(1586), 547–555. https://doi.org/10.1098/rspb.2005.3357

Crozier, L. 2015. Impacts of Climate Change on Columbia River Salmon: A review of the scientific literature published in 2014. Pages D1-D50 in Endangered Species Act Section 7(a)(2) supplemental biological opinion: consultation on remand for operation of the Federal Columbia River Power System. U.S. National Marine Fisheries Service, Northwest Region.

Crozier, L. 2016. Impacts of Climate Change on Columbia River Salmon: A review of the scientific literature published in 2015. Pages D1-D50 in Endangered Species Act Section 7(a)(2) supplemental biological opinion: consultation on remand for operation of the Federal Columbia River Power System. U.S. National Marine Fisheries Service, Northwest Region.

Crozier, L. 2017. Impacts of Climate Change on Columbia River Salmon: A review of the scientific literature published in 2016. Pages D1-D50 in Endangered Species Act Section 7(a)(2) supplemental biological opinion: consultation on remand for operation of the Federal Columbia River Power System. U.S. National Marine Fisheries Service, Northwest Region.

Crozier, L. G., and J. Siegel. 2018. Impacts of Climate Change on Columbia River Salmon: A review of the scientific literature published in 2017. Pages D1-D50 in Endangered Species Act Section 7(a)(2) supplemental biological opinion: consultation on remand for operation of the Federal Columbia River Power System. U.S. National Marine Fisheries Service, Northwest Region.

Crozier, L.G. and R.W. Zabel. 2006. Climate impacts at multiple scales: evidence for differential population responses in juvenile Chinook salmon. Journal of Animal Ecology. 75:1100-1109.

Crozier, L., R.W. Zabel, S. Achord, and E.E. Hockersmith. 2010. Interacting effects of density and temperature on body size in multiple populations of Chinook salmon. Journal of Animal Ecology. 79:342-349.

ER-300

NOAASkagitAR0051268

Crozier L.G., M.M. McClure, T. Beechie, S.J. Bograd, D.A. Boughton, M. Carr, T. D. Cooney, J.B. Dunham, C.M. Greene, M.A. Haltuch, E.L. Hazen, D.M. Holzer, D.D. Huff, R.C. Johnson, C.E. Jordan, I.C. Kaplan, S.T. Lindley, N.Z. Mantua, P.B. Moyle, J.M. Myers, M.W. Nelson, B.C. Spence, L.A. Weitkamp, T.H. Williams, and E. Willis-Norton. 2019. Climate vulnerability assessment for Pacific salmon and steelhead in the California Current Large Marine Ecosystem. PLoS ONE 14(7): e0217711. https://doi.org/10.1371/journal.pone.0217711

Crozier, L.G., Siegel, J.E., Wiesebron, L.E., Trujillo, E.M., Burke, B.J., Sandford, B.P. and Widener, D.L., 2020. Snake River sockeye and Chinook salmon in a changing climate: implications for upstream migration survival during recent extreme and future climates. PloS one, 15(9), p.e0238886.

Cunningham, K. 2021. Letter from Kelly Cunningham (WDFW) to Lynne Barre (NMFS) regarding actions taken in development of WDFW managed fishery season for 2021-2022 beneficial for Southern Resident killer whales. April 21, 2021.

Darnerud, P. O. 2003. Toxic effects of brominated flame retardants in man and in wildlife. Environ. Int. 29:841–853.

Darnerud, P. O. 2008. Brominated flame retardants as possible endocrine disrupters. Int. J. Androl. 31:152–160.

de Swart, R. L., P. S. Ross, J. G. Vos, and A. Osterhaus. 1996. Impaired immunity in habour seals (Phoca vitulina) exposed to bioaccumulated environmental contaminants: Review of long-term feeding study. Environ. Health Perspect. 104:823–828.

Dethier, M.N., Toft, J.D. and Shipman, H. 2017. Shoreline Armoring in an Inland Sea: Science-Based Recommendations for Policy Implementation. Conservation Letters, 10: 626-633. https://doi.org/10.1111/conl.12323

Dethier, M.N., W.W. Raymond, A.N. McBride, J.D. Toft, J.R. Cordell, A.S. Ogston, S.M. Heerhartz, and H.D. Berry. 2016. Multiscale impacts of armoring on Salish Sea shorelines: Evidence for cumulative and threshold effects. Estuarine, Coastal and Shelf Science. 175:106-117.

Di Lorenzo, E., Mantua, N. Multi-year persistence of the 2014/15 North Pacific marine heatwave. 2016. Nature Clim Change 6, 1042–1047.

Doehring, K., Young, R.G., Hay, J. and Quarterman, A.J., 2011. Suitability of Dual-frequency Identification Sonar (DIDSON) to monitor juvenile fish movement at floodgates. New Zealand Journal of Marine and Freshwater Research, 45(3), pp.413-422.

Dorner, B., M.J. Catalano, and R.M. Peterman. 2018. Spatial and temporal patterns of covariation in productivity of Chinook salmon populations of the northeastern Pacific Ocean. Canadian Journal of Fisheries and Aquatic Sciences, 75(7), pp.1082-1095.

ER-301

NOAASkagitAR0051269

Dugger, Phillip J. 2000. Possible water quality and habitat factors influencing the presence of coho salmon and sticklebacks in No Name Slough during summer, 2000. Padilla Bay National Estuarine Research Reserve: Mount Vernon, Washington. 3 pp.

Durban, J., H. Fearnbach, and L. Barrett-Lennard. 2016. No Child Left Behind Evidence of a killer whale's miscarriage. Natural History. 124(8): 14-15.

Ecology (Washington State Department of Ecology). 2011. "Toxics in Surface Runoff to Puget Sound: Phase 3 Data and Load Estimates." Washington State Department of Ecology. Prepared by Herrera Environmental Consultants, Inc. Ecology Publication No. 11-03-010.

Ecology & King County. 2011. "Control of Toxic Chemicals in Puget Sound: Assessment of Selected Toxic Chemicals in the Puget Sound Basin, 2007-2011." Washington State Department of Ecology and King County Department of Natural Resources. Ecology Publication No. 11-03-055.

Ehinger, S. I., L. Abernathy, M. Bhuthimethee, L. Corum, N. Rudh, D. Price, J. Lim, O. C. Monette, S. Smith, and J. Quan. 2023. Puget Sound Nearshore Habitat Conservation Calculator User Guide. NOAA, editor.

Ehinger, S.I., P. Cereghino, J. Chamberlin. 2023. The Puget Sound Nearshore Habitat Conservation Calculator. Document prepared for the Center of Independent Experts review. Agency report available through the author. NWFSC Tech memo, in prep. Corresponding author: Stephanie.Ehinger@noaa.gov.

Ellings, C.S., Davis, M.J., Grossman, E.E., Woo, I., Hodgson, S., Turner, K.L., Nakai, G., Takekawa, J.E. and Takekawa, J.Y., 2016. Changes in habitat availability for outmigrating juvenile salmon (Oncorhynchus spp.) following estuary restoration. Restoration Ecology, 24(3), pp.415-427.

Entranco. 1993. Lower Skagit River Basin water quality study. Final report November 1993. For: Skagit County Dept. of Planning and Community Development and Washington Dept. of Ecology. Bellevue, Washington. 75 pp

Erbe, C. and C. McPherson. 2017. Radiated noise levels from marine geotechnical drilling and standard penetration testing. The Journal of the Acoustical Society of America 141, 3847

Evans, M., K. Fazakas, J. Keating. 2009. Creosote Contamination in Sediments of the Grey Owl Marina in Prince Albert National Park, Saskatchewan, Canada. Water Air Soil Pollution. 201:161–184.

Fagan, W.F. and E.E. Holmes. 2006. Quantifying the extinction vortex. Ecology Letters 9:51-60.

ER-302

NOAASkagitAR0051270

Fearnbach, H., J. W. Durban, D. K. Ellifrit, and K. C. Balcomb. 2011. Size and long-term growth trends of Endangered fish-eating killer whales. Endangered Species Research. 13(3): 173–180.

Fedorenko, A.Y., F.J. Fraser, and D.T. Lightly. 1979. A limnological and salmonid resource study of Nitinat Lake: 1975-1977. Fish. Mar. Serv. (Can.) Tech. Rep. 839:86.

FEMAT (Forest Ecosystem Management Assessment Team). 1993. Forest ecosystem management: An ecological, economic, and social assessment. Report of the Forest Ecosystem Management Assessment Team. 1993-793-071. U.S. Gov. Printing Office.

Ferrara, G. A., T. M. Mongillo, and L. M. Barre. 2017. Reducing Disturbance from Vessels to Southern Resident Killer Whales: Assessing the Effectiveness of the 2011 Federal Regulations in Advancing Recovery Goals. December 2017. NOAA Technical Memorandum NMFS-OPR-58. 82p

Fewtrell, J. L., 2003. The response of marine finfish and invertebrates to seismic survey noise. PhD Thesis. Curtin University. 15125_Fewtrell Leah 2003.pdf (8.064Mb)

Fewtrell, J.L., and R.D. McCauley. 2012. Impact of air gun noise on the behaviour of marine fish and squid. Marine Pollution Bulletin Volume 64(5): 984-993

Fisher, J. L., W. T. Peterson, and R. R. Rykaczewski. 2015. The impact of El Niño events on the pelagic food chain in the northern California Current. Global Change Biology. 21(12): 4401–4414.

FitzGerald, A.M., S.N. John, T.M. Apgar, N.J. Mantua, and B.T. Martin. 2020. Quantifying thermal exposure for migratory riverine species: Phenology of Chinook salmon populations predicts thermal stress. Global Change Biology 27(3).

Fonnum, F., E. Mariussen, and T. Reistad. 2006. Molecular mechanisms involved in the toxic effects of polychlorinated biphenyls (PCBs) and brominated flame retardants (BFRs). J. Toxicol. Environ. Health A 69:21–35.

Ford, J. K. B., G. M. Ellis, L. G. Barrett-Lennard, A. B. Morton, R. S. Palm, and K. C. B. III. 1998. Dietary specialization in two sympatric populations of killer whales (Orcinus orca) in coastal British Columbia and adjacent waters. Canadian Journal of Zoology. 76(8): 1456-1471.

Ford, J. K. B., G. M. Ellis, and K. C. Balcomb. 2000. Killer whales: the natural history and genealogy of Orcinus orca in British Columbia and Washington State. 2nd ed. UBC Press, Vancouver, British Columbia.

Ford, J. K. B. and G.M. Ellis. 2006. Selective foraging by fish-eating killer whales Orcinus orca in British Columbia. Marine Ecology Progress Series 316:185-199.

**ER-303**

NOAASkagitAR0051271

Ford, J.K., Ellis, G.M., Olesiuk, P.F. and Balcomb, K.C., 2010. Linking killer whale survival and prey abundance: food limitation in the oceans' apex predator?. Biology letters, 6(1), pp.139-142.

Ford, M.J., A. Albaugh, K. Barnas, T. Cooney, D. Cowen, J. Hard, J. John, R. Kope, G. McClure, M. Michelle, P. McElhany, J. Myers, N.J. Sands, D.J. Teel, L.A. Weitkamp. 2011. Status review update for Pacific salmon and steelhead listed under the Endangered Species Act : Pacific Northwest. Northwest Fisheries Science Center (U.S.);United States, National Oceanic and Atmospheric Administration; NOAA technical memorandum NMFS-NWFSC ; 113. https://repository.library.noaa.gov/view/noaa/4018. 281pp.

Ford, M. J., J. Hempelmann, B. Hanson, K. L. Ayres, R. W. Baird, C. K. Emmons, J. I. Lundin, G. S. Schorr, S. K. Wasser, and L. K. Park. 2016. Estimation of a killer whale (Orcinus orca) population's diet using sequencing analysis of DNA from feces. PLoS ONE. 11(1): 1-14.

Ford, M. J., K. M. Parsons, E. J. Ward, J. Hempelmann, C. K. Emmons, M. B. Hanson, K. C. Balcomb, L. K. Park. 2018. Inbreeding in an endangered killer whale population. Animal Conservation. https://doi.org/10.1111/acv.12413

Ford, M. J. (editor). 2022. Biological Viability Assessment Update for Pacific Salmon and Steelhead Listed Under the Endangered Species Act: Pacific Northwest. U.S. Department of Commerce, NOAA Technical Memorandum NMFS-NWFSC-171.

Foster, E. A., D. W. Franks, L. J. Morrell, K. C. Balcomb, K. M. Parsons, A. v. Ginneken, and D. P. Croft. 2012. Social network correlates of food availability in an endangered population of killer whales, Orcinus orca. Animal Behaviour. 83: 731-736.

Fresh, K., M. Dethier, C. Simenstad, M. Logsdon, H. Shipman, C.D. Tanner, T.M. Leschine, T.F. Mumford, G. Gelfenbaum, R. Shuman, and J.A. Newton. 2011. Implications of Observed Anthropogenic Changes to the Nearshore Ecosystems in Puget Sound. Prepared for the Puget Sound Nearshore Ecosystem Restoration Project.

Fresh, K.L. 2006. Juvenile Pacific Salmon in Puget Sound (No. N00A-TR-2006-06). NOAA, Seattle, WA, Pacific Marine Environmental Labs.

Freshwater, C., S. C. Anderson, K. R. Holt, A. M. Huang, and C. A. Holt. 2019. Weakened portfolio effects constrain management effectiveness for population aggregates. Ecological Applications 29:14.

Fuhrer, G.J., 1996. Water quality of the Lower Columbia River Basin: Analysis of current and historical water-quality data through 1994 (Vol. 95, No. 4294). US Department of the Interior, US Geological Survey.

ER-304

NOAASkagitAR0051272

Gallagher, S.P., P.B. Adams, D.W. Wright, and B.W. Collins. 2010. Performance of Spawner Survey Techniques at Low Abundance Levels, N. Am. J. Fish. Manage, 30(5):1086-1097, DOI: 10.1577/M09-204.1

Gaydos, J.K., and S. Raverty. 2007. Killer Whale Stranding Response, August 2007 Final Report. Report under UC Davis Agreement No. C 05-00581 V, August 2007.

GeoEngineers. 2022. Biological Assessment and Essential Fish Habitat Evaluation: No Name Slough Tidegate Replacement Project, Skagit County, Washington. Bellingham, WA

Giannico, G.R. and Souder, J.A., 2004. The effects of tide gates on estuarine habitats and migratory fish. Oregon State University, Corvallis, OR.

Giannico, G., J.A. Souder. 2005. Tide gates in the Pacific Northwest: operation, types, and environmental effects. Oregon Sea Grant. ORESU-T-05-001. Oregon State University, Corvallis, OR. 28pp.

Gibson, R.N. 2003. Go with the flow: tidal migrations in marine animals. Hydrobiologia, 503(1–3): 153–161.

Gilliom, R.J., Barbash, J.E., Crawford, C.G., Hamilton, P.A., Martin, J.D., Nakagaki, N., Nowell, L.H., Scott, J.C., Stackelberg, P.E., Thelin, G.P. and Wolock, D.M., 2006. Pesticides in the nation's streams and ground water, 1992–2001 (No. 1291). US Geological Survey.

Gilpin, M. E., and M. E. Soulé. 1986. Minimum viable populations: Processes of species extinction. Conservation biology: the science of scarcity and diversity. 19-34.

Glick, P., J. Clough, and B. Nunley. 2007. Sea-Level Rise and Coastal Habitats in the Pacific Northwest: An analysis for Puget Sound, southwestern Washington, and northwestern Oregon. National Wildlife Federation, Seattle, WA.

Gliwicz, Z.M., E. Babkiewicz, R. Kumar, S. Kunjiappan, and K. Leniowski, 2018. Warming increases the number of apparent prey in reaction field volume of zooplanktivorous fish. Limnology and Oceanography, 63(S1), pp.S30-S43.

Goetz, F. A., Jeanes, E., Moore, M. E., and Quinn, T. P. 2015. Comparative migratory behavior and survival of wild and hatchery steelhead (Oncorhynchus mykiss) smolts in riverine, estuarine, and marine habitats of Puget Sound, Washington. Environmental Biology of Fishes, 98(1), 357-375. doi:http://dx.doi.org/10.1007/s10641-014-0266-3

Gordon, J. and A. Moscrop. 1996. Underwater noise pollution and its significance for whales and dolphins. Pages 281-319 in M. P. Simmonds and J. D. Hutchinson, editors. The conservation of whales and dolphins: science and practice. John Wiley & Sons, Chichester, United Kingdom.

**ER-305**

NOAASkagitAR0051273

Gordon, J., Arbeider, M., Scott, D., Wilson, S.M. and Moore, J.W., 2015. When the tides don't turn: Floodgates and hypoxic zones in the Lower Fraser River, British Columbia, Canada. Estuaries and coasts, 38, pp.2337-2344.

Gosselin, J. L., Buhle, E. R., Van Holmes, C., Beer, W. N., Iltis, S., & Anderson, J. J. 2021. Role of carryover effects in conservation of wild Pacific salmon migrating regulated rivers. Ecosphere, 12(7), e03618.

Gourtay, C., D. Chabot, C. Audet, H. Le Delliou, P. Quazuguel, G. Claireaux, and J.L. Zambonino-Infante. 2018. Will global warming affect the functional need for essential fatty acids in juvenile sea bass (Dicentrarchus labrax)? A first overview of the consequences of lower availability of nutritional fatty acids on growth performance. Marine Biology, 165(9), pp.1-15.

Greene, C.M., J. Hall, D. Small, P. Smith. 2017. Effects of intertidal water crossing structures on estuarine fish and their habitat: A literature review and synthesis. 105pp. Seattle, WA.

Greene, C.M. and Beamer, E.M., 2011. Monitoring population responses to estuary restoration by Skagit River Chinook salmon. Intensively Monitored Watershed Project, Annual Report.

Greene, C. M., and T. J. Beechie, 2004 Habitat-specific population dynamics of ocean-type chinook salmon (Onchorynchus tshawytscha) in Puget Sound, Canadian Journal of Fisheries and Aquatic Sciences, 61, Pages 590–602.

Greene, C., Hall, J., Beamer, E., Henderson, R., Brown, B. and LaConner, W.A., 2012. Biological and physical effects of "fish-friendly" tide gates. National Oceanic and Atmospheric Administration, National Marine Fisheries Service, Watersheds Program, Northwest Fisheries Science Center, and Skagit River System Cooperative, LaConner, Washington.

Greene, C., E. Beamer, and J. Anderson. 2015. Study plan and summary of results for the Skagit River Estuary Intensively Monitored Watershed project. National Marine Fisheries Service, Northwest Fisheries Science Center, Report to Washington State Salmon Recovery Funding Board Monitoring Review Panel, Seattle.

Gresh, T., J. Lichatowich, and P. Schoomaker. 2000. An estimation of historic and current levels of salmon production in the Northeast Pacific ecosystem: evidence of a nutrient deficit in the freshwater systems of the Pacific Northwest. Fisheries 25(1):15–21.

Griggs, G.B., 2010, The effects of armoring shorelines—The California experience, in Shipman, H., Dethier, M.N., Gelfenbaum, G., Fresh, K.L., and Dinicola, R.S., eds., 2010, Puget Sound Shorelines and the Impacts of Armoring— Proceedings of a State of the Science Workshop, May 2009: U.S. Geological Survey Scientific Investigations Report 2010-5254, p. 77-84.

**ER-306**

NOAASkagitAR0051274

Groskreutz, M. J., J. W. Durban, H. Fearnbach, L. G. Barrett-Lennard, J. R. Towers, and J. K. Ford. 2019. Decadal changes in adult size of salmon-eating killer whales in the eastern North Pacific. Endangered Species Research, 40, 183-188.

Groot, C. and L. Margolis. 1991. Pacific Salmon Life Histories. UBC Press, Vancouver, Canada. 564 p.

Haas, A., and B. Collins. 2001. A historical analysis of habitat alterations in the Snohomish River Valley, Washington, Since the Mid-19th century: Implications for Chinook and coho salmon. Snohomish County Public Works, Surface Water Management and the Tulalip Tribes.

Haas, M.E., Simenstad, C.A., Cordell, J.R., Beauchamp, D.A., Miller, B.S. and Stotz, T. 2002. Effects of large overwater structures on epibenthic juvenile salmon prey assemblages in Puget Sound, Washington (No. WA-RD 550.1,). Washington State Department of Transportation.

Herring, D.K., D.L. Bottom, E.F. Prentice, K.K. Jones, and I.A. Fleming. 2010. Tidal movements and residency of subyearling Chinook salmon (Oncorhynchus tshawytscha) in an Oregon salt marsh channel. Canadian Journal of Fisheries and Aquatic Sciences. 67(3): 524-533. https://doi.org/10.1139/F10-003

Halofsky, J.S., D.R. Conklin, D.C. Donato, J.E. Halofsky, and J.B. Kim. 2018. Climate change, wildfire, and vegetation shifts in a high-inertia forest landscape: Western Washington, U.S.A. PLoS ONE 13(12): e0209490. https://doi.org/10.1371/journal.pone.0209490

Halofsky, J.E., Peterson, D.L. and B. J. Harvey. 2020. Changing wildfire, changing forests: the effects of climate change on fire regimes and vegetation in the Pacific Northwest, USA. Fire Ecology 16(4). https://doi.org/10.1186/s42408-019-0062-8.

Hamel, N., J. Joyce, M. Fohn, A. James, J. Toft, A. Lawver, S. Redman and M. Naughton (Eds). 2015. 2015 State of the Sound: Report on the Puget Sound Vital Signs. November 2015. 86 pp. www.psp.wa.gov/sos.

Hanson, M. B., and C. K. Emmons. 2010. Annual Residency Patterns of Southern Resident Killer Whales in the Inland Waters of Washington and British Columbia. Revised Draft - 30 October 10. 11p.

Hanson, M.B., E.J. Ward, C.K. Emmons, M.M. Holt and D.M. Holzer. 2017. Assessing the movements and occurrence of Southern Resident Killer Whales relative to the U.S. Navy's Northwest Training Range Complex in the Pacific Northwest. Prepared for: U.S. Navy, U.S. Pacific Fleet, Pearl Harbor, HI. Prepared by: National Oceanic and Atmospheric Administration, Northwest Fisheries Science Center under MIPR N00070-15-MP-4C363. 30 June 2017. 23 pp

ER-307

NOAASkagitAR0051275

Hanson, M.B., C.K. Emmons, M.J. Ford, M. Everett, K. Parsons, L.K. Park, J. Hempelmann, D.M. Van Doornik, G.S. Schorr, J.K. Jacobson, M.F. Sears, M.S. Sears, J.G. Sneva, R.W. Baird, L. Barre. 2021. Endangered predators and endangered prey: Seasonal diet of Southern Resident killer whales. https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0247031

Hard, J.J., J.M. Myers, M.J. Ford, R G. Cope, G.R. Pess, R S. Waples, G.A. Winans, B.A. Berejikian, F.W. Waknitz, P.B. Adams, P.A. Bisson, D.E. Campton, and R.R. Reisenbichler. 2007. Status review of Puget Sound steelhead (Oncorhynchus mykiss). U.S. Dept. Commer., NOAA Tech. Memo. NMFS-NWFSC-81.

Hard, J.J., J.M. Myers, E.J. Connor, R.A. Hayman, R.G. Kope, G. Lucchetti, A.R. Marshall, G.R. Pess, and B.E. Thompson. 2015. Viability criteria for steelhead within the Puget Sound distinct population segment. U.S. Dept. Commer., NOAA Tech. Memo. NMFS-NWFSC-129. doi:10.7289/V5/TM-NWFSC-129.

Hastings, M.C. 2007. Calculation of SEL for Govoni et al. (2003, 2007) and Popper et al. (2007) studies. Report for Amendment to Project 15218, J&S Working Group, Applied Research Lab, Penn State University. 7 pp.

Hastings, M.C., and A. N. Popper. 2005. Effects of sound on fish. Final Report # CA05-0537 – Project P476 Noise Thresholds for Endangered Fish. For: California Department of Transportation, Sacramento, CA. January 28, 2005, August 23, 2005 (Revised Appendix B). 85 pp.

Hastings, M.C., A.N. Popper, J.J. Finneran, and P. Lanford. 1996. Effects of low-frequency underwater sound on hair cells of the inner ear and lateral line of the teleost fish Astronotus ocellatus. Journal of the Acoustical Society of America 99(3): 1759-1766

Hayman, R., E. Beamer, R. McClure. 1996. FY (Fiscal Year) 1995 Skagit River Chinook research. Skagit System Cooperative Chinook restoration research progress report #1, NWIFC Contract #3311 for FY 1995. Skagit System Cooperative, La Conner, Washington. http://www.skagitcoop.org/documents.html

HCCC (Hood Canal Coordinating Council). 2005. Hood Canal & Eastern Strait of Juan de Fuca summer chum salmon recovery plan. Hood Canal Coordinating Council. Poulsbo, Washington.

Healey, M.C. 1980. Utilization of the Nanimo River estuary by juvenile Chinook salmon, (Oncoryhynchus tshawytscha) Fishery Bulletin 77.653-668.

Healey, M.C. 1982. Juvenile Pacific salmon in estuaries: the life support system, p. 315-341. In: V.S. Kennedy (ed). Estuarine comparisons. Academic Press, New York, NY.

NOAASkagitAR0051276

Healey, M. C. 1991. The life history of Chinook salmon (Oncorhynchus tshawytscha). In C. Groot and L. Margolis (eds), Life history of Pacific salmon, p. 311-393. Univ. BC Press, Vancouver, BC.

Healey, M., 2011. The cumulative impacts of climate change on Fraser River sockeye salmon (Oncorhynchus nerka) and implications for management. Canadian Journal of Fisheries and Aquatic Sciences, 68(4), pp.718-737.

Henderson, M.A. and A.J. Cass. 1991. Effect of smolt size on smolt-to-adult survival for chilko lake sockeye salmon (Oncorhynchus nerka). Canadian Journal of Fisheries and Aquatic Sciences. 48: 988-994.

Herring, S. C., N. Christidis, A. Hoell, J. P. Kossin, C. J. Schreck III, and P. A. Stott, Eds., 2018: Explaining Extreme Events of 2016 from a Climate Perspective. Bull. Amer. Meteor. Soc., 99 (1), S1–S157.

Hilborn, R., S. P. Cox, F. M. D. Gulland, D. G. Hankin, N. T. Hobbs, D. E. Schindler, A. W. Trites. 2012. The effects of salmon fisheries on Southern Resident killer whales: Final report of the Independent Science Panel. Prepared with the assistance of D. R. Marmorek and A. W. Hall, ESSA Technologies Ltd., Vancouver, BC. National Marine Fisheries Service, Seattle, WA, and Fisheries and Oceans Canada, Vancouver, BC.

Hoar WS. 1988. The physiology of smolting salmonids. In: Hoar WS, Randall DJ, eds. Fish physiology. Vol. XIB. New York, NY: Academic Press, pp. 275-343.

Hochachka, W.M. 2006. Unequal lifetime reproductive success, and its implication for small isolated populations. Pages: 155-173. In: Biology of small populations: the song sparrows of Mandarte Island. Edited by J.N.M. Smith, A.B. Marr, L.F. Keller and P. Arcese. Oxford University Press; Oxford, United Kingdom.

Holsman, K.K., M.D. Scheuerell, E. Buhle, and R. Emmett. 2012. Interacting effects of translocation, artificial propagation, and environmental conditions on the marine survival of Chinook Salmon from the Columbia River, Washington, USA. Conservation Biology, 26(5), pp.912-922.

Holden, Z. A., et al. (2018). "Decreasing fire season precipitation increased recent western US forest wildfire activity." Proceedings of the National Academy of Sciences 115(36): E8349-E8357.

Holt, M. M. 2008. Sound Exposure and Southern Resident Killer Whales (Orcinus orca): A Review of Current Knowledge and Data Gaps. February 2008. NOAA Technical Memorandum NMFS-NWFSC-89, U.S. Dept. Commer., NOAA Tech. Memo. NMFS-NWFSC-89. 77p.

ER-309

NOAASkagitAR0051277

Holtby, L.B., Andersen, B.C., and R. Kadowaki. 1990. Importance of smolt size and early ocean growth to interannual variability in marine survival of coho salmon (Oncorynchus kisutch). Department of Fisheries and Oceans, Biological Sciences Branch, Pacific Biological Station, Nanaimo, B.C. V9r 5k6 Canada. Canadian Journal of Fisheries and Aquatic Sciences, 47:2181-2194.

Hood, G. W. 2004. Indirect environmental effects of dikes on estuarine tidal channels: Thinking outside of the dike for habitat restoration and monitoring. Estuaries. Vol. 27, No. 2, p273-282. http://www.skagitcoop.org/documents.html

Hood, W.G. 2005. Sea Level Rise in the Skagit Delta. Pages 14-15 in S. Solomon, editor. Skagit River Tidings. Skagit Watershed Council, Mount Vernon, Washington.

Hoyt, E. 2001. Whale watching 2001: worldwide tourism numbers, expenditures, and expanding socioeconomic benefits. International Fund for Animal Welfare, Yarmouth, Massachusetts.

HSRG (Hatchery Scientific Work Group). 2009. Report to Congress on Columbia River basin hatchery reform. Available at: http://hatcheryreform.us.

Hunter, M.A. 1992. Hydropower flow fluctuations and salmonids: A review of the biological effects, mechanical causes, and options for mitigation. Washington Department of Fisheries. Olympia, Washington. Technical Report No. 119.

IPCC (Intergovernmental Panel on Climate Change). 2014. Climate Change 2014: Synthesis Report. Contribution of Working Groups I, II and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change [Core Writing Team, R.K. Pachauri and L.A. Meyer (eds.)]. IPCC, Geneva, Switzerland, 151 pp.

IPCC (Intergovernmental Panel on Climate Change) Working Group I (WGI). 2021. Climate Change 2021: The Physical Science Basis. Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change. V. Masson-Delmotte, P. Zhai, A. Pirani, S. L. Connors, C. Péan, S. Berger, N. Caud, Y. Chen, L. Goldfarb, M. I. Gomis, M. Huang, K. Leitzell, E. Lonnoy, J.B.R. Matthews, T. K. Maycock, T. Waterfield, O. Yelekçi, R. Yu and B. Zhou editor. Cambridge University Press (https://www.ipcc.ch/report/ar6/wg1/#FullReport).

IPCC Working Group II (WGII). 2022. Climate Change 2022: Impacts, Adaptation and Vulnerability: Contribution of Working Group II to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change. H.O. Pörtner, D.C. Roberts, M. Tignor, E.S. Poloczanska, K. Mintenbeck, A. Alegría, M. Craig, S. Langsdorf, S. Löschke, V. Möller, A. Okem, and B. Rama (eds.) Cambridge University Press (https://report.ipcc.ch/ar6wg2/pdf/IPCC_AR6_WGII_FinalDraft_FullReport.pdf)

ER-310

NOAASkagitAR0051278

Isaak, D.J., C.H. Luce, D.L. Horan, G. Chandler, S. Wollrab, and D.E. Nagel. 2018. Global warming of salmon and trout rivers in the northwestern U.S.: Road to ruin or path through purgatory? Transactions of the American Fisheries Society. 147: 566-587. https://doi.org/10.1002/tafs.10059

Jacox, M. G., Alexander, M. A., Mantua, N. J., Scott, J. D., Hervieux, G., Webb, R. S., & Werner, F. E. 2018. Forcing of multi-year extreme ocean temperatures that impacted California Current living marine resources in 2016. Bull. Amer. Meteor. Soc, 99(1).

Jay, D. A, and T. Kukulka. 2003. Revising the paradigm of tidal analysis—the uses of non-stationary data. Ocean Dynamics 42:1–16.

Joblon, M. J., M. A. Pokra, B. Morse, C. T. Harry, K. S. Rose, S. M. Sharp, M. E. Niemeyer, K. M. Patchett, W. B. Sharp, and M. J. Moore. 2014. Body condition scoring system for delphinids based on short-beaked common dolphins (Delphinus delphis). J Mar Anin Ecol 7(2):5-13.

Johannessen, J., A. MacLennan, A. Blue, J. Waggoner, S. Williams, W. Gerstel, R. Barnard, R. Carman, and H. Shipman. 2014. Marine Shoreline Design Guidelines. Washington Department of Fish and Wildlife, Olympia, Washington.

Johnson, B.M., G.M. Kemp, and G.H. Thorgaard. 2018. Increased mitochondrial DNA diversity in ancient Columbia River basin Chinook salmon Oncorhynchus tshawytscha. PLoS One, 13(1), p.e 0190059.

Johnson, L., B. Anulacion, M. Arkoosh, O. P. Olson, C. Sloan, S. Y. Sol, J. Spromberg, D. J. Teel, G. Yanagida, and G. Ylitalo. 2013. Persistent organic pollutants in juvenile Chinook salmon in the Columbia River Basin: Implications for stock recovery. Transactions of the American Fisheries Society (1900) 142(1):21-40.

Jonsson, N. 1991. Influence of water flow, water temperature and light on fish migration in rivers. Nordic Journal of Freshwater Research 66:20–35.

Junk, W., P.B. Bayley, and R.E. Sparks. 1989. The flood pulse concept in river-floodplain systems. Pages 110-127 in D.P. Dodge, ed. Proceedings of the International Large River Symposium (LARS). Canadian Special Publication of Fisheries and Aquatic Sciences 106.

Kagley, A., J.M. Smith, M.C. Arostegui, J.W. Chamberlin, D. Spilsbury-Pucci, K. L. Fresh, K.E. Frick, and T.P. Quinn. 2016. Movements of sub-adult Chinook salmon (Oncorhynchus tshawytscha) in Puget Sound, Washington, as indicated by hydroacoustic tracking. Presented at Salish Sea Ecosystem Conference, Vancouver, BC, Canada.

Kayhanian, M., Singh, A., Suverkropp, C. and Borroum, S., 2003. Impact of annual average daily traffic on highway runoff pollutant concentrations. *Journal of environmental engineering*, *129*(11), pp.975-990.

ER-311

NOAASkagitAR0051279

Keefer M.L., T.S. Clabough, M.A. Jepson, E.L. Johnson, C.A. Peery, C.C. Caudill. 2018. Thermal exposure of adult Chinook salmon and steelhead: Diverse behavioral strategies in a large and warming river system. PLoS ONE 13(9): e0204274. https://doi.org/10.1371/journal.pone.0204274.

Kelty , R. and Bliven , S. 2003 . Environmental and aesthetic impacts of small docks and piers , Silver Spring , MD : National Centers for Coastal Ocean Science . Workshop report: developing a science-based decision support tool for small dock management, Phase 1: Status of the science. NOAA Coastal Ocean Program Decision Analysis Series Number 22  http://coastalscience.noaa.gov/documents/dockpier.pdf

Kiely, T.; Donaldson, D. & Grube, A. (2004).  Pesticides Industry Sales and Usage. 2000 and 2001 Market Estimates. Washington, DC: U.S. Environmental Protection Agency, Report No. EPA-733-R-99-001

Kilduff, D. P., L.W. Botsford, and S.L. Teo. 2014. Spatial and temporal covariability in early ocean survival of Chinook salmon (Oncorhynchus tshawytscha) along the west coast of North America. ICES Journal of Marine Science, 71(7), pp.1671-1682.

King County. 2019. WRIA 9 Marine Shoreline Monitoring and Compliance Project Phase 2 Final Report. Prepared by Kollin Higgins, King County Water and Land Resources Division, Science and Technical Support Section. Seattle, Washington.

Kondolf, G.M. 1997. Hungry water: Effects of dams and gravel mining on river channels. Environmental Management 21(4):533-551.

Koontz, E.D., E.A. Steel, and J.D. Olden. 2018. Stream thermal responses to wildfire in the Pacific Northwest. Freshwater Science, 37, 731 - 746.

Krahn, M.M., M.J. Ford, W.F. Perrin, P.R. Wade, R.B. Angliss, M.B. Hanson, B.L. Taylor, G.M. Ylitalo, M.E. Dahlheim, J.E. Stein, and R.S. Waples. 2004. 2004 status review of Southern Resident killer whales (Orincus orca) under the Endangered Species Act, U.S. Dept. of Commerce, NOAA Tech. Memo., NMFS-NWFSC-62, 73p.

Krahn, M.M., M.B. Hanson, R.W. Baird, R.H. Boyer, D.G. Burrows, C.K. Emmons, J.K.B. Ford, L.L. Jones, D.P. Noren, P.S. Ross, G.S. Schorr, and T.K. Collier. 2007. Persistent organic pollutants and stable isotopes in biopsy samples (2004/2006) from Southern Resident killer whales. Marine Pollution Bulletin 54:1903-1911.

Krahn, M.M., M.B. Hanson, G.S. Schorr, C.K. Emmons, D.G. Burrows, J.L. Bolton, R.W. Baird, and Gina Ylitalo. 2009. Effects of age, sex and reproductive status on persistent organic pollutant concentrations in "Southern Resident" killer whales. Marine Pollution Bulletin 58:1522-1529.

**ER-312**

NOAASkagitAR0051280

Kroon, F.J. and Ansell, D.H., 2006. A comparison of species assemblages between drainage systems with and without floodgates: implications for coastal floodplain management. Canadian Journal of Fisheries and Aquatic Sciences, 63(11), pp.2400-2417.

Krosby, M. D.M. Theobald, R. Norheim, and B.H. McRae. 2018. Identifying riparian climate corridors to inform climate adaptation planning. PLoS ONE 13(11): e0205156. https://doi.org/10.1371/journal.pone.0205156.

Kynard, B. 1993. Fish behavior important for fish passage. Pages 129–133 in K. Bates, editor. Fish passage policy and technology. Bioengineering section. American Fisheries Society, Bethesda, Maryland.

Lacy, R. C., R. Williams, E. Ashe, K. C. Balcomb III, L. J. N. Brent, C. W. Clark, D. P. Croft, D. A. Giles, M. MacDuffee, and P. C. Paquet. 2017. Evaluating anthropogenic threats to endangered killer whales to inform effective recovery plans. Scientific Reports. 7:14119. doi:10.1038/s41598-017-0.

Lawson, T.M., G.M. Ylitalo, S.M. O'Neill, M.E. Dahlheim, P.R. Wade, C.O. Matkin, V. Burkanov, and D. T. Boyd. 2020. Concentrations and profiles of organochlorine contaminants in North Pacific resident and transient killer whale (Orcinus orca) populations. Science of Total Environment. 722: 137776

Learmonth, J. A., C. D. MacLeod, M. B. Santos, G.J. Pierce, H. Crick and R.A. Robinson. 2007. Potential Effects of Climate Change On Marine Mammals In Oceanography and Marine Biology: An Annual Review, 2006, 44: 431-464. 10.1201/9781420006391.ch8.

Lee, T. S., Toft, J.D., Cordell, J.R., Dethier, M.N., Adams, J.W. and Kelly, R.P., 2018. Quantifying the effectiveness of shoreline armoring removal on coastal biota of Puget Sound. PeerJ, 6, p.e4275.

Legler, J., and A. Brouwer. 2003. Are brominated flame retardants endocrine disruptors? Environ. Int. 29:879–885.

Legler, J. 2008. New insights into the endocrine disrupting effects of brominated flame retardants. Chemosphere 73:216–222

Levings, C.D, McAllister, C.D., Macdonald, J.S., Brown, T.J., Kotyk, M.S. and Kask, B.A. 1989. Chinook salmon (Oncorynchus tshawytscha) and estuarine habitat: a transfer experiment can help evaluate estuary dependency. Canadian Special Publications. Fisheries and Aquatic Sciences. No. 105. pp. 116-122.

Levy, D.A. and T.G. Northcote. 1981. The distribution and abundance of juvenile salmon in the marsh habitats of the Fraser River estuary. Westwater Res. Cent. Univ. Br. Col. Tech. Rep. 25:117p.

ER-313

NOAASkagitAR0051281

Levy, D.A. and Northcote, T.G., 1982. Juvenile salmon residency in a marsh area of the Fraser River estuary. Canadian Journal of Fisheries and Aquatic Sciences, 39(2), pp.270-276.

Lindley S.T., C.B. Grimes, M.S. Mohr, W. Peterson, J. Stein, J.T. Anderson, et al. 2009. What caused the Sacramento River fall Chinook stock collapse? NOAA Fisheries West Coast Region, Santa Cruz, CA. U.S. Department of Commerce NOAA-TM-NMFS-SWFSC-447.

Limburg, K., R. Brown, R. Johnson, B. Pine, R. Rulifson, D. Secor, et al. 2016. Round-the-coast: Snapshots of estuarine climate change effects. Fisheries 41(7):392-394. https://doi.org/10.1080/03632415.2016.1182506.

Lombard, J. 2006. Saving Puget Sound: a conservation strategy for the 21st century. American Fisheries Society, Bethesda, Maryland.

Lucey S. M. and J. A. Nye. 2010. Shifting species assemblages in the Northeast US Continental Shelf Large Marine Ecosystem. Mar Ecol Prog Ser 415:23-33.

Lundin, J.I., R.L. Dills, G.M. Ylitalo, M.B. Hanson, C.K. Emmons, G.S. Schorr, J. Ahmad, J.A. Hempelmann, K.M. Parsons and S.K. Wasser. 2016a. Persistent Organic Pollutant Determination in Killer Whale Scat Samples: Optimization of a Gas 3 Chromatography/Mass Spectrometry Method and Application to Field Samples. Archives of Environmental Contamination and Toxicology 70: 9-19.

Lundin, J. I., G. M. Ylitalo, R. K. Booth, B. F. Anulacion, J. Hempelmann, K. M. Parsons, D. A. Giles, E. A. Seely, M. B. Hanson, C. K. Emmons, S. K. Wasser. 2016b. Modulation in Persistent Organic Pollutant level and profile by prey availability and reproductive status in Southern Resident killer whale scat samples. Environmental Science & Technology, 50:6506-6516.

Lusseau, D., D. E. Bain, R. Williams, and J. C. Smith. 2009. Vessel traffic disrupts the foraging behavior of southern resident killer whales Orcinus orca. Endangered Species Research. 6: 211-221.

Macdonald, J. S. and C.D. Levings. 1988. A field experiment to test the importance of estuaries for Chinook salmon (Oncohynchus tshawytscha) survival: short term results.

Mackenzie, C, J. McIntyre, E. Howe, and J. Israel. 2018. Stormwater quality in Puget Sound: impacts and solutions in reviewed literature. Seattle, WA: The Nature Conservancy, Washington State Chapter, 42 pp.

MacLeod, C D. 2009. Global climate change, range changes and potential implications for the conservation of marine cetaceans: a review and synthesis. Endang Species Res. Vol. 7: 125–136.

**ER-314**

NOAASkagitAR0051282

Magnusson, A., and R. Hilborn. 2003. Estuarine influence on survival rates of coho (Oncorhynchus kisutch) and Chinook salmon (Oncorhynchus tshawytscha) released from hatcheries on the US Pacific Coast. Estuaries 26(4B):1094-1103.

Malek, K., J.C. Adam, C.O. Stockle, and R.T. Peters. 2018. Climate change reduces water availability for agriculture by decreasing non-evaporative irrigation losses. Journal of Hydrology 561:444-460.

Mantua, N. J., S. R. Hare, Y. Zhang, J. M. Wallace, and R. C. Francis. 1997. A Pacific interdecadal climate oscillation with impacts on salmon production. Bulletin of the American Meteorological Society 78:1069-1079.

Marshall, A. R., C. Smith, R. Brix, W. Dammers, J. Hymer and L. LaVoy. 1995. Genetic diversity units and major ancestral lineages for chinook salmon in Washington. Pages 111-173 in C. Busack and J. B. Shaklee, eds. Genetic diversity units and major ancestral lineages of salmonid fishes in Washington. Washington Department of Fish and Wildlife Tech. Rep. RAD 95-02.

Martins, E. G., S. G. Hinch, S. J. Cooke, and D. A. Patterson. 2012. Climate effects on growth, phenology, and survival of sockeye salmon (Oncorhynchus nerka): a synthesis of the current state of knowledge and future research directions. Reviews in Fish Biology and Fisheries. 22(4): 887-914.

Martin, R.M. and A. Wertheimer. 1989. Adult production of Chinook salmon reared at different densities and released as two smolt sizes. The Progressive Fish Culturist. 51:194-2000.

Mauger, G. S., J. H. Casola, H. A. Morgan, R. L. Strauch, B. Jones, B. Curry, T. M. B. Isaksen, L. W. Binder, M. B. Krosby, and A. K. Snover. 2015. State of Knowledge: Climate Change in Puget Sound. Report prepared for the Puget Sound Partnership and the National Oceanic and Atmospheric Administration. Climate Impacts Group, University of Washington, Seattle. November 2015. 309p.

Mayer, J.R. and N.R. Elkins. 1990. Potential for agricultural pesticide runoff to a Puget Sound estuary: Padilla Bay, Washington. Bull. Environ. Cantam. Toxicol. 45:215-222.

McCabe, G.T., R.L. Emmett, W.D.J. Muir, and T.H. Blahm. 1986. Utilization of the Columbia River estuary by subyearling Chinook salmon. Northwest Science. 60:113-124.

McCarthy, S. 2020. Eastern Padilla Bay Tributaries Fecal Coliform Bacteria Total Maximum Daily Load: Water Quality Study Findings. Publication 20-03-001 Washington State Department of Ecology, Olympia.

McCullough D.A. 1999. A review and synthesis of effects of alterations to the water temperature regime on freshwater life stages of salmonids, with special reference to Chinook salmon. Report to the U.S. Environmental Protection Agency, Region 10, Seattle, WA.

**ER-315**

NOAASkagitAR0051283

McDonnell,J. Michael Bruno, Norbert P. Psuty,Thomas Harrington. 1996. Coastal Protection: A White Pape@r on Engineering Approaches to Shoreline Management. New Jersey's Shoreline Future Project Institute of Marine and Coastal Sciences Rutgers - The State University of New Jersey https://www.govinfo.gov/content/pkg/CZIC-gb648-13-n5-m54-1996/html/CZIC-gb648-13-n5-m54-1996.htm

McElhany, P., M.H. Ruckelshaus, M.J. Ford, T.C. Wainwright, and E.P. Bjorkstedt. 2000. Viable Salmonid Populations and the Recovery of Evolutionarily Significant Units. U.S. Dept. Commer., NOAA Tech. Memo. NMFS-NWFSC-42. June 2000. 156 pp.

McGurk, M. D. 1995. Allometry of marine mortality of Pacific salmon. Fishery Bulletin. 94(1) (1996).

McMahon, T. E. and L. Blair Holtby. 1992. Behaviour, habitat use, and movements of coho salmon (Oncorynchus kisutch) smolts during seaward migration. Canadian Journal of Fisheries and Aquatic Sciences. 49: 1478-1458.

Meador, J. P. 2013. Do chemically contaminated river estuaries in Puget Sound (Washington, USA) affect the survival rate of hatchery-reared Chinook salmon? Canadian Journal of Fisheries and Aquatic Sciences 71(1):162-180.

Melbourne, B. A., and A. Hastings. 2008. Extinction risk depends strongly on factors contributing to stochasticity. Nature. 454(7200): 100-103.

Miller, J.A. and C.A. Simenstad. 1997. A comparative assessment of a natural and created estuarine slough as rearing habitat for juvenile Chinook and coho salmon. Estuaries 20:792-806.

Mongillo, T. M., G. M. Ylitalo, L. D. Rhodes, S. M. O'Neill, D. P. Noren, M. B. Hanson. 2016. Exposure to a mixture of toxic chemicals: Implications to the health of endangered Southern Resident killer whales. U.S. Dept. Commer., NOAA Tech. Memo. NMFS-NWFSC-X8.

Moore, M.E., F.A. Goetz, D.M. Van Doornik, E.P. Tezak, T.P. Quinn, J.J. Reyes-Tomassini, and B.A. Berejikian. 2010. Early marine migration patterns of wild coastal cutthroat trout (Oncorhynchus clarki clarki), steelhead trout (Oncorhynchus mykiss), and their hybrids. PLoS ONE 5(9):e12881. Doi:10.1371/journal.pone.0012881. 10 pp.

Moore, M.E., B.A. Berejikian, F.A. Goetz, A.G. Berger, S.S. Hodgson, E.J. Connor, T.P. Quinn. 2015. Multi-population analysis of Puget Sound steelhead survival and migration behavior. Marine Ecology Progress Series. 537: 217–232.

Moore, M. E., and B. A. Berejikian. 2017. Population, habitat, and marine location effects on early marine survival and behavior of Puget Sound steelhead smolts. Ecosphere 8(5):e01834. 10.1002/ecs2.1834

ER-316

NOAASkagitAR0051284

Moore, M.E., Berejikian, B.A., Greene, C.M. and Munsch, S., 2021. Environmental fluctuation and shifting predation pressure contribute to substantial variation in early marine survival of steelhead. Marine Ecology Progress Series, 662, pp.139-156.

Morace, J.L., 2012, Reconnaissance of contaminants in selected wastewater-treatment-plant effluent and stormwater runoff entering the Columbia River, Columbia River Basin, Washington and Oregon, 2008–10: U.S. Geological Survey Scientific Investigations Report 2012–5068, 68 p.

Morley, S.A., J.D. Toft, and K.M. Hanson. 2012. Ecological Effects of Shoreline Armoring on Intertidal Habitats of a Puget Sound Urban Estuary. Estuaries and Coasts. 35:774-784.

Morris, J. F. T., M. Trudel, J. Fisher, S. A. Hinton, E. A. Fergusson, J. A. Orsi, and J. Edward V. Farley. 2007. Stock-specific migrations of juvenile coho salmon derived from coded-wire tag recoveries on the continental shelf of Western North America. American Fisheries Society Symposium. 57: 81.

Munsch, S. H., C. M. Greene, N. J. Mantua, and W. H. Satterthwaite. 2022. One hundred-seventy years of stressors erode salmon fishery climate resilience in California's warming landscape. Global Change Biology.

Munsch, S.H., J.R. Cordell, J.D. Toft, and E.E. Morgan. 2014. Effects of Seawalls and Piers on Fish Assemblages and Juvenile Salmon Feeding Behavior. North American Journal of Fisheries Management. 34:814-827.

Murray, C. C., Hannah, L. C., Doniol-Valcroze, T., Wright, B. M., Stredulinsky, E. H., Nelson, J. C., Locke, A., & Lacy, R. C. (2021). A cumulative effects model for population trajectories of resident killer whales in the Northeast Pacific. Biological Conservation, 257, Article 109124. https://doi.org/10.1016/j.biocon.2021.109124

Myers, J.M., J. Jorgensen, M. Sorel, M. Bond, T. Nodine, and R. Zabel. 2018. Upper Willamette River Life Cycle Modeling and the Potential Effects of Climate Change. Draft Report to the U.S. Army Corps of Engineers. Northwest Fisheries Science Center. 1 September 2018.

National Academies of Sciences, Engineering, and Medicine. 2017. Approaches to Understanding the Cumulative Effects of Stressors on Marine Mammals. Washington, DC: The National Academies Press. https://doi.org/10.17226/23479.

National Research Council. 2003. Ocean Noise and Marine Mammals. Washington, DC: The National Academies Press. https://doi.org/10.17226/10564.

Neilson, J.D., G.H. Geen, and D. Bottom. 1985. Estuarine growth of juvenile Chinook salmon (Oncorhynchus tshawytscha) as inferred from otolith microstructure. Can. J. Fish. Aquat. Sci. 42:899-908.

ER-317

NOAASkagitAR0051285

Newcombe, C.P., and J.O.T. Jensen. 1996. Channel suspended sediment and fisheries: a synthesis for quantitative assessment of risk and impact. North American Journal of Fisheries Management. 16:34.

Nelson, B.W., E.J. Ward, D.W. Linden, E. Ashe, and R. Williams. 2024. Identifying Drivers of Demographic Rates in an At-Risk Population of Marine Mammals Using Integrated Population Models. Ecosphere 15(2): e4773. https://doi.org/10.1002/ecs2.4773

National Marine Fisheries Service (NMFS). 2002. Biological opinion on the collection, rearing, and release of salmonids associated with artificial propagation programs in the middle Columbia River steelhead evolutionarily significant unit (ESU). National Marine Fisheries Service. Portland, Oregon. February 14, 2002.

NMFS. 2005. Appendix A CHART assessment for the PS Salmon ESU from Final Assessment of NOAA Fisheries' Critical Habitat Analytical Review Teams For 12 Evolutionarily Significant Units of West Coast Salmon and Steelhead. August 2005. 55 pp.

NMFS. 2006. Final supplement to the Shared Strategy's Puget Sound salmon recovery plan. National Marine Fisheries Service, Northwest Region. Seattle.

NMFS. 2006b. Endangered Species Act Section 7 Consultation Biological Opinion and Section 10 Statement of Findings and Magnuson-Stevens Fishery Conservation and Managment Act Essential Fish Habitat Consultation. Washington State Forest Practices Habitat Conservation Plan. NMFS Consultation No.: NWR-2005-07225. 335p.

NMFS. 2008. Recovery plan for Southern Resident killer whales (Orcinus orca). National Marine Fisheries Service, Northwest Region, Seattle, Washington.

NMFS. 2008b. Recovery Plan for Southern Resident Killer Whales (Orcinus orca). National Marine Fisheries Service, Seattle, Washington. 251p

NMFS. 2008c. Endangered Species Act Section 7 Consultation Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Consultation on EPA's Proposed Approval of Revised Washington Water Quality Standards for Designated Uses, Temperature, Dissolved Oxygen, and Other Revisions. February 5, 2008. NMFS Consultation No.: NWR-2007-02301. 137p.

NMFS. 2008d. Endangered Species Act Section 7 Consultation Final Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Consultation. Implementation of the National Flood Insurance Program in the State of Washington Phase One Document-Puget Sound Region. NMFS Consultation No.: NWR-2006-00472. 226p.

ER-318

NOAASkagitAR0051286

NMFS. 2009. Endangered Species Act Section 7 Consultation Final Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Consultation for the Skagit Delta Tidegates and Fish Implementation Agreement. (HUC Code 171100070202 – South Fork. NMFS Consultation No: NWR-2008-03803. 48p. Skagit River)

NMFS (National Marine Fisheries Service). 2011. Columbia River Estuary ESA Recovery Plan Module for Salmon and Steelhead. NMFS Northwest Region. Portland, OR. January. Prepared for NMFS by the Lower Columbia River Estuary Partnership (contractor) and PC Trask & Associates, Inc., subcontractor

NMFS. 2014. Endangered Species Act Section 7(a)(2) Biological Opinion, Conference Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Consultation, Mud Mountain Dam, Operations and Maintenance. NMFS, West Coast Region. October 3, 2014.

NMFS. 2016a. Endangered Species Act Section 7(a)(2) Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat (EFH) Consultation. National Marine Fisheries Service (NMFS) Evaluation of Three Hatchery and Genetic Management Plans for Early Winter Steelhead in the Dungeness, Nooksack, and Stillaguamish River basins under Limit 6 of the Endangered Species Act Section 4(d) Rule. April 15, 2016. NMFS Consultation No.: WCR-2015-2024. 220p.

NMFS. 2016b. Southern Resident Killer Whales (Orcinus orca) 5-Year Review: Summary and Evaluation. December 2016. NMFS, West Coast Region, Seattle, Washington. 74p. https://www.fisheries.noaa.gov/resource/document/southern-resident-killer-whales-orcinus-orca-5-year-review-summary-and-evaluation

NMFS. 2016c Endangered Species Act Section 7(a)(2) Biological Opinion, and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response [and Fish and Wildlife Coordination Act Recommendations] for the Regional General Permit 6 (RGP-6): Structures in Inland Marine Waters of Washington State. NMFS Consultation No.: WCR-2016-4361. 109 p.

NMFS. 2017. 2016 5-Year Review: Summary and Evaluation of Puget Sound Chinook Salmon, Hood Canal Summer-Run Chum Salmon, and Puget Sound Steelhead. National Marine Fisheries Service, West Coast Region, Portland, OR. April 6, 2017.

NMFS. 2017b. Endangered Species Act Section 7(a)(2) Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat (EFH) Consultation. NOAA's National Marine Fisheries Service's implementation of the Mitchell Act Final Environmental Impact Statement preferred alternative and administration of Mitchell Act hatchery funding. January 15, 2017. NMFS Consultation No.: WCR-2014-697. 535p.

NOAASkagitAR0051287

NMFS. 2018. 2018 Revisions to: Technical Guidance for Assessing the Effects of Anthropogenic Sound on Marine Mammal Hearing (Version 2.0): Underwater Thresholds for Onset of Permanent and Temporary Threshold Shifts. U.S. Dept. of Commer., NOAA. NOAA Technical Memorandum NMFS-OPR-59, 167 p.

NMFS. 2019. ESA Recovery Plan for the Puget Sound Steelhead Distinct Population Segment (Oncorhynchus mykiss). WCR/NMFS/NOAA. December 20, 2019. 174p.

NMFS. 2019b. Endangered Species Act Section 7(a)(2) Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat (EFH) Consultation. USACE Howard Hanson Dam Operations and Maintenance, Green River, King County, Washington. February 15, 2019. WCR-2014-997. 167p.

NMFS. 2019c. Proposed Revision of the Critical Habitat Designation for Southern Resident Killer Whales: Draft Biological Report (to accompany the Proposed Rule). 92 + Appendix pp.

NMFS. 2020. Endangered Species Act (ESA) Section 7(a)(2) Jeopardy Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat (EFH) Response for the Issuance of Permits for 39 Projects under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act for Actions related to Structures in the Nearshore Environment of Puget Sound. November 9, 2020. NMFS Consultation Number: WCRO-2020-01361. 329p.

NMFS 2021. Endangered Species Act (ESA) Section 7(a)(2) Jeopardy Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat (EFH) Response for the Issuance of Permits for 11 Projects under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act for Actions related to Structures in the Nearshore Environment of Puget Sound. September 30, 2021. NMFS Consultation Number: WCRO-2020-01620. 289p.

NMFS. 2022a. 2021 Southern Resident Killer Whales (Orcinus orca) 5-Year Review: Summary and evaluation. January 04, 2022.

NMFS 2022b. Endangered Species Act Section 7(a)(2) Jeopardy Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response for the Issuance of Permits for 15 Projects under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act for Actions related to Structures in the Nearshore Environment of Puget Sound. May 11, 2022. NMFS Consultation Number: WCRO-2021-03047. 345p.

NMFS 2022c. Endangered Species Act Section 7(a)(2) Biological Opinion, and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response for the Salish Sea Nearshore Programmatic Consultation (SSNP). June 29, 2022. NMFS Consultation Number: WCRO-2022-04086. 354p. with appendices.

**ER-320**

NOAASkagitAR0051288

NMFS and WDFW (Washington Department of Fish and Wildlife). 2018. Southern Resident Killer Whale Priority Chinook Stocks Report. June 22, 2018. 8p

NOAA (National Oceanic Atmospheric Administration) and Washington State Department of Ecology. 1980. Final environmental impact statement, proposed estuarine sanctuary grant award for Padilla Bay, Skagit County, Washington.

NOAA 2007. APPENDIX A to the Biological Opinion for the Blue Heron Conservation Bank. NO 2007/08287. Habitat evaluation of the Blue Heron site for a specific type of juvenile Chinook salmon.

NOAA (National Oceanic and Atmospheric Administration) National Centers for Environmental Information (NCEI), State of the Climate: Global Climate Report for Annual 2021. 2022. Published online January 2022, retrieved on February 28, 2022 from https://www.ncdc.noaa.gov/sotc/global/202113.

NOAA 2024a. 2023 was the world's warmest year on record, by far. https://www.noaa.gov/news/2023-was-worlds-warmest-year-on-record-by-far#:~:text=Earth's%20average%20land%20and%20ocean,0.15%20of%20a%20degree%20C).

NOAA 2024b. Padilla Bay National Estuarine Research Reserve. https://coast.noaa.gov/nerrs/reserves/padilla-bay.html

Noren, D. P., A. H. Johnson, D. Rehder, and A. Larson. 2009. Close approaches by vessels elicit surface active displays by Southern Resident killer whales. Endangered Species Research. 8:179-192.

Noren, D. P. 2011. Estimated field metabolic rates and prey requirements of resident killer whales. Marine Mammal Science. 27(1): 60–77.

Noren, D. P., R. C. Dunkin, T. M. Williams, and M. M. Holt. 2012. Energetic cost of behaviors performed in response to vessel disturbance: One link the in population consequences of acoustic disturbance model. In: Anthony Hawkins and Arthur N. Popper, Eds. The Effects of Noise on Aquatic Life, pp. 427–430.

Norman, S.A., C.E. Bowlby, M.S. Brancato, J. Calambokidis, D. Duffield, P.J. Gearin, T.A. Gornall, M.E. Gosho, B. Hanson, J. Hodder, S.J. Jeffries, B. Lagerquist, D.M. Lanbourn, B. Mate, B. Norberg, R.W. Osborne, J.A. Rash, S. Riemer, and J. Scordino. 2004. Cetacean strandings in Oregon and Washington between 1930 and 2002. Journal of Cetacean Research and Management 6: 87-99.

Northcote, T.G., N. T. Johnston, and K. Tsumura. 1979. Feeding relationships and food web structure of lower Fraser River fishes. Westwater Res. Cent. Univ. Br. Col. Tech. Rep. 16:73p.

ER-321

NOAASkagitAR0051289

NWFSC. 2015. Status review update for Pacific salmon and steelhead listed under the Endangered Species Act: Pacific Northwest. Northwest Fisheries Science Center (NWFSC). https://www.nwfsc.noaa.gov/assets/11/8623_03072016_124156_Ford-NWSalmonBioStatusReviewUpdate-Dec%2021-2015%20v2.pdf.

O'Connor, S., R. Campbell, H. Cortez, and T. Knowles. 2009. Whale Watching Worldwide: Tourism numbers, expenditures and expanding economic benefits, a special report from the International Fund for Animal Welfare. Economists at Large, Yarmouth, MA.

Ohlberger, J., E.J. Ward, D.E. Schindler, and B. Lewis. 2018. Demographic changes in Chinook salmon across the Northeast Pacific Ocean. Fish and Fisheries, 19(3), pp.533-546.

Olesiuk, P. F., M. A. Bigg, and G. M. Ellis. 1990. Life history and population dynamics of resident killer whales (Orcinus orca) in the coastal waters of British Columbia and Washington State. Pages 209-244 in International Whaling Commission, Individual Recognition of Cetaceans: Use of Photo-Identification and Other Techniques to Estimate Population Parameters (Special Issue 12), incorporating the proceedings of the symposium and workshop on individual recognition and the estimation of cetacean population parameters.

Olla, B.L., Davis, M.W. and Schreck, C.B., 1992. Comparison of predator avoidance capabilities with corticosteroid levels induced by stress in juvenile coho salmon. Transactions of the American Fisheries Society, 121(4), pp.544-547.

Olmos M., M.R. Payne, M. Nevoux, E. Prévost, G. Chaput, H. Du Pontavice, J. Guitton, T. Sheehan, K. Mills, and E. Rivot. 2020. Spatial synchrony in the response of a long range migratory species (Salmo salar) to climate change in the North Atlantic Ocean. Glob Chang Biol. 26(3):1319-1337. doi: 10.1111/gcb.14913. Epub 2020 Jan 12. PMID: 31701595.

O'Neill, S.M. and J.E. West. 2009. Marine Distribution, Life History Traits, and the Accumulation of Polychlorinated Biphenyls in Chinook Salmon from Puget Sound, Washington. Transactions of the American Fisheries Society 138: 616-632.

O'Neill, S.M., G. M. Ylitalo, and J. E. West. 2014. Energy content of Pacific salmon as prey of northern and southern resident killer whales. Endanger. Species Res. 25:265–281.

Ou, M., T. J. Hamilton, J. Eom, E. M. Lyall, J. Gallup, A. Jiang, J. Lee, D. A. Close, S. S. Yun, and C. J. Brauner. 2015. Responses of pink salmon to CO2-induced aquatic acidification. Nature Climate Change 5:950-955.

Parametrix. 2011. Creosote Release from Cut/Broken Piles. Washington Department of Natural Resources. Olympia, WA.

Parker, R.R. 1971. Size selective predation among juvenile salmonid fishes in a British Columbia inlet. Journal of the Fisheries Research Board of Canada. 28:1503-1510.

**ER-322**

NOAASkagitAR0051290

Parks, D., A. Shaffer, and D. Barry. 2013. Nearshore drift-cell sediment processes and ecological function for forage fish: implications for ecological restoration of impaired Pacific Northwest marine ecosystems. J. Coast. Res. 29:984–997.

Parsons, K. M., K. C. Balcomb, J. K. B. Ford, and J. W. Durban. 2009. The social dynamics of southern resident killer whales and conservation implications for this endangered population. Animal Behaviour, 77(4), 963-971.

Patrick, C.J, D.E. Weller, X. Li. and M. Ryder. 2014. Effects of shoreline alteration and other stressors on submerged aquatic vegetation in subestuaries of Chesapeake Bay and the mid-Atlantic coastal bays. Estuaries and coasts, 37(6), 1516-1531.

Patterson, D., H. Trim and T. Trohimiovich. 2014. Practical Guide: Cost-effective compliance with Shoreline Regulations. Futurewise.org

Pearcy, W.G. 2002. Marine nekton off Oregon and the 1997–98 El Niño. Progress in Oceanography 54 (1-4), 399-403.

Pearcy, W. G. and S. M. McKinnell. 2007. The ocean ecology of salmon in the Northeast Pacific Ocean: an abridged history, American Fisheries Society.

Penttila, D. 2007. Marine Forage Fishes in Puget Sound. Puget Sound Nearshore Partnership Report No. 2007-03. Published by Seattle District, U.S. Army Corps of Engineers, Seattle, Washington.

Pess, G.R., McHenry, M.L., Denton, K., Anderson, J.H., Liermann, M.C., Peters, R.J., Brenkman, S. and Bennett, T.R., 2020. Initial response of Chinook salmon (Oncorhynchus tshawytscha) and steelhead (Oncorhynchus mykiss) to removal of two dams on the Elwha River, Washington State. USA Can. J. Fish. Aquat. Sci.

Pettis H. M., R. M. Rolland, P. K. Hamilton, S. Brault, A. R. Knowlton, S. D. Kraus. 2004. Visual health assessment of North Atlantic right whales (Eubalaena glacialis) using photographs. Can J Zool 82:8-19.

PFMC (Pacific Fishery Management Council). 1998. Description and identification of essential fish habitat for the Coastal Pelagic Species Fishery Management Plan. Appendix D to Amendment 8 to the Coastal Pelagic Species Fishery Management Plan. Pacific Fishery Management Council, Portland, Oregon. December.

PFMC. 2005. Amendment 18 (bycatch mitigation program), Amendment 19 (essential fish habitat) to the Pacific Coast Groundfish Fishery Management Plan for the California, Oregon, and Washington groundfish fishery. Pacific Fishery Management Council, Portland, Oregon. November.

**ER-323**

NOAASkagitAR0051291

PFMC. 2014. Appendix A to the Pacific Coast Salmon Fishery Management Plan, as modified by Amendment 18 to the Pacific Coast Salmon Plan: Identification and description of essential fish habitat, adverse impacts, and recommended conservation measures for salmon. Pacific Fishery Management Council, Portland, OR. September 2014. 196 p. + appendices.

PFMC. 2020. Pacific Fishery Management Council Salmon Fishery Management Plan Impacts to Southern Resident Killer Whales. Risk Assessment. March 2020. SRKW Workgroup Report 1. 164p

Phinney, D. and Williams. 1975. A catalog of Washington streams and salmon utilization. Vol. 1 Puget Sound. Washington Department of Fisheries. Olympia, Washington.

Popper, A. N. 2003. Effects of Anthropogenic Sounds on Fishes. Available in Fisheries 28(10):24-31·October 2003.

Popper, A.N., M.E. Smith, P.A. Cott, B.W. Hanna, A.O. MacGillivray, M.E. Austin, and D.A. Mann. 2005. Effects of exposure to seismic airgun use on hearing of three fish species. Journal of the Acoustical Society of America 117:3958-3971.

Portnoy, J.W. 1991. Summer oxygen depletion in a diked New England estuary. Estuaries 14, 122–129. https://doi.org/10.2307/1351685.

Portnoy, J. W. 1999. Salt marsh diking and restoration: biogeochemical implications of altered wetland hydrology. Environmental Management 24(1):111–120.

Portnoy, J. W., and A. E. Giblin. 1997. Biogeochemical effects of seawater restoration to diked salt marshes. Ecological Applications 7(3):1054–1063.

Portnoy, J.W. and Allen, J.R., 2006. Effects of tidal restrictions and potential benefits of tidal restoration on fecal coliform and shellfish-water quality. Journal of Shellfish Research, 25(2), pp.609-617.

Portnoy, J. W., C. T. Roman, and M. A. Soukup. 1987. Hydrologic and chemical impacts of diking and drainage of a small estuary (Cape Cod National Seashore): effects on wildlife and fisheries. Pages 254–265 in Waterfowl and wetlands symposium: proceedings of a symposium on waterfowl and wetland management in the coastal zone of the Atlantic Flyway. Dover, New York.

PSAT (Puget Sound Action Team). 2007. 2007 Puget Sound Update: Ninth Report of the Puget Sound Assessment and Monitoring Program. Puget Sound Action Team. Olympia, Washington. 260 pp.

ER-324

NOAASkagitAR0051292

PSEMP (Puget Sound Ecosystem Monitoring Program). PSEMP Marine Waters Workgroup. 2019. Puget Sound marine waters; 2018 overview. S.K. Moore, R. Wold, B. Curry, K. Stark, J. Bos, P. Williams, N. Hamel, J. Apple, S. Kim, A. Brown, C. Krembs, and J. Newton, eds.

PSEMP. PSEMP Toxics Work Group. 2017. 2016 Salish Sea Toxics Monitoring Review: A Selection of Research. C.A. James, J. Lanksbury, D. Lester, S. O'Neill, T. Roberts, C. Sullivan, J. West, eds. Puget Sound Ecosystem Monitoring Program. Tacoma, WA.

PSP (Puget Sound Partnership). 2018. 2018-2022 Action Agenda and Comprehensive Plan. Puget Sound Partnership, Olympia, WA. December 2018. https://psp.wa.gov/action_agenda_center.php

PSP (Puget Sound Partnership). 2019. State of the Sound Report. Olympia, Washington. November 2019. 79 pp. www.stateofthesound.wa.gov.

PSSTRT (Puget Sound Steelhead Technical Recovery Team). 2013. Viability Criteria for Puget Sound Steelhead. Final Review Draft. April 2013. 372p

Quigley, J.T., S.G. Hinch. 2006. Effects of rapid experimental temperature increases on acute physiological stress and behaviour of stream dwelling juvenile chinook salmon. J. Thermal Biol. 31(5):429-441. https://doi.org/10.1016/j.jtherbio.2006.02.003.

Quinn, T. P. 2005. The behavior and ecology of Pacific salmon and trout. American Fisheries Society and University of Washington Press. www.fisheries.org, www.washington.edu

Raposa, K.B. and Roman, C.T., 2003. Using gradients in tidal restriction to evaluate nekton community responses to salt marsh restoration. Estuaries, 26, pp.98-105.

Raverty, S., J. St. Leger, D.P. Noren, K. Burek Huntington, D.S. Rotstein, F.M. D. Gulland, J.K.B. Ford, M.B. Hanson, D.M. Lambourn, J. Huggins, M.A. Delaney, L. Spaven, T. Rowles, L. Barre, P. Cottrell, G. Ellis, T. Goldstein, K. Terio, D. Duffield, J. Rice, J.K. Gaydos. 2020. Pathology findings and correlation with body condition index in stranded killer whales (Orcinus orca) in the northeastern Pacific and Hawaii from 2004 to 2013. https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0242505

Reddy, M. L., J. S. Reif, A. Bachand, and S. H. Ridgway. 2001. Opportunities for using Navy marine mammals to explore associations between organochlorine contaminants and unfavorable effects on reproduction. Sci. Total Environ. 274:171–182.

Reeder, W.S., P.R. Ruggiero, S.L. Shafer, A.K. Snover, L.L Houston, P. Glick, J.A. Newton, and S.M Capalbo. 2013. Coasts: Complex Changes Affecting the Northwest's Diverse Shorelines. In Climate Change in the Northwest: Implications for Our Landscapes, Waters, and Communities, edited by M.M. Dalton, P.W. Mote, and A.K. Snover, 41-58. Island Press, Washington, DC.

ER-325

NOAASkagitAR0051293

Reeves, G. H., Everest, F. H. and Hall, J. D. 1987. Interactions between the redside shiner (Richardsonius balteatus) and the steelhead trout (Salmo gairdneri) in western Oregon: the influence of water temperature. Canadian Journal of Fisheries and Aquatic Sciences, 44: 1603–1613. https://doi.org/10.1139/f87-194

Reijnders, P. J. 1986. Reproductive failure in common seals feeding on fish from polluted coastal waters. Nature 324:456–457.

Reimers, P.E. 1968. Social behavior among juvenile fall Chinook salmon. Journal of the Fisheries Research Board of Canada. Vol. 25, No. 9 (2005-2008).

Reimers, P.E. 1973. The length of residence of juvenile Chinook salmon in the Sixes River, Oregon. Fish Commission of Oregon Research Reports 4(2) 1-43.

Rhodes, L.D., Durkin, C., Nance, S.L. and Rice, C.A., 2006. Prevalence and analysis of *Renibacterium salmoninarum* infection among juvenile Chinook salmon *Oncorhynchus tshawytscha* in North Puget Sound. Diseases of Aquatic Organisms, 71(3), pp.179-190.

Rice, CA. 2006. Effects of shoreline modification on a northern Puget Sound beach: microclimate and embryo mortality in surf smelt (Hypomesus pretiosus). Estuaries and Coasts. 29(1): 63-71

Rice, C.A., Greene, C.M., Moran, P., Teel, D.J., Kuligowski, D.R., Reisenbichler, R.R., Beamer, E.M., Karr, J.R. and Fresh, K.L., 2011. Abundance, stock origin, and length of marked and unmarked juvenile Chinook Salmon in the surface waters of greater Puget Sound. Transactions of the American Fisheries Society, 140(1), pp.170-189.

Richardson, W. J., C. R. Greene, C. I. Malme Jr., and D. H. Thomson. 1995. Marine Mammals and Noise. Academic Press, 525 B Street, Ste. 1900, San Diego, California 92101-4495.

Richardson, J. L., and M. J. Vepraskas. 2001. Wetland soils: genesis, hydrology, landscapes, and classification. CRC Press, Boca Raton, Florida.

Ricker, W.E. 1962. Comparison of ocean growth and mortality of sockeye during their last two years. Journal of the Fisheries Research Board of Canada. 33:1483-1524.

Ricker, W. E. 1976. Review of the rate of growth and mortality of Pacific salmon in salt water, and noncatch mortality caused by fishing. Journal of the Fisheries Research Board of Canada. 33:1483-1524.

Ritter, A.F., Wasson, K., Lonhart, S.I., Preisler, R.K., Woolfolk, A., Griffith, K.A., Connors, S. and Heiman, K.W., 2008. Ecological signatures of anthropogenically altered tidal exchange in estuarine ecosystems. Estuaries and Coasts, 31, pp.554-571.

Roman, C. T., W. A. Niering, and R. S. Warren. 1984. Salt marsh vegetation change in response to tidal restriction. Environmental Management 8:141–150.

ER-326

NOAASkagitAR0051294

Romano, T.A., M. J. Keogh, C. Kelly, P. Feng, L. Berk, C. E. Schlundt, D. A. Carder, and J. J. Finneran. 2003. Anthropogenic sound and marine mammal health: measures of the nervous and immune systems before and after intense sound exposure. Canadian Journal of Fisheries and Aquatic Sciences 61:1124-1134.

Romberg, P. 2005. Recontamination Sources at Three Sediment Caps in Seattle. Proceedings of the 2005 Puget Sound Georgia Basin Research Conference. 7 pp.

Roni, P., G. Pess, T. Beechie & S. Morley. 2010. Estimating Changes in Coho Salmon and Steelhead Abundance from Watershed Restoration: How Much Restoration is Needed to Measurably Increase Smolt Production? N. Am. J. Fish. Manage, 30(6):1469-1484, DOI: 10.1577/M09-162.1

Ross, P.S., G.M. Ellis, M.G. Ikonomou, L.G. Barrett-Lennard, and R.F. Addison. 2000. High PCB concentrations in free-ranging Pacific killer whales, Orcinus orca: effects of age, sex, and dietary preference. Marine Pollution Bulletin 40(6):504-515.

Rozas, L.P., 1995. Hydroperiod and its influence on nekton use of the salt marsh: a pulsing ecosystem. Estuaries, 18, pp.579-590.

Ruckelshaus, M., K. Currens, W. Graeber, R. Fuerstenberg, K. Rawson, N. Sands, and J. Scott. 2002. Planning ranges and preliminary guidelines for the delisting and recovery of the Puget Sound Chinook salmon evolutionarily significant unit. Puget Sound Technical Recovery Team. National Marine Fisheries Service, Northwest Fisheries Science Center. Seattle.

Ruggiero, P., 2010, Impacts of shoreline armoring on sediment dynamics, in Shipman, H., Dethier, M.N., Gelfenbaum, G., Fresh, K.L., and Dinicola, R.S., eds., 2010, Puget Sound Shorelines and the Impacts of Armoring—Proceedings of a State of the Science Workshop, May 2009: U.S. Geological Survey Scientific Investigations Report 2010-5254, p. 179- 186.

Russel, I. C., A. Moore, S. Ives, L. T. Kell, M. J. Ives, and R. O. Stonehewer. 1998. The migratory behaviour of juvenile and adult salmonids in relation to an estuarine barrage. Hydrobiologia 371/372:321–333.

Sanga, R. 2015. US EPA Region 10 Sediment Cleanup Summary. Presentation at Sediment Management Annual Review Meeting (SMARM) 2015, May 6, Seattle, WA.

Sanitwong-Na-Ayutthaya S, Saengsupavanich C, Ariffin EH, Ratnayake AS, Yun LS. 2023. Environmental impacts of shore revetment. Heliyon. 2023 Sep 4;9(9):e19646. doi: 10.1016/j.heliyon.2023.e19646. PMID: 37810042; PMCID: PMC10558918. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10558918/#:~:text=Revetments%20can%20trigger%20updrift%20and,downdrift%20erosion%20on%20adjacent%20beaches.

Schindler, D. E., J. B. Armstrong, and T. E. Reed. 2015. The portfolio concept in ecology and evolution. Frontiers in Ecology and the Environment 13:257-263.

NOAASkagitAR0051295

Schwacke, L. H., E. O. Voit, L. J. Hansen, R. S. Wells, G. B. Mitchum, A. A. Hohn, and P.A. Fair. 2002. Probabilistic risk assessment of reproductive effects of polychlorinated biphenyls on bottlenose dolphins (Tursiops truncatus) from the southeast United States coast. Environ. Toxicol. Chem. 21:2752–2764.

Seattle City Light. 2023. Skagit River Hydroelectric Project, FERC Project No. 553-235 – Final License Application, Exhibit E. Seattle, WA. https://www.seattle.gov/city-light/in-the-community/current-projects/skagit-relicensing.

Seifert, R.E. and Moore, J.W., 2018. Floodgate operations and fish communities in tidal creeks of the lower Fraser River (British Columbia, Canada). Estuaries and Coasts, 41, pp.1206-1221.

Seiler, D., Volkhart, G. and L. Fleischer. 2004. Juvenile Chinook migration and survival in Cedar River and Bear Creek. Washington State Department of Fish and Wildlife. Power point presentation at the 2004 Greater Lake Washington Chinook Workshop. Available at: http://www.cityofseattle.net/salmon/

Sericano, J. L., T. L. Wade, S. T. Sweet, J. Ramirez, and G. G. Lauenstein. 2014. Temporal trends and spatial distribution of DDT in bivalves from the coastal marine environments of the continental United States, 1986–2009. Mar. Pollut. Bull. 81:303–316. https://www.sciencedirect.com/science/article/abs/pii/S0025326X13007972

Servizi, J.A., and D.W. Martens. 1991. Effect of temperature, season, and fish size on acute lethality of suspended sediments to coho salmon (Oncorhynchus kisutch). Canadian Journal of Fisheries and Aquatic Sciences. 48:493-497.

Shaw, B. 2018. Acting Northwest Regional Director, Bureau of Indian Affairs. April 16, 2018. Letter to Barry Thom (Regional Administrator, NMFS West Coast Region) requesting consultation on the 2018-2019 Puget Sound Chinook Harvest Plan. On file with NMFS West Coast Region, Sand Point office.

Shipman, H., 2010, The geomorphic setting of Puget Sound: implications for shoreline erosion and the impacts of erosion control structures, in Shipman, H., Dethier, M.N., Gelfenbaum, G., Fresh, K.L., and Dinicola, R.S., eds., 2010, Puget Sound Shorelines and the Impacts of Armoring— Proceedings of a State of the Science Workshop, May 2009: U.S. Geological Survey Scientific Investigations Report 2010-5254, p. 19-34.

Shipman, H., M. Dethier, G. Gelfenbaum, K. Fresh, and R.S Dinicola. 2010. Puget Sound Shorelines and the Impacts of Armoringin Shipman, H., Dethier, M.N., Gelfenbaum, G., Fresh, K.L., and Dinicola, R.S., eds., 2010, Puget Sound Shorelines and the Impacts of Armoring— Proceedings of a State of the Science Workshop, May 2009: U.S. Geological Survey Scientific Investigations Report 2010-5254.

ER-328

NOAASkagitAR0051296

Shreffler, D.K., C.A. Simenstad, and R.M. Thom. 1990. Temporary residence by juvenile salmon in a restored estuarine wetland. Canadian Journal of Fisheries and Aquatic Sciences 47:2079–2084.

Shreffler, D.K., Simenstad, C.A. and Thom, R.M., 1992. Foraging by juvenile salmon in a restored estuarine wetland. Estuaries, 15, pp.204-213.

Siegel, J., and L. Crozier. 2019. Impacts of Climate Change on Salmon of the Pacific Northwest. A review of the scientific literature published in 2018. Fish Ecology Division, NWFSC. December 2019.

Siegel, J., and L. Crozier. 2020. Impacts of Climate Change on Salmon of the Pacific Northwest: A review of the scientific literature published in 2019.  National Marine Fisheries Service, Northwest Fisheries Science Center, Fish Ecology Division. https://doi.org/10.25923/jke5-c307

Simenstad, C.A., M. Ramirez, B.J. Burke, M. Logsdon, H. Shipman, C. Tanner, Toft J., B. Craig, C. Davis, J. Fung, P. Bloch, K.L. Fresh, S. Campbell, D. Myers, E. Iverson, A. Bailey, P. Schlenger, C. Kiblinger, P. Myre, W.I. Gertsel, and A. MacLennan. 2011. Historical Changes and Impairment of Puget Sound Shorelines. In Puget Sound Nearshore Ecosystem Restoration Project.

Simenstad, S. A., K. L. Fresh, and E. O. Salo.  1982.  The role of Puget Sound estuaries in the life history of Pacific salmon: An underappreciated function.  Pages 343-364 in V. S. Kennedy, ed., Estuarine comparisions.  Academic Press, New York.

Simenstad, S.  1983.  The ecology of estuarine channels of the Pacific Northwest coast: a community profile.  US Fish and Wildlife Service Report FWS/OBS-83/05.  181p.

Simenstad, C. A., J. R. Cordell, R. C. Wissmar, K. L. Fresh, S. L.Schroder, M. Carr, G. Sanbom, and M. E. Burg. 1988b. Assemblage structure, microhabitat distribution, and food web linkages of epibenthic crustaceans in Padilla Bay. NOAA Technical Report OCRM/MEMD FRI-UW-8813.

Skagit Conservation District. 2005. Feasibility Study of Proposed Water Quality,  Drainage, and Habitat Improvement Activities  in the No Name Slough Watershed, Skagit County, Washington. Prepared Pursuant to Washington Department of Ecology Centennial Clean Water Fund Grant No. G030051 "No Name Slough Implementation Phase 1". Padilla Bay National Estuarine Research Reserve. 65pp.

Skagit County. 2017. Quality Assurance Project Plan- Skagit County Pollution Identification and Correction Program – Samish and Padilla Watersheds. Skagit County Public Works, Mount Vernon, WA. https://www.skagitcounty.net/PublicWorksCleanWater/Documents/2017%20FINAL%20 Skagit%20County%20PIC%20QAPP.pdf

ER-329

NOAASkagitAR0051297

Skagit Watershed Council - Beamer, E., T. Beechie, B. Perkowski, and J. Klochak. 1999. Application of the Skagit Watershed Council's Strategy. River basin analysis of the Skagit and Samish Basins: Tools for salmon habitat restoration and protection.

Smith, C. 2003. Salmonid habitat limiting factors in WRIAs 3 and 4 the Skagit Basin. Washington State Conservation Commission, Lacey, Washington.

Smith, C.J. and E. Manary. 2004. House Bill 1418 Report: Tidegates and Intertidal Salmon Habitat in the Skagit Basin. Olympia, WA 133pp.

Smith, S.C. and H. Whitehead. 1993. Variations in the feeding success and behaviour of Galapagos sperm whales (Physeter macrocephalus) as they relate to oceanographic conditions. Canadian Journal of Zoology, 71, 1991-1996. https://www.nrcresearchpress.com/doi/abs/10.1139/z93-283#.XsmzVmhKhPY

Smith, P. 2008. Risks to human health and estuarine ecology posed by pulling out creosote treated timber on oyster farms. Aquatic Toxicology 86 (2008) 287–298.

Sobocinski, K.L., J.R. Cordell and C.A. Simenstad. 2010. Effects of Shoreline Modifications on Supratidal Macroinvertebrate Fauna on Puget Sound, Washington Beaches. Estuaries and Coasts. 33:699-711.

Souder, J. and Giannico, G., 2020. Tide gates: operation, fish passage and recommendations for their upgrade or removal. ORESU-T-20-001. Oregon Sea Grant, Corvallis, OR. 15 pp

Spence, B.C., G.A. Lomnicky, R.M. Hughes, and R.P. Novitzki. 1996. An ecosystem approach to salmonid conservation. ManTech Environmental Research Services, Inc. Corvallis, Oregon. National Marine Fisheries Service, Portland, Oregon.

Sridhar, V., M.M. Billah, J.W. Hildreth. 2018. Coupled Surface and Groundwater Hydrological Modeling in a Changing Climate. Groundwater Vol. 56, Issue 4. https://doi.org/10.1111/gwat.12610

SRSC (Skagit System Cooperative) and USGS (United States Geological Survey). 1999. Skagit Chinook history study progress report number 2. http://www.skagitcoop.org/documents.html

SRSC and WDFW. 2005. Skagit Chinook Recovery Plan. http://skagitcoop.org/documents/

SSPS (Shared Strategy for Puget Sound). 2007. Puget Sound salmon recovery plan. Volume 1, recovery plan. Shared Strategy for Puget Sound. Seattle.

Stachura, M.M., N.J. Mantua, and M.D. Scheuerell. 2014. Oceanographic influences on patterns in North Pacific salmon abundance. Canadian Journal of Fisheries and Aquatic Sciences, 71(2), pp.226-235.

ER-330

NOAASkagitAR0051298

Stephens, C. 2015. Summary of West Coast Oil Spill Data: Calendar Year 2015. Pacific States/British Columbia Oil Spill Task Force. June 2015. 26p. Available at: http://oilspilltaskforce.org/wp-content/uploads/2016/07/Oil-Spill-Data-Summary_2015_FINALpdf.pdf

Stephens, C. 2017. Summary of West Coast Oil Spill Data: Calendar Year 2016. Pacific States/British Columbia Oil Spill Task Force. May 2017. 27p. Available at: http://oilspilltaskforce.org/wp-content/uploads/2013/08/summary_2016_DRAFT_16May2017_2.pdf

Stewart, J. D., J. W. Durban, H. Fearnbach, L. G. Barrett-Lennard, P. K. Casler, E. J. Ward, and D. R. Dapp. 2021. Survival of the fattest: linking body condition to prey availability and survivorship of killer whales. Ecosphere 12(8): e03660. https://doi.org/10.1002/ecs2.3660

Stadler, J.H., and D.P. Woodbury. 2009. Assessing the effects to fishes from pile driving: Application of new hydroacoustic criteria. In inter-noise 2009, Ottawa, CA. 8.

Stokstad, E., 2020. Why were salmon dying? The answer washed off the road. Science 1145.

Strecker, E.W., Driscoll, E.D., Shelley, P.E., Gaboury, D.R. and Sartor, J.D., 1990. The US federal highway administrations receiving water impact methodology. *Science of the total environment*, *93*, pp.489-498.

Sturrock, A.M., S.M. Carlson, J.D. Wikert, T. Heyne, S. Nusslé, J.E. Merz, H.J. Sturrock and R.C. Johnson. 2020. Unnatural selection of salmon life histories in a modified riverscape. Global Change Biology, 26(3), pp.1235-1247.

Subramanian, A., S. Tanabe, R. Tatsukawa, S. Saito, and N. Miyazaki. 1987. Reduction in the testosterone levels by PCBs and DDE in Dall's porpoises of Northwestern North Pacific. Mar. Pollut. Bull. 18:643–646.

Thorne, K.M., Buffington, K.J., Jones, S.F. and Largier, J.L., 2021. Wetlands in intermittently closed estuaries can build elevations to keep pace with sea-level rise. Estuarine, Coastal and Shelf Science, 257, p.107386.

Thorpe, J.E. 1994. Salmonid fishes and the estuarine environment. SOAFD Freshwater Fisheries Laboratory, Pitlochry, PH16 5LB. Scotland, United Kingdom. Estuarine Research Federation. Estuaries, Vol. 17, No. 1a, p. 76-93.

Tian, Z., Zhao, H., Peter, K.T., Gonzalez, M., Wetzel, J., Wu, C., Hu, X., Prat, J., Mudrock, E., Hettinger, R. and Cortina, A.E., 2021. A ubiquitous tire rubber–derived chemical induces acute mortality in coho salmon. Science, 371(6525), pp.185-189.

Tillmann, P., and D. Siemann. 2011. Climate Change Effects and Adaptation Approaches in Marine and Coastal Ecosystems of the North Pacific Landscape Conservation Cooperative Region. National Wildlife Federation.

**ER-331**

NOAASkagitAR0051299

Toft, J.D., J.R. Cordell, C.A. Simenstad, and L.A. Stamatiou. 2007. Fish distribution, abundance, and behavior along city shoreline types in Puget Sound. North American Journal of Fisheries Management. 27, 465-480.

Toft, J.D., Ogston, A.S., Heerhartz, S.M., Cordell, J.R. and Flemer, E.E. 2013. Ecological response and physical stability of habitat enhancements along an urban armored shoreline. Ecological Engineering, 57, pp.97-108.

Tonnes, D., 2007. Fish use and water quality in select channels regulated by tide gates within the Snohomish River estuary. Proceedings of the West Coast Symposium on the Effects of Tide Gates on Estuarine Habitats and Fishes. https://www.researchgate.net/publication/284935377

Trites, A.W. and C.P. Donnelly. 2003. The decline of Steller sea lions Eumetopias jubatus in Alaska: a review of the nutritional stress hypothesis. Mammal Rev. 33(1): 3-28.

Turnpenny, A., and J. Nedwell. 1994. The effects on marine fish, diving mammals, and birds of underwater sound generated by seismic surveys. Fawley Aquatic Research Laboratories Limited, Marine and Freshwater Biology Unit, Southampton, Hampshire, UK. 48 p.

Turnpenny, A.W.H., K.P Thatcher, and J.R. Nedwell. 1994. The effects on fish and other marine animals of high-level underwater sound. Fawley Aquatic Research Laboratory, Ltd., Report FRR 127/94, United Kingdom. 79 p.

USCGS (U.S. Coast & Geodetic Survey). 1886. T-Sheet map of the eastern shore of Padilla Bay and No Name Slough. https://riverhistory.ess.washington.edu/tsheets/framedex.htm

Veilleux, H.D., Donelson, J.M. and Munday, P.L., 2018. Reproductive gene expression in a coral reef fish exposed to increasing temperature across generations. Conservation physiology, 6(1), p.cox077.

Veldhoen, N., M.G. Ikonomou, C. Dubetz, N. MacPherson, T. Sampson, B.C. Kelly, and C.C. Helbing. 2010. Gene expression profiling and environmental contaminant assessment of migrating Pacific salmon in the Fraser River watershed of British Columbia. Aquatic Toxicology 97(3):212-225.

Viberg, H., A. Fredriksson, and P. Eriksson. 2003. Neonatal exposure to polybrominated diphenyl ether (PBDE-153) disrupts spontaneous behaviour, impairs learning and memory, and decreases hippocampal cholinergic receptors in adult mice. Toxicol. Appl. Pharmacol. 192:95–106.

Wagner, H. H., F. P. Conte, and J. L. Fessler. 1969. Development of osmotic and ionic regulation in two races of Chinook Salmon Oncorhynchus tshawytscha. Comparative Biochemistry and Physiology 29: 325-341.

NOAASkagitAR0051300

Wainwright, T.C. and L.A. Weitkamp. 2013. Effects of climate change on Oregon Coast coho salmon: habitat and life-cycle interactions. Northwest Science, 87(3), pp.219-242.

Ward, B.R., Slaney, P.A., Facchin, A.R. and R. W. Land. 1989. Size-biased survival in steelhead trout (Oncorynchus mykiss): Back-calculated lengths form adults' scales compared to migrating smolts at the Keogh River, British Columbia. Canadian Journal of Fisheries and Aquatic Sciences. 46: 1853-1858.

Ward, L., P. Crain, B. Freymond, M. McHenry, D. Morrill, G. Pess, R. Peters, J. A. Shaffer, B. Winter, and B. Wunderlich. 2008. Elwha River Fish Restoration Plan. Developed Pursuant to the Elwha River Ecosystem and Fisheries Restoration Act, Public Law 102-495. U.S. Dept. Commer., NOAA Tech. Memo., NMFS-NWFSC-90. 191p.

Ward, E.J., Holmes, E.E. and Balcomb, K.C., 2009. Quantifying the effects of prey abundance on killer whale reproduction. *Journal of Applied Ecology*, *46*(3), pp.632-640.

Ward, E.J., Dahlheim, M.E., Waite, J.M., Emmons, C.K., Marshall, K.N., Chasco, B.E. and Balcomb III, K.C., 2016. Long-distance migration of prey synchronizes demographic rates of top predators across broad spatial scales. *Ecosphere*, *7*(2), p.e01276.

Ward, E. 2019. Southern Resident Killer Whale Population and Status Update. December 15, 2019. Internal memo. 12p.

Ward, E.J., M.J. Ford, R.G. Kope, J.K.B. Ford, L.A. Velez-Espino, C.K. Parken, L.W. LaVoy, M.B. Hanson, and K.C. Balcomb. 2013. Estimating the impacts of Chinook salmon abundance and prey removal by ocean fishing on Southern Resident killer whale population dynamics. U.S. Dept. Commer., NOAA Tech. Memo. NMFS- NWFSC-123.

Ward, E.J., J.H. Anderson, T.J. Beechie, G.R. Pess, M.J. Ford. 2015. Increasing hydrologic variability threatens depleted anadromous fish populations. Glob Chang Biol. 21(7):2500–9. Epub 2015/02/04. pmid:25644185.

Ward, B.R. and P.A. Slaney. 1988. Life history and smolt-to adult survival of Keogh River steelhead trout (Salmo gairderi) and the relationship to smolt size. Canadian Journal of Fisheries and Aquatic Sciences. 45:1110-1122.

Wasser, S. K., J. I. Lundin, K. Ayers, E. Seely, D. Giles, K. Balcomb, J. Hempelmann, K. Parsons, R. Booth. 2017. Population growth is limited by nutritional impacts on pregnancy success in endangered Southern Resident killer whales (Orcinus orca). PLoS ONE 12(6): e0179824. https://doi.org/10.1371/journal. pone.0179824.

WDFW (Washington Department of Fish and Wildlife). 2009. Fish passage barrier and surface water diversion screening assessment and prioritization manual. Washington Department of Fish and Wildlife, Olympia

**ER-333**

NOAASkagitAR0051301

WDFW (Washington Department of Fish and Wildlife) 2023. Wiley Slough Restoration Project. https://wdfw.wa.gov/species-habitats/habitat-recovery/puget-sound/estuary-restoration-projects/wiley-slough-restoration-project.

WDNR (Washington Department of Natural Resources). 2015. "Spatial Evaluation of the Proximity of Outfalls and Eelgrass (Zostera marina L.) in Greater Puget Sound." Prepared Gaeckle J, Ferrier L, and Sherman K, Washington Department of Natural Resources.

WDOE (Washington Department of Ecology). 2017. Spill Prevention, Preparedness, and Response Program. 2017-2019 Program Plan. Publication 17-08-018. 29p

Weitkamp, L., and K. Neely 2002. Coho salmon (Oncorhynchus kisutch) ocean migration patterns: insight from marine coded-wire tag recoveries Can. J. Fish. Aquat. Sci. 59 1100–1115

Welch, E. B. 1967. Factors initiating phytoplankton blooms and resulting effects on dissolved oxygen in an enriched estuary.

West, J.E., S.M. O'Neill, and G.M. Ylitalo. 2017. Time trends of persistent organic pollutants in benthic and pelagic indicator fishes from Puget Sound, Washington, USA. Arch Environ Contam Toxicol (2017) 73:207–229 DOI 10.1007/s00244-017-0383-z

Whitehead, H. 1997. Sea surface temperature and the abundance of sperm whale calves off the Galapagos Islands: implications for the effects of global warming. Reports of the international Whaling Commission 47: 941-944.

Whitfield, A.K., and A. Becker. 2014. Impacts of recreational motorboats on fishes: A review. Marine Pollution Bulletin 83, 24-31.

Willette, T.M. 2001. Foraging behaviour of juvenile pink salmon (Oncorhynchus gorbuscha) and size-dependent predation risk. Fisheries Oceanography. 10:110-131.

Williams, R, R. C. Lacy, E. Ashe, L. Barrett-Lennard, T. M. Brown, J. K. Gaydos, F. Gulland, M. MacDuffee, B. W. Nelson, K. A. Nielsen, H. Nollens, S. Raverty, S. Reiss, P. S. Ross, M. Salerno Collins, R. Stimmelmayr and P. Paquet 2024. Warning sign of an accelerating decline in critically endangered killer whales (Orcinus orca). Commun Earth Environ 5, 173 (2024).

Williams, R., D. Lusseau and P. S. Hammond. 2006. Estimating relative energetic costs of human disturbance to killer whales (Orcinus orca). Biol. Cons. 133:301–311.

Williams, R., E. Ashe, and D. Lusseau. 2010. Killer whale activity budgets under no-boat, kayak-only and power-boat conditions. Contract via Herrera Consulting, Seattle, Washington. 29 pp.

ER-334

NOAASkagitAR0051302

Williams, T.H., B.C. Spence, D.A. Boughton, R.C. Johnson, L.G. Crozier, N.J. Mantua, M.R. O'Farrell, and S.T. Lindley. 2016. Viability assessment for Pacific salmon and steelhead listed under the Endangered Species Act: Southwest. NOAA Fisheries Southwest Fisheries Science Center, Santa Cruz, CA: U.S. Dep Commerce NOAA Tech Memo NMFS SWFSC 564.

Williams, C. R., A. H. Dittman, P. McElhany, D. S. Busch, M. T. Maher, T. K. Bammler, J. W. MacDonald, and E. P. Gallagher. 2019. Elevated $CO_2$ impairs olfactory-mediated neural and behavioral responses and gene expression in ocean-phase coho salmon (Oncorhynchus kisutch). 25:963-977.

Winemiller, K.O. 2004. Floodplain river food webs: generalizations and implications for fisheries management. In Proceedings of the second international symposium on the management of large rivers for fisheries (Vol. 2, pp. 285-309). Mekong River Commission, Phnom Penh: Cambodia.

Wright, G.V., Wright, R.M. and Kemp, P.S., 2014. Impact of tide gates on the migration of juvenile sea trout, Salmo trutta. Ecological engineering, 71, pp.615-622.

WWAA (Western Washington Agriculture Association), NMFS (National Oceanic and Atmospheric Administration), and WDFW (Washington Department of Fish and Wildlife). 2008. Skagit Tidegates and Fish Initiative Implementation Agreement. 113pp.

Yan, H., N. Sun, A. Fullerton, and M. Baerwalde. 2021. Greater vulnerability of snowmelt-fed river thermal regimes to a warming climate. Environmental Research Letters 16(5). https://doi.org/10.1088/1748-9326/abf393

Yates, S. 2001. Effects of Swinomish Channel jetty and causeway on outmigration Chinook salmon *Oncorhynchus tshawytscha* from the Skagit River, Washington. Master's thesis. Western Washington University, Bellingham, Washington.

Vélez-Espino, L.A., J.K.B. Ford, H.A. Araujo, G. Ellis, C.K. Parken, and K.C. Balcomb. 2014. Comparative demography and viability of northeastern Pacific resident killer whale populations at risk. Can. Tech. Rep. Fish. Aquat. Sci. 3084: v + 58 p.

Yanagida, Gladys K., et al. "Polycyclic aromatic hydrocarbons and risk to threatened and endangered Chinook salmon in the Lower Columbia River estuary." Archives of Environmental Contamination and Toxicology 62 (2012): 282-295.

Ylitalo, G. M., J. E. Stein, T. Horn, L. L. Johnson, K. L. Tilbury, A. J. Hall, T. Rowles, D. Greig, L. J. Lowenstein, and F. M. Gulland. 2005. The role of organochlorines in cancer-associated mortality in California sea lions (Zalophus californianus). Mar. Pollut. Bull. 50:30–39.

**ER-335**

NOAASkagitAR0051303