No. 25-3757

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

SKAGIT COUNTY DIKE, DRAINAGE AND IRRIGATION
IMPROVEMENT DISTRICT NO. 12,

*Plaintiff-Appellant*,

v.

NATIONAL MARINE FISHERIES SERVICE, et al.,

*Defendant-Appellees*.

On appeal from the United States District Court for the Western
District of Washington, No. 2:23-cv-01954-BAT
Hon. Brian A. Tsuchida

---

### APPELLANT'S REPLY BRIEF

---

Charlene Koski
Jenna R. Mandell-Rice
VAN NESS FELDMAN LLP
1191 Second Avenue, Suite 1800
Seattle, WA 98101
(206) 623-9372
cbk@vnf.com
jrm@vnf.com

*Attorneys for Appellant*

# TABLE OF CONTENTS

TABLE OF CONTENTS.......................................................................... i

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ..................................................................................1

ARGUMENT ..........................................................................................5

I.     NMFS's "effects analysis" is legally and factually flawed..............5

     A.     NMFS and the 2024 BiOp use different baselines depending on whether they are describing the "environmental baseline" or the "effects" of the Project. .................................................5

     B.     The "natural conditions" baseline NMFS used in its effects analysis is contrary to law and fact. .......................................8

     C.     A failed tidegate is not "no tidegate" and neither was assumed in the 2024 BiOp's environmental baseline. .........11

     D.     The 2024 BiOp's effects analysis conflicts with the agency's prior practice, applicable regulations, and case law. ...........13

II.     Measuring effects of the action correctly, NMFS's jeopardy finding is contrary to the record and best available science. .....................18

     A.     There is no evidence the Project will have an adverse effect on critical habitat or fish populations. ..................................18

     B.     NMFS's selection of two data points on a timeline to demonstrate the status of the Skagit Chinook populations is arbitrary, misleading, and fails to show jeopardy for this Project. ................................................................................20

III.     NMFS reversed its position on the Project without a reasonable explanation. ................................................................................25

A.    NMFS's claim that it explained its change in position conflicts with the record...........................................................26

B.    NMFS's alternative argument that it never changed its position also fails.................................................................27

    1.    Under the TFI, operational improvements included "replacement" projects. ...............................................28

    2.    Mitigation was not required for construction activities needed to implement operational improvements. .......32

        i.    TFI Agreement:...................................................33

        ii.    NMFS's treatment of similar projects: ...............33

    3.    NMFS's 2019 decision was not the rogue opinion of a single employee. ..........................................................35

C.    NMFS's attempt to distinguish the Project based on its permitting status lacks legal and factual support. .............36

D.    NMFS has not identified any new "best available science" justifying its reversal. ..........................................................37

E.    NMFS's reliance on the draft 2005 Dry Slough BiOp is improper and undercuts its explanation..............................39

IV.    The Swinomish's remaining arguments also fail...........................41

CONCLUSION ..................................................................................45

CERTIFICATE OF COMPLIANCE.....................................................1

CERTIFICATE OF SERVICE ............................................................1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.,*
175 F.3d 1156 (9th Cir. 1999)......................................................... 6

*Ariz. Cattle Growers Ass'n v. U.S. Fish & Wildlife,*
273 F.3d 1229 (9th Cir. 2001)......................................................... 23

*Blue Mountains Biodiversity Project v. Jeffries,*
99 F.4th 438 (9th Cir. 2024) ........................................................... 41

*Ctr. for Biological Diversity v. Env't Protection Agency,*
141 F.4th 153 (D.C. Cir. 2025) ....................................................... 18

*Confederated Tribes and Bands of the Yakama Nation v. McDonald,*
2003 WL 1955763 (E.D. Wash. 2003) ............................................ 17

*Ctr. for Biological Diversity v. Haaland,*
87 F.4th 980 (9th Cir. 2023) ........................................................... 43

*Ctr for Biological Diversity v. US Fish and Wildlife Serv.,*
807 F.3d 1031 (9th Cir. 2015)......................................................... 9

*Defenders of Wildlife v. Babbitt,*
958 F. Supp. 670 (D.D.C. 1997) ..................................................... 24

*Kern Cnty. Farm Bureau v. Allen,*
450 F.3d 1072 (9th Cir. 2006).......................................................... 24

*Lands Council v. Powell,*
395 F.3d 1019 (9th Cir. 2005).......................................................... 40

*Nat'l Wildlife Fed'n v. NMFS,*
524 F.3d 917 (9th Cir. 2008)................................................... 9, 15, 16

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.,*
477 F.3d 668 (9th Cir. 2007)........................................................... 36

*Pac. Coast Fed'n of Fishermen's Ass'n v. Gutierrez*,
606 F. Supp.2d 1195 (E.D. Cal. July 18, 2008) ................................... 8

*Portland Audubon Soc. v. Endangered Species Comm.*,
984 F.2d 1534 (9th Cir. 1993) ....................................................... 41

*Swinomish Indian Tribal Cmty. v. Skagit Cnty. Dike Dist. No. 22*,
618 F. Supp.2d 1262 (W.D. Wash. 2008) ........................................ 39

**Statutes**

16 U.S.C. § 1536(b)(4) ................................................................. 42

**Other Authorities**

50 C.F.R. 402.13(c) ..................................................................... 42

50 C.F.R. § 402.02 .................................................................. 6, 15

84 Fed. Reg. 44976, 44977 (Aug. 27, 2019) .................................. 15

U.S. Fish & Wildlife Service & National Martine Fisheries
Service, Endangered Species Consultation Handbook
(Mar. 1998) ............................................................................. 14

**INTRODUCTION**

The briefs of the National Marine Fisheries Service (NMFS) and Swinomish Indian Tribal Community (Swinomish) exemplify the fundamental flaw in the Biological Opinion on review (2024 BiOp). Like the effects analysis in that decision, the answering parties focus on harms they claim tidegates cause generally to the broader Puget Sound Chinook Salmon population and, by default, Southern Resident killer whales who depend on those fish for food.

But whether tidegates are good or bad for fish is not the question before this Court. Under the Endangered Species Act (ESA), the only question on which the parties and the 2024 BiOp should have focused is whether *this Project*[1]—the primary purpose of which is to replace an existing tidegate with a tidegate that is better for fish—causes new or additional jeopardy.

NMFS did not analyze that question. It analyzed the effects of placing a new tidegate in "natural conditions" as if a tidegate and other infrastructure are not already there. As a result, NMFS held this

---

[1] As described in the opening brief, the "Project" is District 12's replacement of an existing top-hinged tidegate (the No Name Slough Tidegate) with a side-hinged tidegate that improves fish passage.

replacement Project responsible for 140 years of agricultural development and the slow recovery of Puget Sound Chinook salmon broadly, even though the fish populations in the vicinity of the tidegate are healthy, abundant, and trending toward recovery—and even though this Project improves fish passage compared to the status quo.

In defending the 2024 BiOp, NMFS resorts to the same error that is fatal to its opinion: it picks and chooses between two different baselines depending on whether the agency is describing the "environmental baseline" or measuring the "effects of the action." It is undisputed that, as a matter of law, NMFS was required to first define an "environmental baseline" based on existing conditions and then use that same baseline to measure the Project's effects.

But that is not what NMFS did. In its brief and the 2024 BiOp, when describing the effects of the action, NMFS measures effects relative to a different "natural conditions" baseline. This alternative baseline assumes natural conditions as they might have existed 140 years ago without the existing tidegate or any agricultural development. NMFS then defends its finding of "jeopardy" on grounds that the Project will retain "what would be saltwater marsh/estuary

2

habitat as agricultural land." NMFS Br. 31 (quoting 2-ER-260). But because "marsh/estuary habitat" does not describe the existing environment, NMFS is measuring the effects of the action against a fictional baseline. Even if "natural conditions" without existing infrastructure was the standard, there is no world in which this area becomes marsh/estuary habitat because, absent the Project, and as the 2024 BiOp acknowledges in other places, the existing tidegate *will be maintained*, and the shoreline is already developed.

NMFS and the Swinomish defend assumptions made in the 2024 BiOp's effects analysis on grounds that District 12 has described the tidegate as failing. They presume a failed tidegate would result in an immediate return to a natural environment rich in fish habitat and devoid of farming and other infrastructure. But the record demonstrates that a failing tidegate is not the same as "no tidegate" or natural conditions that might have existed more than 140 years ago.

Using the correct baseline to measure the effects of the action, NMFS's jeopardy determination cannot be squared with the record or best available science. The Project will not have an adverse effect on critical habitat, as no such habitat exists there today or has in the past

3

140 years. The record and best available science also establish a positive trend for the Skagit Chinook populations, which are the only fish exposed to the existing tidegate. Neither NMFS nor the Swinomish have explained how the Project, which is better for fish, would reverse that trend.

NMFS also claims its effects analysis is consistent with the agency's prior practice. It dismisses the agency's 2019 finding of "no jeopardy" on the very same Project, but NMFS has failed to offer a reasonable explanation for its reversal. Contrary to NMFS's suggestion, its prior finding of "no jeopardy" for this same Project was consistent with—not contrary to—its policy and practice. Alternatively, NMFS suggests it has changed its position to accomplish broader recovery goals, but this does not explain why or how this Project, which is better for fish, jeopardizes those same fish or prevents recovery.

Additional arguments the Swinomish make involving Section 9 of the ESA and the Tidegate Fish Initiative (TFI) agreement rest on factual and legal inaccuracies and only further demonstrate that NMFS and the Swinomish are asking this Court to do something it has never previously done and that the ESA prohibits: endorse a BiOp that

4

deviates from legal standards and requirements by attributing "jeopardy" in the baseline to a proposed project and requiring mitigation for conditions that already exist.

## ARGUMENT

I. **NMFS's "effects analysis" is legally and factually flawed.**

A. **NMFS and the 2024 BiOp use different baselines depending on whether they are describing the "environmental baseline" or the "effects" of the Project.**

NMFS's defense of the 2024 BiOp's "jeopardy" determination rests on the same legally incoherent contradiction that permeates the BiOp: the use of two different and conflicting baselines. When describing the "environmental baseline," NMFS used current conditions, which include the existing tidegate and impacts from 140 years of agricultural development. When conducting the "effects" analysis, NMFS used a baseline of natural conditions without existing infrastructure and development. The result is that NMFS measured the "effects" of building a new tidegate in an undeveloped area where no tidegate, farming, or other infrastructure exists instead of from the legally correct baseline where all those things *do* exist. In its brief, NMFS

shifts between these two competing baselines depending on which better suits the argument it happens to be making.

Under the ESA, the correct baseline is the environment as it currently exists. NMFS agrees with this legal standard. The agency acknowledges that, to assess whether a proposed project will cause jeopardy, it "must consider the effects of the action when added to the environmental baseline." NMFS Br. 25. NMFS also agrees the baseline "includes past and present impacts of all Federal, State, or private actions, and other human activities in the area." NMFS Br. 25 (citing 50 C.F.R. § 402.02). And NMFS recognizes that to measure the "effects" of an action, it must measure the incremental effects of the proposed project against the existing environmental baseline. NMFS Br. 34–35; *see also Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1162 n.6 (9th Cir. 1999). Yet when describing how NMFS and the district court treated the existing tidegate, NMFS's brief uses two conflicting baselines: one excludes the tidegate and assumes natural conditions (effects analysis) and one includes the existing tidegate and assumes it will be maintained (environmental baseline).

6

For example, when defending the *effects* analysis, NMFS says the district court reasonably "affirmed the Service's decision to *exclude* the existing failing tidegate from the environmental baseline because the permit extends the useful life of the tidegate by 50 years." NMFS Br. 12 (emphasis added). Similarly, NMFS claims that, although any years of the tidegate's "remaining useful life" would have been included in the baseline, because the existing project has no remaining useful life, there was nothing to include (i.e., no existing tidegate in the baseline). NMFS Br. 27–28. NMFS then reasons that, because there was nothing left of the existing tidegate to include in the baseline, it was reasonable to use a "natural conditions" baseline in the effects analysis and determine the Project will "preclude the return of natural habitat features" for the next 50 years. NMFS Br. 14, 27, 31. This is how NMFS defends its finding of "jeopardy" requiring mitigation.

Elsewhere, however, when describing the BiOp's *environmental baseline*, and in direct conflict with its description of the effects analysis, NMFS says it "*included* the effects of the existing tidegate structures in the baseline." NMFS Br. 14, 26, 31–32, 35 (emphasis added). It also acknowledges that the 2024 BiOp's environmental

7

baseline assumed "District 12 would maintain" the existing tidegate for the foreseeable future. NMFS Br. 29. These legal and factual contradictions are fatal to the BiOp.

### B. The "natural conditions" baseline NMFS used in its effects analysis is contrary to law and fact.

Applying the (incorrect) "natural conditions" baseline described above, NMFS claims its jeopardy finding was reasonable because "the disruption of natural tidal processes and the maintenance of agricultural land in place of saltwater marsh" caused by the existing tidegate will "endure" another fifty years due to the Project. NMFS Br. 14. NMFS refers to this as an analysis of the Project's "enduring effects."

The problem with NMFS's argument is twofold. First, as a matter of law, NMFS cannot divorce its "effects" analysis from an environmental baseline that already includes the existing tidegate and agricultural development. The effects of the action are not measured from what might theoretically exist if development had never occurred. Any "jeopardy" caused by this Project must be new or additional compared to what currently exists. *Pac. Coast Fed'n of Fishermen's Ass'n v. Gutierrez,* 606 F. Supp.2d 1195, 1200 (E.D. Cal. July 18, 2008)

8

(agency "may not take action that *deepens* the [existing] jeopardy by causing *additional* harm") (emphasis added); *Ctr for Biological Diversity v. US Fish and Wildlife Serv.*, 807 F.3d 1031, 1052 (9th Cir. 2015) (the federal action itself must cause some incremental deterioration in the species' pre-action condition) (citing cases); *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 930 (9th Cir. 2008) (under ESA, to "jeopardize" means to cause "some new risk of harm").

Second, as a matter of fact, NMFS did not tie this Project to additional or new harm because the only "harms" it describes are those that have already occurred. Contrary to the "natural conditions" assumed for the effects analysis, the 2024 BiOp recognizes that, under present conditions, shoreline armoring exits at the current location along with a sea dike several miles long. 2-ER-148, 2-ER-214. Similarly, the habitat waterward of the tidegate consists of mudflats, not a natural beach or marsh. *Compare* 2-ER-218 (describing current condition as mudflats) with 2-ER-228, 2-ER-248, 2-ER-250, 2-ER-259 (describing enduring effects as including "beach erosion" and noting that armoring near shorelines "can reduce or eliminate shallow water habitats").

Just as egregiously, although the BiOp's environmental baseline acknowledges the existing infrastructure already cuts off habitat landward of the tidegate,[2] when describing the Project's "effects," the BiOp says the Project will "convert what would otherwise be marine wetlands to agricultural land." 2-ER-232. But the Project will not convert marine wetlands to farmland or impact access to critical habitat. Farmland already exists and there is no critical interior habitat to access.

NMFS also claims, for the first time in this litigation, that the 2024 BiOp did, in fact, consider the Project's incremental impacts and District 12 simply dislikes the agency's interpretation of "incremental," which NMFS describes as "the continuation of the fully functioning tidegate structure for the next 50 years in the already-degraded habitat." NMFS Br. 35 (citing its own brief). But, as shown above, that is a gross mischaracterization of what occurred here and District 12's

---

[2] Notably, landward of the tidegate is not, and has never been, identified as critical habitat for Puget Sound Chinook Salmon or Southern Resident killer whales. 2-ER-232, 2-ER-245. Staff have also recognized that Padilla Bay drainages (where the Project is located) provide "little in the way of harm or potential benefit to Puget Sound Chinook." 3-ER-607.

10

argument. For its "effects" analysis, the 2024 BiOp did *not* assume a baseline of "already-degraded conditions" and measure the Project's incremental impacts from that baseline. Instead, it measured the Project's effects from "natural conditions" that do not exist.

## C.  A failed tidegate is not "no tidegate" and neither was assumed in the 2024 BiOp's environmental baseline.

NMFS and the Swinomish emphasize that the existing tidegate is failing. They argue that, because the tidegate has no remaining useful life, it was reasonable for the district court (and NMFS) to assume that, but for the Project, natural conditions would replace farmland, thereby necessitating a finding of jeopardy and the imposition of mitigation for 140 years' worth of tidegate impacts to habitat throughout the region. NMFS Br. 14, 28, 31; Swinomish Br. 55–56 (same).

First, NMFS's position cannot be reconciled with the 2024 BiOp's environmental baseline, which assumes based on a preponderance of evidence that the existing tidegate will not be allowed to fall "into a less-than useful state," and that "it is reasonably likely that regular maintenance will occur, and this structure will not be left to degrade." 2-ER-220. Nor does the collapse of a tidegate pipe remove the existing

11

dike and riprap NMFS blames for the destruction of (nonexistent) critical habitat. NMFS Br. 29 (quoting 2-ER-221).

Second, and as NMFS recognized in its environmental baseline, that a tidegate fails does not mean natural conditions will occur. To the contrary, according to the 2024 BiOp, "if the owner of an existing nearshore, in- or overwater structures ceased to perform any maintenance and essentially abandoned the structure, there could be multiple scenarios relative to how that structure would persist and degrade in the marine shoreline environment." 2-ER-220. NMFS described the "range of potential outcomes" under such a scenario as "exponential to the point it is not reasonable to assume them all, nor is there currently enough data or analysis that would support such an evaluation." 2-ER-220. NMFS and the Swinomish ask this Court to do exactly what the 2024 BiOp described as unreasonable: assume that, because it is failing, the existing tidegate (and presumably the dike and riprap and any other related infrastructure) will be removed and natural conditions will occur.

NMFS notes that when one of the tidegates in this area previously failed, it was "partially removed, and replaced by fill material." NMFS

12

Br. 7. But NMFS's description necessarily recognizes that natural conditions did not follow the tidegate's failure. *See also descriptions at* FER-05; 3-ER-518, 2-ER-149; 3-ER-452. A failed tidegate is not equivalent to natural conditions or improved fish passage.

**D.     The 2024 BiOp's effects analysis conflicts with the agency's prior practice, applicable regulations, and case law.**

To suggest its analysis of "enduring effects" is reasonable, NMFS claims it followed legal requirements and its own prior practice. NMFS Br. 33-35. For support, NMFS cites the same 2022 unpublished interagency memo it cited before the district court. NMFS Br. 32. The memo lacks any precedential weight for reasons given in the opening brief. Nonetheless, NMFS emphasizes that, according to the memo, when the Army Corps of Engineers (Corps) has discretion to issue a permit, it considers "whether the future effects from an existing structure should be considered a consequence of the action." 3-ER-567. When doing so, the agency evaluates whether the Project "may extend the impacts of the existing structure into the future." *Id.* Even accepting that interpretation, it is inconsistent with what the agency did here in at least two ways.

13

First, as described above, under the 2024 BiOp's environmental baseline, the existing tidegate and its effects will continue *regardless of the Project*, so this Project is not the cause of those continued effects. 2-ER-220. Second, for purposes of its effects analysis, NMFS did not merely attribute the future effects of the existing structure to the Project. It also attributed the difference between "natural conditions" and conditions with a tidegate, to the Project. In other words, in addition to assuming the Project will exist for 50 years, NMFS attributed to this Project all environmental effects from 140 years of development, including the existing tidegate. That approach is irreconcilable with the unpublished memo.

NMFS's analysis is also inconsistent with the agency's Consultation Handbook, regulations, and this Court's precedent. Every example in NMFS' Consultation Handbook addressing whether an impact should be treated as an "effect of the action" relies on a comparison to existing conditions, not pre-development conditions from 140 years ago. *See, e.g* U.S. Fish & Wildlife Service and National Marine Fisheries Service, Endangered Species Consultation Handbook at 436 (March 1998) (Handbook). ("Adverse effects on individuals of a

14

species or . . . critical habitat generally do not result in jeopardy . . . unless that loss, *when added to the environmental baseline*, is likely to result in significant adverse effects") (emphasis added). The baseline "includes State, tribal, local, and private actions already affecting the species[.]" Handbook at 4-23. NMFS claims District 12 took an example from the Handbook "out of context" because it involved interrelated projects, but NMFS fails to explain the relevance of its distinction. NMFS Br. 33.

Similarly, under the applicable regulations, NMFS must assess whether a proposed project is the "but for" cause of any *new* harm to listed species. 84 Fed. Reg. 44976, 44977 (Aug. 27, 2019); 50 C.F.R. § 402.02; *Nat'l Wildlife Fed'n*, 524 F.3d at 930 (interpreting regulations and the ESA as requiring "some new risk of harm"). Yet here, when considering the effects of the Project, NMFS did not measure the effects of the proposed action relative to existing conditions. It measured the Project's effects against "natural" conditions that do not, and will not, exist, regardless of the Project. NMFS's jeopardy determination is premised on harm that already exists, not new harm from this Project.

15

This is precisely what this Court has said the ESA prohibits. *Nat'l Wildlife Fed'n*, 524 F.3d at 930.

NMFS claims it complied with precedent because it analyzed whether incremental impacts from the proposed action would tip "a species from a state of precarious survival into a state of likely extinction." NMFS Br. 34. As described above, the record makes clear NMFS did not measure the incremental effects of this Project *from the correct environmental baseline*. There is no way to discern from the BiOp whether or to what extent this Project will cause new or additional harm to listed species or their habitats compared to today.

Like the dam in *National Wildlife Federation*, the existing tidegate is in the environment. 524 F.3d at 930–31. It therefore should have been part of the baseline when measuring the Project's effects. *Id.* at 930 (current existence of dams "must be included in the environmental baseline"). Similarly, it does not matter that District 12's permit is discretionary because, even if the permit is denied, the

16

existing tidegate will remain.[3] There is simply no evidence that, but for the Project, natural conditions will occur.

Similarly, *Confederated Tribes and Bands of the Yakama Nation v. McDonald*, 2003 WL 1955763 (E.D. Wash. 2003), involved a "failing" dam. There, NMFS measured effects of a replacement project from a baseline that included the dam. *Id.* at *18. NMFS acknowledges that, there, "the dam would continue to exist and operate" and the Service "fully accounted for its ongoing adverse impacts in the baseline," suggesting NMFS did the same thing here. NMFS Br. 34.[4] But the "failing" tidegate will also continue to exist, yet NMFS did *not* include it in the baseline when measuring the effects of the action.

---

[3] The discretionary nature of the permit determines whether the agency is required to consult on the action; it does not provide a basis to manipulate the environmental baseline.

[4] The Swinomish claim the case involved only a "temporary repair and time-limited operation of the repaired facility," Swinomish Br. 52–53, but the BiOp at issue found that modifications to the Keechelus Dam were "not likely to jeopardize" a threatened species even though the dam was failing, blocked fish passage, and the final proposed action consisted of "removing and replacing a large section of the existing dam on the upstream side with an impervious barrier of compacted fine-grained soils" without fish passage. 2003 WL 1955763 at *2, 4–5. Whether the nature of the action is "temporary" might be relevant to the duration of effects but has no bearing on the environmental baseline, which must include the existing structure.

17

Finally, NMFS's attempt to distinguish the D.C. Circuit's decision in *Center for Biological Diversity v. Environmental Protection Agency*, 141 F.4th 153, 178 (D.C. Cir. 2025) perfectly captures the agency's problematic two-faced approach to the baseline. NMFS contends that, consistent with *Center for Biological Diversity*, NMFS's baseline "*included* the current impacts of the existing tidegate." NMFS Br. 35. For support, NMFS cites the environmental baseline described in the 2024 BiOp, but, critically, that is not the baseline it used when measuring the effects of the action. NMFS's approach here—assuming a baseline in which the existing tidegate never existed—is precisely what the D.C. Circuit described as foreclosed by the ESA's implementing regulations. 141 F.4th at 178–79.

II.  **Measuring effects of the action correctly, NMFS's jeopardy finding is contrary to the record and best available science.**

A.  **There is no evidence the Project will have an adverse effect on critical habitat or fish populations.**

NMFS notes the Skagit populations have not yet met their overall recovery goal and justifies its finding of jeopardy based on speculative concerns that "[i]f the Skagit populations decline or remain static, this would undermine contributions to successful colonization of other

18

populations," NMFS Br. 19 (citing 2-ER-242). But nowhere in the 2024 BiOp (or NMFS's brief) does the agency explain how, why, or to what extent, a tidegate that improves fish passage will prevent the Skagit Chinook populations from meeting recovery goals, compared to maintaining the existing top-hinged tidegate. As explained above, NMFS has no idea what the Project's incremental impacts are because it never attempted to measure them.

Further, the 2024 BiOp acknowledges that the Project is better for fish than what exists today. Most importantly, and as NMFS acknowledges, even with the less fish-friendly tidegate in place, the evidence demonstrates that the Skagit Chinook populations—the only fish populations exposed to the tidegate—are generally healthy, abundant, and trending toward recovery. NMFS Br. 18–20 (citing 2-ER-242). It is contrary to common sense to conclude that replacing the existing tidegate with one that improves fish passage will reverse this positive trend. Nor is there any evidence that, even if the fish population is declining, an improved tidegate would exacerbate that decline.

19

Although NMFS emphasizes the importance of protecting critical fish habitat, there is no critical habitat landward of the tidegate, 2-ER-232, 2-ER-245 and, regardless the existing tidegate already blocks access. If there is no adverse impact to the Skagit Chinook population, there can be no adverse impact to the broader Puget Sound Chinook population or the Southern Resident killer whales. NMFS cannot back its way into a jeopardy finding by suggesting the broader Puget Sound fish population is doing poorly when that performance has nothing to do with the Project.

**B.      NMFS's selection of two data points on a timeline to demonstrate the status of the Skagit Chinook populations is arbitrary, misleading, and fails to show jeopardy for this Project.**

In support of its jeopardy finding, the 2024 BiOp cites a "15-year" declining trend in the abundance of Skagit populations, which it claims is based on the Ford 2022 study cited in the record. 2-ER-261–62, 3-ER-344. It its brief, NMFS admits this 15-year trend shows "negative, static, or (at best) slight positive trends" in apparent contradiction to the BiOp's assertion of a declining abundance trend.[5] NMFS Br. 22.

_____

[5] NMFS's brief also argues that "Ford 2022 explained that '[i]n recent years, only five populations have had productivities above zero,'" NMFS

Regardless, NMFS does not provide a rational explanation for why it relied on the 15-year trend in the face of five-year and long-term increasing abundance trends.

The relevant chart is Figure 9 in the BiOp, which shows that, since 1980, the Skagit Chinook population has been trending up. 2-ER-242 (orange dotted line below). NMFS acknowledges this upward trend but claims the "1990- and most-recent-point estimates show a population drop from about 13,000 to 10,000." NMFS Br. 21 (citing 2-ER-242). The Swinomish cite the same range for a similar proposition. Swinomish Br. 44.

---

Br. at 22 (quoting 2-ER-576), but fails to acknowledge that all five with productivities above zero are Skagit populations exposed to the existing tidegate. 3-ER-575, 2-ER-167, 3-ER-577.



NMFS all but admits it is improper to rely on the very point-estimates it cites, arguing that "any year's population data would vary." NMFS Br. 22. Indeed, if the Court compares different "points," it will find an even larger population *increase*. For example, the "point" data between 1993 and the most recent year shows an *increase* from about 5,000 to 10,000—a doubling in population. 2-ER-242. And the "point" data between 1980 and the most recent year—an even longer period than NMFS and the Swinomish cite—shows an increase from about 8,000 to 10,000. 2-ER-242. Because population numbers go up and down from year to year, arbitrarily comparing one point on the timeline to another necessarily creates any number of conflicting results. The only way to accurately assess the health of the population is to look at its

overall trend. Here, regardless of whether the population varies from year to year, the overall long-term trend is positive.

There is no rational or fair justification for relying on arbitrary points in time when those numbers are plainly taken out of context and contrary to the overall positive trend of which they are part. Deference is therefore unwarranted and inapplicable. *Ariz. Cattle Growers Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001).

NMFS also claims that short-term positive trends for Skagit Chinook were not "born out over longer periods." NMFS Br. 22. NMFS cites nothing to support its assertion that longer-term trends were negative, and the only evidence in the record, which is reflected in Figure 9, shows a positive long-term trend. The only declining "trend" identified in the BiOp is the 15-year comparison described above, but that is not a trend; it is the arbitrary selection of two years (2005 compared to 2019) that *conflicts with* the only true trend depicted in Figure 9. Regardless, the 2024 BiOp does not explain why NMFS, faced with positive trends, chose to compare 2005—an obvious outlier—with 2019. NMFS must acknowledge inconsistencies in its data and explain why it favored the data it chose. It did not.

23

NMFS also complains of the unreliable nature of data measuring small populations, but this does not explain NMFS's focus on 2005 and 2019 rather than the positive trends because the same reliability issues would apply to all data points, including the ones NMFS chose. Further, NMFS must use best available science, even if it has limitations. *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080–81 (9th Cir. 2006) ("Absent superior data occasional imperfections do not violate" ESA's best available data standard) (cleaned up). The standard does not require "conclusive evidence," only that agencies use the best science available and not ignore contrary evidence. *Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 680 (D.D.C. 1997). NMFS did not, and has not, identified any other best available science.

Instead, before the district court, NMFS's attorneys argued in a reply brief that the 2024 BiOp based its jeopardy finding not on the positive trend reflected in Figure 9, but on "raw data" underlying that figure, which presumably showed a different result. 2-ER-51. But there is no "raw data" in the record. Before this Court, NMFS and the Swinomish claim the "raw data" is Figure 9 and the Ford study on which it is based. But that data is already reflected in the chart, and

24

the chart shows a positive trend. NMFS does not explain how or why "raw data" in the Ford study requires a different conclusion than the chart reflecting that very study. There is no contrary "raw data," and such post-hoc rationalizations are improper.

In sum, the "effects analysis" contained in the 2024 BiOp does not survive legal or factual scrutiny. Even with the existing tidegate in place, the Skagit Chinook populations have experienced positive population trends and it is unrefuted that the Project is better for fish. There is no rational justification for NMFS's conclusion that the Project will reverse the population trend and jeopardize the species.

## III. NMFS reversed its position on the Project without a reasonable explanation.

NMFS's failure to assess impacts from this specific Project is reason enough to vacate the 2024 BiOp, but NMFS also failed to adequately explain its 180-degree reversal from "no jeopardy" in 2019 to "jeopardy" in 2024. NMFS claims otherwise, but the only explanation in the record—and the additional explanations NMFS now provides—run counter to the evidence and fail to justify the agency's decision.

### A. NMFS's claim that it explained its change in position conflicts with the record.

The only explanation in the record directly addressing NMFS's reversal from "no jeopardy" in 2019 to "jeopardy" in 2024, is that under the 2009 TFI BiOp, on which the 2019 "no jeopardy" finding was based, restoration was occurring too slowly. 2-ER-145; 3-ER-595. NMFS contends the agency sufficiently explained "that it reinitiated consultation on the 2009 opinion [on which the 2019 "no jeopardy" decision was based] partially due to overuse of the operational improvement classification." NMFS Br. 38 (citing its response to comments at 3-ER-359).

As a preliminary matter, the response to comments NMFS cites did not tie the pace of restoration to this Project, so does not adequately explain NMFS's reversal on this Project. Second, the reinitiation letter NMFS cites in its response to comments does not say the agency misapplied or misinterpreted the definition of "operational improvements" for this Project, or at all. 3-ER-605. Instead, the only reason the letter gave for withdrawing the 2009 TFI BiOp was that the "pace of both restoration actions *and* tidegate repairs have both been slower than anticipated." 3-ER-605. Indeed, in that same letter, NMFS

26

recognized that the surplus of habitat credits available for use "indicates that restoration actions and tidegate repairs have been moving forward in tandem *as intended* by the TFI, just at a slower pace than expected." 3-ER-605 (emphasis added). Nothing in NMFS's comment or the reinitiation letter the comment cites explains why or how this specific Project warranted "no jeopardy" in 2019 and "jeopardy" in 2024.

## B. NMFS's alternative argument that it never changed its position also fails.

In addition to saying NMFS adequately explained its reversed position, NMFS and the Swinomish claim the agency never changed its position. NMFS Br. 36; Swinomish Br. 57. The main thrust of this argument is that this Project was previously "misclassified" as an operational improvement when it should have been treated as a "replacement project" requiring mitigation, and that NMFS has always maintained that mitigation was required for projects such as this one. But the record makes clear NMFS's classification of the Project was not a mistake; it was consistent with the plain language of the TFI agreement, related decision-making documents, and NMFS's policy and practice.

27

### 1. Under the TFI, operational improvements included "replacement" projects.

NMFS and the Swinomish claim the TFI (and NMFS) always required mitigation for "replacement" projects and, because this Project "replaces" the existing tidegate, it should have been treated as a "replacement" requiring mitigation, not an operational improvement. NMFS Br. 34, 36; Swinomish Br. 17–18. That argument conflicts with the TFI's plain language, which defines "operational improvements" as actions that "*primarily* improve fish passage," and for which every example listed is a "replacement." 4-ER-729–30 (emphasis added). This includes replacing "conventional tidegates . . . with a side hinge gate." 4-ER-730.

The TFI agreement also specifically instructs that "habitat credit will not be required *to implement* any of the operational improvements." 4-ER-731 (emphasis added). Instead, the agreement contemplated that the installation of operational improvements, including the replacement of top-hinged tidegates with side-hinged tidegates, would *generate* habitat credits. 4-ER-731. That was intentional. Instead of simply "replacing" a broken tidegate with an in-kind version of the same thing, the TFI oversight committee, including NMFS, wanted to encourage

28

irrigation districts to spend the extra money required to "replace" failing tidegates with versions better for fish. SER-98, 100; 4-ER-657–58. They achieved that incentive by providing habitat credits for replacement projects that "improved" fish conditions.

NMFS recognized and agreed with this approach. In 2011, NMFS representative James P. Wright reviewed and evaluated the "method proposed in the TFI to award habitat restoration credits for the replacement of a traditional, top mounted steel tide gate with one of the new types of tide gates that are designed for better fish passage," and concluded: "I mostly agree with the simple approach the TFI uses to award habitat restoration credits based on the type of tide gate used to replace an existing traditional tide gate." 4-ER-657. Wright explained that the purpose of awarding mitigation credits to such projects was "to motivate as many projects as possible that will result in widespread improved habitat and access." 4-ER-657–58.

NMFS includes a string of citations to suggest it has always interpreted "operational improvements" that are also replacements as requiring mitigation, NMFS Br. 6–7, 36–37, but, again, that is contrary to the plain language of the TFI and NMFS's position at the time, and

29

nowhere in any of the cited pages does NMFS say that. For instance, NMFS cites the Skagit River System Cooperative's opinion on a different project involving the replacement of pipes and for which the irrigation district had anticipated installing more fish-friendly tidegates at some point in the future. SER-110–11. Nowhere does that letter indicate NMFS believed projects such as the one here had been misclassified under the TFI. Similarly, SER-162 shows a "credit balance" for tidegate actions, not that the signatory districts owed credits for previously misclassified operational improvements.

Likewise, 3-ER-595 is simply another reference to NMFS's 2021 letter recommending reinitiation of the TFI BiOp after the Swinomish threatened to sue exactly because they disliked that, under the TFI, operational improvements "do not require withdrawal of habitat credits." SER-164. In that letter, NMFS did not suggest operational improvements that are replacements required credit; it said the TFI had operated as intended and recommended reinitiation of consultation based on the pace of restoration. 3-ER-595.

NMFS also claims it "repeatedly raised concerns" about the TFI oversight committee's application of the TFI, but it did not. NMFS Br.

30

6. The only support NMFS cites, aside from comments of other entities, is a 2024 memo that says, between 2018 and 2021: "Informally . . . NMFS staff [and others] expressed growing concerns that the pace of restoration . . . was not being achieved" and, in 2019, met to discuss possible solutions. SER-004. Nothing in that memo indicates NMFS thought operational improvements involving replacements had been "misclassified" under the TFI's definitions.

Instead, committee members flatly rejected the Swinomish's claims of misinterpretation: "to be sure we all were comfortable and confident in the decisions" to approve the operational improvements without requiring credit and "recognized the investment of the districts" in superior infrastructure. SER-100. Likewise, the Swinomish's representative recognized a "difference of opinion" between its interpretation and the committee's. SER-100. Although NMFS apparently now prefers the Swinomish's philosophy, that shift on its own fails to provide a reasonable explanation for finding "no jeopardy" for this Project in 2019 and "jeopardy" in 2024.

31

### 2. Mitigation was not required for construction activities needed to implement operational improvements.

NMFS and the Swinomish also claim that the Project should not have been deemed an operational improvement because it involved "new work" involving replacing rock armoring and excavating a dike, and that classifying it as such failed to account for "the [TFI] agreement's framework[.]" NMFS Br. 36; Swinomish Br. 22–24.

As a preliminary matter, there was no "new work" added to the Project between 2019 and 2024, and NMFS was always aware of the excavation needed to complete the improvement because it was described when District 12 applied for a permit under the TFI BiOp. As NMFS recognized in the 2024 BiOp, this Project—which involves "the installation of a coffer dam and pumping system prior to casting in-place a concrete split box culvert," and "excavation"—is "very similar to the proposed action" approved under the TFI. 2-ER-144, 2-ER-150–52; *see also* 4-ER-653–54 (2019 TFI oversight-committee minutes describing the Project). The interpretation offered by NMFS and the Swinomish also directly conflicts with what the TFI says and NMFS's prior practice, so cannot explain NMFS's reversed position.

32

### i.     TFI Agreement:

Under the TFI agreement, operational improvements were "replacements" requiring excavation and other construction activities. *See, e.g.*, 4-ER-818 (describing construction impacts that occur during "implementation of tidegate repair and replacement projects"). Nowhere does Wright's memo (above) describing the award of mitigation credits for the installation of side-hinged tidegates mention a need to subtract credits for the construction work necessary for implementation. 4-ER-657–67. That is unsurprising because, as explained above, the TFI's definition of "operational improvement" expressly said habitat credits are not required "to *implement* any of the operational improvements." 4-ER-731 (emphasis added). The definition of "operational improvement" was expressly *not* limited to the physical component by which fish passage is improved and included construction activities necessary for implementation. 4-ER-729.

### ii.    NMFS's treatment of similar projects:

NMFS regularly found "no jeopardy" for similar operational improvements, all of which required excavation and other construction activities. For example, the Joe Leary Slough replacement involved removing old pipes and tidegates and pouring concrete into a sheet pile

33

enclosure. SER-24–25 (photos). After construction, the area outside the tidegate was backfilled. FER-13–14; SER-24–25; 3-ER-634; SER-107 (approved as operational improvement and noting that "no [committee] members objected to or disagreed with the TFI credit administrator's preliminary decision to approve . . . operational improvement tidegate replacements").

Similarly, the Big Ditch improvement project included "removing seven 60-inch diameter top-hinged tidegates and seven 75-foot long 60-inch diameter corrugated metal pipes embedded within a 60-foot-wide earthen dike spanning Big Ditch, . . . constructing a 30-foot wide concrete structure and installing two 8-foot tall by 10-foot wide side-hinged tidegates," and diking the "remaining void . . . as needed, on either side of the new tidegate structure." FER-16; 3-ER-633 (approved as operational improvement). And the Wiley Slough improvement project involved excavating the dike "for the removal of the current tide gate," placing riprap and other materials for erosion protection, and installing a new tidegate. FER-22; 3-ER-633, SER-098 (approved as operational improvement).

34

NMFS rejected the Swinomish's claim that this practice conflicted with the TFI, and instead "[r]ecommend[ed] that the operational improvement decisions are *consistent with* the [TFI] framework and should stand." SER-101 (emphasis added). NMFS's suggestion here, that its "no jeopardy" determination was a mistake that ran contrary to the TFI framework and the agency's position, fails on the record.

### 3. NMFS's 2019 decision was not the rogue opinion of a single employee.

NMFS further attempts to distance itself from its prior "no jeopardy" decision by blaming a NMFS representative who served on the oversight committee and suggests her agreement reflected her personal opinion, not the agency's. NMFS Br. 37; *see also* Swinomish Br. 23. But under the TFI agreement, "each Party is solely and entirely responsible for the acts of its agents and employees during the period this Agreement is in effect." 4-ER-741. NMFS also had more than one representative involved with the committee (at various and sometimes overlapping times: Laurel Jennings/NOAA (SER-106), Janet Curran/NOAA (SER-106), Tom Sibley/NMFS (4-ER-678, SER-098), Polly Hicks/NMFS, (4-ER-653); Dayna Matthews/NMFS (4-ER-653), and James Wright/NMFS (4-ER-657)). None of them expressed

35

disagreement with the committee's approach. *See, e.g.*, 4-ER-657 (agreeing with approach), SER-101 (same). The TFI speaks for itself, as does the record, and neither supports NMFS's explanation that the Project was mistakenly "misclassified" despite NMFS's disagreement or even that NMFS disagreed.

NMFS's 2024 "jeopardy" decision requiring extensive mitigation for a Project its own agency previously recognized as a benefit for fish and worthy of generating habitat credits is, by any definition, a change in position. NMFS cannot justify its reversal by manufacturing excuses the record so plainly contradicts.

## C. NMFS's attempt to distinguish the Project based on its permitting status lacks legal and factual support.

NMFS attempts to distinguish its prior "no jeopardy" finding on grounds the Project "was never permitted or authorized to proceed without habitat mitigation[.]" NMFS Br. 36. What NMFS refers to here is that the Corps did not issue the underlying permit. But NMFS's obligation to explain its change in position does not turn on whether or when the project to which that position applies was permitted by the action agency, and NMFS cites no authority to suggest otherwise. NMFS Br. 36. *See also Nw. Env't Def. Ctr. v. Bonneville Power Admin.*,

477 F.3d 668, 687-88 (9th Cir. 2007) (agency must "clearly set forth" its reasons when departing "from prior norms"). In 2019, although the Corps had not yet issued its permit, ESA consultation was complete and NMFS's 2019 "no jeopardy" finding was final—certainly as final as the "jeopardy" finding on review here.

### D. NMFS has not identified any new "best available science" justifying its reversal.

NMFS also contends the agency's change from "no jeopardy" to "jeopardy" was based on "the evolution of the best available science since 2009." NMFS Br. 39 (citing 3-ER-359). Again, *what science?* NMFS does not identify any additional or new data it considered in 2024 that explains why operational improvements did not cause jeopardy in 2009 (when the TFI BiOp was issued) or 2019 (when the Project was approved under the TFI BiOp) but did in 2024.

For operational improvements that generated habitat credits under the 2009 TFI BiOp to cause jeopardy in 2024, the "best available science" would, at minimum, need to show the relevant fish populations were worse in 2024 than 2009. Further, even if such declines had occurred, the agency would still need to show that this Project would cause new or additional harm. NMFS made no such findings. Instead,

37

the most recent fish abundance trends for the Skagit Chinook are positive and updated science shows the Skagit Chinook were doing better in 2024 than in 2009. 2-ER-242 (population of about 8,000 in 2009 versus 10,000 in most recent year); *see also* 2-ER-165; 2-ER-166–67; 3-ER-575 (showing increases between 35 and 70 percent for Lower Skagit River, Upper Skagit River, Lower Sauk River, Upper Sauk River, and Suiattle River populations).

In 2009, NMFS concluded that the entire Skagit-wide program of tidegate replacement/improvement projects would not cause jeopardy, yet in 2024 found that this single Project, far removed from the natal estuary, will. There is no evidence in the record to support such a drastic change in position. Instead, what the record suggests, and what NMFS appears to argue, is that it wanted to reach its restoration goals more quickly, so assigned jeopardy to this Project and required mitigation without making the necessary findings under the ESA, despite evidence that this Project will *help* listed species, not cause new or additional harm.

### E. NMFS's reliance on the draft 2005 Dry Slough BiOp is improper and undercuts its explanation.

To further suggest it has always objected to the classification of tidegate replacement projects as operational improvements (despite having consistently approved them), NMFS describes a draft BiOp issued in 2005 on the Dry Slough tidegate. NMFS Br. 39. That draft BiOp is not in the record and was not before the district court, and what is known about that draft BiOp supports District 12's position, not NMFS's.

The parties' arguments—and district court's analysis—instead turn on a related 2005 case, in which a federal court considered whether the unauthorized replacement of the Dry Slough Tidegate had caused take of Chinook Salmon under Section 9 of the ESA. *Swinomish Indian Tribal Cmty. v. Skagit Cnty. Dike Dist. No. 22*, 618 F. Supp.2d 1262, 1269–70 (W.D. Wash. 2008).

As a preliminary matter, Section 9 and its legal standards are not at issue here, and the Dry Slough project was an in-kind replacement, not an operational improvement, making the entire case largely inapplicable. Nonetheless, in that case, the court described the draft BiOp as having found, "as a result of" the replacement project, that

39

juvenile fish could "no longer use the Dry Slough habitat."[6] *Id.* at 1270. To avoid jeopardy, the draft BiOp apparently required District 22 to do exactly what District 12 has already proposed: install an improved tidegate better for fish. *Id.* at 1265. This suggests the draft Dry Slough BiOp supports District 12's position that operational improvements, such as the Project, avoid jeopardy.

Even if the draft BiOp supported NMFS's position, the agency cannot rely on evidence not in the record. NMFS argues it was allowed to rely on the document without producing it because District 12 did not move to supplement the record, but NMFS's position "stands at odds with the norms of administrative law and typical judicial review of agency action." *Lands Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2005). It is NMFS who claims it relied on the 2005 draft BiOp, but NMFS has not produced that document or otherwise made it part of the record.

The public's right to view the information on which an agency claims to have relied does not turn on whether *the challenging party*

---

[6] Here, by contrast, NMFS made no findings that this Project, as opposed to tidegates generally, would block critical habitat.

seeks to have that information included in the record. That burden belongs to the agency and courts generally presume "that what is presented [by the agency] was everything before the agency." *Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 453 (9th Cir. 2024); *Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1536-37 (9th Cir. 1993) ("a record that does not include all matters on which the [agency] relied" violates the Administrative Procedures Act). Because NMFS did not produce the draft Dry Slough BiOp it may not defend its decision based on that document.

## IV.     The Swinomish's remaining arguments also fail.

Most of the Swinomish's arguments overlap with NMFS's brief and are addressed above. Separately, the Swinomish claim District 12 sought authorization for incidental take under Section 9 of the ESA "to harm" listed species "for the next fifty years or longer." Swinomish Br. 61; *see also* 1, 36, 46, 55 (same). They argue that by seeking an incidental take statement (ITS), District 12 admitted its project will harm those species in violation of the ESA. Swinomish Br. 1. This argument is based on factual and legal misconstructions.

41

First, District 12 played no role in requesting an ITS or NMFS's decision to issue one. For background, though not relevant to District 12's appeal, under Section 7 of the ESA, in addition to making a "jeopardy" determination, the reviewing agency must specify whether any taking of a protected species will occur that is "incidental" to, and not the purpose of, the carrying out of the activity authorized under Section 7. 16 U.S.C. § 1536(b)(4). If so, NMFS "shall provide" an ITS. *Id.*

As explained in its opening brief, District 12 concluded in its Biological Assessment that its Project is not likely to adversely affect listed species. The Corps agreed with District 12. 3-ER-510–11; 2-ER-145. Had NMFS concurred, the Section 7 process would have ended there without an ITS. 50 C.F.R. 402.13(c). But NMFS did not concur, and its unilateral decision to prepare a biological opinion and issue an ITS is not an admission by District 12 of anything.

Second, issuance of an ITS for purposes of Section 9, which occurs even if there is take of a single member of a listed species, does not automatically equate to "jeopardy" under Section 7. Unlike an ITS, a "jeopardy" determination is concerned with the proposed action's impact

42

on the whole species. *Ctr. for Biological Diversity v. Haaland*, 87 F.4th 980, 991 (9th Cir. 2023).

The Swinomish also claim that, under the TFI, District 12 had agreed to 8.6 acres of habitat restoration, which the Swinomish describe as "modest mitigation" considering District 12 is "seeking legal authorization to harm iconic" listed species "for the next fifty years or longer." Swinomish Br. 60–61. Again, District 12 is not seeking legal authorization to harm species. It wants to replace a broken tidegate with one that is better for fish. District 12 determined, and the Corps— and, in 2019, NMFS—agreed, the Project would help fish, not harm them. Moreover, District 12 is undertaking this improvement project at considerable expense when it could continue performing repairs on the failing tidegate for less. 3-ER-387 (replacing existing pipes and gates costs approximately $100,000 while operational improvement projects cost more than $1 million).

The Swinomish also misunderstand (and NMFS misstates) how mitigation worked under the TFI.[7] That agreement set forth habitat

---

[7] The Swinomish claim District 12 is "bootstrapping" an appeal of the TFI agreement to this litigation, Swinomish Br. 58, but District 12 is

credits that would be required for each project if the project was not undertaken as an operational improvement, but operational improvements *generated* habitat credits. 4-ER-731 ("habitat credit will not be required to implement any of the operational improvements" and credits earned through operational improvements will be "deposited in the habitat bank"). An in-kind replacement or repair would have required habitat credits, but that is not the project District 12 proposed.

By agreeing to implement an operational improvement instead of simply replacing a broken tidegate with a non-broken version of the same thing, District 12 committed to a project that is better for listed species and therefore would have *earned* habitat credits under the TFI—which, as described above, was the entire goal of that provision: to encourage and incentivize exactly the type of project District 12 has proposed.

It makes no sense to interpret the TFI as the Swinomish suggest, which would have had the exact opposite effect by requiring expensive

---

not challenging the TFI, only whether NMFS has adequately explained its departure from its prior position under the TFI.

mitigation for an improvement that costs ten times more than the district would otherwise need to spend and is better for fish.

## CONCLUSION

For the reasons stated herein and in District 12's opening brief, this Court should reverse the district court's judgment with instructions to remand.

Respectfully submitted,

*s/ Charlene Koski*
Charlene Koski, WSBA No. 43178
Jenna R. Mandell-Rice, WSBA No. 49667

VAN NESS FELDMAN LLP
1191 Second Avenue, Suite 1800
Seattle, WA 98101
(206) 623-9372
ckoski@vnf.com
jrm@vnf.com

*Attorneys for Appellant Skagit County Dike, Drainage, and Irrigation Improvement District No. 12*

Date: July 16, 2026

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s): 25-3757**

I am the attorney or self-represented party.

**This brief contains 8385 words,** including **27** words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6). I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[**X**] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [**X**] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Charlene Koski* **Date** July 16, 2026

1

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated at Seattle, WA, this 16th day of July, 2026.

*/s/ Charlene Koski*
Charlene Koski

1